| | |
|---|---|
| L.E., by his next friends and parents, SHELLEY ESQUIVEL and MARIO ESQUIVEL<br><br>     *Plaintiff,*<br><br>   v.<br><br>BILL LEE, in his official capacity as Governor of Tennessee; PENNY SCHWINN, in her official capacity as the Tennessee Education Commissioner; TENNESSEE STATE BOARD OF EDUCATION; SARA HEYBURN MORRISON in her official capacity as the Executive Director of the Tennessee State Board of Education; NICK DARNELL, MIKE EDWARDS, ROBERT EBY, GORDON FERGUSON, ELISSA KIM, LILLIAN HARTGROVE, NATE MORROW, LARRY JENSEN, DARRELL COBBINS, and EMILY HOUSE, the individual members of the Tennessee State Board of Education, in their official capacities; KNOX COUNTY BOARD OF EDUCATION a/k/a KNOX COUNTY SCHOOLS a/k/a KNOX COUNTY SCHOOL DISTRICT; ROBERT M. "BOB" THOMAS, in his official capacity as Director of Knox County Schools,<br><br>     *Defendants.* | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## NATURE OF THE ACTION

1. L.E. is a 14-year-old boy in his freshman year at Farragut High School. L. plays golf. He loves the sport, the precision and focus it requires, and the camaraderie of playing with teammates. L. would like to try out for, and if successful play on, his high school's boys' golf team.

2.      Without this Court's intervention, L. has no possibility of playing on the boys' golf team, regardless of his skill.  That is because a Tennessee law categorically bars transgender students like L. from participating on middle school and high school sports teams consistent with their gender identity.  2021 Tenn. Pub. Acts ch. 40, S.B. 228, 112th Gen. Assemb. (amending Tenn. Code Ann. tit. 49, ch. 6, pt. 3, by adding a new a section) ("SB 228").  The law requires participation to be based on "sex at the time of the student's birth as indicated on the student's original birth certificate" regardless of their gender identity.  SB 228 § 1(a).  It would be stigmatizing for L., just as it would be for a cisgender (non-transgender) boy, to be forced to be the only boy on the girls' team.  And for transgender boys, being designated a girl in this way can cause significant psychological harm.  The law thus denies transgender students like L. the opportunity to participate in interscholastic sports altogether.

3.      SB 228 deprives L. and other transgender students of the athletic training and competition that comes with interscholastic sports, in addition to the many social, educational, and physical and emotional health benefits of participation in interscholastic sports that can have significant positive impacts over the course of their lives.

4.      Because of the significant benefits of school athletics to the health and well-being of youth, the American Academy of Pediatrics condemns bills like SB 228 that deny transgender youth the ability to participate on sports teams matching their gender identity.

5.      SB 228 contravenes prevailing standards adopted by athletic associations across the country and around the world.  Neither the National Collegiate Athletic Association ("NCAA") nor the International Olympic Committee has adopted any sort of categorical bar on the participation of transgender athletes, and many transgender athletes do in fact participate in such elite athletic competition consistent with their gender identity.  In addition, many states

- 2 -

have implemented policies clarifying that transgender students may participate in interscholastic athletics in accordance with their gender identity.

6.      SB 228 is a solution in search of a problem.  Although it purports to have the purpose of protecting cisgender girls' safety and opportunities to participate in sports, proponents of SB 228 during legislative debates could not identify a single example of a transgender student's participation in interscholastic sports either limiting opportunities for or injuring cisgender girls.  In fact, the sponsor was not aware of any transgender students participating in interscholastic sports at all in Tennessee.

7.      Moreover, SB 228's sweeping exclusion of *all* transgender students from participation on *any* athletic teams consistent with their gender identity, regardless of the circumstances, is disconnected from its own stated purposes of protecting the athletic opportunities and safety of cisgender girls.  Excluding L. from the boys' golf team does nothing to further those purposes.

8.      SB 228 was not enacted to address any problem in school sports.  Rather, it was part of a wave of legislation in Tennessee and across the country targeting transgender people for disapproval and exclusion from full participation in society.

9.      By excluding transgender students like L. from participation in middle school and high school interscholastic sports, SB 228 discriminates on the basis of sex and transgender status in violation of the right to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX").  Unless enjoined, SB 228 will deny L. equal educational opportunities and the multiple long-term benefits of participation in interscholastic athletics. And by singling out transgender students for exclusion, it will perpetuate discrimination against,

and stigmatization of, transgender young people, and will exacerbate the already poorer mental health outcomes experienced by transgender youth as a result of such treatment.

10.     L. therefore seeks declaratory and injunctive relief from this Court to allow him to try out for and, if successful, participate on the boys' golf team.

## PARTIES

**Plaintiff**

11.     L. is a 14-year-old boy who lives in Knoxville, Tennessee.  He appears in this case through his mother and next friend, Shelley Esquivel, and his father and next friend, Mario Esquivel.  He is a freshman at Farragut High School.  He planned to try out for the Farragut High School boys' golf team before SB 228 was enacted, which bars him from being able to do so because he is transgender.

**Defendants**

12.     Defendant Bill Lee ("Governor Lee") is Governor of Tennessee.  Article III, section 1 of the Constitution of the State of Tennessee provides that "[t]he supreme executive power of this state shall be vested in a governor," and Article III, section 10 states that the governor "shall take care that the laws be faithfully executed."  Tenn. Const. art. III, §§ 1, 10. Governor Lee is responsible for upholding and ensuring compliance with Tennessee state statutes enacted by the Tennessee General Assembly, including SB 228.  He is also responsible for establishing and implementing the policies of Tennessee's executive branch.  Governor Lee nominates all appointed members of the Tennessee State Board of Education, who serve for five-year terms.  Tenn. Code Ann. § 49-1-301(a).  Governor Lee is specifically connected to SB 228, and has encouraged, condoned, and acquiesced in SB 228's prohibition on transgender youth's ability to participate in school sports consistent with their gender identity, including signing and

- 4 -

tweeting his support for the bill.[1]  Governor Lee is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law regarding the allegations in this complaint.  Governor Lee's official residence is in Davidson County, Tennessee, within the Middle District of Tennessee.  He is sued in his official capacity.

13.     Defendant Penny Schwinn is the Education Commissioner for Tennessee.  She is responsible for the implementation of law or policies established by the General Assembly or the Tennessee State Board of Education, such as SB 228.  Tenn. Code Ann. § 49-1-201(a).  Section 1(b) of SB 228 expressly requires that the Tennessee State Board of Education "adopt and enforce policies to ensure compliance" with SB 228, policies which Commissioner Schwinn is required to implement.  Commissioner Schwinn is further required to "[s]ee that the school laws and the regulations of the state board of education are faithfully executed," *id*. § 49-1-201(c)(5), and to "[p]repare and present to the state board of education … rules that are necessary to implement the policies, standards or guidelines of the state board or the education laws of the state," *id*. § 49-1-201(c)(20)(A).  She is therefore required to faithfully execute SB 228's prohibition on transgender youth's ability to participate in school sports consistent with their gender identity.  Commissioner Schwinn is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.  Commissioner Schwinn resides in Tennessee.  She is sued in her official capacity.

14.     Defendant Tennessee State Board of Education ("State Board") is the governing and policy-making body for Tennessee's pre-K-12 public education system.  The State Board is responsible for generally supervising Tennessee's state educational systems and public-school

---

[1] Gov. Bill Lee (@GovBillLee), Twitter (Mar. 26, 2021, 4:21 PM CDT), https://twitter.com/govbilllee/status/1375558428702220289.

systems. The State Board is required, under SB 228, to adopt and enforce policies to ensure compliance with SB 228. *See* SB 228 § 1(b) ("The state board of education, each local board of education, and each governing body of a public charter school shall adopt and enforce policies to ensure compliance with subsection (a) in the public schools governed by the respective entity.").

15.     Defendant Sara Heyburn Morrison is the executive director of the Tennessee State Board of Education. Director Morrison is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Director Morrison resides in Tennessee. She is sued in her official capacity.

16.     Defendants Nick Darnell, Mike Edwards, Robert Eby, Gordon Ferguson, Elissa Kim, Lillian Hartgrove, Nate Morrow, Larry Jensen, Darrell Cobbins, and Emily House (collectively, the "Individual State Board Members") serve on the State Board and are responsible for generally supervising Tennessee's state educational systems and public-school systems.[2] The Individual State Board Members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. All reside in Tennessee. They are sued in their official capacities. Defendant Morrison and the Individual State Board Members are referred to in this Complaint collectively as the "Individual State Board Defendants."

17.     Defendant Knox County Board of Education, a/k/a Knox County Schools, a/k/a Knox County School District ("Knox County Board of Education") is a public school district located in Knoxville, Tennessee. The Knox County Board of education is a person within the

---

[2] The Tennessee State Board of Education also includes a student member, whom Plaintiff does not name as a defendant in this action.

- 6 -

meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.

18.     Defendant Robert M. "Bob" Thomas is the Director of Knox County Board of Education, appointed by the Knox County Board of Education.  Director Thomas serves as the chief executive officer for Knox County Board of Education and is responsible for carrying out the policies of Knox County Board of Education.  Knox County Board of Education is required, under SB 228, to adopt and enforce policies to ensure compliance with SB 228.  *See* SB 228 § 1(b).  Director Thomas is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.  Director Thomas resides in Tennessee.  He is sued in his official capacity.  Knox County Board of Education and Director Thomas are referred to in this Complaint collectively as the "Knox County Schools Defendants."

## JURISDICTION AND VENUE

19.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution, and under Title IX of the Education Amendments of 1972.

20.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

21.     Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391(b)(1) and (2) because some of the Defendants reside in the District and because a substantial part of the events or omissions giving rise to the claims occurred in the District.

22.     This Court has the power to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over Defendants because they are domiciled in Tennessee and because their denial of Plaintiff L.'s federal constitutional and statutory rights occurred within Tennessee.

## FACTUAL ALLEGATIONS

### A.  Gender Identity and Gender Dysphoria

24.     Gender identity is a well-established medical and psychological term that refers to a person's fundamental, internal sense of gender.  It is a core characteristic that everyone possesses.  Gender identity is innate and typically fixed at an early age.

25.     A person's gender identity is a fundamental component of their identity.  Gender identity is durable and deeply rooted.  It cannot be voluntarily altered by social or medical intervention.  Attempts to change a person's gender identity to align it with the person's birth-assigned sex are not only futile but psychologically harmful.

26.     According to medical consensus, there is a substantial biological component to gender identity.

27.     A person's sex encompasses numerous biological characteristics, such as genes, chromosomes, gonads, one's production of and reaction to specific hormones, internal and external genitalia, secondary sex characteristics, and gender identity.  For example, intersex individuals are born with variations in physiological traits associated with sex that do not all align as typically male or female.  The variations may occur in the individual's chromosomes, hormone production and reception, internal organs such as ovaries or testes, genitalia, or

- 8 -

secondary sex characteristics.  Up to about 2% of the population is intersex.[3]  For this reason, the

Endocrine Society has said the term "biological sex" is an "imprecise" term that should be

avoided.[4]

28.     At birth, a sex designation is typically made based on an observation of the

infant's external genitalia.  The sex designation is usually listed on the infant's birth certificate.

For most people, their gender identity aligns with their sex assigned at birth.

29.     However, transgender people have gender identities that do not align with the sex

assigned to them at birth.  This misalignment between gender identity and sex assigned at birth

can create severe distress for transgender people.

30.     The American Psychiatric Association's *Diagnostic and Statistical Manual of

Mental Disorders* (DSM-5) uses the diagnostic term "gender dysphoria" for the clinically

significant distress that results from "a marked incongruence between one's

experienced/expressed gender and their assigned gender" at birth.[5]

31.     Gender dysphoria is a serious medical condition.  If left untreated, it can result in

serious anxiety, depression, self-harm, and suicidality.

32.     To avoid these serious harms, the widely accepted standards of care recommend

recognizing and affirming a person's gender identity.

---

[3] United Nations Human Rights, Office of the High Commissioner, Intersex People, https://www.ohchr.org/EN/Issues/LGBTI/Pages/IntersexPeople.aspx (last visited Oct. 29, 2021).

[4] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3875 (2017), https://tinyurl.com/ahx3auw4.

[5] American Psychiatric Ass'n, What is Gender Dysphoria?, Diagnosis, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited Oct. 29, 2021).

- 9 -

33.     The protocols for the treatment of gender dysphoria are set forth in clinical practice guidelines of the Endocrine Society—the leading professional association of endocrinologists in the United States—and the standards of care issued by the World Professional Association for Transgender Health.[6]  These protocols are recognized as authoritative standards for the treatment of gender dysphoria by every major medical and mental health professional association in the United States.  These groups also agree that this treatment is safe, effective, and medically necessary for many individuals with gender dysphoria.

34.     Treatment under these protocols is individualized based on the needs and circumstances of the patient.

35.     For prepubertal children, treatment is limited to therapy and "social transition"—the process by which a person expresses themself consistent with their gender identity in their day-to-day life, such as through the use of one's name, pronouns, manner of dress and grooming, use of single-sex facilities, and participation in single-sex activities.

36.     When young people with gender dysphoria reach the onset of puberty, pubertal suppression may be medically indicated.  Such treatment, which pauses endogenous puberty, has the impact of limiting the influence of a person's endogenous hormones on their body.  For example, a boy who is transgender who undergoes pubertal suppression will not experience the impact of estrogen that would be typical if he underwent his endogenous puberty.  Similarly, a

---

[6] The World Professional Association for Transgender Health promotes the highest standards of health care for individuals through the articulation of Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People.  The SOC are based on the best available science and expert professional consensus.  *See* World Professional Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, ver. 7 (2012), https://www.wpath.org/publications/soc.

- 10 -

girl who is transgender who undergoes pubertal suppression will not experience the impact of testosterone that would be typical if she underwent her endogenous puberty.

37.     For older adolescents, gender-affirming hormone therapy may be provided. For transgender boys, this means undergoing testosterone therapy. For transgender girls, it means undergoing estrogen therapy and suppression of testosterone. Surgical interventions are generally not indicated until after a patient has reached the age of majority, with the exception of chest surgery in some cases for young men who are transgender.

38.     When transgender boys are treated with puberty suppression followed by testosterone therapy, their bodies develop the skeletal structure, fat distribution, muscle development, chest, and facial hair typical of other boys their age. Similarly, when transgender girls are treated with puberty suppression followed by testosterone suppression and estrogen therapy, their bodies develop the skeletal structure, fat distribution, muscle development, breasts, and lack of facial hair typical of other girls their age.

39.     For people with gender dysphoria, being able to live consistently with their gender identity is essential to their health and well-being. When they are forced to live in a manner inconsistent with their gender identity, it undermines their ability to socially transition and, thus, exacerbates their gender dysphoria. Excluding a transgender boy from activities designated for boys, such as school sports, or requiring him to take part in single-sex activities for girls, is extremely harmful and can create serious health repercussions.

**B.  The Benefits of Participation in School Sports**

40.     Interscholastic athletics offer students not only the opportunity to develop their athletic skills and participate in competition, but also a range of academic, social, emotional, and health benefits and life skills that provide a foundation for success throughout their lives.

- 11 -

41.     Participation in sports has a documented positive effect on academic achievement, with student athletes generally experiencing better academic achievement than students who are not athletes.[7] Students who participate in high school sports are more likely to finish college and more likely to be actively engaged in planning for their future after their athletic career ends.

42.     Through participation in sports, students learn to better manage academic and social pressures. Participation in sports provides students the opportunity to make friends and become part of a supportive community of teammates and peers, easing social pressures to "fit in."[8] It also reduces the effects of risk factors, such as stressful life events, that lead to increases in depression.[9] Learning how to manage these pressures at a young age provides benefits to student athletes throughout their lives—even after their participation in sports has ended.

43.     Participation in athletics also allows students to build teamwork and discipline skills. Students learn the importance of working as part of a group to achieve a common goal, and the necessity of each individual member's role in bringing about success. Students also experience the success and personal fulfillment achieved from discipline, hard work, and perseverance through countless hours of practice.

44.     Through sports, students develop social skills and an emotional maturity that allow them to create and sustain life-long friendships. Athletes spend considerable time with their teammates, often experiencing high-pressure situations together that lead to deeper and

---

[7] *See, e.g.*, Angela Lumpkin & Judy Favor, *Comparing the Academic Performance of High School Athletes and Non-Athletes in Kansas in 2008-2009*, 4 J. Sport Admin & Supervision 41 (2012), http://hdl.handle.net/2027/spo.6776111.0004.108.

[8] *See* Erin M. Boone & Bonnie J. Leadbeater, *Game On: Diminishing Risks for Depressive Symptoms in Early Adolescence Through Positive Involvement in Team Sports*, 16 J. Res. Adolesc. 79 (2006), https://doi.org/10.1111/j.1532-7795.2006.00122.x.

[9] *See id.* at 79, 88.

more meaningful social bonds and friendships. These sports experiences in turn result in reduced anxiety and higher self-esteem.[10] These benefits impact students throughout the entirety of their lives.

45. Coaches and athletic support staff provide students who participate in sports access to meaningful mentorship and guidance.[11] This mentorship extends beyond school athletics, guiding students through academics and life.

46. Students who participate in athletics also derive physical and mental health benefits from sports. In general, students who play sports in school have fewer physical and mental health problems than those who do not.[12] Students who participate in sports further learn how to regulate their emotions, and experience significantly lower levels of emotional problems and distress as a result.[13] Participation in sports at a young age also encourages continued participation as an adult, in turn reducing the morbidity and mortality of many diseases that arise later in life.[14]

---

[10] *See* Leanne C. Findlay, & Robert J. Coplan*, Come Out and Play: Shyness in Childhood and the Benefits of Organized Sports Participation*, 40 Canadian J. Behavioural Science / Revue Canadienne des sciences du comportement 153 (2008), https://doi.org/10.1037/0008-400X.40.3.153.

[11] *See* Nicholas L. Holt et al., *Benefits and Challenges Associated with Sport Participation by Children and Parents from Low-Income Families*, 12 Psychol. Sport Exercise 490 (2011), https://doi.org/10.1016/j.psychsport.2011.05.007.

[12] Hans Steiner et al., *Adolescents and Sports: Risk or Benefit?*, 39 Clinical Pediatrics 161, 164 (2000), https://doi.org/10.1177/000992280003900304.

[13] *See* Sarah J. Donaldson & Kevin R. Ronan, *The Effects of Sports Participation on Young Adolescents' Emotional Well-Being*, 41 Adolescence 369 (2006), http://www-personal.umich.edu/~cyiu/psych%20458/out.pdf.

[14] Christer Malm et al., *Physical Activity and Sports—Real Health Benefits: A Review with Insight into the Public Health of Sweden*, 7 Sports 1, 13-14 (2019), https://doi.org/10.3390/sports7050127.

- 13 -

47.     Athletic participation also teaches young people how to overcome challenges and develop problem-solving skills, providing pathways to success later in life.  Athletic participation tests student athletes' resilience and helps them confront and overcome adversity.  This equips students with the ability to excel in high stakes and impressive professional roles after their athletic careers have ended.  Participation in school sports provides numerous benefits to students, creating a strong foundation for success both in and outside of school.

## C.  Current Policies of United States and International Sports Bodies

48.     The NCAA is a member-led organization of over 1,000 colleges and universities and over 100 athletic conferences that establishes policies for participating colleges and universities.[15]  Numerous colleges and universities in Tennessee, including Tennessee State University, the University of Tennessee, Middle Tennessee State University, and Tennessee Technology University, are members of the NCAA.[16]

49.     In 2011, after consulting with medical, legal, and athletic experts, the NCAA issued a policy regarding the participation of transgender athletes in collegiate athletics.[17]  This policy recognizes that "[c]oncern[s] about creating an 'unfair competitive advantage'" are based on "assumptions" that "are not well founded."[18]  Under the NCAA policy, transgender male student athletes may compete on men's teams regardless of medical treatment.  If the transgender male student is receiving treatment with testosterone, which is typically a banned substance, the

---

[15] What is the NCAA?, https://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited Nov. 1, 2021).

[16] NCAA, Directory, https://web3.ncaa.org/directory/memberList?type=1 (last visited Nov. 1, 2021).

[17] NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* (Aug. 2011), https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf.

[18] *Id*. at 7.

- 14 -

school simply notifies the NCAA of the student's request to receive a medical exception for testosterone treatment in order to participate on men's teams. A man who is transgender and taking testosterone as part of treatment for gender dysphoria is prohibited from participating on women's teams under the NCAA policy. The NCAA policy permits transgender female athletes to compete on women's teams after completing one calendar year of testosterone suppression treatment.[19]

50.     Almost half a million student-athletes compete in 24 NCAA sports every year.[20] Since the NCAA policy for transgender athletes was established in 2011, millions of NCAA student athletes have competed without any reported disturbances to collegiate athletics as a result of the inclusion of transgender people.

51.     On April 12, 2021, the NCAA Board of Governors issued a statement that affirmed participation of transgender athletes in sports consistent with their gender identity. The NCAA Board of Governors "firmly and unequivocally supports the opportunity for transgender student-athletes to compete in college sports," which is based on a "commitment grounded in [its] values of inclusion and fair competition." The NCAA Board of Governors further stated that it will "closely monitor" locations where potential championships may be held "to determine whether NCAA championships can be conducted in ways that are welcoming and respectful of all participants."[21]

---

[19] *Id.* at 13.

[20] NCAA, Student-Athletes, http://www.ncaa.org/student-athletes (last visited Nov. 1, 2021).

[21] *NCAA Board of Governors Statement on Transgender Participation* (Apr. 12, 2021), https://www.ncaa.org/about/resources/media-center/news/ncaa-board-of-governors-statement-on-transgender-participation.

- 15 -

52.     The International Olympic Committee also permits transgender athletes to participate in athletic competitions consistent with their gender identity.  In 2015, the International Olympic Committee issued guidelines recognizing that "[i]t is necessary to ensure insofar as possible that trans athletes are not excluded from the opportunity to participate in sporting competition."[22]  Under the International Olympic Committee' policy, transgender men "are eligible to compete in the male category without restriction."  Transgender women "are eligible to compete in the female category" if the athlete declares that she has a female gender identity and demonstrates that her testosterone level is below 10 nmol/L for a one-year period.[23]

53.     World Athletics, the international governing body for track and field and other running sports, permits transgender men to participate in the male category of international competitions after declaring that their gender identity is male, and permits transgender women to participate in the female category after declaring that their gender identity is female and demonstrating that their testosterone level is below 5 nmol/L for a one-year period.[24]

54.     These well-established athletic bodies have adopted policies enabling transgender people to participate consistent with their gender identities in elite athletic competitions.  None of them restrict eligibility to participate based solely on the athlete's sex assigned at birth.

55.     Because SB 228 bars *all* transgender student athletes from participating in accordance with their gender identity regardless of the circumstances, it is more restrictive than

---

[22] International Olympic Committee, *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism* at 2 (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf.

[23] *Id*.

[24] Press Release, World Athletics, *Decisions Made at IAAF Council Meetings in Doha* (Oct. 14, 2019), https://www.worldathletics.org/news/press-release/iaaf-council-219-decisions; World Athletics, Eligibility Regulations for Transgender Athletes at 5-6 (Oct. 1. 2019).

the policies adopted by the elite athletic regulatory bodies in the United States and around the world.  SB 228 thus imposes upon middle school and high school students in Tennessee who would like to play school sports a standard far more prohibitive than those applied to the world's top athletes.

**D.  Tennessee Policies Prior to SB 228**

56.     High school and middle school interscholastic athletics in Tennessee are governed by the Tennessee Secondary School Athletic Association ("TSSAA") and the Tennessee Middle School Athletic Association ("TMSAA").

57.     Before the enactment of SB 228, the policy for inclusion of transgender students in athletics for Tennessee students in grades 5-12 was set by the TSSAA and TSMAA.  In 2018, the TSSAA and TMSAA adopted a policy recognizing that "[a]ll students should have the opportunity to participate in TSSAA/TMSAA activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's record" ("TSSAA/TMSAA Policy for Transgender Student Athletes").[25]

58.     The TSSAA/TMSAA Policy for Transgender Student Athletes permitted transgender athletes to participate in sports consistent with their gender identity after complying with the following notification requirements:[26]

> **1. Notice to the School:**  The student and/or parent(s)/guardian(s) shall contact the administration at their member school indicating that the student has a consistent gender identity different than listed on the student's school registration records or birth certificate and that the student desires to participate in athletics in a manner consistent with his/her gender identity.

---

[25] Exhibit A at 1 (TSSAA/TSMAA Policy for Transgender Student Athletes).

[26] *Id.* at 1-2.

**2. Notice to the TSSAA/TMSAA:**  The member school administration shall contact the TSSAA office, which will assign a facilitator who will assist the school and student in preparation and completion of the TSSAA/TMSAA Gender Identity Eligibility Process.

**3. Necessary Documentation:**  The member school shall assist in collecting the following information:
    A. Current transcript and school registration information;
    B. Documentation from individuals such as, but not limited to, parent(s)/guardian(s), friends, and/or teachers which affirm that the action, attitudes, dress, and manner demonstrate the student's consistent gender identification and expression;
    C. Documentation from the member school administration outlining specific accommodations that have been made for the student;
    D. Written verification from an appropriate health care professional (i.e. doctor, psychiatrist, psychologist) of the student's consistent gender identification and expression; and
    E. Any other pertinent documentation or information.

**4. Referral to Gender Identity Eligibility Committee:** Upon receipt of the required documentation from the member school, the Executive Director will refer all necessary documentation to the TSSAA/TMSAA Gender Identity Eligibility Committee (GIEC) for consideration.  The GIEC will be selected by the TSSAA/TMSAA and will make a determination on the gender eligibility from the member school.  The GIEC will be comprised of a minimum of three of the following individuals:
    A. Physician with experience in gender identity health care and the World Professional Association of Transgender Health (WPATH) Standards of Care;
    B. Psychiatrist, psychologist, or licensed mental health professional familiar with the WPATH;
    C. School administrator from a non-appealing member school;
    D. TSSAA/TMSAA staff member; or
    E. Advocate familiar with Gender Identity and Expression issues.

**5. Notification:**  Written notification of the decision of the GIEC will be rendered to the member school administration by the Executive Director.

59.     The TSSAA/TMSAA Policy for Transgender Student Athletes also provided for

appeals by a member school on behalf of a denied student, to be decided by the TSSAA Board of

Control during its regularly scheduled meeting.[27]

---

[27] *Id.* at 3.

- 18 -

60.     The TSSAA/TMSAA Policy for Transgender Student Athletes further advised schools to "[u]se correct names/pronouns according to the student's self-identification," ensure restroom and locker room accessibility, and "[r]ecognize that the student is living in the 'gender identity.'"[28]

61.     Neither the TSSAA nor the TMSAA has ever reported any issues of misuse or abuse of this policy by a student to gain competitive advantage. In fact, the TSSAA has no record of any athletes even making use of the policy.

**E. The Enactment of SB 228**

62.     HB 3, "An Act to amend Tennessee Code Annotated, Title 49, relative to school sports," was introduced in the Tennessee House of Representatives by Representative Scott Cepicky ("Rep. Cepicky") on January 12, 2021. On February 8, 2021, the same act was introduced in the Tennessee Senate as SB 228 by Senator Joey Hensley ("Sen. Hensley"). The only aspect of "school sports" regulated by the Act is the addition of a requirement that a student's gender for purposes of participating in public middle or high school interscholastic sports shall be determined by the student's sex assigned at birth, as indicated on the student's original birth certificate or by "other evidence."

63.     The operative language of section 1 of HB 3 as introduced (and ultimately passed as SB 228) provides:

> (a) A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate. If a birth certificate provided by a student pursuant to this subsection (a) does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth, then the student must provide other evidence indicating the student's sex at the time of birth. The student or the student's parent or guardian must pay any costs associated with providing the evidence required under this subsection (a).

_____

[28] _Id._

- 19 -

(b) The state board of education, each local board of education, and each governing body of a public charter school shall adopt and enforce policies to ensure compliance with subsection (a) in the public schools governed by the respective entity.

(c) As used in this section:

      (1) "High school" means a school in which any combination of grades nine through twelve (9-12) are taught; and

      (2) "Middle school" means a school in which any combination of grades five through eight (5-8) are taught.

(d) This section does not apply to students in any grade kindergarten through four (K-4).

64.     The bill does not specify what constitutes "other evidence" of a student's sex at the time of birth where the student does not provide an original birth certificate, and it appears to delegate that question to the state or local boards of education. Such regulations have not yet been passed but other states' laws and a previous bill in Tennessee identify genital examinations and genetic testing as evidence of "biological sex" for participation in school sports.[29]

65.     The language of SB 228 does not specify whether all students will be required to "prove" their sex by providing an original birth certificate or other evidence, or if this requirement will be imposed only on a select few questioned by coaches, teachers, parents, or other students. Female athletes who are successful or who have features that are considered masculine may be targeted to "prove" their sex at birth, even if they are not transgender. Even if a birth certificate is required across the board, students who have difficulty obtaining a birth

---

[29] *See, e.g.*, Idaho Code Ann. § 33-6203(3) (West) ("A dispute regarding a student's sex shall be resolved by the school or institution by requesting that the student provide a health examination … verify[ing] the student's biological sex as part of a routine sports physical examination relying only on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels."); Tenn. H.B. 1689, 111th Gen. Assemb., Reg. Sess. (2020) (SB 228 predecessor, providing that a student may have to provide "the certified results of a genetic or DNA test conducted by a healthcare practitioner … that establishes the student's biological sex.").

certificate will be required to provide "other evidence" that may be potentially intrusive. SB 228 will therefore result in humiliation and embarrassment for cisgender students, on top of stigmatizing transgender students.

66.    The bill's sponsor in the Tennessee House, Rep. Cepicky, stated that the intent of the bill was to "maintain the competitive balance of our female sports, to maintain safety for our female athletes, and to provide the opportunity for scholarships and advancement in recognition of our female athletes." [30]  Despite this purported intent however, proponents of the bill made clear that disapproval of transgender people was the true motivation for the law.[31]

67.    For example, in emails sent in March of 2021, Representative John Ragan, one of the co-sponsors of SB 228, explained that the purpose of the bill was to "battl[e] the evil of transgenderism," and expressed concern with "the illogical position of transgenderism."

68.    Representative Michele Carringer, citing her religious background and speaking in support of the bill, said "I was born a girl, they were born a boy … that is how it is.  God made men and women."[32]  Similarly, Senator Paul Rose, in expressing his support for the bill, cited the biblical quote that "God created man in his own image … male and female created he them."[33]

---

[30] *See House K-12 Subcommittee Hearing*, 112th Tenn. Gen. Assemb. (Feb. 9, 2021), http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=23848&meta_id=561797.

[31] Some proponents of the bill apparently didn't even bother to find out the view of the state body charged with regulating interscholastic athletics.  *See Senate Floor Session Hearing*, 112th Tenn. Gen. Assemb. (Mar. 1, 2021), http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24026&meta_id=565261 (Sen. Hensley incorrectly stating that the TSSAA had no policy on the participation of transgender youth in sports).

[32] *See House K-12 Subcommittee Hearing*, 112th Tenn. Gen. Assemb. (Feb. 9, 2021), http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=23848&meta_id=561797.

[33] *Senate Floor Session Hearing*, 112th Tenn. Gen. Assemb. (Mar. 1, 2021), http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24026&meta_id=565261.

- 21 -

69.     SB 228 passed the Tennessee Senate on March 1, 2021, passed the House on March 22, and was signed into law by Governor Bill Lee on March 26.  The bill took effect in the 2021-2022 school year.

70.     SB 228 is part of a disturbing trend of state legislation across the country targeting transgender youth.[34]  Indeed, SB 228 is not the only anti-transgender law passed by the Tennessee legislature this past session.  Tennessee lawmakers passed legislation restricting access of transgender youth to health care, school restrooms, and other school facilities; limiting school curriculum addressing gender identity; and requiring parental notice and the ability to opt out of classroom discussions involving gender identity.  Outside the school context, the legislature passed a bill requiring businesses to post a sign to disclose the existence of any policy permitting transgender individuals to use the restroom consistent with their gender identity.

71.     Against the backdrop of this targeting of transgender people, SB 228 sends a clear message to transgender youth in Tennessee that, as far as the State of Tennessee is concerned, who they are is unacceptable and they do not belong.

**F.  SB 228's Impact on L. and Other Students Who Are Transgender**

72.     L. is a 14-year-old boy in his freshman year at Farragut High School.

73.     L. plays golf.  He loves golf because it requires precision and focus.  He also likes the competitive aspects of being on a golf team and enjoys working to improve his golf game.

74.     L. is transgender.

75.     L. is a boy who was assigned the sex of female at birth, which is documented on his original birth certificate.

---

[34] *See* Li Cohen, *A Surge in Legislation Targeting Trans Youth 'could come at the literal cost of lives,' Advocates Warn*, CBS News (Apr. 10, 2021), https://www.cbsnews.com/news/transgender-rights-legislation-surge-youth-mental-health/.

- 22 -

76. In 2019, L. told his parents that he was a boy. Since 2020, he has been using a typically male name and pronouns and grooming and dressing in traditionally male styles.

77. L.'s parents and twin sister have fully supported his transition. His parents have legally changed his name to the one he has been using since he transitioned.

78. L. sees a therapist for treatment for gender dysphoria.

79. In April 2021, with the guidance of his parents, therapist, pediatrician, and endocrinologist, and consistent with the accepted protocols for treatment of gender dysphoria, L. began pubertal suppression medication. This treatment prevents the production of estrogen and progesterone, which are responsible for many feminizing physical changes during puberty. With the support of his parents, L. intends to begin testosterone therapy when he is older and his health care providers deem it medically appropriate.

80. L.'s health and well-being depend on him being able to live his life fully as the boy he is.

81. L. would like to try out and play golf on the Farragut High School boys' golf team.

82. Under the TSSAA's rules, L. would have been permitted to participate on the boys' golf team.

83. But under SB 228, transgender boys like L. are barred from participating on middle school and high school athletic teams for boys, and transgender girls are barred from participating on middle school and high school athletic teams for girls.

84. Prior to his transition, L. joined a girls' golf club at his middle school. But now, it would be painful and humiliating to force him to be the only boy on the girls' team. Designating him a girl in this way would also be contrary to L.'s treatment for gender dysphoria, which

entails living as a boy in all aspects of his life.  SB 228 thus denies L. the opportunity to participate in interscholastic athletics.

85.     By denying L. the ability to participate in school sports, SB 228 denies him the opportunity to develop his golf skills, participate in team competitions, and experience the numerous social, educational, and physical and emotional health benefits of school sports set forth above.  Though SB 228 purports to "promote continued participation and equitable opportunities for all children" in school athletic programs, in actuality it shunts transgender students like L. out of participation by excluding them from participating on teams consistent with their gender identity.

86.     L. was deeply upset for himself and other transgender student athletes in Tennessee when he learned about SB 228.  He is crushed to think that he may never be able to compete on his high school golf team.  The prospect of missing out on the team experience and camaraderie that is available to other students is devastating to him.

87.     L. also has a reasonable fear that SB 228 will encourage bullying and harassment against transgender students like himself since it sends a message that it is acceptable to treat transgender students differently because they are transgender.

88.     For some transgender students, being required to play on a team that does not match their gender identity would have the additional consequence of revealing private medical information, as not all students who are transgender are known to be transgender by their peers.

### CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection, U.S. Const. Amend. XIV
Against Defendant Lee, Defendant Schwinn, the Individual State Board Defendants, and the Knox County Schools Defendants

89.     L. incorporates paragraphs 1 through 88 as though fully set forth herein.

- 24 -

90.     L. brings this Count against Defendant Lee, Defendant Schwinn, the Individual State Board Defendants, and the Knox County Schools Defendants.

91.     The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Equal Protection Clause, discrimination by the government based on sex and transgender status is tested under heightened scrutiny and is therefore presumptively unconstitutional absent a showing by the government that the discrimination is adequately tailored to further a sufficiently important state interest.

92.     Transgender people as a group possess all the indicia of a suspect class that have been identified by the U.S. Supreme Court as triggering heightened scrutiny, including: (1) transgender people have experienced a history of discrimination; (2) being transgender does not limit or affect one's ability to contribute to society; (3) transgender people are a discrete and insular minority who lack the political power to protect themselves through the legislative process; and (4) gender identity and being transgender are a core part of one's identity so fundamental to one's identity and conscience that a person cannot be required to abandon it (even if that were possible) as a condition of equal treatment.

93.     SB 228 singles out and categorically bars L. and other transgender youth from playing interscholastic sports consistent with their gender identity, thus precluding them from participating in interscholastic sports.

94.     SB 228 discriminates against L. and other transgender students on the basis of their transgender status.

- 25 -

95. SB 228 discriminates against L. and other transgender students on the basis of sex. It treats L. and other transgender boys differently from other students with a male gender identity based solely on their sex assigned at birth, and it treats transgender girls differently from other students with a female gender identity based solely on their sex assigned at birth. And the law discriminates against L. and other transgender students for failing to fit gender-based stereotypes of what it means to be a boy or a girl.

96. SB 228 does not satisfy heightened scrutiny or any level of equal protection scrutiny. Its sweeping exclusion of *all* transgender students from participation on *any* athletic teams consistent with their gender identity regardless of the circumstances is disconnected from its own stated purposes of protecting the athletic opportunities and safety of cisgender girls. Prohibiting L. from participating on the boys' golf team does nothing to advance the statute's purported concerns.

97. SB 228 was passed not to protect female athletes but to marginalize transgender people. The law amounts to a bare desire to harm a politically unpopular group, which is an impermissible government purpose and fails any level of equal protection scrutiny.

98. Absent injunctive relief, L. will be irreparably harmed.

### COUNT II
### Violation of Title IX, 20 U.S.C. § 1681, et seq.
Against Defendant Tennessee State Board of Education and Defendant the Knox County Board of Education

99. L. incorporates paragraphs 1 through 88 as though fully set forth herein.

100. L. brings this Count against Defendant Tennessee State Board of Education and Defendant Knox County Board of Education.

- 26 -

101.    Tennessee's state educational institutions, including Tennessee's public school system and Defendant Tennessee State Board of Education, are education programs receiving Federal financial assistance.

102.    The State Board is a proper defendant because "State[s] shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for a [Title IX] violation."  42 U.S.C. § 2000d-7(a)(1).

103.    The Knox County Board of Education is a recipient of Federal financial assistance that operates education programs and activities, including interscholastic athletics.

104.    Under Title IX of the Educational Amendments of 1972, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

105.    Athletic programs are not excluded from Title IX's prohibition on sex discrimination.

106.    Discrimination against students because they are transgender is discrimination based on sex.

107.    Under SB 228, Defendant Tennessee State Board of Education and Defendant Knox County Board of Education prohibit L. and other transgender students from playing on interscholastic teams consistent with their gender identity, thus precluding them from participating in interscholastic sports.  This denies L. and other transgender students the benefits of, and subjects them to discrimination in, educational programs and activities "on the basis of sex," in violation of their rights under Title IX.

108.    Absent injunctive relief, L. will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, L. prays that this Court grant the following relief:

1.      Declaring that the provisions of and enforcement by Defendants of SB 228 violate L.'s rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972;

2.      Permanently enjoining all Defendants, their officials, agents, employees, assigns, and all other persons acting in concert or participating with them from enforcing SB 228 or any other law, custom, or policy that precludes L.'s participation on a boys' school sports team in Tennessee;

3.      Awarding L. his costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4.      Granting such other and further relief as the Court deems just and proper.

Dated: November 4, 2021                    Respectfully submitted,

                                           /s/  Thomas H. Castelli
                                           Thomas H. Castelli (No. 24849)
                                           Stella Yarbrough (No. 33637)
                                           AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION OF TENNESSEE
                                           P.O. Box 120160
                                           Nashville, TN 37212
                                           Tel: (615) 320-7142
                                           tcastelli@aclu-tn.org
                                           syarborough@aclu-tn.org

- 28 -

/s/ Leslie Cooper
Leslie Cooper
(*pro hac vice* forthcoming)
Taylor Brown
(*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lcooper@aclu.org
tbrown@aclu.org


/s/ Tara L. Borelli
Tara L. Borelli
(*pro hac vice* forthcoming)
Carl S. Charles
(*pro hac vice* forthcoming)
LAMBDA LEGAL DEFENSE AND EDUCATION
    FUND INC.
1 West Court Square, Suite 105
Decatur, GA 30030-2556
Tel: (404) 897-1880
Fax: (404) 506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Sasha Buchert
(*pro hac vice* forthcoming)
LAMBDA LEGAL DEFENSE AND EDUCATION
    FUND INC.
1776 K Street NW, 8th Floor
Washington, DC 20006-5500
Tel: (202) 804-6245
sbuchert@lambdalegal.org

/s/ Alan Schoenfeld
Alan Schoenfeld
(*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street, 45th Floor
New York, NY 10007
Tel: (212) 937-7294
Alan.Schoenfeld@wilmerhale.com

Matthew D. Benedetto
(*pro hac vice* forthcoming)
Thomas F. Costello-Vega
(*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Tel: (213) 443-5300
Matthew.Benedetto@wilmerhale.com
Thomas.Costello@wilmerhale.com

Emily L. Stark
(*pro hac vice* forthcoming)
Samuel M. Strongin
(*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel: (202) 663-6000
Emily.Stark@wilmerhale.com
Samuel.Strongin@wilmerhale.com


***Attorneys for Plaintiff L.E., by his next
friends and parents, Shelley Esquivel and
Mario Esquivel***

- 29 -