# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

L.E., by next friends and parents,     )
SHELLEY ESQUIVEL and     )
MARIO ESQUIVEL,     )
     )
    Plaintiff,     )
     )     **No. 3:21-cv-00835**
v.     )
     )     **Chief Judge Crenshaw**
BILL LEE, in his official capacity as     )
Governor of Tennessee; et al.,     )     **Magistrate Judge Newbern**
     )
KNOX COUNTY BOARD OF     )
EDUCATION a/k/a KNOX COUNTY     )
SCHOOL DISTRICT; et al.,     )
     )
    Defendants.     )

---

## MEMORANDUM OF LAW IN SUPPORT OF
## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Governor Lee, Commissioner Schwinn, Executive Director Morrison, members of the Tennessee State Board of Education, in their official capacities, and the Tennessee State Board of Education ("State Defendants") submit this memorandum of law in support of their motion for summary judgment.

## UNDISPUTED FACTS

L.E., whose sex at birth was female, told L.E.'s parents in 2019 that L.E. was a boy and since 2020 began using a typically male name and grooming and dressing in traditionally male styles. (Compl. ¶¶ 75-76, ECF 1, PageID # 22-23.) L.E. has not yet received testosterone therapy and has not had any relevant surgeries. (Shelley Esquivel Dep. 14:10-25; 15:1-5; 79:12-15.)

Initially, L.E.'s pediatrician had a wait-and-see approach, "meaning wait to see if this is a phase or if it's not, and then to proceed with hormone treatment or whatever the next step was after the age of 18." (Shelley Esquivel Dep. 9:9-21.) The pediatrician only provided a referral for additional care after Mrs. Esquivel learned that Children's in Knoxville provides care to children under the age of 18 and asked for it. (Shelley Esquivel Dep. 10:15-23.)

**Whether L.E. Plays Golf**

L.E. does not keep track of or record a score when playing golf. (Shelley Esquivel Dep. 37:7-12); (L.E. Dep. 13:8-14.) L.E. has never calculated and does not have a handicap index in golf. (Mario Esquivel Dep. 33:8-16.)

L.E .and Mario Esquivel primarily play a par-three golf course. (Mario Esquivel Dep. 7:20-23.) Par-three golf courses have nine holes, and the holes themselves are shorter in distance than an 18-hole golf course. (Mario Esquivel Dep. 7:12-16.)

When asked to identify the date and location of the last ten (10) rounds of golf played, Plaintiff responded that L.E. had played eighteen (18) holes of golf five (5) times and did not track

1

or record L.E.'s score.  (Mario Esquivel Dep. 33:17-25; 34:1-13; 35:16-20); (Shelley Esquivel Dep. Ex. 1, Int. No. 3); (L.E. Dep. 16:20-23; 17:1-7).  From January 1, 2022, to July 13, 2022, L.E. played one round of golf.  (Mario Esquivel 33:17-25; 34:1-5.)

L.E. was not a top scorer on the Farragut Middle School girls' golf team and so did not participate in the state or district meets.  (Mario Esquivel 43:10-25; 44:1-16.)

L.E. has not tried out for the Farragut High School boys' golf team or girls' golf team. (Shelley Esquivel Dep. 33:5-8.)  L.E. and L.E.'s parents are unaware of the dates on which the golf teams' tryouts occurred. (Mario Esquivel Dep. 19:19-21); (Shelley Esquivel Dep. 31:10-16); (L.E. Dep. 18:11-13).  During the course of this lawsuit, an attorney from Knox County offered to let L.E. tryout for the golf team, and L.E. did not agree to participate in the tryout.  (Shelley Esquivel Dep. 33:19-25; 34:1.)

**Farragut High School Golf Teams**

The Farragut High School boys' golf team won the state championship tournament in 2020. (Higgins Dep. 88:17-21.)  The Farragut High School boys' golf team placed second in the 2021 state regional tournament, and its top four players scored 75, 78, 78, and 80.  (Higgins Dep. 88:22; 89:1-5; 90:21-22; 91:1-17; Ex. 7.)

The Tennessee Secondary Schools Athletic Association ("TSSAA"), which Farragut High School is a member of, sets the number of players who can play in a golf match, and only five (5) boys can play in a match.  (Higgins Dep. 38:21-22; 39:1-6; 51:5-16.)

Players who try out for the Farragut High School boys' golf team need to shoot an average score of 90 or better for 18-walking holes through 3 rounds to make the team.  (Higgins Dep. 46:11-15; Ex. 3.)  Farragut High School does not have a junior varsity golf team.  (Higgins Dep. 19:11-15.)

2

There is not a separate tryout for the boys' golf team and the girls' golf team. (Higgins Dep. 46:5-7.) The Farragut High School boys' golf team and girls' golf team regularly practice and play together. (Higgins Dep. 35:1-5.) L.E. has never tried out for the Farragut High School boys' or girls' golf team. (Higgins Dep. 94:7-9.)

**Defendants**

The Tennessee State Board of Education does not receive federal funds for its operations. (Morrison Dep. 42:14-16.)

**High School Sports**

Farragut High School must comply with TSSAA policies. (Bartlett Dep. 85:8-13 Hemmelgarn Dep. 46:8-19.) TSSAA's regulations separate several interscholastic sports (including basketball, cross country, golf, tennis, and track and field) into separate divisions for boys and girls. (Hemmelgarn Dep. 128:21-22, 129, 130:1-13; Dodgen Dep. Ex. 3- 2022-23 TSSAA Handbook; Bergmeyer Decl. ¶ 3; Ex. 1- TSSAA Sports.)

**Gender identity**

Plaintiff's putative expert Dr. Cyperski testified that "there's an infinite number of gender identities," and some individuals have "an inner sense of gender that is consistent with male, female, neither, or both, and that that may fluctuate over time." (Cyperski Dep. 49:21-24, 50:20-22.) Not all transgender adolescents are diagnosed with gender dysphoria (Cyperski Dep. 184:22-25; 185:1-2.)

## INTRODUCTION

Plaintiff presents two questions in this case: (1) Is it unconstitutional under the Equal Protection Clause to define a "student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event" as "the student's sex at the time of

the student's birth, as indicated on the student's original birth certificate," S.B. 228, 2021 Tenn. Pub. Acts, ch. 40, § 1(a) (the "Gender in Athletics Law");[1] and (2) is that definition a violation of Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a).  The definition of "gender" as "sex" cannot violate the Fourteenth Amendment or Title IX because, among other reasons, that definition was the common definition of "gender" when the States ratified the Fourteenth Amendment and when Congress enacted Title IX.  And that definition of "gender" remains in common usage to this day.

Plus, as a more basic matter, Plaintiff cannot sue the State Defendants in this Court. Plaintiff (identified at birth as a girl) alleges a desire to play *as a boy* on the "boys' golf team," not simply to compete against boys.  (Compl. ¶¶ 1-2, 11, 81, ECF 1, PageID # 1-2, 4, 23, 28.)  But Plaintiff has never tried out for either golf team at Farragut High School or produced any evidence that Plaintiff could score well enough to make the boys' golf team.  Nor has Plaintiff sued TSSAA—the entity actually responsible for separating golf into different divisions for boys and girls—or provided any proof that TSSAA would decide to allow Plaintiff to play boys' golf if this Court invalidated the Gender in Athletics Law.  Plaintiff thus lacks standing and the ability to sue the State Defendants.  But even if Plaintiff could sue them to challenge the Gender in Athletics Law, the statute does not violate federal law.

## STANDARDS OF REVEW

Summary judgment is appropriate where the pleadings and admissions on file demonstrate that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th

---

[1] This law was codified at Tenn. Code Ann. § 49-6-310(a).  Subsequent legislation has deleted § 1(b) of the Gender in Athletics law and amended Tenn. Code Ann. § 49-6-310, *see* 2022 Pub. Acts, ch. 909; 2022 Pub. Acts, ch. 1005, but Plaintiff's Complaint does not challenge the new laws.

4

Cir. 2013).  The main inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

In order to avoid a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.  "The  mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Id.* at 252.   The evidence must be "such that a reasonable  jury could return a verdict for the nonmoving party." *Id.* at 248.  Therefore, summary judgment is  warranted if the nonmoving party fails to establish the existence of an element essential to their  case on which they bear the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,  322 (1986).

Courts must presume that state laws are constitutional and seek to uphold them wherever possible. *Northland Fam. Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 339 (6th Cir. 2007).

## ARGUMENT

### I.     Plaintiff lacks standing.

The threshold inquiry into standing "in no way depends on the merits of the [Plaintiff's] contention that particular conduct is illegal." *Warth v. Seldin,* 422 U.S. 490, 500 (1975).  Thus, at the outset, it is proper to set aside Plaintiff's Equal Protection and Title IX claims and, instead, focus solely on whether Plaintiff has established the existence of a case or controversy.

 The irreducible constitutional minimum of standing contains three elements.  *First*, the plaintiff must have suffered an "injury in  fact" (i.e., an injury that is both "concrete and particularized," and "actual or imminent"—not "conjectural or hypothetical"). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  *Second*, the alleged injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

5

third party not before the court." *Id.* at 561 (quotation omitted). *Third*, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted).

Plaintiff bears the burden of establishing these elements. And while "general factual allegations of injury" may satisfy those elements at the pleading stage, the standard at summary judgment is more demanding. *Id.* L.E. "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'" in order to demonstrate standing. *Id.* (quoting Fed. R. Civ. P. 56(e)). Here, Plaintiff fails to meet that demanding standard.

### A. Plaintiff's alleged injuries are speculative and hypothetical.

Plaintiff's allegations of harm can be categorized into two main theories: (1) Plaintiff was barred from the boys' golf team because Plaintiff is transgender person; and (2) Plaintiff was barred from trying out for the team as a boy because Plaintiff is transgender person. Neither is justiciable.

To survive summary judgment, Plaintiff must submit specific factual evidence showing, not only that a transgender sports policy is unlawful, but also that Plaintiff would be "directly" and uniquely affected by the rule. *Lujan*, 504 U.S. at 563. To demonstrate a unique and direct interest in a rule, it is not enough to simply assert a "'special interest' in th[e] subject"—a plaintiff must use specific evidence to show that he is, in fact, a member of the class of people affected by the rule. *Id.* (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Plaintiff fails to meet that standard. There is no question that L.E. enjoys golf, but a special interest does not create standing. Plaintiff must actually provide objective indicators showing that Plaintiff is in the class of golfers who would otherwise have the requisite skill to play on the boys' golf team. For Farragut High School, that means being able to play three rounds of golf on an 18-

hole course and finish with an average score of 90 or better.  (Higgins Dep. 46:11-15; Ex. 3.)  Plaintiff provides no specific evidence to suggest that Plaintiff is capable of playing at that level.

In fact, virtually every piece of evidence cuts in the opposite direction.  L.E. plays golf for fun and doesn't keep score, even after commencing this lawsuit.  (Shelley Esquivel Dep. 37:7-12); (L.E. Dep. 13:8-14).  L.E. does not golf that often—L.E. has only played golf a handful of times over the last year.  (Mario Esquivel Dep. 33:17-25; 34:1-13; 35:16-20); (Shelley Esquivel Dep. Ex. 1, Int. No. 3); (L.E. Dep. 16:20-23; 17:1-7).  And, when L.E. does play golf, L.E. usually plays at a local par-three course (a much smaller course that does not require driving balls from the tee box).  (Mario Esquivel Dep. 7:12-16); (L.E. Dep. 36:19-25).  In the past year, L.E. has visited only one 18-hole course, and neither L.E. nor L.E.'s father kept score.  (Mario Esquivel Dep. 33:17-25; 34:1-5.)  Plaintiff presented no scorecards, no handicap data, no driving distances, no statements from golf coaches or instructors.  Plaintiff has not presented a single piece of evidence indicating that Plaintiff has *ever* shot a 90 or better on a standard 18-hole course.  Finding that Plaintiff is otherwise qualified for the golf team thus requires crossing "into pure speculation and fantasy." *Lujan*, 504 U.S. at 567.

Plaintiff's alternative theory of harm (i.e., some day being barred from trying out for the team) fares no better.  A "profession of an intent" to try out, without supporting evidence, "is simply not enough."  *Id.* at 564.  To survive summary judgment, Plaintiff must bolster that theory with specific facts.  And Plaintiff fails to carry that burden:  L.E. and L.E.'s parents are unaware of the dates of the tryouts, (Mario Esquivel Dep. 19:19-21); (Shelley Esquivel Dep. 31:10-16); (L.E. Dep. 18:11-13); L.E. has not exhibited a training regimen commensurate with the fact that the Farragut boys' golf team won the state championship in 2020 and in 2021 placed second in the regional tournament with its players scoring 75, 78, 78, and 80, (Higgins Dep. 88:17-21; 88:22;

89:1-5; 90:21-22; 91:1-17; Ex. 7.); neither L.E. nor L.E.'s parents ever spoke to Coach Higgins about L.E.'s desire to try out for the team (Higgins Dep. 36:16-17; 37:7-9); and when Plaintiff was invited to try out for the 2022 season, Plaintiff rejected the offer. (Shelley Esquivel Dep. 33:19-34:1). Of note, there is not a separate tryout for the boys' golf team and the girls' golf team. (Higgins Dep. 46:5-7.) Plaintiff's "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" that the caselaw requires. *Lujan*, 504 U.S. at 564 (1992).

### B. Plaintiff's alleged injuries are not traceable to the law.

Even if Plaintiff's two theories of harm were cognizable, they still bear no relation to the State Defendants or the challenged law. Although Plaintiff places the statute at the center of the theories of harm, the actual injuries alleged cannot be traced back to the statute. Instead, the alleged harms are the product of rules and policies issued by the TSSAA. Those rules and policies reflect the independent judgment of the TSSAA, not an outcome preordained by the law.

At the most fundamental level, Plaintiff misunderstands what the Gender in Athletics Law does. Plaintiff correctly recognizes that several States have passed laws separating some sports teams based on sex. *See, e.g.*, W. Va. Code Ann. § 18-2-25d(2).[2] But Tenn. Code Ann. § 49-6-310(a) is different. While those other laws explicitly bar students from playing certain sports, this law merely sets a baseline definition for "gender" in the context of interscholastic sports and then allows TSSAA and localities to set other sports policies, just as they always have.

The proper reading of Tennessee's law matters for the purposes of traceability. To establish standing, a plaintiff's injury must be "fairly . . . trace[able] to the challenged action of the

---

[2] Indeed, the General Assembly *has* passed such a law for intercollegiate sports. Tenn. Code Ann. § 49-7-180. But it did not do so here.

defendant," and "not" the "result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation omitted). Here, the Gender in Athletics Law does not mandate any participation rules. The TSSAA must acknowledge the birth sex of athletes when crafting rules, but the decision to have separate divisions for boys' golf and girls' golf was entirely TSSAA's independent action. And the relevant local agencies abide by the policies of the TSSAA. (Bartlett Dep. 85:8-13; Hemmelgarn Dep. 46:8-19.) So, to the extent that any justiciable injury exists in this case, it is not caused by the Gender in Athletics Law. Because any alleged injury in this case cannot be fairly traced to the State Defendants, Plaintiff lacks standing.

C. **Even if Plaintiff prevailed in invalidating the Gender in Athletics Law, it is not at all clear whether Plaintiff's alleged harms would be redressed.**

Because the TSSAA is absent from this case, it is nearly impossible for Plaintiff to prove that the alleged injuries are redressable. To demonstrate redressability, a plaintiff must prove that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted). When a plaintiff claims to be injured by the regulation of a third party who is not before the court, it becomes "substantially more difficult" to establish standing. *Id.* at 562. When traceability and redressability hinge on the independent choices of a regulated third party, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* And, at summary judgment, the plaintiff's burden is significant. Mere "unadorned speculation" about third-party conduct "will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Plaintiff no doubt suspects that if the challenged law were invalidated, the TSSAA might reverse course and once again adopt a policy defining gender as gender identity. But Plaintiff fails to provide specific facts to support that suspicion. The reality is that, even if Plaintiff prevailed in

9

invalidating the Gender in Athletics Law, the 2018 TSSAA policy has been gone now for a year-and-a-half; the Gender in Athletics Law did away with it. And, for a variety of reasons, the TSSAA might decide not to resurrect it.[3] Indeed, the Eastern District of Tennessee has clarified that "nowhere in *Bostock*, Title IX, or its implementing regulations" is there an "obligation[] for regulated entities not to discriminate based on sexual orientation or gender identity." *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022). Given that development, TSSAA might decide not to take the same approach it took in 2018.

At bottom, only one thing is plain: there is simply no way for this Court to know what the future TSSAA policy will be when the TSSAA is not a party to this case. This Court, along with the parties, can only speculate. And because speculation has no place in a redressability analysis, this Court should find that the Plaintiff lacks standing.

## II. The State's Sovereign Immunity Bars This Suit Against State Defendants.

Consistent with the Eleventh Amendment, federal courts cannot "entertain a suit brought by a citizen against his own State." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). There are limited exceptions to a State's sovereign immunity: "(a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young*[, 209 U.S. 123 (1908)] applies; and (c) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).

The State of Tennessee has not waived its immunity from 42 U.S.C. § 1983 cases. *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986). And Congress did not override the State's

---

[3] Plaintiff may insist that, because the Gender in Athletics Law *influenced* the TSSAA's approach to gender, then it is natural to assume that the policy would necessarily change if the law were invalidated. But that conclusion simply doesn't follow from those premises. *See Simon*, 426 U.S. at 40-46 (rejecting such reasoning).

Eleventh Amendment immunity in passing 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). Therefore, the consent and abrogation exceptions do not apply for Plaintiff's Equal Protection claim. Accordingly, the Eleventh Amendment bars this cause of action against State Defendants unless the *Ex parte Young* exception is applicable.

In *Ex parte Young*, the Supreme Court allowed injunctive actions against state officers "clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and who are about to commence proceedings" that violate someone's federal constitutional rights. 209 U.S. 123, 155-56 (1908). "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, . . . such officer must have some connection with the enforcement of the act." *Id.*[4]

In the instant case, the *Ex parte Young* exception does not apply, and the Eleventh Amendment bars Plaintiff's Equal Protection claim against the State Defendants. The only action Plaintiff alleges that Governor Lee took is to support and sign the bill into law, actions he has already completed. (Compl. ¶ 12, ECF 1, PageID # 4.) Commissioner Schwinn is required to faithfully execute *all* education laws, rules, and regulations. (Compl. ¶ 13, ECF 1, PageID# 5.) Plaintiff alleges no action taken by Executive Director Morrison or the State Board members beyond supervision of the education. (Compl. ¶¶ 15-16, ECF 1, PageID # 6.) The general duty of a Governor and state executives to execute the laws is insufficient to invoke jurisdiction. *See Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1413 (6th Cir. 1996).

---

[4] In subsequent decisions, "[c]ourts have not read *Young* expansively." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996). "*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *Id.* A "state official's obligation to execute the laws a sufficient connection to the enforcement of a challenged statute." *Id.* (concluding that the *Ex parte Young* exception did not apply because "[t]he Attorney General did not threaten to commence and was not about to commence proceedings against the plaintiffs").

Therefore, sovereign immunity bars the Equal Protection claim against the State Defendants, and they should be dismissed.

Nor does any sovereign immunity exception allow the Title IX claim against the State Board. Congress enacted Title IX under its Spending Clause powers and thus did not automatically abrogate the State's immunity. State "recipients of Federal financial assistance" waive their immunity by accepting Title IX funding. 42 U.S.C. § 2000d-7(a)(1). But the Tennessee State Board of Education—the only State Defendant that Plaintiff has brought a Title IX claim against— does not receive federal funds and thus is not subject to Title IX. (Morrison Dep. 42:14-16.)

## III. Plaintiff Fails to Establish an Equal-Protection Claim Against the State Defendants.

On the present record, Plaintiff fails to establish that the State Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.[5] This Clause guarantees that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Section 49-6-310(a) treats all students alike by applying the same definition of "gender" to all students: For purposes of interscholastic sports, gender is determined in the same way across the board—by the student's sex at the time of birth—regardless of sex or transgender status. This definitional statute accords with the definitions of "gender" and "sex" at the time of the Fourteenth Amendment's ratification and more than satisfies rational-basis review. Even if the Gender in Athletics Law did create separate classifications for the two sexes, the statute still would not violate the Equal Protection Clause because (1) Plaintiff and other transgender students are not alike in all

---

[5] Plaintiff brought Count I "Deprivation of Equal Protection" against all State Defendants except the State Board of Education itself. (Compl. 24, ECF 1, PageID # 24.)

relevant aspects to students of the opposite sex; and (2) such a classification would satisfy intermediate scrutiny (the proper standard for a sex-based classification) and rational-basis review (the proper standard for a transgender-status classification).

### A. The statute satisfies rational-basis review as a definition of "gender."

Section § 49-6-310(a) does not itself separate students into different sports, and Plaintiff has declined to sue the agency that does—the TSSAA. The TSSAA separates several interscholastic sports (including basketball, cross country, golf, tennis, and track and field[6]) into separate divisions for boys and girls. (Hemmelgarn Dep. 128:21-22, 129, 130:1-13; Dodgen Dep. Ex. 3- 2022-23 TSSAA Handbook; Bergmeyer Decl. ¶ 3; Ex. 1- TSSAA Sports.) Because Plaintiff does not challenge TSSAA's rules separating students on the basis of sex, there is no further "implication of any constitutionally protected fundamental right (or suspect classification)," and "heightened scrutiny is indisputably inappropriate." *Ill. Health Care Ass'n v. Ill. Dep't of Pub. Health*, 879 F.2d 286, 288 n.4 (7th Cir. 1989). Rational-basis review applies to the definition of "gender" as the "student's sex at the time of the student's birth, as indicated on the student's original birth certificate," Tenn. Code Ann. § 49-6-310(a), and the Gender in Athletics Law more than satisfies that standard.

#### 1. Rational-basis review is the proper standard for this definition.

Courts have repeatedly applied rational-basis review to challenges of the definitional contours of various classifications, even racial ones. *See, e.g.*, *Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) (applying rational-basis review to definition of "Hispanic"); *Orion Ins. Grp. v. Wash. State Off. of Minority & Women's Bus. Enters.*, No. 16-

---

[6] TSSAA also has a unified track and field category for students with special needs that includes some mixed gender competition.

5582, 2017 WL 3387344, at *2, 11, 13 (W.D. Wash. Aug. 7, 2017) (applying rational-basis review to definition of "Black"), *aff'd sub nom. Orion Ins. Grp. v. Washington's Off. of Minority & Women's Bus. Enterprises*, 754 F. App'x 556 (9th Cir. 2018); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986) (applying rational-basis review to definition of "Hawaiian").

In *Jana-Rock Construction, Inc.*, a plaintiff challenged New York's decision not to classify him as Hispanic for purposes of an affirmative-action program. 438 F.3d at 200, 205. Plaintiff Rocco Luiere was "the son of a Spanish mother whose parents were born in Spain" and submitted a sworn affidavit stating "I am a Hispanic from Spain." *Id.* at 199, 203. The Second Circuit held that New York's rejection of the plaintiff's definition of himself as Hispanic did not violate the Equal Protection Clause because, although strict scrutiny applies to the decision to treat individuals differently on the basis of race or national origin, the definitional contours of New York's classification required only a rational basis. *Id.* at 210. A state's definitions may "appear arbitrary or unfair to persons classified as being within or without the chosen category," but that is insufficient to subject the definitions themselves to heightened scrutiny. *Id.*

"Gender-based distinctions are less likely to create the analytical and practical[]problems present in preferential programs premised on racial or ethnic criteria," so there is no reason not to apply rational-basis review to Tennessee's definition of gender as sex as identified at birth. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 302-03 (1978) (op. of Powell, J.). After all, "[w]ith respect to gender," using this traditional equivalence of "gender" and "sex," "there are only two possible classifications." *Id.* at 303.[7]

### 2. The statutory definition satisfies rational-basis review.

---

[7] Plaintiff has identified no animus against either sex or transgender individuals on the face of the statute. And the Supreme Court "has long disfavored arguments based on alleged legislative motives." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255-56 (2022).

14

A state law satisfies rational-basis review when it "is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. This is a "relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976). A "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Borman's, Inc. v. Mich. Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir. 1991) (quoting *Baker v. Vanderbilt Univ.*, 616 F. Supp. 330, 331 (M.D. Tenn. 1985)).

Section 49-6-310(a) is rationally related to several legitimate state interests. Indeed, even if intermediate scrutiny applied to this definitional statute, the law serves "important governmental objectives" and employs means "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

*First*, the statute clarifies the meaning of "gender" in Tennessee interscholastic sports by defining "gender" as "sex." The Supreme Court has applied heightened (or intermediate) scrutiny to discrimination "based on sex." (Compl. ¶ 91, ECF 1, PageID #25.) And since the Court began using that standard, it has treated "sex" and "gender" as synonymous. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 202-04 (1976); *Miss. Univ. for Women*, 458 U.S. at 728-31.

The Supreme Court was correct in treating "gender" and "sex" as synonyms: the definition of "gender" at the time of the Equal Protection Clause's ratification in 1868 was "sex." In 1868, the noun "gender" had two non-obsolete definitions: (1) "Sex, male or female"; or (2) "(*Gram.*) A difference in words to express distinction of sex." *Gender*, An American Dictionary of the English

Language (1865).[8]  The non-grammatical form of "gender" thus referred to binary "sex," which itself meant the "distinguishing peculiarity of male or female; the physical difference between male and female; the assemblage of properties or qualities by which male is distinguished from female, or female from male."  *Sex*, An American Dictionary of the English Language (1865).[9]

For most Americans, both "sex" and "gender" continue to refer to the biological binary based on the organization of reproductive systems.  *See, e.g.*, *Gender*, The American Heritage Dictionary (5th ed. 2011) ("Either of the two divisions, designated male and female, by which most organisms are classified on the basis of their reproductive organs and functions; sex."; *Sex*, The American Heritage Dictionary (5th ed. 2011) (same).[10]  As the statute provides, sex is observed at "the time of the student's birth" and "indicated on the student's original birth certificate."  Tenn. Code Ann. § 49-6-310(a).  Even Plaintiff's putative expert Dr. Cyperski does not deny that, "[a]t birth, most people are assigned a sex, typically male or female, based solely on the appearance of their external genitalia."  (Cyperski Dep. 27:13-24.)

Nevertheless, while most Tennesseans continue to use the biologically binary understanding of "sex" and "gender," "[s]ome people maintain that the word *sex* should be

---

[8] *See also Gender*, A Dictionary of the English Language (1860) (providing the non-obsolete definitions of "gender" as (1) "Sex, male or female"; and (2) "(*Gram.*) A distinction made in words, usually by some change of form, to note a difference of sex, or a difference of classification according to some property analogous to that of sex.").

[9] *See also Sex*, A Dictionary of the English Language (1860) ("One of the two divisions of animals, male and female.")  This is not a stereotype; the distinction between males and females was (and still is) the different organization of reproductive systems.  A female is an "individual of the sex among animals which conceives and brings forth young," *Female*, An American Dictionary of the English Language (1865), while a male is an individual of the "sex that begets or procreates young, as distinguished from the female," *Male*, An American Dictionary of the English Language (1865).

[10] *See also Gender*, Fowler's Dictionary of Modern English Usage (4th ed. 2015) ("In the 20th cent., as *sex* came increasingly to mean sexual intercourse, *gender* began to replace it (in early use euphemistically) as the usual word for the biological grouping of males and females.").

16

reserved for reference to the biological aspects of being male or female or to sexual activity, and that the word *gender* should be used only to refer to sociocultural roles." *Gender*, The American Heritage Dictionary (5th ed. 2011).[11] Section 49-6-310(a) resolves any ambiguity about the meaning of gender for purposes of participation in interscholastic sports by adopting the meaning that most Tennesseans use.

We can all agree that it is not a good idea to hide such a significant policy where citizens cannot see it. *Summa Holdings, Inc. v. Comm'r of IRS*, 848 F.3d 779, 781 (6th Cir. 2017). Tennessee has ninety-five counties; students from Bristol to Memphis compete against each other. Without the statute in place, unpublished TSSAA policies failed to provide clarity to Tennesseans. The 2018 TSSAA policy that Plaintiff attached to the Complaint did not require the provision of any notice to other schools. (Compl. Ex. A, ECF 1-1, PageID # 31-33). No one ever made use of the policy—not even Plaintiff, even though the policy was in effect for middle and high school athletics over a year after Plaintiff identified as a boy. (Compl. ¶¶ 61, 76, ECF 1, PageID # 19, 23.). Section 49-6-310(a) remedied that notice problem by clearly defining gender.

*Second*, the Gender in Athletics Law achieves its stated objective of ensuring that boys cannot displace girls in interscholastic athletics—costing girls opportunities to participate, to achieve victory, to be recruited to play college athletics, and to earn scholarships—simply by "claim[ing] a female gender identity." 2021 Tenn. Pub. Acts, ch. 40. If Plaintiff's understanding

---

[11] *See also Sex Discrimination*, Black's Law Dictionary (11th ed. 2019) (defining "sex discrimination" as "[d]iscrimination based on gender" but also noting that "[t]he terminology is gradually shifting" with gender increasingly used to refer "to the psychological and societal aspects of being male or female" while sex "refers specifically to the physical aspects"); *Gender*, Fowler's Dictionary of Modern English Usage (4th ed. 2015) ("Since the 1960s this secondary meaning has come into much more frequent use, especially among feminists to denote 'the state of being male or female as expressed by social or cultural distinctions and differences, rather than biological ones.'"). "In everyday usage," gender remains a synonym for the differences between the sexes. Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Historical Rev. 1346, 1352 (2008).

of gender identity is correct, "there's an infinite number of gender identities," and some individuals have "an inner sense of gender that is consistent with male, female, neither, or both, and that that may fluctuate over time." (Cyperski Depo. 49:24-24, 50:20-22.) That subjective approach to gender leaves school officials with no objective standard to determine what TSSAA-established category to place a nonbinary or gender-fluid student in. If an unscrupulous male student claimed a female gender identity so he could play on a girls' team, a subjective gender-identity approach would not stop him. Rather than equating gender with an infinite variety of fluctuating gender identities, the Gender in Athletics Law provides an immutable, binary, and objective definition of gender as "sex" that prevents boys from displacing girls simply by claiming a female gender identity.

*Third*, the statute achieves other stated objectives by reducing the risk of injury when girls compete against boys and by enabling interscholastic sports to be conducted in a safer manner to promote continued participation and equitable opportunities for all children. 2021 Tenn. Pub. Acts, ch. 40. Sports are safer when athletes know whom they are competing against and have a clearer understanding of injury risks. While injury from physical contact might not be a concern in golf, it is a very important consideration for mitigating risk in contact sports.

TSSAA's wrestling rules are illustrative. TSSAA regulations establish a girls' wrestling division and a general wrestling division that both boys and girls can compete in. Despite the option to wrestle against boys, many girls still choose to wrestle only against other girls. And the biology of sex remains an important consideration in the general wrestling division. As is common in middle and high school wrestling, TSSAA separates wrestlers into different weight categories based on a body measurement process. TSSAA Wrestling Regulations at 4 (Oct. 26, 2021), https://cms-files.tssaa.org/documents/tssaa/2021-22/sports-regulations/202122Wrestling

Regulations.pdf.  TSSAA calculates and establishes "a minimum wrestling weight based on 7% body fat for males and 12% for females" to discourage wrestlers from engaging in unhealthy fasting and binging practices throughout the season.  *Id.*  The result under TSSAA regulations is that a boy will have a higher minimum weight class than a girl with a similar weight at the beginning of the wrestling season.  If a student of the female sex who, like Plaintiff, now identifies as a boy were to be considered a boy for this process, then that student would have to compete in a higher weight class where the student would be less competitive and more susceptible to injury.  Section 49-6-310(a) thus promotes safer competition.

*Fourth*, the statute achieves the State's interest in educating Tennessee students according to what the State views as the correct understanding of "gender" and "sex."  Student-athletes are still students.  And the State retains its obligation to educate them.  From time to time, the General Assembly provides specific instructions for how to educate Tennessee students.  *See, e.g.*, Tenn. Code Ann. § 49-1-308 (urging education about Civil Rights Movement).  Local educational agencies have some flexibility when instructing their students about "sex" and "gender," but interscholastic sports inherently include more than one school and frequently cross county lines.  Because local educational agencies might take different approaches, the General Assembly resolved that the educational message to Tennessee students should be the same one they likely encounter in biology classrooms:  that male and female are immutable binaries identified at birth in recognition of reproductive system differences that are central to sexual reproduction.

The General Assembly's definition of "gender" as "sex" for purposes of participation in public school interscholastic sports is thus government speech, and "the Equal Protection Clause does not apply to government speech."  *Fields v. Speaker of Pa. House of Reps.*, 936 F.3d 142 (3d Cir. 2019); *see also Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 F.3d

686, 698 (6th Cir. 2013).  Equal Protection claims challenging government speech are barred because "it is the very business of government to favor and disfavor points of view," and "a government entity is entitled to say what it wishes and to select the views it wants to express." *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)).  That holds true despite Plaintiff's allegation of animus.  *Id.*[12]

### B.  The statute remains constitutional even if it were more than a definition.

Even if the Gender in Athletics Law required separating boys and girls onto different sports teams, which TSSAA's regulations clearly show is not the case, the statute still would not violate the Equal Protection Clause.  (Compl. ¶ 93, ECF 1, PageID # 25.)

#### 1.  The statute would still treat like students alike.

For starters, the statute would not "treat[] the plaintiff disparately as compared to similarly situated persons."  *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022) (quotation omitted).  "To be 'similarly situated' for purposes of an equal-protection claim, the plaintiff and the comparator must be alike 'in all relevant respects.'"  *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  Students of the male sex and students of the female sex are not "alike in all the

---

[12] Plaintiff, of course, disagrees with the statute's definition of "gender" and wants the State instead to adopt Plaintiff's message that gender equates to gender identity.  But the democratic process, not the Equal Protection Clause, is the method by which we determine the content of government speech.  *See Freedom from Religion Foundation*, 707 F.3d at 698 (rejecting an Equal Protection Clause challenge to government speech where plaintiff wanted the government to express plaintiff's "preferred message").  Indeed, this very Court prohibited the State from forcing its message about gender identity onto bathroom signs in private businesses because the Court viewed gender identity as "a controversial matter of public concern" about which "people do, in fact, genuinely and sharply disagree."  *Bongo Prods., LLC v. Lawrence*, No. 3:21-cv-00490, 2022 WL 1557664, at *18 (M.D. Tenn. May 17, 2022).  What is good for the goose is good for the gander.  If the State cannot require private companies to express the State's preferred message about gender or gender identity, then a private individual cannot force State Defendants to express a private individual's preferred message either.

relevant respects." *Id.* (quotation omitted). The law of the land has always approached the two sexes as biologically distinct, recognizing that "physical differences between men and women are enduring: The two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex . . . is an immutable characteristic determined solely by the accident of birth.").

Since birth, Plaintiff's anatomy has been that of a girl. Plaintiff never denies having the genitalia of a girl, the reproductive system of a girl, and the endocrine system of a girl.[13] Plaintiff has not undergone any surgery to make Plaintiff's body appear more like that of a boy. (Shelley Esquivel Dep. 79:12-15.) And Plaintiff filed suit *before* taking cross-sex hormones (exogenous testosterone). (Compl., ECF 1; Shelley Esquivel Dep. 14:10-15:5.) Plaintiff's body will never naturally produce the normal level of testosterone that boys' bodies would. In every relevant respect for purposes of athletic competition, from bone density to testosterone levels, Plaintiff is not alike in all relevant respects to (biological) boys.

To the extent that Plaintiff's Equal Protection claim is based on transgender status, the Gender in Athletics Law does not treat transgender students differently from anyone else: Everyone's gender is defined as sex. Gender identity, as Plaintiff's putative expert Dr. Cyperski defines the term, is a purely "inner sense." (Cyperski Dep. 49:21-24.)[14] Thus, that inner sense of self that defines gender identity, in Dr. Cyperski's understanding, does not change the physical differences that separate a (biological) boy from a girl who claims to be a boy.

---

[13] To be clear, in case Plaintiff contests the definition of "girl," these include a vagina, uterus, Fallopian tubes, and ovaries.

[14] According to her, not all transgender adolescents are diagnosed with gender dysphoria, and whether her patients receive puberty blockers, cross-sex hormones, or surgery is "individualized" regardless of whether the patient has a gender dysphoria diagnosis. (Cyperski Dep. 184:22-25, 185, 188, 195.)

## 2. The statute would satisfy intermediate scrutiny.

Such a sex-based classification would also satisfy intermediate scrutiny by substantially advancing the important government interests identified above. If anything, such a classification would be even more effective at advancing the second and third interests: protecting athletic opportunities for girls and making interscholastic sports safer for all involved. And, to the extent that the statute impacts locker rooms, restrooms, and the like, then it would substantially advance important privacy interests. Even as the Supreme Court required the Virginia Military Institute to enroll women, it acknowledged that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19. The State (and this Court) must consider the impact of the law on all students, not just Plaintiff.

The substantially-related inquiry does not "require[ ] that the [policy] under consideration . . . be capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001). A "substantial" relation between the policy and the objective will do. *Cf. O'Connor v. Bd. of Educ.*, 449 U.S. 1301, 1306-07 & n.4 (1980) (Stevens, J., in chambers) (noting that, even if the requirement of sex-separated athletic teams "appear[ed] arbitrary in an individual case," the policy's validity depended on its operation "in most of its normal applications"). Even under Plaintiff's definition of gender as gender identity, the Gender in Athletics Law would still classify the vast majority of students correctly. That is all that intermediate scrutiny requires.

Contrary to Plaintiff's assertion that transgender status is a suspect class entitled to heightened scrutiny under the Equal Protection Clause, (Compl. ¶¶ 91-92, ECF 1, PageID #25), "[t]he Supreme Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender."

22

*Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).  Moreover, Plaintiff hasn't established that transgender individuals (1) have "been subjected to discrimination" "[a]s a historical matter," (2) exhibit "immutable" "characteristics that define them as a discrete a group," and (3) are "politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).[15]  Rational-basis review applies to claims based on transgender status, and the law easily satisfies that standard.[16]

## IV.     Plaintiff Fails to Establish a Title IX Claim Against the State Board of Education.

Plaintiff also alleges a Title IX claim against the State Board of Education itself.  But the State Board is entitled to summary judgment as a matter of law because the existence of the Gender in Athletics Law does not mean that the State Board has "on the basis of sex" "excluded" Plaintiff or any other student "from participation in" "any education program or activity receiving Federal financial assistance," "denied" any student "the benefits of" such activity, or otherwise "subjected" any student to "discrimination."  20 U.S.C. § 1681(a).

To start, Title IX prohibits only discrimination "on the basis of sex," not discrimination on the basis of transgender status or gender identity.  Title IX defines sex according to reproductive biology, not gender identity.  "[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'"  *Wis. C. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).  At the time of

---

[15] And Plaintiff cannot satisfy these factors.  Among other reasons, transgender status is not "immutable"; a person's stated gender identity is often fluid and "may fluctuate over time."  Cyperski Deposition at 49:21-24.  There are no set characteristics that unite these "infinite" gender identities.  Cyperski Deposition at 50:20-22.  Further, not every transgender individual will persist in that identity.  Cyperski Deposition at 122:5-10 (identifying an example of a detransitioner).  In addition, Plaintiff cannot establish that transgender individuals are politically powerless given the actions of the current presidential administration.  *See Tennessee*, 2022 WL 2791450, at *2-3.

[16] Ironically, Plaintiff's proposed solution would *require* students to be treated differently on the basis of gender identity.  The U.S. Constitution does not mandate that.

Title IX's enactment in 1972, the ordinary meaning of sex was "[e]ither the male or female division of a species, esp. as differentiated with reference to the reproductive functions." *Sex*, The Random House College Dictionary (rev. ed. 1975).[17]

Section 49-6-310(a) does not violate Title IX by defining a "student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event" as "the student's sex at the time of the student's birth, as indicated on the student's original birth certificate." That immutable, binary definition is exactly what Congress understood sex to mean. Title IX itself describes how an institution may change "from . . . admit[ting] only students of one sex to . . . admit[ting] students of *both* sexes," 20 U.S.C. § 1681(a)(2) (emphasis added), and also refers to "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one sex," *id.* § 1681(a)(6)(B). And Title IX regulations[18] expressly allow institutions to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill," as is the case with golf, "or the activity is a contact sport." 34 C.F.R. § 106.41(b).[19]

---

[17] *See also Sex*, The American Heritage Dictionary of the English Language (1st ed. 1969) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, Webster's New Collegiate Dictionary (8th ed. 1973) ("either of two divisions of organisms distinguished respectively as male or female"); *Sex*, Black's Law Dictionary (5th ed. 1979) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female.").

[18] Title IX regulations "expressly acknowledg[e] physiological differences between the male and female sexes." Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020).

[19] This is not the first attempt to use Title IX to nullify this law. When the current presidential administration attempted, via a putative guidance document, to expand Title IX to include discrimination on the basis of gender identity, the Eastern District of Tennessee preliminarily enjoined the guidance because the guidance unlawfully attempted to "create[] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Tennessee*, 2022 WL 2791450, at *21. The Eastern District of Tennessee expressly identified Tenn. Code

Acknowledging sex differences does not equate to sex discrimination. The text of Title IX repeatedly allows institutions to distinguish between the two sexes. The purpose of Title IX was to increase opportunities for women and girls in education, not to eliminate societal recognition of biological distinctions between boys and girls. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 523-25 (1982) (also using "gender" and "sex" as synonyms). The text of Title IX makes that clear. For example, 20 U.S.C. § 1686 states that "nothing contained herein [in Title IX] shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." Senator Bayh, the chief Senate sponsor of Title IX, added that provision to clarify that institutions may "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5,807 (1972). Plaintiff's construction of Title IX—that the State and schools cannot define gender as (biological) sex or separate students based on (biological) sex—runs headlong into 20 U.S.C. § 1686. *Cf. Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Plaintiff does not allege that the State Board is treating one sex worse than the other, and thus the Title IX claim fails.[20]

## CONCLUSION

For the reasons stated, this Court should grant the State Defendants' motion for summary judgment.

---

Ann. § 49-6-310(a) as a provision that comports with the long-accepted meaning of Title IX and existing Title IX regulations but not with such an unlawful attempt to redefine Title IX to include discrimination based on gender identity. *Id.* at *7, *21.

[20] Moreover, even if Title IX's definition of "sex" were unclear, the State Board still would not be liable under Title IX because Congress enacted Title IX under the Spending Clause. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because these contractual attributes inform the scope of Title IX, Tennessee violates federal law only if defining gender as sex *unambiguously violates* Title IX. Tennessee's law does not *unambiguously* violate Title IX.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

CLARK L. HILDABRAND, BPR # 038199
Assistant Solicitor General

/s/ Stephanie Bergmeyer
STEPHANIE BERGMEYER, BPR # 027096
Senior Assistant Attorney General
Office of Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Stephanie.Bergmeyer@ag.tn.gov
(615) 741-6828

*Attorneys for Governor Lee, Commissioner Schwinn, Dr. Morrison, and the individual members of the Tennessee State Board of Education, in their official capacities, and the Tennessee State Board of Education*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this Memorandum of Law has been served through the e-filing system on October 7, 2022, to:

Leslie Cooper
Lisa Nowlin-Sohl
Taylor Brown
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1776 K St. NW, 8th Floor
Washington, DC 20006-5500

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1 West Court Sq., Ste. 105
Decatur, GA 30030-2556

Alan E. Schoenfeld
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St., 45th Floor
New York, NY 10007

Thomas F. Costello-Vega
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Ave., Ste. 2400
Los Angeles, CA 90071

Britany Riley-Swanbeck
Emily L. Stark
Samuel M. Strongin
Jennifer Milici
John W. O'Toole
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006

Matthew D. Benedetto
WILMER & LEE, P.A.
100 Washington St., Ste. 200
Huntsville, AL 35804

Stella Yarbrough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212

David M. Sanders
Senior Deputy Law Director
Knox County, Tennessee
400 W. Main St., Suite 612
City-County Building
Knoxville, TN 37902

Jessica Jernigan-Johnson
LONDON & AMBURN, PLLC
607 Market St., Ste. 900
Knoxville, TN 37902

s/Stephanie Bergmeyer
Stephanie Bergmeyer