IN THE UNITED STATES DISTRICT COURT
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


L.E., by his next friends      )
and parents, SHELLEY           )
ESQUIVEL and MARIO ESQUIVEL    )
                               )
      Plaintiff              )
                               )
vs.                            )      No. 3:21-cv-00835
                               )
BILL LEE, in his official      )
capacity as Governor of the    )
Tennessee, et al.              )
                               )
      Defendants             )


VIDEOTAPED

DEPOSITION

OF

SHELLEY ESQUIVEL

August 1, 2022

---

DONNA D. TOUSEULL, LCR
HOOD & McMASTERS
P. O. Box 894, Seymour, TN 37865-0894
Telephone:  865-577-5181


VIDEOGRAPHER:  Ernie Tracy, Tracy Imaging

APPEARANCES:

     MS. SASHA BUCHERT

     MS. LI NOWLIN-SOHL

     MS. BRITANY RILEY-SWANBACK

     Attorneys for Plaintiff

     L.E. by his next friends and

     parents, Shelley and Mario Esquivel

     MS. STEPHANIE BERGMEYER

     MR. TRAVIS ROYER

     MR. CLARK HILDABRAND (via Zoom)

     Attorneys for Defendants

     Governor Bill Lee, et al.

     MS. JESSICA JOHNSON

     MS. AMANDA MORSE

     MR. DAVID SANDERS (via Zoom)

     Attorneys for Defendants

     Knox County Board of Education, et al.

INDEX

WITNESS                                        PAGE

SHELLEY ESQUIVEL

        Examination by Ms. Bergmeyer.............4

        Examination by Ms. Johnson..............70

        Examination by Ms. Bergmeyer............73

        Examination by Ms. Nowlin-Sohl..........76

        Examination by Ms. Bergmeyer............81

INDEX OF EXHIBITS

NO.                 DESCRIPTION              PAGE

  1     Plaintiff's Responses to Defendant.......41

        Knox County Board of Education's First

        Set of Interrogatories

  2     Plaintiff's Responses to Defendants......53

        Penny Schwinn, Sara Heyburn Morrison and

        the Tennessee State Board of Education's

        Second Set of Interrogatories

  3     (Collective)  Social Media Posts.........66

        Beginning November 4th of 2021 through

        April 26th

  4     (Late-Filed)  Golf Digest Article........66

  5     Email Chain dated March 4, 2021 from.....73

        Ms. Esquivel to Mr. Bartlett

1        The videotaped deposition of SHELLEY ESQUIVEL,

2    taken pursuant to notice for any and all purposes

3    allowable under the Federal Rules of Civil Procedure

4    before DONNA D. TOUSEULL, Licensed Court Reporter in the

5    State of Tennessee, on the 1st day of August 2022 at the

6    Knox County Law Office, Suite 612, City-County Building,

7    400 W. Main Street, Knoxville, Tennessee.

8        It is agreed that the reporter may swear the

9    witness, take the deposition stenographically, and

10    afterwards reduce the same to typewritten form when the

11    completed deposition may be used in the above-styled

12    cause.

13        All objections except as to the form of the

14    question are reserved until the time of hearing.  All

15    formalities are expressly waived as to caption,

16    certificate, transmission, and the reading and signing of

17    the deposition by the witness.

18                THE VIDEOGRAPHER:  Okay.  We're on the

19           record.  The time on the camera is 1:28 p.m.  You

20           may swear the witness.

21                SHELLEY ESQUIVEL,

22           having been first duly sworn, was examined and

23           testified as follows:

24                EXAMINATION

25    BY MS. BERGMEYER:

1    you knew a resource for you when you were deciding the

2    proper response to L.E.?

3          A      She was more of an acquaintance of ours,

4    so I don't -- I don't believe that we ever really talked

5    about L.E. transitioning.

6          Q      And so did you take L.E. to the

7    pediatrician on or around that time?

8          A      Yes, early on in 2020.

9          Q      What was the pediatrician's advice?

10          A      She -- so I did research on my own, and I

11    knew that there was such a thing as puberty blockers, and

12    so in my discussion with her, I mentioned that being a way

13    to kind of pause things, you know, pause puberty while

14    L.E., you know, figures things out with his gender, and

15    she at the time did not know that there were doctors in

16    our area who would provide that treatment to children

17    under 18.

18               So she had more of a kind of wait-and-see

19    approach, meaning wait to see if this is a phase or if

20    it's not, and then to proceed with hormone treatment or

21    whatever the next step was after the age of 18.  She has

22    since apologized because she was very much so uninformed

23    that care is indeed being treated to kids who are younger

24    than 18.

25          Q      So the pediatrician's advice in early

1   2020 was to wait and see.

2                    MS. NOWLIN-SOHL:  Object to form.

3          A       It was -- well, it was either to wait and

4   see or to potentially travel out of state to receive

5   treatment because, again, she wasn't aware of anybody

6   nearby who would provide treatment to children under the

7   age of 18.

8          Q       And why -- did she tell you why providers

9   may not provide treatment to a child under the age of 18

10  for puberty blockers?

11         A       No, she didn't tell me why.  She just

12  said that that was the practice as she was aware of it

13  even though, again, it was not accurate.

14         Q       Did you get a second opinion?

15         A       Actually, I've -- I learned that there --

16  Children's in Knoxville does indeed provide care to

17  children under the age of 18.  So I reached back out to

18  her.  She's been L.E.'s pediatrician since the day my kids

19  were born.

20                   So I reached back out to her, and then

21  when she followed up with -- with the clinic herself is

22  when she realized she had made a mistake and that the

23  information she had provided was incorrect.  So at that

24  point she was very -- she was very happy to be able to

25  provide a referral so that L.E. could see an

1    Q    Sure.  Was there anything else you

2 observed or other knowledge you have that made you think

3 L.E. being a boy was not a phase?

4    A    He would consistently say things like he

5 wished he were born a boy, he doesn't want to develop

6 breasts, absolutely no desire to have children, he wants a

7 deeper voice.  In my -- in -- in my opinion, phases don't

8 last for as long as what these kinds of feelings that he

9 conveyed to me lasted.

10    Q    So you mentioned testosterone therapy.

11 Has that been discussed with Dr. Eatajoo?

12    A    Yes.

13    Q    Okay.  And is there a plan for L.E. to

14 begin testosterone therapy?

15    A    Yes.

16    Q    And what is the plan?

17    A    The plan is for him to meet with the

18 endocrinologist again in October, and there is something

19 that Children's has put together.  It's called a gender

20 clinic, so where other kids -- actually, I really don't --

21 to be honest with you, I don't know all that it entails,

22 but it's something that where they work through with, I

23 guess, talking about the side effects and things like that

24 of testosterone.

25         And then originally the plan was for him

1    to begin testosterone at 16, but the endocrinologist feels

2    comfortable, given that he wants to begin sooner so that

3    he can continue puberty, that around -- at some point

4    after October, so I think 15 and a half is kind of what

5    I'm hearing, which would put us into December, January.

6              Q        Has L.E. expressed any hesitation at

7    receiving testosterone therapy?

8              A        Not at all.

9              MS. NOWLIN-SOHL:  Object to the form.

10             Q        What has L.E. said about receiving

11   testosterone therapy?

12             A        He says that he can't wait, he wants to

13   make sure that breast development doesn't occur, he wants

14   a deeper voice, he wants to have body hair, he wants to go

15   into puberty again so he can begin to get taller.  So he's

16   overall conveyed that he's excited to begin testosterone

17   treatment.

18             Q        If L.E. wanted to play a club sport, golf

19   in  a club sport, would you have the financial means to

20   afford that?

21             MS. NOWLIN-SOHL:  Object to form.

22             A        It depends.  I don't know how much that

23   would cost.

24             Q        Have you looked into leagues, or club

25   sports, or other avenues for L.E. to play golf outside of

1  playing on the eighth-grade girls' team.  He was very

2  adamant that he wanted to try out for the boys' team in

3  high school, and at that time he still would have been

4  allowed to since the law had not been passed, so that was

5  his plan for moving forward into high school.

6          Q       When was the middle-school golf team?

7  What season did they play?

8          A       I believe they were a fall sport with

9  tryouts in the summer, so, yeah.

10         Q       Did you research when the Farragut High

11 School boys' golf team tryouts were for L.E.'s freshman

12 year?

13         A       We did not because at that time the law

14 had already passed that prohibited him from playing on the

15 boys' golf team.  I believe they were held around the same

16 time as the girls, but I couldn't be certain.

17         Q       Do you know when the law -- when you say

18 the law, what law are you referring to?

19         A       SB228 I believe is the number of it, the

20 one that requires students in middle school and in high

21 school to play on the team that corresponds with the sex

22 on their birth certificate.

23         Q       Do you recall when that was passed,

24 Senate Bill 228?

25         A       I believe it was in March of 2021.

1    he was being discriminated against, and I knew that we

2    couldn't be the only ones in this situation, and so

3    together our whole family decided that we wanted to work

4    to try to make things different.

5        Q    L.E. has not tried out for the Farragut

6    High School golf team whether it is the boys' team or the

7    girls' team; is that correct?

8        A    Yes, that's correct.

9        Q    Have you ever spoken to the Farragut High

10   School golf coach about L.E.?

11       A    No, not directly.

12       Q    What do you mean not directly?  Who did

13   you speak to L.E. about playing high-school golf?

14       MS. NOWLIN-SOHL:  Object to form.

15       A    I talked to -- I had emailed the

16   principal introducing L.E. and letting him know that L.E.

17   wanted to try out for the boys' golf team.  That was

18   before the law had passed.

19       Q    After this lawsuit was filed in November

20   of 2021, an attorney from Knox County raised the idea of

21   L.E. trying out for the golf team.  Were you made aware of

22   that offer?

23       A    Yes, I was.

24       Q    Okay.  And the offer was denied; is that

25   correct?

1        A       Yes, we denied the offer.

2        Q       Okay.  Why?

3        A       Because he wouldn't be able to play on
the team.  The tryouts were -- would be pretty much
meaningless.

6        Q       I would like for you to find the
Plaintiff's Responses to Defendant Knox County Board of
Education's First Set of Interrogatories.  Have you seen
the Plaintiff's Responses to Knox County Board of
Education's Interrogatories before?

11       A       Yes, I have.

12      Q      Okay.  If you'll turn to Page 5, please,
and look at Interrogatory Number 2.  Interrogatory Number
2 states, "Identify your 2021 handicap index and the
course handicap as well as your current handicap index and
course handicap."  Did I read that correctly?

17       A       Yes.

18      Q      Okay.  Do you know what a handicap index
is?

20      A       I have a vague understanding of it.

21      Q      Okay.  What's your understanding?

22      A       That's it's a way to rank your
performance in the game of golf.

24      Q      And do you know what a course handicap
is?

1  sound familiar?

2          A        It does.  I've never taken him there, so

3  -- his dad might have.

4          Q        Do you ever go with L.E. and his father

5  when they golf?

6          A        No, I don't.

7          Q        Do you have any reason to disagree with

8  the information provided in Interrogatory Number 3, the

9  plaintiff did not track or record L.E.'s score when he

10  played golf?

11         A        That is my understanding that they don't

12  take score.

13         Q        For Interrogatories Number 5 and 6 which

14  reference L.E. playing golf, would Mr. Esquivel be the

15  correct person to discuss those interrogatories with?

16                  MS. NOWLIN-SOHL:  Object to form.

17         A        Yes, he would be.

18         Q        Would you have provided any of the

19  information in the response to Interrogatory Number 5 or

20  6?

21         A        No.

22         Q        And do you have any information or any

23  reason to disagree with the information provided by either

24  L.E. or your husband for these interrogatories?

25         A        No, I have no reason to disagree.

1            A        Yes.

2            Q        And for you, what are some of those

3     milestones?

4            A        So him identifying as a male and using

5     male pronouns with his peers and with his teachers.

6     There's him getting a puberty blocker, name change,

7     getting his name officially named legally to a more

8     typical male name.

9            Q        Was the gender dysphoria diagnosis a

10    milestone?

11           A        I would say that was, yeah.  Yeah.

12           Q        And so what are some of the future

13    milestones that you anticipate for L.E.'s transition?

14           A        Beginning testosterone treatment,

15    possibly surgeries, if he so chooses to do that later on.

16    I don't know.  That's all that I can think of.  There

17    might be more that we just haven't encountered yet.

18           Q        Okay.  And all of those things you just

19    mentioned, the blocker, the name change, coming out, using

20    a new name with his peers, are those all part of his

21    transition?

22           A        Yes.

23                    MS. BERGMEYER:  Object to form.

24                    THE WITNESS:  Yes.

25           Q        Okay.  And remind me when L.E. first

1                    FURTHER THE DEPONENT SAITH NOT.

2                          SHELLEY ESQUIVEL

3

4

5

6        Sworn to before me when

7        taken August 1, 2022.

8

9

10       /s/ Donna D. Touseull

11             Donna D. Touseull

12          Licensed Court Reporter

13       LCR No. 342 / License Expires:  06-30-2024

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

STATE OF TENNESSEE )

COUNTY OF KNOX )

      I, DONNA D. TOUSEULL, Licensed Court Reporter in and the State of Tennessee, do hereby certify that I reported in machine shorthand the foregoing testimony held on the 1st day of August 2022 and that the foregoing 82 pages were transcribed by me and constitute a true record of the proceedings to the best of my knowledge and ability.

      I further certify that I am not an attorney or counsel for any of the parties, nor an employee or relative of anyone connected with the action, nor financially interested in the action.

      I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this 20th day of August 2022.


/s/ Donna D. Touseull
_____
        DONNA D. TOUSEULL
      Licensed Court Reporter
LCR No. 342 / License Expires: 06-30-2024

L.E., by his next friends and
parents, SHELLEY ESQUIVEL
and MARIO ESQUIVEL,

                *Plaintiff*,

        v.

BILL LEE, in his official capacity
as Governor of Tennessee, *et al.*,

                *Defendants*.

Case No. 3:21-cv-00835

## PLAINTIFF'S RESPONSES TO DEFENDANT KNOX COUNTY BOARD OF EDUCATION'S FIRST SET OF INTERROGATORIES

Plaintiff, by and through his attorneys, and pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and the Local Rules of this Court, responds and objects to Defendant Knox County Board of Education's ("Defendant") First Set of Interrogatories, Requests for Admissions, and Requests for Production of Documents and Things as follows:

### GENERAL RESPONSES

1. Plaintiff's investigation and development of all facts and circumstances relating to this action is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

2. By making the accompanying responses and objections to Defendant's requests for documents and interrogatories, Plaintiff does not waive, and hereby expressly reserves, his right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency,

EXHIBIT

relevancy, materiality, and privilege. Further, Plaintiff makes the responses and objections herein without in any way implying that he considers the requests and interrogatory, and responses to the requests and interrogatory, to be relevant or material to the subject matter of this action.

3. To the extent responsive documents exist, Plaintiff will produce responsive documents only to the extent that such documents are in his possession, custody, or control, as set forth in the Federal Rules of Civil Procedure. Plaintiff's possession, custody, or control does not include any constructive possession that may be conferred by Plaintiff's right or power to compel the production of documents or information from third parties.

4. A response to a document request or interrogatory stating objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents; that Plaintiff performed any of the acts described in the document request, interrogatory, or definitions and/or instructions applicable to the document request or interrogatory; or that Plaintiff acquiesces in the characterization of the conduct or activities contained in the document request, interrogatory, or definitions and/or instructions applicable to the document request or interrogatory.

5. Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

6. Publicly available documents including, but not limited to, newspaper clippings, court papers, and documents available on the Internet, will not be produced.

2

## GENERAL OBJECTIONS

1. Plaintiff objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each interrogatory that is overly broad, vague, unduly burdensome, or seeks information beyond the scope of discovery and disproportionate to the needs of the case.

3. Plaintiff objects to each interrogatory that seeks information that is in the possession of, known to, or otherwise equally available to Defendant.

4. Plaintiff objects to each interrogatory to the extent that it seeks information and/or documents duplicative of information and/or documents already produced to Defendant in the course of this litigation or produced in response to Defendant's First Set of Requests for Admissions or First Set of Requests for Production of Documents.

5. Plaintiff objects to each interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

6. Plaintiff incorporates by reference every general objection set forth above into each specific interrogatory response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive his right to amend his responses.

3

2. "Identify your 2021 Handicap Index and Course Handicap as well as your current Handicap Index and Course Handicap."

**Plaintiff's Response to Interrogatory No. 2:**

Plaintiff objects to the terms "Handicap Index" and "Course Handicap" as vague and overbroad, as those terms are undefined in Defendant's Requests. Plaintiff therefore adopts reasonable interpretations of those terms in this response. Plaintiff also objects that this interrogatory is beyond the scope of and irrelevant to this matter, and unduly burdensome. Subject to Plaintiff's objections, Plaintiff responds that he has not calculated and does not have a Handicap Index or Course Handicap for 2021 or 2022.

3. "Identify the date and location of the last ten (10) rounds of golf that you have played and your score for each round."

**Plaintiff's Response to Interrogatory No. 3:**

Plaintiff objects to the term "rounds of golf" as vague, as that term is undefined in Defendant's Requests. Plaintiff therefore adopts a reasonable interpretation of that term in this response to mean the activity of playing 18 holes of golf. Plaintiff also objects that this interrogatory is beyond the scope of and irrelevant to this matter, and unduly burdensome.

Subject to Plaintiff's objections, the following are the ten most recent "rounds of golf" that Plaintiff has played:

- May 7, 2022, at Knoxville Municipal Golf Course. Plaintiff did not track or record the score.
- November 13, 2021, at Knoxville Municipal Golf Course. Plaintiff did not track or record the score.
- September 23, 2021, at Centennial Golf Course. Plaintiff did not track or record the score.
- July 31, 2021, at Williams Creek Golf Course. Plaintiff did not track or record the score.

5

- July 13, 2021, at Centennial Golf Course. Plaintiff did not track or record the score.

4. "Identify the date and location of each golf round that you played in 2021 and your score for each round."

**Plaintiff's Response to Interrogatory No. 4:**

Plaintiff objects to the term "golf round" as vague, as that term is undefined in Defendant's Requests. Plaintiff therefore adopts a reasonable interpretation of that term in this response to mean the activity of playing 18 holes of golf. Plaintiff also objects that this interrogatory is beyond the scope of and irrelevant to this matter, and unduly burdensome.

Subject to Plaintiff's objections, see the above response to Interrogatory No. 3.

5. "Identify the tee box that you played from in 2021."

**Plaintiff's Response to Interrogatory No. 5:**

Plaintiff objects to the term "tee box" as vague, as that term is undefined in Defendant's Requests. Plaintiff therefore adopts a reasonable interpretation of the term in this response. Plaintiff objects to the entire interrogatory as vague and overbroad, as Plaintiff's understanding of the term "tee box" is the area where a game of golf begins. The interrogatory, as constructed, requests identification of a singular "tee box" and as Plaintiff participated in numerous golf sessions in the year 2021, it is unclear to Plaintiff which golf session and tee box the interrogatory is seeking identification of. Plaintiff also objects that this interrogatory is beyond the scope of and irrelevant to this matter.

Subject to Plaintiff's objections, Plaintiff played from the white tee box and, when playing with his middle school team, from the brown tee box, per league rules.

6

Subject to Plaintiff's objections, Plaintiff states that he was discriminated against by

Defendants by being denied the opportunity to participate in the boys' golf team.

Respectfully submitted,

Dated: July 13, 2022

/s/ Stella Yarbrough
Stella Yarbrough (No. 33637)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
syarbrough@aclu-tn.org

/s/ Leslie Cooper
Leslie Cooper (*pro hac vice*)
L. Nowlin-Sohl (*pro hac vice*)
Taylor Brown (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lcooper@aclu.org
lnowlin-sohl@aclu.org
tbrown@aclu.org

/s/ Tara L. Borelli
Tara L. Borelli (*pro hac vice*)
Carl S. Charles (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
    FUND INC.
1 West Court Square, Suite 105
Decatur, GA 30030-2556
Tel: (404) 897-1880
Fax: (404) 506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Sasha Buchert (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
    FUND INC.

/s/ Alan Schoenfeld
Alan Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street, 45th Floor
New York, NY 10007
Tel: (212) 937-7294
alan.schoenfeld@wilmerhale.com

Matthew D. Benedetto (*pro hac vice*)
Thomas F. Costello-Vega (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Tel: (213) 443-5300
matthew.benedetto@wilmerhale.com
thomas.costello@wilmerhale.com

Emily L. Stark (*pro hac vice*)
Samuel M. Strongin (*pro hac vice*)
Britany Riley-Swanbeck (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel: (202) 663-6000

13

1776 K Street NW, 8th Floor
Washington, DC 20006-5500
Tel: (202) 804-6245
sbuchert@lambdalegal.org

emily.stark@wilmerhale.com
samuel.strongin@wilmerhale.com
britany.riley-swanbeck@wilmerhale.com

*Attorneys for Plaintiff L.E., by his next friends and parents, Shelley Esquivel and Mario Esquivel*

14