# L.E.

## vs

## LEE, et al.

---

# MELISSA CYPERSKI, PH.D.

# August 10, 2022

---



**Deborah H. Honeycutt, LCR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION
     _____
 3
     L.E., by his next friends and
 4   parents, SHELLEY ESQUIVEL and
     MARIO ESQUIVEL,
 5
                 Plaintiff,
 6
     vs.                            No.: 3:21-cv-00835
 7
     BILL LEE, in his official
 8   capacity as Governor of       Chief Judge Crenshaw
     Tennessee, et al.,
 9                                  Magistrate Judge
     KNOX COUNTY BOARD OF           Newbern
10   EDUCATION a/k/a KNOX COUNTY
     SCHOOL DISTRICT; ROBERT M.
11   "BOB" THOMAS, in his official
     capacity as Director of Knox
12   County Schools,
13              Defendants.
     _____
14   _____

15

16           Videoconference Deposition of:

17           MELISSA A. CYPERSKI, Ph.D.

18           Taken on behalf of the Defendants
             August 10, 2022
19
             Commencing at 9:37 a.m.
20

21   _____

22   _____

23           Elite-Brentwood Reporting Services
              www.elitereportingservices.com
24      Deborah H. Honeycutt, LCR, Associate Reporter
                    P.O. Box 292382
25                 Nashville, TN 37229
                    (615)595-0073
```

```
 1

 2                A  P  P  E  A  R  A  N  C  E  S

 3

 4   For the Plaintiff:

 5              MS. TAYLOR BROWN
               Attorney at Law
 6              American Civil Liberties Union Foundation
               125 Broad Street
 7              New York, NY  10004
               (212)549-2500
 8              stbrown@aclu.org

 9

10              MR. LUCAS CAMERON VAUGHN
               Attorney at Law
11              American Civil Liberties Union
               Foundation of Tennessee
12              P.O. Box 120160
               Nashville, TN  37212
13              syarborough@aclu-tn.org

14

15              MS. TARA L. BORELLI
               Attorney at Law
16              Lambda Legal
               Southern Regional Office
17              1 West Court Square, Suite 105
               Decatur, GA  30030
18              (404)897-1880 Ext. 6224
               tborelli@lambdalegal.org
19

20              MS. BRITANY RILEY-SWANBECK
21              Attorney at Law
               Wilmer Hale
22              1875 Pennsylvania Ave. NW
               Washington, DC  20006
23              (202)663-6137
               britanyriley-swanbeck@wilmerhale.com
24

25
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 3 of 293 PageID #: 1660

```
 1

 2    For the Defendants/Governor Lee, Commissioner
      Schwinn, Dr. Morrison, and the individual members of
 3    the Tennessee State Board of Education, in their
      official capacities, and the Tennessee State Board
 4    of Education:

 5              MS. STEPHANIE A. BERGMEYER
                MR. CLARK HILDABRAND
 6              MR. TRAVIS ROYER
                Attorneys at Law
 7              P.O. BOX 20207
                Nashville, TN  37202-0207
 8              (615)741-6828
                stephanie.bergmeyer@ag.tn.gov
 9              clark.hildabrand@ag.tn.gov
                travis.royer@ag.tn.gov
10

11
      For the Defendants/Knox County Board of
12    Education/a/k/a Knox County School District; Robert
      M. "Bob" Thomas, in his official capacity as
13    Director of Knox County Schools:

14              MR. DAVID M. SANDERS
                MS. JESSICA JERNIGAN-JOHNSON
15              Attorneys at Law
                Senior Deputy Law Director
16              Knox County, Tennessee
                400 W. Main Street, Suite 612
17              City-County Building
                Knoxville, TN  37902
18              (865)637-3900
                david.sanders@knoxcounty.org
19              jessica.johnson@knoxcounty.org

20

21

22

23

24

25
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 4 of 293 PageID #: 1661

                    I  N  D  E  X

                                              Page

Examination
By Mr. Hildabrand                              8


                E  X  H  I  B  I  T  S

                                              Page

Exhibit No. 1                                  11
      Expert Report of Dr. Melissa A. Cyperski

Exhibit No. 2                                  55
      Hembree Article, Endocrine Treatment of
      Gender-Dysphoric/Gender-Incongruent
      Persons: An Endocrine Society* Clinical
      Practice Guideline, Page 3869 through
      3903

Exhibit No. 3                                  91
      Docs C, D, E, Feb. 2017 Presentation 1,
      2, and 3, Collective

Exhibit No. 4                                  92
      Presentation,
      https:\\www.YouTube.com\watch?v=322u6en50
      d8, Late-filed

Exhibit No. 5                                  103
      Presentation,
      https:\\www.YouTube.com\watch?v=HvLYai7qq
      0A, late-filed

Exhibit No. 6                                  125
      Individuals Treated for Gender Dysphoria
      with Medical and/or Surgical Transition
      Who Subsequently Detransitioned: A Survey
      of 100 Detransitioners, Lisa Littman

Exhibit No. 7                                  125
      Examining Executive Functioning Deficits
      in Juvenile Delinquents with a History of
      Trauma Exposure by Melissa A. Cyperski

E X H I B I T S

Page

Exhibit No. 8                                           130
    Supporting Transgender/Gender Diverse
    Youth Across Settings and Systems of
    Care: Experiences From a Pediatric
    Interdisciplinary Clinic Article

Exhibit No. 9                                           166
    Obtaining Access to Your Child's My
    Health Account

Exhibit No. 10                                          168
    Vanderbilt University Medical Center
    Parental Access to the My Health at
    Vanderbilt (MHAV) Account of a Teen 13-17
    Years Old

Exhibit No. 11                                          181
    Ensuring Comprehensive Care and Support
    for Transgender and Gender-Diverse
    Children and Adolescents by Jason
    Rafferty, MD, MPH, EdM, FAAP

Exhibit No. 12                                          200
    Guidelines for Psychological Practice
    With Transgender and Gender Nonconforming
    People, American Psychological
    Association

Exhibit No. 13                                          217
    AMA March 26, 2021: State Advocacy Update

Exhibit No. 14                                          225
    AACAP Statement Responding to Efforts to
    Ban Evidence-Based Care for Transgender
    and Gender Diverse Youth, November 8,
    2019

Exhibit No. 15                                          250
    WPATH Standards of Care for the Health of
    Transsexual, Transgender, and Gender
    Nonconforming People, 7th Version

Exhibit No. 16                                          253
    AAP News Risk of pseudotumor cerebri
    added to labeling for
    gonadotropin-releasing hormone agonists

```
 1

 2                S T I P U L A T I O N S

 3

 4          The videoconference deposition of

 5    MELISSA A. CYPERSKI, Ph.D. was taken by counsel for

 6    the Defendants, by Notice, with all participants

 7    appearing at their respective locations, on

 8    August 10, 2022, for all purposes under the

 9    Tennessee Rules of Civil Procedure.

10          All objections, except as to the form of

11    the question, are reserved to the hearing, and said

12    deposition may be read and used in evidence in said

13    cause of action in any trial thereon or any

14    proceeding herein.

15          It is agreed that Deborah H. Honeycutt,

16    Notary Public and Licensed Court Reporter for the

17    State of Tennessee, may swear the witness remotely,

18    and that the reading and signing of the completed

19    deposition by the witness is not waived.

20

21

22

23

24

25
```

```
 1                      *    *    *

 2

 3              THE REPORTER:  Good morning.  My name is

 4     Deborah Honeycutt.  I am a stenographic reporter

 5     with Elite-Brentwood Reporting Services.  My license

 6     number is 472.

 7                   Today's date is August 10, 2022, and the

 8     time is approximately 9:37 a.m. Central time.

 9                   This is the deposition of Melissa A.

10     Cyperski, Ph.D. in the matter of L.E. by his next

11     friends and parents, Shelley Esquivel and Mario

12     Esquivel vs. Bill Lee, Governor of Tennessee, et

13     al., filed in the United States District Court for

14     the Middle District of Tennessee, Nashville

15     Division.  The Case Number is 3:21-cv-00835.  This

16     deposition is being taken by videoconference, and

17     the oath will be administered remotely by me.

18                   At this time, I'll ask counsel to

19     identify yourselves and state whom you represent.

20     If you have any objections with the procedures I've

21     outlined, please state so when you introduce

22     yourself.  We will start with the noticing attorney.

23                   MR. HILDABRAND:  This is Clark

24     Hildabrand.  I am representing the State Defendants

25     in this case, along with Travis Royer is here right
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 8 of 293 PageID #: 1665

```
 1   now, and Stephanie Bergmeyer will be joining later
 2   in the deposition.
 3              MS. BROWN:  Again, Taylor Brown from the
 4   American Civil Liberties Union for Plaintiff.
 5              MS. BORELLI:  This is Tara Borelli with
 6   Lambda Legal for the plaintiff.
 7              MS. BROWN:  We also have with us Cameron
 8   Vaughn for Plaintiff from the ACLU of Tennessee.
 9   And then we also have -- Britany, do you want to
10   introduce yourself?
11              MS. RILEY-SWANBECK:  Yes.  This is
12   Britany Riley-Swanbeck from Wilmer Hale.
13              MR. SANDERS:  And this is David Sanders
14   representing Knox County Board of Ed. and Dr. Jon
15   Rysewyk.
16
17                       *    *    *
18              MELISSA A. CYPERSKI, Ph.D.,
19   was called as a witness, and after having been duly
20   sworn, testified as follows:
21
22                       EXAMINATION
23   QUESTIONS BY MR. HILDABRAND:
24   Q.    All right.  Thank you for coming to testify
25   today.  As we just said, my name is Clark
```

1  Hildabrand.  I'm one of the attorneys for the State

2  of Tennessee.  Just for the record, could you say

3  and spell your last name?

4  A.     Good morning.  My name is Melissa Cyperski.

5  C-Y-P-E-R-S-K-I.

6  Q.     Thank you.  Before we get underway, I just

7  want to lay out some ground rules.  If I cut you off

8  too early, just let me know and I'll let you finish

9  your answer.  Similarly, just try to let me finish

10 my answer as well -- sorry -- finish my question as

11 well before you answer.  The attorneys there would

12 also appreciate if you give them a second to give

13 them a chance to object if they need to.  But unless

14 they instruct you not to answer because of

15 attorney-client privilege, after they object you

16 should answer the question.  Is that good with you?

17 A.     Yes.

18 Q.     And since we're trying to create a clear

19 transcript, I'd appreciate it if you could answer

20 with a clear verbal response rather than just

21 shaking your head yes or no like we do in a

22 conversation if we were just having conversation

23 back and forth.  Does that make sense?

24 A.     Yes.

25 Q.     And unless you tell me you don't understand

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 10 of 293 PageID #: 1667

1  the question, is it fair to assume you understood
2  the question and answered to the best of your
3  ability?
4  A.     Yes.
5  Q.     If you need to take a break at any point, let
6  us know.  We'll try to take breaks every once in a
7  while, maybe once an hour, and also break for lunch
8  at some point.
9         And just to establish the validity of the
10 deposition, there's no reason you would be impaired
11 today or unable to give truthful testimony, such as
12 for taking medication or something like that?
13 A.     There is not.
14 Q.     Thank you.  Did you review anything to
15 refresh your recollection in preparation for this
16 deposition?
17 A.     I reviewed my report.
18 Q.     Anything else?
19 A.     Not that I recall.
20 Q.     Did you have discussions with anyone in
21 preparation for today's deposition?
22 A.     I had discussions with counsel.
23 Q.     When were those discussions?
24 A.     Over the past week we met on several
25 occasions.

```
 1   Q.     Thank you.  And you cited in the report every

 2   authority that you relied upon in drafting your

 3   report, correct?

 4   A.     Yes.

 5             MR. HILDABRAND:  So I'll start by

 6   entering what we have as Doc A.  We'll have this as

 7   Exhibit 1.

 8             Travis, can you circulate that around.

 9   You should see in chat there's a Document A,

10   Cyperski report.  We're going to enter that as

11   Exhibit 1.

12             (WHEREUPON, a document was marked as

13   Exhibit Number 1.)

14   BY MR. HILDABRAND:

15   Q.     Thank you.  Dr. Cyperski, can you see that

16   document?

17   A.     Yes, I can.

18   Q.     Is this your expert report?

19   A.     Yes.

20   Q.     Thank you.  So we're going to look at this a

21   little bit.  On page one, paragraph three, do you

22   see where that is?

23   A.     Yes.

24   Q.     So here do you say that you reviewed the text

25   of Senate Bill 228 at issue in this matter?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 12 of 293 PageID #: 1669

```
 1   A.    Yes.
 2   Q.    Just to confirm, you are not an attorney,
 3   correct?
 4   A.    That is correct.
 5   Q.    So you're not offering an expert legal
 6   opinion on the meaning of the law, correct?
 7   A.    That is correct.
 8   Q.    Later in paragraph three you say that you
 9   relied on professional guidelines and scientific
10   literature in the pertinent fields.  Is the
11   pertinent field for you psychology?
12   A.    Yes.
13   Q.    And you are testifying as an offered expert
14   in psychology; is that correct?
15              MS. BROWN:  Objection.
16              THE WITNESS:  So my expert report is
17   around gender identity and including the guidelines.
18   And considering gender dysphoria my expertise is as
19   a mental health professional and psychologist.
20   BY MR. HILDABRAND:
21   Q.    A medical professional and psychologist.  Can
22   you be more specific?  What as a medical
23   professional?  Are you a psychiatrist?
24   A.    I am sorry.  I believe I said a mental health
25   professional --
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 13 of 293 PageID #: 1670

```
 1   Q.      Okay.
 2   A.      -- in which I am a psychologist.
 3   Q.      So you're not offering an expert opinion in
 4   psychiatry?
 5   A.      That is correct.
 6   Q.      What is the difference between psychology and
 7   psychiatry?
 8   A.      So psychologists tend to rely on more talk
 9   therapy and in reviewing literature and research
10   related to mental health broadly.  Psychiatrists in
11   practice are specifically MDs and focus on
12   prescription of medication to treat psychiatric
13   conditions.
14   Q.      And you mentioned the guidelines.  Are you an
15   expert in the WPATH Standards of Care?
16   A.      I rely on these guidelines in my work.
17   Q.      Thank you.  And would other psychologists
18   look to the most recent WPATH Standards of Care as
19   well?
20              MS. BROWN:  Objection.
21              THE WITNESS:  I'm sorry, can you repeat
22   the question?
23   BY MR. HILDABRAND:
24   Q.      Do psychologists rely upon the WPATH
25   Standards of Care?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 14 of 293 PageID #: 1671

```
 1   A.     At this time, WPATH Standards of Care are
 2   professional guidelines for mental health
 3   professionals and medical professionals that are
 4   specializing in working with individuals from the
 5   transgender community and who experience gender
 6   dysphoria.
 7   Q.     Do you rely upon the most current WPATH
 8   Standards of Care in your practice?
 9   A.     I do.
10   Q.     And you joined WPATH last year, 2021,
11   correct?
12   A.     I believe that's correct, yes.
13   Q.     Let's go to I think it's page 12 in the PDF.
14   Page two in the CV.  Do you see?
15          MS. BROWN:  Sorry.  Clark, if you'll
16   give me one second, we're still scrolling.
17          MR. HILDABRAND:  Of course.  No problem.
18          MS. BROWN:  Okay.  We're on page two.
19   Where would you like her to look?
20   BY MR. HILDABRAND:
21   Q.     Do you see where it says professional
22   organizations?
23   A.     Yes.
24   Q.     Does it list your membership in WPATH?
25   A.     It does.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 15 of 293 PageID #: 1672

```
 1   Q.     When is the start date?

 2   A.     It lists 2021.

 3   Q.     Through present, correct?

 4   A.     Correct.

 5   Q.     Thank you.  So let's take a step back and

 6   talk about your education.  So this is going to be

 7   on page 11 of the PDF, page one of the CV, if y'all

 8   could scroll there.

 9                 MS. BROWN:  Okay.

10   BY MR. HILDABRAND:

11   Q.     Where did you go to college?

12   A.     I attended Danville University, Granville,

13   Ohio.

14   Q.     What did you major in there?

15   A.     I majored in psychology.

16   Q.     And then where did you earn your M.S. degree?

17   A.     I earned my Master's at Auburn University in

18   Auburn, Alabama.

19   Q.     So just curious, working at Vandy, are you

20   more of a War Eagle or a Commodore, or are you

21   really not much a sports person?

22   A.     My heart would be in the Southeastern

23   Conference with Auburn.

24   Q.     Fair enough.  I see here you wrote a thesis

25   at Auburn for your M.S.; is that correct?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 16 of 293 PageID #: 1673

```
 1   A.     That is correct.
 2   Q.     Was that thesis required to earn your M.S.?
 3   A.     Yes.
 4   Q.     Did professors review and approve your
 5   thesis?
 6   A.     Yes.
 7   Q.     Then you received your Ph.D. in clinical
 8   psychology from Auburn as well; is that correct?
 9   A.     That is correct.
10   Q.     What was your thesis on for your Ph.D.?
11   A.     My dissertation for my Ph.D. was looking at
12   the therapeutic alliances across the milieu.  And
13   these would be implications and challenges working
14   with adjudicated adolescent males in residential
15   treatment.
16   Q.     Okay.  Thank you.  During your education at
17   Tennessee University, did you receive education in
18   transgender psychology?
19                MS. BROWN:  Objection to form.
20                THE WITNESS:  So I received my education
21   at Auburn University.
22   BY MR. HILDABRAND:
23   Q.     Yes.  During your undergrad -- while
24   receiving your undergraduate degree, your B.S. in
25   psychology at Denison University, did you receive
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 17 of 293 PageID #: 1674

```
 1    any education there in transgender psychology?
 2              MS. BROWN:  Same objection.
 3              THE WITNESS:  I do not recall the
 4    specifics of my coursework at Denison.  But I do not
 5    recall specifically learning about transgender
 6    psychology.
 7    BY MR. HILDABRAND:
 8    Q.    While receiving your M.S. and Ph.D. at
 9    Auburn, did you receive education in transgender
10    psychology?
11              MS. BROWN:  Objection to form.
12              THE WITNESS:  So in my doctoral study at
13    Auburn University, part of the curriculum, including
14    a semester-long course, was focused on clinical
15    competencies with diverse populations on cultural
16    considerations, which would include professions and
17    content related to the LGBTQ+ community and the
18    transgender community.
19    BY MR. HILDABRAND:
20    Q.    Is what you learned there consistent with
21    your report in this case?
22    A.    So my understanding and professional
23    expertise that was utilized to draft the report has
24    been developed over time, including through
25    continuing education and professional experience
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 18 of 293 PageID #: 1675

```
 1   post-graduation.
 2   Q.      And you received your Ph.D. in 2016; is that
 3   correct?
 4   A.      Yes, that is correct.
 5   Q.      How many years ago was that?
 6   A.      I believe it was seven years ago.
 7   Q.      So 2016 was seven years ago from now?
 8   A.      If my math is correct, yes.
 9   Q.      And while working toward your Ph.D., did you
10   have pre-doctoral internship at Vanderbilt?
11   A.      That is correct.
12   Q.      Did you also have a doctoral fellowship at
13   Vanderbilt University Medical Center?
14   A.      Yes.
15   Q.      And that's where you work today, correct?
16   A.      Correct.
17   Q.      Thank you.  I know some of these questions
18   are basic but we just have to get out of the way.
19   And have you worked at the Vanderbilt Pediatric and
20   Adolescent Transgender Health Clinic since the
21   clinic opened in 2018?
22   A.      That is correct.
23   Q.      Is that clinic referred to as the acronym
24   VPATH?
25   A.      Yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 19 of 293 PageID #: 1676

```
 1    Q.     So VPATH sounds similar to WPATH.  Does VPATH
 2    follow WPATH's approach to transgender medicine?
 3                MS. BROWN:  Objection to form.
 4                THE WITNESS:  So we are an
 5    interdisciplinary clinic that relies on multiple
 6    standards of care, including the WPATH Standards of
 7    Care and the Endocrine Society.
 8    BY MR. HILDABRAND:
 9    Q.     Do the WPATH Standards of Care and the
10    Endocrine Society Guidelines conflict?
11                MS. BROWN:  Objection to form.
12                THE WITNESS:  Those guidelines from the
13    Endocrine Society and the WPATH are long documents.
14    They are often in agreement with one another but may
15    have points in which there is conflicting
16    information within the hundreds of pages that are
17    present.
18    BY MR. HILDABRAND:
19    Q.     If there is a conflicting recommendation
20    between the WPATH Standards of Care and the
21    Endocrine Guidelines, is there one or the other that
22    you would prefer?
23                MS. BROWN:  Objection to form.
24                THE WITNESS:  My experience is that it
25    would be up to the treatment team and the particular
```

```
 1   specialist that was making a decision about care
 2   which guidelines they would refer to specifically
 3   and rely on more.
 4              MS. BROWN:  Clark, I have a quick
 5   question, so I don't mean to interrupt.  Do you want
 6   us to still be looking at the exhibit?  Because when
 7   we are looking at it, it's taking up the whole
 8   screen, so we're not the seeing the Zoom.  I'm just
 9   flagging that for you.
10              MR. HILDABRAND:  You don't have to keep
11   looking at it if you don't want to right now.  But
12   we'll return to it in just a second.  So we'll leave
13   it up there.
14              MS. BROWN:  So leave it up.
15   BY MR. HILDABRAND:
16   Q.    You mentioned that the provider would choose
17   between the two of those.  Is that up to their
18   discretion to decide which is appropriate?
19              MS. BROWN:  Objection to form.
20              THE WITNESS:  The provider would rely on
21   their expertise and scientific knowledge, as well as
22   that assessment and collaboration with the patient
23   and their guardian to determine an appropriate
24   treatment plan and review of the guidelines.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 21 of 293 PageID #: 1678

```
 1   BY MR. HILDABRAND:
 2   Q.     Do you provide service at VPATH inconsistent
 3   with both WPATH and the Endocrine Guidelines?
 4                MS. BROWN:  Objection to form.
 5                THE WITNESS:  I just want to make sure I
 6   heard the question correctly.  Did you say
 7   consistent or inconsistent?  Could you repeat,
 8   please?
 9   BY MR. HILDABRAND:
10   Q.     So we have discussed situations where there
11   might be conflict or tension between the two.  Would
12   there be any scenario where you would provide
13   service to the patient that would be inconsistent
14   with both the Endocrine Guidelines and the WPATH
15   Standards of Care?
16                MS. BROWN:  Same objection.
17                THE WITNESS:  We rely on the
18   Endocrine Society Guidelines and the WPATH
19   Guidelines to inform our practice.  Treatment is
20   individualized to meet the needs of each individual
21   patient and their caregiver.
22   BY MR. HILDABRAND:
23   Q.     Could it be individualized not to follow
24   either the Endocrine Guidelines or the WPATH
25   Standards of Care?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 22 of 293 PageID #: 1679

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  Not that I'm aware of.

 3    BY MR. HILDABRAND:

 4    Q.     Thank you.  So turning back to the report,

 5    we're going to go up to the bottom of page two, top

 6    of page three.  This is paragraph eight.

 7    A.     We are scrolling.

 8    Q.     Thank you.

 9              MS. BROWN:  Can you see that?

10              THE WITNESS:  Yes.  We are at the bottom

11    of page two.

12    BY MR. HILDABRAND:

13    Q.     All right.  At the top of page three, do you

14    see where it says:  VPATH is an interdisciplinary

15    clinic bringing together practitioners from

16    endocrinology, psychology, primary care, and other

17    fields provide comprehensive care to transgender

18    children, adolescents, and their families; is that

19    correct?

20    A.     Yes.

21    Q.     Just for the record, you are not an

22    endocrinologist, correct?

23    A.     I am not an endocrinologist.

24    Q.     And you are not a primary care doctor,

25    correct?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 23 of 293 PageID #: 1680

```
 1    A.      I am not a primary care physician.
 2    Q.      So you are not offering expert testimony
 3    about endocrinology?
 4                   MS. BROWN:  Objection to form.
 5                   THE WITNESS:  I am offering expert
 6    testimony around my role and experience as a
 7    psychologist and mental health professional.  A part
 8    of that work, particularly in the VPATH Clinic, we
 9    collaborate very closely with our interdisciplinary
10    team of providers, including endocrinologists,
11    primary care physicians, and other providers as
12    well.
13    BY MR. HILDABRAND:
14    Q.      I understand that you may collaborate with
15    them, but you are not an endocrinologist, correct?
16    A.      I am not an endocrinologist, no.
17    Q.      So do you offer an expert opinion about
18    endocrinology?  Yes or no?
19    A.      I do not offer an expert opinion about
20    endocrinology, although there may be some aspects of
21    endocrinology practice that are represented in the
22    Endocrine Society Guidelines or the WPATH that are
23    pertinent to my practice as a mental health
24    professional.
25    Q.      And as we mentioned, you are not a primary
```

```
 1    care physician.  Are you offering expert testimony
 2    as a primary care physician?
 3    A.      No, I am not.
 4    Q.      Thank you.  So turning down to -- back down
 5    to page 17 of the PDF.  This is page seven of the
 6    CV.
 7    A.      We are on page seven of the CV.
 8    Q.      Does this list community and professional
 9    education activities?
10    A.      Yes.  These are community and professional
11    education activities which are coursework primarily
12    that I have provided to other professionals.
13    Q.      I see did you provide information to the
14    Tennessee Department of Children's Services
15    otherwise called DCS?
16    A.      Yes.
17    Q.      When was that?
18    A.      In my role at Vanderbilt University Medical
19    Center, I have partnered closely with the Department
20    of Children's Services since starting my
21    pre-doctoral internship in 2016.
22    Q.      And I see the dates for the Child Protective
23    Services Supervisor Academy.  Was that from 2020 to
24    2021?
25    A.      Yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 25 of 293 PageID #: 1682

1  Q.    But then also the Child Protective Services
2  Academy was 2015 to 2020; is that correct?
3  A.    That is correct.
4  Q.    So in providing this guidance to CPS, are you
5  using the same sort of psychological expertise that
6  you're using to testify in this case?
7          MS. BROWN:  Objection to form.
8          THE WITNESS:  In my work with the
9  Department of Children's Services, I rely on my
10 professional expertise working in trauma influence
11 care and as a licensed clinical psychologist with
12 expertise in child and adolescent psychology.
13 BY MR. HILDABRAND:
14 Q.    So you use your expertise as a psychologist
15 and mental health provider?
16 A.    Yes.
17 Q.    Have you given presentations to the Tennessee
18 Department of Children's Services?
19 A.    Yes, I have.
20 Q.    Do you still give presentations to DCS?
21 A.    I do.
22 Q.    When was the last presentation you remember
23 giving to DCS?
24 A.    I believe my last presentation with the
25 Department of Children's Services was in May or June

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 26 of 293 PageID #: 1683

```
 1   of this year.
 2   Q.      Thank you.  So going back up in your report
 3   to page one, paragraph two, so all the way back in
 4   the beginning.  Are y'all there?
 5   A.      Almost.
 6              MS. BROWN:  We'll let you know when
 7   we're there.
 8   BY MR. HILDABRAND:
 9   Q.      Thank you.
10   A.      We are on page one of the report.
11   Q.      Thank you.  So do you see where it says
12   you've been asked to provide your expert opinion on
13   gender identity, gender dysphoria in children,
14   adolescents, the treatment of gender dysphoria, and
15   the impact of laws like Senate Bill 228, Tennessee's
16   legislative ban on transgender middle and high
17   school students for participating on interscholastic
18   sports teams consistent with your gender; is that
19   what you said there?
20   A.      It is.
21   Q.      Are those the subjects you opine on in your
22   expert report?
23   A.      They are.
24   Q.      No other topics?
25              MS. BROWN:  Objection to form.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 27 of 293 PageID #: 1684

```
 1              THE WITNESS:  Those are the topics that
 2   I addressed through my expert report.
 3   BY MR. HILDABRAND:
 4   Q.    And just to go back on to expertise, you're
 5   also not a sports physiologist, correct?
 6   A.    I am not a sports physiologist, no.
 7   Q.    You are not an expert in exercise science,
 8   correct?
 9   A.    I am not.
10   Q.    So turning to page three in the report,
11   paragraph 13?
12   A.    We're there.
13   Q.    Thank you.  So you say here:  At birth, most
14   people are assigned a sex, typically male or female
15   based solely on the appearance of their external
16   genitalia; is that correct?
17   A.    Yes.
18   Q.    And you did not offer an alternative
19   definition of sex in your report, correct?
20              MS. BROWN:  Objection to form.
21              THE WITNESS:  This statement reflects
22   that people are assigned a sex at birth typically
23   based on the appearance of their external genitalia.
24   BY MR. HILDABRAND:
25   Q.    Do you provide a definition of sex other than
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 28 of 293 PageID #: 1685

```
 1    this one here in your report?
 2               MS. BROWN:  Objection to form.
 3               THE WITNESS:  I do not offer a
 4    definition of sex in the report outside of this,
 5    although there are other understandings and can
 6    provide additional information about a definition.
 7    BY MR. HILDABRAND:
 8    Q.    But you did not mention other understandings
 9    of sex in your report, correct?
10               MS. BROWN:  Same objection.
11    BY MR. HILDABRAND:
12    Q.    And feel free to look through your report and
13    point me to somewhere if you did.
14    A.    Not that I am aware of.
15               MS. BROWN:  Do you want to take a moment
16    to go through it?
17               THE WITNESS:  I'm happy to take a moment
18    to look through just in case.
19               MS. BROWN:  Clark, we'll let you know.
20    We are going to scroll and come back and then she'll
21    answer your question.  Okay.
22    BY MR. HILDABRAND:
23    Q.    Thank you.
24    A.    So we finished reviewing the document and
25    there are references to sex assigned at birth, which
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 29 of 293 PageID #: 1686

1  is what my field primarily uses to discuss an
2  individual's sex assigned at birth.  So the
3  definition of sex may be more complicated and
4  nuanced than that, particularly within the medical
5  community.
6  Q.    Just for the benefit of the transcript, you
7  spent the past several minutes reviewing your expert
8  report, correct?
9  A.    That is correct.
10  Q.    And you cannot point me to any page in your
11  expert report where you provide a more complex or
12  complicated definition of sex other than sex
13  assigned at birth, correct?
14          MS. BROWN:  Objection to form.
15          THE WITNESS:  Although there may not be
16  a more complex definition in the body of the report,
17  professional experience would suggest and happy to
18  provide more information about the complications and
19  nuances of the definition of sex.
20  BY MR. HILDABRAND:
21  Q.    Even if that's the case, you did provide a
22  more complex definition of sex in the report,
23  correct?
24          MS. BROWN:  Objection to form.
25          THE WITNESS:  In my report primarily

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 30 of 293 PageID #: 1687

1 referring to sex assigned at birth and the concept

2 of being assigned a sex at birth.

3 BY MR. HILDABRAND:

4 Q.    You say primarily.  Is there anywhere else

5 that you refer to sex other than sex assigned at

6 birth?  Yes or no?

7            MS. BROWN:  Objection to form.

8            THE WITNESS:  The convention in the

9 field is to refer to sex assigned at birth.

10 BY MR. HILDABRAND:

11 Q.    So, sorry.  I need you to answer the

12 question.  Did you use a definition of sex other

13 than sex assigned at birth in your expert report?

14 Yes or no?

15            MS. BROWN:  Objection to form.

16            THE WITNESS:  I used terminology

17 consistent with sex assigned at birth.

18 BY MR. HILDABRAND:

19 Q.    Did you use any other terminology in your

20 expert report that you spent several minutes

21 reviewing?

22            MS. BROWN:  Same objection.

23            THE WITNESS:  No.

24 BY MR. HILDABRAND:

25 Q.    Thank you.  In your expert report, did you

use the words "biology" or "biological"?  And,
again, feel free if you need to take a few minutes
to review your expert report.

A.    Yes.  We'll need to take a few minutes.

Q.    Of course.

        MS. BROWN:  And just let me know when
you'd like me to scroll.

        THE WITNESS:  Okay.  Scroll.  You can
scroll further.  Can you scroll down.  Scroll down.
Please scroll down.  Okay.  You can scroll.

BY MR. HILDABRAND:

Q.    Have you reviewed your report, or are you
still looking over?

        MS. BROWN:  Again, Clark, we'll let you
know when we have finished reviewing it.  You gave
her the offer to review it for the specific words
that you mentioned and that's what we're doing.
Okay?

BY MR. HILDABRAND:

Q.    That's perfectly fine.  I didn't know if I
had missed you saying you were finished, so take as
much time as you need.

A.    Thank you.  Scroll down.  Okay.  You can
scroll.  Go to the next page.  Okay.  You can
scroll.  You can scroll.  You can scroll.

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 32 of 293 PageID #: 1689

```
 1              MS. BROWN:  Okay.  We reviewed.
 2              THE WITNESS:  Can you repeat the
 3    question for me?
 4    BY MR. HILDABRAND:
 5    Q.    Do you do not use the words "biological" or
 6    "biology" anywhere in your expert report, correct?
 7              MS. BROWN:  Objection to form.
 8              THE WITNESS:  I do not appear to use the
 9    word "biology", though aspects of biology are
10    represented in the report.
11    BY MR. HILDABRAND:
12    Q.    And you did not use the word -- just for the
13    record, you did not use the word "biological"
14    either, correct?
15              MS. BROWN:  Same objection.
16              THE WITNESS:  Same as previous answer.
17    The word "biological" is not captured but aspects of
18    biology or biological consideration are discussed.
19    BY MR. HILDABRAND:
20    Q.    Thank you.  So getting back to sex assigned
21    at birth, is sex assigned at birth or identified at
22    birth?
23              MS. BROWN:  Object to the form.
24              THE WITNESS:  The terminology we use in
25    the field is sex assigned at birth or sometimes sex
```

```
1    designated at birth.
2    BY MR. HILDABRAND:
3    Q.      And who makes that assignment?
4    A.      Typically sex is assigned by the physician
5    and medical team delivering a baby.
6    Q.      If there's no physician when the baby is
7    delivered, which I know nowadays people deliver most
8    babies in hospitals, but imagine you're in a
9    situation where there's no doctor present when the
10   baby is born.  When the baby is born, before anyone
11   has said a word, does the baby already have a sex?
12              MS. BROWN:  Objection to form.
13              THE WITNESS:  An individual sex can be
14   determined by many different factors.  It is often
15   based on the appearance of external genitalia which
16   may be visible in some cases at birth.
17   BY MR. HILDABRAND:
18   Q.      To get back to the question, before anyone in
19   the room says a word to say what the baby's sex is,
20   does the baby already have a sex?
21              MS. BROWN:  Same objection.
22              THE WITNESS:  At birth a baby has
23   aspects of their sex.  However, their sex in this
24   context and by definition is assigned at birth.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 34 of 293 PageID #: 1691

```
 1   BY MR. HILDABRAND:
 2   Q.    So if a baby born has XY chromosomes, has a
 3   penis, has no disorder of sexual development, is
 4   born, before any doctor says a word what is the sex
 5   of that baby?
 6              MS. BROWN:  Objection to form.
 7              THE WITNESS:  So from that scenario it's
 8   hard to give an answer because, for example, many
 9   individuals with a disorder of sexual development or
10   a DSD would not be available and/or detected at
11   birth.  So sex may be assigned at birth based on the
12   appearance of the child's external genitalia.
13   BY MR. HILDABRAND:
14   Q.    In the question I said a baby who does not
15   have a DSD, a baby who is born with XY chromosomes,
16   has a penis, has no DSD, they are born, they are
17   sitting there, no doctor, the mother, the father, no
18   one has said a word, does the baby already have a
19   sex?
20              MS. BROWN:  Objection to form.
21              THE WITNESS:  I'm sorry, I have to
22   reject the question because a DSD would often be
23   determined later in life.  It would not necessarily
24   be detectable at birth.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 35 of 293 PageID #: 1692

```
 1    BY MR. HILDABRAND:
 2    Q.    So rather than fighting the hypothetical,
 3    assume that later in life the baby is determined not
 4    to have a DSD, even back then when the baby was
 5    born, did the baby have a sex before anyone said a
 6    word?
 7                  MS. BROWN:  Same objection.
 8                  THE WITNESS:  The baby has aspects of
 9    sex that might include their biology of gametes and
10    chromosomes and genitalia.
11                  (Court Reporter interrupts for
12    clarification.)
13                  THE WITNESS:  Thank you, Ms. Honeycutt.
14    So they have aspects of biology, such as their
15    gametes, their chromosomes, their genitalia, their
16    hormones.  Those are present in every individual and
17    a sex is assigned at birth.
18    BY MR. HILDABRAND:
19    Q.    But is it your position that the baby does
20    not have a sex until it is assigned after birth?
21                  MS. BROWN:  Objection to form.
22                  THE WITNESS:  The consensus in the field
23    is that a sex is assigned at birth.
24    BY MR. HILDABRAND:
25    Q.    And that the baby does not have a sex until
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 36 of 293 PageID #: 1693

```
 1   it is assigned at birth?
 2   A.      In our experience and the way that we
 3   conceptualize cases, yes, sex is assigned at birth.
 4   Q.      And to return to the question, so there is no
 5   sex until it is assigned at birth?
 6              MS. BROWN:  Objection to form.
 7              THE WITNESS:  Sex is assigned at birth.
 8   BY MR. HILDABRAND:
 9   Q.      Can you please answer the question yes or no.
10   Is there a sex before it is assigned at birth?
11   A.      It's very hard to answer as a yes or no
12   because sex is a construct made of many different
13   factors and is considered based on many different
14   aspects of a person's biology and sex itself is a
15   construct.
16   BY MR. HILDABRAND:
17   Q.      So you cannot say that a baby has a sex
18   before it is assigned at birth; is that correct?
19              MS. BROWN:  Objection to form.
20              THE WITNESS:  My opinion is that a sex
21   is assigned at birth.
22   BY MR. HILDABRAND:
23   Q.      When the child is in the womb does it have a
24   sex?
25              MS. BROWN:  Objection to form.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 37 of 293 PageID #: 1694

1          THE WITNESS:  In the womb a sex may be

2   assigned based on review of, for example, a child's

3   external genitalia.

4   BY MR. HILDABRAND:

5   Q.     And that would be before birth, correct?

6   A.     So those individuals who received prenatal

7   care, yes, that would be before birth.

8   Q.     So is your definition of sex really sex is

9   assigned at birth or sex is assigned when the child

10  is in the womb?

11          MS. BROWN:  Objection to form.

12          THE WITNESS:  Sex is assigned at birth

13  and represented on legal documents such as a birth

14  certificate.

15  BY MR. HILDABRAND:

16  Q.     So if the doctor sees -- performs an

17  ultrasound -- sorry.  First of all, does Vanderbilt

18  University Medical Center provide ultrasounds to

19  pregnant mothers?

20          MS. BROWN:  Objection to form.

21          THE WITNESS:  I'm here to represent my

22  practice.  And my professional opinion, it is likely

23  that Vanderbilt University Medical Center does

24  indeed perform ultrasounds on pregnant mothers, yes.

25  / /

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 38 of 293 PageID #: 1695

1   BY MR. HILDABRAND:

2   Q.     So during an ultrasound, say that the mother

3   is 20 weeks pregnant with the baby -- I'm sorry.

4   Let's say 24 weeks pregnant with the baby.  And the

5   doctor sees in the ultrasound that the baby has a

6   penis.  They don't see any signs of a DSD being

7   present, and they say that the baby is a boy.  Is

8   that accurate to say at that time that the sex of

9   the baby is male?

10              MS. BROWN:  Again, objection to form.

11              THE WITNESS:  You have described a

12  common experience of individuals receiving an

13  ultrasound at 24 weeks, in which a sex is assigned

14  and designated by a physician or an ultrasound tech.

15  BY MR. HILDABRAND:

16  Q.     So in some cases, sex could be assigned while

17  the mother is still pregnant before birth?

18  A.     A designation could be made before birth.

19  Q.     So before birth we've established that you

20  could designate a sex before then.  If the doctor

21  does not -- some parents don't want to know the

22  baby's sex until the baby is born.  That is a common

23  occurrence.

24         Would the baby still have a sex while in the

25  womb even if the doctor has not designated what the

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 39 of 293 PageID #: 1696

1  sex of the baby is?

2          MS. BROWN:  Objection to form.

3          THE WITNESS:  As I have shared

4  previously, there are aspects of sex which may be

5  present and the sex would be then assigned or

6  designated at birth.

7  BY MR. HILDABRAND:

8  Q.    But you cannot say that the baby in the womb

9  has a sex?

10          MS. BROWN:  Objection to form.

11          THE WITNESS:  Again, we use the

12  terminology of sex assigned at birth.

13  BY MR. HILDABRAND:

14  Q.    I understand that you use that terminology.

15  But are you telling me that the baby in the womb

16  does not have a sex even though other babies in the

17  womb could be assigned a sex?

18          MS. BROWN:  Again, objection to form.

19  And, Clark, I'm just going to note that, again,

20  she's repeatedly said there are aspects of sex and

21  I'm just confused --

22          MR. HILDABRAND:  I understand that's

23  what she has said, but she has not answered the

24  question that was asked.  I understand that she has

25  answered the question she wanted asked, but she has

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 40 of 293 PageID #: 1697

```
 1   not answered the question that was asked.

 2              THE WITNESS:  Can you remind me of the

 3   question that was asked then, please?

 4   BY MR. HILDABRAND:

 5   Q.    Yes.  So we have established that some babies

 6   can have their sex assigned while they are in the

 7   womb.  Other parents do not want to learn the baby's

 8   sex until the child is born.  In those cases where

 9   the doctor has not said this child's sex is male or

10   female, would the baby still have a sex in the womb

11   before birth?

12              MS. BROWN:  Same objection.

13              THE WITNESS:  My previous answer stands,

14   that a baby would have aspects of sex and that would

15   be then designated a sex at birth for those parents

16   that were not aware of what had been designated

17   previously.

18   BY MR. HILDABRAND:

19   Q.    Let's go ahead and move on, then.  In

20   paragraph two of your report, this is up on page

21   one.

22   A.    We are there.

23   Q.    Do you see where you used the word "gender",

24   consistent with their gender?

25   A.    I see use of the word "gender" and consistent
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 41 of 293 PageID #: 1698

```
 1   with their gender, yes.
 2   Q.     So let's move forward to page three,
 3   paragraph 12.  Do you see where it says:  A person's
 4   gender identity refers to their inner sense of their
 5   own gender?  Again, do you use the noun --
 6   A.     I'm sorry, can you give us one moment?
 7   Q.     Of course.  Take as much time as you need.
 8   A.     You said read paragraph 12; is that right?
 9   Q.     That is correct.
10   A.     Okay.  Paragraph 12.  I see it now.
11   Q.     So is the first sentence there, A person's
12   gender identity refers to their inner sense of their
13   own gender; is that correct?
14   A.     That is correct.
15   Q.     And you used the noun gender here at the end
16   of this sentence, correct?
17              MS. BROWN:  Objection to form.
18              THE WITNESS:  Gender is at the end of a
19   sentence, yes.
20   BY MR. HILDABRAND:
21   Q.     And this may take some time if you want to
22   review the document.  But can you review your report
23   and let me know if anywhere in your report you
24   define the noun gender?
25              MS. BROWN:  Same objection.  And we'll
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 42 of 293 PageID #: 1699

```
 1   take the time to review.  Doctor, is there anywhere
 2   you would like me to start or at the beginning?
 3                THE WITNESS:  We can start right here.
 4                MS. BROWN:  Again, just let me know when
 5   to scroll.
 6                THE WITNESS:  Okay.  Okay.  We can
 7   scroll.  We can scroll.  We can scroll further.  We
 8   can scroll down.  We can scroll.  We can scroll.  We
 9   can scroll further.  We can scroll down.  We
10   reviewed the document.  Can you repeat the question?
11   BY MR. HILDABRAND:
12   Q.    Of course.  Thank you for reviewing it.  In
13   your report, do you define the noun gender anywhere?
14                MS. BROWN:  Same objection.
15                THE WITNESS:  So in my report I define
16   gender identity.
17   BY MR. HILDABRAND:
18   Q.    To go back to the question, did you define
19   the noun gender?
20   A.    Gender is based on an individual's gender
21   identity.
22   Q.    So in paragraph 12, the definition of a
23   person's gender identity refers to the inner sense
24   of their own gender.  Is it your position that
25   gender itself is defined by gender identity?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 43 of 293 PageID #: 1700

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  So here we have a

 3    definition of a person's gender identity refers to

 4    their inner sense of their own gender in

 5    paragraph 12.

 6    BY MR. HILDABRAND:

 7    Q.      Yes.  Are gender and gender identity distinct

 8    concepts?

 9    A.      Not that I am aware of.

10    Q.      So is it your understanding that gender

11    identity and gender are the same concepts?

12              MS. BROWN:  Objection to form.

13              THE WITNESS:  So an individual's gender

14    identity is their sense of -- of their own gender.

15    I'm sorry, I don't think I understand what you're

16    getting at.

17    BY MR. HILDABRAND:

18    Q.      Of course.  So my concern is, I'm trying

19    to -- how did you define gender in your report?  You

20    referred to the definition of gender identity here,

21    but what is the definition of the gender that you

22    provide in your report, or did you not provide a

23    definition of gender in your report?

24              MS. BROWN:  Objection to form.

25              THE WITNESS:  I provided a definition of
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 44 of 293 PageID #: 1701

1  gender identity.  And based on my experience and
2  review of the literature would be happy to expand
3  further and discuss the social construct that is
4  gender.
5  BY MR. HILDABRAND:
6  Q.     So gender is a social construct?
7  A.     Gender is a social construct that is
8  representative of many different aspects of an
9  individual's experience in the world and what's most
10  important to here is that we're talking about what
11  is a person's sense of their own gender.
12  Q.     Did you define -- did you provide that
13  definition of gender in your expert report?
14            MS. BROWN:  Objection to form.
15            THE WITNESS:  We've established that
16  here it is a definition of gender identity.
17  BY MR. HILDABRAND:
18  Q.     Yes.  I think we have established that you
19  provided a definition of gender identity.  Please
20  point me to the page in your report where you define
21  the word "gender", not the word "gender identity",
22  the word "gender".
23  A.     So although there may not be a definition of
24  gender specific in the pages of this report, I'm
25  happy to provide an opinion and information about

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 45 of 293 PageID #: 1702

```
1    that definition based on some of the same things
2    that were used to draft the report, which would
3    include review of the literature and my professional
4    experience.
5    Q.    Before we do that, can you point me to the
6    paragraph in your report where you define the word
7    "gender" or did you not define the word "gender" in
8    your report?
9              MS. BROWN:  Objection to form.
10             THE WITNESS:  My experience is that
11   gender is best understood by a person's inner sense
12   of their own gender and gender identity.  And so I
13   believe that it is captured in this report by
14   reflecting an individual's inner sense of their
15   gender.
16   BY MR. HILDABRAND:
17   Q.    Which paragraph in this report defines
18   gender?
19   A.    Here we are looking at paragraph 12, which
20   refers to gender identity and the importance of an
21   individual's inner sense.
22   Q.    So this is your definition of gender in your
23   report?
24             MS. BROWN:  Objection to form.
25             THE WITNESS:  This is a definition of
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 46 of 293 PageID #: 1703

gender identity and the construct and importance of
an individual's inner sense.  There may be other
information that we can use to break down or to
understand the noun gender specifically if that
would be helpful.

BY MR. HILDABRAND:

Q.    Do you break down the word "gender" in
paragraph 12?

A.    I do not.

Q.    Thank you.  And there is no other paragraph
in this report that breaks down the word "gender",
correct?

          MS. BROWN:  Objection to form.

          THE WITNESS:  In the report, there is no
additional information about the definition of the
term "gender".

BY MR. HILDABRAND:

Q.    Thank you.  I'm glad we got there.

          MS. BROWN:  We've been going about an
hour, so we'd like a ten-minute break when it's
convenient for you.  If you have another question
that you want to ask...

          MR. HILDABRAND:  That's a great place to
pause for me.  Glad to go off the record.

          MS. BROWN:  Okay.  Thank you.

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 47 of 293 PageID #: 1704

```
 1                    (Recess observed.)
 2   BY MR. HILDABRAND:
 3   Q.      Turning back to your expert report,
 4   Exhibit 1, Doc A.  We are going to go to
 5   paragraph 13, which straddles pages three and four.
 6   A.      Okay.  Paragraph 13.  We are there.
 7   Q.      Great.  Do you see where you write that:
 8   Non-transgender people, also referred to as
 9   cisgender people, have a gender identity that aligns
10   with their sex assigned at birth.  Transgender
11   people have a gender identity that is incongruent
12   within the sex they were assigned at birth.  Is that
13   what you wrote here?
14   A.      Yes.  That's what's in my report.
15   Q.      And do you still agree with that statement?
16   And feel free to answer and explain further as you
17   need.
18   A.      I believe the report captures the definition
19   of cisgender people and transgender people.
20   Q.      So are there two categories, cisgender people
21   on the one hand and transgender people on the other
22   hand; is that correct?
23              MS. BROWN:  Objection to form.
24              THE WITNESS:  In the report, I'm
25   offering definitions of cisgender and transgender.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 48 of 293 PageID #: 1705

```
 1   However, in the current terminology, there are many
 2   categories of a gender identity.
 3   BY MR. HILDABRAND:
 4   Q.     So are there additional categories besides
 5   transgender and cisgender?
 6                  MS. BROWN:  Object to the form.
 7                  THE WITNESS:  Our terminology is often
 8   evolving and changing, and there are other gender
 9   identities that people may have, yes.
10   BY MR. HILDABRAND:
11   Q.     So going back up a little bit to
12   paragraph 12, on page three, do you see the last
13   sentence:  Every person has a gender identity?  Is
14   that what you wrote?
15   A.     That is in the report, yes.
16   Q.     So do you still agree today that every person
17   has a gender identity?
18   A.     Yes, every person has a gender identity.
19   Q.     Does every person have just one gender
20   identity?
21                  MS. BROWN:  Objection to form.
22                  THE WITNESS:  So the terminology that an
23   individual may use to describe their own gender
24   identity may reflect multiple identities and yet we
25   each have a sense of our own gender, as written in
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 49 of 293 PageID #: 1706

```
 1   the report, right, that define our gender identity.
 2   BY MR. HILDABRAND:
 3   Q.    So just to make sure I'm understanding you,
 4   it could be that they have one sense but they could
 5   sense that they have multiple identities?
 6              MS. BROWN:  Objection to form.
 7              THE WITNESS:  So I'm sharing that a
 8   person has a gender identity that refers to their
 9   own sense of gender, and what terminology or
10   understanding of their gender is is unique to each
11   individual.
12   BY MR. HILDABRAND:
13   Q.    So if it's unique to each individual, have
14   you ever encountered someone who claims to have
15   multiple gender identities?
16              MS. BROWN:  Objection to form.
17              THE WITNESS:  I have met individuals in
18   my clinical practice who identify as gender fluid.
19   BY MR. HILDABRAND:
20   Q.    Can you explain what gender fluid means?
21   A.    Gender fluid is a gender identity in which an
22   individual may have an inner sense of gender that is
23   consistent with male, female, neither, or both, and
24   that that may fluctuate over time.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 50 of 293 PageID #: 1707

```
 1   BY MR. HILDABRAND:

 2   Q.    You said a minute ago that gender identity is

 3   unique.  How many gender identities would you

 4   estimate there are?

 5                MS. BROWN:  Objection to form.

 6                THE WITNESS:  I do not currently have a

 7   way to quantify the number of gender identities.

 8   Again, the terminology is often changing and being

 9   updated and there may be many gender identities or

10   individual gender identity may have an understanding

11   or a terminology that has not yet been published or

12   used by others.

13   BY MR. HILDABRAND:

14   Q.    Fair enough.  Just to get a sense of the

15   numbers that we are talking about, are there more

16   than two gender identities that you've encountered?

17   A.    Yes, there are more than two gender

18   identities.

19   Q.    Are there more than three gender identities?

20   A.    There are more than three gender identities.

21   In fact, there's an infinite number of gender

22   identities.

23   Q.    Thank you.  Going down to paragraph 16 in

24   your report.  This is on page four.

25   A.    Did you say paragraph 16?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 51 of 293 PageID #: 1708

```
 1   Q.     Yes.
 2   A.     Is that correct?  Okay.  Yes, we're there.
 3   Q.     So do you cite the American Psychiatric
 4   Association's Diagnostic and Statistical Manual of
 5   Mental Disorders, Fifth Edition, Text Revision?  Do
 6   you cite that in that paragraph?
 7   A.     Yes, that is referenced.  Yes.
 8   Q.     Who publishes the DSM?
 9   A.     The American Psychiatric Association.
10   Q.     Do you use that in your practice?
11   A.     It is common and part of the best practice in
12   mental health to rely on the DSM.
13   Q.     And that's published by the American
14   Psychiatric Association, right?
15   A.     Yes, it is published by the American
16   Psychiatric Association.
17   Q.     And you not a psychiatrist, correct?
18   A.     I am not a psychiatrist, although I am very
19   familiar and well trained in the DSM, and it is part
20   of our best practice as psychologists, as perhaps
21   individuals with Master's degrees who have other
22   backgrounds in mental health, to rely on and use the
23   DSM.
24   Q.     So it's common for nonpsychiatrists, like
25   psychologists or other individuals you described, to
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 52 of 293 PageID #: 1709

```
 1   use the DSM as well?

 2   A.      Yes.

 3   Q.      How does -- does the DSM 5 use the term

 4   "gender dysphoria"?

 5   A.      It does.

 6   Q.      Are you aware of previous editions of the DSM

 7   using other terminology to refer to that?

 8               MS. BROWN:  Objection to form.

 9               THE WITNESS:  It says:  Previous

10   editions of the DSM, which are no longer considered

11   valid and appropriate in the field, refer to other

12   disorders by other names.

13   BY MR. HILDABRAND:

14   Q.      Was the phrase "gender identity disorder" one

15   of the terms previously used in earlier editions of

16   the DSM?

17   A.      It was previously used.

18   Q.      But since the DSM Edition 5 published in

19   2013, is that phrase no longer commonly used?

20   A.      That is correct.

21   Q.      Is one of the treatments for gender dysphoria

22   in the DSM surgery?

23               MS. BROWN:  Objection to form.

24               THE WITNESS:  We could reference the DSM

25   specifically.  How the DSM is used is often to
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 53 of 293 PageID #: 1710

```
 1   outline a list of symptoms and psychological or
 2   psychosocial diagnoses that are the label to
 3   describe a symptom cluster.  There is additional
 4   information in the DSM about backgrounds of
 5   disorders and how the symptoms may have been derived
 6   as a cluster.
 7   BY MR. HILDABRAND:
 8   Q.     Have any of your patients in your practice
 9   received surgery as treatment for gender dysphoria?
10            MS. BROWN:  Again, objection to form.
11            THE WITNESS:  In my practice, I have
12   worked with adolescents and young adults who have
13   received surgical interventions as one aspect of
14   their treatment for gender dysphoria.
15   BY MR. HILDABRAND:
16   Q.     So surgical intervention can be one aspect of
17   treating gender dysphoria?
18            MS. BROWN:  Objection to form.
19            THE WITNESS:  The interventions and
20   treatment plan for individuals with gender dysphoria
21   is unique to each individual and surgery may be one
22   component of their treatment plan.
23   BY MR. HILDABRAND:
24   Q.     Are there any other mental health issues that
25   you are aware of that are treated with surgery?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 54 of 293 PageID #: 1711

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  Yes, I'm aware of other

 3    mental health conditions that may be treated with

 4    surgery.

 5    BY MR. HILDABRAND:

 6    Q.    Would body dysmorphic disorder be treated

 7    with surgery or is surgery one option for treating

 8    body dysmorphic disorder?

 9              MS. BROWN:  Objection to form.

10              THE WITNESS:  Body dysmorphic disorder

11    an individual may wish to seek surgery as part of

12    the diagnosis and experience of body dysmorphic

13    disorder.

14    BY MR. HILDABRAND:

15    Q.    Is it appropriate for health providers to

16    provide the surgical interventions that that body

17    dysmorphic individual seeks?

18              MS. BROWN:  Objection to form.

19              THE WITNESS:  A mental health provider

20    would not be offering surgical intervention in

21    performing those surgical interventions, no.

22    BY MR. HILDABRAND:

23    Q.    Would they recommend surgical interventions

24    for or is there a scenario where a mental health

25    provider would recommend surgical interventions for
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 55 of 293 PageID #: 1712

```
 1   an individual with body dysmorphic disorder?
 2   A.     In my practice, I have not treated an
 3   individual with body dysmorphic disorder so I cannot
 4   say.
 5   BY MR. HILDABRAND:
 6   Q.     Fair enough.  Going forward a little bit to
 7   page five, footnote seven.
 8           MS. BROWN:  I'm sorry, did you say page
 9   or paragraph five?
10   BY MR. HILDABRAND:
11   Q.     Page five, footnote seven.
12   A.     Page five, footnote seven.  Yes, we are
13   there.
14   Q.     So not as a substantive question, but do you
15   cite an article here where the first author is
16   Hembree, Endocrine Treatment of Gender
17   Dysmorphic/Gender Incongruent Persons, an Endocrine
18   Society Clinical Practice Guideline?
19   A.     Yes.
20           MR. HILDABRAND:  Travis, can you
21   circulate, I believe it's Document B.  And we will
22   mark this as Exhibit 2.
23           (WHEREUPON, a document was marked as
24   Exhibit Number 2.)
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 56 of 293 PageID #: 1713

```
 1   BY MR. HILDABRAND:

 2   Q.     Can you identify what this document is?

 3   A.     This document is the article by Hembree, et

 4   al., titled, Endocrine Treatments of Gender

 5   Dysphoric, Gender-Incongruent Persons, and Endocrine

 6   Society Clinical Practice Guidelines.

 7   Q.     And would you refer to this as the Endocrine

 8   Society Guideline?

 9   A.     Yes.

10   Q.     So let's go -- oh, before we scroll down, on

11   the list of authors, just because of this case, do

12   you see the name Joshua D. Safer?

13   A.     I see that name, yes.

14   Q.     So he would be one of authors on this

15   document?

16   A.     It appears that way, yes.

17   Q.     Thank you.  All right.  Scrolling down to

18   it's page 3873 in the Journal.  It's page five in

19   the PDF.

20   A.     We are on page five of the PDF.  Yes.

21   Q.     All right.  Thank you.  So down in the bottom

22   right-hand column, do you see the line that begins

23   yet such a classification?

24   A.     Can you scroll down a little bit?  Yet such a

25   classification, yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 57 of 293 PageID #: 1714

1  Q.    I'm going to just read it out so we have a
2  copy of it.  Does it say:  Yet such a classification
3  does not take into account that people may have
4  gender identities outside this continuum.  For
5  instance, some experience having both a male and
6  female gender identity, whereas others completely
7  renounce any gender classification.  Did I read that
8  correctly?
9  A.    Yes.
10 Q.    Would you agree that some individuals
11 experience themselves as having both a male and
12 female gender identity?
13           MS. BROWN:  Objection to form.
14           THE WITNESS:  I do agree that some
15 individuals have gender identity consistent with a
16 male and female gender identity.
17 BY MR. HILDABRAND:
18 Q.    And the second part of that is:  Whereas
19 others completely renounce any gender
20 classification.
21       Are there some individuals that you're aware
22 of who renounce any gender classification?
23           MS. BROWN:  Objection to form.
24           THE WITNESS:  In the field is
25 established that others renounce gender

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 58 of 293 PageID #: 1715

1    classification and labels.

2    BY MR. HILDABRAND:

3    Q.     Thank you.  So going on to the line, there

4    are also reports of individuals experiencing a

5    continuous and rapid involuntary alternation between

6    a male and female identity or men who do not

7    experience themselves as men but do not want to live

8    as women.  So looking at the first part of that

9    sentence, do you agree that some individuals

10   experience a continuous and rapid involuntary

11   alternation between a male and female gender

12   identity?

13   A.     There are some individuals who experience

14   alternations between male and female identity.

15   Q.     And the second half of that sentence, are

16   there some men who do not experience themselves as

17   men but do not want to live as women; would you

18   agree with that?

19   A.     I agree there are some individuals who may

20   reject the sex they were assigned at birth and do

21   not identify in a binary identity.

22   Q.     So if they were born male at birth, they'd

23   reject -- make sure I'm understanding.  They reject

24   being male but they don't necessarily want to be

25   female either; is that your understanding?

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 59 of 293 PageID #: 1716

```
 1            MS. BROWN:  Objection to form.

 2            THE WITNESS:  There are individuals

 3  whose sense of gender may not fall on the gender

 4  binary, so who may not identify with the sex they

 5  were assigned at birth or another binary gender

 6  identity.

 7  BY MR. HILDABRAND:

 8  Q.    So they wouldn't want to be a binary male or

 9  female; they might want to be something else?

10            MS. BROWN:  Objection to form.

11            THE WITNESS:  It's not just a question

12  of what they want to be so much as who they are in

13  their gender identity.

14  BY MR. HILDABRAND:

15  Q.    So would they view who they are as something

16  else besides a binary male or a binary female?

17  A.    Some individuals do not identify as a binary

18  male or a binary female.

19  Q.    Is that what the phrase "nonbinary" refers

20  to, or is that one understanding of what nonbinary

21  means?

22            MS. BROWN:  Objection to form.

23            THE WITNESS:  Individuals who identify

24  as nonbinary tend to have a gender identity that

25  exists outside the gender binary of male or female.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 60 of 293 PageID #: 1717

BY MR. HILDABRAND:

Q.    Thank you for -- thanks for explaining.

All right.  Let's go to page 11 in the PDF.
That's page 3879 in the way the Journal does its
paging.

A.    Page 11 of the PDF.  We are there.

Q.    Before we ask about this, the
Endocrine Society Guideline is something that you
rely upon in your practice, correct?

A.    Yes.  We rely on the Endocrine Society
Guidelines.

Q.    All right.  On the bottom left-hand column,
do you see the sentence that begins, However, social
transition?

A.    On the bottom of the first paragraph, yes.

Q.    So does it say:  However, social transition
in addition to GD/gender incongruence has been found
to contribute to the likelihood of persistence?  Did
I read that accurately?

MS. BROWN:  Objection.

THE WITNESS:  That statement is in the
document and would be important to be considered in
context and with the evolving state of the
literature.

/ /

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 61 of 293 PageID #: 1718

```
 1   BY MR. HILDABRAND:
 2   Q.    Feel free to explain further, but do you
 3   agree with that statement?
 4              MS. BROWN:  Again, objection to form.
 5   You read one line of this.  Just noting that
 6   objection.
 7   BY MR. HILDABRAND:
 8   Q.    Would you agree that social transition is
 9   likely to contribute to persistence?
10              MS. BROWN:  Objection to form.
11              THE WITNESS:  I am not aware of the data
12   and scientific findings that support this particular
13   claim that social transition contributes to the
14   likelihood of persistence.
15   BY MR. HILDABRAND:
16   Q.    In your practice, has it been your experience
17   that social transition is likely to contribute to
18   persistence in an expressed gender identity?
19              MS. BROWN:  Again, same objection.
20              THE WITNESS:  In my professional
21   experience, individuals who make a social transition
22   often persist in their gender identities, including
23   because of the significant distress and
24   identification with transgender identity that
25   precipitated the social transition.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 62 of 293 PageID #: 1719

```
 1   BY MR. HILDABRAND:

 2   Q.     Is social transition likely to encourage

 3   persistence or does it discourage persistence?

 4               MS. BROWN:  Objection to form.

 5               THE WITNESS:  I am not aware of the

 6   evidence that suggests the social transition

 7   specifically contributes to persistence.

 8   BY MR. HILDABRAND:

 9   Q.     So you wouldn't know if it is likely to or is

10   not likely to contribute to persistence?

11               MS. BROWN:  Same objection.

12               THE WITNESS:  Whether it is likely to or

13   not likely to is a research question that I'm not

14   aware of.

15   BY MR. HILDABRAND:

16   Q.     And so that's something that you would need

17   further research on?

18               MS. BROWN:  Objection to form.

19               THE WITNESS:  It is important for us to

20   continue to study and to understand phenomenology in

21   all aspects of psychological mental health and

22   medical science, and understanding particulars of

23   persistence may be one area that would benefit from

24   further study.

25   / /
```

BY MR. HILDABRAND:

Q.     Is it established in the field of psychology
whether social transition contributes to the
likelihood of persistence?

            MS. BROWN:  Objection to form.  Again,
you've asked this question.  It's been asked and
answered some, Clark.

            MR. HILDABRAND:  This is a different
question from what I asked and I had asked it
definitely precisely because you've objected to the
form several times, so I'd like her to answer the
question.

            MS. BROWN:  I'm just letting you know
I'm not hearing a different question, so I'm going
to continue to object.

            MR. HILDABRAND:  That fine.  I'll keep
asking a different question.

BY MR. HILDABRAND:

Q.     So is it established in the field of
psychology whether social transition contributes to
the likelihood of persistence?

            MS. BROWN:  Same objection.

            THE WITNESS:  To my knowledge and review
of the literature, it has not been established that
a social transition contributes to persistence.

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 64 of 293 PageID #: 1721

```
1   BY MR. HILDABRAND:
2   Q.     Thank you.  So earlier we discussed the
3   number of gender identities.  What is your opinion
4   on how many sexes there are?
5               MS. BROWN:  Objection to form.
6               THE WITNESS:  So to state your question,
7   that would be best directed at one of my
8   interdisciplinary colleagues.  You could speak to
9   the medical aspects and definitions of sex, that
10  there may be multiple -- I'm trying to remember the
11  word that you used -- multiple sexes, for lack of a
12  better term.
13  BY MR. HILDABRAND:
14  Q.     But that's not something -- to be fair,
15  that's not something you would be best situated to
16  answer?
17              MS. BROWN:  Objection to form.
18              THE WITNESS:  I am able to speak to an
19  individual's sex assigned at birth and how that
20  relates to their gender identity.
21  BY MR. HILDABRAND:
22  Q.     But not to the question of how many sexes
23  there are?
24              MS. BROWN:  Objection to form.
25              THE WITNESS:  I previously stated that
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 65 of 293 PageID #: 1722

```
 1    there may be multiple sexes and that a medical
 2    provider may be able provide more information.
 3    BY MR. HILDABRAND:
 4    Q.    Different question.  How many genders are
 5    there?
 6              MS. BROWN:  Objection to form.
 7              THE WITNESS:  We've established that are
 8    many different gender identities.
 9    BY MR. HILDABRAND:
10    Q.    How many different?  Are there more than two?
11    A.    I believe we previously established there
12    were more than three and an infinite number of
13    possibilities.
14    Q.    To clarify, we previously discussed the
15    number of gender identities.  How many genders, not
16    gender identities, are there?  How many genders are
17    there?
18    A.    So an individual gender identity is their
19    understanding of their inner sense of gender, and I
20    don't believe that those two can be separated.
21    Q.    So there could also infinite genders?
22              MS. BROWN:  Objection to form.
23              THE WITNESS:  There are many different
24    gender identities which reflect an individual's
25    inner sense of gender, yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 66 of 293 PageID #: 1723

```
1   BY MR. HILDABRAND:
2   Q.      Yes.  So given as you testified earlier that
3   there can be infinite gender identities, can there
4   also be infinite genders?  Please answer yes or no
5   and then feel free to elaborate.
6   A.      Yes, I believe there are many different
7   gender reflected as a person's gender identity and
8   their own sense of gender.
9   Q.      So to return to the question, yes or no.  Can
10  there be infinite genders?
11  A.      I believe I just answered that question and
12  my previous answer stands.
13  Q.      Can you provide a yes or no answer to the
14  question, are there infinite genders?
15  A.      My previous answer included the word yes.
16  I'm sorry if that was not legible and then an
17  ongoing explanation that an individuals' gender
18  identity, there may be many different gender
19  identities reflected of the individual's inner sense
20  of gender.
21  Q.      Sorry, I'm not trying to just ask a
22  question --
23  A.      I'm sorry.
24  Q.      -- so I'm sorry if I misunderstood you.  So I
25  just want to understand that your answer was yes,
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 67 of 293 PageID #: 1724

1   there can be infinite genders and then you provided
2   a fuller explanation that explained your answer; is
3   that fair?
4           MS. BROWN:  Objection to form.  Again, I
5   understand, Clark, that you want a yes or no answer
6   and you can ask her that, but you can't command her
7   answer.  She's going to give her answer and that's
8   her answer.
9           MR. HILDABRAND:  I totally get that,
10  too, but I did request a yes or no answer and I want
11  to know what the yes or no answer was.  And if she
12  says she has said a yes or no, I also don't want to
13  ask the same question again but I really would like
14  a yes or no answer to this.  So yes or no --
15          MS. BROWN:  But there, again, it may
16  just be a situation where, again, she's testifying
17  as an expert.  She's giving her opinions and
18  answering your questions.  And if she has to provide
19  context and say yes, like she did, then that's going
20  to be the answer.
21  BY MR. HILDABRAND:
22  Q.    That's totally fine.  At the same time, I
23  need to know what the yes or the no is, not go
24  straight into the explanation.  I am happy to have
25  her provide further explanation.  But I would just

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 68 of 293 PageID #: 1725

```
 1   like to know the yes or no to the question, are
 2   there infinite genders?  And provide any fuller
 3   explanation after that, but please begin with a yes
 4   or no or I don't know and then provide your fuller
 5   explanation to the question are there infinite
 6   genders.
 7              MS. BROWN:  You can answer the question
 8   again, but I'm going to, again, same objection to
 9   form that I have been noting.
10              THE WITNESS:  So my previous answer
11   stands.  Yes, there are many different gender
12   identities that are reflective of an individual's
13   inner sense of gender.
14   BY MR. HILDABRAND:
15   Q.    All right.  Thank you.  We'll move on from
16   that.  On page ten of the PDF, page 3878 in the
17   Journal's paging.
18              MS. BROWN:  Sorry, what was the page
19   number?
20   BY MR. HILDABRAND:
21   Q.    Of course.  It's page 3878 or page ten in the
22   PDF.
23   A.    Page ten of the PDF.  We are there.
24   Q.    And feel free -- this starts on the previous
25   page at 1.2 so feel free to read that if you want to
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 69 of 293 PageID #: 1726

1   just to completely understand that.  But can you

2   just read to yourself 1.2 and then I'll ask you a

3   question about part of that.  But I want to make

4   sure you've been able to see the entirety of it

5   before the question.  So can you please read 1.2?

6   A.      Uh-huh.  Scroll down.  Okay.  I have read

7   1.2.

8   Q.      Great.  And so do you see where it says that

9   one of the factors that's important is the ability

10  to make a distinction between GD/gender incongruence

11  and conditions that have similar features, e.g.,

12  body dysmorphic disorder.  Can you describe for

13  us --

14  A.      Yes.

15  Q.      Thank you.  I think we discussed this a

16  little bit earlier, but can you define for us what

17  body dysmorphic disorder is in your understanding?

18  A.      My understanding of body dysmorphic disorder

19  is a diagnostic label and psychiatric condition

20  which an individual has a significant

21  misrepresentation of their body and this creates

22  distress for them.

23  Q.      Is it your understanding that an appropriate

24  treatment for that misunderstanding, would an

25  appropriate treatment for that be surgery?

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 70 of 293 PageID #: 1727

1          MS. BROWN:  Objection to form.

 2          THE WITNESS:  So the specifics of body

 3   dysmorphic disorder may be better left to an expert

 4   in body dysmorphic disorder.  I would suspect that

 5   an individualized treatment plan for an individual

 6   with body dysmorphic disorder would be crafted

 7   between that individual and their provider and may

 8   include an individual to pursue surgery.

 9   BY MR. HILDABRAND:

10   Q.     Are you aware of whether physicians at

11   Vanderbilt provide surgery for body dysmorphic

12   disorder?

13   A.     I am not aware.

14   Q.     On the right column here, do you see where it

15   says:  Examples of conditions with similar features

16   are body dysmorphic disorder, bodily integrity --

17   sorry -- body identity integrity disorder, a

18   condition in which individuals have a sense that

19   their anatomical configuration as an able-bodied

20   person is somehow how wrong or inappropriate?

21   A.     I see that.

22   Q.     Did you see that?  Okay.  And then does it

23   mention eunuchism after that?

24          MS. BROWN:  Sorry, Clark, you're coming

25   through very choppy.  I think there's an internet

connection issue.  We are hearing bits and pieces of
what you're saying.

BY MR. HILDABRAND:

Q.     All right.  I can hear y'all clearly.  Do you
see on the right column --

A.     You're speaking but we're not able to hear
you.  I don't know if others are having the same
problem.

          MR. SANDERS:  I'm not having any
problem.  I can hear everyone clearly.

          MR. ROYER:  Here as well.

          MR. HILDABRAND:  Can you hear everyone
else?

          MS. BROWN:  Sorry, can folks hear us?

          MR. HILDABRAND:  We can hear y'all.

          MS. RILEY-SWANBECK:  Yes.

          MR. HILDABRAND:  I think the problem may
be on y'all's end.  Can y'all hear us?

          MS. BROWN:  I can hear you now.  You're
coming through clear again.

          MR. HILDABRAND:  Okay.  Whatever was
going on I'm glad it resolved.  So that's how Zoom
works.

BY MR. HILDABRAND:

Q.     On the right-hand column here, do you see

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 72 of 293 PageID #: 1729

1  where it provides examples of conditions with

2  similar features are body dysmorphic disorder, body

3  identity integrity disorder?  Do you see that there?

4  A.     Yes.

5  Q.     And then it goes on to describe eunuchism, in

6  which a person is preoccupied with or engages in

7  castration and/or penectomy for reasons that are not

8  gender identity related.

9  A.     I see that.

10 Q.     Is eunuchism a gender identity?

11        MS. BROWN:  Objection to form.

12        THE WITNESS:  Eunuchism is not a gender

13 identity that I have encountered.

14 BY MR. HILDABRAND:

15 Q.     Are you aware of literature in the

16 psychological field describing eunuchism as a gender

17 identity?

18 A.     I am not.

19 Q.     And I assume that's -- if you're not aware, I

20 assume you're not aware of Vanderbilt treating

21 anyone with castration for eunuchism?

22 A.     I am not aware.

23 Q.     All right.  So earlier today we've talked

24 about how you've given presentations to the

25 Tennessee Department of Children's Services using

```
 1   your psychological expertise, right?
 2   A.     Yes.
 3   Q.     Let's turn to page 18 of Exhibit 1, your
 4   expert report.  This is PDF page 18.  Page 18.  CV
 5   page eight.  Do you see where you list a
 6   February 27 --
 7   A.     We're not there quite yet.  Slight
 8   malfunction, so very sorry.
 9   Q.     No problem.  Take your time.
10   A.     Page 18 of the PDF.  We are there.
11   Q.     All right.
12   A.     We are there.
13   Q.     All right.  Do you see where you list a
14   February 2017 presentation to DCS?
15   A.     I do.  Item five.
16   Q.     And would that presentation reflect your
17   psychological experience?
18          MS. BROWN:  Objection to form.
19          THE WITNESS:  So yes.  This presentation
20   was developed and delivered as a part of my
21   professional expertise.
22   BY MR. HILDABRAND:
23   Q.     Just one second.
24   A.     Uh-huh.
25          MR. HILDABRAND:  All right.  Travis, can
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 74 of 293 PageID #: 1731

```
 1   you circulate Doc C, which I think we'll mark as
 2   Exhibit 3.
 3            MR. ROYER:  One moment.  I think I --
 4   Clark, you're familiar with our wonderful dual
 5   authentication system.  I believe that I got kicked
 6   off.  Give me one second.
 7            MR. HILDABRAND:  No problem.  So what
 8   would I do to share, Travis?  Do I copy and paste or
 9   what is the --
10            MR. ROYER:  You could drag and drop or
11   just hit the little paper symbol, do you see that,
12   and skip to location there, or just drag and drop by
13   the folder.
14            MR. HILDABRAND:  Thank you-all for your
15   patience with us.
16            MR. ROYER:  Yes, thank you very much.
17            MS. BROWN:  Of course.  Of course.
18            MR. HILDABRAND:  All right.  I should
19   have just circulated Doc C, which we'll mark
20   exhibit -- well, sorry.  What's -- we are going to
21   mark this as a cumulative exhibit with the next
22   couple.  So if we can just hold off on marking it
23   for right now.  But this is Doc C if y'all want to
24   pull this up.
25            MS. BROWN:  Sorry, where did you
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 75 of 293 PageID #: 1732

```
 1    circulate it?
 2              MR. HILDABRAND:  Can y'all not see the
 3    document?
 4              MS. BROWN:  No.  There's nothing in the
 5    chat.
 6              MR. HILDABRAND:  All right.  Can we go
 7    off the record for minute while we sort this out?
 8              (Off-the-record discussion.)
 9    BY MR. HILDABRAND:
10    Q.    Thank you.  Now that we're back, can you
11    please pull up Doc C?
12    A.    We have it open.
13    Q.    Thank you.  Is that a picture of you on the
14    upper right?
15    A.    Yes, that is.
16    Q.    And is this you giving the presentation back
17    in February 2017?
18    A.    It is.
19    Q.    All right.  On the left side from the
20    presentation, can you read the quotation there and
21    can you read it out loud?
22    A.    Sure.  So it says:  Sexuality is much more
23    than sex.  It's our values, attitudes, feelings,
24    interactions, and behavior.  Sexual development is
25    one part of sexuality and it begins much earlier in
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 76 of 293 PageID #: 1733

```
1   life than puberty.  Infants and children may not
2   think about sexuality in the same way as adults but
3   they learn and interpret messages related to
4   sexuality that will shape their future actions and
5   attitudes.
6   Q.     All right.  And did you include a picture on
7   the left-hand side of the slide here?
8   A.     There is a picture on the slide, yes.
9   Q.     Can you please describe just for the
10  transcript what the picture depicts?
11  A.     It is a picture of two children who are
12  engaged in play with what appears to be a
13  stethoscope.
14  Q.     What age would you say those children are, or
15  what would be your best guess at what age those
16  children are?
17            MS. BROWN:  Objection to form.
18            THE WITNESS:  The children in the image
19  appear to be toddlers.  I would estimate three to
20  four years of age.
21  BY MR. HILDABRAND:
22  Q.     And is one of them -- does one on the left
23  appear to be a boy?  Sorry.  I don't know if that
24  got through.  Does the child on the left appear to
25  be a boy?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 77 of 293 PageID #: 1734

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  So I cannot make

 3    assumptions of their gender identity.  The child on

 4    the left has stereotypically short hair and is

 5    wearing a striped shirt.  They are also wearing pink

 6    glasses.

 7    BY MR. HILDABRAND:

 8    Q.     And the child on the right, how would you

 9    describe their features or how would society

10    describe -- are they stereotypically a girl?

11              MS. BROWN:  Again, objection to form.

12              THE WITNESS:  I could not assume this

13    child's gender identity.  They appear to be wearing

14    a pink shirt, to have longer hair that is styled in

15    pigtails.

16    BY MR. HILDABRAND:

17    Q.     And the child on the right, is that child

18    holding up the child's shirt?

19    A.     The child on the right is holding up their

20    own shirt, yes.

21    Q.     And the child on the left, is that child

22    touching the child on the right anywhere?

23    A.      In my interpretation of the image, it appears

24    as though the child on the left is holding a

25    stethoscope and perhaps touching the stethoscope but
```

1  does not appear to be touching the child on the
2  right.
3  Q.     Thank you for providing that description.
4  Around where on the child in the right's body is the
5  child on the left placing the stethoscope?
6  A.     The child on the left is placing the
7  stethoscope on approximately the child on the
8  right's chest.
9  Q.     Thank you.  Why did you select this picture
10 for this slide?
11 A.     This was many years ago, back in 2017, so
12 I'll do my best to estimate why I selected that at
13 the time.  It is likely because this image
14 represented typical play in childhood and which many
15 toddlers and young children will play doctor or
16 house in their imaginary play.
17            MR. HILDABRAND:  All right.  Travis, can
18 you circulate Doc D.
19            MS. BROWN:  Clark, before you do that,
20 for the record, I'd like to clarify.  Is the quote
21 that you had Dr. Cyperski read attributable to the
22 source at the bottom of the slide, which says
23 National Sexual (inaudible) Center 2013?
24            (Court Reporter interrupts for
25 clarification.)

```
 1          MS. BROWN:  Yes, I'll say it again.
 2   Clark, again, to clarify for the record, the quote
 3   that you had Dr. Cyperski read, is that attributable
 4   to the source at the bottom of the quote on the
 5   slide and in parentheses it says:  National Sexual
 6   Violence Resource Center 2013?
 7   BY MR. HILDABRAND:
 8   Q.     So just to clarify the record, you're
 9   citing -- you're quoting this source on the slide,
10   correct?
11          MS. BROWN:  I am asking if it's
12   attributable to that source?  Is that where you
13   pulled the quote from that you had
14   Dr. Cyperski read?  Did you hear my question?  Are
15   we having audio issues again?  Can folks hear me?
16          MR. HILDABRAND:  I can hear you.  I
17   can't hear Dr. Cyperski.
18          MS. BROWN:  Dr. Cyperski didn't say
19   anything.  I'm asking you about the quote that
20   you've put on the slide and the source of the slide.
21   BY MR. HILDABRAND:
22   Q.     So depositions are asking the witness
23   questions, not asking other attorneys, so let's ask
24   the witness.  Did she pull this quotation from the
25   National Sexual Violence Resource Center?  It says
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 80 of 293 PageID #: 1737

```
 1    on the slide -- is that where you pulled the
 2    quotation from?
 3    A.      That would be my assumption on how the slide
 4    is developed.  But the quotation that was read
 5    previously is attributed to the source from the
 6    national Sexual Violence Resource center in 2013.
 7                  MR. HILDABRAND:  Thank you.  Does that
 8    clear things up?
 9                  MS. BROWN:  It does.  And for the
10    record, I'll just state that, again, this was a
11    slide and exhibit that you prepared and a source
12    that you included.  And of course you're right, the
13    witness is here to answer questions, but I just want
14    to note that I asked you that question.
15                  MR. HILDABRAND:  And you of course have
16    an opportunity to ask questions later on as well but
17    I'm glad we can have it as accurate for the record
18    as possible.  All right.
19    BY MR. HILDABRAND:
20    Q.      Let's turn to Doc D which was circulated.  So
21    does this also depict you on the right?
22                  MS. BROWN:  Sorry.  Give us one moment.
23    BY MR. HILDABRAND:
24    Q.      Okay.
25    A.      This is an image of me on the right.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 81 of 293 PageID #: 1738

1    Q.     And is it, again, the slide presentation on

2    the left?

3    A.     That is correct.

4    Q.     So the left column, does it have a column

5    that says stage of development?

6    A.     Yes.

7    Q.     And then underneath that, does it say early

8    childhood, age two to five?

9    A.     It does.

10   Q.     And then there's a column in the middle that

11   says common behavior; is that correct?

12   A.     Yes.

13   Q.     And then a column on the right that says

14   caregiver tasks; is that correct?

15   A.     Yes.

16   Q.     Is one of the caregiver tasks for two- to

17   five-year-olds to provide basic information about

18   reproduction?

19   A.     And it's listed as the first bullet point.

20   Q.     And is consensual and playful exploration

21   with peers, e.g., playing doctor, is that in the

22   common behavior column?

23   A.     It is.

24   Q.     So do you agree today that consensual and

25   playful exploration with peers, e.g., playing

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 82 of 293 PageID #: 1739

```
 1   doctor, is a common behavior for two- to
 2   five-year-olds?
 3                MS. BROWN:  Objection to form.
 4                THE WITNESS:  Children in early
 5   childhood often engage in consensual and playful
 6   exploration with peers in a variety of ways.
 7   BY MR. HILDABRAND:
 8   Q.    So to provide a yes or no answer, is it
 9   common behavior, yes or no, for two- to
10   five-year-olds to engage in consensual and playful
11   exploration with peers, e.g., playing doctor, yes or
12   no?
13                MS. BROWN:  Same objection.
14                THE WITNESS:  Yes.
15   BY MR. HILDABRAND:
16   Q.    On the right --
17                MS. BROWN:  Are you finished?  So before
18   your next question, I'm going to -- as long as you
19   continue this line of questioning, I'm going to
20   raise a standing objection to scope as we're talking
21   about sexuality here.  And, again, for the record, I
22   believe you're conflating sexuality with gender
23   identity and that's going to be my standing
24   objection and I'll continue to make objections.  You
25   may proceed.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 83 of 293 PageID #: 1740

```
 1              MR. HILDABRAND:  Yes.  I believe we
 2    agreed to do form objections in this case and not --
 3    I understand you're trying to explain your position
 4    but you've talked a lot in the past half hour.
 5    That's not how we've been conducting these
 6    depositions.  And that may be your perspective on
 7    the scope of it, but she is testifying as a
 8    psychologist and has talked about sexual issues
 9    throughout her report.
10              So I think that's why we are asking
11    these questions today and that's something we can
12    work out later.  But for now, please, if you want to
13    object to form whenever you would like.
14    BY MR. HILDABRAND:
15    Q.    On the right --
16              MS. BROWN:  Yes.
17              MR. HILDABRAND:  So on the right -- all
18    right.  Let's turn to -- Travis, can you circulate
19    Doc E.
20              THE WITNESS:  I think we're getting a
21    new document.
22              MS. BROWN:  We have the document open.
23    But, again, for the record, a standing objection to
24    the extent Mr. Hildabrand is questioning the witness
25    about collective slides from what appear to be
```

```
 1  larger presentations.  You may proceed.  We have D
 2  open.
 3              MR. HILDABRAND:  And we're glad to
 4  circulate the -- and, actually, I'll circulate the
 5  YouTube link right now if that's what you'd like.
 6  And in a minute we will enter the entire video as an
 7  exhibit.
 8              MS. BROWN:  This is your time.  If you'd
 9  like to do that, that's fine.  I just noted my
10  objection.
11              MR. HILDABRAND:  That's great.
12  BY MR. HILDABRAND:
13  Q.    All right.  On this document -- so do you see
14  I circulated a link to a YouTube page?  All right.
15  A.    Yes.  We see that in the chat.
16  Q.    Thank you.
17  A.    But we have not opened the link to confirm.
18  Q.    Okay.  Can you pull up Doc E?  Are you
19  looking at that now?  All right.  On Doc E, is that,
20  again, you on the right?
21  A.    Yes, this is me in Doc E.
22  Q.    And is there a slide show presentation on the
23  left?
24  A.    There is.
25  Q.    Are there, again, columns labeled stage of
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 85 of 293 PageID #: 1742

1  development, common behavior, and caregiver tasks?

2  A.     Yes.  They are columns which reflect tables

3  from the source about sexual development.

4  Q.     Is it your understanding that sexual

5  development, is that relevant to the report that you

6  are providing in this case?

7  A.     The report that I provided was within the

8  scope of gender identity and gender dysphoria in

9  individuals who identify as transgender in their

10  treatment, including the treatment guidelines.

11  Sexual development is an important part of childhood

12  development but it's distinct from an individual's

13  gender identity.

14  Q.     So sexual development is not relevant to your

15  report on gender identity; is that correct?

16              MS. BROWN:  Objection to form.

17              THE WITNESS:  Sexual development and

18  gender identity, even say sex identity or sexuality

19  are distinct concepts.

20  BY MR. HILDABRAND:

21  Q.     So yes or no, sexual development is not

22  relevant to your expert report?

23              MS. BROWN:  Same objection.

24              THE WITNESS:  Again, I would like to

25  make clear that sexual development and identity are

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 86 of 293 PageID #: 1743

```
 1  different than gender identity.  So I'm not sure how
 2  to answer your question with that.
 3  BY MR. HILDABRAND:
 4  Q.    So you can't give -- you can't say that this
 5  is not sexual -- you cannot say that sexual
 6  development is not relevant to your report?
 7              MS. BROWN:  Same objection.
 8              THE WITNESS:  Sexual development is an
 9  important part of childhood development and to the
10  scope that, you know, I can provide expert
11  information about child and adolescent development.
12  BY MR. HILDABRAND:
13  Q.    But you cannot provide a yes or no answer to
14  that question?
15              MS. BROWN:  Same objection.
16              THE WITNESS:  I'm sorry, I don't mean to
17  be obstinate.  I just -- I'm not sure how to answer
18  the question because they're different concepts.
19  BY MR. HILDABRAND:
20  Q.    Okay.  That's fair.  Let's ask a few
21  questions about this and then we'll go out to lunch
22  at that point.
23  A.    Okay.
24  Q.    So here is the stage of development listed
25  middle childhood, age five to eight?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 87 of 293 PageID #: 1744

```
1    A.    Yes.
2    Q.    And in the common behavior column, does it
3    say may start showing interest in opposite sex?
4    A.    Yes.
5    Q.    And you used the phrase "opposite sex" here,
6    correct?
7    A.    Yes.
8    Q.    Then the slide says, common behavior includes
9    masturbation for pleasure, increasingly in private.
10   Is that what you said here?
11   A.    Citing the source that's listed at the bottom
12   of the slide; however, that information is listed on
13   the slide.
14   Q.    Would you agree that masturbation for
15   pleasure, increasingly in private, is common
16   behavior for five- to eight-year-olds?
17             MS. BROWN:  Objection to form.
18             THE WITNESS:  Masturbating for pleasure,
19   increasingly in private, is listed as a common
20   behavior and supported in the literature as a common
21   behavior in childhood.
22   BY MR. HILDABRAND:
23   Q.    Thank you.  On the right lists caregiver
24   tasks.  Do you see where it says:  Promote
25   understanding of gender and how children experience
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 88 of 293 PageID #: 1745

1  their identity?  Is that what you said on the first
2  bullet?
3  A.     Again, this is citing a particular source.
4  Then we would -- we could verify within that source
5  that is what's listed on the slide to promote
6  understanding of gender and how children experience
7  their identity.
8  Q.     So in your opinion, is that an appropriate
9  caregiver task to help five-to eight-year-olds
10 understand gender and how they experience their
11 gender?
12 A.     I think this is a caregiver task across
13 development in childhood and adolescence, that
14 children, adolescents, and young adults can be
15 supported in understanding concepts about themselves
16 in the world around them, including gender.
17 Q.     Including at ages five through eight,
18 correct?
19          MS. BROWN:  Objection.
20          THE WITNESS:  Yes.  Ages five through
21 eight in and across development.
22 BY MR. HILDABRAND:
23 Q.     Does it also say on the right that a
24 caregiver task is to explain basics of reproduction,
25 including vaginal intercourse?  Is that what the

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 89 of 293 PageID #: 1746

```
 1   slide says in the second bullet?
 2              MS. BROWN:  Sorry, I did not mean to
 3   interrupt you.  Again, I'm going to note my
 4   objection.  Clark, I understand but I'm going to say
 5   it again.  I'm objecting to scope for all of these
 6   questions and I'm going to continue.
 7              MR. HILDABRAND:  Yes.  Just object to
 8   form, as was agreed by both parties before the
 9   deposition.  So I'll repeat my question.
10   BY MR. HILDABRAND:
11   Q.    On the right-hand side, does it say:  Explain
12   basics of reproduction, including vaginal
13   intercourse?  Is that in the caregiver task column?
14              MS. BROWN:  Same objection.
15              THE WITNESS:  That is listed in the
16   caregiver task column in this image.
17   BY MR. HILDABRAND:
18   Q.    Do you agree today that this is an
19   appropriate caregiver task for children ages five
20   through eight?
21              MS. BROWN:  Same objection.
22              THE WITNESS:  Yes.  It is an important
23   task for caregivers to provide information and
24   explain basics of reproduction to children.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 90 of 293 PageID #: 1747

1    BY MR. HILDABRAND:

2    Q.      Farther down that column, do you say:  As a

3    caregiver task, explain differences in sexual

4    orientations?  Is that an appropriate caregiver task

5    for children ages five through eight?

6                 MS. BROWN:  Same objection.

7                 THE WITNESS:  Yes.

8    BY MR. HILDABRAND:

9    Q.      And then, finally, is there also listed in

10   the caregiver task column for children ages five

11   through eight, teach that masturbation is something

12   that occurs in private; is that listed?

13                MS. BROWN:  Same objection.

14                THE WITNESS:  It is listed.

15   BY MR. HILDABRAND:

16   Q.      Is that an appropriate caregiver task for

17   children ages five through eight?

18                MS. BROWN:  Same objection.

19                THE WITNESS:  It is appropriate within

20   the family's value system and is an important part

21   of an individual's development.

22   BY MR. HILDABRAND:

23   Q.      Is the family's value system referenced on

24   this slide?

25   A.      On this particular slide, it is not

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 91 of 293 PageID #: 1748

referenced; however, it was several slides
previously and within the context of this
presentation, if I recall correctly.

            MR. HILDABRAND:  Thank you.  That's the
logical end point for questions right now if y'all
want to break for lunch.

            MS. BROWN:  Before that, quickly, if
you'll give me one moment before we go off the
record.

            MR. HILDABRAND:  Before we go off the
record, I'll enter collectively as Exhibit 3.  This
presentation will be Exhibit 3.

            (WHEREUPON, documents were marked as
Collective Exhibit Number 3.)

            MS. BROWN:  When you say presentation,
are you speaking about the YouTube link you
inserted?

            MR. HILDABRAND:  Yes.  This entire
presentation will be Exhibit 3.  And these clips are
from that presentation, so this is collectively
Exhibit 3.  If you'd like me to, I can enter the
clips as a separate exhibit if that's what you'd
prefer but that's how we -- is that fine with you?

            MS. BROWN:  I'm requesting that all the
presentations be separately entered in as exhibits.

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 92 of 293 PageID #: 1749

```
 1              MR. HILDABRAND:  All right.  So we'll
 2    enter the screenshots collectively as Exhibit 3.
 3    The presentation will be Exhibit 4.  If that's the
 4    case, let's go and pull up this presentation.  If
 5    you can click the YouTube link in there just so we
 6    can establish that this is the presentation.
 7              (WHEREUPON, a document was designated to
 8    be marked as Late-filed Exhibit Number 4, when
 9    provided.)
10              MS. BROWN:  Okay.  We have the
11    presentation playing.
12              MR. HILDABRAND:  Great.  So on the first
13    page, do you see -- I'm sorry.  Let's play a little
14    bit.  At point -- at the first second of the video,
15    if you can go there?
16              MS. BROWN:  Sorry, the second?
17              MR. HILDABRAND:  Yes.  0:01 of the
18    presentation.  Just go there.
19              MS. BROWN:  Okay.
20    BY MR. HILDABRAND:
21    Q.     Do you see -- Dr. Cyperski, do you see
22    yourself in the upper right corner of this video?
23    A.     Yes.
24    Q.     And is there a slide show presentation on the
25    left that says:  Sexual behavior problems toward
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 93 of 293 PageID #: 1750

```
 1  health and healing for children, adolescents, and
 2  their families; is that correct?
 3  A.     Yes.
 4  Q.     All right.  Now let's go to 239.  Just go
 5  there.  We don't need to watch it.
 6         Is that the same slide that we discussed as
 7  Doc C?
 8  A.     It appears so, yes.  If I could, like to
 9  request to take a break soon.
10  Q.     Yes.  I'm just going to go and just confirm
11  for the other two and then take a break at that
12  point.
13  A.     Okay.
14  Q.     I know we wanted to end at noon but I just
15  wanted to -- so we don't have to go back and confirm
16  each of these.
17         Let's go now to 3:52 in the video.  I'm
18  sorry.  This one is -- sorry 5:52 in the video.  At
19  5:52 in the video, do you see a slide that lists
20  stage of development, common behavior, and caregiver
21  tasks?
22  A.     So early childhood age two through five, yes.
23  Q.     Yes.  And is that the same slide that we
24  discussed earlier as Doc D?
25  A.     Yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 94 of 293 PageID #: 1751

```
1    Q.    All right.  Last time, let's go to I think
2    it's seven minutes into the video.  Is that the same
3    slide that we discussed as Doc E?
4    A.    It appears that way.
5              MR. HILDABRAND:  That's all that I have
6    if y'all want to take a break now.
7              MS. BROWN:  Okay.  I need to say -- we
8    can go off the record.
9              (Recess observed.)
10             MR. HILDABRAND:  Let's go back on the
11   record.  All right.  Now that we are back on the
12   record, I have that we've spent two hours and 20
13   minutes so far in the deposition.  Now that we are
14   back, I just want to note, we discussed this off the
15   record a little bit, but my understanding is under
16   the Federal Rules of Civil Procedure 30(c)(2) is
17   that an objection must be stated concisely in a
18   non-argumentative and non-suggestive manner.  If
19   there is a concern about speaking objections and
20   coaching, I will put that on the record, that's
21   fine, and we reserve the right to request from the
22   court any further action that we deem necessary to
23   make sure that our deposition is carried out.  All
24   right.  To restart.
25   BY MR. HILDABRAND:
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 95 of 293 PageID #: 1752

```
 1   Q.     Is the mental health of children relevant to
 2   your report?
 3               MR. ROYER:  Clark, hold on one second.
 4   Their mic is still activating.
 5               MR. HILDABRAND:  Oh.
 6               MS. BROWN:  Okay.  We're back.
 7   BY MR. HILDABRAND:
 8   Q.     Great.  Is the mental health of children
 9   relevant to your report?
10   A.     Yes.
11   Q.     Is the psychological development of children
12   relevant to your report?
13   A.     Yes.
14   Q.     Is a child's experience of identity relevant
15   to your report?
16   A.     Yes.
17   Q.     Are the changes that occur during puberty
18   relevant to your report?
19               MS. BROWN:  Objection.
20               THE WITNESS:  The changes that occur
21   during puberty may be considered in part of a
22   gender-affirming process.
23   BY MR. HILDABRAND:
24   Q.     All right.  Is instruction of children about
25   sex relevant to your report?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 96 of 293 PageID #: 1753

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  Can you say what you mean?

 3   BY MR. HILDABRAND:

 4   Q.    Is instructing children about sexual acts

 5   relevant to your report?

 6              MS. BROWN:  Objection to form again.

 7              THE WITNESS:  What does instructing

 8   children about sexual acts mean?

 9   BY MR. HILDABRAND:

10   Q.    Is teaching children about sexual acts

11   relevant to your report?

12              MS. BROWN:  Same objection.

13              THE WITNESS:  Not that I'm aware.

14   Although talking about sexual identity and an

15   individual's sense of identity may be.

16   BY MR. HILDABRAND:

17   Q.    Is sex as a noun to refer to someone's sex,

18   is that relevant to your report?

19              MS. BROWN:  Objection to form.

20              THE WITNESS:  Again, what do you mean by

21   sex in this context?

22   BY MR. HILDABRAND:

23   Q.    Not necessarily how I understand it but is

24   sex assigned at birth relevant to your report?

25   A.    Yes.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 97 of 293 PageID #: 1754

```
 1   Q.     Is the privacy of children a relevant
 2   consideration for your report?
 3              MS. BROWN:  Objection to form.
 4              THE WITNESS:  What do you mean by
 5   privacy?
 6   BY MR. HILDABRAND:
 7   Q.     Is the privacy of children in exposing or not
 8   exposing their genitalia a relevant consideration in
 9   your report?
10              MS. BROWN:  Objection to form.
11              THE WITNESS:  Discussing whether a child
12   is exposing their genitalia to others is not
13   relevant.
14   BY MR. HILDABRAND:
15   Q.     Can we turn to paragraph 26 in your report.
16   That's Doc A, Exhibit 1, at the bottom of page
17   seven, going on to the top of page eight.
18              MS. BROWN:  I'm sorry, can you provide
19   me with the page number again?
20              MR. HILDABRAND:  Of course.  Bottom of
21   page seven, top of page eight.  The paragraph goes
22   on to both.
23              THE WITNESS:  Okay.  We're on the bottom
24   of page seven.
25   / /
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 98 of 293 PageID #: 1755

```
 1    BY MR. HILDABRAND:

 2    Q.     You say there that maintaining privacy about

 3    one's transgender identity can be important to

 4    safety given the persistence of harassment and even

 5    violence exhibited against transgender people.

 6    A.     Yes.

 7    Q.     So is maintaining privacy relevant to your

 8    report?

 9              MS. BROWN:  Objection to form.

10              THE WITNESS:  It may be helpful to know

11    in what specific context we're talking about

12    maintaining privacy as the reports states

13    maintaining privacy about one's identity can be

14    important to their safety.

15    BY MR. HILDABRAND:

16    Q.     How do you understand the term "privacy" that

17    you used here?  What's your understanding of that?

18              MS. BROWN:  Objection to form.

19              THE WITNESS:  My interpretation is

20    privacy representing confidentiality.

21    BY MR. HILDABRAND:

22    Q.     What sort of confidentiality are you talking

23    about?

24              MS. BROWN:  Objection to form.

25              THE WITNESS:  Is the question about in
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 99 of 293 PageID #: 1756

```
 1   the report?

 2   BY MR. HILDABRAND:

 3   Q.     You just used the word "confidentiality".  In

 4   your answer that you gave, what do you mean by

 5   confidentiality?

 6   A.     I was providing an answer about the

 7   definition of privacy.  So in this sentence in the

 8   report might be that maintaining confidentiality

 9   about one's identity could be important to safety.

10   Q.     So not having other people know that one is

11   transgender could be relevant to privacy?

12              MS. BROWN:  Objection to form.

13              THE WITNESS:  Maintaining

14   confidentiality about their identity can be

15   important to safety and that would include about

16   their gender identity.

17   BY MR. HILDABRAND:

18   Q.     Thank you.  Is the understanding of gender

19   identity among psychologists still developing?

20              MS. BROWN:  Objection to form.

21              THE WITNESS:  I'm not sure what you mean

22   still developing.

23   BY MR. HILDABRAND:

24   Q.     Are there still aspects of gender identity

25   that psychologists disagree about?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 100 of 293 PageID #: 1757

```
 1              MS. BROWN:  Objection to form.
 2              THE WITNESS:  It's common in medical and
 3    scientific fields for the literature or terminology
 4    to continue to be evolving with new study and
 5    evidence and in that way it is possible that things
 6    are still evolving.
 7    BY MR. HILDABRAND:
 8    Q.    Is this a rapidly evolving field?
 9              MS. BROWN:  Objection to form.
10              THE WITNESS:  What do you mean by
11    rapidly?
12    BY MR. HILDABRAND:
13    Q.    We can come back to that in a minute.  Is
14    there much data on the mental health in transgender
15    children?
16              MS. BROWN:  Objection to form.
17              THE WITNESS:  There is a significant
18    body of evidence about mental health in transgender
19    children.
20    BY MR. HILDABRAND:
21    Q.    Are most of the studies on transgender mental
22    health based on small sample sizes?
23              MS. BROWN:  Objection to form.
24              THE WITNESS:  I would need to see
25    specific numbers of sample sizes that you referenced
```

```
 1   and this would be specific to each article.
 2   BY MR. HILDABRAND:
 3   Q.    That's fair.  In general, are larger sample
 4   sizes preferred to smaller sample sizes?
 5              MS. BROWN:  Objection to form.
 6              THE WITNESS:  In the mental health
 7   literature, we often have peer-review publications
 8   that include single case studies or small case
 9   studies, ranging all the way from one individual up
10   to large sample sizes.  Thousands of people.
11   BY MR. HILDABRAND:
12   Q.    Everything else being equal, would you prefer
13   a study that had one individual case or a study that
14   had multiple cases considered?
15              MS. BROWN:  Again, objection to form.
16              THE WITNESS:  It would depend on the
17   purpose of the literature and the article I was
18   reviewing.
19   BY MR. HILDABRAND:
20   Q.    Is the study more likely to be statistically
21   valid if it has a larger sample size or a smaller
22   sample size?
23              MS. BROWN:  Objection to form.
24              THE WITNESS:  Here there may be some
25   nuances about statistical analysis that would be
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 102 of 293 PageID #: 1759

```
 1    important to review with a statistician.  It's very
 2    likely that in large sample sizes, for example, it's
 3    easy to find significant differences that have
 4    little meaning because there are so many people we
 5    can find information.  If we're looking at hundreds
 6    of thousands of people, that would be significant.
 7    BY MR. HILDABRAND:
 8    Q.     Thank you.  Let's go to PDF page 13.  Page
 9    two of your -- sorry -- page three of your CV if you
10    want to scroll down to that.  This is back in Doc A,
11    Exhibit 1, your report.
12               MS. BROWN:  Sorry, Clark, page two of
13    the CV?
14               MR. HILDABRAND:  Just one second.  Page
15    three of your CV.
16               THE WITNESS:  Okay.  We're there.
17    BY MR. HILDABRAND:
18    Q.     Do you see under continuing medical education
19    an October of 2020 presentation?
20    A.     Yes.
21    Q.     What's the title of that presentation listed
22    there?
23    A.     Path to Affirmative Medical Care for
24    Transgender/Gender Diverse Youth:  A Guide for
25    Mental Health Provider.
```

```
 1   Q.    All right.  I'm going to circulate the
 2   recording of that in just one second.
 3              MR. HILDABRAND:  This will be Doc F, and
 4   we'll enter this as Exhibit 5.  This will be 5.
 5              (WHEREUPON, a document was designated to
 6   be marked as Late-filed Exhibit Number 5, when
 7   provided.)
 8   BY MR. HILDABRAND:
 9   Q.    Do you have that pulled up?
10   A.    Yes.
11   Q.    Feel free to go ahead to around the 22 second
12   mark, 0:22.  When you're there, does it say:  Path
13   to Affirmative Medical Care for Transgender/Gender
14   Diverse (TGD Youth):  A Guide for Mental Health
15   Providers?
16   A.    It does.
17   Q.    And is your name listed there at the top?
18   A.    It is.
19   Q.    Does this appear to be the presentation that
20   you gave back in October of 2020?
21   A.    Yes.
22   Q.    Okay.  Now let's turn to the -- jumping ahead
23   to the 58:22 second mark.  58:22.  And if you can,
24   please listen to 58:22 to 58:50.  And when you do
25   that, just let me know.
```

```
 1              MS. BROWN:  Clark, we're actually not
 2   getting the audio from this video and I'm sure it's
 3   a tech situation on our end.  So do you want to go
 4   off the record for like five minutes so I can figure
 5   out how to get the audio to play?  Or is there
 6   audio?  I'm not hearing anything.
 7              MR. HILDABRAND:  Yes.  There is audio.
 8   So if you want to go off the record for a minute we
 9   can sort that out.  All right.  Let's go off the
10   record.
11              MS. BROWN:  We're ready.
12   BY MR. HILDABRAND:
13   Q.     All right.  We are now back on the record.
14   Before we get to the video, I'm going to read out
15   first the website address of what was entered as
16   Exhibit 4 and what the cumulative Exhibit 3 slides
17   were taken from.  That is
18   https:\\www.YouTube.com\watch?v=322u6en50d8.  And
19   then I will say the website address for what has
20   been marked Exhibit 5.  That is
21   https:\\www.YouTube.com\watch?v=HvLYai7qq0A.  All
22   right.  And now --
23              MS. BROWN:  Oh, sorry, I didn't want to
24   interrupt.  I just wanted to flag Britany on our
25   team, you're not on mute and I saw the audio switch
```

```
1    to you.  Okay.  Thanks.  You got it.  Thanks.
2              MR. HILDABRAND:  Thanks for making sure.
3    And now the witness is going to click play around
4    the 58:20 or 58:22 mark of the video and listen to
5    58:50.
6              THE WITNESS:  Okay.  Pressing play.
7              (Playing video.)
8              Our best practices are still emerging
9    for children and adolescents.  This is, you know --
10   what we know about therapy and mental health is done
11   through relatively small case studies at this point
12   in time but the literature is growing every day.  We
13   look a lot to the principles of trauma-informed care
14   to be supportive and so leading with the
15   individual's affirmation believing their truth and
16   helping them to identify where the distress and the
17   hurt is.  I think --
18             (Stopped video.)
19             MS. BROWN:  Okay.  That's at 58:51.
20   You're on mute again.  Sorry.
21   BY MR. HILDABRAND:
22   Q.    Yeah.  Dr. Cyperski, was that you speaking?
23   A.    That was me speaking as part of a one-hour
24   presentation.
25   Q.    Did you say that our best practices are still
```

```
 1   emerging for children adolescents?
 2              MS. BROWN:  If you want to hear it
 3   again, it was playing very quickly, to confirm, we
 4   can do that.
 5              THE WITNESS:  Uh-huh.  Uh-huh.
 6              MS. BROWN:  And I'm sorry.  Will you
 7   just repeat the question and then we'll try to
 8   confirm?
 9   BY MR. HILDABRAND:
10   Q.    Sure.  Yes.  This question is, Our best
11   practices are still emerging for children and
12   adolescents, did you say that?
13              (Playing video.)
14              Our best practices are still emerging
15   for children and adolescents.  This is, you know,
16   what we know about --
17              (Stopped video.)
18   BY MR. HILDABRAND:
19   Q.    Right.  So did you say that statement?
20   A.    That statement was said again as part of
21   context within a one-hour presentation.
22   Q.    Do you agree that the best practices for
23   psychological treatment of transgender children are
24   still emerging?
25              MS. BROWN:  Objection to form.
```

```
1            THE WITNESS:  So this particular

2   statement would need to be understood in context and

3   I believe at this point in the presentation we were

4   answering Q&A.  And so would be preferable to review

5   some more of the contents before and after that

6   statement to inform interpretation.

7   BY MR. HILDABRAND:

8   Q.    Rather than watching the whole -- the entire

9   video, which glad at any point if you -- glad after

10  the deposition if you want to review that or during

11  a break.  But would you agree with the statement

12  today that best practices are still emerging for

13  children and adolescents regarding transgender

14  healthcare?

15            MS. BROWN:  Objection to form.

16            THE WITNESS:  So the question is if best

17  practices are still emerging -- can you repeat it?

18  I'm so sorry.

19  BY MR. HILDABRAND:

20  Q.    Are best practices for transgender children,

21  treating them for mental health, still emerging?

22            MS. BROWN:  Same objection.

23            THE WITNESS:  We have many established

24  best practice guidelines such as the Endocrine

25  Society and the WPATH.  As previously provided in an
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 108 of 293 PageID #: 1765

```
 1    answer a few minutes ago, in all of medical sciences
 2    we are regularly updating the literature and
 3    exploring new information to keep our practice
 4    current in support of best practices.
 5    BY MR. HILDABRAND:
 6    Q.    Did you also say that what we know about
 7    therapy and mental health is done through relatively
 8    small case studies at this point in time?  And if
 9    you want to watch the video, that's fine.
10    A.    Okay.  We're going to pull up the video
11    again.
12              MS. BROWN:  Clark, do you have a time
13    stamp?  I know it's relatively short but...
14              MR. HILDABRAND:  And you can start at
15    5:24.  I'll be after that statement, the statement
16    we discussed a minute ago.
17              MS. BROWN:  58:25.
18              THE WITNESS:  Okay.  Hitting play.
19              MS. BROWN:  Oh, wait.  And just to make
20    sure, Clark, will you repeat the question?
21    BY MR. HILDABRAND:
22    Q.    Did you say that what we know about therapy
23    and mental health is done through relatively small
24    case studies at this point in time?
25              (Playing video.)
```

1           What we know about therapy and mental
2    health is done through relatively small case studies
3    at this point in time.
4           (Stopped video.)
5           THE WITNESS:  Yes.  Again, that
6    statement was made in context of a larger discussion
7    in a one-hour presentation and is a very small
8    snippet of which may wish to more accurately
9    describe and articulate in another context.
10   BY MR. HILDABRAND:
11   Q.    So at this point in time, two years later,
12   would you agree that what we know about therapy and
13   mental health is done through relatively small case
14   studies at this point in time?  And feel free to
15   elaborate or provide further context.
16          MS. BROWN:  Objection to form.
17          THE WITNESS:  What we know about mental
18   health in the transgender population is that there
19   is a significant body of literature that identifies
20   mental health concerns and experience in transgender
21   children and we are ongoing working to update and
22   advance the literature in the state of the science
23   as is consistent with best practices across medicine
24   and other professions.
25   / /

BY MR. HILDABRAND:

Q.    Are those developments done through relatively small case studies at this point in time today?

MS. BROWN:  Objection to form.

THE WITNESS:  I would be curious what you mean and what the definition of relatively small case studies would be.

BY MR. HILDABRAND:

Q.    How would you understand that phrase, "relatively small case studies"?  Do you have an understanding of what that would mean?

MS. BROWN:  Same objection.

THE WITNESS:  I can see several different interpretations of what relatively small case studies would mean.

BY MR. HILDABRAND:

Q.    What are some of those interpretations?

A.    If someone were using that phrase, it might mean that there were a small number, so a handful of case studies.  It might mean that there were case studies which included a small number of participants would be another interpretation.

Q.    In your practice, do you begin by believing the individual's truth about their gender identity?

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  Can you repeat the

 3  question?

 4  BY MR. HILDABRAND:

 5  Q.    Of course.  In your practice treating

 6  transgender individuals, do you begin by believing

 7  their truth about what they express their gender

 8  identity to be?

 9              MS. BROWN:  Same objection.

10              THE WITNESS:  It might be important to

11  define believing their truth and the statement could

12  be considered in the context of gender-affirming

13  care.

14  BY MR. HILDABRAND:

15  Q.    Are some children incorrect about what their

16  gender identity is?

17              MS. BROWN:  Objection to form.

18              THE WITNESS:  No.

19  BY MR. HILDABRAND:

20  Q.    So all children know what their gender

21  identity is; is that your position?

22              MS. BROWN:  Objection to form.

23              THE WITNESS:  By definition that we

24  established previously, individual gender identity

25  is their own sense of self of their internal sense
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 112 of 293 PageID #: 1769

1  of gender.  So I'm having a hard time thinking

2  through when an individual's declaration of their

3  gender identity would ever be incorrect because it

4  is their own understanding of their gender.

5  Q.    Thank you.  That's helpful.  Let's go to your

6  report, paragraph 14, which is on page four.

7  A.    Okay.  Page four of the report.

8  Paragraph 14?

9  Q.    Yes.

10  A.    We are there.

11  Q.    Great.  Does it say that many transgender

12  people become aware of their gender identity at a

13  very early age?  Is that what the report says?

14  A.    That is in the report.

15  Q.    Do you still agree with that statement today?

16  A.    Yes.

17  Q.    You used the phrase "at a very early age."

18  What ages do you mean by that phrase here?

19  A.    In the literature, there is evidence that

20  children and people can start to become aware of

21  their gender as young as three years old or younger.

22  It is going to vary by individual and by their

23  unique abilities.

24  Q.    What is the youngest a patient has told you

25  that they are transgender?

```
 1              MS. BROWN:  Objection to form.

 2              THE WITNESS:  In my clinical experience,

 3    I have heard patients and their caregivers recount

 4    that they first became aware and shared their gender

 5    identity at the age of two or three.

 6    BY MR. HILDABRAND:

 7    Q.    Just to clarify, is that a transgender

 8    identity they shared at the age of two or three?

 9              MS. BROWN:  Objection to form.

10              THE WITNESS:  Can you restate the

11    question for me, please?

12    BY MR. HILDABRAND:

13    Q.    Glad to.  So are you aware of children ages

14    two to three expressing a gender identity

15    inconsistent with their sex assigned at birth?

16    A.    Yes.

17    Q.    Have children at the ages of two to three who

18    have expressed a gender identity inconsistent with

19    their sex assigned at birth been treated at VPATH?

20              MS. BROWN:  Objection to form.

21              THE WITNESS:  Within the VPATH Clinic, I

22    am not aware of the specific age range for all of

23    the patients seen by all of the providers in our

24    clinic.  So I don't know that I am aware of how to

25    answer that question at this point.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 114 of 293 PageID #: 1771

BY MR. HILDABRAND:

Q.    What's the youngest age child who expressed a gender identity inconsistent with their sex assigned at birth that you are aware being treated at VPATH?

          MS. BROWN:  Same objection.

          THE WITNESS:  I am aware of children who are probably six years old that have been -- who have met with one of the providers in our interdisciplinary clinic.

BY MR. HILDABRAND:

Q.    Are you aware of children at ages five or younger who have met with professionals at VPATH?

A.    It is certainly possible that children under six years old could meet with one of the professionals.

Q.    But today you're not aware one way or the other?

A.    I am not.

Q.    All right.  Going back to Exhibit 5, the YouTube video.  Actually, before we do that, what percentage of children persist in their expressed transgender identity?

          MS. BROWN:  Objection to form.

          THE WITNESS:  We would need some additional context to answer that question.

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 115 of 293 PageID #: 1772

BY MR. HILDABRAND:

Q.    What's your estimation of the percentage of children that persist in their gender identity?  And feel free to break it out if you want to between prepubertal children or children in the middle of puberty or children are teenagers who have completed puberty?

MS. BROWN:  Same objection.

THE WITNESS:  So the question is around individuals who persist in their gender identity. And there is a high percentage of individuals, children and adolescents who, upon sharing and discovering their gender identity, will persist in their identity.

BY MR. HILDABRAND:

Q.    Let's go in the video, Exhibit 5, to the 12:15 mark.  We're not going to listen to anything here.  We're just going to just look at the screen if you can see that.

MS. BROWN:  I'm sorry, Clark.  What's the title of the video?

MR. HILDABRAND:  Oh.  This is the more recent one, the Path to Affirmative Medical Care for Transgender/Gender Diverse Youth.

MS. BROWN:  So are we done with audio?

```
 1              MR. HILDABRAND:  Don't need the audio.

 2              MS. BROWN:  Okay.  Well, we have it

 3    pulled up.

 4    BY MR. HILDABRAND:

 5    Q.    In about the 12:15, 12:20 mark, the slide

 6    there.

 7              MS. BROWN:  Okay.  We're at 12:16.

 8    BY MR. HILDABRAND:

 9    Q.    Does this slide say considerations for youth?

10    A.    Yes.

11    Q.    Then does it say validity in prepubertal

12    children versus adolescents?

13    A.    It does.

14    Q.    What percentage does it give for how children

15    persist?

16    A.    On this slide from, I believe it was a

17    presentation in 2020, it says:  Fluidity in

18    prepubertal children versus adolescents and the

19    first bullet point is children persist 12 to

20    27 percent.

21    Q.    And just to be fair with you earlier, in the

22    bottom right-hand side corner, is there anything

23    that it looks like the slide is citing?

24    A.    Yes, sir.  There are several articles that

25    are cited on this slide.
```

1   Q.      And then going back up, does it say that

2   adolescents near 100 percent persistence?

3   A.      It does.

4   Q.      In your experience as a psychologist, is it

5   12 to 27 percent persistence, do you find that

6   accurate for children?

7                   MS. BROWN:  Objection to form.

8                   THE WITNESS:  In my professional

9   practice, I find this number is significantly lower

10  than what I have experienced in practice.

11  BY MR. HILDABRAND:

12  Q.      And then for the adolescents near 100 percent

13  persistence, is that accurate with what you've found

14  in your practice?

15                  MS. BROWN:  Same objection.

16                  THE WITNESS:  In my professional

17  practice adolescents have 100 percent persistence.

18  BY MR. HILDABRAND:

19  Q.      Are you aware of any academic studies done of

20  individuals who have desisted from an express

21  transgender gender identity?

22                  MS. BROWN:  Objection to form.

23                  THE WITNESS:  Define what you mean by

24  academic studies in this case.

25  / /

```
 1   BY MR. HILDABRAND:
 2   Q.    A peer-reviewed journal article, for example.
 3   A.    And the question was a peer-reviewed journal
 4   article about what?
 5   Q.    A peer-reviewed journal article about
 6   individuals who previously expressed that their
 7   gender identity was inconsistent with their sex
 8   assigned at birth but later expressed that they were
 9   incorrect and that their gender identity really was
10   consistent with their sex assigned at birth?
11             MS. BROWN:  Objection to form.
12             THE WITNESS:  There has been
13   peer-reviewed studies on a number of topics,
14   including individuals' persistence of gender
15   identity.
16             MR. HILDABRAND:  Travis, can you go
17   ahead and circulate Document K.
18             THE WITNESS:  We have that open.
19   BY MR. HILDABRAND:
20   Q.    And what is the title of this article?
21   A.    It reads:  Individuals Treated for Gender
22   Dysphoria with Medical and/or Surgical Transition
23   who Subsequently Detransitioned, A Survey of 100
24   Detransitioners by Lisa Littman.
25   Q.    And what journal does this appear to be
```

```
 1   published in?  And --
 2   A.      This is published -- I'm sorry.  Go ahead.
 3   Q.      I'm sorry, just for help, toward the top
 4   would be somewhere to look.  But if you want to
 5   answer.
 6   A.      Yes.  It's published in the, appears, in The
 7   Archives of Sexual Behavior, 2021.
 8   Q.      Is that a reputable journal?
 9             MS. BROWN:  Objection to form.
10   BY MR. HILDABRAND:
11   Q.      In your professional experience, is this the
12   sort of journal whose articles you might rely upon?
13   A.      I am not familiar with the specifics of this
14   journal.  And it appears to be a publication from
15   that journal, however.
16   Q.      Have you read this article or heard about it
17   before?
18             MS. BROWN:  Objection to form.
19             THE WITNESS:  I have read this article
20   in the past.
21   BY MR. HILDABRAND:
22   Q.      Do you remember what your impression of the
23   article was when you read it?
24             MS. BROWN:  Objection to form.
25             THE WITNESS:  Is the question about when
```

```
 1   I initially read the article?
 2   BY MR. HILDABRAND:
 3   Q.    What's your -- do you have an opinion about
 4   this article?
 5              MS. BROWN:  Objection to form.
 6              THE WITNESS:  I would need to review the
 7   article again.  It has been sometime since I last
 8   read this article.
 9   BY MR. HILDABRAND:
10   Q.    All right.  So let's go through parts of this
11   article and discuss.
12   A.    Okay.
13   Q.    I'll point you to parts of it in just one
14   second.
15              MS. BROWN:  Is it zoomed in enough for
16   you?
17              THE WITNESS:  Yeah, I can see it.  Thank
18   you.
19   BY MR. HILDABRAND:
20   Q.    So under introduction, do you see the first
21   line?  Can you read that out?
22   A.    Uh-huh.  Detransition is the act of stopping
23   or reversing a gender transition.
24   Q.    Do you agree that that is a fair definition
25   of the word "detransition" in this field?
```

```
 1            MS. BROWN:  Objection to form.

 2            THE WITNESS:  This is a definition of

 3   detransition and our field uses other terms to

 4   describe this phenomenon as well.

 5   BY MR. HILDABRAND:

 6   Q.    What terms would you use to describe this

 7   phenomenon?

 8   A.    One common term that's been identified in the

 9   field is also retransition.

10   Q.    Is detransition a term that others in your

11   field use to describe this?

12            MS. BROWN:  Objection to form.

13            THE WITNESS:  Some professionals use the

14   term "detransition".

15   BY MR. HILDABRAND:

16   Q.    How many of your patients have ever

17   detransitioned or retransitioned?

18            MS. BROWN:  Objection to form.

19            THE WITNESS:  We would need to define

20   those terms of detransition or retransition to

21   answer that question.

22   BY MR. HILDABRAND:

23   Q.    How many of your -- how many of the

24   individuals you have treated in your practice have

25   stopped or reversed a gender transition?
```

```
 1              MS. BROWN:  Objection to form.
 2              THE WITNESS:  None of my patients have
 3  ever stopped or reversed a gender transition.
 4  BY MR. HILDABRAND:
 5  Q.     Are you aware of any patients at VPATH who
 6  have stopped or reversed a gender transition?
 7              MS. BROWN:  Objection to form.
 8              THE WITNESS:  I am aware of one case by
 9  another provider in the Interdisciplinary Clinic of
10  an individual who identified as retransitioning.
11  BY MR. HILDABRAND:
12  Q.     Can you give me any particulars you can
13  remember about that case without providing names of
14  the individual?
15              MS. BROWN:  Objection to form.
16              THE WITNESS:  Which particulars would
17  you be interested in?
18  BY MR. HILDABRAND:
19  Q.     Sure.  Have they been on puberty blockers at
20  any point in their treatment to the best of your
21  knowledge?
22  A.     So the patient I am thinking of I did not
23  have contact with.  And in fact I believe they may
24  have established care prior to the initiation of our
25  interdisciplinary clinic at VPATH with one of our
```

```
 1   endocrinologists.  So I'm not aware of many of the
 2   details of their case.
 3   Q.     Which professional at VPATH would be aware of
 4   the details of that case?
 5   A.     I believe it was a patient of Dr. Jennifer
 6   Najjar, who is a pediatric endocrinologist.
 7   Q.     Thank you.  If it's the case that that doctor
 8   handled, I'll stop asking you questions about it.
 9          Going back up to the abstract of this.  Do
10   you see where it says that only 24 percent of
11   respondents informed their clinicians that they had
12   detransitioned?
13   A.     I see that text in the abstract, yes.
14   Q.     Do you mainly treat children and adolescents?
15   A.     I work with children, adolescents, young
16   adults, and their caregivers.
17   Q.     What's the age range of patients whom you
18   treat?
19   A.     Are you asking about current caseload or in
20   my practice in general?
21   Q.     We can ask current caseload first.
22   A.     Okay.  In my current caseload, I have
23   patients I would estimate who are seven to 22.
24   Q.     Are most of your patients under the age of
25   18?
```

```
 1   A.     Many of my patients are under the age of 18.
 2   I would agree that most are, yes.
 3   BY MR. HILDABRAND:
 4   Q.     How long have you been licensed to practice
 5   psychology in Tennessee?
 6   A.     I believe I have been licensed since 2017 in
 7   the state of Tennessee.
 8   Q.     Any states prior to that where you were
 9   licensed to practice psychology?
10   A.     No.  I was licensed as soon as I was
11   eligible.
12   Q.     And so that's about five years; is that
13   correct?
14   A.     Yes.
15   Q.     So you have not been treating -- there is no
16   patient you have been treating -- I'm sorry.
17   Rephrase.
18          Are there any patients you are treating whom
19   you have been treating for more than five years?
20   A.     I have some patients in my practice that I
21   have had a treatment relationship with since I would
22   say the start of my predoctoral internship or the
23   year of my predoctoral internship, which would be
24   2015 or 2016.
25   Q.     So you have not been treating -- you do not
```

```
 1   have any relationship with a patient who you been

 2   treating that's lasted more than eight years; is

 3   that correct?

 4   A.     That's correct.

 5   Q.     All right.  So earlier you mentioned that you

 6   wrote a thesis that was required to receive your

 7   Master's of Science from Auburn University; is that

 8   correct?

 9   A.     Yes.

10          MR. HILDABRAND:  Travis, can you

11   circulate Document G.  And we'll mark that as

12   Exhibit 6.

13          THE REPORTER:  Did we mark Exhibit K?

14          MR. HILDABRAND:  Oh, you're right.  I

15   think that one should be marked Exhibit 6 and this

16   will be Exhibit 7.

17          (WHEREUPON, documents were marked as

18   Exhibit Numbers 6 and 7.)

19   BY MR. HILDABRAND:

20   Q.     Just one second.  All right.  If you can see

21   that, what is the title of this document?

22   A.     It says Examining Executive Functioning

23   Deficits in Juvenile Delinquents with a History of

24   Trauma Exposure.

25   Q.     And who is the author?
```

```
 1   A.      Myself, Melissa Cyperski.
 2   Q.      Is this the thesis you submitted for your MS?
 3   A.      It appears that way.  This is the title page.
 4   We've not reviewed the full document.
 5   Q.      On the title page, does it say approved by
 6   and lists three different professors?
 7   A.      Yes.
 8   Q.      All right.  Let's turn to page 20 in the PDF.
 9   This will be page 14 in the thesis pagination but
10   it'll be page 20 in the PDF.
11   A.      Which page on the document?  We're on page 20
12   of the PDF, but to confirm.
13   Q.      Page 14 in the thesis's pagination.
14   A.      Yes.
15   Q.      Do you see -- in the first full paragraph, do
16   you see the line that says:  Throughout their
17   lifetime, trauma survivors of both sexes experience
18   increased rates of new disturbance, anxiety,
19   disordered personality, maladaptive eating and
20   substance use, ADHD, and oppositional defiant
21   behavior?
22   A.      I see that sentence in the document.
23   Q.      In that sentence, did you use the phrase
24   "both sexes"?
25   A.      In this document from 2012, I did use the
```

```
 1   term "both sexes".
 2   Q.     Do you still use the phrase "both sexes"
 3   today?
 4               MS. BROWN:  Objection to form.
 5               THE WITNESS:  I would not use the
 6   terminology "both sexes" today.
 7   BY MR. HILDABRAND:
 8   Q.     So you would not use the terminology today
 9   that you used in your MS thesis ten years ago?
10               MS. BROWN:  Objection to form.
11               THE WITNESS:  I would use current
12   terminology and my understanding of the literature
13   and the state of our science in our field in my
14   practice today.
15   BY MR. HILDABRAND:
16   Q.     So is both sexes not current terminology?
17               MS. BROWN:  Objection to form.
18               THE WITNESS:  It is not consistent with
19   my current practice.
20   BY MR. HILDABRAND:
21   Q.     All right.  Let's go back to your report.
22   This is Doc A, Exhibit 1.  Let's go to -- it's page
23   21 in the PDF, page 11 in the CV.
24   A.     Page 21 of the PDF and I believe that this is
25   11 of the CV.  We are scrolling to confirm.  Yes, we
```

```
 1   are there.
 2   Q.     Does this list all the articles you have
 3   published?
 4   A.     It does list peer-reviewed articles that I
 5   have published, yes.
 6   Q.     Have you published any since submitting your
 7   expert report?
 8   A.     No.
 9              MR. HILDABRAND:  All right.  Do y'all
10   want to take a break here?  We've been going for
11   about an hour since then, or do you want to keep
12   going?
13              MS. BROWN:  We're happy to take a break.
14              MR. HILDABRAND:  Okay.  Let's go off the
15   record, then.
16              (Recess observed.)
17              MR. HILDABRAND:  So I have about three
18   hours and 12 minutes on the record so far.
19   BY MR. HILDABRAND:
20   Q.     So going back to your CV, we were just
21   discussing this list of articles.  Is the first
22   article listed there titled:  Disproportionate
23   minority contact: Comparisons across juveniles
24   adjudicated for sexual and non-sexual offenses?  Is
25   that the article title?
```

```
 1   A.     Yes.  Yes.
 2   Q.     Does it appear that the subject of this
 3   article is the mental health of transgender
 4   adolescents or children?
 5            MS. BROWN:  Objection to form.
 6            THE WITNESS:  So I would need to review
 7   the specifics of that article.
 8   BY MR. HILDABRAND:
 9   Q.     If you can't remember off of the top of your
10   head, that's fine.  You can't just remember right
11   now that that's the subject of it?
12   A.     The subject is related to the concept of
13   disproportionate minority contacts.
14   Q.     So the second article is:  Installing
15   trauma-informed care through the Tennessee Child
16   Protective Services Academy.
17            Do you remember -- and of course feel free to
18   say if you can't remember off the top of your head
19   right now -- whether or not that was related to the
20   subject of the mental health of transgender
21   adolescents or children?
22   A.     That paper is not related to transgender
23   individuals.
24   Q.     And then the third article is:  Heterogeneity
25   in male adolescents with illegal sexual behaviors:
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 130 of 293 PageID #: 1787

```
 1   A latent profile approach to classification.  Is
 2   that the title of the article?
 3   A.     Yes.
 4   Q.     Do you recall whether or not the subject of
 5   that article is the mental health of transgender
 6   adolescents or children?
 7   A.     That article is not related to transgender
 8   children or adolescents.
 9   Q.     And then the last article here is titled:
10   Supporting transgender/gender diverse (TGD) youth
11   across settings in systems of care:  Experiences
12   from a pediatric interdisciplinary clinic.  Is that
13   the title of the article?
14   A.     It is.
15   Q.     And that would be related to the subject of
16   the mental health in transgender adolescents or
17   children?
18   A.     Correct.
19          MR. HILDABRAND:  Travis, can you
20   circulate Document H.  And we'll mark that as
21   Exhibit 8 I believe is the number we're on.
22          (WHEREUPON, a document was marked as
23   Exhibit Number 8.)
24   BY MR. HILDABRAND:
25   Q.     Thank you.  Dr. Cyperski, when you can see
```

1   that, what is the title of the article here?
        2   A.      We can see it.  The title reads:  Supporting
        3   transgender/gender diverse youth across settings and
        4   systems of care:  Experiences from a pediatric
        5   interdisciplinary clinic.
        6   Q.      Does this appear to be the fourth article
        7   listed in your CV?
        8   A.      It does appear that way, yes.
        9   Q.      And who are the authors of this article?
       10   A.      Authors are Melissa Cyperski, along with
       11   Drs. Mary Romano and Cassandra Brady.
       12   Q.      And do you work with Mary Romano and
       13   Cassandra Brady at Vanderbilt University Medical
       14   Center?
       15   A.      I do.
       16   Q.      If you can remember, what is the subject of
       17   this?  What is this article about?
       18   A.      From what I can recall, this article is about
       19   ways to support transgender youth across various
       20   settings and systems of care, so different ways that
       21   youth, that providers can support youth in various
       22   situations and settings in which they interact on a
       23   daily basis.
       24   Q.      And was this a peer-reviewed article?
       25   A.      It was.

```
 1   Q.     Did you conduct any scientific experiment --

 2              MS. BROWN:  Objection to form.

 3   BY MR. HILDABRAND:

 4   Q.     -- in providing this article?

 5              MS. BROWN:  Same objection.

 6              THE WITNESS:  Have I conducted

 7   scientific experiments before writing this article?

 8   Yes.

 9   BY MR. HILDABRAND:

10   Q.     Did you conduct a scientific experiment to

11   contribute to writing this article?

12   A.     Scientific experimentation was not a part of

13   writing this article.

14   Q.     Thank you for clarifying.  So there wasn't --

15   this article doesn't involve a control and

16   experiment group?

17              MS. BROWN:  Objection to form.

18              THE WITNESS:  There is no control or

19   experiment group in this paper.

20   BY MR. HILDABRAND:

21   Q.     All right.  Was there any statistical --

22   original statistical analysis conducted in this

23   article?

24              MS. BROWN:  Objection to form.

25              THE WITNESS:  This paper does not
```

1    include original statistical analysis.

     2    BY MR. HILDABRAND:

     3    Q.    Does this article reflect your opinion at the

     4    time, along with the opinions of the other authors

     5    listed?

     6              MS. BROWN:  Objection to form.

     7              THE WITNESS:  This article reflects our

     8    experiences and practices and recommendations at the

     9    time.

    10    BY MR. HILDABRAND:

    11    Q.    So on PDF page one, the first page here,

    12    Journal page 242, in the middle column, can you read

    13    the first two sentences here, starting with

    14    therefore?

    15    A.    I'm not seeing.  At the top of the second

    16    column?

    17    Q.    Do you see a therefore, the purpose of this

    18    paper is?

    19    A.    Yes.

    20    Q.    Do you mind reading that sentence and then

    21    the sentence that follows it?

    22    A.    Sure.  Therefore, the purpose of this paper

    23    is to outline several possible opportunities for

    24    mental providers or other healthcare professionals

    25    to advocate for transgender and gender diverse

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 134 of 293 PageID #: 1791

```
 1  patients, TGD patients, in order to address their
 2  psychosocial needs, enhance health outcomes, and
 3  promote resiliency across setting.  Do you want me
 4  to continue?
 5  Q.    If you want to finish the second sentence.
 6  Sorry about that.
 7  A.    Do you want me to read the second sentence,
 8  too?
 9  Q.    Yes.
10  A.    Okay.  We hope to highlight various
11  strategies or actions providers can take as needed
12  to support patients and their families on an
13  individual, community, or systemic scale.
14  Q.    Was a purpose of this paper to encourage
15  advocacy by mental health professionals?
16            MS. BROWN:  Object to form.
17            THE WITNESS:  Define what you mean by
18  advocacy.
19  BY MR. HILDABRAND:
20  Q.    How do you understand the word "advocacy" as
21  used in this paper?
22  A.    I would need to review this paper more
23  specifically.
24  Q.    Okay.  We'll do that.  Let's look at the
25  left-hand column here.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 135 of 293 PageID #: 1792

```
 1   A.      Okay.
 2   Q.      Do you see about halfway down, where you
 3   describe studies about how transgender individuals
 4   are more likely to consider suicide?
 5   A.      I believe I know where you're looking.
 6   Q.      Is it consistent with your experience and
 7   practice that transgender individuals are more
 8   likely to consider suicide?
 9              MS. BROWN:  Objection to form.
10              THE WITNESS:  The question of
11   comparison, more likely than what?
12   BY MR. HILDABRAND:
13   Q.      More likely than, for example, cisgender
14   individuals?
15              MS. BROWN:  Objection to form.
16              THE WITNESS:  Can you restate the
17   question for me, please?
18   BY MR. HILDABRAND:
19   Q.      Of course.  Is it your experience and
20   practice that transgender individuals are more
21   likely to consider suicide than cisgender
22   individuals are?
23              MS. BROWN:  Same objection.
24              THE WITNESS:  There is a body of
25   evidence which suggests that transgender individuals
```

1  may have higher percentages of suicidality or

2  suicide attempts when compared to their cisgender

3  peers.

4  BY MR. HILDABRAND:

5  Q.     I know it's a weighty subject, but have any

6  of your patients ever attempted suicide?

7  A.     Unfortunately, I have had patients who have

8  attempted suicide in the past, yes.

9  Q.     Have any attempted suicide after beginning a

10 patient-provider relationship with you?

11          MS. BROWN:  Object to form.

12          THE WITNESS:  Individuals have attempted

13 suicide after establishing a therapeutic

14 relationship with me as their provider.

15 BY MR. HILDABRAND:

16 Q.     About how many patients in that category have

17 attempted suicide?

18 A.     I can think of two individuals who have

19 attempted suicide.

20 Q.     Toward the bottom of the left column, do you

21 see where you say that healthcare professionals and

22 mental health counselors in particular are in a

23 unique position to recognize, respond to, and

24 advocate for the multifarious and complex needs of

25 TGD youth?  Do you see that?

```
 1    A.      I do.

 2    Q.      Just to clarify, what are TGD youth?

 3    A.      TGD stands for transgender or gender diverse.

 4    Q.      Are there other individuals in the gender

 5    diverse category who are not transgender?

 6                 MS. BROWN:  Object to form.

 7                 THE WITNESS:  There are individuals who

 8    identify as gender diverse.

 9    BY MR. HILDABRAND:

10    Q.      Who would not identify as transgender?

11    A.      There are individuals who identify as various

12    gender identities which are broadly conceptualized

13    as gender diverse that do not specifically identify

14    as transgender.

15    Q.      Thank you.

16    A.      Uh-huh.

17    Q.      Then here I think you mention that:  However,

18    professionals may hesitate to step into the role of

19    patient advocate for a variety of reasons, including

20    a lack of awareness about appropriate resources for

21    SGN patients and fear of overstepping their

22    boundaries as a provider or operating outside the

23    bounds of their competence, even if they feel

24    strongly about the cost.  Is that what the authors

25    wrote here?
```

```
 1   A.     Yes.   That's in the text.

 2   Q.     Is this a valid concern for health

 3   professionals to be hesitant about engaging in

 4   advocacy?

 5              MS. BROWN:  Object to form.

 6              THE WITNESS:  I'm not sure what is meant

 7   by valid concerns.

 8   BY MR. HILDABRAND:

 9   Q.     Is it acceptable for health professionals to

10   hesitate or not step into the role of patient

11   advocate?

12              MS. BROWN:  Same objection.

13              THE WITNESS:  Acceptable would be a

14   matter of personal preference and attitude.

15   BY MR. HILDABRAND:

16   Q.     So some health professionals may have

17   personal preferences not to step into the role of

18   patient advocate; is that correct?

19              MS. BROWN:  Same objection.

20              THE WITNESS:  Some professionals may

21   hesitate for various reasons to step into a role of

22   advocate for their patient.

23   BY MR. HILDABRAND:

24   Q.     Is it unprofessional for a health

25   professional to decide not to step into the role of
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 139 of 293 PageID #: 1796

```
 1    a patient advocate?
 2              MS. BROWN:  Objection to form.
 3              THE WITNESS:  I think we would need to
 4    define what patient advocate means or what the term
 5    "advocate" means.
 6    BY MR. HILDABRAND:
 7    Q.    How did you understand the term "patient
 8    advocate" as it's used here?
 9    A.    Uh-huh.  So my impression of the term
10    "patient advocate", as represented in this article,
11    would be professional who is acting or seeking in
12    the best interest of their patient and seeking to
13    ensure that their patient is getting the care that
14    they need.
15    Q.    Does that include speaking to individuals
16    other than the patient?
17              MS. BROWN:  Objection to form.
18              THE WITNESS:  In what way?
19    BY MR. HILDABRAND:
20    Q.    Would that include speaking to elected
21    officials?
22              MS. BROWN:  Objection the form.
23              THE WITNESS:  It would be a question of
24    what role that professional was playing in various
25    behaviors.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 140 of 293 PageID #: 1797

```
 1   BY MR. HILDABRAND:

 2   Q.      Is it normal for psychologists to discuss

 3   transgender medicine with elected officials?

 4                   MS. BROWN:  Objection to form.

 5                   THE WITNESS:  Define what you mean by

 6   normal.

 7   BY MR. HILDABRAND:

 8   Q.      In your professional expertise and

 9   experience, is it often the case that psychologists

10   are expected as part of being a psychologist to

11   discuss transgender medicine issues with elected

12   officials?

13                   MS. BROWN:  Same objection.

14                   THE WITNESS:  So the American

15   Psychological Association, for example, has

16   information about professional roles and

17   responsibilities and would be perhaps one governing

18   body that might be able to answer the question

19   related to the role of a psychologist in this

20   manner.

21   BY MR. HILDABRAND:

22   Q.      Is it an appropriate role of psychologists to

23   tell politicians what laws to pass or not to pass?

24                   MS. BROWN:  Objection to form.

25                   THE WITNESS:  It would be an appropriate
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 141 of 293 PageID #: 1798

```
 1  role for a psychologist or mental health
 2  professional to have conversations and to provide
 3  information that may inform practices that I would
 4  say, that impact truly their patient population.
 5  BY MR. HILDABRAND:
 6  Q.    Do you consider that provision of information
 7  to elected officials advocacy?
 8             MS. BROWN:  Objection to form.
 9             THE WITNESS:  It would, again, be a
10  question of the definition of advocacy.
11  BY MR. HILDABRAND:
12  Q.    Would that be part of your definition of
13  advocacy is the question, the provision of
14  information to elected officials on transgender
15  medicine?
16             MS. BROWN:  Objection to form.
17             THE WITNESS:  I think there are many
18  possible definitions and as we said advocacy may
19  take shape.
20  BY MR. HILDABRAND:
21  Q.    Would you understand that under your
22  definition of advocacy to include discussing laws
23  relating to transgender medicine with elected
24  officials?  Is that according to your definition of
25  advocacy, advocacy?
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 142 of 293 PageID #: 1799

```
1              MS. BROWN:  Same objection.
2              THE WITNESS:  Informing legislation that
3   benefit or harm an individual and the patient
4   population may be a role of a psychologist in terms
5   of protecting the wellbeing of their patient
6   population and advocating or truly supporting rather
7   than advocating the needs and wellbeing of their
8   patients.
9   BY MR. HILDABRAND:
10  Q.   Let's turn to the upper right-hand column in
11  the first full paragraph here.
12           Do you see where it says:  For example,
13  imagine you are working with a student who
14  identifies as nonbinary and is repeatedly
15  misgendered with consistent incorrect pronoun usage
16  by one of their teachers.  As the provider, you
17  offer to reach out to their teacher to express your
18  concerns and request they change their classroom
19  behavior to become more affirming but the patient
20  declines and indicates they would like to talk with
21  their teacher independently first.
22           Is a psychologist talking with a patient's
23  teacher advocacy?
24              MS. BROWN:  Objection to form.
25  / /
```

BY MR. HILDABRAND:

Q.     Sorry.  To clarify, is a psychologist talking with a patient's teacher about the usage of pronouns advocacy?

MS. BROWN:  Same objection.

THE WITNESS:  I think the psychologist talking with a patient's teacher about any of their mental health needs, including about the possibility and importance of using that individual's pronouns, is within the role of a psychologist to speak to the wellbeing and needs of their client.

BY MR. HILDABRAND:

Q.     Including if the psychologist feels it necessary, the teacher's use of what the psychologist used as incorrect pronouns, correct?

A.     The use of incorrect pronouns has been widely established in the literature as a harmful, destructing experience for transgender individuals. And so as a psychologist and mental health provider, it might be important to collaborate with a patient around their needs in the school setting and then to discuss what would be supportive of their mental health and reducing or eliminating their distress at school.

BY MR. HILDABRAND:

```
1   Q.     What are the correct pronouns to use for a
2   nonbinary student?
3                 MS. BROWN:  Objection to form.
4                 THE WITNESS:  Pronouns vary by
5   individuals.  It would be important to collaborate
6   and discuss with each individual what were their
7   pronouns.
8   BY MR. HILDABRAND:
9   Q.     Could they include pronouns other than he/him
10  or she/her?
11  A.     They could.
12  Q.     Could they include pronoun such as they/them
13  to refer to an individual student?
14  A.     It might, yes.
15  Q.     Could they include pronouns other than the
16  ones we just discussed to refer to that student?
17  A.     Yes, it could.
18  Q.     What should a psychologist do if the teacher
19  says that she does not want to use what she used as
20  biologically inaccurate pronouns?
21                 MS. BROWN:  Object to form.  Sorry.
22  BY MR. HILDABRAND:
23  Q.     Should the teacher -- should the psychologist
24  still recommend that the teacher use the pronouns
25  the teacher views as biologically inaccurate?
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 145 of 293 PageID #: 1802

```
 1            MS. BROWN:  Same objection.

 2            THE WITNESS:  I don't understand what's

 3   meant by biologically accurate or inaccurate

 4   pronouns.

 5   BY MR. HILDABRAND:

 6   Q.     Sure.  I'll explain.  So imagine that there

 7   were a child whose sex assigned at birth is female

 8   but the child identifies as nonbinary and prefers

 9   the pronouns they/them.  If the teacher says that

10   she will only use she/her pronouns to refer to the

11   student, is that incorrect of a teacher to do so?

12            MS. BROWN:  Object to form.

13            THE WITNESS:  For an individual who has

14   expressed that they do they/them pronouns, those

15   would ideally be the pronouns that are used for that

16   individual across settings.  Use of other pronouns,

17   and particularly use of pronouns consistent with

18   their sex assigned at birth, have been demonstrated

19   to be damaging to that individual's mental health

20   and may worsen experiences of gender dysphoria.

21   BY MR. HILDABRAND:

22   Q.     Could it damage the mental health of the

23   teacher if she were forced to use the they/them

24   pronouns in that scenario?

25            MS. BROWN:  Object to form.  And scope.
```

```
 1              THE WITNESS:  I would be curious what
 2    you mean by damage the teacher's mental health.
 3    BY MR. HILDABRAND:
 4    Q.    So you said it can be hurtful to the student
 5    for the teacher to fail to use the pronouns the
 6    student prefers.  But what about the teacher?  Could
 7    it be harmful to a teacher to be forced to use
 8    pronouns that do not match the child's sex assigned
 9    at birth?
10              MS. BROWN:  Same objection.  Scope.
11              THE WITNESS:  So my practice tends to
12    focus on children and adolescents and young adults.
13    I have not evaluated teachers in this particular
14    instance who may have this experience.
15    BY MR. HILDABRAND:
16    Q.    So you would not be able to offer an expert
17    opinion about the mental health of the teachers?
18              MS. BROWN:  Objection to form.
19              THE WITNESS:  It is not within the scope
20    of the expert report I offered.
21    BY MR. HILDABRAND:
22    Q.    Thank you.  Also on here it describes
23    role-playing sessions with nonbinary or transgender
24    students to prepare for having those discussions
25    with teachers.
```

1        Have you engaged in role-playing sessions

2   with nonbinary or transgender patients before they

3   discuss the issue of the use of pronouns with

4   teachers or family?

5             MS. BROWN:  Objection to form.

6             THE WITNESS:  Can you repeat the

7   specific question for me?

8   BY MR. HILDABRAND:

9   Q.      Have you engaged in role-playing sessions of

10  the sort described here in the right column that you

11  recommend for psychologists to do?  Have you engaged

12  in such role-playing discussions with students about

13  playing through the student, the transgender and

14  nonbinary student, discussing with the teacher or a

15  parent the pronouns that the student prefers?

16  A.      The use of role play is a common activity in

17  child and adolescent mental health and I -- from

18  what I can recall, I have engaged in role play with

19  transgender or nonbinary individuals.

20  BY MR. HILDABRAND:

21  Q.      Is that something that insurance companies

22  would reimburse your time for?

23             MS. BROWN:  Objection to form, and

24  objection to scope.

25             THE WITNESS:  So I do not know the ins

```
 1   and outs of billing.  But, yes, my understanding is
 2   that that is a common and respected practice in
 3   psychotherapy to engage in interpersonal role play,
 4   and I have no evidence to suggest that it is not
 5   reimbursable.
 6   BY MR. HILDABRAND:
 7   Q.     I won't go into billing practices, but are
 8   any of your patients on Medicaid?
 9              MS. BROWN:  Objection to scope.  This is
10   like nothing that -- like at all relevant.
11              MR. HILDABRAND:  Again, if you have an
12   objection, you can note objection to form, objection
13   to scope, but not speaking objections.
14   BY MR. HILDABRAND:
15   Q.     Can you please answer my question?
16              MS. BROWN:  I'm going to be very clear
17   that it's my right and I will speak and so I would
18   appreciate if you didn't say that again.  I'm not
19   going to go back and forth with you but it's the
20   right under the case law and the rules.  So, again,
21   the objection stands.  You can continue to ask your
22   question.
23              MR. HILDABRAND:  Yes.  And also in the
24   case law not to give speaking objections.
25   / /
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 149 of 293 PageID #: 1806

```
 1   BY MR. HILDABRAND:

 2   Q.     Can you please answer the question.  Are any

 3   of your patients on Medicaid?

 4              MS. BROWN:  Same objection.  Scope.

 5   Relevance.

 6              THE WITNESS:  Many of my psychotherapy

 7   clients have commercial insurance.  Patients in the

 8   VPATH Clinic have TennCare, which I believe would be

 9   consistent with medicaid.

10   BY MR. HILDABRAND:

11   Q.     All right.  Thank you.  Now, let's go to PDF

12   page two.  This is page 243 in the article, left

13   column.  Can you see the paragraph that starts, for

14   example?

15   A.     I believe so, yes.

16   Q.     And so it says here:  For example, consider

17   the case of a transgender adolescent male who is

18   forbidden by his high school to participate in

19   extracurricular activities in his affirmed gender.

20              Was that a case that one of the authors of

21   this article encountered?

22   A.     We have many cases of individuals who may be

23   forbidden from participating in activities in their

24   affirmed gender.  And as far as this scenario was

25   based on a particular case, yes.
```

```
 1    Q.     Was it based on one of your patient's case or
 2    if you can remember?
 3    A.     I would need to review the example to be
 4    certain.
 5    Q.     So it goes on to say:  Therefore, upon
 6    obtaining consent from a patient, his healthcare
 7    provider advocated directly on his behalf by
 8    expressing concern to school administrators in a
 9    letter of support.
10           If you can remember, who was the healthcare
11    provider who advocated directly?
12    A.     Review of the additional context in this
13    paragraph, the information above that sentence, I
14    believe this particular paragraph is about a patient
15    of mine, although many of the providers in our
16    Interdisciplinary Clinic also write letters of
17    support.
18    Q.     So is that patient at a school in Tennessee?
19    A.     I'm trying to recall which patient this may
20    have been specifically.  Many of my patients are in
21    Tennessee.  Clinic also supports patients in other
22    surrounding states as well.
23    Q.     And if you can't remember, that's fine, and
24    we can move on.  But do you recall at this point in
25    time?
```

```
 1  A.     I -- I think I am remembering the patient.
 2  And, yes, it was a student in Tennessee.
 3  Q.     All right.  Continuing in the middle column
 4  here.
 5  A.     Uh-huh.
 6  Q.     Do you see where:  As is to be expected,
 7  sociopolitical factors often dictate the extent to
 8  which the school system may be able to accommodate
 9  requests and adapt their policies?  It goes on, and
10  feel free to read the rest of the sentence if you
11  want to.
12         But what did you mean here by sociopolitical
13  factors?
14  A.     My interpretation of sociopolitical factors
15  in this context in this paragraph and in the article
16  could be referring to a number of things, but would
17  include correct legislation.
18  Q.     What sort of legislation?  Is that what you
19  said?
20  A.     Uh-huh.
21  Q.     Do you mean like the legislation in this case
22  or is there other legislation that you have in mind?
23             MS. BROWN:  Objection to form.
24             THE WITNESS:  It may be legislation such
25  as in this case or legislation pertaining to other
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 152 of 293 PageID #: 1809

1  transgender-related concerns.

 2  BY MR. HILDABRAND:

 3  Q.    So the sentence goes on to say:  However, it

 4  has been our experience that educational staff

 5  members will hear and respond to individual requests

 6  to the extent possible.

 7        Has that been your experience here in

 8  Tennessee?

 9  A.    I have experienced many educators to be

10  responsive and kind but not all.

11  Q.    Going down this column, it describes -- and

12  feel free to read it if you want to.  Going down the

13  column and on to the right-hand side here, that

14  column, it describes compromises that are sometimes

15  reached with other members of the extracurricular

16  activities.  For example, I believe here the school

17  district may agree that an individual youth can be

18  offered the opportunity to participate in

19  extracurricular activities in their affirmed gender

20  if the parents of other team members agree and offer

21  a statement of support.

22        Is that a compromise that you have been aware

23  has been reached here in Tennessee at any point in

24  time?

25              MS. BROWN:  Object to the form.

1      THE WITNESS:  What would be the specific
2   compromise in question, again?
3   BY MR. HILDABRAND:
4   Q.    Asking other parents if they'd consent to
5   having the transgender individual play on the sports
6   team that he or she prefers?
7           MS. BROWN:  Object to form.
8           THE WITNESS:  I'm sorry, I think I got
9   lost.  So a question about asking other parents --
10  can you repeat it one more time for me?  I'm so
11  sorry.
12  BY MR. HILDABRAND:
13  Q.    No.  It's been a long day.  So this describes
14  a compromise where other parents on the team are
15  asked whether or not they would consent to an
16  individual who wants to play on the team that
17  matches their gender identity would consent to that
18  individual playing on the team.  Is that a
19  compromise that you are aware any team in Tennessee
20  has reached in the past few years?
21  A.    So if I am reading correctly, I'm not seeing
22  specifically related to this instance of a team,
23  although it may be reflective of an athletic policy
24  and submitting that language in the report, but
25  that -- let's see.  I'm reading again.

```
 1   Q.     I guess it refers to extracurricular
 2   activity.  Is that the language that it uses?
 3   A.     Yes.  Extracurricular activities in their
 4   affirmed gender.  And then I could see if other team
 5   members.  Uh-huh.
 6   Q.     Is there a compromise that you're aware has
 7   been reached at any point in Tennessee?
 8   A.     I am not aware of that particular compromise
 9   being reached in Tennessee.  I think the case in
10   question, if I'm recalling correctly, was about an
11   individual who wished to go on an overnight band
12   trip.
13   Q.     Thank you.  All right.  Let's turn to page
14   three in the PDF, page 244 in the Journal.  I'll go
15   to the top left column.
16   A.     Page three of the PDF, top left.  Okay.
17   Q.     And then let's go to the first full
18   paragraph.  Do you see where it says:  Consider the
19   case of?
20   A.     Yes.
21   Q.     So it says:  Consider the case of the TGD
22   adolescent who experienced bullying when using the
23   restroom associated with their affirmed gender at
24   school.  Is that what the first line here says?
25   A.     Yes.
```

1  Q.    And feel free to read through silently if you

2  want to the rest of the paragraph.  But does it say

3  at the end that -- just one second.  Sorry.  The

4  next paragraph begins:  The school system was

5  initially frustrated and resisting to making such

6  accommodations as they believe they had already

7  provided reasonable accommodation.  However, they

8  were ultimately swayed by persistent advocacy and

9  articulation of the patient's need in a sensitive

10  matter.  Do you see that?

11  A.    I see that statement, yes.

12  Q.    Does this describe a case where you advocated

13  on behalf of the patient or one of the other authors

14  advocated on behalf of the patient?

15  A.    I'm not certain.  I'm not recalling this

16  particular case in my own practice.

17  Q.    Then about midway down through that

18  paragraph, do you see where it says:  Although the

19  provider was singularly focused in advocating for

20  the youth's right and need to feel comfortable and

21  safe using the restroom of their choosing.  He goes

22  on to describe the presentation of this information

23  was balanced and validated the school's concerns.

24        Is it appropriate for a professional to be

25  singularly focused only on the individual patient's

```
 1    rights when doing this sort of advocacy?
 2                MS. BROWN:  Objection to form.
 3                THE WITNESS:  I'm not sure what you
 4    mean.  Can you restate the question, please?
 5    BY MR. HILDABRAND:
 6    Q.    So when a provider is doing advocacy about
 7    bathroom use for transgender or nonbinary youth, is
 8    it acceptable, professionally acceptable for the
 9    provider to be singularly focused only on the
10    patient's interest?
11                MS. BROWN:  Objection to form, scope,
12    and relevance.
13                THE WITNESS:  I think it can be very
14    important for a healthcare professional to be
15    focused in what are the needs of their patient that
16    would support their health and wellbeing.
17    BY MR. HILDABRAND:
18    Q.    Is that the only interest a psychologist
19    should consider?
20                MS. BROWN:  Object to the form.
21                THE WITNESS:  What other interests would
22    we be considering?
23    BY MR. HILDABRAND:
24    Q.    That's my question.  What other interests
25    should the psychologist consider?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 157 of 293 PageID #: 1814

```
 1              MS. BROWN:  Same objection.
 2              THE WITNESS:  So the question is what
 3   are other interests a psychologist should consider?
 4   BY MR. HILDABRAND:
 5   Q.     Before engaging in this advocacy, are there
 6   any other interests the psychologist should
 7   consider?
 8              MS. BROWN:  Same objection.
 9              THE WITNESS:  I think it would be
10   appropriate for a psychologist, mental health
11   provider or other healthcare professional, to be
12   focused on their patient's needs and what supports
13   their health and wellbeing.
14   BY MR. HILDABRAND:
15   Q.     Anything else that they should be focused on?
16              MS. BROWN:  Same objection.
17              THE WITNESS:  I think it would depend
18   and there are probably lots of other things that
19   providers could focus on.  But that is an organizing
20   principle in much of the work that we do is to
21   promote health and wellbeing in our patients.
22   BY MR. HILDABRAND:
23   Q.     All right.  Turn to the right column.  Do you
24   see the paragraph that begins, data are lacking?
25   A.     Toward the bottom of the page?  Yes, I am
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 158 of 293 PageID #: 1815

seeing that.

Q.    So does it read:  Data are lacking but
anecdotally parental responses to their SGM youth
are often affected by factors such as culture,
socioeconomic status, and religious beliefs?  Has
that been your experience and practice?

A.    My experience has been that parental
responses vary and can be influenced by a variety of
factors, including but not limited to those that are
listed.

Q.    How should a psychologist respond when the
child expresses a gender identity inconsistent with
the child's sex assigned at birth but the parents
disagree and say that the child is not transgender?
What should a psychologist do?

         MS. BROWN:  Objection to form.

         THE WITNESS:  The question is about an
individual child or adolescent who has a gender
identity incongruent with their sex assigned at
birth and the parents are not supportive?  Is that
right?

BY MR. HILDABRAND:

Q.    And the parents do not agree that the child
is transgender, should the child still be treated as
transgender?

```
 1              MS. BROWN:  Same objection.

 2              THE WITNESS:  So in the psychologist's

 3    practice, we would really look to the best practice

 4    guidelines, including the WPATH and the Endocrine

 5    Society to help us navigate complex individualized

 6    patient situations.  We would collaborate with the

 7    youth and their caregiver to determine an

 8    appropriate course of action that really promotes

 9    the health and wellbeing of that individual patient.

10    BY MR. HILDABRAND:

11    Q.    Have you ever treated a patient as

12    transgender where the parents disagree about whether

13    the child is transgender?

14              MS. BROWN:  Objection to form.

15              THE WITNESS:  I have worked with

16    individuals who identified as transgender and

17    parents were not supportive of their child's gender

18    identity.

19    BY MR. HILDABRAND:

20    Q.    When you say not supportive, do you mean that

21    the parents do not agree that the child was

22    transgender?

23              MS. BROWN:  Object to the form.

24              THE WITNESS:  I am not sure about

25    parents' agreement with whether the child is
```

```
1    transgender or not.  But I do recall consents where
2    their caregivers were not supportive of their
3    identity and exhibited behaviors accordingly,
4    including not using their child's name and pronoun,
5    which has been largely demonstrated in the
6    literature as important to the health and wellbeing
7    of the transgender individual.
8    BY MR. HILDABRAND:
9    Q.     So was it psychologically -- in your opinion,
10   in those cases where the parents refused to use the
11   child's preferred pronoun, did that cause
12   psychological harm to the patient?
13               MS. BROWN:  Object to form.
14               THE WITNESS:  I think the term
15   "psychological harm" would be complicated and we
16   would want to break that down further.  It is very
17   potentially damaging and distracting to an
18   individual child when their parents and others do
19   not use their name and pronouns.
20   BY MR. HILDABRAND:
21   Q.     So in your experience as a psychologist, it
22   can be damaging to the child if the parent declines
23   to use the child's preferred pronouns?
24   A.     Yes.
25   Q.     Should parents make the final decision about
```

```
 1    how to treat children in adolescence who have
 2    expressed a transgender gender identity?
 3                MS. BROWN:  Object to form.
 4    BY MR. HILDABRAND:
 5    Q.    Let me rephrase.  Should parents make the
 6    final decision about how to treat children in
 7    adolescence who have expressed that their gender
 8    identity is inconsistent with their sex assigned at
 9    birth?
10                MS. BROWN:  Same objection.
11                THE WITNESS:  I think the decisions
12    about how to treat the child who has expressed their
13    gender identity is different from or incongruent
14    with their sex assigned at birth, decisions about
15    how to move forward are -- that information is
16    really informed by the guidelines, such as in the
17    WPATH, in which we are striving to work together and
18    that a mental health provider, for example, would be
19    collaborating with that patient and their caregiver
20    to develop a treatment plan and to work towards what
21    would promote health and resiliency for that
22    individual.
23    BY MR. HILDABRAND:
24    Q.    I understand it would be complex.  You might
25    want to discuss -- provide your opinion and discuss
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 162 of 293 PageID #: 1819

```
1    that with the patient and the parents.  But at the
2    end of the day, who makes the final decision about
3    how to treat a minor child?  Is it the patient
4    child?  Is it the psychologist or other health
5    provider?  Or is it the parents?
6               MS. BROWN:  Again, objection to form.
7               THE WITNESS:  I think in the field of
8    child development and for the cisgender and gender
9    diverse individuals, for all people and all
10   children, right, but ideally the treatment of the
11   child is made collaboratively with that child's
12   wishes and voice as a part of the discussion.
13   BY MR. HILDABRAND:
14   Q.    So is it your opinion that even in situations
15   where laws do not dictate a treatment one way or the
16   other, parents are not the final decision maker for
17   health decisions for minor transgender children and
18   adolescents?
19               MS. BROWN:  Objection to form.
20               THE WITNESS:  Is the question about who
21   makes medical decisions?
22   BY MR. HILDABRAND:
23   Q.    Who is the final decision maker?  Is it the
24   parents?
25   A.    I'm not sure what final decision maker means.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 163 of 293 PageID #: 1820

In our practice and my clinical experience, those
decisions around patient care are made
collaboratively between the patient, their legal
guardian, and their treatment team.

Q.    Okay.  So to give an example, if you
recommend that a patient start hormone therapy, the
patient/minor child would like to start hormone
therapy but the parents say no.  Do the parents get
to make that decision and not start hormone therapy
for their minor child?

            MS. BROWN:  Object to form.

            THE WITNESS:  In our practice, legal
guardian consent is required to begin a course of
treatment.

BY MR. HILDABRAND:

Q.    So VPATH would not start a course of
treatment like that without receiving parental or
other legal guardian permission, correct?

A.    What treatment specifically?

Q.    Hormone therapy is the example we were using
in our discussion, I think.

A.    Thanks for the reminder.  I appreciate it.
VPATH would not initiate hormone therapy without
legal guardian consent.

Q.    On PDF page four, Journal page 260 -- or 245,

```
 1   let's turn there.  It mentions the Trans Buddy
 2   Program down here in the right column, the bottom
 3   right of the column, around the middle of the page.
 4   A.    Yes, I see it.
 5   Q.    Can you describe what the Trans Buddy Program
 6   is?
 7   A.    Sure.  So I am not affiliated with that
 8   program.  I'll do my best to describe what I
 9   understand it to be.  The Trans Buddy Program is a
10   part of the program for LGBTQ Health at Vanderbilt
11   University Medical Center.  And the trans study
12   program includes a trained volunteer who can serve
13   as a patient and guardian's request for a variety of
14   reasons, from initiating appointments at the medical
15   center, all the way through conclusion of the visits
16   and receiving support thereafter.
17   Q.    Do any of your patients have a trans buddy
18   assigned to them?
19   A.    I don't know that trans buddies are assigned,
20   per se, to follow an individual over time.  Patients
21   in my clinic in VPATH have relied on support from a
22   trans buddy in the past.
23   Q.    Other than cases such as child abuse by a
24   parent, are parents given access to all of their
25   minor children's medical information at Vanderbilt
```

```
 1   University Medical Center that you're aware of?
 2              MS. BROWN:  Object to form.
 3              THE WITNESS:  So I'm not sure of all the
 4   ins and outs of when parents are given access to the
 5   records for children and adolescents.  They are, I
 6   believe, provided the option and information about
 7   the pathways to receive all of that information.
 8   BY MR. HILDABRAND:
 9   Q.    Have you heard the phrase -- do you know what
10   My Health at Vanderbilt is, or MHAV?
11   A.    I do.
12   Q.    What a My Health at Vanderbilt account would
13   be?
14   A.    Yes.  Sorry to interrupt.
15   Q.    Sorry to interrupt you as well.  Can you just
16   explain what your understanding of that would be?
17   A.    Uh-huh.  My Health at Vanderbilt is a patient
18   portal consistent with my chart, which is a common
19   practice for medical systems across the country.
20   And it allows access to communicate with your
21   provider, to schedule appointments, to pay your
22   bill, to navigate all of your experiences in the
23   Medical Center.
24              MR. HILDABRAND:  Travis, can you
25   circulate what I believe is Document J, VUMC Website
```

1    Parental Access.

2              THE WITNESS:  I think it might be in the

3    chat.  And if we could take a break in a few

4    minutes, that might be great.

5              MR. HILDABRAND:  If you want to take a

6    break, now is fine with me if you want to take a

7    break.  Would you like --

8              MS. BROWN:  Sure.  Let's say ten

9    minutes.

10             THE WITNESS:  Thank you.

11             (Recess observed.)

12             MR. HILDABRAND:  Let's go back on the

13   record.  I have four hours and five minutes is what

14   we have spent on the record so far.

15   BY MR. HILDABRAND:

16   Q.    So let's go back to the document circulated

17   as Doc J, which we will enter as Exhibit 9.

18             (WHEREUPON, a document was marked as

19   Exhibit Number 9.)

20   BY MR. HILDABRAND:

21   Q.    Dr. Cyperski, does this appear to be a screen

22   capture from a Vanderbilt University Medical Center

23   website?

24   A.    It looks consistent with the website, yes.

25   Q.    So going down to the bottom of PDF page one,

```
 1   sorry -- going down to -- going down to page -- PDF
 2   page two, do you see where it says, Children age 13
 3   to 17?
 4   A.      Yes, I see that.
 5   Q.      So does it say there:  If your child is
 6   between the ages of 13 to 17 and you need to obtain
 7   My Health at Vanderbilt access follow these steps.
 8   If you are the biological parent, you can complete
 9   the application at the child's next appointment or
10   download and complete the form below.  My Health at
11   Vanderbilt Account Access for Children 13 to 17.
12   Bring it with you to the child's next appointment or
13   visit the nearest Vanderbilt walk-in clinic as your
14   government issued photo ID has to be verified.
15   Ensure your child signs the application as well.
16   Did I read that accurately?
17   A.      Yes.
18   Q.      And then does it say:  Access to My Health at
19   Vanderbilt can be granted within the clinic once the
20   application is turned into the clinic staff?  Did I
21   read that accurately?
22   A.      That's what it says.
23   Q.      Has one of your patients or their parents
24   ever provided to you with this form?
25   A.      I have not received this form.  This type of
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 168 of 293 PageID #: 1825

1   administrative work is often handled at the front

2   desk.

3   Q.    Does it appear from this website that without

4   this form parents would not have access to a child

5   age 13 to 17 to their data on My Health at

6   Vanderbilt?

7            MS. BROWN:  Objection to form.

8   Objection to scope.  Objection to relevance.

9            THE WITNESS:  It appears as though this

10  website is describing how parents can gain access to

11  My Health at Vanderbilt for children 13 to 17.

12           MR. HILDABRAND:  Travis, can you

13  circulate Doc I.  So this would be Exhibit 10.

14           (WHEREUPON, a document was marked as

15  Exhibit Number 10.)

16  BY MR. HILDABRAND:

17  Q.    Dr. Cyperski, can you read to me, at the top

18  of this, does it say:  Vanderbilt University Medical

19  Center Parental Access to the My Health at

20  Vanderbilt, MHAV, account of a teen 13 to 17 years

21  old?  Is that what it says at the top of the first

22  page?

23  A.    It does say that.

24  Q.    And turn to page two of this document.  Do

25  you see about a little less than midway down, where

1  it says:  I understand that I may revoke this access
2  at any time by asking my doctor to do so?  Is that
3  what it says here?
4  A.    I see that in the text, yes.
5  Q.    And a few lines above, does it say:  Teen's
6  agreement?
7  A.    Yes.
8  Q.    Have you ever seen this form before or a
9  completed version of this form before?
10  A.    I have not.
11  Q.    For any of the patients that you treat, are
12  legal guardian parents not granted access to their
13  My Health at Vanderbilt accounts?
14            MS. BROWN:  Objection to form.
15  Objection to relevance.  Objection to scope.
16            THE WITNESS:  For the patients in my
17  practice, I am not aware of patients who do not have
18  parents or legal guardian access to My Health at
19  Vanderbilt unless they are adults.
20            MR. HILDABRAND:  Let's return to --
21  before I return, though, for opposing counsel,
22  objection to form, relevance, and scope, do you
23  understand relevance and scope to be outside of
24  objection to form?
25            MS. BROWN:  I am preserving the

```
 1   objections that I want to preserve.  And yes, I do
 2   understand this to be outside of the objection to
 3   form.
 4               MR. HILDABRAND:  So unless you say
 5   relevance and scope, you have not objected to
 6   relevance and scope?  Is that your understanding?
 7               MS. BROWN:  Again, I'm going to make the
 8   objections I'm going to make and that's all that I
 9   can -- I can say any further, Clark.
10               MR. HILDABRAND:  I understand.  But if
11   you're -- please keep your objections short.  If you
12   don't think that form covers relevance and scope, of
13   course do so.  It's common practice for form to
14   cover both of those.  So by using additional
15   language beyond that, my concern is that you are
16   coaching the witness.  And so if you really think
17   that those are outside of objection to form then of
18   course you can use those.  But if you think those
19   are covered by objection to form, then please leave
20   your objection to objection to form.
21               MS. BROWN:  Again, I'm going to make the
22   objections I'm going to make.  As an attorney I
23   would never coach my client and, again, I understand
24   them to be especially in this context of this case
25   and this witness, to be exactly the objections that
```

```
1   I have made.  But I have noted your concerns and
2   they are on the record.  Thank you.
3             MR. HILDABRAND:  Thank you.  I'll
4   understand that there are additionals there.
5   BY MR. HILDABRAND:
6   Q.    All right.  Let's go back to the Journal, PDF
7   page five, Journal page 246.  And just to clarify, I
8   think this was Document H.  Do you see in the bottom
9   left column where it says:  Providers who are
10  interested in offering high quality care to TGD
11  youth are encouraged to be aware that they will be
12  called to go above and beyond for their patients by
13  promoting wellness and supporting collaboration,
14  coordination, or continuity of care outside the
15  standard appointment time.  Is that what it says
16  there?
17  A.    It does, yes.
18  Q.    So is it common for psychologists to treat
19  their patients outside the standard appointment
20  time?
21  A.    It was standard practice.  There are a
22  variety of activities that require completion
23  outside of the standard appointment time.
24  Q.    And top of the middle column, do you see the
25  sentence that says:  Therefore, providers can play
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 172 of 293 PageID #: 1829

an important role in advocating at the state and
federal level for legislation that honors, protects,
and serves the SGM community?  Is that what you
wrote?

A.     I see that statement, yes.

Q.     Do you offer any expert testimony about what
legislation that honors, protects, and serves the
SGM community is?

                MS. BROWN:  Objection to form.

                THE WITNESS:  Testimony in what context?

BY MR. HILDABRAND:

Q.     In this case, in your report?

                MS. BROWN:  Same objection.

                THE WITNESS:  Can you repeat the
question for me?

BY MR. HILDABRAND:

Q.     Yes.  So you used the phrase in this article,
advocating at the state and federal level for
legislation that honors, protects, and serves the
SGM community.  Do you provide --

A.     Uh-huh.

Q.     Do you provide any expert testimony about
what such legislation is or is not?

                MS. BROWN:  Objection to form.

                THE WITNESS:  I provide an opinion and

```
 1   information in the report around the legislation in
 2   question in this case and practices that honor,
 3   protect, and serve the SGM community, which would
 4   include transgender individuals.
 5   BY MR. HILDABRAND:
 6   Q.     So in the next paragraph, middle column, I
 7   believe you -- do you specifically cite legislation
 8   proposed by the Tennessee State Legislature in 2020?
 9   Do you see that?
10   A.     I do.
11   Q.     And you say that these healthcare
12   professionals collaborated with community agencies,
13   legal experts, and lobbyists to draft expert
14   testimony to be presented to legislators; is that
15   correct?
16   A.     I see that healthcare professionals
17   collaborated with community agencies, legal experts,
18   and lobbyists, yes.
19   Q.     Did you draft expert testimony to present to
20   legislators regarding this 2020 legislation?
21              MS. BROWN:  Object to form.
22              THE WITNESS:  I drafted expert
23   testimony.
24   BY MR. HILDABRAND:
25   Q.     What expert testimony -- what legislation was
```

that expert testimony about?

A.    I did not end up providing expert testimony
in 2020 but my colleagues in the Interdisciplinary
Clinic have.

Q.    So you yourself did not draft expert
testimony about 2020 legislation; is that correct?

A.    I drafted testimony.

Q.    Yes.  So what legislation did you draft
testimony about?

A.    I drafted testimony about the legislation
that would prevent prescribing hormones to
prepubertal children.  I am forgetting the specific
number to the legislation.

BY MR. HILDABRAND:

Q.    Was your draft for or against the
legislation?

A.    It was against the legislation.

Q.    Did you send this draft to anyone?

A.    I do not recall specifically, although it is
possible we were collaborating with lobbyists and
experts at Vanderbilt Medical Center.  And so it is
possible that I shared a draft with them.

Q.    Which lobbyists were you collaborating with?

A.    Forgive me, I'm trying to recall.  So we
partnered with professionals at Vanderbilt

```
 1    University Medical Center, as well as lobbyists with
 2    Emap, whose name I believe was Jim Schmidt
 3    (phonetic) and his company.
 4    Q.    And have they requested that you draft this
 5    or is that something you just decided to do
 6    yourself?
 7    A.    I don't recall the specifics.
 8    Q.    Did that legislation that you had drafted, a
 9    document in opposition to, did it pass the Tennessee
10    Legislature?
11    A.    It did.
12    Q.    Have you pinned any op ed pieces opposing
13    pieces of Tennessee legislation?
14              MS. BROWN:  Object to form.
15              THE WITNESS:  I have not.
16    BY MR. HILDABRAND:
17    Q.    Have you posted commentaries on social media
18    about Tennessee legislation?
19              MS. BROWN:  Object to form.  And
20    objection to scope.
21              THE WITNESS:  Not that I recall.
22    BY MR. HILDABRAND:
23    Q.    Have you signed any petitions about Tennessee
24    legislation?
25              MS. BROWN:  Same objections.
```

```
 1                THE WITNESS:  I do not recall about
 2   Tennessee specific legislation.
 3   BY MR. HILDABRAND:
 4   Q.    Did you advocate for or against the
 5   legislation challenged in this case before its
 6   passage?
 7                MS. BROWN:  Object to the form.
 8                THE WITNESS:  I do not recall.
 9   BY MR. HILDABRAND:
10   Q.    Are there any other legislation in Tennessee
11   or outside of Tennessee that you have advocated for
12   or against because you are a psychologist?
13                MS. BROWN:  Objection to form.
14   Objection to scope.  And objection to relevance.
15                THE WITNESS:  I along with members of
16   the medical community may have signed petitions that
17   were not in support of legislation that targeted the
18   transgender community.
19   BY MR. HILDABRAND:
20   Q.    Targeted the transgender community in what
21   ways, if you can remember?
22   A.    I suspect that there may have been petitions
23   against healthcare bills that would be banning
24   affirmative care for transgender individuals --
25   / /
```

1   BY MR. HILDABRAND:

2   Q.    What sorts of care --

3   A.    -- or other --

4   Q.    Sorry.

5   A.    No.  Or other concerns may also have been

6   represented.  I'm not sure.

7   Q.    What sorts of affirmative care are you

8   talking, just because that can mean a broad

9   category?  Do you mean hormone therapy?

10   A.    Affirmative care -- uh-huh.  I'm sorry?

11   Q.    Would hormone therapy be included in the

12   category of affirmative care you mentioned?

13   A.    Hormone therapy is one of many components of

14   affirmative care.

15   Q.    Are you concerned that it might weaken

16   societal respect for psychologists or other mental

17   health providers if they engaged in such advocacy?

18            MS. BROWN:  Objection to form.

19            THE WITNESS:  The question is about

20   weakening public respect?

21   BY MR. HILDABRAND:

22   Q.    Yes.

23   A.    Okay.  No, I'm not concerned that -- that

24   psychologists speaking on behalf of their patient

25   means would generate disrespect for mental health

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 178 of 293 PageID #: 1835

```
 1   professionals.
 2   Q.     Do you have any other concerns about
 3   psychologists engaging in that sort of advocacy?
 4               MS. BROWN:  Objection to form.
 5               THE WITNESS:  There are other concerns
 6   about engaging in speaking on behalf of patients,
 7   including fear potentially of being targeted or
 8   harassed by the public.
 9   BY MR. HILDABRAND:
10   Q.     So the concerns are more about the public
11   targeting or harassing psychologists; is that
12   correct?
13               MR. HILDABRAND:  Objection to form.
14               THE WITNESS:  Yes.  I believe there is
15   fear in the community of mental health providers and
16   other healthcare providers about the repercussions
17   from the community.
18   BY MR. HILDABRAND:
19   Q.     On the right column of this PDF page five,
20   Journal page 246, do you see where it describes
21   establishing affirmative schools?  Healthcare
22   professionals can work with educational personnel to
23   establish affirmative schools.  Do you see that?
24   A.     Which page is that on?  I'm sorry.
25   Q.     PDF page five, 246 in the Journal pagination.
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 179 of 293 PageID #: 1836

```
 1   The right column, kind of upper right.
 2   A.     I don't think I'm seeing the sentence or
 3   statement that you are looking for.  Can you say it
 4   again, please?
 5   Q.     Of course.  Do you see:  In the community in
 6   settings where youth interact frequently, healthcare
 7   professionals can work with educational personnel to
 8   establish affirmative schools and spaces that
 9   provide a safe place for TGD patients?
10   A.     Yes.  I have located that.
11   Q.     Can you explain for me what an affirmative
12   school is as you used that phrase here?
13   A.     So we likely used the term "affirmative
14   school" to represent schools that engage in
15   affirmative practices that have been well
16   established in support of transgender students.
17   Q.     Are you an expert in educational practices?
18              MS. BROWN:  Objection to form.
19              THE WITNESS:  I am not an educator or an
20   expert in educational practices.
21   BY MR. HILDABRAND:
22   Q.     All right.  So that's -- those are all the
23   questions about that article.  But before we leave
24   this document, can you turn to PDF page six, Journal
25   page 247.
```

1          What is the title of the article that
2    followed the one that you co-authored?
3    A.     It says:  Advocacy Opportunities from
4    Academics Community Partnership.  Three Examples
5    from Transcollaboration.
6    Q.     Are articles about advocacy the sorts of
7    articles that often appear in this sort of journal?
8              MR. HILDABRAND:  Objection to form.
9              THE WITNESS:  I believe this journal
10   called The Behavior Therapist is a part of
11   professional organizations of psychologists and
12   mental health professionals and this particular
13   journal had a call for submission related to
14   supporting special patient population.
15   BY MR. HILDABRAND:
16   Q.     So they specifically requested articles about
17   supporting patient populations such as transgender
18   children and adolescents?
19   A.     I believe that's true.  Yes.
20   Q.     Okay.  Let's go back to your expert report.
21   This is Exhibit 1, Doc A.  And we're going to go to
22   footnote eight, which is on page five of the report.
23   A.     Okay.  We're there.
24   Q.     Do you see where you cited an article by
25   Rafferty, J.?

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 181 of 293 PageID #: 1838

1  A.    Yes.

2  Q.    Insuring Comprehensive Care and Support for

3  Transgender and Gender-Diverse Children and

4  Adolescents; is that the title of the article it

5  appears?

6  A.    Yes.

7           MR. HILDABRAND:  All right.  Travis, can

8  you circulate Document R.  We'll mark this as

9  Exhibit 11, I believe is the number we're on.

10           (WHEREUPON, a document was marked as

11  Exhibit Number 11.)

12  BY MR. HILDABRAND:

13  Q.    Dr. Cyperski, is this the article by Jason

14  Rafferty that you cited in your expert report?

15  A.    It appears so, yes.

16  Q.    Now, was this article, I believe it has a

17  date down at the bottom of the page of October 2018;

18  is that correct?

19  A.    Yes.

20  Q.    So this is published less than four years ago

21  from today; is that correct?

22  A.    If the math is right, yes.

23  Q.    Is this an article from the American Academy

24  of Pediatrics?  Is that what it says in the bottom

25  right?

```
 1   A.      It does.

 2   Q.      Are you a pediatrician?

 3   A.      I am not.

 4   Q.      Is this the sort of article that you would

 5   rely upon, though, as a psychologist?

 6   A.      I'm not sure that I would rely on this

 7   article and it was cited in context of the report

 8   and we could consider it in that context.

 9   Q.      Fair enough.  Let's turn to -- it's Table 1

10   but it's on page two of the PDF.

11   A.      Table 1, yes, we're there.

12   Q.      Do you see it says:  Relevant terms and

13   definitions related to gender care?

14   A.      Uh-huh.

15   Q.      What is the first term?

16   A.      The first term is sex.

17   Q.      Can you read the definition of sex in

18   Table 1?

19   A.      Sure.  It says:  An assignment that is made

20   at birth, usually male or female, typically on the

21   basis of external genital anatomy but sometimes on

22   the basis of internal gonads, chromosomes, or

23   hormone levels.

24   Q.      Do you agree with this definition of sex or

25   is there an alternative definition that you provide?
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 183 of 293 PageID #: 1840

```
 1   Just let me know if you would tweak it in any way or
 2   provide a different definition.
 3              MS. BROWN:  Objection to form.
 4              THE WITNESS:  This appears to be an
 5   acceptable definition.
 6   BY MR. HILDABRAND:
 7   Q.    Does this table define the term "gender" by
 8   itself?
 9   A.    I am not seeing that.
10   Q.    Can you look at the term at the definition of
11   agender about halfway down through the table and can
12   you read that definition for us?
13   A.    Uh-huh.  Agender:  A term used to describe a
14   person who does not identify as having a particular
15   gender.
16   Q.    All right.  In your professional experience,
17   would you agree that some people do not have a
18   particular gender?
19              MS. BROWN:  Object to form.
20              THE WITNESS:  In my experience an
21   individual may identify as agender.
22   BY MR. HILDABRAND:
23   Q.    In your experience, would someone identify as
24   not having a particular gender?
25   A.    I have not heard someone use the terms of "I
```

1  don't have a particular gender".  I have heard

2  people use the gender identity label of agender.

3  Q.     Do any of your patients use that label to

4  describe themselves?

5  A.     I do not believe so.

6  Q.     Let's go down to page three, under where it

7  says, Mental Health Implications.

8  A.     Okay.  We are there.

9  Q.     Do you see where it says:  Evidence suggests

10 that an identity of TGD has an increased prevalence

11 among individuals with autism spectrum disorder but

12 this association is not yet well understood?  Would

13 you agree with that sentence, or are there any parts

14 of that sentence that you disagree with?

15             MS. BROWN:  Object to form.

16             THE WITNESS:  If this is one statement

17 within some broader context, I don't see a reason to

18 object with this statement.

19 BY MR. HILDABRAND:

20 Q.     All right.  Do you see farther down in this

21 column where it says:  Some youth who identify as

22 TGD also experience gender dysphoria.  Are there

23 some youth who identify as transgender or gender

24 diverse who do not experience gender dysphoria?

25 A.     Some individuals of transgender identity or a

```
 1   gender diverse identity do not experience gender
 2   dysphoria.
 3   Q.     Would it be acceptable in the standards of
 4   care to provide puberty blockers to a transgender
 5   individual who does not experience gender dysphoria?
 6           MS. BROWN:  Objection to form.
 7           THE WITNESS:  My interpretation of the
 8   practice guidelines suggests that yes, it may be
 9   appropriate.
10   BY MR. HILDABRAND:
11   Q.     Would it also be appropriate to provide
12   hormone therapy to a transgender individual who does
13   not have gender dysphoria?
14           MS. BROWN:  Objection to form.
15           THE WITNESS:  So the decision about
16   whether to pursue hormone therapy would be made
17   between the patient and their legal guardians and
18   their treatment team and the guidelines would
19   support and inform the treatment plan.
20   BY MR. HILDABRAND:
21   Q.     So a treatment plan might include hormone
22   therapy for a transgender individual who does not
23   have gender dysphoria if in those individual
24   circumstances the patient health provider and legal
25   guardian or parent decide on that course of action?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 186 of 293 PageID #: 1843

```
 1              MS. BROWN:  Object to form.

 2              THE WITNESS:  So the treatment plan for

 3  gender incongruence and what would be specifically

 4  required by the individual in question, that would

 5  be decided upon -- the treatment plan, to be clear,

 6  would be decided upon in collaboration and through

 7  an evaluation of the patient in collaboration with

 8  their legal guardian, and with their treating

 9  provider.

10  BY MR. HILDABRAND:

11  Q.      And so yes or no?  It might include hormone

12  therapy even if the individual does not have gender

13  dysphoria?

14              MS. BROWN:  Same objection.

15              THE WITNESS:  Yes.  The treatment plan

16  may include hormones for an individual with gender

17  incongruence.

18  BY MR. HILDABRAND:

19  Q.      So you're using a different term here.  For

20  an individual who does not have gender dysphoria,

21  yes or no, could you answer that question not using

22  the term "gender incongruence"?

23              MS. BROWN:  Same objection.

24              THE WITNESS:  Can you repeat the

25  question for me then?
```

```
 1   BY MR. HILDABRAND:
 2   Q.    Yes.  For a transgender individual who does
 3   not have gender dysphoria -- we can have the
 4   conversation about gender incongruence in a minute.
 5   But for a transgender individual who does not have
 6   gender dysphoria, might it be acceptable for that
 7   individual or might their treatment plan include
 8   hormones?  Yes or no?  And then provide any
 9   additional explanation you'd like.
10             MS. BROWN:  Same objection.
11             THE WITNESS:  Yes.  A treatment plan for
12   a transgender individual with or without gender
13   dysphoria may include the use of gender-affirming
14   hormones as, again, would be decided upon after
15   careful and thoughtful evaluation, collaboration
16   among all the parties we've discussed before -- the
17   patient, particularly in adolescence, their legal
18   guardian, and their treatment team.
19   BY MR. HILDABRAND:
20   Q.    And might a treatment plan for a transgender
21   individual who does not have gender dysphoria also
22   include surgery?  Yes or no?  And then any further
23   explanation.
24             MS. BROWN:  Same objection.
25             THE WITNESS:  We would look to the
```

guidelines to support decisions about treatment
planning.  But it is possible that an individual who
identifies as transgender or gender diverse may not
experience gender dysphoria and could decide or move
forward with gender-affirming surgery.
BY MR. HILDABRAND:
Q.     All right.  So you mentioned the term "gender
incongruence".  What does that mean?
A.     Uh-huh.  So gender incongruence would be
similar to what we've discussed before around gender
identity, in which an individual's gender identity
would be incongruent or does not match or is not
aligned with the sex they were assigned at birth.
BY MR. HILDABRAND:
Q.     Is that a mental health condition to be
gender incongruent?
            MS. BROWN:  Objection to form.
            THE WITNESS:  It is not a mental health
condition and is not considered to be pathological
to have a transgender identity or experience gender
incongruence.
            MR. HILDABRAND:  Thank you.  All right.
Travis, turn to page five in this document.  It's
page five in the PDF and that's also the page that
is here.  Make our life real easy.  Go to where you

```
 1    can see pubertal suppression.
 2              MS. BROWN:  Sorry.  Give us one moment.
 3    The mouse went out.
 4              MR. HILDABRAND:  Of course, yes.
 5    BY MR. HILDABRAND:
 6    Q.     Can you read the first sentence under
 7    pubertal suppression?
 8    A.     Just so I remember, this is the AAP
 9    publication; is that right?
10    Q.     Yes.  It's --
11    A.     Okay.
12    Q.     -- the American Academy of Pediatrics.
13    A.     Okay.  Thank you.  Under pubertal
14    suppression, it says:  Gonadotrophin-releasing
15    hormones have been used to delayed puberty since the
16    1980s for central precocious puberty.
17    Q.     Thanks.
18    A.     Do you want me to keep going?
19    Q.     No, that's fine.  Is that your understanding
20    as well that these have been used since around the
21    1980s?
22    A.     That would be a great question for an
23    endocrinologist.  However, that's my understanding.
24    Q.     Would these gonadotrophin-releasing hormones,
25    are these often referred to as puberty blockers or
```

```
 1   puberty suppressors?
 2   A.      Yes.
 3   Q.      Are some of your patients on puberty blockers
 4   or puberty suppressors?  And feel free to tell me
 5   which term you prefer to refer to them.
 6   A.      Sure.  In my mental health practice, I do not
 7   believe I have patients that are currently on
 8   puberty-blocking medications.  So there are patients
 9   in the VPATH Clinic who are on pubertal blockers.
10           MR. SANDERS:  Clark, can I interrupt for
11   a second?
12           MR. HILDABRAND:  Yes.
13           MR. SANDERS:  This is David Sanders,
14   Madam Court Reporter.  I'm going to log off at this
15   point.  Jessica Jernigan Johnson in my office has
16   logged on.  She's already counsel of record in the
17   case so she's just in for me.
18           MR. HILDABRAND:  Sounds good.  Thanks,
19   David.
20           MR. SANDERS:  See you-all tomorrow.
21           MR. HILDABRAND:  See you tomorrow.
22   BY MR. HILDABRAND:
23   Q.      On the right-hand column --
24   A.      Uh-huh.
25   Q.      -- do you see about halfway down the page
```

```
 1   where it says pubertal suppression is not without
 2   risk?
 3   A.      Yes.
 4   Q.      Do you agree with that statement or is that
 5   something that we should ask somebody else?
 6                   MS. BROWN:  Objection to form.
 7                   THE WITNESS:  Discussing the risks and
 8   benefits of pubertal suppression is within the
 9   specialty of endocrinology.  So it may be a good
10   question for them.
11   BY MR. HILDABRAND:
12   Q.      That's fair.  Thank you.  So turning to page
13   six in the PDF.  When you get there, do you see a
14   Table 2, the process of gender affirmation may
15   include greater than or equal to one of the
16   following components?
17   A.      Yes, I do.
18   Q.      Do you see that table?
19   A.      Yes, I do.
20   Q.      Thank you.  And is the first component social
21   affirmation?
22   A.      That's what I'm seeing, yes.
23   Q.      As a psychologist, is that something that you
24   can understand that component and speak about as an
25   expert?
```

```
 1   A.     Yes.

 2   Q.     The second one, is that puberty blockers?

 3   A.     Yes.

 4   Q.     Is that something that you can speak to as an

 5   expert?

 6               MS. BROWN:  Objection to form.

 7               THE WITNESS:  I would be curious about

 8   what speak to refers to and what questions you may

 9   ask specifically.

10   BY MR. HILDABRAND:

11   Q.     Are you offering any expert testimony about

12   puberty blockers?

13               MS. BROWN:  Objection to form.

14   BY MR. HILDABRAND:

15   Q.     Or do you have sufficient experience and

16   knowledge to offer expert testimony about puberty

17   blockers?

18               MS. BROWN:  Objection to form.

19               THE WITNESS:  I think it would depend on

20   the particular questions and context related to

21   pubertal blockers.  We work within an

22   Interdisciplinary Clinic so often I myself need to

23   consult with the endocrinologist about some of these

24   terms and practices.

25   / /
```

BY MR. HILDABRAND:

Q.     So you yourself don't prescribe the puberty blockers; is that correct?

A.     That's correct.

Q.     And so the next component listed cross-sex hormone therapy.  And, again, you yourself do not prescribe cross-sex hormones; is that correct?

A.     That's correct.

Q.     Is the phrase "cross-sex hormone" or "cross-sex hormone therapy", are those phrases that you have heard in your practice, though?

A.     I have heard those terms.  We now prefer the term "gender-affirming hormones."

Q.     About when in your practice did that preference change?

            MS. BROWN:  Object to form.

            THE WITNESS:  Uh-huh.  I'm not sure of the specific time line.  Again, the terminology and practices are updating all the time.  But I would say within the past couple of years.

BY MR. HILDABRAND:

Q.     Thank you.  That's helpful.  And then gender-affirming surgeries, you don't perform yourself gender-affirming surgeries; is that correct?

```
 1    A.      I do not.
 2    Q.      Are you aware of what gender-affirming
 3    surgeries might entail for your patients, though?
 4    A.      Yes.
 5    Q.      What sort of surgeries would you consider
 6    gender-affirming surgeries?
 7    A.      Uh-huh.  The table provides a pretty good
 8    definition.  So top surgery, which might include
 9    creating a male typical chest shape (inaudible) --
10                (Court Reporter interrupts for clarity.
11                THE WITNESS:  I'm reading from the
12    table.  But top surgery, which would be to create a
13    male-typical chest shape or enhanced breasts.  Then
14    there would be bottom surgery, which would be
15    surgery on genitals or reproductive organs.  And
16    there may be surgeries such as facial feminization
17    or other procedures, including various other
18    procedures.
19    BY MR. HILDABRAND:
20    Q.      For top surgery, you described creating a
21    male-typical chest shape or enhanced breasts?
22    A.      Uh-huh.
23    Q.      For someone born with a sex assigned at birth
24    of female, would that involve mastectomies?
25    A.      Often I think this would be discussed between
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 195 of 293 PageID #: 1852

1  an individual patient and their surgeon.  But yes,
2  often there is a -- my understanding is there is a
3  double mastectomy and then re-creation of
4  affirmative chest.
5  Q.     And for bottom surgery, I think it's
6  described as surgery on genitals or reproductive
7  organs.  For those natal boys or individuals born
8  with the sex assigned at birth of male, would that
9  involve removing their penis and using it to
10  construct the vagina?
11            MS. BROWN:  Object to form.
12            THE WITNESS:  So for an individual
13  assigned male at birth, there may be a variety of
14  surgeries that they determine to be medically
15  necessary for each individual.  And just remind
16  everyone that moving through gender-affirming
17  surgery or receiving gender-affirming surgery and
18  the treatment plans here are individualized to each
19  patient.  So not all patients seek surgery to begin
20  with.
21  BY MR. HILDABRAND:
22  Q.     But is that a surgery that some patients may
23  receive?
24  A.     Which surgery is that?
25  Q.     The removing -- cutting off their penis and

1  using that to shape an artificial vagina, is that a
2  bottom surgery that some natal boys may receive?
3              MS. BROWN:  Object to form.
4              THE WITNESS:  So I'm not sure as to the
5  details of how the surgeries are performed.  That
6  would be a great question for a plastic surgeon.
7  But some individuals who may seek bottom surgery may
8  experience changes to their genitalia and creation
9  of genitalia that would be more consistent with
10 their gender identity.
11 BY MR. HILDABRAND:
12 Q.    Have any of your patients received top
13 surgery?
14             MS. BROWN:  Objection to form.
15             THE WITNESS:  I have had patients who
16 have received top surgery, yes.
17 BY MR. HILDABRAND:
18 Q.    What is the youngest age of a patient of
19 yours who has received top surgery?
20 A.    This is a bit of a complex question and
21 nuanced about the way they practice.  So I'm
22 thinking about patients in my mental healthcare
23 practice and I think the youngest I have worked with
24 them in my mental healthcare practice would be 18, I
25 believe.

```
 1   Q.      Eighteen at the time of the surgery; is that
 2   correct?
 3   A.      Yes.  Many are older and college aged.
 4   Q.      And what is the youngest age you can recall
 5   for one of your patients receiving bottom surgery?
 6              MS. BROWN:  Objection to form.
 7              THE WITNESS:  I am not aware of that
 8   bottom surgery performed on individuals younger than
 9   18.
10   BY MR. HILDABRAND:
11   Q.      So the same age for top surgery?
12              MS. BROWN:  Object to form.
13              THE WITNESS:  Can you repeat the
14   question for me?
15   BY MR. HILDABRAND:
16   Q.      That's okay.  We can -- we can move on.
17   That's all right.  All right.
18          On PDF page eight, can you go there?
19   A.      Page eight.  Give us a minute.
20   Q.      And the quotation will extend from the bottom
21   of page eight to page nine, if that's helpful for
22   what you're pulling up.
23   A.      Okay.  I think we're there.
24   Q.      Thanks.  Do you see the sentence that says:
25   Youth who identify as TGD are becoming more visible
```

1  because gender-diverse expression is increasingly
2  admissible in the media, on social media, and in
3  schools and communities.
4       Do you agree with this statement?  And let me
5  know if there are any parts that you would disagree
6  with.
7  A.    I think I would need some more information
8  about what the authors mean by admissible, a word
9  I'm not understanding in the context, I don't think.
10 Q.    So other than the increase in admissible,
11 would you agree that youth who identified as TGD are
12 becoming more visible in the media, on social media,
13 and in schools and communities?
14 A.    Yes, there is increased visibility of the
15 transgender community, although it is still quite
16 limited.
17 Q.    All right.  We're going to put this article
18 to the side and go back to your expert report.
19 A.    Okay.
20 Q.    It's Exhibit 1.  We are just going back to
21 footnote eight here on page five.
22 A.    Okay.  We are there.
23 Q.    Do you see where you cite the 2015 article
24 from the American Psychological Association,
25 Guidelines for Psychological Practice of Transgender

```
 1    and Gender-Nonconforming People?
 2              MR. HILDABRAND:  Can y'all hear us?
 3    Let's go off the record for a second while they
 4    reestablish audio if that's all right.
 5              (Recess observed.)
 6              MR. HILDABRAND:  Before we go back to
 7    questions, I have that we are at four hours and 57
 8    minutes on the record.  Is that what opposing
 9    counsel has as well?
10              MS. BROWN:  That sounds accurate.  We'll
11    trust you.
12              MR. HILDABRAND:  All right.
13              MS. BORELLI:  Are you tracking,
14    Ms. Honeycutt?
15              (Off-the-record discussion.)
16              MR. HILDABRAND:  I hope we don't have to
17    use down to the last minute but we'll see.  All
18    right.
19    BY MR. HILDABRAND:
20    Q.    So going back, you saw where you cited the
21    2015 American Psychological Association article,
22    correct?
23    A.    In footnote eight.  Yes, I'm with you.
24              MR. HILDABRAND:  Great.  Travis, can you
25    circulate Doc M.  And we'll mark this as Exhibit 12.
```

```
 1              (WHEREUPON, a document was marked as
 2   Exhibit Number 12.)
 3   BY MR. HILDABRAND:
 4   Q.     Does this appear to be the article that you
 5   cited in your expert report?
 6   A.     It does.
 7   Q.     Let's go to the second page in the PDF,
 8   Journal page 833.
 9   A.     Okay.
10   Q.     Do you see at the first full paragraph where
11   it says:  Given the added complexity of working with
12   TGNC and gender-questioning youth and the
13   limitations of available research, the guidelines
14   focus primarily, though not exclusively, on TGNC
15   adults?  Is that what the article says?
16   A.     I see that text, yes.
17   Q.     Do you agree that there is added complexity
18   with working with transgender and gender-questioning
19   youth?
20              MS. BROWN:  Object to form.
21              THE WITNESS:  The mental health field in
22   general, I believe that there is added complexity
23   working with children and adolescents of all gender
24   identity.  That includes cisgender children and
25   adolescents.
```

```
 1   BY MR. HILDABRAND:

 2   Q.     And are there any limitations to the

 3   available research regarding transgender and

 4   gender-questioning youth?

 5            MS. BROWN:  Objection to form.

 6            THE WITNESS:  There are limitations in

 7   every field of research and particular to each

 8   article they may have their own limitations.

 9   BY MR. HILDABRAND:

10   Q.     Are there any limitations particular to

11   research regarding transgender and

12   gender-questioning youth?

13            MS. BROWN:  Same objection.

14            THE WITNESS:  Particular in what way?

15   BY MR. HILDABRAND:

16   Q.     So you mention that all fields can have

17   limitations.  Are there any limitations that you can

18   think of specifically for research regarding

19   transgender and gender-questioning youth?

20            MS. BROWN:  Same objection.

21            THE WITNESS:  No.

22   BY MR. HILDABRAND:

23   Q.     So these are just limitations that any field

24   of research would have?

25            MS. BROWN:  Objection to form.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 202 of 293 PageID #: 1859

1          THE WITNESS:  There may be limitations
2    present in all fields of study, and I cannot think
3    of unique limitations in this field of study.
4    BY MR. HILDABRAND:
5    Q.    Do you use these guidelines in this article
6    during your practice as a psychologist?
7          MS. BROWN:  Objection to form.
8          THE WITNESS:  I have reviewed these
9    guidelines.  We primarily rely on the Endocrine
10   Society and the WPATH.
11   BY MR. HILDABRAND:
12   Q.    So these guidelines are -- you might consider
13   these guidelines, but these are not guidelines that
14   you would rely upon as much as the WPATH Standards
15   of Care or the Endocrine Guidelines; is that
16   correct?
17         MS. BROWN:  Objection to form.
18         THE WITNESS:  These are guidelines I
19   have reviewed and considered.  And the standards of
20   care from the WPATH and the Endocrine Society
21   Guidelines are the primary sources in our field.
22   BY MR. HILDABRAND:
23   Q.    Thank you.  Do these guidelines in this
24   article focus primarily on adults?
25         MS. BROWN:  Objection to form.

1      THE WITNESS:  I would need to re-review
2  this particular article.
3  BY MR. HILDABRAND:
4  Q.    So you're not aware off the top of your head
5  if this article focuses primarily on adults?
6          MS. BROWN:  Same objection.
7          THE WITNESS:  Off of the top of my head,
8  I recall this article references both youth and
9  adults.
10  BY MR. HILDABRAND:
11  Q.    That's fair.  On the right-hand side, do you
12  see where it says distinction between standards and
13  guidelines?
14  A.    I do.
15  Q.    Can you read the sentence under that heading?
16  A.    Sure.  So it says:  When using these
17  guidelines, psychologists should be aware that APA
18  has made an important distinction between standards
19  and guidelines.  Should I keep going?
20  Q.    Yes.  If you want to keep going for the next
21  sentence.
22  A.    All right.  The standards are mandates to
23  which all psychologists must adhere, e.g., the
24  ethical principles, a psychologist, and code of
25  conduct, whereas guidelines are aspirational.

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 204 of 293 PageID #: 1861

```
 1    Q.     Do you agree that guidelines are
 2    aspirational?
 3                    MS. BROWN:  Objection to form.
 4                    THE WITNESS:  I think guidelines are
 5    guidelines that can inform in a very important way
 6    treatment plans and best practice.
 7    BY MR. HILDABRAND:
 8    Q.     Do you view there as being a distinction
 9    between guidelines and standards of care?
10                    MS. BROWN:  Same objection.
11                    THE WITNESS:  In this context, as
12    referenced in this article, I understand the
13    distinction that they're making between standards
14    and guidelines.
15    BY MR. HILDABRAND:
16    Q.     Is that a distinction you make in your
17    practice as a psychologist?
18                    MS. BROWN:  Objection to form.
19                    THE WITNESS:  I am not sure I have
20    really thought in depth about the definition between
21    standards and guidelines.
22    BY MR. HILDABRAND:
23    Q.     All right.  Now let's look at page three in
24    the PDF.  Do you see it says foundational knowledge
25    and awareness?
```

```
 1   A.     Yes.
 2   Q.     And it says:  Guideline one:  Psychologists
 3   understand that is gender is a nonbinary construct
 4   that allows for a range of gender identities and
 5   that a person's gender identity may not align with
 6   sex assigned at birth?
 7   A.     Yes.  Uh-huh.
 8   Q.     Do you agree with the statements in that
 9   guideline or are there any that you disagree with?
10   A.     I can agree with that statement.
11   Q.     For the first sentence that says rationale,
12   can you read the first sentence there?
13   A.     Yes.  It says:  Gender identity is defined as
14   a person's deeply felt, inherent sense of being a
15   girl, woman, or female, a boy, a man, or male, a
16   blend of male or female, or an alternative gender.
17   Q.     Do you agree with that statement or are there
18   any components of it that you disagree with?
19   A.     So this is one particular statement in what I
20   believe is an older document, if I remember
21   correctly, and is in process of being updated.  I
22   think it could be stated better and more precisely
23   in a future iteration.
24   Q.     And this was published, I think at the bottom
25   it says December 2015; is that what it says?
```

```
 1   A.      Yes.
 2   Q.      It's already outdated less than seven years
 3   later; is that correct?
 4              MS. BROWN:  Object to form.
 5              THE WITNESS:  So seven years can be a
 6   long time in scientific literature.  There may be
 7   many advances in that time.  It's likely that when
 8   these guidelines and papers such as these are
 9   developed that they are in the works for many years
10   and in committee for many years prior to their
11   publication date.
12   BY MR. HILDABRAND:
13   Q.      Do you agree that gender identity can be a
14   blend of male or female?
15   A.      Yes, I think gender identity could be a
16   blend.
17   Q.      All right.  Let's go forward to page 11 in
18   the PDF.  This is Journal page 842.  Do you see the
19   paragraph that begins:  A clear distinction between
20   care of TGNC and gender-questioning children and
21   adolescents exists in the literature?
22   A.      Yes, I see that paragraph.
23   Q.      Can you read the next sentence there?
24   A.      Sure.  I'm going to read the first sentence
25   again just so I'm in the right place.  Sorry.  A
```

clear distinction between care of TGNC and
gender-questioning children and adolescents exists
in the literature due to the evidence that not all
children persist in a TGNC identity into adolescence
or adulthood and because no approach to working with
TGNC children has been adequately empirically
validated consensus does not exist regarding best
practice with prepubertal children.

Q.     Do you agree that reasonable psychologists
can differ about the proper treatment of transgender
youth?

                MS. BROWN:  Objection to form.

                THE WITNESS:  And what do you mean by a
reasonable psychologist?

BY MR. HILDABRAND:

Q.     You tell me.  Is that something that a
psychologist who you could respect could disagree
with how you approach treating a transgender child?

                MS. BROWN:  Same objection.

                THE WITNESS:  Professionals do sometimes
differ in their approach to treatment plans or
treatment strategies for children and all kinds of
conditions.

BY MR. HILDABRAND:

Q.     Let's go to the next paragraph.  Do you see

1   where it says:  One approach encouragings an
2   affirmation and acceptance of children's expressed
3   gender identity?
4   A.      Yes, I see that paragraph.
5   Q.      In your practice, is that more -- is that
6   similar to the approach that you try to take of
7   affirming the child's expressed gender identity?
8               MS. BROWN:  Objection to form.
9               THE WITNESS:  In my practice, I work
10  closely and intentionally with each patient and
11  their caregiver to assess their gender identity and
12  to collaborate on an appropriate treatment plan.
13  BY MR. HILDABRAND:
14  Q.      And so then the next paragraph begins:  In
15  the second approach, children are encouraged to
16  embrace their given bodies and to align with their
17  assigned gender roles.  Is that what the article
18  says?
19  A.      I think in that paragraph I'm going to repeat
20  it back just to be sure.  In the second approach,
21  children are encouraged to embrace their given
22  bodies and to align with their assigned gender
23  roles.  That's what this text states.
24  Q.      Is that second approach consistent with your
25  practice?

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 209 of 293 PageID #: 1866

```
 1              MS. BROWN:  Objection to form.
 2              THE WITNESS:  The approach that's
 3   described in this statement I would need more
 4   information around.  At first blush, it sounds like
 5   a practice that is no longer supported in the
 6   literature.
 7   BY MR. HILDABRAND:
 8   Q.     So then the next sentence says:  This
 9   includes endorsing and supporting behavior and
10   attitudes that align with the child's sex assigned
11   at birth prior to the onset of puberty.  Is that an
12   approach that psychologists no longer take?
13              MS. BROWN:  Objection to form.
14              THE WITNESS:  So the statement -- this
15   includes endorsing and supporting behaviors and
16   attitudes that align with the child's sex assigned
17   at birth prior to onset of puberty.  I think it
18   would be important to assess each individual child
19   and their needs.  However, encouraging a transgender
20   child or gender incongruence to identify and behave
21   as their sex assigned at birth could be consistent
22   with something called conversion therapy.
23   Q.     So do you view this second approach as
24   conversion therapy?
25              MS. BROWN:  Objection to form.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 210 of 293 PageID #: 1867

```
 1              THE WITNESS:  I would need more

 2   information about what the authors were intending

 3   and maybe to read some additional context.

 4   BY MR. HILDABRAND:

 5   Q.     Feel free to read the rest of the paragraph

 6   if you want to but --

 7   A.     Sure.

 8   Q.     Do you want to do that?  Then I'll return to

 9   the question in a second?

10   A.     Okay.  That would be great.  Thank you so

11   much.  Okay.  I finished reading that paragraph.

12   Q.     Is conversion therapy -- before we get back

13   to this, is conversion therapy an acceptable or

14   unacceptable choice of therapy for a psychologist?

15              MS. BROWN:  Objection to form.

16              THE WITNESS:  Conversion therapy is

17   unacceptable and unethical.  It's been found to be

18   harmful to patients.

19   BY MR. HILDABRAND:

20   Q.     Based on what this second approach is

21   described as here, would you view this as conversion

22   therapy?

23              MS. BROWN:  Objection to form.

24              THE WITNESS:  Again, I would need some

25   more information.  But it sounds consistent with
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 211 of 293 PageID #: 1868

1   conversion therapy and I appreciate the context
2   later in the paragraph, that when addressing
3   psychological interventions for children and
4   adolescents, the WPATH standards of care identify
5   interventions "aimed at trying to change gender
6   identity and expression to become more congruent
7   with the sex assigned at birth as unethical, with
8   hopes that future research will offer improved
9   guidance in this area of practice".
10  BY MR. HILDABRAND:
11  Q.      So based on what you see here, you would
12  agree with WPATH that this second approach would be
13  unethical?
14              MS. BROWN:  Objection to form.
15              THE WITNESS:  I would agree that
16  conversion therapy is unethical.  And indeed the
17  American Psychological Association has also posted
18  statements in support of this belief as well since
19  the time that these guidelines came out.
20  BY MR. HILDABRAND:
21  Q.      You mentioned at the time these guidelines
22  came out.  Has this approach ever been viewed as
23  more acceptable amongst psychologists?
24              MS. BROWN:  Objection to form.
25              THE WITNESS:  Many years ago people were

1  practicing conversion therapy but it's very

2  important to note that this has been widely

3  identified and clearly articulated by mental and

4  medical health professionals and inappropriate,

5  unethical, and harmful --

6  BY MR. HILDABRAND:

7  Q.     Just to be --

8  A.     -- and no longer practiced.

9  Q.     Just to be clear about many years, is that

10 ten years ago or longer?

11 A.     I don't know the specifics of folks who

12 practice conversion therapy or have practiced

13 conversion therapy in the past.

14 Q.     All right.  So in the upper right column, do

15 you see where it says consensus does not exist

16 regarding whether this approach may provide benefits

17 or may cause harm or lead to psychosocial

18 adversities?

19 A.     I see that statement listed here.

20 Q.     Do you think that there is now consensus?

21 A.     I do believe that is there is consensus now

22 that conversion therapy is harmful.

23 Q.     Farther down the right column on page 11, do

24 you see -- it's about halfway down in the first full

25 paragraph?

```
1    A.      Uh-huh.

2    Q.      Do you see where it says:  Complicating their

3    clinical presentation, many gender-questioning

4    adolescents also present with co-occurring

5    psychological concerns, such as suicidal ideation,

6    self-injurious behaviors, drug and alcohol use, and

7    autism spectrum disorders?  Is that what the article

8    says with additional in-line citations?

9    A.      I see that in the article, yes.

10   Q.      Do you agree with that statement?  Are there

11   any components of it that you disagree with?

12   A.      There are many possible co-occurring

13   conditions and it's very common in child adolescent

14   mental health broadly for there to be co-occurring

15   diagnoses or conditions.

16   Q.      Do you see where it says:  Additionally,

17   adolescents can become intensely focused on their

18   immediate desires?

19   A.      I see that, yes.

20   Q.      Is that something you observed about

21   adolescents in your practice?

22              MS. BROWN:  Objection to form.

23              THE WITNESS:  So questions about

24   adolescents who may become intensely focused on

25   immediate desires, I believe this is regarded as an
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 214 of 293 PageID #: 1871

```
 1   experience of adolescence, where they may be focused
 2   on what brings them pleasure or are unable to delay
 3   gratification for some individuals.
 4   BY MR. HILDABRAND:
 5   Q.     Now I want to move forward to page 29 in the
 6   PDF.  It's page 860 in the Journal.  Do you see
 7   where its says Appendix A definitions?
 8   A.     Yes, I see Appendix A.
 9   Q.     Do you see the sentence:  Terminology within
10   the healthcare field in transgender and gender
11   non-conforming TGNC communities is constantly
12   evolving?
13   A.     Yes.
14   Q.     Do you agree that this terminology is
15   constantly evolving?
16   A.     I agree it is often evolving.  Constantly is
17   a very specific frequency.
18   Q.     Thanks for clarifying.
19   A.     Sorry.
20   Q.     The second sentence says:  The evolution of
21   terminology has been especially rapid in the last
22   decade as the profession's awareness of gender
23   diversity has increased as more literature and
24   research in this area has been published and as
25   voices of the TGNC community have strengthened?  Do
```

1  you agree with this statement?

2  A.    I think there has been increased

3  proliferation of research and awareness of gender

4  diversity in the past decade, yes.

5  Q.    Given the change that's occurred in the past

6  decade, as a psychologist, do you think that the

7  field of psychology should slow down a little bit or

8  take a more conservative approach to this change in

9  terminology?

10          MS. BROWN:  Objection to form.

11          THE WITNESS:  In best practices in the

12  mental health field, it has been well established

13  that using terminology consistent with our patients'

14  understanding of their culture and their identity is

15  important to delivering culturally competent care.

16  And in the fact that terminology may be changing and

17  evolving, it would be important to remain updated on

18  that terminology and to continue to meet our

19  patients where they're at, again, as consistent with

20  culturally competent care.

21  BY MR. HILDABRAND:

22  Q.    So now I'm going to ask to scroll through the

23  definitions, specifically, since they go in

24  alphabetical order, pages 30 and 31, in the PDF

25  pages 861, 862 in the document.  And let me know if

```
1   you see a definition of the word "gender" standing
2   by itself?
3   A.     We are scrolling.  I did not see a definition
4   on page 861.  We've made it to the alphabetical
5   section of H and did not see a specific definition
6   for the term "gender".
7   Q.     Thank you.  On page 862, do you see a
8   definition of sex?
9   A.     I see sex or sex assigned at birth.
10  Q.     And is the first sentence there:  Sex is
11  typically assigned at birth or before during
12  ultrasound based on the appearance of external
13  genitalia?
14  A.     Yes, I see that.
15  Q.     And feel free to read the additional context
16  they provide there in that definition.  But once
17  you've done so, can you let me know if you agree
18  with the definition here or if they're related how
19  you would change it?
20  A.     I've read the definition.  I think the
21  current definition of sex and how sex is assigned,
22  including the many factors of informed sex, like
23  internal genitalia, chromosomal and hormonal sex,
24  that those would be considered for all individuals
25  and not just when external genitalia are ambiguous.
```

```
 1              MR. HILDABRAND:  Thank you for
 2   clarifying.  I believe we have entered this already
 3   as Exhibit 12; is that correct?
 4              COURT REPORTER:  Yes, sir.
 5              MR. HILDABRAND:  Great.  Thank you.  I
 6   just wanted to make sure before we moved on.  All
 7   right.
 8   BY MR. HILDABRAND:
 9   Q.    Let's go back to Exhibit 1, your expert
10   report.
11   A.    Okay.
12   Q.    And we're still on for there page five, but
13   now we are going to turn to footnote nine.
14   A.    I see footnote nine.
15   Q.    Do you cite a state advocacy update there?
16   A.    From the American Medical Association, yes.
17              MR. HILDABRAND:  Travis, can you
18   circulate Doc N.  And we will mark this as
19   Exhibit 13.
20              (WHEREUPON, a document was marked as
21   Exhibit Number 13.)
22   BY MR. HILDABRAND:
23   Q.    Dr. Cyperski, does this appear to be the
24   March 26, 2021, state advocacy update from the AMA
25   that you've cited?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 218 of 293 PageID #: 1875

```
 1   A.     Yes.
 2   Q.     Are state advocacy updates the source or
 3   sources that psychologists usually rely on in
 4   forming their opinions?
 5              MS. BROWN:  Object to form.
 6              THE WITNESS:  This document deals within
 7   the scope of the opinions that I provided.
 8   BY MR. HILDABRAND:
 9   Q.     So would it be the sort -- so is it a
10   document you relied upon in forming your expert
11   opinion?
12   A.     Yes.
13   Q.     So you see where it says, AMA fights to
14   protect healthcare for transgender patients?
15   A.     Yes.
16   Q.     Is it normal for medical associations to
17   fight political battles?
18              MS. BROWN:  Object to form.
19              THE WITNESS:  Normally the specific
20   term, it is very common for professional
21   organizations to make policy statements or updates
22   such as this.
23   BY MR. HILDABRAND:
24   Q.     Then in the last -- do you see the sentence,
25   before criminalizing healthcare for transgender
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 219 of 293 PageID #: 1876

1   minors that says:  The AMA state advocacy resource

2   center remains actively engaged in defeating

3   legislation that would harm transgender patients?

4   A.    Yes, I see that statement.

5   Q.    Are you aware that the AMA has an advocacy

6   resource center?

7   A.    I am not familiar with the AMA organizational

8   structure but it is listed in this document that

9   they have an advocacy resource center.

10   Q.    Is it customary for the AMA to actively

11   attempt to defeat legislation?

12           MS. BROWN:  Objection to form.

13           THE WITNESS:  Again, I'm not familiar

14   with the particulars of the AMA and their activities

15   within the organization.  I think it makes sense

16   that physicians and professionals would work to

17   protect their patients and to defeat things

18   including legislation that would harm their

19   patients.

20   BY MR. HILDABRAND:

21   Q.    Do you see farther down where it says:  The

22   AMA used these bills as a dangerous legislative

23   intrusion into the practice of medicine and has been

24   working closely with state medical associations to

25   vigorously oppose them.

```
 1   A.     I see that statement, yes.
 2   Q.     Is it dangerous for state legislatures to
 3   intrude into the practice of medicine?
 4               MS. BROWN:  Objection to form.
 5               THE WITNESS:  I think it would be
 6   important to define the word "dangerous".
 7   BY MR. HILDABRAND:
 8   Q.     So you cited this article to support your
 9   expert report.  How do you understand the word
10   "dangerous" as it is used here?
11   A.     Uh-huh.  So defining in context, might be AMA
12   used these bills as a harmful endeavor and dangerous
13   legislative intrusion into the practice of medicine
14   and working closely with state medical associations
15   to vigorously oppose them.
16   Q.     So is some legislative intrusion into the
17   practice of medicine acceptable?
18               MS. BROWN:  Object to form.
19   BY MR. HILDABRAND:
20   Q.     Or not dangerous?
21               MS. BROWN:  Same objection.
22               THE WITNESS:  It's my experience that
23   the practice of medicine should be guided by best
24   practice guidelines and by the current state of the
25   literature and the science that guides their
```

```
 1   practice.

 2   BY MR. HILDABRAND:

 3   Q.      Not guided by the decisions of elected

 4   officials?

 5            MS. BROWN:  Objection to form.

 6            THE WITNESS:  I am not aware of the fact

 7   that elected officials are trained medical

 8   professionals, although some of them may be.  And to

 9   the extent to which they are current and up to date

10   in the scientific literature about the practices of

11   medicine.

12   BY MR. HILDABRAND:

13   Q.      So is it your position that only medical

14   professionals should decide how to limit the

15   practice of medicine?

16            MS. BROWN:  Objection to form.

17            THE WITNESS:  I believe the practice of

18   medicine should be informed by the current state of

19   the science, as well as by the patients that are

20   served by the medicine and populations of

21   individuals who are impacted by them and by many

22   other factors as well.

23   BY MR. HILDABRAND:

24   Q.      So to give a yes or no, is it -- to yes or

25   no, should the practice of medicine only be
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 222 of 293 PageID #: 1879

```
 1   restricted by medical professionals?  And then feel
 2   free to explain.
 3               MS. BROWN:  Same objection.
 4               THE WITNESS:  It's very difficult to
 5   answer any question when posed with an always or an
 6   only or an absolute, and we often must consider the
 7   complexities, particularly when it comes to the
 8   health and wellbeing of people.
 9   BY MR. HILDABRAND:
10   Q.    All right.  Now let's turn to page two of the
11   PDF.  Do you see under where it says, excluding
12   transgender youth from athletics, where it says:
13   Another concerning trend are bills that would
14   prohibit transgender women and girls from
15   participating in school athletics consistent with
16   their gender identity?
17   A.    I see the statement, yes.
18   Q.    So do you understand the AMA to take the
19   position that these bills are a concerning trend?
20   A.    Yes, that's my understanding.
21   Q.    Are you concerned that the AMA is taking a
22   position on a political question?
23               MR. HILDABRAND:  Objection to form.
24               THE WITNESS:  Can you restate that, or
25   repeat the question for me, please?
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 223 of 293 PageID #: 1880

```
 1   BY MR. HILDABRAND:

 2   Q.     Yes.  Is it a concern for you as a

 3   psychologist that the AMA is picking sides in

 4   political debates?

 5              MS. BROWN:  Same objection.

 6              THE WITNESS:  I'm not sure they are

 7   picking sides in political debates and instead are

 8   offering an opinion about what would promote health

 9   and wellbeing and resiliency in a particular patient

10   population that they serve.

11   BY MR. HILDABRAND:

12   Q.     All right.  Move down to where it says:  In

13   2020, Idaho became the first-ever state to enact a

14   ban on transgender minors' participation in youth

15   athletics.  The law was challenged and blocked by a

16   federal court in August 2020.  The AMA, along with

17   the American Academy of Pediatrics and other

18   healthcare organizations, submitted a Friend of the

19   Court brief with the Ninth Circuit Court of Appeals

20   noting that the law undermines the accepted approach

21   for treating gender dysphoria.

22          So is it your understanding that the AMA and

23   the American Academy of Pediatrics have taken a side

24   against the Idaho legislation?

25   A.     Based on what's written in this document, it
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 224 of 293 PageID #: 1881

1   appears as though the AMA and the AAP and other
2   healthcare organizations submitted a brief noting
3   that the law undermines the accepted approach for
4   treating gender dysphoria.
5   Q.    So do you view the AMA as an impartial source
6   of information on the appropriateness of the law
7   challenged in this case?
8               MS. BROWN:  Objection to form.
9               THE WITNESS:  I believe the AMA is
10  taking a stance about what promotes wellbeing and
11  resiliency in patients that they treat, including
12  individuals with gender dysphoria, and seeking to
13  promote health and wellbeing for individuals with
14  gender dysphoria.
15  BY MR. HILDABRAND:
16  Q.    So yes or no?  Do you view them as impartial
17  on the Tennessee law challenged in this case?  And
18  feel free to explain more.
19              MS. BROWN:  Same objection.
20              THE WITNESS:  I'm not sure how to answer
21  that question.  I'm so sorry.
22  BY MR. HILDABRAND:
23  Q.    If you're not sure that's fine.  We'll move
24  on from that.  Let's go back to your report, page
25  five, again, footnote nine.

```
 1   A.     Okay.  Footnote nine.
 2   Q.     And then do you see the last citation on that
 3   page to an AACAP 2019 article?
 4   A.     Yes.
 5          MR. HILDABRAND:  Travis, can you
 6   circulate Doc O.  Dr. Cyperski, we'll mark this as
 7   Exhibit 14.
 8          THE WITNESS:  I have it open.
 9          (WHEREUPON, a document was marked as
10   Exhibit Number 14.)
11   BY MR. HILDABRAND:
12   Q.     Dr. Cyperski, does this appear to be the
13   AACAP statement that you cited in your expert
14   report?
15   A.     Yes.
16   Q.     Looking down at the third paragraph, do you
17   see the second sentence that reads:  Blocking access
18   to timely care has been shown to increase youths'
19   risk for suicidal ideation and other negative mental
20   health outcomes?
21   A.     I'm not seeing that yet.
22          MS. BROWN:  There's a lag in my
23   scrolling.  So if you can repeat it again.
24   BY MR. HILDABRAND:
25   Q.     No problem.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 226 of 293 PageID #: 1883

```
 1    A.     What statement are we looking for?
 2    Q.     Sorry.  The sentence is:  AACAP strongly
 3    opposes any efforts, legal, legislative, and
 4    otherwise, to block access to these recognized
 5    interventions.
 6    A.     I see that statement.
 7    Q.     So is the AACAP taking a side in debate about
 8    legislation regarding transgender children and
 9    adolescents?
10              MS. BROWN:  Objection to form.
11              THE WITNESS:  I am not sure AACAP is
12    taking a side so much as they are making a statement
13    that the types of legal and legislative acts are
14    incongruent with the current evidence-based clinical
15    care that is important to those promoting the health
16    and wellbeing of children and adolescents.
17    BY MR. HILDABRAND:
18    Q.     So is the AACAP discouraging the passage of
19    this sort of legislation?
20              MS. BROWN:  Same objection.
21              THE WITNESS:  Their statement states:
22    AACAP opposed any efforts, legal, legislative, and
23    otherwise, to block access to these recognized
24    interventions.
25    / /
```

BY MR. HILDABRAND:

Q.    So do you view AACAP as an impartial organization when it comes to a law like the one challenged in this case?

        MS. BROWN:  Objection to form.

        THE WITNESS:  I am not familiar enough with AACAP and their organization in particular to determine if they are impartial or not.

BY MR. HILDABRAND:

Q.    Going back down to the first paragraph, do you see the second sentence in that paragraph that says:  Health promotion for all youth encourages open exploration of all identity issues, including sexual orientation, gender identity, and/or gender expression according to recognized practice guidelines?  Do you agree with this statement about what health promotion involves?

A.    Health promotion involves many various components of lots of different practices, one of which would be exploration of all aspects of identity.

BY MR. HILDABRAND:

Q.    Thank you.  Let's put this to the side and go back to your expert report.  And we'll stay with your expert report for a little bit longer this

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 228 of 293 PageID #: 1885

```
 1   time.
 2   A.      Okay.
 3   Q.      So look at paragraph 19, also on page five.
 4   A.      Paragraph 19, I see that.
 5   Q.      So you mention the widely accepted
 6   guidelines.  Are those the Endocrine Society
 7   Guidelines and the WPATH Standards of Care?
 8   A.      Yes.
 9   Q.      Let's turn now to paragraph 20, which is on
10   page six.  Can you read the first sentence there for
11   me?
12   A.      Sure.  The treatment for gender dysphoria is
13   to reduce or eliminate the individual's clinically
14   significant distress or impairments in functioning,
15   which includes helping the patient to live in
16   accordance with their gender identity.
17   Q.      Is this the goal of treatment for gender
18   dysphoria?
19   A.      Yes, though there may be others well.
20   Q.      Is a goal for treatment of gender dysphoria
21   to help the child or adolescent become comfortable
22   in the body he or she was born with?
23           MS. BROWN:  Object to the form.
24           THE WITNESS:  A goal of treatment for
25   individuals with gender dysphoria would be to reduce
```

1  the distress or impairments that they feel and to

2  help them live in accordance with their gender

3  identity.  That would be to decrease discomfort.

4  BY MR. HILDABRAND:

5  Q.    But not to make them comfortable with their

6  sex assigned at birth; is that correct?  Is it to

7  make them comfortable with their gender identity

8  rather than their sex assigned at birth; is that

9  correct?

10          MS. BROWN:  Same objection.

11          THE WITNESS:  I think this is a

12  complicated and nuanced issue that's hard to answer

13  distinctly and specifically and that the individual

14  treatment plan for a particular patient would

15  identify treatment goals for that individual.

16  BY MR. HILDABRAND:

17  Q.    When you are creating patient treatment

18  plans, is it more important when you're creating

19  those for the individual to be comfortable with

20  their gender identity or to be comfortable with

21  their sex assigned at birth?

22          MS. BROWN:  Objection to form.

23          THE WITNESS:  Treatment plans often are

24  aimed at reducing distress and impairment and

25  improving positive psychology and functioning that

```
1   is often going to focus on supporting their gender
2   identity and helping them seek congruence in their
3   gender identity.
4   BY MR. HILDABRAND:
5   Q.     For some patients, would it be more
6   helpful -- I understand that is how several patients
7   might be helped.  But for some patients is it more
8   helpful to encourage them to be comfortable in their
9   sex assigned at birth rather than their gender
10  identity?
11            MS. BROWN:  Objection to form.
12            THE WITNESS:  I would need more
13  information about what you mean and what that
14  treatment would look like.  Again, in the
15  description it sounds like the unethical practice of
16  conversion therapy.
17  BY MR. HILDABRAND:
18  Q.     So going down -- so in the second sentence
19  here, you used the phrase "gender-affirming care".
20  Is that a commonly used phrased among psychologists?
21  A.     Among psychologists in the field, yes.
22  Q.     And the same for gender transition?
23  A.     We in the field tend to use gender-affirming
24  care.  Other terms like gender transition or
25  transition-related care may also fall in this realm.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 231 of 293 PageID #: 1888

```
 1   Q.     Would other care providers understand what
 2   you mean when you use those terms?
 3               MS. BROWN:  Objection to form.
 4   BY MR. HILDABRAND:
 5   Q.     Or do you understand what other healthcare
 6   providers mean when they use those terms?
 7               MS. BROWN:  Objection to form.
 8               THE WITNESS:  I believe there is
 9   consensus around gender-affirming care and would
10   understand what an individual was referring to,
11   though there's always room for further discussion
12   and collaboration with the provider about the
13   specific treatment that they're referencing.
14   BY MR. HILDABRAND:
15   Q.     Moving down to paragraph 22.  You say that --
16   we are talking about prepubertal children here.  And
17   the second sentence says:  For these patients,
18   social transition, living in accordance with one's
19   gender identity may be appropriate.  Is that what
20   you said here?
21   A.     Yes.
22   Q.     And do you agree with that statement today?
23   A.     That's correct.
24   Q.     Might it also not be appropriate for some
25   prepubertal children who have gender dysphoria for
```

1    them to socially transition?

2            MS. BROWN:  Objection to form.

3            THE WITNESS:  So can you repeat the

4    question for me?

5    BY MR. HILDABRAND:

6    Q.    Yes.  So here it says:  Social transition for

7    prepubertal children may be appropriate.  Is it

8    always appropriate or are there scenarios where

9    social transitions to prepubertal children with

10   gender dysphoria is not appropriate?

11           MS. BROWN:  Same objection.

12           THE WITNESS:  I think there's two

13   distinctions here that are important.  There's the

14   definition and practice of a social transition and

15   then there is gender dysphoria.  And those two are

16   related and may inform one another but speak to the

17   complexities of developing a treatment plan and when

18   it may be appropriate to engage in which practice.

19   Q.    So you say may be appropriate.  So it may not

20   be appropriate in some treatment plans for

21   prepubertal children with gender dysphoria to

22   socially transition; is that correct?

23   A.    For prepubertal children with gender

24   dysphoria specifically as a clinical diagnosis, it's

25   likely that a social transition is appropriate for

```
 1   the majority of those patients.
 2   BY MR. HILDABRAND:
 3   Q.      So for the majority of those patients, are
 4   there some patients, even if they're minority, whom
 5   social transition would not be an appropriate
 6   treatment for gender dysphoria?
 7   A.      There are individual considerations for every
 8   child and family.  And in the majority of cases, if
 9   a child has gender dysphoria, a social transition is
10   an important part of their treatment plan that would
11   promote health and wellbeing and resiliency.
12   Q.      So percentage-wise when you say the majority,
13   you mean greater than 50 percent but less than 100
14   percent; is that correct?
15   A.      In which patient population are we talking
16   about?
17   Q.      So for prepubertal children with gender
18   dysphoria, you say it may be appropriate in some
19   situations.  And then we discussed a little further
20   and you said a majority of prepubertal children with
21   gender dysphoria this would be appropriate.  And I'm
22   sorry to talk quickly there.
23           But when you use the word majority, do you
24   mean greater than 50 percent but less than
25   100 percent?
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 234 of 293 PageID #: 1891

A. In my personal practice, the individuals that
I have met that have a diagnosis of gender
dysphoria, it is often appropriate for them to
initiate a social transition and they have initiated
a social transition prior to arriving at my
practice.

Q. But give me the yes or no format and then
feel free to explain. Is it always appropriate for
a prepubertal child with gender dysphoria to
socially transition? Please give a yes or no and
then you can continue if you need to.

A. I really can't give a yes or no because using
terms like always, which are very complicated,
always, no. There are individual nuances and
circumstances that must be considered with every
patient. For the majority of individuals, a social
transition is appropriate.

Q. Thank you. So then I think it goes on to say
that: After an individual begins puberty, medical
intervention may be indicated, including puberty
delaying medications and/or hormone therapy to
initiate puberty consistent with one's gender
identity. Individuals who receive hormone therapy
develop secondary sex characteristics consistent
with their gender identity.

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 235 of 293 PageID #: 1892

```
 1          What are sex characteristics consistent with
 2     their gender identity?  And if you need to give an
 3     example, feel free to give examples for children
 4     based on what their sex assigned at birth would be.
 5               MS. BROWN:  Objection to form.
 6               THE WITNESS:  I'm happy to provide
 7     examples from my understanding and then some of the
 8     specifics may be more appropriate for a medical
 9     provider, an endocrinologist, or a primary care
10     physician to address.
11               But, for example, a child who was
12     assigned male at birth and identifies as a female
13     and begins estrogen, for example, as an adolescent,
14     they may start to develop some breasts and develop
15     their chest that would be consistent with their
16     gender identity.
17               For individuals who are assigned female
18     at birth and have a transgender identity or identify
19     as male and in adolescence initiate a course of
20     testosterone treatments, they may develop
21     characteristics consistent with clitoral
22     enlargement, or facial hair, more body hair, things
23     like that.
24     BY MR. HILDABRAND:
25     Q.     Thank you.  Let's turn now to paragraph 24.
```

```
 1    This is on page seven of your report.
 2    A.     Okay.
 3    Q.     And there you mention typically male names,
 4    correct?
 5    A.     I see in the second sentence that there are
 6    transgender boys who have typically male names.  Is
 7    that what you're referring to?
 8    Q.     Yes.
 9    A.     Okay.
10    Q.     In your experience, do parents usually put a
11    lot of effort into choosing a child's name?
12              MS. BROWN:  Objection to form.
13              THE WITNESS:  Some parents may put
14    effort into choosing a name.
15    BY MR. HILDABRAND:
16    Q.     And do some childrens' names carry deep
17    significance to a family?
18              MS. BROWN:  Objection to form.
19              THE WITNESS:  Do some parents use family
20    names for childrens' first names?
21              MS. BROWN:  Same objection.  And
22    objection as to relevance.
23              THE WITNESS:  Some parents use
24    meaningful names or family names when assigning a
25    name to their child.
```

```
 1  BY MR. HILDABRAND:
 2  Q.     What if a child expresses a transgender
 3  identity and wishes to change a family name that
 4  their parents gave them; what should a parent do if
 5  the parent does not want to refer to their
 6  transgender child by a new name?
 7              MS. BROWN:  Objection to form.
 8              THE WITNESS:  In that hypothetical
 9  situation, it would be really important for the
10  individual and their family to collaborate with a
11  mental health provider.  The research is very clear
12  that using an individual's chosen name and pronoun
13  is important and promotes their wellbeing in the
14  short and long term.
15  BY MR. HILDABRAND:
16  Q.     Is it always harmful to use a transgender
17  child's pronouns that match their sex assigned at
18  birth rather than their preferred pronouns?
19              MS. BROWN:  Objection to form.
20              THE WITNESS:  Typically it is harmful
21  for an individual who has declared their gender
22  identity and their pronouns to continue to be
23  referred to by the pronouns of their sex assigned at
24  birth.
25  / /
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 238 of 293 PageID #: 1895

BY MR. HILDABRAND:

Q.    Was it harmful for parents to use pronouns
consistent with the child's sex assigned at birth a
year or two before the child expressed a transgender
identity?

           MR. HILDABRAND:  Objection to form.

           THE WITNESS:  Is the question about
whether it is appropriate for an individual to use
pronouns consistent with sex assigned at birth when
an individual has a cisgender identity consistent
with their sex assigned at birth?

BY MR. HILDABRAND:

Q.    So my question would be, so say you have a
12-year-old who tells the parents that the child
is -- and we'll assume for this example that the
child was assigned a sex of female at birth and the
child tells the parents that the child is really a
boy.

      At that point on, you would advise the
parents to use the male pronouns to refer to the
child if that's what the child prefers, correct?

           MS. BROWN:  Objection to form.

           THE WITNESS:  It is important to use an
individual's pronouns.

/ /

BY MR. HILDABRAND:

Q.     So it would be harmful to then call the transgender boy by female pronouns; is that correct?

          MS. BROWN:  Same objection.

          THE WITNESS:  It is often harmful to use incorrect pronouns or misgender an individual.

BY MR. HILDABRAND:

Q.     Was it harmful two years before the child expressed that the child was a transgender boy in that example?

          MS. BROWN:  Same objection.

          THE WITNESS:  I'm not sure I understand. So is it harmful when the child has a cisgender identity?

BY MR. HILDABRAND:

Q.     So would you agree in that hypothetical that the child has a cisgender identity before expressing a transgender identity?

A.     You'd have to repeat all of the specifics for me, I'm really sorry, in the hypothetical situation. But when an individual identifies as cisgender, it would be appropriate to use pronouns consistent with their cisgender identity.  When an individual identifies as transgender, made a declaration about their pronouns, it is appropriate and supportive of

```
 1   their mental health to use those pronouns.  Does
 2   that -- sorry.
 3   Q.    I know it's hypothetical.  Thank you for
 4   answering it as best you could.
 5         MR. HILDABRAND:  I think this is a good
 6   point for a break, if y'all would like to take a
 7   short break.
 8         MS. BROWN:  Ms. Honeycutt, during the
 9   break could you give us a time check if you have
10   time and can add up what you've been recording on
11   the record?  I would really appreciate it.  And,
12   yes, we would like to take a ten-minute break.
13   Thanks, Clark.
14         MR. HILDABRAND:  Thanks.
15         (Recess observed.)
16   BY MR. HILDABRAND:
17   Q.    Let's go back onto the record then.  So in
18   paragraph 24, do you see where it says:  For some
19   transgender adolescents, particularly those who have
20   changed schools after initiating medical transition,
21   their peers may not be aware that they are
22   transgender; is that correct?
23   A.    Yes.
24   Q.    So this concern is particularly troubling for
25   those who have changed schools after initiating
```

```
 1   medical transition?
 2              MS. BROWN:  Objection to form.
 3              THE WITNESS:  I'm not sure what concern
 4   you're speaking of.
 5   BY MR. HILDABRAND:
 6   Q.    The concern expressed in paragraph 24 of your
 7   report.
 8   A.    I'm going to need to review for context to be
 9   clear in what concern we are talking about.
10   Q.    That's fine.  We can move on then.  Is it
11   psychologically harmful to have separate teams for
12   boys and girls?
13              MS. BROWN:  Objection to form.
14              THE WITNESS:  What would be meant by
15   psychological harm?
16   BY MR. HILDABRAND:
17   Q.    I believe you used the term "harm" in your
18   report.  So as you understand in your report, would
19   it be harmful to have separate teams for boys and
20   girls?
21              MS. BROWN:  Same objection.
22              THE WITNESS:  It is not necessarily
23   harmful to have separate teams for girls and boys.
24   BY MR. HILDABRAND:
25   Q.    Should teams be separated on the basis of
```

```
 1   gender identity or on the basis of sex in your
 2   opinion as a psychologist?
 3               MS. BROWN:  Objection to form.
 4               THE WITNESS:  I am not an expert in
 5   designing team structure.  I think the question is
 6   whether an individual should participate on a team
 7   based on their gender identity.
 8   BY MR. HILDABRAND:
 9   Q.    Which team should nonbinary students play on
10   if their gender identity is neither male or female?
11               MS. BROWN:  Objection to form.
12               THE WITNESS:  It would be important to
13   collaborate closely with the nonbinary individual to
14   determine a course of action and plan that was most
15   appropriate to them in promoting their wellbeing.
16   BY MR. HILDABRAND:
17   Q.    So we would ask the nonbinary individual
18   which team they would prefer to play on?
19               MS. BROWN:  Objection to form.
20               THE WITNESS:  We would collaborate with
21   the nonbinary individual to determine which team was
22   appropriate for them.
23   BY MR. HILDABRAND:
24   Q.    Should transgender students participating in
25   athletic activities dress according to their sex or
```

```
1    according to their gender identity?
2                MS. BROWN:  Objection to form.
3                THE WITNESS:  It would be important for
4    many transgender individuals to dress and
5    participate in a manner consistent with their gender
6    identity.
7    BY MR. HILDABRAND:
8    Q.    So if a transgender boy found it important to
9    the transgender boy's gender identity to dress like
10   a boy, should that transgender boy dress like a boy
11   while playing on boys' teams?
12               MS. BROWN:  Objection to form.
13               THE WITNESS:  It would be important for
14   a transgender male who has engaged in a social
15   transition to dress and appear in a manner
16   consistent with the gender identity, in this case
17   male.
18   BY MR. HILDABRAND:
19   Q.    So if you had a 16-year-old transgender boy
20   who found it important to dress like a boy, who was
21   on a boys' swim team, should the transgender boy
22   wear a swimsuit -- a boy's swimsuit?
23               MS. BROWN:  Objection to form.
24               THE WITNESS:  In that hypothetical
25   scenario, I think it would be important to
```

```
 1    collaborate with the individual about the uniform

 2    and dress that would be comfortable and safe for

 3    them to participate.

 4    BY MR. HILDABRAND:

 5    Q.      If the individual insisted that -- if the

 6    transgender boy insisted that the transgender boy

 7    wanted to wear a boy's swimsuit, is that the correct

 8    swimsuit for the boy to wear?

 9               MR. HILDABRAND:  Objection to form.

10               THE WITNESS:  In my clinical experience,

11    I have not encountered that hypothetical scenario in

12    which an individual would only want to wear a male

13    swimsuit.  It would be up to that individual to

14    determine what was appropriate for them.

15    BY MR. HILDABRAND:

16    Q.      So we discussed earlier how most transgender

17    adolescents have not gone through surgery before

18    they turn 18; is that correct?

19    A.      Correct.

20    Q.      Would it psychologically harm a cisgender

21    girl to have to change in front of a transgender boy

22    who still has a penis?

23               MS. BROWN:  Objection to form.

24    Irrelevant.

25               THE WITNESS:  The question is about a
```

1  cisgender girl and locker room policies; is that
2  right?  Can you repeat the question?
3  BY MR. HILDABRAND:
4  Q.    Yes.  Would it harm a cisgender girl to have
5  to change in front of a transgender girl who still
6  has a penis?
7            MS. BROWN:  Same objection.
8            THE WITNESS:  I think it would be
9  important to explore the risks and benefits.  And
10  the important issue is around the individual with
11  their gender identity being permitted to participate
12  in activities in the full scope that's consistent
13  with their gender identity, and that would mean
14  developing an individualized plan for what that
15  would involve for that individual.
16  BY MR. HILDABRAND:
17  Q.    So you cannot categorically say that it is
18  inappropriate for a transgender girl who still has a
19  penis to change in front of a cisgender girl; is
20  that correct?
21            MS. BROWN:  Same objection.
22  BY MR. HILDABRAND:
23  Q.    Yes or no, and then please answer further if
24  you need.
25  A.    No.  I think many cisgender and transgender

```
 1    individuals are -- can be uncomfortable in locker

 2    rooms.  So if uncomfortable is a question of harm,

 3    then we could delve into harm more specifically.

 4    BY MR. HILDABRAND:

 5    Q.     So there might be some scenarios where it

 6    would be harmful?

 7                 MS. BROWN:  Same objection.

 8                 THE WITNESS:  I am not aware of specific

 9    harms in that scenario.

10    BY MR. HILDABRAND:

11    Q.     Going to -- so in this section in your

12    report, the impact of SB 228 on transgender

13    students, from paragraphs 24 through 30, do you cite

14    only two studies?  And feel free to scroll through

15    that to confirm.

16    A.     You can scroll down.  Keep scrolling.  In

17    this section, I see two cited studies, and

18    additional information in the section was drafted

19    based on my professional and personal experience.

20    Q.     Turning to paragraph 30 on page nine, do you

21    conclude by saying:  By making it impossible for

22    many transgender students to participate in

23    interscholastic athletics, SB 228 denies transgender

24    youth the opportunity to engage in positive

25    experiences that can protect and enhance their
```

```
 1   mental health?  Is that what it says there?
 2   A.    Yes.
 3   Q.    Do you understand the law to make it
 4   impossible for all transgender students to
 5   participate in interscholastic athletics or only
 6   many transgender students?
 7   A.    I would need to review the law again
 8   specifically.
 9   Q.    Off the top of your head, you couldn't say if
10   it's all transgender students or many transgender
11   students?
12            MS. BROWN:  Objection to form.
13            THE WITNESS:  My impression is that the
14   law restricts all transgender youth from
15   participating in interscholastic athletics.
16   BY MR. HILDABRAND:
17   Q.    Thank you.  Are there other activities that
18   could provide, besides interscholastic athletics,
19   that students could participate at school to receive
20   similar mental health benefits?
21            MS. BROWN:  Objection to form.
22            THE WITNESS:  Within a school there are
23   many available extracurricular activities.
24   Athletics may be a very important part of someone's
25   experience and identity, however.
```

Case 3:21-cv-00835  Document 57-12  Filed 10/07/22  Page 248 of 293 PageID #: 1905

BY MR. HILDABRAND:

Q.     Would it harm a cisgender girl if she did not
receive All State honors because a transgender girl
bumped her out of that position of earning All State
honors?

          MS. BROWN:  Objection to form,
relevance, and scope.

          THE WITNESS:  No, I don't believe that
would harm her.

BY MR. HILDABRAND:

Q.     Would it harm a natal girl or a cisgender
girl if a transgender girl beat her and every other
cisgender girl in the competition?

          MS. BROWN:  Same three objections.

          THE WITNESS:  No, I do not believe
that's a circumstance of harm.

BY MR. HILDABRAND:

Q.     Would it harm a cisgender girl if she were
injured playing girls' basketball against a
transgender girl?

          MS. BROWN:  Object to the form.

          THE WITNESS:  Risk of injury is present
in participating in sports for people regardless of
their gender identity.

/ /

```
 1   BY MR. HILDABRAND:
 2   Q.     So yes or no?  Do you view that as a harm?
 3              MS. BROWN:  Objection to form.
 4              THE WITNESS:  In what manner?
 5   BY MR. HILDABRAND:
 6   Q.     Is it a harm for a cisgender girl to be
 7   injured playing girls' basketball against a
 8   transgender girl?
 9              MS. BROWN:  Same objection.
10   BY MR. HILDABRAND:
11   Q.     Or is that simply a risk that comes with
12   playing basketball?
13   A.     I think that's a risk that comes with playing
14   basketball.
15   Q.     Let's turn ahead to -- you cite your current
16   WPATH Standards of Care and we discussed those
17   today, correct?
18   A.     Correct.
19   Q.     To the best of your understanding, do the
20   current standards of care take a position on whether
21   social transition is appropriate for prepubertal
22   children?
23   A.     The standards of care is a lengthy document.
24   And from my recollection, I believe they address
25   complexities and nuances in making decisions about
```

```
 1   treatment planning, including a social transition.
 2              MR. HILDABRAND:  Opposing counsel, when
 3   is the end time that you have?
 4              MS. BROWN:  We're at 12 minutes and 36
 5   seconds.  Ten minutes.
 6              MR. HILDABRAND:  Ten minutes, okay.  All
 7   right.  Travis, can you circulate Doc R.
 8              THE WITNESS:  Do you think we can open
 9   that?  Yes.
10              MR. HILDABRAND:  And we are going to
11   mark this as Exhibit 15.
12              (WHEREUPON, a document was marked as
13   Exhibit Number 15.)
14   BY MR. HILDABRAND:
15   Q.     Does this appear to be the seventh edition of
16   the standards of care?
17   A.     It does.
18   Q.     Is that the current version of the standards
19   of care?
20   A.     It is.  Standards of care eight is in
21   development and hope to be released soon.
22   Q.     When it's released, will you begin to
23   consider version eight once it's released and use
24   that in your practice?
25   A.     I will review standards of care eight when
```

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 251 of 293 PageID #: 1908

```
1   it's released.
2   Q.    Let's turn for this to I think it's page 17
3   in the standards of care's page numbering but it's
4   page 23 of the PDF.  It's the page that says:
5   Social transition in early childhood.
6   A.    Okay.  23, we're there.
7   Q.    Can you read the first paragraph, starting at
8   the line -- let's see.  Just one second.  Do you see
9   where it says:  Social transitions in early
10  childhood do occur within some families with early
11  success?  This is a controversial issue and
12  divergent views are held by health professionals.
13  The current evidence base is insufficient to predict
14  the long-term outcomes of competing a gender role
15  transition during early childhood.  Outcomes
16  research with children who completed early social
17  transition would greatly inform future clinical
18  recommendations.  Do you agree or disagree with
19  these sentences, and are there any parts of it that
20  you would change?
21  A.    I agree a social transition is a complex
22  issue and is often navigated with success.
23  Q.    All right.  Are you aware of any new chapters
24  that will be added to the WPATH Standards of Care in
25  version eight?
```

```
 1   A.    My impression is that the standards of care
 2   eight will include informed updates around the
 3   treatment of nonbinary and gender-diverse
 4   individuals.  They may also include some updates in
 5   mental health considerations for children as well.
 6              MR. HILDABRAND:  Travis, can you
 7   circulate doc -- actually, no.
 8   BY MR. HILDABRAND:
 9   Q.    Are you aware that there is a draft chapter
10   on eunuchs in version eight?
11              MS. BROWN:  Objection to form.
12              THE WITNESS:  I was not aware of that.
13   BY MR. HILDABRAND:
14   Q.    All right.  Do you view eunuchism as a gender
15   identity?
16              MS. BROWN:  Objection to form.
17              THE WITNESS:  I am not aware of anyone
18   with the identity eunuchism.
19   BY MR. HILDABRAND:
20   Q.    If WPATH published a standard of care chapter
21   on eunuchism and said that eunuchism is a gender
22   identity, would that be something that you would
23   follow in your practice?
24              MS. BROWN:  Objection to form.
25              THE WITNESS:  I would need to review the
```

```
1   standards of care and make a decision about how that
2   would influence my practice.
3   BY MR. HILDABRAND:
4   Q.     While you're not a pediatrician or an
5   endocrinologist, are you aware that the FDA recently
6   placed additional warnings on the use of puberty
7   blockers?
8   A.     I was not aware.
9           MR. HILDABRAND:  Travis, can you
10  circulate Doc W.  And we'll enter this as
11  Exhibit 16.
12          (WHEREUPON, a document was marked as
13  Exhibit Number 16.)
14  BY MR. HILDABRAND:
15  Q.     Is this titled, Risk of Pseudotumor Therapy
16  Added to Labeling for Gonadotrophin-Releasing
17  Hormone Agonists?  Is that the title of the
18  document?
19  A.     Yes.
20  Q.     And does it say from the Food and Drug
21  Administration?
22  A.     I see that, yes.
23  Q.     Would you consider FDA warnings if you were
24  aware that are one of your patients were on puberty
25  blockers?
```

```
 1                MS. BROWN:  Objection to form and scope.
 2                THE WITNESS:  I am not a prescriber and
 3   so do not follow closely FDA warnings.
 4   BY MR. HILDABRAND:
 5   Q.    So you have not advised any patients about
 6   any new FDA warnings about puberty blockers; is that
 7   correct?
 8                MS. BROWN:  Same objection.
 9                THE WITNESS:  I am not aware of these
10   until this exhibit was presented.
11   BY MR. HILDABRAND:
12   Q.    Are you aware that the United Kingdom's
13   National Health Service recently closed the
14   Tavistock Gender Identity Disorder Clinic?
15                MS. BROWN:  Same objection and objection
16   to relevance.
17                THE WITNESS:  Yes, I'm aware.
18   BY MR. HILDABRAND:
19   Q.    What is your understanding of why it was
20   closed?
21                MS. BROWN:  Same objection.
22                THE WITNESS:  My impression is that
23   clinics have been closing due to significant
24   backlash and discrimination against providers and an
25   inability to provide care for the patients that they
```

```
 1  serve.
 2  BY MR. HILDABRAND:
 3  Q.     Given that clinics such as Tavistock have
 4  been closing recently, does that give you any
 5  concern or doubt about your current approach to the
 6  practice of psychology?
 7            MS. BROWN:  Same objection.
 8            THE WITNESS:  I continue to practice in
 9  a way that is consistent with best practice
10  guidelines and the guidelines we've discussed today.
11  Any concern in my practice would be related to fear
12  of response in the community and harassment from
13  others who are not affirming of a transgender or
14  gender-diverse identity.
15  BY MR. HILDABRAND:
16  Q.     Are there generally many more individuals
17  identifying as transgender or nonbinary in the past
18  few years than there were, say, ten years ago in
19  your experience?
20            MS. BROWN:  Objection to form.
21            THE WITNESS:  In the past ten years,
22  more individuals have come forward as identifying as
23  gender diverse or transgender and this is true of
24  many psychological conditions as well, that our
25  prevalence rates have increased for depression and
```

```
 1   autism spectrum disorder and other conditions as

 2   well.

 3   BY MR. HILDABRAND:

 4   Q.    Just to wrap up, have you understood the

 5   questions that I have asked today and answered to

 6   the best of your ability?

 7   A.    Yes, I have or sought clarification when

 8   needed.  Thank you.

 9             MR. HILDABRAND:  Of course.  Thank you.

10   That is all that I have.  Thank y'all for going

11   through this.  Does Jessica, I guess, do you have

12   any questions?

13             MS. JERNIGAN-JOHNSON:  I do not.  Thank

14   you.

15             MS. BROWN:  Okay.  If you could give

16   us --

17             MR. HILDABRAND:  If you need a few

18   minutes before coming back, that's fine with me.

19             MS. BROWN:  No.  We don't have any

20   redirect or questions for this witness.

21             THE REPORTER:  Mr. Hildabrand, would you

22   like to order this transcribed?

23             MR. HILDABRAND:  Yes.  Thank you.

24             THE REPORTER:  Ms. Brown, would you like

25   to order a copy?
```

```
 1              MS. BROWN:  Yes, we would.
 2              MR. HILDABRAND:  Before we wrap up, did
 3    we enter the FDA risk article as an exhibit?
 4              THE REPORTER:  Document W, Exhibit 16,
 5    yes, sir.
 6              MR. HILDABRAND:  We did, okay.  Great.
 7    Just wanted to make sure.  All right.
 8              MS. BROWN:  And, Ms. Honeycutt, we'll
 9    read and sign instead of waiving.
10              FURTHER DEPONENT SAITH NOT
11         (Proceedings concluded at 5:57 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    E R R A T A   P A G E

2              I, MELISSA A. CYPERSKI, Ph.D., having
3    read the foregoing videoconference deposition, pages
     1 through 257, do hereby certify said testimony is a
4    true and accurate transcript, with the following
     changes (if any):
5

6    PAGE  LINE            SHOULD HAVE BEEN

7    _____ _____    _____

8    _____ _____    _____

9    _____ _____    _____

10   _____ _____    _____

11   _____ _____    _____

12   _____ _____    _____

13   _____ _____    _____

14   _____ _____    _____

15   _____ _____    _____

16   _____ _____    _____

17   _____ _____    _____

18   _____ _____    _____

19   _____ _____    _____

20
                      _____
21                    MELISSA A. CYPERSKI, Ph.D.

22
     _____
23   Notary Public

24   My Commission Expires: _____

25   Reported by: Deborah H. Honeycutt, LCR
```

```
 1                    REPORTER'S CERTIFICATE

 2
     STATE OF TENNESSEE
 3
     COUNTY OF DAVIDSON
 4

 5

 6            I, Deborah H. Honeycutt, Licensed Court

 7    Reporter, with offices in Hermitage, Tennessee,

 8    hereby certify that I reported the foregoing

 9    videoconference deposition of MELISSA A. CYPERSKI,

10    Ph.D., by machine shorthand to the best of my

11    skills and abilities, and thereafter the same was

12    reduced to typewritten form by me.  I am not

13    related to any of the parties named herein, nor

14    their counsel, and have no interest, financial or

15    otherwise, in the outcome of the proceedings.

16            I further certify that in order for this
     document to be considered a true and correct copy
17    it must bear my original signature, and that any
     unauthorized reproduction in whole or in part
18    and/or transfer of this document is not authorized,
     will not be considered authentic, and will be in
19    violation of Tennessee Code Annotated 39-14-104,
     Theft of Services.
20

21           Deborah H. Honeycutt

22    Deborah H. Honeycutt, LCR
      Elite-Brentwood Reporting Services
23    Associate Reporter
      Notary Public State of Tennessee
24
      My Notary Public Commission Expires: 07/09/24
25    LCR # 472 - Expires: 06/30/24
```

*Elite-Brentwood Reporting Services * (615)595-0073   259*

**Exhibits**

**Ex 01 -**
  Melissa Cyperski,
  **PhD** 4:8 11:7,11,13
  47:4 73:3 97:16
  102:11 127:22 180:21
  198:20 217:9

**Ex 02 -**
  Melissa Cyperski,
  **Ph.D** 4:9 55:22,24

**Ex 03 -**
  Melissa Cyperski,
  **Ph.D** 4:13 74:2
  91:11,12,14,19,21
  92:2 104:16

**Ex 06 -**
  Melissa Cyperski,
  **Ph.D** 4:20 125:12,15

**Ex 07 -**
  Melissa Cyperski,
  **Ph.D** 4:23 125:16

**Ex 08 -**
  Melissa Cyperski,
  **Ph.D** 5:3 130:21,23

**Ex 09 -**
  Melissa Cyperski,
  **Ph.D** 5:6 166:17,19

**Ex 10 -**
  Melissa Cyperski,
  **Ph.D** 5:8 168:13,15

**Ex 11 -**
  Melissa Cyperski,
  **Ph.D** 5:11 181:9,11

**Ex 12 -**
  Melissa Cyperski,
  **Ph.D** 5:14 199:25
  200:2 217:3

**Ex 13 -**
  Melissa Cyperski,
  **Ph.D** 5:17 217:19,21

**Ex 14 -**
  Melissa Cyperski,
  **Ph.D** 5:18 225:7,10

**Ex 15 -**
  Melissa Cyperski,
  **Ph.D** 5:21 250:11,13

**Ex 16 -**
  Melissa Cyperski,
  **Ph.D** 5:24 253:11,13
  257:4

**0**

**0:01** 92:17

**0:22** 103:12

**1**

**1** 11:7,11,13 47:4 73:3
97:16 102:11 127:22
180:21 182:9,11,18
198:20 217:9

**1.2** 68:25 69:2,5,7

**10** 7:7 168:13,15

**100** 117:2,12,17
118:23 233:13,25

**11** 15:7 60:3,6 127:23,
25 181:9,11 206:17
212:23

**12** 14:13 41:3,8,10
42:22 43:5 45:19 46:8
48:12 116:19 117:5
128:18 199:25 200:2
217:3 250:4

**12-year-old** 238:14

**12:15** 115:17 116:5

**12:16** 116:7

**12:20** 116:5

**13** 27:11 47:5,6 102:8
167:2,6,11 168:5,11,
20 217:19,21

**14** 112:6,8 126:9,13
225:7,10

**15** 250:11,13

**16** 50:23,25 253:11,13
257:4

**16-year-old** 243:19

**17** 24:5 167:3,6,11
168:5,11,20 251:2

**18** 73:3,4,10 123:25
124:1 196:24 197:9
244:18

**19** 228:3,4

**1980s** 189:16,21

**2**

**2** 55:22,24 191:14

**20** 38:3 94:12 126:8,
10,11 228:9

**2012** 126:25

**2013** 52:19 78:23 79:6
80:6

**2015** 25:2 124:24
198:23 199:21 205:25

**2016** 18:2,7 24:21
124:24

**2017** 73:14 75:17
78:11 124:6

**2018** 18:21 181:17

**2019** 225:3

**2020** 24:23 25:2
102:19 103:20 116:17
173:8,20 174:3,6
223:13,16

**2021** 14:10 15:2 24:24
119:7 217:24

**2022** 7:7

**21** 127:23,24

**22** 103:11 123:23
231:15

**228** 11:25 26:15
246:12,23

**23** 251:4,6

**239** 93:4

**24** 38:4,13 123:10
235:25 240:18 241:6
246:13

**242** 133:12

**243** 149:12

**244** 154:14

**245** 163:25

**246** 171:7 178:20,25

**247** 179:25

**26** 97:15 217:24

**260** 163:25

**27** 73:6 116:20 117:5

**29** 214:5

**3**

**3** 74:2 91:11,12,14,19,
21 92:2 104:16

**30** 215:24 246:13,20

**30(c)(2)** 94:16

**31** 215:24

**36** 250:4

**3873** 56:18

**3878** 68:16,21

**3879** 60:4

**3:21-cv-00835** 7:15

**3:52** 93:17

**4**

**4** 92:3,8 104:16

**472** 7:6

**5**

**5** 52:3,18 103:4,6
104:20 114:19 115:16

**50** 233:13,24

**57** 199:7

**58:20** 105:4

**58:22** 103:23,24
105:4

**58:25** 108:17

**58:50** 103:24 105:5

**58:51** 105:19

**5:24** 108:15

**5:52** 93:18,19

**5:57** 257:11

---

**6**

**6** 125:12,15,18

---

**7**

**7** 125:16,18

---

**8**

**8** 130:21,23

**833** 200:8

**842** 206:18

**860** 214:6

**861** 215:25 216:4

**862** 215:25 216:7

---

**9**

**9** 166:17,19

**9:37** 7:8

---

**A**

**a.m.** 7:8

**AACAP** 225:3,13 226:2,7,11,18,22 227:2,7

**AAP** 189:8 224:1

**abilities** 112:23

**ability** 10:3 69:9 256:6

**able-bodied** 70:19

**absolute** 222:6

**abstract** 123:9,13

**abuse** 164:23

**academic** 117:19,24

**Academics** 180:4

**Academy** 24:23 25:2 129:16 181:23 189:12 223:17,23

**acceptable** 138:9,13 156:8 183:5 185:3 187:6 210:13 211:23 220:17

**acceptance** 208:2

**accepted** 223:20 224:3 228:5

**access** 164:24 165:4, 20 166:1 167:7,11,18 168:4,10,19 169:1,12, 18 225:17 226:4,23

**accommodate** 151:8

**accommodation** 155:7

**accommodations** 155:6

**accordance** 228:16 229:2 231:18

**account** 57:3 165:12 167:11 168:20

**accounts** 169:13

**accurate** 38:8 80:17 117:6,13 145:3 199:10

**accurately** 60:19 109:8 167:16,21

**ACLU** 8:8

**acronym** 18:23

**act** 120:22

**acting** 139:11

**action** 94:22 159:8 185:25 242:14

**actions** 76:4 134:11

**activating** 95:4

**actively** 219:2,10

**activities** 24:9,11 149:19,23 152:16,19 154:3 171:22 219:14 242:25 245:12 247:17,23

**activity** 147:16 154:2

**acts** 96:4,8,10 226:13

**adapt** 151:9

**add** 240:10

**added** 200:11,17,22 251:24 253:16

**addition** 60:17

**additional** 28:6 46:15 48:4 53:3 114:25 150:12 170:14 187:9 210:3 213:8 216:15 246:18 253:6

**Additionally** 213:16

**additionals** 171:4

**address** 104:15,19 134:1 235:10 249:24

**addressed** 27:2

**addressing** 211:2

**adequately** 207:6

**ADHD** 126:20

**adhere** 203:23

**adjudicated** 16:14 128:24

**administered** 7:17

**Administration** 253:21

**administrative** 168:1

**administrators** 150:8

**admissible** 198:2,8, 10

**adolescence** 88:13 161:1,7 187:17 207:4

214:1 235:19

**adolescent** 16:14 18:20 25:12 86:11 147:17 149:17 154:22 158:18 213:13 228:21 235:13

**adolescents** 22:18 26:14 53:12 88:14 93:1 105:9 106:1,12, 15 107:13 115:12 116:12,18 117:2,12, 17 123:14,15 129:4, 21,25 130:6,8,16 146:12 162:18 165:5 180:18 181:4 200:23, 25 206:21 207:2 211:4 213:4,17,21,24 226:9,16 240:19 244:17

**adulthood** 207:5

**adults** 53:12 76:2 88:14 123:16 146:12 169:19 200:15 202:24 203:5,9

**advance** 109:22

**advances** 206:7

**adversities** 212:18

**advise** 238:19

**advised** 254:5

**advocacy** 134:15,18, 20 138:4 141:7,10,13, 18,22,25 142:23 143:4 155:8 156:1,6 157:5 177:17 178:3 180:3,6 217:15,24 218:2 219:1,5,9

**advocate** 133:25 136:24 137:19 138:11,18,22 139:1,4, 5,8,10 176:4

**advocated** 150:7,11 155:12,14 176:11

**advocating** 142:6,7 155:19 172:1,18

**affected** 158:4

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 262 of 293 PageID #: 1919

**affiliated** 164:7

**affirmation** 105:15 191:14,21 208:2

**affirmative** 102:23 103:13 115:23 176:24 177:7,10,12,14 178:21,23 179:8,11, 13,15 195:4

**affirmed** 149:19,24 152:19 154:4,23

**affirming** 142:19 208:7 255:13

**age** 76:14,15,20 81:8 86:25 93:22 112:13, 17 113:5,8,22 114:2 123:17,24 124:1 167:2 168:5 196:18 197:4,11

**aged** 197:3

**agencies** 173:12,17

**agender** 183:11,13, 21 184:2

**ages** 88:17,20 89:19 90:5,10,17 112:18 113:13,17 114:11 167:6

**Agonists** 253:17

**agree** 47:15 48:16 57:10,14 58:9,18,19 61:3,8 81:24 87:14 89:18 106:22 107:11 109:12 112:15 120:24 124:2 152:17,20 158:23 159:21 182:24 183:17 184:13 191:4 198:4,11 200:17 204:1 205:8,10,17 206:13 207:9 211:12, 15 213:10 214:14,16 215:1 216:17 227:16 231:22 239:16 251:18,21

**agreed** 83:2 89:8

**agreement** 19:14 159:25 169:6

**ahead** 40:19 103:11,

22 118:17 119:2 249:15

**aimed** 211:5 229:24

**Alabama** 15:18

**alcohol** 213:6

**align** 205:5 208:16,22 209:10,16

**aligned** 188:13

**aligns** 47:9

**alliances** 16:12

**alphabetical** 215:24 216:4

**alternation** 58:5,11

**alternations** 58:14

**alternative** 27:18 182:25 205:16

**AMA** 217:24 218:13 219:1,5,7,10,14,22 220:11 222:18,21 223:3,16,22 224:1,5,9

**ambiguous** 216:25

**American** 8:4 51:3,9, 13,15 140:14 181:23 189:12 198:24 199:21 211:17 217:16 223:17,23

**analysis** 101:25 132:22 133:1

**anatomical** 70:19

**anatomy** 182:21

**and/or** 34:10 72:7 118:22 227:14 234:21

**anecdotally** 158:3

**answering** 67:18 107:4 240:4

**anxiety** 126:18

**APA** 203:17

**Appeals** 223:19

**appearance** 27:15, 23 33:15 34:12 216:12

**appears** 56:16 76:12 77:23 93:8 94:4 119:6,14 126:3 168:9 181:5,15 183:4 224:1

**Appendix** 214:7,8

**application** 167:9, 15,20

**appointment** 167:9, 12 171:15,19,23

**appointments** 164:14 165:21

**approach** 19:2 130:1 207:5,18,21 208:1,6, 15,20,24 209:2,12,23 210:20 211:12,22 212:16 215:8 223:20 224:3 255:5

**appropriateness** 224:6

**approve** 16:4

**approved** 126:5

**approximately** 7:8 78:7

**Archives** 119:7

**area** 62:23 211:9 214:24

**arriving** 234:5

**article** 55:15 56:3 101:1,17 118:2,4,5,20 119:16,19,23 120:1,4, 7,8,11 128:22,25 129:3,7,14,24 130:2, 5,7,9,13 131:1,6,9,17, 18,24 132:4,7,11,13, 15,23 133:3,7 139:10 149:12,21 151:15 172:17 179:23 180:1, 24 181:4,13,16,23 182:4,7 198:17,23 199:21 200:4,15 201:8 202:5,24 203:2, 5,8 204:12 208:17 213:7,9 220:8 225:3 257:3

**articles** 116:24 119:12 128:2,4,21

180:6,7,16

**articulate** 109:9

**articulated** 212:3

**articulation** 155:9

**artificial** 196:1

**aspect** 53:13,16

**aspects** 23:20 32:9, 17 33:23 35:8,14 36:14 39:4,20 40:14 44:8 62:21 64:9 99:24 227:20

**aspirational** 203:25 204:2

**assess** 208:11 209:18

**assessment** 20:22

**assigned** 27:14,22 28:25 29:2,13 30:1,2, 5,9,13,17 32:20,21,25 33:4,24 34:11 35:17, 20,23 36:1,3,5,7,10, 18,21 37:2,9,12 38:13,16 39:5,12,17 40:6 47:10,12 58:20 59:5 64:19 96:24 113:15,19 114:3 118:8,10 145:7,18 146:8 158:13,19 161:8,14 164:18,19 188:13 194:23 195:8, 13 205:6 208:17,22 209:10,16,21 211:7 216:9,11,21 229:6,8, 21 230:9 235:4,12,17 237:17,23 238:3,9,11, 16

**assigning** 236:24

**assignment** 33:3 182:19

**association** 51:9,14, 16 140:15 184:12 198:24 199:21 211:17 217:16

**Association's** 51:4

**associations** 218:16 219:24 220:14

**assume** 10:1 35:3 72:19,20 77:12 238:15

**assumption** 80:3

**assumptions** 77:3

**athletic** 153:23 242:25

**athletics** 222:12,15 223:15 246:23 247:5, 15,18,24

**attempt** 219:11

**attempted** 136:6,8,9, 12,17,19

**attempts** 136:2

**attended** 15:12

**attitude** 138:14

**attitudes** 75:23 76:5 209:10,16

**attorney** 7:22 12:2 170:22

**attorney-client** 9:15

**attorneys** 9:1,11 79:23

**attributable** 78:21 79:3,12

**attributed** 80:5

**Auburn** 15:17,18,23, 25 16:8,21 17:9,13 125:7

**audio** 79:15 104:2,5, 6,7,25 115:25 116:1 199:4

**August** 7:7 223:16

**authentication** 74:5

**author** 55:15 125:25

**authority** 11:2

**authors** 56:11,14 131:9,10 133:4 137:24 149:20 155:13 198:8 210:2

**autism** 184:11 213:7

256:1

**aware** 22:2 28:14 40:16 43:9 52:6 53:25 54:2 57:21 61:11 62:5,14 70:10,13 72:15,19,20,22 96:13 112:12,20 113:4,13, 22,24 114:4,6,11,16 117:19 122:5,8 123:1, 3 152:22 153:19 154:6,8 165:1 169:17 171:11 194:2 197:7 203:4,17 219:5 221:6 240:21 246:8 251:23 252:9,12,17 253:5,8, 24 254:9,12,17

**awareness** 137:20 204:25 214:22 215:3

---

**B**

**B.S.** 16:24

**babies** 33:8 39:16 40:5

**baby** 33:5,6,10,11,20, 22 34:2,5,14,15,18 35:3,4,5,8,19,25 36:17 38:3,4,5,7,9,22, 24 39:1,8,15 40:10,14

**baby's** 33:19 38:22 40:7

**back** 9:23 15:5 22:4 24:4 26:2,3 27:4 28:20 32:20 33:18 35:4 42:18 47:3 48:11 75:10,16 78:11 93:15 94:10,11,14 95:6 100:13 102:10 103:20 104:13 114:19 117:1 123:9 127:21 128:20 148:19 166:12,16 171:6 180:20 198:18, 20 199:6,20 208:20 210:12 217:9 224:24 227:10,24 240:17 256:18

**backgrounds** 51:22 53:4

**backlash** 254:24

**balanced** 155:23

**ban** 26:16 223:14

**band** 154:11

**banning** 176:23

**base** 251:13

**based** 27:15,23 33:15 34:11 36:13 37:2 42:20 44:1 45:1 100:22 149:25 150:1 210:20 211:11 216:12 223:25 235:4 242:7 246:19

**basic** 18:18 81:17

**basics** 88:24 89:12, 24

**basis** 131:23 182:21, 22 241:25 242:1

**basketball** 248:19 249:7,12,14

**bathroom** 156:7

**battles** 218:17

**beat** 248:12

**begin** 68:3 110:24 111:6 163:13 195:19 250:22

**beginning** 26:4 42:2 136:9

**begins** 56:22 60:13 75:25 155:4 157:24 206:19 208:14 234:19 235:13

**behalf** 150:7 155:13, 14 177:24 178:6

**behave** 209:20

**behavior** 75:24 81:11,22 82:1,9 85:1 87:2,8,16,20,21 92:25 93:20 119:7 126:21 142:19 180:10 209:9

**behaviors** 129:25 139:25 160:3 209:15 213:6

**belief** 211:18

**beliefs** 158:5

**believing** 105:15 110:24 111:6,11

**benefit** 29:6 62:23 142:3

**benefits** 191:8 212:16 245:9 247:20

**Bergmeyer** 8:1

**bill** 7:12 11:25 26:15 165:22

**billing** 148:1,7

**bills** 176:23 219:22 220:12 222:13,19

**binary** 58:21 59:4,5,8, 16,17,18,25

**biological** 31:1 32:5, 13,17,18 167:8

**biologically** 144:20, 25 145:3

**biology** 31:1 32:6,9, 18 35:9,14 36:14

**birth** 27:13,22 28:25 29:2,13 30:1,2,6,9,13, 17 32:21,22,25 33:1, 16,22,24 34:11,24 35:17,20,23 36:1,3,5, 7,10,18,21 37:5,7,9, 12,13 38:17,18,19 39:6,12 40:11,15 47:10,12 58:20,22 59:5 64:19 96:24 113:15,19 114:4 118:8,10 145:7,18 146:9 158:13,20 161:9,14 182:20 188:13 194:23 195:8, 13 205:6 209:11,17, 21 211:7 216:9,11 229:6,8,21 230:9 235:4,12,18 237:18, 24 238:3,9,11,16

**bit** 11:21 48:11 55:6 56:24 69:16 92:14 94:15 196:20 215:7 227:25

**bits** 71:1

**blend** 205:16 206:14, 16

**block** 226:4,23

**blocked** 223:15

**blockers** 122:19 185:4 189:25 190:3,9 192:2,12,17,21 193:3 253:7,25 254:6

**Blocking** 225:17

**blush** 209:4

**Board** 8:14

**bodies** 208:16,22

**bodily** 70:16

**body** 29:16 54:6,8,10, 12,16 55:1,3 69:12, 17,18,21 70:2,4,6,11, 16,17 72:2 78:4 100:18 109:19 135:24 140:18 228:22 235:22

**Borelli** 8:5 199:13

**born** 33:10 34:2,4,15, 16 35:5 38:22 40:8 58:22 194:23 195:7 228:22

**bottom** 22:5,10 56:21 60:12,15 78:22 79:4 87:11 97:16,20,23 116:22 136:20 157:25 164:2 166:25 171:8 181:17,24 194:14 195:5 196:2,7 197:5, 8,20 205:24

**boundaries** 137:22

**bounds** 137:23

**boy** 38:7 76:23,25 205:15 238:18 239:3, 9 243:8,10,19,20,21 244:6,8,21

**boy's** 243:9,22 244:7

**boys** 195:7 196:2 236:6 241:12,19,23

**boys'** 243:11,21

**Brady** 131:11,13

**break** 10:5,7 46:3,7, 20 91:6 93:9,11 94:6 107:11 115:4 128:10, 13 160:16 166:3,6,7 240:6,7,9,12

**breaks** 10:6 46:11

**breasts** 194:13,21 235:14

**Bring** 167:12

**bringing** 22:15

**brings** 214:2

**Britany** 8:9,12 104:24

**broad** 177:8

**broader** 184:17

**broadly** 13:10 137:12 213:14

**Brown** 8:3,7 12:15 13:20 14:15,18 15:9 16:19 17:2,11 19:3, 11,23 20:4,14,19 21:4,16 22:1,9 23:4 25:7 26:6,25 27:20 28:2,10,15,19 29:14, 24 30:7,15,22 31:6,14 32:1,7,15,23 33:12,21 34:6,20 35:7,21 36:6, 19,25 37:11,20 38:10 39:2,10,18 40:12 41:17,25 42:4,14 43:1,12,24 44:14 45:9,24 46:13,19,25 47:23 48:6,21 49:6,16 50:5 52:8,23 53:10,18 54:1,9,18 55:8 57:13, 23 59:1,10,22 60:20 61:4,10,19 62:4,11,18 63:5,13,22 64:5,17,24 65:6,22 67:4,15 68:7, 18 70:1,24 71:14,19 72:11 73:18 74:17,25 75:4 76:17 77:1,11 78:19 79:1,11,18 80:9,22 82:3,13,17 83:16,22 84:8 85:16, 23 86:7,15 87:17 88:19 89:2,14,21 90:6,13,18 91:7,15,24

92:10,16,19 94:7 95:6,19 96:1,6,12,19 97:3,10,18 98:9,18,24 99:12,20 100:1,9,16, 23 101:5,15,23 102:12 104:1,11,23 105:19 106:2,6,25 107:15,22 108:12,17, 19 109:16 110:5,13 111:1,9,17,22 113:1, 9,20 114:5,23 115:8, 20,25 116:2,7 117:7, 15,22 118:11 119:9, 18,24 120:5,15 121:1, 12,18 122:1,7,15 127:4,10,17 128:13 129:5 132:2,5,17,24 133:6 134:16 135:9, 15,23 136:11 137:6 138:5,12,19 139:2,17, 22 140:4,13,24 141:8, 16 142:1,24 143:5 144:3,21 145:1,12,25 146:10,18 147:5,23 148:9,16 149:4 151:23 152:25 153:7 156:2,11,20 157:1,8, 16 158:16 159:1,14, 23 160:13 161:3,10 162:6,19 163:11 165:2 166:8 168:7 169:14,25 170:7,21 172:9,13,24 173:21 175:14,19,25 176:7, 13 177:18 178:4 179:18 183:3,19 184:15 185:6,14 186:1,14,23 187:10, 24 188:17 189:2 191:6 192:6,13,18 193:16 195:11 196:3, 14 197:6,12 199:10 200:20 201:5,13,20, 25 202:7,17,25 203:6 204:3,10,18 206:4 207:12,19 208:8 209:1,13,25 210:15, 23 211:14,24 213:22 215:10 218:5,18 219:12 220:4,18,21 221:5,16 222:3 223:5 224:8,19 225:22 226:10,20 227:5

228:23 229:10,22 230:11 231:3,7 232:2, 11 235:5 236:12,18, 21 237:7,19 238:22 239:4,11 240:8 241:2, 13,21 242:3,11,19 243:2,12,23 244:23 245:7,21 246:7 247:12,21 248:6,14, 21 249:3,9 250:4 252:11,16,24 254:1,8, 15,21 255:7,20 256:15,19,24 257:1,8

**buddies** 164:19

**buddy** 164:1,5,9,17, 22

**bullet** 81:19 88:2 89:1 116:19

**bullying** 154:22

**bumped** 248:4

---

**C**

**C-Y-P-E-R-S-K-I** 9:5

**call** 180:13 239:2

**called** 8:19 24:15 171:12 180:10 209:22

**Cameron** 8:7

**capture** 166:22

**captured** 32:17 45:13

**captures** 47:18

**care** 13:15,18,25 14:1,8 19:6,7,9,20 20:1 21:15,25 22:16, 17,24 23:1,11 24:1,2 25:11 37:7 102:23 103:13 105:13 111:13 115:23 122:24 129:15 130:11 131:4,20 139:13 163:2 171:10, 14 176:24 177:2,7,10, 12,14 181:2 182:13 185:4 202:15,20 204:9 206:20 207:1 211:4 215:15,20 225:18 226:15 228:7

230:19,24,25 231:1,9
235:9 249:16,20,23
250:16,19,20,25
251:24 252:1,20
253:1 254:25

**care's** 251:3

**careful** 187:15

**caregiver** 21:21
81:14,16 85:1 87:23
88:9,12,24 89:13,16,
19 90:3,4,10,16 93:20
159:7 161:19 208:11

**caregivers** 89:23
113:3 123:16 160:2

**carried** 94:23

**carry** 236:16

**case** 7:15,25 17:21
25:6 28:18 29:21
56:11 83:2 85:6 92:4
101:8,13 105:11
108:8,24 109:2,13
110:3,8,11,16,21
117:24 122:8,13
123:2,4,7 140:9
148:20,24 149:17,20,
25 150:1 151:21,25
154:9,19,21 155:12,
16 170:24 172:12
173:2 176:5 190:17
224:7,17 227:4
243:16

**caseload** 123:19,21,
22

**cases** 33:16 36:3
38:16 40:8 101:14
149:22 160:10 164:23
233:8

**Cassandra** 131:11,
13

**castration** 72:7,21

**categorically** 245:17

**categories** 47:20
48:2,4

**category** 136:16
137:5 177:9,12

**center** 18:13 24:19
37:18,23 78:23 79:6,
25 80:6 131:14
164:11,15 165:1,23
166:22 168:19 174:21
175:1 219:2,6,9

**central** 7:8 189:16

**certificate** 37:14

**challenged** 176:5
223:15 224:7,17
227:4

**challenges** 16:13

**chance** 9:13

**change** 142:18
193:15 211:5 215:5,8
216:19 237:3 244:21
245:5,19 251:20

**changed** 240:20,25

**changing** 48:8 50:8
215:16

**chapter** 252:9,20

**chapters** 251:23

**characteristics**
234:24 235:1,21

**chart** 165:18

**chat** 11:9 75:5 84:15
166:3

**check** 240:9

**chest** 78:8 194:9,13,
21 195:4 235:15

**child** 24:22 25:1,12
36:23 37:9 40:8 76:24
77:3,8,17,19,21,22,24
78:1,4,5,6,7 86:11
97:11 114:2 129:15
145:7,8 147:17
158:12,14,18,23,24
159:13,21,25 160:18,
22 161:12 162:3,4,8,
11 163:7,10 164:23
167:5,15 168:4
207:18 209:18,20
213:13 228:21 233:8,
9 234:9 235:11
236:25 237:2,6 238:4,

14,16,17,21 239:8,9,
13,17

**child's** 34:12 37:2
40:9 77:13,18 95:14
146:8 158:13 159:17
160:4,11,23 162:11
167:9,12 208:7
209:10,16 236:11
237:17 238:3

**childhood** 78:14
81:8 82:5 85:11 86:9,
25 87:21 88:13 93:22
251:5,10,15

**children** 22:18 26:13
76:1,11,14,16,18
78:15 82:4 87:25
88:6,14 89:19,24
90:5,10,17 93:1 95:1,
8,11,24 96:4,8,10
97:1,7 100:15,19
105:9 106:1,11,15,23
107:13,20 109:21
111:15,20 112:20
113:13,17 114:6,11,
13,21 115:3,5,6,12
116:12,14,18,19
117:6 123:14,15
129:4,21 130:6,8,17
146:12 161:1,6
162:10,17 165:5
167:2,11 168:11
174:12 180:18 181:3
200:23,24 206:20
207:2,4,6,8,22
208:15,21 211:3
226:8,16 231:16,25
232:7,9,21,23 233:17,
20 235:3 249:22
251:16 252:5

**children's** 24:14,20
25:9,18,25 72:25
164:25 208:2

**childrens'** 236:16,20

**choice** 210:14

**choose** 20:16

**choosing** 155:21
236:11,14

**choppy** 70:25

**chosen** 237:12

**chromosomal**
216:23

**chromosomes** 34:2,
15 35:10,15 182:22

**Circuit** 223:19

**circulate** 11:8 55:21
74:1 75:1 78:18 83:18
84:4 103:1 118:17
125:11 130:20 165:25
168:13 181:8 199:25
217:18 225:6 250:7
252:7 253:10

**circulated** 74:19
80:20 84:14 166:16

**circumstance**
248:16

**circumstances**
185:24 234:15

**cisgender** 47:9,19,
20,25 48:5 135:13,21
136:2 162:8 200:24
238:10 239:13,17,21,
23 244:20 245:1,4,19,
25 248:2,11,13,18
249:6

**citation** 225:2

**citations** 213:8

**cite** 51:3,6 55:15
173:7 198:23 217:15
246:13 249:15

**cited** 11:1 116:25
180:24 181:14 182:7
199:20 200:5 217:25
220:8 225:13 246:17

**citing** 79:9 87:11 88:3
116:23

**Civil** 8:4 94:16

**claim** 61:13

**claims** 49:14

**clarification** 35:12
78:25 256:7

**clarify** 65:14 78:20
79:2,8 113:7 137:2

143:2 171:7

**clarifying** 132:14 214:18 217:2

**clarity** 194:10

**Clark** 7:23 8:25 14:15 20:4 28:19 31:14 39:19 63:7 67:5 70:24 74:4 78:19 79:2 89:4 95:3 102:12 104:1 108:12,20 115:20 170:9 190:10 240:13

**classification** 56:23, 25 57:2,7,20,22 58:1 130:1

**classroom** 142:18

**clear** 9:18,20 71:20 80:8 85:25 148:16 186:5 206:19 207:1 212:9 237:11 241:9

**click** 92:5 105:3

**client** 143:11 170:23

**clients** 149:7

**clinic** 18:20,21,23 19:5 22:15 23:8 113:21,24 114:9 122:9,25 130:12 131:5 149:8 150:16, 21 164:21 167:13,19, 20 174:4 190:9 192:22 254:14

**clinical** 16:7 17:14 25:11 49:18 55:18 56:6 113:2 163:1 213:3 226:14 232:24 244:10 251:17

**clinically** 228:13

**clinicians** 123:11

**clinics** 254:23 255:3

**clips** 91:19,22

**clitoral** 235:21

**closed** 254:13,20

**closely** 23:9 24:19 208:10 219:24 220:14 242:13 254:3

**closing** 254:23 255:4

**cluster** 53:3,6

**co-authored** 180:2

**co-occurring** 213:4, 12,14

**coach** 170:23

**coaching** 94:20 170:16

**code** 203:24

**collaborate** 23:9,14 143:20 144:5 159:6 208:12 237:10 242:13,20 244:1

**collaborated** 173:12, 17

**collaborating** 161:19 174:20,23

**collaboration** 20:22 171:13 186:6,7 187:15 231:12

**collaboratively** 162:11 163:3

**colleagues** 64:8 174:3

**collective** 83:25 91:14

**collectively** 91:11,20 92:2

**college** 15:11 197:3

**column** 56:22 60:12 70:14 71:5,25 81:4, 10,13,22 87:2 89:13, 16 90:2,10 133:12,16 134:25 136:20 142:10 147:10 149:13 151:3 152:11,13,14 154:15 157:23 164:2,3 171:9, 24 173:6 178:19 179:1 184:21 190:23 212:14,23

**columns** 84:25 85:2

**comfortable** 155:20 228:21 229:5,7,19,20 230:8 244:2

**command** 67:6

**commentaries** 175:17

**commercial** 149:7

**committee** 206:10

**Commodore** 15:20

**common** 38:12,22 51:11,24 81:11,22 82:1,9 85:1 87:2,8,15, 19,20 93:20 100:2 121:8 147:16 148:2 165:18 170:13 171:18 213:13 218:20

**commonly** 52:19 230:20

**communicate** 165:20

**communities** 198:3, 13 214:11

**community** 14:5 17:17,18 24:8,10 29:5 134:13 172:3,8,20 173:3,12,17 176:16, 18,20 178:15,17 179:5 180:4 198:15 214:25 255:12

**companies** 147:21

**company** 175:3

**compared** 136:2

**comparison** 135:11

**Comparisons** 128:23

**competence** 137:23

**competencies** 17:15

**competent** 215:15, 20

**competing** 251:14

**competition** 248:13

**complete** 167:8,10

**completed** 115:6 169:9 251:16

**completely** 57:6,19 69:1

**completion** 171:22

**complex** 29:11,16,22 136:24 159:5 161:24 196:20 251:21

**complexities** 222:7 232:17 249:25

**complexity** 200:11, 17,22

**complicated** 29:3,12 160:15 229:12 234:13

**Complicating** 213:2

**complications** 29:18

**component** 53:22 191:20,24 193:5

**components** 177:13 191:16 205:18 213:11 227:19

**comprehensive** 22:17 181:2

**compromise** 152:22 153:2,14,19 154:6,8

**compromises** 152:14

**concept** 30:1 129:12

**concepts** 43:8,11 85:19 86:18 88:15

**conceptualize** 36:3

**conceptualized** 137:12

**concern** 43:18 94:19 138:2 150:8 170:15 223:2 240:24 241:3,6, 9 255:5,11

**concerned** 177:15, 23 222:21

**concerns** 109:20 138:7 142:18 152:1 155:23 171:1 177:5 178:2,5,10 213:5

**concisely** 94:17

conclude 246:21

concluded 257:11

conclusion 164:15

condition 69:19
70:18 188:15,19

conditions 13:13
54:3 69:11 70:15 72:1
207:23 213:13,15
255:24 256:1

conduct 132:1,10
203:25

conducted 132:6,22

conducting 83:5

Conference 15:23

confidentiality
98:20,22 99:3,5,8,14

configuration 70:19

confirm 12:2 84:17
93:10,15 106:3,8
126:12 127:25 246:15

conflating 82:22

conflict 19:10 21:11

conflicting 19:15,19

confused 39:21

congruence 230:2

congruent 211:6

connection 71:1

consensual 81:20,24
82:5,10

consensus 35:22
207:7 212:15,20,21
231:9

consent 150:6 153:4,
15,17 163:13,24

consents 160:1

conservative 215:8

consideration 32:18
97:2,8

considerations
17:16 116:9 233:7

252:5

considered 36:13
52:10 60:22 95:21
101:14 111:12 188:19
202:19 216:24 234:15

consistent 17:20
21:7 26:18 30:17
40:24,25 49:23 57:15
109:23 118:10 127:18
135:6 142:15 145:17
149:9 165:18 166:24
196:9 208:24 209:21
210:25 215:13,19
222:15 234:22,24
235:1,15,21 238:3,9,
10 239:22 243:5,16
245:12 255:9

constantly 214:11,
15,16

construct 36:12,15
44:3,6,7 46:1 195:10
205:3

consult 192:23

contact 122:23
128:23

contacts 129:13

content 17:17

contents 107:5

context 33:24 60:23
67:19 91:2 96:21
98:11 106:21 107:2
109:6,9,15 111:12
114:25 150:12 151:15
170:24 172:10 182:7,
8 184:17 192:20
198:9 204:11 210:3
211:1 216:15 220:11
241:8

continue 62:20 63:15
82:19,24 89:6 100:4
134:4 148:21 215:18
234:11 237:22 255:8

continuing 17:25
102:18 151:3

continuity 171:14

continuous 58:5,10

continuum 57:4

contribute 60:18
61:9,17 62:10 132:11

contributes 61:13
62:7 63:3,20,25

control 132:15,18

controversial
251:11

convenient 46:21

convention 30:8

conversation 9:22
187:4

conversations
141:2

conversion 209:22,
24 210:12,13,16,21
211:1,16 212:1,12,13,
22 230:16

coordination 171:14

copy 57:2 74:8
256:25

corner 92:22 116:22

correct 11:3 12:3,4,6,
7,14 13:5 14:11,12
15:3,4,25 16:1,8,9
18:3,4,8,11,15,16,22
22:19,22,25 23:15
25:2,3 27:5,8,16,19
28:9 29:8,9,13,23
32:6,14 36:18 37:5
41:9,13,14,16 46:12
47:22 51:2,17 52:20
60:9 79:10 81:3,11,14
85:15 87:6 88:18 93:2
124:13 125:3,4,8
130:18 138:18 143:15
144:1 151:17 163:18
173:15 174:6 178:12
181:18,21 193:3,4,7,
8,25 197:2 199:22
202:16 206:3 217:3
229:6,9 231:23
232:22 233:14 236:4
238:21 239:3 240:22
244:7,18,19 245:20
249:17,18 254:7

correctly 21:6 57:8
91:3 153:21 154:10
205:21

cost 137:24

counsel 7:18 10:22
169:21 190:16 199:9
250:2

counselors 136:22

country 165:19

County 8:14

couple 74:22 193:20

coursework 17:4
24:11

court 7:13 35:11
78:24 94:22 190:14
194:10 217:4 223:16,
19

cover 170:14

covered 170:19

covers 170:12

CPS 25:4

crafted 70:6

create 9:18 194:12

creates 69:21

creating 194:9,20
229:17,18

creation 196:8

criminalizing 218:25

cross-sex 193:5,7,9,
10

cultural 17:15

culturally 215:15,20

culture 158:4 215:14

cumulative 74:21
104:16

curious 15:19 110:6
146:1 192:7

current 14:7 48:1
108:4 123:19,21,22
127:11,16,19 216:21

220:24 221:9,18 226:14 249:15,20 250:18 251:13 255:5

**curriculum** 17:13

**customary** 219:10

**cut** 9:7

**cutting** 195:25

**CV** 14:14 15:7 24:6,7 73:4 102:9,13,15 127:23,25 128:20 131:7

**Cyperski** 7:10 8:18 9:4 11:10,15 78:21 79:3,14,17,18 92:21 105:22 126:1 130:25 131:10 166:21 168:17 181:13 217:23 225:6, 12

**D**

**daily** 131:23

**damage** 145:22 146:2

**damaging** 145:19 160:17,22

**dangerous** 219:22 220:2,6,10,12,20

**Danville** 15:12

**data** 61:11 100:14 157:24 158:2 168:5

**date** 7:7 15:1 181:17 206:11 221:9

**dates** 24:22

**David** 8:13 190:13,19

**day** 105:12 153:13 162:2

**DCS** 24:15 25:20,23 73:14

**deals** 218:6

**debate** 226:7

**debates** 223:4,7

**Deborah** 7:4

**decade** 214:22 215:4, 6

**December** 205:25

**decide** 20:18 138:25 185:25 188:4 221:14

**decided** 175:5 186:5, 6 187:14

**decision** 20:1 160:25 161:6 162:2,16,23,25 163:9 185:15 253:1

**decisions** 161:11,14 162:17,21 163:2 188:1 221:3 249:25

**declaration** 112:2 239:24

**declared** 237:21

**declines** 142:20 160:22

**decrease** 229:3

**deem** 94:22

**deep** 236:16

**deeply** 205:14

**defeat** 219:11,17

**defeating** 219:2

**Defendants** 7:24

**defiant** 126:20

**Deficits** 125:23

**define** 41:24 42:13, 15,18 43:19 44:12,20 45:6,7 49:1 69:16 111:11 117:23 121:19 134:17 139:4 140:5 183:7 220:6

**defined** 42:25 205:13

**defines** 45:17

**defining** 220:11

**definition** 27:19,25 28:4,6 29:3,12,16,19, 22 30:12 33:24 37:8 42:22 43:3,20,21,23,

25 44:13,16,19,23 45:1,22,25 46:15 47:18 99:7 110:7 111:23 120:24 121:2 141:10,12,22,24 182:17,24,25 183:2,5, 10,12 194:8 204:20 216:1,3,5,8,16,18,20, 21 232:14

**definitions** 47:25 64:9 141:18 182:13 214:7 215:23

**degree** 15:16 16:24

**degrees** 51:21

**delay** 214:2

**delayed** 189:15

**delaying** 234:21

**Delinquents** 125:23

**deliver** 33:7

**delivered** 33:7 73:20

**delivering** 33:5 215:15

**delve** 246:3

**demonstrated** 145:18 160:5

**denies** 246:23

**Denison** 16:25 17:4

**Department** 24:14, 19 25:9,18,25 72:25

**depend** 101:16 157:17 192:19

**depict** 80:21

**depicts** 76:10

**DEPONENT** 257:10

**deposition** 7:9,16 8:2 10:10,16,21 89:9 94:13,23 107:10

**depositions** 79:22 83:6

**depression** 255:25

**depth** 204:20

**derived** 53:5

**describe** 48:23 53:3 69:12 72:5 76:9 77:9, 10 109:9 121:4,6,11 135:3 155:12,22 164:5,8 183:13 184:4

**describes** 146:22 152:11,14 153:13 178:20

**describing** 72:16 168:10

**description** 78:3 230:15

**designate** 38:20

**designated** 33:1 38:14,25 39:6 40:15, 16 92:7 103:5

**designation** 38:18

**designing** 242:5

**desires** 213:18,25

**desisted** 117:20

**desk** 168:2

**destructing** 143:18

**details** 123:2,4 196:5

**detectable** 34:24

**detected** 34:10

**determine** 20:23 159:7 195:14 227:8 242:14,21 244:14

**determined** 33:14 34:23 35:3

**detransition** 120:22, 25 121:3,10,14,20

**detransitioned** 118:23 121:17 123:12

**Detransitioners** 118:24

**develop** 161:20 234:24 235:14,20

**developed** 17:24 73:20 80:4 206:9

**developing** 99:19,22 232:17 245:14

**development** 34:3,9 75:24 81:5 85:1,3,5, 11,12,14,17,21,25 86:6,8,9,11,24 88:13, 21 90:21 93:20 95:11 162:8 250:21

**developments** 110:2

**diagnoses** 53:2 213:15

**diagnosis** 54:12 232:24 234:2

**diagnostic** 51:4 69:19

**dictate** 151:7 162:15

**differ** 207:10,21

**difference** 13:6

**differences** 90:3 102:3

**difficult** 222:4

**directed** 64:7

**directly** 150:7,11

**disagree** 99:25 158:14 159:12 184:14 198:5 205:9,18 207:17 213:11 251:18

**discomfort** 229:3

**discourage** 62:3

**discouraging** 226:18

**discovering** 115:13

**discretion** 20:18

**discrimination** 254:24

**discuss** 29:1 44:3 120:11 140:2,11 143:22 144:6 147:3 161:25

**discussed** 21:10 32:18 64:2 65:14 69:15 93:6,24 94:3,14

108:16 144:16 187:16 188:10 194:25 233:19 244:16 249:16 255:10

**discussing** 97:11 128:21 141:22 147:14 191:7

**discussion** 75:8 109:6 162:12 163:21 199:15 231:11

**discussions** 10:20, 22,23 146:24 147:12

**disorder** 34:3,9 52:14 54:6,8,10,13 55:1,3 69:12,17,18 70:3,4,6, 12,16,17 72:2,3 184:11 254:14 256:1

**disordered** 126:19

**disorders** 51:5 52:12 53:5 213:7

**disproportionate** 128:22 129:13

**disrespect** 177:25

**dissertation** 16:11

**distinct** 43:7 85:12, 19

**distinction** 69:10 203:12,18 204:8,13, 16 206:19 207:1

**distinctions** 232:13

**distinctly** 229:13

**distracting** 160:17

**distress** 61:23 69:22 105:16 143:23 228:14 229:1,24

**district** 7:13,14 152:17

**disturbance** 126:18

**divergent** 251:12

**diverse** 17:15 102:24 103:14 115:24 130:10 131:3 133:25 137:3,5, 8,13 162:9 184:24 185:1 188:3 255:23

**diversity** 214:23 215:4

**Division** 7:15

**doc** 11:6 47:4 74:1, 19,23 75:11 78:18 80:20 83:19 84:18,19, 21 93:7,24 94:3 97:16 102:10 103:3 127:22 166:17 168:13 180:21 199:25 217:18 225:6 250:7 252:7 253:10

**doctor** 22:24 33:9 34:4,17 37:16 38:5, 20,25 40:9 42:1 78:15 81:21 82:1,11 123:7 169:2

**doctoral** 17:12 18:12

**document** 11:9,12, 16 28:24 41:22 42:10 55:21,23 56:2,3,15 60:22 75:3 83:21,22 84:13 92:7 103:5 118:17 125:11,21 126:4,11,22,25 130:20,22 165:25 166:16,18 168:14,24 171:8 175:9 179:24 181:8,10 188:23 200:1 205:20 215:25 217:20 218:6,10 219:8 223:25 225:9 249:23 250:12 253:12,18 257:4

**documents** 19:13 37:13 91:13 125:17

**double** 195:3

**doubt** 255:5

**download** 167:10

**draft** 17:23 45:2 173:13,19 174:5,8,15, 18,22 175:4 252:9

**drafted** 173:22 174:7, 10 175:8 246:18

**drafting** 11:2

**drag** 74:10,12

**dress** 242:25 243:4,9,

10,15,20 244:2

**drop** 74:10,12

**Drs** 131:11

**drug** 213:6 253:20

**DSD** 34:10,15,16,22 35:4 38:6

**DSM** 51:8,12,19,23 52:1,3,6,10,16,18,22, 24,25 53:4

**dual** 74:4

**due** 207:3 254:23

**duly** 8:19

**dysmorphic** 54:6,8, 10,12,17 55:1,3 69:12,17,18 70:3,4,6, 11,16 72:2

**Dysmorphic/gender** 55:17

**dysphoria** 12:18 14:6 26:13,14 52:4,21 53:9,14,17,20 85:8 118:22 145:20 184:22,24 185:2,5,13, 23 186:13,20 187:3,6, 13,21 188:4 223:21 224:4,12,14 228:12, 18,20,25 231:25 232:10,15,21,24 233:6,9,18,21 234:3,9

**Dysphoric** 56:5

---

**E**

**e.g.** 69:11 81:21,25 82:11 203:23

**Eagle** 15:20

**earlier** 52:15 64:2 66:2 69:16 72:23 75:25 93:24 116:21 125:5 244:16

**early** 9:8 81:7 82:4 93:22 112:13,17 251:5,9,10,15,16

**earn** 15:16 16:2

earned 15:17

earning 248:4

easy 102:3 188:25

eating 126:19

ed 8:14 175:12

edition 51:5 52:18
250:15

editions 52:6,10,15

education 15:6
16:16,17,20 17:1,9,25
24:9,11 102:18

educational 152:4
178:22 179:7,17,20

educator 179:19

educators 152:9

effort 236:11,14

efforts 226:3,22

eight-year-olds
87:16 88:9

Eighteen 197:1

elaborate 66:5
109:15

elected 139:20 140:3,
11 141:7,14,23 221:3,
7

eligible 124:11

eliminate 228:13

eliminating 143:23

Elite-brentwood 7:5

Emap 175:2

embrace 208:16,21

emerging 105:8
106:1,11,14,24
107:12,17,21

empirically 207:6

enact 223:13

encountered 49:14
50:16 72:13 149:21
244:11

encourage 62:2
134:14 230:8

encouraged 171:11
208:15,21

encourages 227:12

encouraging 209:19

encouragings 208:1

end 41:15,18 71:18
91:5 93:14 104:3
155:3 162:2 174:2
250:3

endeavor 220:12

Endocrine 19:7,10,
13,21 21:3,14,18,24
23:22 55:16,17 56:4,
5,7 60:8,10 107:24
159:4 202:9,15,20
228:6

endocrinologist
22:22,23 23:15,16
123:6 189:23 192:23
235:9 253:5

endocrinologists
23:10 123:1

endocrinology
22:16 23:3,18,20,21
191:9

endorsing 209:9,15

engage 82:5,10 148:3
179:14 232:18 246:24

engaged 76:12
147:1,9,11,18 177:17
219:2 243:14

engages 72:6

engaging 138:3
157:5 178:3,6

enhance 134:2
246:25

enhanced 194:13,21

enlargement 235:22

ensure 139:13
167:15

entail 194:3

enter 11:10 84:6
91:11,21 92:2 103:4
166:17 253:10 257:3

entered 91:25 104:15
217:2

entering 11:6

entire 84:6 91:18
107:8

entirety 69:4

equal 101:12 191:15

Esquivel 7:11,12

establish 10:9 92:6
178:23 179:8

established 38:19
40:5 44:15,18 57:25
63:2,19,24 65:7,11
107:23 111:24 122:24
143:17 179:16 215:12

establishing 136:13
178:21

estimate 50:4 76:19
78:12 123:23

estimation 115:2

estrogen 235:13

ethical 203:24

eunuchism 70:23
72:5,10,12,16,21
252:14,18,21

eunuchs 252:10

evaluated 146:13

evaluation 186:7
187:15

evidence 62:6 100:5,
18 112:19 135:25
148:4 184:9 207:3
251:13

evidence-based
226:14

evolution 214:20

evolving 48:8 60:23
100:4,6,8 214:12,15,

16 215:17

EXAMINATION 8:22

Examining 125:22

examples 70:15 72:1
180:4 235:3,7

excluding 222:11

exclusively 200:14

Executive 125:22

exercise 27:7

exhibit 11:7,11,13
20:6 47:4 55:22,24
73:3 74:2,20,21 80:11
84:7 91:11,12,14,19,
21,22 92:2,3,8 97:16
102:11 103:4,6
104:16,20 114:19
115:16 125:12,13,15,
16,18 127:22 130:21,
23 166:17,19 168:13,
15 180:21 181:9,11
198:20 199:25 200:2
217:3,9,19,21 225:7,
10 250:11,13 253:11,
13 254:10 257:3,4

exhibited 98:5 160:3

exhibits 91:25

exist 207:7 212:15

exists 59:25 206:21
207:2

expand 44:2

expected 140:10
151:6

experience 14:5
17:25 19:24 23:6
29:17 36:2 38:12
44:1,9 45:4,10 54:12
57:5,11 58:7,10,13,16
61:16,21 73:17 87:25
88:6,10 95:14 109:20
113:2 117:4 119:11
126:17 135:6,19
140:9 143:18 146:14
152:4,7 158:6,7
160:21 163:1 183:16,
20,23 184:22,24
185:1,5 188:4,20

192:15 196:8 214:1 220:22 236:10 244:10 246:19 247:25 255:19

**experienced** 117:10 152:9 154:22

**experiences** 130:11 131:4 133:8 145:20 165:22 246:25

**experiencing** 58:4

**experiment** 132:1, 10,16,19

**experimentation** 132:12

**experiments** 132:7

**expert** 11:18 12:5,13, 16 13:3,15 23:2,5,17, 19 24:1 26:12,22 27:2,7 29:7,11 30:13, 20,25 31:3 32:6 44:13 47:3 67:17 70:3 73:4 85:22 86:10 128:7 146:16,20 172:6,22 173:13,19,22,25 174:1,2,5 179:17,20 180:20 181:14 191:25 192:5,11,16 198:18 200:5 217:9 218:10 220:9 225:13 227:24, 25 242:4

**expertise** 12:18 17:23 20:21 25:5,10, 12,14 27:4 73:1,21 140:8

**experts** 173:13,17 174:21

**explain** 47:16 49:20 61:2 83:3 88:24 89:11,24 90:3 145:6 165:16 179:11 222:2 224:18 234:8

**explained** 67:2

**explaining** 60:2

**explanation** 66:17 67:2,24,25 68:3,5 187:9,23

**exploration** 81:20,25

82:6,11 227:13,20

**explore** 245:9

**exploring** 108:3

**exposing** 97:7,8,12

**Exposure** 125:24

**express** 111:7 117:20 142:17

**expressed** 61:18 113:18 114:2,21 118:6,8 145:14 161:2, 7,12 208:2,7 238:4 239:9 241:6

**expresses** 158:12 237:2

**expressing** 113:14 150:8 239:17

**expression** 198:1 211:6 227:15

**extend** 197:20

**extent** 83:24 151:7 152:6 221:9

**external** 27:15,23 33:15 34:12 37:3 182:21 216:12,25

**extracurricular** 149:19 152:15,19 154:1,3 247:23

---

**F**

**facial** 194:16 235:22

**fact** 50:21 122:23 215:16 221:6

**factors** 33:14 36:13 69:9 151:7,13,14 158:4,9 216:22 221:22

**fail** 146:5

**fair** 10:1 15:24 50:14 55:6 64:14 67:3 86:20 101:3 116:21 120:24 182:9 191:12 203:11

**fall** 59:3 230:25

**familiar** 51:19 74:4 119:13 219:7,13 227:6

**families** 22:18 93:2 134:12 251:10

**family** 147:4 233:8 236:17,19,24 237:3, 10

**family's** 90:20,23

**farther** 90:2 184:20 212:23 219:21

**father** 34:17

**FDA** 253:5,23 254:3,6 257:3

**fear** 137:21 178:7,15 255:11

**features** 69:11 70:15 72:2 77:9

**February** 73:6,14 75:17

**federal** 94:16 172:2, 18 223:16

**feel** 28:12 31:2 47:16 61:2 66:5 68:24,25 103:11 109:14 115:4 129:17 137:23 151:10 152:12 155:1,20 190:4 210:5 216:15 222:1 224:18 229:1 234:8 235:3 246:14

**feelings** 75:23

**feels** 143:13

**fellowship** 18:12

**felt** 205:14

**female** 27:14 40:10 49:23 57:6,12,16 58:6,11,14,25 59:9, 16,18,25 145:7 182:20 194:24 205:15,16 206:14 235:12,17 238:16 239:3 242:10

**feminization** 194:16

**field** 12:11 29:1 30:9

32:25 35:22 52:11 57:24 63:2,19 72:16 100:8 120:25 121:3,9, 11 127:13 162:7 200:21 201:7,23 202:3,21 214:10 215:7,12 230:21,23

**fields** 12:10 22:17 100:3 201:16 202:2

**fight** 218:17

**fighting** 35:2

**fights** 218:13

**figure** 104:4

**filed** 7:13

**final** 160:25 161:6 162:2,16,23,25

**finally** 90:9

**find** 102:3,5 117:5,9

**findings** 61:12

**fine** 31:20 63:16 67:22 84:9 91:23 94:21 108:9 129:10 150:23 166:6 189:19 224:23 241:10 256:18

**finish** 9:8,9,10 134:5

**finished** 28:24 31:15, 21 82:17 210:11

**first-ever** 223:13

**five-** 87:16

**five-to** 88:9

**five-year-olds** 81:17 82:2,10

**flag** 104:24

**flagging** 20:9

**fluctuate** 49:24

**fluid** 49:18,20,21

**Fluidity** 116:17

**focus** 13:11 146:12 157:19 200:14 202:24 230:1

**focused** 17:14 155:19,25 156:9,15 157:12,15 213:17,24 214:1

**focuses** 203:5

**folder** 74:13

**folks** 71:14 79:15 212:11

**follow** 19:2 21:23 164:20 167:7 252:23 254:3

**Food** 253:20

**footnote** 55:7,11,12 180:22 198:21 199:23 217:13,14 224:25 225:1

**forbidden** 149:18,23

**forced** 145:23 146:7

**forgetting** 174:12

**Forgive** 174:24

**form** 16:19 17:11 19:3,11,23 20:19 21:4 22:1 23:4 25:7 26:25 27:20 28:2 29:14,24 30:7,15 32:7,23 33:12 34:6,20 35:21 36:6, 19,25 37:11,20 38:10 39:2,10,18 41:17 43:1,12,24 44:14 45:9,24 46:13 47:23 48:6,21 49:6,16 50:5 52:8,23 53:10,18 54:1,9,18 57:13,23 59:1,10,22 61:4,10 62:4,18 63:5,11 64:5, 17,24 65:6,22 67:4 68:9 70:1 72:11 73:18 76:17 77:1,11 82:3 83:2,13 85:16 87:17 89:8 96:1,6,19 97:3, 10 98:9,18,24 99:12, 20 100:1,9,16,23 101:5,15,23 106:25 107:15 109:16 110:5 111:1,17,22 113:1,9, 20 114:23 117:7,22 118:11 119:9,18,24 120:5 121:1,12,18

**format** 234:7

**forming** 218:4,10

**forward** 41:2 55:6 161:15 188:5 206:17 214:5 255:22

**found** 60:17 117:13 210:17 243:8,20

122:1,7,15 127:4,10, 17 129:5 132:2,17,24 133:6 134:16 135:9, 15 136:11 137:6 138:5 139:2,17,22 140:4,24 141:8,16 142:24 144:3,21 145:12,25 146:18 147:5,23 148:12 151:23 152:25 153:7 156:2,11,20 158:16 159:14,23 160:13 161:3 162:6,19 163:11 165:2 167:10, 24,25 168:4,7 169:8, 9,14,22,24 170:3,12, 13,17,19,20 172:9,24 173:21 175:14,19 176:7,13 177:18 178:4,13 179:18 180:8 183:3,19 184:15 185:6,14 186:1 188:17 191:6 192:6,13,18 193:16 195:11 196:3,14 197:6,12 200:20 201:5,25 202:7,17,25 204:3,18 206:4 207:12 208:8 209:1, 13,25 210:15,23 211:14,24 213:22 215:10 218:5,18 219:12 220:4,18 221:5,16 222:23 224:8 226:10 227:5 228:23 229:22 230:11 231:3,7 232:2 235:5 236:12,18 237:7,19 238:6,22 241:2,13 242:3,11,19 243:2,12, 23 244:9,23 247:12, 21 248:6,21 249:3 252:11,16,24 254:1 255:20

**foundational** 204:24

**fourth** 131:6

**free** 28:12 31:2 47:16 61:2 66:5 68:24,25 103:11 109:14 115:4 129:17 151:10 152:12 155:1 190:4 210:5 216:15 222:2 224:18 234:8 235:3 246:14

**frequency** 214:17

**frequently** 179:6

**Friend** 223:18

**friends** 7:11

**front** 168:1 244:21 245:5,19

**frustrated** 155:5

**full** 126:4,15 142:11 154:17 200:10 212:24 245:12

**fuller** 67:2 68:2,4

**functioning** 125:22 228:14 229:25

**future** 76:4 205:23 211:8 251:17

---

**G**

---

**gain** 168:10

**gametes** 35:9,15

**gave** 31:15 99:4 103:20 237:4

**GD/GENDER** 60:17 69:10

**gender** 12:17,18 14:5 26:13,14,18 40:23,24, 25 41:1,4,5,12,13,15, 18,24 42:13,16,19,20, 23,24,25 43:3,4,7,10, 11,13,14,19,20,21,23 44:1,4,6,7,11,13,16, 19,21,22,24 45:7,11, 12,15,18,20,22 46:1, 4,7,11,16 47:9,11 48:2,8,13,17,18,19,

23,25 49:1,8,9,10,15, 18,20,21,22 50:2,3,7, 9,10,16,17,19,20,21 52:4,14,21 53:9,14, 17,20 55:16 56:4 57:4,6,7,12,15,16,19, 22,25 58:11 59:3,5, 13,24,25 61:18,22 64:3,20 65:8,15,16, 18,19,24,25 66:3,7,8, 17,18,20 68:11,13 72:8,10,12,16 77:3,13 82:22 85:8,13,15,18 86:1 87:25 88:6,10, 11,16 99:16,18,24 110:25 111:7,16,20, 24 112:1,3,4,12,21 113:4,14,18 114:3 115:3,10,13 117:21 118:7,9,14,21 120:23 121:25 122:3,6 133:25 137:3,4,8,12, 13 145:20 149:19,24 152:19 153:17 154:4, 23 158:12,18 159:17 161:2,7,13 162:8 182:13 183:7,15,18, 24 184:1,2,22,23,24 185:1,5,13,23 186:3, 12,16,20,22 187:3,4, 6,12,21 188:3,4,7,9, 10,11,16,20 191:14 196:10 200:23 205:3, 4,5,13,16 206:13,15 208:3,7,11,17,22 209:20 211:5 214:10, 22 215:3 216:1,6 222:16 223:21 224:4, 12,14 227:14 228:12, 16,17,20,25 229:2,7, 20 230:1,3,9,22,24 231:19,25 232:10,15, 21,23 233:6,9,17,21 234:2,9,22,25 235:2, 16 237:21 242:1,7,10 243:1,5,9,16 245:11, 13 248:24 251:14 252:14,21 254:14 255:23

**gender-affirming** 95:22 111:12 187:13 188:5 193:13,23,24 194:2,6 195:16,17

230:19,23 231:9

**gender-diverse** 181:3 198:1 252:3 255:14

**Gender-incongruent** 56:5

**Gender-nonconforming** 199:1

**gender-questioning** 200:12,18 201:4,12, 19 206:20 207:2 213:3

**genders** 65:4,15,16, 21 66:4,10,14 67:1 68:2,6

**general** 101:3 123:20 200:22

**generally** 255:16

**generate** 177:25

**genital** 182:21

**genitalia** 27:16,23 33:15 34:12 35:10,15 37:3 97:8,12 196:8,9 216:13,23,25

**genitals** 194:15 195:6

**girl** 77:10 205:15 244:21 245:1,4,5,18, 19 248:2,3,11,12,13, 18,20 249:6,8

**girls** 222:14 241:12, 20,23

**girls'** 248:19 249:7

**give** 9:12 10:11 14:16 25:20 34:8 41:6 67:7 74:6 80:22 86:4 91:8 116:14 122:12 148:24 163:5 189:2 197:19 221:24 234:7,10,12 235:2,3 240:9 255:4 256:15

**giving** 25:23 67:17 75:16

**glad** 46:18,24 71:22 80:17 84:3 107:9 113:13

**glasses** 77:6

**goal** 228:17,20,24

**goals** 229:15

**gonadotrophin-releasing** 189:14,24 253:16

**gonads** 182:22

**good** 7:3 9:4,16 190:18 191:9 194:7 240:5

**governing** 140:17

**government** 167:14

**Governor** 7:12

**granted** 167:19 169:12

**Granville** 15:12

**gratification** 214:3

**great** 46:23 47:7 69:8 84:11 92:12 95:8 112:11 166:4 189:22 196:6 199:24 210:10 217:5 257:6

**greater** 191:15 233:13,24

**greatly** 251:17

**ground** 9:7

**group** 132:16,19

**growing** 105:12

**guardian** 20:23 163:4,13,18,24 169:12,18 185:25 186:8 187:18

**guardian's** 164:13

**guardians** 185:17

**guess** 76:15 154:1 256:11

**guidance** 25:4 211:9

**Guide** 102:24 103:14

**guided** 220:23 221:3

**guideline** 55:18 56:8 60:8 205:2,9

**guidelines** 12:9,17 13:14,16 14:2 19:10, 12,21 20:2,24 21:3, 18,19,24 23:22 56:6 60:11 85:10 107:24 159:4 161:16 185:8,18 188:1 198:25 200:13 202:5, 9,12,13,15,18,21,23 203:13,17,19,25 204:1,4,5,9,14,21 206:8 211:19,21 220:24 227:16 228:6, 7 255:10

**guides** 220:25

---

## H

**hair** 77:4,14 235:22

**Hale** 8:12

**half** 58:15 83:4

**halfway** 135:2 183:11 190:25 212:24

**hand** 47:21,22

**handful** 110:20

**handled** 123:8 168:1

**happy** 28:17 29:17 44:2,25 67:24 128:13 235:6

**harassed** 178:8

**harassing** 178:11

**harassment** 98:4 255:12

**hard** 34:8 36:11 112:1 229:12

**harm** 142:3 160:12,15 212:17 219:3,18 241:15,17 244:20 245:4 246:2,3 248:2, 9,11,16,18 249:2,6

**harmful** 143:17 146:7 210:18 212:5,22 220:12 237:16,20 238:2 239:2,5,8,13 241:11,19,23 246:6

**harms** 246:9

**he/him** 144:9

**head** 9:21 129:10,18 203:4,7 247:9

**heading** 203:15

**healing** 93:1

**health** 12:19,24 13:10 14:2 18:20 23:7,23 25:15 51:12,22 53:24 54:3,15,19,24 62:21 93:1 95:1,8 100:14, 18,22 101:6 102:25 103:14 105:10 107:21 108:7,23 109:2,13,18, 20 129:3,20 130:5,16 134:2,15 136:22 138:2,9,16,24 141:1 143:8,19,23 145:19, 22 146:2,17 147:17 156:16 157:10,13,21 159:9 160:6 161:18, 21 162:4,17 164:10 165:10,12,17 167:7, 10,18 168:5,11,19 169:13,18 177:17,25 178:15 180:12 184:7 185:24 188:15,18 190:6 200:21 212:4 213:14 215:12 222:8 223:8 224:13 225:20 226:15 227:12,17,18 233:11 237:11 240:1 247:1,20 251:12 252:5 254:13

**healthcare** 107:14 133:24 136:21 150:6, 10 156:14 157:11 173:11,16 176:23 178:16,21 179:6 196:22,24 214:10 218:14,25 223:18 224:2 231:5

**hear** 71:4,6,10,12,14, 15,18,19 79:14,15,16,

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 274 of 293 PageID #: 1931

17 106:2 152:5 199:2

**heard** 21:6 113:3
119:16 165:9 183:25
184:1 193:11,12

**hearing** 63:14 71:1
104:6

**heart** 15:22

**held** 251:12

**helped** 230:7

**helpful** 46:5 98:10
112:5 193:22 197:21
230:6,8

**helping** 105:16
228:15 230:2

**Hembree** 55:16 56:3

**hesitant** 138:3

**hesitate** 137:18
138:10,21

**Heterogeneity**
129:24

**high** 26:16 115:11
149:18 171:10

**higher** 136:1

**highlight** 134:10

**Hildabrand** 7:23,24
8:23 9:1 11:5,14
12:20 13:23 14:17,20
15:10 16:22 17:7,19
19:8,18 20:10,15
21:1,9,22 22:3,12
23:13 25:13 26:8
27:3,24 28:7,11,22
29:20 30:3,10,18,24
31:11,19 32:4,11,19
33:2,17 34:1,13 35:1,
18,24 36:8,16,22
37:4,15 38:1,15 39:7,
13,22 40:4,18 41:20
42:11,17 43:6,17
44:5,17 45:16 46:6,
17,23 47:2 48:3,10
49:2,12,19 50:1,13
52:13 53:7,15,23
54:5,14,22 55:5,10,20
56:1 57:17 58:2 59:7,
14 60:1 61:1,7,15

62:1,8,15 63:1,8,16,
18 64:1,13,21 65:3,9
66:1 67:9,21 68:14,20
70:9 71:3,12,15,17,
21,24 72:14 73:22,25
74:7,14,18 75:2,6,9
76:21 77:7,16 78:17
79:7,16,21 80:7,15,
19,23 82:7,15 83:1,
14,17,24 84:3,11,12
85:20 86:3,12,19
87:22 88:22 89:7,10,
17 90:1,8,15,22 91:4,
10,18 92:1,12,17,20
94:5,10,25 95:5,7,23
96:3,9,16,22 97:6,14,
20 98:1,15,21 99:2,
17,23 100:7,12,20
101:2,11,19 102:7,14,
17 103:3,8 104:7,12
105:2,21 106:9,18
107:7,19 108:5,14,21
109:10 110:1,9,17
111:4,14,19 113:6,12
114:1,10 115:1,15,22
116:1,4,8 117:11,18
118:1,16,19 119:10,
21 120:2,9,19 121:5,
15,22 122:4,11,18
124:3 125:10,14,19
127:7,15,20 128:9,14,
17,19 129:8 130:19,
24 132:3,9,20 133:2,
10 134:19 135:12,18
136:4,15 137:9 138:8,
15,23 139:6,19 140:1,
7,21 141:5,11,20
142:9 143:1,12,25
144:8,22 145:5,21
146:3,15,21 147:8,20
148:6,11,14,23 149:1,
10 152:2 153:3,12
156:5,17,23 157:4,14,
22 158:22 159:10,19
160:8,20 161:4,23
162:13,22 163:15
165:8,24 166:5,12,15,
20 168:12,16 169:20
170:4,10 171:3,5
172:11,16 173:5,24
174:14 175:16,22
176:3,9,19 177:1,21
178:9,13,18 179:21

180:8,15 181:7,12
183:6,22 184:19
185:10,20 186:10,18
187:1,19 188:6,14,22
189:4,5 190:12,18,21,
22 191:11 192:10,14
193:1,21 194:19
195:21 196:11,17
197:10,15 199:2,6,12,
16,19,24 200:3 201:1,
9,15,22 202:4,11,22
203:3,10 204:7,15,22
206:12 207:15,24
208:13 209:7 210:4,
19 211:10,20 212:6
214:4 215:21 217:1,5,
8,17,22 218:8,23
219:20 220:7,19
221:2,12,23 222:9,23
223:1,11 224:15,22
225:5,11,24 226:17
227:1,9,22 229:4,16
230:4,17 231:4,14
232:5 233:2 235:24
236:15 237:1,15
238:1,6,12 239:1,7,15
240:5,14,16 241:5,16,
24 242:8,16,23 243:7,
18 244:4,9,15 245:3,
16,22 246:4,10
247:16 248:1,10,17
249:1,5,10 250:2,6,
10,14 252:6,8,13,19
253:3,9,14 254:4,11,
18 255:2,15 256:3,9,
17,21,23 257:2,6

**History** 125:23

**hit** 74:11

**Hitting** 108:18

**hold** 74:22 95:3

**holding** 77:18,19,24

**Honeycutt** 7:4 35:13
199:14 240:8 257:8

**honor** 173:2

**honors** 172:2,7,19
248:3,5

**hope** 134:10 199:16
250:21

**hopes** 211:8

**hormonal** 216:23

**hormone** 163:6,7,9,
20,23 177:9,11,13
182:23 185:12,16,21
186:11 193:6,9,10
234:21,23 253:17

**hormones** 35:16
174:11 186:16 187:8,
14 189:15,24 193:7,
13

**hospitals** 33:8

**hour** 10:7 46:20 83:4
128:11

**hours** 94:12 128:18
166:13 199:7

**house** 78:16

**https:\\www.
youtube.com\
watch?v=
322u6en50d8.**
104:18

**https:\\www.
youtube.com\
watch?v=
hvlyai7qq0a.** 104:21

**hundreds** 19:16
102:5

**hurt** 105:17

**hurtful** 146:4

**hypothetical** 35:2
237:8 239:16,20
240:3 243:24 244:11

---

**I**

**ID** 167:14

**Idaho** 223:13,24

**ideally** 145:15 162:10

**ideation** 213:5
225:19

**identification** 61:24

**identified** 32:21 121:8 122:10 159:16 198:11 212:3

**identifies** 109:19 142:14 145:8 188:3 235:12 239:21,24

**identify** 7:19 49:18 56:2 58:21 59:4,17,23 85:9 105:16 137:8,10, 11,13 183:14,21,23 184:21,23 197:25 209:20 211:4 229:15 235:18

**identifying** 255:17, 22

**identities** 48:9,24 49:5,15 50:3,7,9,16, 18,19,20,22 57:4 61:22 64:3 65:8,15, 16,24 66:3,19 68:12 137:12 205:4

**identity** 12:17 26:13 41:4,12 42:16,21,23, 25 43:3,7,11,14,20 44:1,16,19,21 45:12, 20 46:1 47:9,11 48:2, 13,17,18,20,24 49:1, 8,21 50:2,10 52:14 57:6,12,15,16 58:6, 12,14,21 59:6,13,24 61:18,24 64:20 65:18 66:7,18 70:17 72:3,8, 10,13,17 77:3,13 82:23 85:8,13,15,18, 25 86:1 88:1,7 95:14 96:14,15 98:3,13 99:9,14,16,19,24 110:25 111:8,16,21, 24 112:3,12 113:5,8, 14,18 114:3,22 115:3, 10,13,14 117:21 118:7,9,15 153:17 158:12,19 159:18 160:3 161:2,8,13 184:2,10,25 185:1 188:11,20 196:10 200:24 205:5,13 206:13,15 207:4 208:3,7,11 211:6 215:14 222:16 227:13,14,21 228:16

229:3,7,20 230:2,3,10 231:19 234:23,25 235:2,16,18 237:3,22 238:5,10 239:14,17, 18,23 242:1,7,10 243:1,6,9,16 245:11, 13 247:25 248:24 252:15,18,22 254:14 255:14

**illegal** 129:25

**image** 76:18 77:23 78:13 80:25 89:16

**imaginary** 78:16

**imagine** 33:8 142:13 145:6

**impact** 26:15 141:4 246:12

**impacted** 221:21

**impaired** 10:10

**impairment** 229:24

**impairments** 228:14 229:1

**impartial** 224:5,16 227:2,8

**implications** 16:13 184:7

**importance** 45:20 46:1 143:9

**important** 44:10 60:22 62:19 69:9 85:11 86:9 89:22 90:20 98:3,14 99:9,15 102:1 111:10 143:20 144:5 156:14 160:6 172:1 203:18 204:5 209:18 212:2 215:15, 17 220:6 226:15 229:18 232:13 233:10 237:9,13 238:23 242:12 243:3,8,13,20, 25 245:9,10 247:24

**impossible** 246:21 247:4

**impression** 119:22 139:9 247:13 252:1 254:22

**improved** 211:8

**improving** 229:25

**in-line** 213:8

**inability** 254:25

**inaccurate** 144:20,25 145:3

**inappropriate** 70:20 212:4 245:18

**inaudible** 78:23 194:9

**include** 17:16 35:9 45:3 70:8 76:6 99:15 101:8 133:1 139:15, 20 141:22 144:9,12, 15 151:17 173:4 185:21 186:11,16 187:7,13,22 191:15 194:8 252:2,4

**included** 66:15 80:12 110:22 177:11

**includes** 87:8 164:12 200:24 209:9,15 228:15

**including** 12:17 17:13,24 19:6 23:10 61:22 85:10 88:16,17, 25 89:12 118:14 137:19 143:8,13 158:9 159:4 160:4 178:7 194:17 216:22 219:18 224:11 227:13 234:20 250:1

**incongruence** 60:17 69:10 186:3,17,22 187:4 188:8,9,21 209:20

**incongruent** 47:11 55:17 158:19 161:13 188:12,16 226:14

**inconsistent** 21:2,7, 13 113:15,18 114:3 118:7 158:12 161:8

**incorrect** 111:15 112:3 118:9 142:15 143:15,16 145:11 239:6

**increase** 198:10 225:18

**increased** 126:18 184:10 198:14 214:23 215:2 255:25

**increasingly** 87:9, 15,19 198:1

**independently** 142:21

**individual** 21:20 33:13 35:16 48:23 49:11,13,22 50:10 53:21 54:11,17 55:1,3 65:18 69:20 70:5,7,8 101:9,13 111:24 112:22 122:10,14 134:13 142:3 144:6, 13 145:13,16 152:5, 17 153:5,16,18 154:11 155:25 158:18 159:9 160:7,18 161:22 164:20 183:21 185:5,12,22,23 186:4, 12,16,20 187:2,5,7, 12,21 188:2 195:1,12, 15 209:18 229:13,15, 19 231:10 233:7 234:14,19 237:10,21 238:8,10 239:6,21,23 242:6,13,17,21 244:1, 5,12,13 245:10,15

**individual's** 29:2 42:20 43:13 44:9 45:14,21 46:2 64:19 65:24 66:19 68:12 85:12 90:21 96:15 105:15 110:25 112:2 143:9 145:19 188:11 228:13 237:12 238:24

**individualized** 21:20,23 70:5 159:5 195:18 245:14

**individuals** 14:4 34:9 37:6 38:12 49:17 51:21,25 53:20 57:10, 15,21 58:4,9,13,19 59:2,17,23 61:21 70:18 85:9 111:6 115:10,11 117:20 118:6,21 121:24

129:23 135:3,7,14,20,
22,25 136:12,18
137:4,7,11 139:15
143:18 144:5 147:19
149:22 159:16 162:9
173:4 176:24 184:11,
25 195:7 196:7 197:8
214:3 216:24 221:21
224:12,13 228:25
234:1,16,23 235:17
243:4 246:1 252:4
255:16,22

**individuals'** 66:17
118:14

**Infants** 76:1

**infinite** 50:21 65:12,
21 66:3,4,10,14 67:1
68:2,5

**influence** 25:10
253:2

**influenced** 158:8

**inform** 21:19 107:6
141:3 185:19 204:5
232:16 251:17

**information** 19:16
24:13 28:6 29:18
44:25 46:3,15 53:4
65:2 81:17 86:11
87:12 89:23 102:5
108:3 140:16 141:3,6,
14 150:13 155:22
161:15 164:25 165:6,
7 173:1 198:7 209:4
210:2,25 224:6
230:13 246:18

**informed** 123:11
161:16 216:22 221:18
252:2

**Informing** 142:2

**inherent** 205:14

**initially** 120:1 155:5

**initiate** 163:23 234:4,
22 235:19

**initiated** 234:4

**initiating** 164:14
240:20,25

**initiation** 122:24

**injured** 248:19 249:7

**injury** 248:22

**ins** 147:25 165:4

**inserted** 91:17

**insisted** 244:5,6

**Installing** 129:14

**instance** 57:5 146:14
153:22

**instruct** 9:14

**instructing** 96:4,7

**instruction** 95:24

**insufficient** 251:13

**insurance** 147:21
149:7

**Insuring** 181:2

**integrity** 70:16,17
72:3

**intending** 210:2

**intensely** 213:17,24

**intentionally** 208:10

**interact** 131:22 179:6

**interactions** 75:24

**intercourse** 88:25
89:13

**interdisciplinary**
19:5 22:14 23:9 64:8
114:9 122:9,25
130:12 131:5 150:16
174:3 192:22

**interest** 87:3 139:12
156:10,18

**interested** 122:17
171:10

**interests** 156:21,24
157:3,6

**internal** 111:25
182:22 216:23

**internet** 70:25

**internship** 18:10
24:21 124:22,23

**interpersonal** 148:3

**interpret** 76:3

**interpretation** 77:23
98:19 107:6 110:23
151:14 185:7

**interpretations**
110:15,18

**interrupt** 20:5 89:3
104:24 165:14,15
190:10

**interrupts** 35:11
78:24 194:10

**interscholastic**
26:17 246:23 247:5,
15,18

**intervention** 53:16
54:20 234:20

**interventions** 53:13,
19 54:16,21,23,25
211:3,5 226:5,24

**introduce** 7:21 8:10

**introduction** 120:20

**intrude** 220:3

**intrusion** 219:23
220:13,16

**involuntary** 58:5,10

**involve** 132:15
194:24 195:9 245:15

**involves** 227:17,18

**Irrelevant** 244:24

**issue** 11:25 71:1
147:3 229:12 245:10
251:11,22

**issued** 167:14

**issues** 53:24 79:15
83:8 140:11 227:13

**Item** 73:15

**iteration** 205:23

**J**

**Jason** 181:13

**Jennifer** 123:5

**Jernigan** 190:15

**JERNIGAN-
JOHNSON** 256:13

**Jessica** 190:15
256:11

**Jim** 175:2

**Johnson** 190:15

**joined** 14:10

**joining** 8:1

**Jon** 8:14

**Joshua** 56:12

**journal** 56:18 60:4
118:2,3,5,25 119:8,
12,14,15 133:12
154:14 163:25 171:6,
7 178:20,25 179:24
180:7,9,13 200:8
206:18 214:6

**Journal's** 68:17

**jumping** 103:22

**June** 25:25

**Juvenile** 125:23

**juveniles** 128:23

**K**

**kicked** 74:5

**kind** 152:10 179:1

**kinds** 207:22

**Kingdom's** 254:12

**knowledge** 20:21
63:23 122:21 192:16
204:24

**Knox** 8:14

## L

**L.E.** 7:10

**label** 53:2 69:19 184:2,3

**labeled** 84:25

**Labeling** 253:16

**labels** 58:1

**lack** 64:11 137:20

**lacking** 157:24 158:2

**lag** 225:22

**Lambda** 8:6

**language** 153:24 154:2 170:15

**large** 101:10 102:2

**largely** 160:5

**larger** 84:1 101:3,21 109:6

**lasted** 125:2

**Late-filed** 92:8 103:6

**latent** 130:1

**law** 12:6 148:20,24 223:15,20 224:3,6,17 227:3 247:3,7,14

**laws** 26:15 140:23 141:22 162:15

**lay** 9:7

**lead** 212:17

**leading** 105:14

**learn** 40:7 76:3

**learned** 17:20

**learning** 17:5

**leave** 20:12,14 170:19 179:23

**Lee** 7:12

**left** 70:3 75:19 76:22, 24 77:4,21,24 78:5,6 81:2,4 84:23 92:25 136:20 149:12

154:15,16 171:9

**left-hand** 60:12 76:7 134:25

**legal** 8:6 12:5 37:13 163:3,12,18,24 169:12,18 173:13,17 185:17,24 186:8 187:17 226:3,13,22

**legible** 66:16

**legislation** 142:2 151:17,18,21,22,24, 25 172:2,7,19,23 173:1,7,20,25 174:6, 8,10,13,16,17 175:8, 13,18,24 176:2,5,10, 17 219:3,11,18 223:24 226:8,19

**legislative** 26:16 219:22 220:13,16 226:3,13,22

**legislators** 173:14,20

**Legislature** 173:8 175:10

**legislatures** 220:2

**lengthy** 249:23

**letter** 150:9

**letters** 150:16

**letting** 63:13

**level** 172:2,18

**levels** 182:23

**LGBTQ** 164:10

**LGBTQ+** 17:17

**Liberties** 8:4

**license** 7:5

**licensed** 25:11 124:4, 6,9,10

**life** 34:23 35:3 76:1 188:25

**lifetime** 126:17

**likelihood** 60:18 61:14 63:4,21

**limit** 221:14

**limitations** 200:13 201:2,6,8,10,17,23 202:1,3

**limited** 158:9 198:16

**lines** 169:5

**link** 84:5,14,17 91:16 92:5

**Lisa** 118:24

**list** 14:24 24:8 53:1 56:11 73:5,13 128:2, 4,21

**listed** 81:19 86:24 87:11,12,19 88:5 89:15 90:9,12,14 102:21 103:17 128:22 131:7 133:5 158:10 193:5 212:19 219:8

**listen** 103:24 105:4 115:17

**lists** 15:2 87:23 93:19 126:6

**literature** 12:10 13:9 44:2 45:3 60:24 63:24 72:15 87:20 100:3 101:7,17 105:12 108:2 109:19,22 112:19 127:12 143:17 160:6 206:6,21 207:3 209:6 214:23 220:25 221:10

**Littman** 118:24

**live** 58:7,17 228:15 229:2

**living** 231:18

**lobbyists** 173:13,18 174:20,23 175:1

**located** 179:10

**location** 74:12

**locker** 245:1 246:1

**log** 190:14

**logged** 190:16

**logical** 91:5

**long** 19:13 82:18 124:4 153:13 206:6 237:14

**long-term** 251:14

**longer** 52:10,19 77:14 209:5,12 212:8, 10 227:25

**lost** 153:9

**lot** 83:4 105:13 236:11

**lots** 157:18 227:19

**loud** 75:21

**lower** 117:9

**lunch** 10:7 86:21 91:6

## M

**M.S.** 15:16,25 16:2 17:8

**Madam** 190:14

**made** 36:12 38:18 109:6 162:11 163:2 171:1 182:19 185:16 203:18 216:4 239:24

**maintaining** 98:2,7, 12,13 99:8,13

**major** 15:14

**majored** 15:15

**majority** 233:1,3,8, 12,20,23 234:16

**make** 9:23 21:5 49:3 58:23 61:21 69:3,10 77:2 82:24 85:25 94:23 108:19 160:25 161:5 163:9 170:7,8, 21,22 188:25 204:16 217:6 218:21 229:5,7 247:3 253:1 257:7

**maker** 162:16,23,25

**makes** 33:3 162:2,21 219:15

**making** 20:1 105:2 155:5 204:13 226:12

246:21 249:25

**maladaptive** 126:19

**male** 27:14 38:9 40:9 49:23 57:5,11,16 58:6,11,14,22,24 59:8,16,18,25 129:25 149:17 182:20 194:9 195:8,13 205:15,16 206:14 235:12,19 236:3,6 238:20 242:10 243:14,17 244:12

**male-typical** 194:13, 21

**males** 16:14

**malfunction** 73:8

**man** 205:15

**mandates** 203:22

**manner** 94:18 140:20 243:5,15 249:4

**Manual** 51:4

**March** 217:24

**Mario** 7:11

**mark** 55:22 74:1,19, 21 103:12,23 105:4 115:17 116:5 125:11, 13 130:20 181:8 199:25 217:18 225:6 250:11

**marked** 11:12 55:23 91:13 92:8 103:6 104:20 125:15,17 130:22 166:18 168:14 181:10 200:1 217:20 225:9 250:12 253:12

**marking** 74:22

**Mary** 131:11,12

**mastectomies** 194:24

**mastectomy** 195:3

**Master's** 15:17 51:21 125:7

**Masturbating** 87:18

**masturbation** 87:9, 14 90:11

**match** 146:8 188:12 237:17

**matches** 153:17

**math** 18:8 181:22

**matter** 7:10 11:25 138:14 155:10

**MDS** 13:11

**meaning** 12:6 102:4

**meaningful** 236:24

**means** 49:20 59:21 139:4,5 162:25 177:25

**meant** 138:6 145:3 241:14

**media** 175:17 198:2, 12

**medicaid** 148:8 149:3,9

**medical** 12:21,22 14:3 18:13 24:18 29:4 33:5 37:18,23 62:22 64:9 65:1 100:2 102:18,23 103:13 108:1 115:23 118:22 131:13 162:21 164:11,14,25 165:1, 19,23 166:22 168:18 174:21 175:1 176:16 212:4 217:16 218:16 219:24 220:14 221:7, 13 222:1 234:19 235:8 240:20 241:1

**medically** 195:14

**medication** 10:12 13:12

**medications** 190:8 234:21

**medicine** 19:2 109:23 140:3,11 141:15,23 219:23 220:3,13,17,23 221:11,15,18,20,25

**meet** 21:20 114:14 215:18

**Melissa** 7:9 8:18 9:4 126:1 131:10

**members** 152:5,15, 20 154:5 176:15

**membership** 14:24

**men** 58:6,7,16,17

**mental** 12:19,24 13:10 14:2 23:7,23 25:15 51:5,12,22 53:24 54:3,19,24 62:21 95:1,8 100:14, 18,21 101:6 102:25 103:14 105:10 107:21 108:7,23 109:1,13,17, 20 129:3,20 130:5,16 133:24 134:15 136:22 141:1 143:8,19,22 145:19,22 146:2,17 147:17 157:10 161:18 177:16,25 178:15 180:12 184:7 188:15, 18 190:6 196:22,24 200:21 212:3 213:14 215:12 225:19 237:11 240:1 247:1,20 252:5

**mention** 28:8 70:23 137:17 201:16 228:5 236:3

**mentioned** 13:14 20:16 23:25 31:17 125:5 177:12 188:7 211:21

**mentions** 164:1

**messages** 76:3

**met** 10:24 49:17 114:8,12 234:2

**MHAV** 165:10 168:20

**mic** 95:4

**middle** 7:14 26:16 81:10 86:25 115:5 133:12 151:3 164:3 171:24 173:6

**midway** 155:17 168:25

**milieu** 16:12

**mind** 133:20 151:22

**mine** 150:15

**minor** 162:3,17 163:10 164:25

**minority** 128:23 129:13 233:4

**minors** 219:1

**minors'** 223:14

**minute** 50:2 75:7 84:6 100:13 104:8 108:16 187:4 197:19 199:17

**minutes** 29:7 30:20 31:2,4 94:2,13 104:4 108:1 128:18 166:4,9, 13 199:8 250:4,5,6 256:18

**misgender** 239:6

**misgendered** 142:15

**misrepresentation** 69:21

**missed** 31:21

**misunderstanding** 69:24

**misunderstood** 66:24

**moment** 28:15,17 41:6 74:3 80:22 91:8 189:2

**morning** 7:3 9:4

**mother** 34:17 38:2,17

**mothers** 37:19,24

**mouse** 189:3

**move** 40:19 41:2 68:15 150:24 161:15 188:4 197:16 214:5 223:12 224:23 241:10

**moved** 217:6

**moving** 195:16 231:15

**multifarious** 136:24

**multiple** 19:5 48:24
49:5,15 64:10,11 65:1
101:14

**mute** 104:25 105:20

---

### N

**Najjar** 123:6

**names** 52:12 122:13
236:3,6,16,20,24

**Nashville** 7:14

**natal** 195:7 196:2
248:11

**national** 78:23 79:5,
25 80:6 254:13

**navigate** 159:5
165:22

**navigated** 251:22

**nearest** 167:13

**necessarily** 34:23
58:24 96:23 241:22

**needed** 134:11 256:8

**negative** 225:19

**Ninth** 223:19

**non-argumentative**
94:18

**non-conforming**
214:11

**non-sexual** 128:24

**non-suggestive**
94:18

**Non-transgender**
47:8

**nonbinary** 59:19,20,
24 142:14 144:2
145:8 146:23 147:2,
14,19 156:7 205:3
242:9,13,17,21 252:3
255:17

**nonpsychiatrists**
51:24

**noon** 93:14

**normal** 140:2,6
218:16

**note** 39:19 80:14 89:3
94:14 148:12 212:2

**noted** 84:9 171:1

**noticing** 7:22

**noting** 61:5 68:9
223:20 224:2

**noun** 41:5,15,24
42:13,19 46:4 96:17

**nowadays** 33:7

**nuanced** 29:4 196:21
229:12

**nuances** 29:19
101:25 234:14 249:25

**number** 7:6,15 11:13
50:7,21 55:24 64:3
65:12,15 68:19 91:14
92:8 97:19 103:6
110:20,22 117:9
118:13 130:21,23
151:16 166:19 168:15
174:13 181:9,11
200:2 217:21 225:10
250:13 253:13

**numbering** 251:3

**numbers** 50:15
100:25 125:18

---

### O

**oath** 7:17

**object** 9:13,15 32:23
48:6 63:15 83:13 89:7
134:16 136:11 137:6
138:5 144:21 145:12,
25 152:25 153:7
156:20 159:23 160:13
161:3 163:11 165:2
173:21 175:14,19
176:7 183:19 184:15,
18 186:1 193:16
195:11 196:3 197:12
200:20 206:4 218:5,
18 220:18 228:23

248:21

**objected** 63:10 170:5

**objecting** 89:5

**objection** 12:15
13:20 16:19 17:2,11
19:3,11,23 20:19
21:4,16 22:1 23:4
25:7 26:25 27:20
28:2,10 29:14,24
30:7,15,22 32:7,15
33:12,21 34:6,20
35:7,21 36:6,19,25
37:11,20 38:10 39:2,
10,18 40:12 41:17,25
42:14 43:1,12,24
44:14 45:9,24 46:13
47:23 48:21 49:6,16
50:5 52:8,23 53:10,18
54:1,9,18 57:13,23
59:1,10,22 60:20
61:4,6,10,19 62:4,11,
18 63:5,22 64:5,17,24
65:6,22 67:4 68:8
70:1 72:11 73:18
76:17 77:1,11 82:3,
13,20,24 83:23 84:10
85:16,23 86:7,15
87:17 88:19 89:4,14,
21 90:6,13,18 94:17
95:19 96:1,6,12,19
97:3,10 98:9,18,24
99:12,20 100:1,9,16,
23 101:5,15,23
106:25 107:15,22
109:16 110:5,13
111:1,9,17,22 113:1,
9,20 114:5,23 115:8
117:7,15,22 118:11
119:9,18,24 120:5
121:1,12,18 122:1,7,
15 127:4,10,17 129:5
132:2,5,17,24 133:6
135:9,15,23 138:12,
19 139:2,17,22 140:4,
13,24 141:8,16 142:1,
24 143:5 144:3 145:1
146:10,18 147:5,23,
24 148:9,12,21 149:4
151:23 156:2,11
157:1,8,16 158:16
159:1,14 161:10
162:6,19 168:7,8

169:14,15,22,24
170:2,17,19,20 172:9,
13,24 175:20 176:13,
14 177:18 178:4,13
179:18 180:8 183:3
185:6,14 186:14,23
187:10,24 188:17
191:6 192:6,13,18
196:14 197:6 201:5,
13,20,25 202:7,17,25
203:6 204:3,10,18
207:12,19 208:8
209:1,13,25 210:15,
23 211:14,24 213:22
215:10 219:12 220:4,
21 221:5,16 222:3,23
223:5 224:8,19
226:10,20 227:5
229:10,22 230:11
231:3,7 232:2,11
235:5 236:12,18,21,
22 237:7,19 238:6,22
239:4,11 241:2,13,21
242:3,11,19 243:2,12,
23 244:9,23 245:7,21
246:7 247:12,21
248:6 249:3,9 252:11,
16,24 254:1,8,15,21
255:7,20

**objections** 7:20
82:24 83:2 94:19
148:13,24 170:1,8,11,
22,25 175:25 248:14

**observed** 47:1 94:9
128:16 166:11 199:5
213:20 240:15

**obstinate** 86:17

**obtain** 167:6

**obtaining** 150:6

**occasions** 10:25

**occur** 95:17,20
251:10

**occurred** 215:5

**occurrence** 38:23

**occurs** 90:12

**October** 102:19
103:20 181:17

off-the-record 75:8
199:15

offenses 128:24

offer 23:17,19 27:18
28:3 31:16 142:17
146:16 152:20 172:6
192:16 211:8

offered 12:13 146:20
152:18

offering 12:5 13:3
23:2,5 24:1 47:25
54:20 171:10 192:11
223:8

office 190:15

officials 139:21
140:3,12 141:7,14,24
221:4,7

Ohio 15:13

older 197:3 205:20

one's 98:3,13 99:9
231:18 234:22

one-hour 105:23
106:21 109:7

ongoing 66:17
109:21

onset 209:11,17

op 175:12

open 75:12 83:22
84:2 118:18 225:8
227:13 250:8

opened 18:21 84:17

operating 137:22

opine 26:21

opinion 12:6 13:3
23:17,19 26:12 36:20
37:22 44:25 64:3 88:8
120:3 133:3 146:17
160:9 161:25 162:14
172:25 218:11 223:8
242:2

opinions 67:17 133:4
218:4,7

opportunities
133:23 180:3

opportunity 80:16
152:18 246:24

oppose 219:25
220:15

opposed 226:22

opposes 226:3

opposing 169:21
175:12 199:8 250:2

opposite 87:3,5

opposition 175:9

oppositional 126:20

option 54:7 165:6

order 134:1 215:24
256:22,25

organization 219:15
227:3,7

organizational
219:7

organizations 14:22
180:11 218:21 223:18
224:2

organizing 157:19

organs 194:15 195:7

orientation 227:14

orientations 90:4

original 132:22 133:1

outcomes 134:2
225:20 251:14,15

outdated 206:2

outline 53:1 133:23

outlined 7:21

outs 148:1 165:4

overnight 154:11

overstepping
137:21

---

**P**

p.m. 257:11

pages 19:16 44:24
47:5 215:24,25

pagination 126:9,13
178:25

paging 60:5 68:17

paper 74:11 129:22
132:19,25 133:18,22
134:14,21,22

papers 206:8

paragraph 11:21
12:8 22:6 26:3 27:11
40:20 41:3,8,10 42:22
43:5 45:6,17,19 46:8,
10 47:5,6 48:12
50:23,25 51:6 55:9
60:15 97:15,21 112:6,
8 126:15 142:11
149:13 150:13,14
151:15 154:18 155:2,
4,18 157:24 173:6
200:10 206:19,22
207:25 208:4,14,19
210:5,11 211:2
212:25 225:16
227:10,11 228:3,4,9
231:15 235:25 240:18
241:6 246:20 251:7

paragraphs 246:13

parent 147:15 160:22
164:24 167:8 185:25
237:4,5

parental 158:3,7
163:17 166:1 168:19

parentheses 79:5

parents 7:11 38:21
40:7,15 152:20 153:4,
9,14 158:13,20,23
159:12,17,21 160:10,
18,25 161:5 162:1,5,
16,24 163:8 164:24
165:4 167:23 168:4,
10 169:12,18 236:10,
13,19,23 237:4 238:2,

14,17,20

parents' 159:25

part 17:13 23:7 51:11,
19 54:11 57:18 58:8
69:3 73:20 75:25
85:11 86:9 90:20
95:21 105:23 106:20
132:12 140:10 141:12
162:12 164:10 180:10
233:10 247:24

participants 110:23

participate 149:18
152:18 242:6 243:5
244:3 245:11 246:22
247:5,19

participating 26:17
149:23 222:15 242:24
247:15 248:23

participation 223:14

particulars 62:22
122:12,16 219:14

parties 89:8 187:16

partnered 24:19
174:25

Partnership 180:4

parts 120:10,13
184:13 198:5 251:19

pass 140:23 175:9

passage 176:6
226:18

past 10:24 29:7 83:4
119:20 136:8 153:20
164:22 193:20 212:13
215:4,5 255:17,21

paste 74:8

Path 102:23 103:12
115:23

pathological 188:19

pathways 165:7

patience 74:15

patient 20:22 21:13,
21 112:24 122:22
123:5 124:16 125:1

14,17,20

---

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 281 of 293 PageID #: 1938

137:19 138:10,18,22 139:1,4,7,10,12,13,16 141:4 142:3,5,19 143:20 150:6,14,18, 19 151:1 155:13,14 156:15 159:6,9,11 160:12 161:19 162:1, 3 163:2,3,6 164:13 165:17 177:24 180:14,17 185:17,24 186:7 187:17 195:1, 19 196:18 208:10 223:9 228:15 229:14, 17 233:15 234:16

**patient's** 142:22 143:3,7 150:1 155:9, 25 156:10 157:12

**patient-provider** 136:10

**patient/minor** 163:7

**patients** 53:8 113:3, 23 121:16 122:2,5 123:17,23,24 124:1, 18,20 134:1,12 136:6, 7,16 137:21 142:8 147:2 148:8 149:3,7 150:20,21 157:21 164:17,20 167:23 169:11,16,17 171:12, 19 178:6 179:9 184:3 190:3,7,8 194:3 195:19,22 196:12,15, 22 197:5 210:18 215:19 218:14 219:3, 17,19 221:19 224:11 230:5,6,7 231:17 233:1,3,4 253:24 254:5,25

**patients'** 215:13

**pause** 46:24

**pay** 165:21

**PDF** 14:13 15:7 24:5 56:19,20 60:3,6 68:16,22,23 73:4,10 102:8 126:8,10,12 127:23,24 133:11 149:11 154:14,16 163:25 166:25 167:1 171:6 178:19,25

179:24 182:10 188:24 191:13 197:18 200:7 204:24 206:18 214:6 215:24 222:11 251:4

**pediatric** 18:19 123:6 130:12 131:4

**pediatrician** 182:2 253:4

**Pediatrics** 181:24 189:12 223:17,23

**peer-review** 101:7

**peer-reviewed** 118:2,3,5,13 128:4 131:24

**peers** 81:21,25 82:6, 11 136:3 240:21

**penectomy** 72:7

**penis** 34:3,16 38:6 195:9,25 244:22 245:6,19

**people** 27:14,22 33:7 47:8,9,11,19,20,21 48:9 57:3 98:5 99:10 101:10 102:4,6 112:12,20 162:9 183:17 184:2 199:1 211:25 222:8 248:23

**percent** 116:20 117:2,5,12,17 123:10 233:13,14,24,25

**percentage** 114:21 115:2,11 116:14

**percentage-wise** 233:12

**percentages** 136:1

**perfectly** 31:20

**perform** 37:24 193:23

**performed** 196:5 197:8

**performing** 54:21

**performs** 37:16

**permission** 163:18

**permitted** 245:11

**persist** 61:22 114:21 115:3,10,13 116:15, 19 207:4

**persistence** 60:18 61:9,14,18 62:3,7,10, 23 63:4,21,25 98:4 117:2,5,13,17 118:14

**persistent** 155:8

**person** 15:21 48:13, 16,18,19 49:8 70:20 72:6 183:14

**person's** 36:14 41:3, 11 42:23 43:3 44:11 45:11 66:7 205:5,14

**personal** 138:14,17 234:1 246:19

**personality** 126:19

**personnel** 178:22 179:7

**Persons** 55:17 56:5

**perspective** 83:6

**pertaining** 151:25

**pertinent** 12:10,11 23:23

**petitions** 175:23 176:16,22

**Ph.d.** 7:10 8:18 16:7, 10,11 17:8 18:2,9

**phenomenology** 62:20

**phenomenon** 121:4, 7

**phonetic** 175:3

**photo** 167:14

**phrase** 52:14,19 59:19 87:5 110:10,19 112:17,18 126:23 127:2 165:9 172:17 179:12 193:9 230:19

**phrased** 230:20

**phrases** 193:10

**physician** 23:1 24:1, 2 33:4,6 38:14 235:10

**physicians** 23:11 70:10 219:16

**physiologist** 27:5,6

**picking** 223:3,7

**picture** 75:13 76:6,8, 10,11 78:9

**pieces** 71:1 175:12, 13

**pigtails** 77:15

**pink** 77:5,14

**pinned** 175:12

**place** 46:23 179:9 206:25

**placing** 78:5,6

**plaintiff** 8:4,6,8

**plan** 20:24 53:20,22 70:5 161:20 185:19, 21 186:2,5,15 187:7, 11,20 208:12 229:14 232:17 233:10 242:14 245:14

**planning** 188:2 250:1

**plans** 195:18 204:6 207:21 229:18,23 232:20

**plastic** 196:6

**play** 76:12 78:14,15, 16 92:13 104:5 105:3, 6 108:18 147:16,18 148:3 153:5,16 171:25 242:9,18

**playful** 81:20,25 82:5, 10

**playing** 81:21,25 82:11 92:11 105:7 106:3,13 108:25 139:24 147:13 153:18 243:11 248:19 249:7, 12,13

**pleasure** 87:9,15,18 214:2

**point** 10:5,8 28:13 29:10 44:20 45:5 81:19 86:22 91:5 92:14 93:12 105:11 107:3,9 108:8,24 109:3,11,14 110:3 113:25 116:19 120:13 122:20 150:24 152:23 154:7 190:15 238:19 240:6

**points** 19:15

**policies** 151:9 245:1

**policy** 153:23 218:21

**political** 218:17 222:22 223:4,7

**politicians** 140:23

**population** 109:18 141:4 142:4,6 180:14 223:10 233:15

**populations** 17:15 180:17 221:20

**portal** 165:18

**posed** 222:5

**position** 35:19 42:24 83:3 111:21 136:23 221:13 222:19,22 248:4 249:20

**positive** 229:25 246:24

**possibilities** 65:13

**possibility** 143:8

**post-graduation** 18:1

**posted** 175:17 211:17

**potentially** 160:17 178:7

**practice** 13:11 14:8 21:19 23:21,23 37:22 49:18 51:10,11,20 53:8,11 55:2,18 56:6 60:9 61:16 107:24 108:3 110:24 111:5 117:9,10,14,17 121:24 123:20 124:4,

9,20 127:14,19 135:7, 20 146:11 148:2 155:16 158:6 159:3 163:1,12 165:19 169:17 170:13 171:21 185:8 190:6 193:11, 14 196:21,23,24 198:25 202:6 204:6, 17 207:8 208:5,9,25 209:5 211:9 212:12 213:21 219:23 220:3, 13,17,23,24 221:1,15, 17,25 227:15 230:15 232:14,18 234:1,6 250:24 252:23 253:2 255:6,8,9,11

**practiced** 212:8,12

**practices** 105:8,25 106:11,14,22 107:12, 17,20 108:4 109:23 133:8 141:3 148:7 173:2 179:15,17,20 192:24 193:19 215:11 221:10 227:19

**practicing** 212:1

**practitioners** 22:15

**pre-doctoral** 18:10 24:21

**precipitated** 61:25

**precisely** 63:10 205:22

**precocious** 189:16

**predict** 251:13

**predoctoral** 124:22, 23

**prefer** 19:22 91:23 101:12 190:5 193:12 242:18

**preferable** 107:4

**preference** 138:14 193:15

**preferences** 138:17

**preferred** 101:4 160:11,23 237:18

**prefers** 145:8 146:6

147:15 153:6 238:21

**pregnant** 37:19,24 38:3,4,17

**prenatal** 37:6

**preoccupied** 72:6

**preparation** 10:15,21

**prepare** 146:24

**prepared** 80:11

**prepubertal** 115:5 116:11,18 174:12 207:8 231:16,25 232:7,9,21,23 233:17, 20 234:9 249:21

**prescribe** 193:2,7

**prescriber** 254:2

**prescribing** 174:11

**prescription** 13:12

**present** 15:3 19:17 33:9 35:16 38:7 39:5 173:19 202:2 213:4 248:22

**presentation** 25:22, 24 73:14,16,19 75:16, 20 81:1 84:22 91:3, 12,15,19,20 92:3,4,6, 11,18,24 102:19,21 103:19 105:24 106:21 107:3 109:7 116:17 155:22 213:3

**presentations** 25:17,20 72:24 84:1 91:25

**presented** 173:14 254:10

**preserve** 170:1

**preserving** 169:25

**Pressing** 105:6

**pretty** 194:7

**prevalence** 184:10 255:25

**prevent** 174:11

**previous** 32:16 40:13 52:6,9 66:12,15 68:10,24

**previously** 39:4 40:17 52:15,17 64:25 65:11,14 80:5 91:2 107:25 111:24 118:6

**primarily** 24:11 29:1, 25 30:4 200:14 202:9, 24 203:5

**primary** 22:16,24 23:1,11,25 24:2 202:21 235:9

**principle** 157:20

**principles** 105:13 203:24

**prior** 122:24 124:8 206:10 209:11,17 234:5

**privacy** 97:1,5,7 98:2, 7,12,13,16,20 99:7,11

**private** 87:9,15,19 90:12

**privilege** 9:15

**problem** 14:17 71:8, 10,17 73:9 74:7 225:25

**problems** 92:25

**Procedure** 94:16

**procedures** 7:20 194:17,18

**proceed** 82:25 84:1

**proceedings** 257:11

**process** 95:22 191:14 205:21

**profession's** 214:22

**professional** 12:9, 19,21,23,25 14:2,21 17:22,25 23:7,24 24:8,10 25:10 29:17 37:22 45:3 61:20 73:21 117:8,16 119:11 123:3 138:25 139:11,24 140:8,16

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 283 of 293 PageID #: 1940

141:2 155:24 156:14 157:11 180:11 183:16 218:20 246:19

**professionally** 156:8

**professionals** 14:3 24:12 114:12,15 121:13 133:24 134:15 136:21 137:18 138:3, 9,16,20 173:12,16 174:25 178:1,22 179:7 180:12 207:20 212:4 219:16 221:8, 14 222:1 251:12

**professions** 17:16 109:24

**professors** 16:4 126:6

**profile** 130:1

**program** 164:2,5,8,9, 10,12

**prohibit** 222:14

**proliferation** 215:3

**promote** 87:24 88:5 134:3 157:21 161:21 223:8 224:13 233:11

**promotes** 159:8 224:10 237:13

**promoting** 171:13 226:15 242:15

**promotion** 227:12, 17,18

**pronoun** 142:15 144:12 160:4,11 237:12

**pronouns** 143:3,9, 15,16 144:1,4,7,9,15, 20,24 145:4,9,10,14, 15,16,17,24 146:5,8 147:3,15 160:19,23 237:17,18,22,23 238:2,9,20,24 239:3, 6,22,25 240:1

**proper** 207:10

**proposed** 173:8

**protect** 173:3 218:14 219:17 246:25

**protecting** 142:5

**Protective** 24:22 25:1 129:16

**protects** 172:2,7,19

**provide** 21:2,12 22:17 24:13 26:12 27:25 28:6 29:11,18, 21 37:18 43:22 44:12, 25 54:16 65:2 66:13 67:18,25 68:2,4 70:11 81:17 82:8 86:10,13 89:23 97:18 109:15 141:2 161:25 172:20, 22,25 179:9 182:25 183:2 185:4,11 187:8 212:16 216:16 235:6 247:18 254:25

**provided** 24:12 43:25 44:19 67:1 85:7 92:9 103:7 107:25 155:7 165:6 167:24 218:7

**provider** 20:16,20 25:15 54:19,25 65:2 70:7 102:25 122:9 136:14 137:22 142:16 143:19 150:7,11 155:19 156:6,9 157:11 161:18 162:5 165:21 185:24 186:9 231:12 235:9 237:11

**providers** 23:10,11 54:15 103:15 113:23 114:8 131:21 133:24 134:11 150:15 157:19 171:9,25 177:17 178:15,16 231:1,6 254:24

**providing** 25:4 78:3 85:6 99:6 122:13 132:4 174:2

**provision** 141:6,13

**Pseudotumor** 253:15

**psychiatric** 13:12 51:3,9,14,16 69:19

**psychiatrist** 12:23 51:17,18

**Psychiatrists** 13:10

**psychiatry** 13:4,7

**psychological** 25:5 53:1 62:21 72:16 73:1,17 95:11 106:23 140:15 160:12,15 198:24,25 199:21 211:3,17 213:5 241:15 255:24

**psychologically** 160:9 241:11 244:20

**psychologist** 12:19, 21 13:2 23:7 25:11,14 83:8 117:4 140:10,19 141:1 142:4,22 143:2, 6,10,13,15,19 144:18, 23 156:18,25 157:3,6, 10 158:11,15 160:21 162:4 176:12 182:5 191:23 202:6 203:24 204:17 207:14,17 210:14 215:6 223:3 242:2

**psychologist's** 159:2

**psychologists** 13:8, 17,24 51:20,25 99:19, 25 140:2,9,22 147:11 171:18 177:16,24 178:3,11 180:11 203:17,23 205:2 207:9 209:12 211:23 218:3 230:20,21

**psychology** 12:11, 14 13:6 15:15 16:8, 18,25 17:1,6,10 22:16 25:12 63:2,20 124:5,9 215:7 229:25 255:6

**psychosocial** 53:2 134:2 212:17

**psychotherapy** 148:3 149:6

**pubertal** 189:1,7,13 190:9 191:1,8 192:21

**puberty** 76:1 95:17,

21 115:6,7 122:19 185:4 189:15,16,25 190:1,3,4 192:2,12,16 193:2 209:11,17 234:19,20,22 253:6, 24 254:6

**puberty-blocking** 190:8

**public** 177:20 178:8, 10

**publication** 119:14 189:9 206:11

**publications** 101:7

**published** 50:11 51:13,15 52:18 119:1, 2,6 128:3,5,6 181:20 205:24 214:24 252:20

**publishes** 51:8

**pull** 74:24 75:11 79:24 84:18 92:4 108:10

**pulled** 79:13 80:1 103:9 116:3

**pulling** 197:22

**purpose** 101:17 133:17,22 134:14

**pursue** 70:8 185:16

**put** 79:20 94:20 198:17 227:23 236:10,13

---

**Q**

**Q&a** 107:4

**quality** 171:10

**quantify** 50:7

**question** 9:10,16 10:1,2 13:22 20:5 21:6 28:21 30:12 32:3 33:18 34:14,22 36:4,9 39:24,25 40:1,3 42:10,18 46:21 55:14 59:11 62:13 63:6,9, 12,14,17 64:6,22 65:4 66:9,11,14,22 67:13

68:1,5,7 69:3,5 79:14
80:14 82:18 86:2,14,
18 89:9 98:25 106:7,
10 107:16 108:20
111:3 113:11,25
114:25 115:9 118:3
119:25 121:21
135:10,17 139:23
140:18 141:10,13
147:7 148:15,22
149:2 153:2,9 154:10
156:4,24 157:2
158:17 162:20 172:15
173:2 177:19 186:4,
21,25 189:22 191:10
196:6,20 197:14
210:9 222:5,22,25
224:21 232:4 238:7,
13 242:5 244:25
245:2 246:2

**questioning** 82:19
83:24

**questions** 8:23 18:17
67:18 79:23 80:13,16
83:11 86:21 89:6 91:5
123:8 179:23 192:8,
20 199:7 213:23
256:5,12,20

**quick** 20:4

**quickly** 91:7 106:3
233:22

**quotation** 75:20
79:24 80:2,4 197:20

**quote** 78:20 79:2,4,
13,19

**quoting** 79:9

**R**

**Rafferty** 180:25
181:14

**raise** 82:20

**range** 113:22 123:17
205:4

**ranging** 101:9

**rapid** 58:5,10 214:21

**rapidly** 100:8,11

**rates** 126:18 255:25

**rationale** 205:11

**re-creation** 195:3

**re-review** 203:1

**reach** 142:17

**reached** 152:15,23
153:20 154:7,9

**read** 41:8 57:1,7
60:19 61:5 68:25
69:2,5,6 75:20,21
78:21 79:3,14 80:4
104:14 119:16,19,23
120:1,8,21 133:12
134:7 151:10 152:12
155:1 158:2 167:16,
21 168:17 182:17
183:12 189:6 203:15
205:12 206:23,24
210:3,5 216:15,20
228:10 251:7 257:9

**reading** 133:20
153:21,25 194:11
210:11

**reads** 118:21 131:2
255:17

**ready** 104:11

**real** 188:25

**realm** 230:25

**reason** 10:10 184:17

**reasonable** 155:7
207:9,14

**reasons** 72:7 137:19
138:21 164:14

**recall** 10:19 17:3,5
91:3 130:4 131:18
147:18 150:19,24
160:1 174:19,24
175:7,21 176:1,8
197:4 203:8

**recalling** 154:10
155:15

**receive** 16:17,25 17:9
125:6 165:7 195:23

196:2 234:23 247:19
248:3

**received** 16:7,20
18:2 37:6 53:9,13
167:25 196:12,16,19

**receiving** 16:24 17:8
38:12 163:17 164:16
195:17 197:5

**recent** 13:18 115:23

**recently** 253:5
254:13 255:4

**recess** 47:1 94:9
128:16 166:11 199:5
240:15

**recognize** 136:23

**recognized** 226:4,23
227:15

**recollection** 10:15
249:24

**recommend** 54:23,
25 144:24 147:11
163:6

**recommendation**
19:19

**recommendations**
133:8 251:18

**record** 9:2 22:21
32:13 46:24 75:7
78:20 79:2,8 80:10,17
82:21 83:23 91:9,11
94:8,11,12,15,20
104:4,8,10,13 128:15,
18 166:13,14 171:2
190:16 199:3,8
240:11,17

**recording** 103:2
240:10

**records** 165:5

**recount** 113:3

**redirect** 256:20

**reduce** 228:13,25

**reducing** 143:23
229:24

**reestablish** 199:4

**refer** 20:2 30:5,9 52:7,
11 56:7 96:17 144:13,
16 145:10 190:5
237:5 238:20

**reference** 52:24

**referenced** 51:7
90:23 91:1 100:25
204:12

**references** 28:25
203:8

**referencing** 231:13

**referred** 18:23 43:20
47:8 189:25 237:23

**referring** 30:1 151:16
231:10 236:7

**refers** 41:4,12 42:23
43:3 45:20 49:8 59:19
154:1 192:8

**reflect** 48:24 65:24
73:16 85:2 133:3

**reflected** 66:7,19

**reflecting** 45:14

**reflective** 68:12
153:23

**reflects** 27:21 133:7

**refresh** 10:15

**refused** 160:10

**regarded** 213:25

**regularly** 108:2

**reimbursable** 148:5

**reimburse** 147:22

**reject** 34:22 58:20,23

**related** 13:10 17:17
72:8 76:3 129:12,19,
22 130:7,15 140:19
153:22 180:13 182:13
192:20 216:18 232:16
255:11

**relates** 64:20

**relating** 141:23

relationship 124:21
125:1 136:10,14

released 250:21,22,
23 251:1

relevance 149:5
156:12 168:8 169:15,
22,23 170:5,6,12
176:14 236:22 248:7
254:16

relevant 85:5,14,22
86:6 95:1,9,12,14,18,
25 96:5,11,18,24
97:1,8,13 98:7 99:11
148:10 182:12

relied 11:2 12:9
164:21 218:10

relies 19:5

religious 158:5

rely 13:8,16,24 14:7
20:3,20 21:17 25:9
51:12,22 60:9,10
119:12 182:5,6 202:9,
14 218:3

remain 215:17

remains 219:2

remember 25:22
64:10 119:22 122:13
129:9,10,17,18
131:16 150:2,10,23
176:21 189:8 205:20

remembering 151:1

remind 40:2 195:15

reminder 163:22

remotely 7:17

removing 195:9,25

renounce 57:7,19,22,
25

repeat 13:21 21:7
32:4 42:10 89:9 106:7
107:17 108:20 111:2
147:6 153:10 172:14
186:24 197:13 208:19
222:25 225:23 232:3
239:19 245:2

repeatedly 39:20
142:14

repercussions
178:16

rephrase 124:17
161:5

report 10:17 11:1,3,
10,18 12:16 17:21,23
22:4 26:2,10,22 27:2,
10,19 28:1,4,9,12
29:8,11,16,22,25
30:13,20,25 31:3,12
32:6,10 40:20 41:22,
23 42:13,15 43:19,22,
23 44:13,20,24 45:2,
6,8,13,17,23 46:11,14
47:3,14,18,24 48:15
49:1 50:24 73:4 83:9
85:5,7,15,22 86:6
95:2,9,12,15,18,25
96:5,11,18,24 97:2,9,
15 98:8 99:1,8 102:11
112:6,7,13,14 127:21
128:7 146:20 153:24
172:12 173:1 180:20,
22 181:14 182:7
198:18 200:5 217:10
220:9 224:24 225:14
227:24,25 236:1
241:7,18 246:12

reporter 7:3,4 35:11
78:24 125:13 190:14
194:10 217:4 256:21,
24 257:4

Reporting 7:5

reports 58:4 98:12

represent 7:19 37:21
179:14

representative 44:8

represented 23:21
32:10 37:13 78:14
139:10 177:6

representing 7:24
8:14 98:20

reproduction 81:18
88:24 89:12,24

reproductive 194:15

195:6

reputable 119:8

request 67:10 93:9
94:21 142:18 164:13

requested 175:4
180:16

requesting 91:24

requests 151:9 152:5

require 171:22

required 16:2 125:6
163:13 186:4

research 13:9 62:13,
17 200:13 201:3,7,11,
18,24 211:8 214:24
215:3 237:11 251:16

reserve 94:21

residential 16:14

resiliency 134:3
161:21 223:9 224:11
233:11

resisting 155:5

resolved 71:22

resource 79:6,25
80:6 219:1,6,9

resources 137:20

respect 177:16,20
207:17

respected 148:2

respond 136:23
152:5 158:11

respondents 123:11

response 9:20
255:12

responses 158:3,8

responsibilities
140:17

responsive 152:10

rest 151:10 155:2
210:5

restart 94:24

restate 113:10
135:16 156:4 222:24

restricted 222:1

restricts 247:14

restroom 154:23
155:21

retransition 121:9,20

retransitioned
121:17

retransitioning
122:10

return 20:12 36:4
66:9 169:20,21 210:8

reversed 121:25
122:3,6

reversing 120:23

review 10:14 16:4
20:24 31:3,16 37:2
41:22 42:1 44:2 45:3
63:23 102:1 107:4,10
120:6 129:6 134:22
150:3,12 241:8 247:7
250:25 252:25

reviewed 10:17
11:24 31:12 32:1
42:10 126:4 202:8,19

reviewing 13:9 28:24
29:7 30:21 31:15
42:12 101:18

Revision 51:5

revoke 169:1

right's 78:4,8

right-hand 56:22
71:25 89:11 116:22
142:10 152:13 190:23
203:11

rights 156:1

Riley-swanbeck
8:11,12 71:16

risk 191:2 225:19
248:22 249:11,13
253:15 257:3

**risks** 191:7 245:9

**role** 23:6 24:18
137:18 138:10,17,21,
25 139:24 140:19,22
141:1 142:4 143:10
147:16,18 148:3
172:1 251:14

**role-playing** 146:23
147:1,9,12

**roles** 140:16 208:17,
23

**Romano** 131:11,12

**room** 33:19 231:11
245:1

**rooms** 246:2

**Royer** 7:25 71:11
74:3,10,16 95:3

**rules** 9:7 94:16
148:20

**Rysewyk** 8:15

────────

**S**

────────

**safe** 155:21 179:9
244:2

**Safer** 56:12

**safety** 98:4,14 99:9,
15

**SAITH** 257:10

**sample** 100:22,25
101:3,4,10,21,22
102:2

**Sanders** 8:13 71:9
190:10,13,20

**SB** 246:12,23

**scale** 134:13

**scenario** 21:12 34:7
54:24 145:24 149:24
243:25 244:11 246:9

**scenarios** 232:8
246:5

**schedule** 165:21

**Schmidt** 175:2

**school** 26:17 143:21,
24 149:18 150:8,18
151:8 152:16 154:24
155:4 179:12,14
222:15 247:19,22

**school's** 155:23

**schools** 178:21,23
179:8,14 198:3,13
240:20,25

**science** 27:7 62:22
109:22 125:7 127:13
220:25 221:19

**sciences** 108:1

**scientific** 12:9 20:21
61:12 100:3 132:1,7,
10,12 206:6 221:10

**scope** 82:20 83:7
85:8 86:10 89:5
145:25 146:10,19
147:24 148:9,13
149:4 156:11 168:8
169:15,22,23 170:5,6,
12 175:20 176:14
218:7 245:12 248:7
254:1

**screen** 20:8 115:18
166:21

**screenshots** 92:2

**scroll** 15:8 28:20
31:7,8,9,10,23,24,25
42:5,7,8,9 56:10,24
69:6 102:10 215:22
246:14,16

**scrolling** 14:16 22:7
56:17 127:25 216:3
225:23 246:16

**secondary** 234:24

**seconds** 250:5

**section** 216:5 246:11,
17,18

**seek** 54:11 195:19
196:7 230:2

**seeking** 139:11,12
224:12

**seeks** 54:17

**sees** 37:16 38:5

**select** 78:9

**selected** 78:12

**self-injurious** 213:6

**semester-long**
17:14

**Senate** 11:25 26:15

**send** 174:18

**sense** 9:23 41:4,12
42:23 43:4,14 44:11
45:11,14,21 46:2
48:25 49:4,5,9,22
50:14 59:3 65:19,25
66:8,19 68:13 70:18
96:15 111:25 205:14
219:15

**sensitive** 155:9

**sentence** 41:11,16,
19 48:13 58:9,15
60:13 99:7 126:22,23
133:20,21 134:5,7
150:13 151:10 152:3
171:25 179:2 184:13,
14 189:6 197:24
203:15,21 205:11,12
206:23,24 209:8
214:9,20 216:10
218:24 225:17 226:2
227:11 228:10 230:18
231:17 236:5

**sentences** 133:13
251:19

**separate** 91:22
241:11,19,23

**separated** 65:20
241:25

**separately** 91:25

**serve** 164:12 173:3
223:10 255:1

**served** 221:20

**serves** 172:3,7,19

**service** 21:2,13
254:13

**Services** 7:5 24:14,
20,23 25:1,9,18,25
72:25 129:16

**sessions** 146:23
147:1,9

**setting** 134:3 143:21

**settings** 130:11
131:3,20,22 145:16
179:6

**seventh** 250:15

**sex** 27:14,19,22,25
28:4,9,25 29:2,3,12,
19,22 30:1,2,5,9,12,
13,17 32:20,21,25
33:4,11,13,19,20,23
34:4,11,19 35:5,9,17,
20,23,25 36:3,5,7,10,
12,14,17,20,24 37:1,
8,9,12 38:8,13,16,20,
22,24 39:1,4,5,9,12,
16,17,20 40:6,8,9,10,
14,15 47:10,12 58:20
59:4 64:9,19 75:23
85:18 87:3,5 95:25
96:17,21,24 113:15,
19 114:3 118:7,10
145:7,18 146:8
158:13,19 161:8,14
182:16,17,24 188:13
194:23 195:8 205:6
209:10,16,21 211:7
216:8,9,10,21,22,23
229:6,8,21 230:9
234:24 235:1,4
237:17,23 238:3,9,11,
16 242:1,25

**sexes** 64:4,11,22
65:1 126:17,24 127:1,
2,6,16

**sexual** 34:3,9 75:24
78:23 79:5,25 80:6
83:8 85:3,4,11,14,17,
21,25 86:5,8 90:3
92:25 96:4,8,10,14
119:7 128:24 129:25
227:14

**sexuality** 75:22,25
76:2,4 82:21,22 85:18

**SGM** 158:3 172:3,8, 20 173:3

**SGN** 137:21

**shaking** 9:21

**shape** 76:4 141:19 194:9,13,21 196:1

**share** 74:8

**shared** 39:3 113:4,8 174:22

**sharing** 49:7 115:12

**she'll** 28:20

**she/her** 144:10 145:10

**Shelley** 7:11

**shirt** 77:5,14,18,20

**short** 77:4 108:13 170:11 237:14 240:7

**show** 84:22 92:24

**showing** 87:3

**shown** 225:18

**side** 75:19 76:7 89:11 116:22 152:13 198:18 203:11 223:23 226:7, 12 227:23

**sides** 223:3,7

**sign** 257:9

**signed** 175:23 176:16

**significance** 236:17

**significant** 61:23 69:20 100:17 102:3,6 109:19 228:14 254:23

**significantly** 117:9

**signs** 38:6 167:15

**silently** 155:1

**similar** 19:1 69:11 70:15 72:2 188:10 208:6 247:20

**Similarly** 9:9

**simply** 249:11

**single** 101:8

**singularly** 155:19,25 156:9

**sir** 116:24 217:4 257:5

**sitting** 34:17

**situated** 64:15

**situation** 33:9 67:16 104:3 237:9 239:20

**situations** 21:10 131:22 159:6 162:14 233:19

**size** 101:21,22

**sizes** 100:22,25 101:4,10 102:2

**skip** 74:12

**slide** 76:7,8 78:10,22 79:5,9,20 80:1,3,11 81:1 84:22 87:8,12,13 88:5 89:1 90:24,25 92:24 93:6,19,23 94:3 116:5,9,16,23,25

**slides** 83:25 91:1 104:16

**Slight** 73:7

**slow** 215:7

**small** 100:22 101:8 105:11 108:8,23 109:2,7,13 110:3,7, 11,15,20,22

**smaller** 101:4,21

**snippet** 109:8

**social** 44:3,6,7 60:13, 16 61:8,13,17,21,25 62:2,6 63:3,20,25 175:17 191:20 198:2, 12 231:18 232:6,9,14, 25 233:5,9 234:4,5,16 243:14 249:21 250:1 251:5,9,16,21

**socially** 232:1,22 234:10

**societal** 177:16

**society** 19:7,10,13 21:18 23:22 55:18 56:6,8 60:8,10 77:9 107:25 159:5 202:10, 20 228:6

**socioeconomic** 158:5

**sociopolitical** 151:7, 12,14

**solely** 27:15

**someone's** 96:17 247:24

**sort** 25:5 75:7 98:22 104:9 119:12 147:10 151:18 156:1 178:3 180:7 182:4 194:5 218:9 226:19

**sorts** 177:2,7 180:6

**sought** 256:7

**sounds** 19:1 190:18 199:10 209:4 210:25 230:15

**source** 78:22 79:4,9, 12,20 80:5,11 85:3 87:11 88:3,4 218:2 224:5

**sources** 202:21 218:3

**Southeastern** 15:22

**spaces** 179:8

**speak** 64:8,18 143:10 148:17 191:24 192:4, 8 232:16

**speaking** 71:6 91:16 94:19 105:22,23 139:15,20 148:13,24 177:24 178:6 241:4

**special** 180:14

**specialist** 20:1

**specializing** 14:4

**specialty** 191:9

**specific** 12:22 31:16 44:24 98:11 100:25

101:1 113:22 147:7 153:1 174:12 176:2 193:18 214:17 216:5 218:19 231:13 246:8

**specifically** 13:11 17:5 20:2 46:4 52:25 62:7 134:23 137:13 150:20 153:22 163:19 173:7 174:19 180:16 186:3 192:9 201:18 215:23 229:13 232:24 246:3 247:8

**specifics** 17:4 70:2 119:13 129:7 175:7 212:11 235:8 239:19

**spectrum** 184:11 213:7 256:1

**spell** 9:3

**spent** 29:7 30:20 94:12 166:14

**sports** 15:21 26:18 27:5,6 153:5 248:23

**staff** 152:4 167:20

**stage** 81:5 84:25 86:24 93:20

**stamp** 108:13

**stance** 224:10

**standard** 171:15,19, 21,23 252:20

**standards** 13:15,18, 25 14:1,8 19:6,9,20 21:15,25 185:3 202:14,19 203:12,18, 22 204:9,13,21 211:4 228:7 249:16,20,23 250:16,18,20,25 251:3,24 252:1 253:1

**standing** 82:20,23 83:23 216:1

**stands** 40:13 66:12 68:11 137:3 148:21

**start** 7:22 11:5 15:1 42:2,3 87:3 108:14 112:20 124:22 163:6, 7,9,16 235:14

**starting** 24:20 133:13 251:7

**starts** 68:24 149:13

**state** 7:19,21,24 9:1 60:23 64:6 80:10 109:22 124:7 127:13 172:1,18 173:8 217:15,24 218:2 219:1,24 220:2,14,24 221:18 223:13 248:3, 4

**stated** 64:25 94:17 205:22

**statement** 27:21 47:15 60:21 61:3 106:19,20 107:2,6,11 108:15 109:6 111:11 112:15 152:21 155:11 172:5 179:3 184:16, 18 191:4 198:4 205:10,17,19 209:3, 14 212:19 213:10 215:1 219:4 220:1 222:17 225:13 226:1, 6,12,21 227:16 231:22

**statements** 205:8 211:18 218:21

**states** 7:13 98:12 124:8 150:22 208:23 226:21

**statistical** 51:4 101:25 132:21,22 133:1

**statistically** 101:20

**statistician** 102:1

**status** 158:5

**stay** 227:24

**stenographic** 7:4

**step** 15:5 137:18 138:10,17,21,25

**Stephanie** 8:1

**steps** 167:7

**stereotypically** 77:4, 10

**stethoscope** 76:13 77:25 78:5,7

**stop** 123:8

**stopped** 105:18 106:17 109:4 121:25 122:3,6

**stopping** 120:22

**straddles** 47:5

**straight** 67:24

**strategies** 134:11 207:22

**strengthened** 214:25

**striped** 77:5

**striving** 161:17

**strongly** 137:24 226:2

**structure** 219:8 242:5

**student** 142:13 144:2,13,16 145:11 146:4,6 147:13,14,15 151:2

**students** 26:17 146:24 147:12 179:16 242:9,24 246:13,22 247:4,6,10,11,19

**studies** 100:21 101:8, 9 105:11 108:8,24 109:2,14 110:3,8,11, 16,21,22 117:19,24 118:13 135:3 246:14, 17

**study** 17:12 62:20,24 100:4 101:13,20 164:11 202:2,3

**styled** 77:14

**subject** 129:2,11,12, 20 130:4,15 131:16 136:5

**subjects** 26:21

**submission** 180:13

**submitted** 126:2 223:18 224:2

**submitting** 128:6 153:24

**Subsequently** 118:23

**substance** 126:20

**substantive** 55:14

**success** 251:11,22

**sufficient** 192:15

**suggest** 29:17 148:4

**suggests** 62:6 135:25 184:9 185:8

**suicidal** 213:5 225:19

**suicidality** 136:1

**suicide** 135:4,8,21 136:2,6,8,9,13,17,19

**Supervisor** 24:23

**support** 61:12 108:4 131:19,21 134:12 150:9,17 152:21 156:16 164:16,21 176:17 179:16 181:2 185:19 188:1 211:18 220:8

**supported** 87:20 88:15 209:5

**supporting** 130:10 131:2 142:6 171:13 180:14,17 209:9,15 230:1

**supportive** 105:14 143:22 158:20 159:17,20 160:2 239:25

**supports** 150:21 157:12

**suppression** 189:1, 7,14 191:1,8

**suppressors** 190:1,4

**surgeon** 195:1 196:6

**surgeries** 193:23,24

194:3,5,6,16 195:14 196:5

**surgery** 52:22 53:9, 21,25 54:4,7,11 69:25 70:8,11 187:22 188:5 194:8,12,14,15,20 195:5,6,17,19,22,24 196:2,7,13,16,19 197:1,5,8,11 244:17

**surgical** 53:13,16 54:16,20,21,23,25 118:22

**surrounding** 150:22

**Survey** 118:23

**survivors** 126:17

**suspect** 70:4 176:22

**swayed** 155:8

**swim** 243:21

**swimsuit** 243:22 244:7,8,13

**switch** 104:25

**sworn** 8:20

**symbol** 74:11

**symptom** 53:3

**symptoms** 53:1,5

**system** 74:5 90:20,23 151:8 155:4

**systemic** 134:13

**systems** 130:11 131:4,20 165:19

---

**T**

---

**table** 182:9,11,18 183:7,11 191:14,18 194:7,12

**tables** 85:2

**taking** 10:12 20:7 222:21 224:10 226:7, 12

**talk** 13:8 15:6 142:20 233:22

talked 72:23 83:4,8

talking 44:10 50:15 82:20 96:14 98:11,22 142:22 143:2,7 177:8 231:16 233:15 241:9

Tara 8:5

targeted 176:17,20 178:7

targeting 178:11

task 88:9,12,24 89:13, 16,19,23 90:3,4,10,16

tasks 81:14,16 85:1 87:24 93:21

Tavistock 254:14 255:3

Taylor 8:3

teach 90:11

teacher 142:17,21,23 143:3,7 144:18,23,24, 25 145:9,11,23 146:5, 6,7 147:14

teacher's 143:14 146:2

teachers 142:16 146:13,17,25 147:4

teaching 96:10

team 19:25 23:10 33:5 104:25 152:20 153:6,14,16,18,19,22 154:4 163:4 185:18 187:18 242:5,6,9,18, 21 243:21

teams 26:18 241:11, 19,23,25 243:11

tech 38:14 104:3

teen 168:20

Teen's 169:5

teenagers 115:6

telling 39:15

tells 238:14,17

ten 68:16,21,23 127:9 166:8 212:10 250:5,6

255:18,21

ten-minute 46:20 240:12

tend 13:8 59:24 230:23

Tenncare 149:8

Tennessee 7:12,14 8:8 9:2 16:17 24:14 25:17 72:25 124:5,7 129:15 150:18,21 151:2 152:8,23 153:19 154:7,9 173:8 175:9,13,18,23 176:2, 10,11 224:17

Tennessee's 26:15

tension 21:11

term 46:16 52:3 64:12 98:16 121:8,10,14 127:1 139:4,7,9 160:14 179:13 182:15,16 183:7,10, 13 186:19,22 188:7 190:5 193:13 216:6 218:20 237:14 241:17

terminology 30:16, 19 32:24 39:12,14 48:1,7,22 49:9 50:8, 11 52:7 100:3 127:6, 8,12,16 193:18 214:9, 14,21 215:9,13,16,18

terms 52:15 121:3,6, 20 142:4 182:12 183:25 192:24 193:12 230:24 231:2,6 234:13

testified 8:20 66:2

testify 8:24 25:6

testifying 12:13 67:16 83:7

testimony 10:11 23:2,6 24:1 172:6,10, 22 173:14,19,23,25 174:1,2,6,7,9,10 192:11,16

testosterone 235:20

text 11:24 51:5 123:13 138:1 169:4 200:16 208:23

TGD 103:14 130:10 134:1 136:25 137:2,3 154:21 171:10 179:9 184:10,22 197:25 198:11

TGNC 200:12,14 206:20 207:1,4,6 214:11,25

therapeutic 16:12 136:13

Therapist 180:10

therapy 13:9 105:10 108:7,22 109:1,12 163:6,8,9,20,23 177:9,11,13 185:12, 16,22 186:12 193:6, 10 209:22,24 210:12, 13,14,16,22 211:1,16 212:1,12,13,22 230:16 234:21,23 253:15

thesis 15:24 16:2,5, 10 125:6 126:2,9 127:9

thesis's 126:13

they/them 144:12 145:9,14,23

things 45:1 80:8 100:5 151:16 157:18 219:17 235:22

thinking 112:1 122:22 196:22

thought 204:20

thoughtful 187:15

thousands 101:10 102:6

time 7:8,18 14:1 17:24 31:22 38:8 41:7,21 42:1 49:24 67:22 73:9 78:13 84:8 94:1 105:12 108:8,12, 24 109:3,11,14 110:3 112:1 133:4,9 147:22

150:25 152:24 153:10 164:20 169:2 171:15, 20,23 193:18,19 197:1 206:6,7 211:19, 21 228:1 240:9,10 250:3

timely 225:18

times 63:11

title 102:21 115:21 118:20 125:21 126:3, 5 128:25 130:2,13 131:1,2 180:1 181:4 253:17

titled 56:4 128:22 130:9 253:15

today 8:25 10:11 18:15 48:16 72:23 81:24 83:11 89:18 107:12 110:4 112:15 114:16 127:3,6,8,14 181:21 231:22 249:17 255:10 256:5

today's 7:7 10:21

toddlers 76:19 78:15

told 112:24

tomorrow 190:20,21

top 22:5,13 97:17,21 103:17 119:3 129:9, 18 133:15 154:15,16 168:17,21 171:24 194:8,12,20 196:12, 16,19 197:11 203:4,7 247:9

topics 26:24 27:1 118:13

totally 67:9,22

touching 77:22,25 78:1

tracking 199:13

trained 51:19 164:12 221:7

trans 164:1,5,9,11,17, 19,22

Transcollaboration 180:5

**transcribed** 256:22

**transcript** 9:19 29:6
76:10

**transgender** 14:5
16:18 17:1,5,9,18
18:20 19:2 22:17
26:16 47:10,19,21,25
48:5 61:24 85:9 98:3,
5 99:11 100:14,18,21
106:23 107:13,20
109:18,20 111:6
112:11,25 113:7
114:22 117:21 129:3,
20,22 130:5,7,16
131:19 133:25 135:3,
7,20,25 137:3,5,10,14
140:3,11 141:14,23
143:18 146:23 147:2,
13,19 149:17 153:5
156:7 158:14,24,25
159:12,13,16,22
160:1,7 161:2 162:17
173:4 176:18,20,24
179:16 180:17 181:3
184:23,25 185:4,12,
22 187:2,5,12,20
188:3,20 198:15,25
200:18 201:3,11,19
207:10,18 209:19
214:10 218:14,25
219:3 222:12,14
223:14 226:8 235:18
236:6 237:2,6,16
238:4 239:3,9,18,24
240:19,22 242:24
243:4,8,9,10,14,19,21
244:6,16,21 245:5,18,
25 246:12,22,23
247:4,6,10,14 248:3,
12,20 249:8 255:13,
17,23

**transgender-related**
152:1

**transgender/gender**
102:24 103:13 115:24
130:10 131:3

**transition** 60:14,16
61:8,13,17,21,25
62:2,6 63:3,20,25
118:22 120:23 121:25
122:3,6 230:22,24

231:18 232:1,6,14,22,
25 233:5,9 234:4,5,
10,17 240:20 241:1
243:15 249:21 250:1
251:5,15,17,21

**transition-related**
230:25

**transitions** 232:9
251:9

**trauma** 25:10 125:24
126:17

**trauma-informed**
105:13 129:15

**Travis** 7:25 11:8
55:20 73:25 74:8
78:17 83:18 118:16
125:10 130:19 165:24
168:12 181:7 188:23
199:24 217:17 225:5
250:7 252:6 253:9

**treat** 13:12 123:14,18
161:1,6,12 162:3
169:11 171:18 224:11

**treated** 53:25 54:3,6
55:2 113:19 114:4
118:21 121:24 158:24
159:11

**treating** 53:17 54:7
72:20 107:21 111:5
124:15,16,18,19,25
125:2 186:8 207:18
223:21 224:4

**treatment** 16:15
19:25 20:24 21:19
26:14 53:9,14,20,22
55:16 69:24,25 70:5
85:10 106:23 122:20
124:21 161:20
162:10,15 163:4,14,
17,19 185:18,19,21
186:2,5,15 187:7,11,
18,20 188:1 195:18
204:6 207:10,21,22
208:12 228:12,17,20,
24 229:14,15,17,23
230:14 231:13
232:17,20 233:6,10
250:1 252:3

**treatments** 52:21
56:4 235:20

**trend** 222:13,19

**trip** 154:12

**troubling** 240:24

**true** 180:19 255:23

**trust** 199:11

**truth** 105:15 110:25
111:7,11

**truthful** 10:11

**turn** 73:3 80:20 83:18
97:15 103:22 126:8
142:10 154:13 157:23
164:1 168:24 179:24
182:9 188:23 217:13
222:10 228:9 235:25
244:18 249:15 251:2

**turned** 167:20

**turning** 22:4 24:4
27:10 47:3 191:12
246:20

**tweak** 183:1

**two-** 81:16 82:1,9

**type** 167:25

**types** 226:13

**typical** 78:14 194:9

**typically** 27:14,22
33:4 182:20 216:11
236:3,6 237:20

**U**

**uh-huh** 69:6 73:24
106:5 120:22 137:16
139:9 151:5,20 154:5
165:17 172:21 177:10
182:14 183:13 188:9
190:24 193:17 194:7,
22 205:7 213:1
220:11

**ultimately** 155:8

**ultrasound** 37:17
38:2,5,13,14 216:12

**ultrasounds** 37:18,
24

**unable** 10:11 214:2

**unacceptable**
210:14,17

**uncomfortable**
246:1,2

**undergrad** 16:23

**undergraduate**
16:24

**undermines** 223:20
224:3

**underneath** 81:7

**understand** 9:25
23:14 39:14,22,24
43:15 46:4 62:20
66:25 67:5 69:1 83:3
88:10 89:4 96:23
98:16 110:10 134:20
139:7 141:21 145:2
161:24 164:9 169:1,
23 170:2,10,23 171:4
191:24 204:12 205:3
220:9 222:18 230:6
231:1,5,10 239:12
241:18 247:3

**understanding**
17:22 43:10 49:3,10
50:10 58:23,25 59:20
62:22 65:19 69:17,18,
23 85:4 87:25 88:6,15
94:15 98:17 99:18
110:12 112:4 127:12
148:1 165:16 170:6
189:19,23 195:2
198:9 215:14 222:20
223:22 235:7 249:19
254:19

**understandings**
28:5,8

**understood** 10:1
45:11 107:2 184:12
256:4

**underway** 9:6

**unethical** 210:17
211:7,13,16 212:5
230:15

uniform 244:1

Union 8:4

unique 49:10,13 50:3
53:21 112:23 136:23
202:3

United 7:13 254:12

University 15:12,17
16:17,21,25 17:13
18:13 24:18 37:18,23
125:7 131:13 164:11
165:1 166:22 168:18
175:1

unprofessional
138:24

update 109:21
217:15,24

updated 50:9 205:21
215:17

updates 218:2,21
252:2,4

updating 108:2
193:19

upper 75:14 92:22
142:10 179:1 212:14

usage 142:15 143:3

utilized 17:23

V

vagina 195:10 196:1

vaginal 88:25 89:12

valid 52:11 101:21
138:2,7

validated 155:23
207:7

validity 10:9 116:11

values 75:23

Vanderbilt 18:10,13,
19 24:18 37:17,23
70:11 72:20 131:13
164:10,25 165:10,12,
17 166:22 167:7,11,
13,19 168:6,11,18,20

169:13,19 174:21,25

Vandy 15:19

variety 82:6 137:19
158:8 164:13 171:22
195:13

vary 112:22 144:4
158:8

Vaughn 8:8

verbal 9:20

verified 167:14

verify 88:4

version 169:9
250:18,23 251:25
252:10

versus 116:12,18

video 84:6 92:14,22
93:17,18,19 94:2
104:2,14 105:4,7,18
106:13,17 107:9
108:9,10,25 109:4
114:20 115:16,21

videoconference
7:16

view 59:15 204:8
209:23 210:21 224:5,
16 227:2 249:2
252:14

viewed 211:22

views 144:25 251:12

vigorously 219:25
220:15

violence 79:6,25 80:6
98:5

visibility 198:14

visible 33:16 197:25
198:12

visit 167:13

visits 164:15

voice 162:12

voices 214:25

volunteer 164:12

VPATH 18:24 19:1
21:2 22:14 23:8
113:19,21 114:4,12
122:5,25 123:3 149:8
163:16,23 164:21
190:9

VUMC 165:25

W

wait 108:19

waiving 257:9

walk-in 167:13

wanted 39:25 93:14,
15 104:24 217:6
244:7 257:7

War 15:20

warnings 253:6,23
254:3,6

watch 93:5 108:9

watching 107:8

ways 82:6 131:19,20
176:21

weaken 177:15

weakening 177:20

wear 243:22 244:7,8,
12

wearing 77:5,13

website 104:15,19
165:25 166:23,24
168:3,10

week 10:24

weeks 38:3,4,13

weighty 136:5

wellbeing 142:5,7
143:11 156:16
157:13,21 159:9
160:6 222:8 223:9
224:10,13 226:16
233:11 237:13 242:15

wellness 171:13

widely 143:16 212:2

228:5

Wilmer 8:12

wished 154:11

wishes 162:12 237:3

woman 205:15

womb 36:23 37:1,10
38:25 39:8,15,17
40:7,10

women 58:8,17
222:14

wonderful 74:4

word 32:9,12,13,17
33:11,19 34:4,18 35:6
40:23,25 44:21,22
45:6,7 46:7,11 64:11
66:15 99:3 120:25
134:20 198:8 216:1
220:6,9 233:23

words 31:1,16 32:5

work 13:16 18:15
23:8 25:8 83:12
123:15 131:12 157:20
161:17,20 168:1
178:22 179:7 192:21
208:9 219:16

worked 18:19 53:12
159:15 196:23

working 14:4 15:19
16:13 18:9 25:10
109:21 142:13
200:11,18,23 207:5
219:24 220:14

works 71:23 206:9

world 44:9 88:16

worsen 145:20

WPATH 13:15,18,24
14:1,7,10,24 19:1,6,9,
13,20 21:3,14,18,24
23:22 107:25 159:4
161:17 202:10,14,20
211:4,12 228:7
249:16 251:24 252:20

WPATH's 19:2

wrap 256:4 257:2

Case 3:21-cv-00835   Document 57-12   Filed 10/07/22   Page 292 of 293 PageID #: 1949

**write** 47:7 150:16

**writing** 132:7,11,13

**written** 48:25 223:25

**wrong** 70:20

**wrote** 15:24 47:13
48:14 125:25 137:25
172:4

---

**X**

---

**XY** 34:2,15

---

**Y**

---

**y'all** 15:7 26:4 71:4,
15,18 74:23 75:2 91:5
94:6 128:9 199:2
240:6 256:10

**y'all's** 71:18

**year** 14:10 26:1
124:23 238:4

**years** 18:5,6,7 76:20
78:11 109:11 112:21
114:7,14 124:12,19
125:2 127:9 153:20
168:20 181:20 193:20
206:2,5,9,10 211:25
212:9,10 239:8
255:18,21

**you-all** 74:14 190:20

**young** 53:12 78:15
88:14 112:21 123:15
146:12

**younger** 112:21
114:12 197:8

**youngest** 112:24
114:2 196:18,23
197:4

**youth** 102:24 103:14
115:24 116:9 130:10
131:3,19,21 136:25
137:2 152:17 156:7
158:3 159:7 171:11
179:6 184:21,23
197:25 198:11
200:12,19 201:4,12,

---

19 203:8 207:11
222:12 223:14 227:12
246:24 247:14

**youth's** 155:20

**youths'** 225:18

**Youtube** 84:5,14
91:16 92:5 114:20

---

**Z**

---

**Zoom** 20:8 71:22

**zoomed** 120:15