# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

L.E., by his next friends and parents,
SHELLEY ESQUIVEL and MARIO
ESQUIVEL,

     Plaintiff,

v.

BILL LEE, et al.,

     Defendants.

Case No. 3:21-cv-00835

Chief Judge Waverly D. Crenshaw Jr.
Magistrate Judge Alistair E. Newbern

## KNOX COUNTY DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.01(b), Defendants Knox County Board of Education ("KCBOE") and Superintendent Jon Rysewyk (the "Superintendent") (collectively "Knox County Defendants") submit this Response to Plaintiff's Statement of Undisputed Material Facts and state as follows:

**L.E. Is A Transgender Boy**

    1.    Plaintiff L.E. is a fifteen-year-old boy. Declaration of L.E. ¶2, Ex. 1 ("L.E. Decl."); Deposition Transcript of L.E. at 6:11-16, Ex. 2 ("L.E. Dep.").

**RESPONSE:** It is undisputed that L.E.'s sex at birth was female but has since 2019 identified as a male including using a typical male name and adopting customarily male grooming and dressing habits. (Compl. ¶¶ 75-76, Doc. 1, PageID# 22-23).

2.      L.E. is currently a tenth-grade student at Farragut High School, a public high school in Knoxville, Tennessee.  L.E. Decl. ¶2; L.E. Dep. at 6:14-16.

**RESPONSE:** Undisputed for the purposes of summary judgment.

3.      Farragut High School is a public high school that is part of the Knox County Schools public school system.  Deposition Transcript of Jennifer Hemmelgarn at 25:1-26:14, Ex. 7 ("Hemmelgarn Dep.").

**RESPONSE:** Undisputed for the purposes of summary judgment.

4.      L.E. was assigned the sex of female at birth.  L.E. Decl. ¶3; Deposition Transcript of Shelley Esquivel at 6:19-23, Ex. 3 ("Shelly Dep."); Knox County Defendants' Responses to Plaintiff's First Set of Requests for Admission ("KCD RFA Resp.") #1, Ex. 13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

5.      L.E. has a male gender identity.  L.E. Decl. ¶3; KCD RFA Resp. #2-3.

**RESPONSE:** L.E. currently identifies as male. (Compl. ¶¶ 75-76, Doc. 1, PageID# 22-23).   The definition of "Gender Identity" is not identified in this Statement of Undisputed Material Facts.

2

6.      A person's "gender identity is a fundamental and core component of human identity."  Expert Report of Dr. Melissa A. Cyperski ("Cyperski Rep.") ¶12, Ex. 18.

**RESPONSE:** It is undisputed that this accurately reflects Dr. Cyperski's expert report.

7.      The term "cisgender" refers to people who have a gender identity that aligns with their sex assigned at birth.  Cyperski Rep. ¶13.

**RESPONSE**: Undisputed for the purposes of summary judgment.

8.      Transgender people have a gender identity that does not align with the sex that they were assigned at birth.  Cyperski Rep. ¶13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

9.      Because L.E.'s female sex assigned at birth and male gender identity are not in alignment, L.E. is considered a transgender boy or male.  L.E. Decl. ¶3; Deposition Transcript of Dr. Penny Schwinn at 13:11-18, Ex. 5 ("Schwinn Dep."); Deposition Transcript of Dr. Sara Heyburn Morrison at 92:3-14, Ex. 6 ("Morrison Dep."); Hemmelgarn Dep. at 13:16-14:2; KCD RFA Resp. #3.

**RESPONSE:** It is undisputed that L.E. is a transgender boy.

10.     L.E. feels like he has "always been a boy."  L.E. Decl. ¶3; L.E. Dep. at 33:11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

11.     For example, he has "always preferred … boys' clothes and … activities," L.E.

Decl. ¶¶3,9; Shelley Dep. at 7:7-9; L.E. Dep. at 26:4-10, and has long "gravitated towards boys'

clothes and wanting to do things with other boys," L.E. Decl. ¶¶3-9; Shelley Dep. at 8:9-16;

Deposition Transcript of Mario Esquivel at 23:10-19, Ex. 4 ("Mario Dep.").

**RESPONSE:** Undisputed for the purposes of summary judgment.

12.     L.E. also told his parents that he was anxious about the changes to his body that

female puberty would cause, and he expressed a desire for a deeper voice, Shelley Dep. at 7:7-9,

14:4-9, 22:20-22.

**RESPONSE:** Undisputed for the purposes of summary judgment.

13.     In late 2019, when he was in seventh grade, L.E. told his parents that he did not

feel like a girl and considered himself a boy.  L.E. Decl. ¶4; Shelley Dep. at 7:5-11; Mario Dep.

at 23:3-24:13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

4

14.     L.E.'s parents were "not very surprised" when L.E. told them he considered himself a boy.  L.E. Decl. ¶4; Shelley Dep. at 8:9-16; Mario Dep. at 23:10-19.

**RESPONSE:** Undisputed for the purposes of summary judgment.

15.     The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") recognizes that an incongruence between gender identity and sex assigned at birth can cause severe psychological distress, a condition the DSM-V recognizes as "gender dysphoria."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 452 (5th ed. 2013), *available at* https://tinyurl.com/jp2453k7, Ex. 33.

**RESPONSE:** Undisputed for the purposes of summary judgment.

16.     Singling out transgender individuals can further stigmatize and isolate transgender individuals.  Cyperski Rep. ¶25; Expert Report of Helen Carroll ¶44, Ex. 19 ("Carroll Rep.").

**RESPONSE:** It is undisputed that this accurately reflects Dr. Cyperski's and Dr. Carroll's expert reports.  This is not an admission that KCBOE or its employees or officers in any way singled Plaintiff out at any time material to this action.

17.     L.E. did not feel comfortable living as a girl and experienced significant anxiety as a result of the disjunction between his female sex assigned at birth and his male gender identity.  L.E. Decl. ¶¶6, 18, 21, 22; Shelley Dep. at 22:11-22; Mario Dep. at 26:6-28:6, 50:6-25; *see* L.E. Dep. at 31:5-12.

**RESPONSE:** Undisputed for the purposes of summary judgment.


18.     In 2020, L.E. saw his pediatrician to discuss ways to assist with his extreme discomfort with his sex assigned at birth and to assist in his transition.  L.E. Decl. ¶5; Shelley Dep. at 9:6-17; Plaintiff's Responses to Defendants Penny Schwinn, Sara Heyburn Morrison, and the Tennessee State Board of Education's Second Set of Interrogatories #2, Ex. 16 ("L.E. Resp. to SD Int.").

**RESPONSE:** Undisputed for the purposes of summary judgment.


19.     Following consultations with multiple doctors and a mental health therapist, L.E. was diagnosed with gender dysphoria on January 28, 2021.  Declaration of Samuel Steinbrugge ¶5, Ex. 12; L.E. Decl. ¶6; L.E. Dep. at 41:14-42:10; Shelley Dep. at 21:22-22:4; L.E. Resp. to SD Int. #1.

**RESPONSE:** Undisputed for the purposes of summary judgment.

6

20.     As part of his treatment plan for gender dysphoria, L.E. is "being allowed to …

live his life as a boy."  Shelly Dep. at 23:7-11; L.E. Decl. ¶¶4-11; *see also* L.E. Resp. to S.D. Int.

#2 (L.E. began his social transition in 2020).

**RESPONSE:**  Undisputed for the purposes of summary judgment.


21.     Living in accordance with one's gender identity is referred to as social

transitioning.  Cyperski Rep. ¶23.

**RESPONSE:** Undisputed for the purposes of summary judgment.


22.     L.E. has legally changed his name from a traditionally feminine one to a

traditionally masculine one.  L.E. Decl. ¶9; L.E. Dep. at 26:11-27:2; Shelley Dep. at 16:14-

17:11; Mario Dep. at 51:13-18.

**RESPONSE:** Undisputed for the purposes of summary judgment.


23.     L.E. uses male pronouns.  L.E. Decl. ¶9; Shelley Dep. at 19:8-17.

**RESPONSE:** Undisputed for the purposes of summary judgment.


24.     L.E. uses the boys' restrooms.  L.E. Decl. ¶9; Shelley Dep. at 66:14-18.

**RESPONSE:** It is undisputed that L.E. and his mother reported that he uses male restrooms.

25.     L.E. dresses and grooms himself in traditionally masculine ways.  L.E. Decl.

¶¶3,9; Shelley Dep.at 17:12-18:3.

**RESPONSE:** Undisputed for the purposes of summary judgment.



26.     L.E.'s family, peers, and teachers regularly recognize him as a male.  L.E. Decl.

¶10; L.E. Dep. at 26:19-27:9, 41:14-25; Mario Dep. at 51:22-52:2; Deposition Transcript of John

Bartlett at 35:11-36:10, Ex. 8 ("Bartlett Dep.").

**RESPONSE:** Undisputed for the purposes of summary judgment.



27.     Much of L.E.'s gender-dysphoria-related anxiety has been significantly alleviated

since he began living and being recognized as a boy.  L.E. Decl. ¶10; Shelley Dep. at 23:10-11.

In the words of L.E.'s father, a "weight lifted off [L.E.'s] shoulders" after he began socially

transitioning.  Mario Dep. at 66:14-23.

**RESPONSE:** Undisputed for the purposes of summary judgment.

28.     L.E. is currently receiving puberty-delaying medications that prevent the development of feminine features inconsistent with his gender identity.  L.E. Decl. ¶8; L.E. Dep. at 28:8-10; Shelley Dep. at 23:12-17.

**RESPONSE:**  Undisputed for the purposes of summary judgment.


29.     L.E. began taking pubertal suppression medications on April 23, 2021.  L.E. Decl. ¶8; Shelley Dep. at 43:3-9; L.E. Resp. to SD Int. #3.

**RESPONSE:** Undisputed for the purposes of summary judgment.


30.     L.E will begin testosterone treatment in October 2022 in order to cause a puberty consistent with his gender identity.  L.E. Decl. ¶8; L.E. Dep. at 28:11-16; Shelley Dep. at 14:10-24.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**Benefits Of Participating In Interscholastic Athletics**

31.     Participation in interscholastic sports, including at the high-school level, "has long-lasting, definitive benefits," Deposition Transcript of Jonathan Higgins at 28:12-22, Ex. 9 ("Higgins Dep."), and is often considered a "pivotal and life-changing experience," Carroll Rep. ¶41. *Accord id.* ¶¶35, 37; Cyperski Rep. ¶29; KCD RFA Resp. #18-20; Knox County Defendants' Answer ¶¶40-47, Dkt. 20 ("KCD Answer"); Morrison Dep. at 37:15-38:17; Schwinn Dep. at 190:12-192:11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

32.     The benefits of participating in interscholastic sports include the development of resilience, discipline, teamwork, and other life skills not taught in the classroom.  Carroll Rep. ¶¶37-38; Cyperski Rep. ¶¶29-30; KCS RFA Resp. #21; KCD Answer ¶43; Higgins Dep. at 29:10-11; Bartlett Dep. at 24:19-26:12; Morrison Dep. at 37:15-38:17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

33.     Participation in interscholastic athletics also generally provides various benefits, including social and psychological benefits, to students who participate.  Carroll Rep. ¶¶36-38; Cyperski Rep. ¶29; KCD RFA Resp. #18-20; KCD Answer ¶44.

**RESPONSE:** Undisputed for the purposes of summary judgment.

34.     Participation in sports has also been shown to increase young people's self-esteem and decrease the likelihood that young people will engage in illicit activities, such as drug and alcohol abuse.  *See* Cyperski Rep. ¶29; Carroll Rep. ¶¶36-39, 43-44; KCD RFA Resp. #18-20; Bartlett Dep. at 30:1-32:16; Mario Dep. at 75:12-77:6.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**Tennessee's Interscholastic Athletics Policy Before SB 228**

35.     Tennessee has a system of sex-segregated interscholastic sports at the middle and high school levels which depend on the sport in question and the level of interest in playing the sport that exists at a given school.  Tennessee Secondary School Athletic Association Handbook, at 31-37, Ex. 30 ("TSSAA Handbook"); Hemmelgarn Dep. at 59:12-18, 129:11-18.

**RESPONSE:** Undisputed for the purposes of summary judgment.

36.     Some sports (such as girls' volleyball or girls' softball) are designated exclusively for girls.  TSSAA Handbook at 32, 36; Hemmelgarn Dep. at 59:12-18, 129:11-18.

**RESPONSE:** Undisputed for the purposes of summary judgment.

11

37.     Many other sports are divided into boys' and girls' teams provided there is enough interest at the school to form both teams.  TSSAA Handbook at 31-37; Hemmelgarn Dep. at 51:5-52:12, 53:9-54:8, 55:15-59:11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

38.     Golf is in the category of sports teams that are divided into boys' and girls' teams. TSSAA Handbook at 31; Higgins Dep. at. 18:21-19:1.

**RESPONSE:** Undisputed for the purposes of summary judgment.

39.     A third category of sports (e.g., football) are, as a default, not explicitly gender-specific.  TSSAA Handbook at 31; Hemmelgarn Dep. at 54:9-55:4, 59:12-61:3, 129:22-130:13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

40.     A recent example of a coed football team was FHS's football team, which had a female player during the 2021 season.  Deposition Transcript of Donald Dodgen at 35:15-16, Ex. 10 ("Dodgen Dep.").

**RESPONSE:** Undisputed for the purposes of summary judgment.

41.     This female student-athlete played on the offensive line, a "high-contact" role that often involves tackling and being tackled by other players.  Dodgen Dep. at 42:4-43:7.

**RESPONSE:** Undisputed for the purposes of summary judgment.

42.     The principal of FHS had no concern about this female student-athlete safely participating on the FHS football team.  Bartlett Dep. at 45:6-8.

**RESPONSE:** Undisputed for the purposes of summary judgment.

43.     Sex-segregated sports teams existed in Tennessee prior to SB 228.  *See* KCD RFA Resp. #15.

**RESPONSE:** Undisputed for the purposes of summary judgment.

44.     The entities that oversee middle and high school athletics in Tennessee public schools are the Tennessee Secondary School Athletic Association ("TSSAA") and its affiliate entity the Tennessee Middle School Athletic Association ("TMSAA").  State Defendants' Answer ¶56, Dkt. 19 ("SD Answer"); Declaration of Mark Reeves. ¶¶1-5, Ex. 11 ("Reeves Decl."); Schwinn Dep. at 34:17-21; Hemmelgarn Dep. at 46:3-19.

**RESPONSE:**   Undisputed for the purposes of summary judgment.

13

45.     Many schools—including all Knox County Schools—are members of the TSSAA and follow TSSAA policies for interscholastic athletics to the extent those policies are not inconsistent with federal, state, or municipal law.  *See* Hemmelgarn Dep. at 47:18-48:5, 50:3-51:4, 99:20-100:6, 119:19-121:6.

**RESPONSE:** Undisputed for the purposes of summary judgment.

46.     Before SB 228 was signed into law, TSSAA had a policy allowing all students "to participate in TSSAA/TMSAA activities in a manner that is consistent with their gender identity, irrespective of the gender listed on the student's record."  Reeves Decl. ¶¶6-8; TSSAA/TMSAA Transgender Policy, Ex. 32 ("Prior TSSAA Policy").

**RESPONSE:** Undisputed for the purposes of summary judgment.

47.     All TSSAA policies are subordinate to duly enacted state law.  Bartlett Dep. at 87:22-88:6; Dodgen Dep. at 71:17-72:2.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**Tennessee Enacts SB 228 Into Law**

48.     On February 8, 2021, Senate Bill 228 ("SB 228") was introduced in the Tennessee Senate.  *See* Bill History of HB 3 and SB. 228, Tenn. General Assembly, *available at* https://tinyurl.com/38srfma2 (last viewed Oct. 7, 2022).

**RESPONSE:** Undisputed for the purposes of summary judgment.

49.     SB 228's text specifically identified concerns over "girls who compete in interscholastic athletic activity" as a motivation for the legislation.  Tennessee Pub. Ch. 40, No. 228, Ex. 24 ("Pub. Ch. 40").

**RESPONSE:** Undisputed for the purposes of summary judgment.

50.     A prefatory clause of SB 228 posits that the "dreams, goals, and opportunities for participation, recruitment, and scholarships can be directly and negatively affected by new school policies permitting boys who are male in every biological respect to compete in girls' athletic competitions if they claim a female gender identity."  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

51.     Another prefatory clause of SB 228 asserts that "allowing boys to compete in girls' athletics competitions discriminates against girls by regularly resulting in boys displacing girls in competitive events and excluding specific and identifiable girls from opportunities to compete at higher levels and from public recognition critical to college recruiting and scholarship opportunities that should go to those outstanding female athletes."  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

52.     Another prefatory clause of SB 228 claims that "studies show that boys, on average can be physically stronger than girls, having more skeletal muscle mass than girls and more upper-body and lower-body strength, which can result in injury to girls if girls participate in contact sports with boys."  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

53.     State Defendants have pointed to SB 228's prefatory clauses, including those mentioned in the three preceding paragraphs, as "provid[ing] some governmental interests" furthered by SB 228.  Response of the Tennessee State Board of Education to Plaintiff's First Set of Interrogatories #6, Ex. 14; Response of Dr. Penny Schwinn, Commissioner, Tennessee Department of Education, to Plaintiff's First Set of Interrogatories #6, Ex. 15; Morrison Dep. at 62:17-63:2.

**RESPONSE:** Undisputed for the purposes of summary judgment.

54.     Section 1(a) of SB 228 amended Tennessee Code Annotated Title 49 to specify that "a student's gender for purposes of participation in public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate."  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

55.     Section 1(b) of SB 228 directed the "state board of education, each local board of education, and each governing body of a public charter school [to] adopt and enforce policies to ensure compliance with" the law.  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

56.     SB 228 passed both chambers of the Tennessee Legislature, and was signed into law by the Governor on March 26, 2021.  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

57.     SB 228 took effect in the 2021-2022 school year.  Pub. Ch. 40.

**RESPONSE:** Undisputed for the purposes of summary judgment.

58.     In January 2022, a follow-on bill to SB 228 called Senate Bill 1861 ("SB 1861") was introduced in the Tennessee Senate. *See* Bill History of SB. 1861, Tenn. General Assembly, *available at* https://tinyurl.com/d96ujyn4 (last viewed Oct. 7, 2022); Morrison Dep. at 54:1-5.

**RESPONSE:** Undisputed for the purposes of summary judgment.

59.     SB 1861, which amends the same chapter of the Tennessee Code Annotated as SB 228, permits the Commissioner of the Tennessee Department of Education ("TDOE") to "withhold a portion of the state education finance funds" if a school district does not comply with SB 228.  Tennessee Pub. Ch. 909, No. 1861, Ex. 25 ("Pub. Ch. 909").

**RESPONSE:** Undisputed for the purposes of summary judgment.

60.     The Governor signed SB 1861 on April 22, 2022.  Pub. Ch. 909.

**RESPONSE:** Undisputed for the purposes of summary judgment.

61.     SB 1861 went into effect on July 1, 2022.  Tenn. Code Ann. § 49-6-310(b)(1).

**RESPONSE:** Undisputed for the purposes of summary judgment.

**Defendants Take Steps To Enforce SB 228**

62.     Defendant State Board of Education ("SBOE") is primarily responsible for developing policies and rules affecting education in the State of Tennessee.  SD Answer ¶14; Schwinn Dep. at 32:14-33:15, 74:19-75:1; Morrison Dep. at 21:11-22:17, 108:3-109:20.

**RESPONSE:** Undisputed for the purposes of summary judgment.

63.     Among other powers, SBOE has primary rulemaking authority over education in Tennessee.  Schwinn Dep. at 33:13-15, 74:19-75:1; Morrison Dep. at 21:11-22:17, 44:3-45:11, 108:3-109:20.

**RESPONSE:** Undisputed for the purposes of summary judgment.

64.     SBOE's authority to set policies and rules for the Tennessee public education system extends to setting policies that the Tennessee Department of Education ("TDOE") must follow.  Morrison Dep. at 41:2-21; Schwinn Dep. at 40:10-16, 75:2-4.

**RESPONSE:** Undisputed for the purposes of summary judgment.

65.     TDOE is the entity principally responsible for enforcing and implementing statutes related to public education and rules promulgated by SBOE.  SD Answer ¶13; Schwinn Dep. at 32:14-33:5, 70:2-9, 135:12-136:6, 173:21-175:17; Morrison Dep. at 44:3-45:11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

19

66.     TDOE receives federal financial assistance.  Schwinn Dep. at 35:3-5, 36:6-8, 37:20-22.

**RESPONSE:** Undisputed for the purposes of summary judgment.

67.     TDOE is responsible for ensuring that Local Education Areas ("LEAs") comply with relevant rules and policies. Schwinn Dep. at 32:14-33:5, 135:13-136:6, 173:21-175:17; Morrison Dep. at 108:3-109:20.

**RESPONSE:** Undisputed for the purposes of summary judgment.

68.     LEAs are required to provide TDOE with reports signaling their compliance with various state laws, including SB 228.  Schwinn Dep. at 173:21-175:17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

69.     SBOE is currently developing a rule (the "Funding Rule") that will implement SB 228 and SB 1861.  Morrison Dep. at 54:12-15, 55:14-61:11, 107:20-109:20.

**RESPONSE:** Undisputed for the purposes of summary judgment.

70.     As currently written, the Funding Rule will permit TDOE to withhold "state education finance funds" from any LEA—including Knox County—not in compliance with SB 228.  SBOE Rule 0520-01-23, Ex. 29; Morrison Dep. at 54:12-15, 61:3-17, 107:20-109:20; Schwinn Dep. at 135:13-138:2.

**RESPONSE:** Undisputed for the purposes of summary judgment.

71.     The Funding Rule authorizes TDOE to withhold the state education funding of any LEA that does not comply with SB 228.  Morrison Dep. at 107:20-109:20; Schwinn Dep. at 176:4-180:6.

**RESPONSE:** Undisputed for the purposes of summary judgment.

72.     Day-to-day enforcement of SB 228 is primarily done at the county level. Hemmelgarn Dep. at 43:6-45:10; Schwinn Dep. at 158:18-159:3.

**RESPONSE:** Undisputed for the purposes of summary judgment.

73.     Education policies in Knox County are set by the Knox County Board of Education ("KCBOE").  Hemmelgarn Dep. at 25:1-13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

74.     KCBOE members are elected by the voting public of Knox County.  Hemmelgarn Dep. at 25:14-26:14.

**RESPONSE:** Undisputed for the purposes of summary judgment.

75.     KCBOE is a recipient of federal financial assistance.  KCD RFA Resp. #22; KCD Answer ¶103.

**RESPONSE:** Undisputed for the purposes of summary judgment.

76.     Knox County Schools ("KCS") is the entity that implements the policies enacted by KCBOE.  Hemmelgarn Dep. at 25:1-13.

**RESPONSE:** Undisputed for the purposes of summary judgment.

77.     The leader of KCS holds the title of "Superintendent."  Hemmelgarn Dep. at 26:15-27:11.

**RESPONSE:** It is undisputed for purposes of Summary Judgment that the chief executive of the Knox County school systems is its Director of Schools, colloquially referred to as "Superintendent."

78. Following SB 228's enactment, KCBOE revised its Interscholastic Athletics Policy ("I-171 Policy") in July 2021. Hemmelgarn Dep. at 79:8-80:16, 96:2-16; Higgins Dep. at 75:12-76:1.

**RESPONSE:** Undisputed for the purposes of summary judgment.

79. The new I-171 Policy states that "a student's gender for purposes of participation in middle or high school athletics is determined by the student's sex at the time of the student's birth. A valid original birth certificate must be provided for this purpose." Knox County Board of Education Policy I-171: Interscholastic Athletics, Ex. 31.

**RESPONSE:** Undisputed for the purposes of summary judgment.

80. Farragut High School is obligated to comply with the revised I-171 policy. Hemmelgarn Dep. at 29:1-4, 119:19-120:6; Higgins Dep. at 78:7-10.

**RESPONSE:** Undisputed for the purposes of summary judgment.

81. Any failure to abide by the I-171 Policy would trigger an investigation and, ultimately, "there would be action taken" by KCS. Hemmelgarn Dep. at 45:6-10, 101:6-103:10.

**RESPONSE:** Disputed as written. As KCBOE's 30(b)(6) witness testified, KCBOE is unaware of any transgender student who has attempted to participate in interscholastic athletics on a team that differs from the sex of their birth since the passage of SB 228. (Hemmelgarn Depo., 105-106).

This includes the Plaintiff who has not tried out for the Farragut golf team or spoken to anyone at Farragut about trying out for a golf team. (L.E. Depo., 19-20, 40, Doc. 58-2). There is no evidence in the record that KCBOE has removed funding from a school as a result of any violation of this policy or that any KCS employee has been disciplined or terminated as a result of violating this policy. KCBOE's 30(b)(6) witness testified that if there was a violation of the policy, KCBOE would follow the procedure it follows for any policy violation-namely investigating the alleged violation and taking appropriate action. (Hemmelgarn Depo. At 45:6-10). For these reasons, Knox County Defendants dispute Plaintiff's characterization of the deponent's testimony.

82.     The revised I-171 Policy will remain in place unless affirmatively repealed, even if SB 228 itself is no longer operative. Hemmelgarn Dep. at 114:10-17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

83.     In light of SB 228's enactment, the TSSAA policy authorizing students to participate on interscholastic athletics teams consistent with their gender identity is no longer operative. KCD RFA Resp. #9; Morrison Dep. at 80:11-81:11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**L.E. Loves To Play Golf**

84.     L.E. has played golf since the summer of 2018.  L.E. Decl. ¶11; L.E. Dep. at 6:17-18; Plaintiff's Responses to Defendant Knox County Board of Education's First Set of Interrogatories #7, Ex. 17 ("L.E. Resp. to KCD Int.").

**RESPONSE:** Undisputed for the purposes of summary judgment.

85.     L.E. first played at a free golf clinic at a local course in the Knoxville area.  L.E. Decl. ¶11; Shelley Dep. at 24:3-11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

86.     After playing golf for the first time, L.E. began to "really, really love" the sport. L.E. Decl. ¶11; L.E. Dep. at 6:19-24; 31:10-11.

**RESPONSE:** Undisputed for the purposes of summary judgment.

87.     L.E. loves that playing golf requires skill, focus, and determination.  L.E. always wants to play more.  L.E. loves the challenge of having to focus on improving his game and feels really proud when he can see how his focus pays off.  L.E. Decl. ¶¶13-14.

**RESPONSE:** Undisputed for the purposes of summary judgment.

88. In the summer of 2018, L.E.'s parents bought him some golf clubs and golf shoes. L.E. Decl. ¶11; L.E. Dep. at 7:7-11; 13:18-22.

**RESPONSE:** Undisputed for the purposes of summary judgment.

89. Beginning in the summer of 2018, L.E. started taking golf lessons. L.E. Decl. ¶15; L.E. Dep. at 14:4-16:6. Over the next three years, L.E. took golf lessons from several instructors as often as weekly. L.E. Decl. ¶15; L.E. Resp. to KCD Int. #7.

**RESPONSE:** Undisputed for the purposes of summary judgment.

90. L.E. plays golf with his father, including at various courses throughout the Knoxville area. L.E. Decl. ¶16; L.E. Dep. at 12:3-13:7; 36:13-18; Shelley Dep. at 36:15-21; Mario Dep. at 7:20-9:1; L.E. Resp. to KCD Int., #3-6.

**RESPONSE:** It is undisputed that L.E. plays golf with his father. However, L.E. primarily plays par-three golf courses which typically consist of nine holes and the holes themselves are a shorter distance from the tee than they are at an 18-hole course. (Mario Esquivel Depo., 7:12-16, 20-23, Doc. 57-6). Further, from January 1, 2022-July 13, 2022, L.E. played one round of golf. (Mario Esquivel Depo., 33:17-25, 34:1-5, Doc. 57-6).

91. L.E. tries to go to the driving range a few times a month. L.E. Decl. ¶16; Mario Dep. at 18:16-20.

26

**RESPONSE:** Undisputed for the purposes of summary judgment.

## SB 228 Bars L.E. From The FHS Boys' Golf Team

92.     In seventh and eighth grade, before L.E. changed his name or began puberty suppression treatment, L.E. played on the Farragut Middle School ("FMS") girls' golf team. L.E. Dep. at 41:14-42:10; L.E. Decl. ¶¶8-9, 17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

93.     L.E. felt an overwhelming sense of discomfort playing on the FMS girls' golf team, and he found the experience "embarrassing," and a "little angering." L.E. Decl. ¶18; L.E. Dep. at 30:16-24, 31:8.  That is because L.E. did not feel like himself because he feels that he is "a boy and it [was] awkward to be the only boy playing on a girls' golf team."  L.E. Decl. ¶18; L.E. Dep. at 30:16-24; *see also* Shelley Dep. at 29:1-11; Mario Dep. at 17:11-17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

94.     During his eighth-grade golf season, L.E. felt it was essential for him to play on the boys' team when he got to high school, and he has consistently expressed his desire to play on the FHS boys' golf team since.  L.E. Decl. ¶19; L.E. Dep. at 18:1-6; 20:12-16; Shelley Dep. at 30:20-31:5; Mario Dep. at 74:4-10.

**RESPONSE:** Disputed for the purposes of summary judgment. It is undisputed that L.E. has

never spoken to anyone at Farragut High School about playing golf on the boy's team.

(Deposition of L.E., p. 39-40, Doc. 58-2).


95.     L.E. feels it is important to play on the boys' golf team at FHS because "[he is] a

boy," and he wants to be able to be who he is while also playing the sport he loves. L.E. Decl.

¶19, 23; L.E. Dep. at 17:23-18:5; Mario Dep. at 15:8-21.

**RESPONSE:** Undisputed for the purposes of summary judgment.


96.     Before the passage of SB 228, L.E. would have been eligible to play on the FHS

boys' golf team assuming he had successfully tried out. Prior TSSAA Policy; Higgins Dep. at

80:15-20; Dodgen Dep. at 71:16-72:14.

**RESPONSE:** Undisputed for the purposes of summary judgment.


97.     Now that SB 228 and the revised I-171 Policy provide the governing law, L.E. is

barred from the boys' golf team. KCD RFA Resp. #6, 16; Schwinn Dep. at 197:8-15;

Hemmelgarn Dep. at 99:5-19, 119:19-121:17.

**RESPONSE:** Undisputed for the purposes of summary judgment.

98.     The reason SB 228 bars L.E. from the boys' golf team is because L.E.'s sex assigned at birth of female does not match his male gender identity.  Schwinn Dep. at 83:11-22, 84:1-85:3; Bartlett Dep. at 41:4-42:18.

**RESPONSE:** Undisputed for the purposes of summary judgment.


99.     If L.E. was a cisgender boy, i.e., if L.E. was assigned the male sex at birth, he would be eligible to join the FHS boys' golf team.  Hemmelgarn Dep. at 121:13-122:5; Schwinn Dep. at 90:5-91:9.

**RESPONSE:** Disputed as written.  L.E. would only be eligible to join the FHS boys' golf team if he tried out successfully. Players who try out for the FHS boys' golf team need to shoot average score of 90 or better for 18-walking holes through 3 rounds to make the team. (Higgins Depo., 38:21-22, 39:1-6, 51:5-16, Doc. 57-5)  It is further undisputed that L.E. has never tried out for any golf team at FHS. (Shelly Esquivel Depo., 33:5-8, Doc. 57-7)  Finally, it is undisputed that L.E. has never spoken to anyone at FHS about playing on any golf team. (Deposition of L.E., p. 39-40, Doc. 58-2).


100.    In light of L.E.'s previous discomfort when he participated on the FMS girls' golf team, and the importance to his gender dysphoria treatment of living as a boy in all aspects of his life, L.E. and his parents agree that the harm to L.E. of feeling "out of place" playing on the high school girls' team, Mario Dep. at 74:4-75:5, would "far outweigh the benefits that he would get

29

from playing on a girls' … team," Shelley Dep. at 30:6-15. *See* L.E. Dep. at 29:8-30:14; L.E. Decl. ¶22.

**RESPONSE:** Undisputed for the purposes of summary judgement.

101.    The passage of SB 228 made L.E. feel very angry, "devastated," "not worthy," and like an "outcast" because he would be unable to play for the boys' golf team.  L.E. Decl. ¶¶20, 24; Shelley Dep. at 61:1-12; Mario Dep. at 75:17-77:6.

**RESPONSE:** Undisputed for the purposes of summary judgment.

102.    Even though playing sports, and specifically golf, makes L.E. "really, really … happy," Mario Dep. at 54:17-23, L.E. has not played golf for a school team his freshman and sophomore year because SB 228 only permits him to play on the girls' team, which he does not feel he can do. *id.* 71:21-72:2; L.E. Decl. ¶22; L.E. Dep. at 42:11-14.

**RESPONSE:** Disputed as written.  Setting aside issues of gender, L.E. would only be eligible to join the FHS golf team if he tried out successfully. (Higgins Depo., 38:21-22, 39:1-6, 51:5-16, Doc. 57-5).

103.    L.E. has not tried out for the boys' golf team because he saw "no point" to doing so if he couldn't ultimately play with the team.  L.E. Dep. at 19:2-4.

**RESPONSE:** It is undisputed that L.E. has not tried out for any golf team at FHS.  (Deposition of L.E., p. 39-40, Doc. 58-2).

104.     After this suit was filed, County Defendants offered L.E. an opportunity to try out for the FHS boys' golf team, an offer L.E. rejected as "meaningless" because even if otherwise successful, he still would be unable to join the team.  Shelley Dep. at 33:19-34:5.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**SB228 Differs From The Policies Of Elite Sports Organizations In Its Categorical Exclusion Of Transgender Males From Competing On Male Sports Teams**

105.     Since 2004, the International Olympic Committee ("IOC") has allowed transgender athletes to participate in accordance with their gender identity in elite Olympic-level competitions so long as certain requirements are met.  Carroll Rep. ¶26.

**RESPONSE:** Undisputed for the purposes of summary judgment.

106.     The IOC's current policy, updated in 2021, delegates to each sport's governing body the responsibility of "develop[ing] eligibility criteria for their individual sports."  Carroll Rep. ¶28.

**RESPONSE:** Undisputed for the purposes of summary judgment.

107.     To date, no body governing an individual Olympic sport is known to have categorically banned transgender athletes from participating based on transgender status.  Carroll Rep. ¶28.

**RESPONSE:** Undisputed for the purposes of summary judgment.

108. In January 2022, the National Collegiate Athletics Association ("NCAA") delegated the promulgation of eligibility determination policies to each individual sport's national governing body. Carroll Rep. ¶33.

**RESPONSE:** Undisputed for the purposes of summary judgment.

109. Only one governing body, USA Swimming, has issued a policy pursuant to the NCAA's delegation. Carroll Rep. ¶34.

**RESPONSE:** Undisputed for the purposes of summary judgment.

110. That policy does not impose a categorical ban on transgender athletes participating on teams consistent with their gender identity. Carroll Rep. ¶34.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**<u>Barring L.E. From The Boys' Golf Team Does Not Further Opportunities For Cisgender Girls In Interscholastic Sports</u>**

111. The State Defendants have produced an expert report from Dr. Gregory A. Brown, Ph.D., FACSM, claiming that individuals assigned the sex of male at birth have inherent and enduring physiological advantages over individuals assigned the sex of female at birth that enable individuals assigned the sex of male at birth, regardless of gender identity, to outperform "equally aged, gifted, and trained" individuals assigned the sex of female at birth. Declaration of Gregory A. Brown, PhD., FACSM, at 4, Ex. 20.

32

**RESPONSE:** Undisputed for the purposes of summary judgment.

112.    Dr. Brown has acknowledged that his report does not discuss "competitive advantages that transgender boys have against non transgender boys in athletics." Deposition Transcript of Dr. Gregory Brown at 26:14-20, Ex. 22.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**<u>Barring L.E. From The Boys' Golf Team Does Not Further The Safety Of Cisgender Girls Participating In Interscholastic Sports</u>**

113.    The State Defendants have produced an expert report from Dr. Chad T. Carlson asserting that "participation by biological males in …girls' or women's sports, based on gender identity, creates significant additional risk of injury for the biologically female participants competing alongside these transgender athletes." Declaration of Dr. Chad T. Carlson, M.D., FACSM, at 1-2, Ex. 21.

**RESPONSE:** Undisputed for the purposes of summary judgment.

114.    Dr. Carlson has acknowledged that his report contains no opinion on whether transgender boys competing on boys' interscholastic sports teams pose heightened safety risks to cisgender boys competing in those same events. Deposition Transcript of Dr. Chad Carlson at 67:20-21,70:2-15, 277:14-20, Ex. 23 ("Carlson Dep.").

**RESPONSE:** Undisputed for the purposes of summary judgment.

115.     Golf is considered a non-contact sport.  KCD RFA Resp. #5; Dodgen Dep. at 48:11-14; Higgins Dep. at 31:13-15; Carlson Dep. at 77:4-9.

**RESPONSE:** Undisputed for the purposes of summary judgment.

116.     Dr. Carlson has acknowledged that his report contains no opinion on whether transgender individuals competing in non-contact sports pose heightened safety risks to cisgender individuals competing in those same events.  Carlson Dep. at 76:5-14, 77:10-16.

**RESPONSE:** Undisputed for the purposes of summary judgment.

**Several Pieces Of Legislation Pertaining To Transgender Individuals Have Recently Been Enacted, Both In Tennessee And Nationwide**

117.     In the same session SB 228 was passed, the Tennessee Legislature passed legislation barring health care providers from prescribing to prepubertal minor children hormone treatments for gender dysphoria or gender incongruency.  2021 Tennessee Laws Pub. Ch. 460, Ex. 26.

**RESPONSE:** Undisputed for the purposes of summary judgment.

118.     In the same session SB 228 was passed, the Tennessee Legislature passed legislation barring transgender youth from using school restrooms and other facilities consistent with their gender identity.  2021 Tennessee Laws Pub. Ch. 452, Ex. 27.

**RESPONSE:** Undisputed for the purposes of summary judgment.

119.    In the same session SB 228 was passed, the Tennessee Legislature passed legislation requiring that parents be notified, and have the right to opt out, of any classroom discussion involving gender identity.  2021 Tennessee Laws Pub. Ch. 281, Ex. 28.

**RESPONSE:** Undisputed for the purposes of summary judgment.

120.    In the first quarter of 2022, more than 130 pieces of legislation specifically targeting transgender people had been introduced in state legislatures across the county.  Henry Berg-Brousseau, *ICYMI: As Lawmakers Escalate Attacks on Transgender Youth Across the Country, Some GOP Leaders Stand Up for Transgender Youth*, Human Rights Campaign (Mar. 24, 2022), *available at* https://tinyurl.com/392wcmxz, Ex. 34.

**RESPONSE:**  Undisputed for the purposes of summary judgment.

Respectfully submitted this the 4th day of November, 2022.

s/Jessica Jernigan-Johnson
DAVID M. SANDERS (BPR # 016885)
Senior Deputy Law Director
JESSICA JERNIGAN-JOHNSON (BPR # 032192)
Deputy Law Director
Suite 612, City-County Building
400 Main Street
Knoxville, TN  37902
(865) 215-2327

*Counsel for Defendants, Knox County Board of Education, Knox County Schools and  Dr. Jon Rysewyk*

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing was filed electronically on the date recorded by the Court's electronic filing system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties who have filed an appearance in the case, by and through the following counsel:

Sasha Buchert
LAMBDA LEGAL DEFENSE AND EDUCATION
   FUND INC.
1776 K Street NW, 8th Floor
Washington, DC 20006-5500
Tel: (202) 804-6245
sbuchert@lambdalegal.org

Leslie Cooper
L. Nowlin-Sohl
Meredith Taylor Brown
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lcooper@aclu.org
lnowlin-sohl@aclu.org
tbrown@aclu.org

Tara L. Borelli (*pro hac vice*)
Carl S. Charles (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
   FUND INC.
1 West Court Square, Suite 105
Decatur, GA 30030-2556
Tel: (404) 897-1880
Fax: (404) 506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Stella Yarbrough
Lucas Cameron-Vaughn
Thomas H. Castelli
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
tcastelli@gmail.com

Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street, 45th Floor
New York, NY 10007
Tel: (212) 937-7294
alan.schoenfeld@wilmerhale.com

Matthew D. Benedetto
Thomas F. Costello-Vega
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Tel: (213) 443-5300
matthew.benedetto@wilmerhale.com
thomas.costello@wilmerhale.com

Jennifer Milici
John W. O'Toole
Wilmer, Cutler & Pickering Hale and Dorr,
LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6256
jennifer.milici@wilmerhale.com
john.o'toole@wilmerhale.com

Clark Lassiter Hildabrand
Stephanie A. Bergmeyer
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-6828
clark.hildabrand@ag.tn.gov
stephanie.bergmeyer@ag.tn.gov

Emily L. Stark (*pro hac vice*)
Samuel M. Strongin (*pro hac vice*)
Britany Riley-Swanbeck (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel: (202) 663-6000
emily.stark@wilmerhale.com
samuel.strongin@wilmerhale.com
britany.riley-swanbeck@wilmerhale.com

s/Jessica Jernigan-Johnson
JESSICA JERNIGAN-JOHNSON

38