**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

L.E., by his next friends and parents, SHELLEY
ESQUIVEL and MARIO ESQUIVEL,

     Plaintiff,

v.

BILL LEE, et al.,

     Defendants.

Case No. 3:21-cv-00835

Chief Judge Waverly D. Crenshaw Jr.
Magistrate Judge Alistair E. Newbern

---

**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

---

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff L.E., by his next friends and

parents Shelley Esquivel and Mario Esquivel, respectfully submits the following memorandum

of law in opposition to Defendants' motions for summary judgment, Dkt. 46, 54.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.   L.E. HAS STANDING ................................................................................................. 3

     A.   L.E.'s Injuries Are Neither Speculative Nor Hypothetical ...................................3

     B.   State Defendants Have Caused L.E.'s Injuries ......................................................7

     C.   L.E.'s Injuries Are Redressable .............................................................................8

II.  SOVEREIGN IMMUNITY DOES NOT BAR ANY OF L.E.'S CLAIMS ......................... 9

     A.   *Ex Parte Young* .....................................................................................................9

          1.   State Defendants .......................................................................................... 10

          2.   County Defendants....................................................................................... 12

     B.   Title IX's Abrogation Of Sovereign Immunity ...................................................14

III. SB 228, AS APPLIED TO L.E., VIOLATES THE EQUAL PROTECTION CLAUSE.................... 15

     A.   SB 228 Discriminates Against L.E. Because He Is A Transgender Boy..............15

     B.   SB 228's Exclusion Of L.E. From The Boys' Golf Team Is Subject To
          Intermediate Scrutiny...........................................................................................17

     C.   The Application Of SB 228 To L.E. Fails Intermediate Scrutiny ........................21

     D.   The Application Of SB 228 To L.E. Cannot Survive Rational Basis Review.......25

     E.   SB 228 Does Not Constitute Government Speech .................................................27

IV.  SB 228, AS APPLIED TO L.E., VIOLATES TITLE IX..........................................................28

CONCLUSION....................................................................................................................... 33

i

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982)...........................12

*A.M. ex rel. E.M. v. Indianapolis Public Schools*, --- F. Supp. 3d ---, 2022 WL
2951430 (S.D. Ind. July 26, 2022)............................................................28

*American Atheists, Inc. v. Port Authority of New York & New Jersey*, 760 F.3d
227 (2d Cir. 2014)..........................................................................27

*Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992)...............................23

*Bostock v. Clayton County*, 140 S.Ct. 1731 (2020) ........................................17, 18, 29, 30, 31, 32

*B.P.J. v. West Virginia State Board of Education*, 550 F. Supp. 3d 347 (S.D.
W.Va. 2021)................................................................................28

*Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) .................................18

*Bucklew v. Precythe*, 139 S.Ct. 1112 (2019) ................................................30

*Camreta v. Greene*, 563 U.S. 692 (2011) ...................................................31

*Chisholm v. St. Marys City School District Board of Education*, 947 F.3d 342 (6th
Cir. 2020) .................................................................................29, 30

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985) ............................25

*Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S.Ct.
1009 (2020)................................................................................30

*Cutter v. Wilkinson*, 423 F.3d 579 (6th Cir. 2005) .......................................32

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419 (6th Cir. 2014)....................30

*Doe v. DeWine*, 910 F.3d 842 (6th Cir. 2018) ........................................9, 10

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018)....................17

*Ex Parte Young*, 209 U.S. 123 (1908) ......................................................9

*Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142 (3d
Cir. 2019).................................................................................27

ii

*Franks v. Kentucky School for the Deaf*, 142 F.3d 360 (6th Cir. 1998) ..................................14, 32

*Freedom from Religion Foundation, Inc. v. City of Warren*, 707 F.3d 686 (6th Cir. 2013) ....................................................................................................................27

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ...........................................................19

*Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020) ....................................8, 15, 17, 18, 19, 20, 32

*Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265 (6th Cir. 1994) ...........................14

*Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418 (6th Cir. 2022) ...................................3

*Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005).................................32

*Jana-Rock Construction, Inc. v. New York Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006) ........................................................................................20

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................................13

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999) ....................................................6, 7

*Lawrence v. Texas*, 539 U.S. 558 (2003) ....................................................................17

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ...............11

*Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) ...........................30

*Love v. Beshear*, 989 F. Supp. 2d 536 (W.D. Ky. 2014) ............................................19

*Loving v. Virginia*, 388 U.S. 1 (1967).................................................................16, 28

*Lyng v. Castillo*, 477 U.S. 635 (1986) .......................................................................19

*Matal v. Tam*, 137 S.Ct. 1744 (2017) ........................................................................27

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) ............................................................5

*Nguyen v. INS*, 533 U.S. 53 (2001).............................................................................25

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) ..............................................................3, 4

*O'Connor v. Board of Education*, 449 U.S. 1301 (1980)........................................24, 25

*Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015)...........................................19

iii

*Palazzo v. Harvey*, 380 F. Supp. 3d 723 (M.D. Tenn. 2019).........................................30

*Parsons v. United States Department of Justice*, 801 F.3d 701 (6th Cir. 2015)............................7

*Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000)................................4

*Pusey v. City of Youngstown*, 11 F.3d 652 (6th Cir. 1993)..........................................12

*Rice v. Village of Johnstown*, 30 F.4th 584 (6th Cir. 2022).........................................7

*R.K. ex rel. J.K. v. Lee*, 575 F. Supp. 3d 957 (M.D. Tenn. 2021)..................................11

*Romer v. Evans*, 517 U.S. 620 (1996)................................................25, 27

*Russell v. Lundergan-Grimes*, 784 F.3d 1037 (6th Cir. 2015) ................................10, 11

*Sessions v. Morales-Santana*, 137 S.Ct. 1678 (2017)...............................................25

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ....................................................16

*Simpkins v. Boyd County Fiscal Court*, 48 F.4th 440 (6th Cir. 2022)...........................27

*Tennessee v. United States Department of Education*, --- F. Supp. 3d ---, 2022 WL 2791450 (E.D. Tenn. July 15, 2022)...............................................................31

*Tineo v. Attorney General.*, 937 F.3d 200 (3d Cir. 2019)...............................................25

*TriHealth, Inc. v. Board of Commisioners of Hamilton County*, 430 F.3d 783 (6th Cir. 2005) ...............................................................16

*United States v. Perry*, 360 F.3d 519 (6th Cir. 2004) ...............................................19

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................21, 22, 25

*United States v. Windsor*, 570 U.S. 744 (2013) ...............................................26

*Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022) ...............................................................9, 10

*U.S. Department of Agriculcture v. Moreno*, 413 U.S. 528 (1973)...............................26

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)...............................................................27

*Virginia Office for Protection & Advocacy v. Stuart*, 563 U.S. 247 (2011)...................13

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021)...............................................20, 21, 22

*WCI, Inc. v. Ohio Department of Public Safety*, 18 F.4th 509 (6th Cir. 2021)............................10

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017) .............................................................. 18

*Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) ................................................ 14

## STATUTES

20 U.S.C. §1681 .............................................................. 1, 14, 28, 30, 31, 32

42 U.S.C.
§2000e-2 ................................................................................................ 30, 31
§12112 .............................................................................................................. 30

Tenn. Code. Ann.
§49-1-102 .................................................................................................... 10, 11
§49-1-201 ............................................................................................................ 11
§49-1-302 ............................................................................................................ 11

## REGULATIONS

34 C.F.R. §106.41 .............................................................................................. 28

45 C.F.R. §86.41 ................................................................................................ 28

## OTHER AUTHORITIES

House K-12 Subcommittee Hearing, 112th Tennessee General Assembly (Feb. 9, 2021), https://tinyurl.com/5633tyrc ................................................................ 26

Senate Floor Session Hearing, 112th Tennessee General Assembly (Mar. 1, 2021), https://tinyurl.com/5y53n95d .............................................................. 26

U.S. Const., amend. XIV ................................................................................. 16

v

## PRELIMINARY STATEMENT

Following Tennessee's enactment of SB 228 into law, and Knox County's subsequent revision to its interscholastic athletics policy, Plaintiff L.E. is excluded from participating on his high school boys' golf team. The undisputed evidence in this case shows that L.E.'s categorical ineligibility is due solely to the fact that he is a transgender boy. As a matter of law, this discriminatory exclusion violates both the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a), and summary judgment in L.E.'s favor is warranted. State and County Defendants each argue the opposite, i.e., that they are entitled to judgment as a matter of law. They are wrong.

County Defendants' motion is most notable for what it does not include, namely any argument that excluding L.E. from the boys' golf team is consistent with the Equal Protection Clause. Instead, the primary focus of their motion is the threshold argument that they are not proper defendants because they are merely enforcing state law. This ignores both that municipal policy goes beyond what SB 228 requires and that, in any event, county officials (such as the Knox County Schools Superintendent) act as state officers when enforcing state law.

State Defendants also raise threshold arguments, and those too come up short. Rather than demonstrating flaws in L.E.'s claims, their standing and sovereign immunity defenses reflect misunderstandings and errors regarding the record, governing law, and the relief L.E. is seeking. For example, they claim that L.E. lacks standing to challenge SB 228 because L.E. is unlikely to make the team even if he were to try out. A plaintiff challenging discriminatory treatment, however, need only prove that he lacks the opportunity to compete for the benefit in question on equal footing; he need not show that, but for the discriminatory treatment, he would

1

receive the benefit (nor have defendants shown any evidence that L.E. would *not* make the team). Similarly, State Defendants posit that L.E. lacks standing because he is not suing the entity responsible for splitting interscholastic golf teams into separate teams for boys and girls. But L.E. is not challenging the decision to separate interscholastic golf teams; he is challenging his categorical ineligibility to participate on a specific sex-segregated team.

On the merits of L.E.'s equal protection claim, State Defendants (the only ones to address the merits of this claim) fail entirely to show that excluding L.E. from the Farragut High School ("FHS") boys' golf team is substantially related to an important government interest. To the contrary, the interests they do cite are *post-hoc* (and therefore not cognizable under the heightened scrutiny required here), pertain entirely to interscholastic girls' sports, and/or are nothing more than semantic efforts at disguising discrimination. State Defendants other arguments in support of SB 228's constitutionality, meanwhile, run headlong into longstanding Supreme Court and Sixth Circuit precedent.

SB 228 and the revised I-171 Policy fare no better under Title IX. As on-point binding caselaw holds, transgender status discrimination constitutes discrimination on the basis of sex (which Title IX expressly proscribes) both because a transgender individual's sex assigned at birth is a but-for cause of the discrimination, and because discrimination on the basis of transgender status entails unlawful consideration of stereotypical notions about how gender identity and presentation interact with reproductive organs. Neither State Defendants nor County Defendants refute these basic principles.

At bottom, L.E. seeks only prospective relief against the enforcement of laws that directly bar him from participating on his high school's boys' golf team. As such, a reasonable factfinder

2

could only conclude that summary judgment for L.E. is warranted and Defendants' motions for summary judgment should be denied.

## ARGUMENT

### I. L.E. HAS STANDING

State Defendants argue that L.E. lacks standing to challenge SB 228. Dkt. 56 ("SD Mem.") at 5-10. In order to demonstrate standing, L.E. "must show: (1) a 'concrete, particularized, and actual or imminent' injury in fact; (2) that the defendant likely caused the injury; and (3) that judicial relief would likely redress the injury." *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 423 (6th Cir. 2022). On this record, L.E. satisfies all three elements as a matter of law. State Defendants' three arguments to the contrary misconstrue L.E.'s claims, the record, and binding precedent.[1]

### A. L.E.'s Injuries Are Neither Speculative Nor Hypothetical

State Defendants challenge L.E.'s standing by asserting (SD Mem. 6) that he "must actually provide objective indicators showing that [he] is in the class of golfers who would otherwise have the requisite skill to play on the boys' golf team." This is not the law.

The Supreme Court rejected this very argument in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). There, the Court of Appeals held that a trade association lacked standing to bring an Equal Protection Clause challenge to a municipality's minority set-aside program "because it failed to allege that one or more of its members would have been awarded a contract but for the challenged ordinance." *Id.* at 658, 664. The Supreme Court overturned that ruling. *Id.* at 664. Instead, the Court explained, "[t]he 'injury in fact' in an equal protection case … is the denial of equal

---

[1] At the very least, it cannot be said that L.E. has failed, as a matter of law, to satisfy the three elements of standing.

treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 666. In other words, where a plaintiff faces an "inability to compete on an equal footing," that plaintiff has an injury sufficient for standing. *Id.*; *see also Pederson v. Louisiana State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000) (applying *Jacksonville* to a Title IX claim regarding failure to field a women's soccer team and rejecting the argument that, in order to show standing, the plaintiffs needed to demonstrate that they would have made the team).

The record indisputably shows that while cisgender boys are able to try out for the FHS boys' golf team and qualify (or not) on the basis of their golf skills, L.E. cannot qualify for the team—regardless of how well he performs at the tryout—because L.E. is a transgender boy and is therefore categorically barred from participating on the boys' golf team. Dkt. 51 ("L.E. Mem.") at 10; Dkt. 52 ("PSUMF") ¶¶97-99. And that testimony is, of course, consistent with the text of SB 228 and the revised I-171 Policy issued by Knox County Schools ("KCS"), each of which provides that "a student's gender for purposes of participation in middle or high school athletics is determined by the student's sex at the time of the student's birth." *Id.* ¶¶54, 79. Because L.E.'s transgender status statutorily forecloses him from participating on the FHS boys' golf team, he has shown the "inability to compete on an equal footing" necessary for standing, *Jacksonville*, 508 U.S. at 666. The purported shortcomings to L.E.'s golf game State Defendants dwell on (SD Mem. 7) are therefore of no moment.

State Defendants also posit (SD Mem. 7-8) that L.E. has not shown injury in fact because he supposedly has no "concrete plans" to try out for the boys' golf team. Because L.E's injury involves the denial of the right to compete for a particular benefit on equal terms, he "need only demonstrate that [he] is able and ready to" seek the benefit in question. *Jacksonville*, 508 U.S. at 666. L.E. easily meets this requirement.

4

For one, there is no genuine dispute that L.E. desires to try out for the FHS boys' golf team. He testified as much, both at his deposition and in his declaration, and his parents both confirmed that intention in their depositions. PSUMF ¶94. Additionally, L.E.'s mother emailed the principal of FHS days before SB 228 was enacted into law informing him that L.E. "would like to try out for the boys' [golf] team," but was concerned that SB 228 would make that difficult. Supplemental Yarbrough Declaration ("S.Y. Dec."), Ex. 2, at 2. L.E. had previously played on a middle school golf team, demonstrating a pre-existing interest in playing interscholastic golf. PSUMF ¶92. And L.E. has offered uncontroverted testimony that the only reason he has yet to try out for the FHS boys' golf team is because—due to SB 228 and the revised I-171 Policy—he would be unable to qualify for the team regardless of how well his tryout went. PSUMF ¶103. As soon as SB 228 and the revised I-171 Policy are no longer in effect, L.E. will be able to try out for the FHS boys' golf team; nothing more is required on his part other than to wait for the next round of tryouts.[2]

State Defendants proffer four pieces of evidence in their attempt to refute this factual record. Most are answered by the black-letter rule that "Article III does not require plaintiffs to take action simply to establish standing" "[w]hen doing so would be futile." *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020). For example, State Defendants reference (SD Mem. 8) L.E.'s rejection of County Defendants' offer (made after L.E. filed suit) to try out for the FHS boys' golf team. As L.E.'s mother explained, this offer was rejected as "meaningless" because, no matter how well L.E. played at the tryout, he ultimately could not make the team so long as SB

---

[2]Notably, L.E.'s first year of high school was the 2021-22 school year, *see* PSUMF ¶2, the same year SB 228 took effect, PSUMF ¶57. As such, L.E. has never had a season in which he was both eligible to compete on FHS interscholastic athletic teams and not categorically barred from competing on boys' teams because he is a transgender boy.

228 and the revised I-171 Policy remain in effect. PSUMF ¶104. The same ultimate futility of a tryout renders irrelevant the facts that neither L.E. nor his parents knew the exact date tryouts would take place and that neither L.E. nor his parents notified the FHS golf coach about L.E.'s interest in trying out for the boys' golf team (SD Mem. 7-8). If L.E. need not undertake a futile tryout in order to have standing, it follows *a fortiori* that he need not nail down the logistics of when such a tryout would take place.[3]

The final factual assertion State Defendants make on this front (SD Mem. 7) takes aim at the supposed inadequacy of L.E.'s "training regimen." The Sixth Circuit's opinion in *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999), is instructive for why that argument is misplaced. In *Lac Vieux*, a tribe seeking to develop a casino challenged a city ordinance it alleged unconstitutionally gave a preference to two competitor gaming companies. *Id.* at 399-400. The district court held that the tribe lacked standing because, in part, the tribe failed to show that it could adequately submit a competitive casino proposal and had failed to complete a previous effort to develop a casino in the city. *Id.* at 404-405. The Sixth Circuit reversed this decision, explaining that "evidence of whether a proposal that [the tribe] might have submitted would ultimately have been successful," such as that relied on by the district court, is "not indicative of whether [the tribe] had the capability simply *to submit* a proposal." *Id.* at 405. And because, under *Jacksonville*, the tribe had to demonstrate "only that it was capable of submitting a proposal," and "not … that it would

---

[3]In any event, State Defendants provide an incomplete picture. For example, L.E.'s mother testified that she believed, but was not certain, that tryouts for the upcoming fall golf season take place during the preceding summer. Dkt. 53-3 at 31:6-16. Consistent with that understanding, the FHS Athletic Director testified that he recalled the golf team tryouts for the current season taking place this past June. S.Y. Dec., Ex. 1, at 95:10-12. And although neither L.E. nor his parents informed the FHS golf coach of L.E.'s interest in trying out, L.E.'s mother did inform the principal of his interest. *Supra* p.5.

6

have been awarded a contract but for the … unconstitutional selection process," the district court's standing decision was overturned. *Id.* Under *Lac Vieux*, the assertion that L.E.'s golfing habits are supposedly not "commensurate with" the skill of the current FHS boys' golf team (SD Mem. 7) at most suggests L.E. may not succeed in making the team. As explained, however, such a claim is irrelevant to L.E.'s standing. *Supra* pp.3-4.[4]

### B. State Defendants Have Caused L.E.'s Injuries

Beyond arguing that L.E. has not demonstrated a cognizable injury in fact, State Defendants also contend (SD Mem. 8) that L.E.'s "actual injuries alleged cannot be traced back to the statute." Instead, State Defendants point (*id.*) to "rules and policies issued by the" Tennessee Secondary School Athletic Association ("TSSAA") as the cause of L.E.'s harms. This argument rests on a misunderstanding of L.E.'s claim. When properly understood, a reasonable factfinder could only conclude that L.E.'s "injur[ies are] 'fairly traceable to' the allegedly un[lawful]" SB 228 and revised I-171 Policy, *Rice v. Village of Johnstown*, 30 F.4th 584, 592 (6th Cir. 2022), because these laws were, at a minimum, "a motivating factor" in L.E.'s ultimate exclusion from the right to equally compete for a spot on the FHS boys' golf team, *Parsons v. United States Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).

The only TSSAA rule State Defendants posit (SD Mem. 9) injured L.E. is "the decision to have separate divisions for boys' golf and girls' golf." But L.E. is not challenging the separation of interscholastic golf teams into boys' and girls' teams; tellingly, State Defendants

---

[4]State Defendants point out (SD Mem. 8) that "there is not a separate tryout for the boys' golf team and the girls' golf team," but give no explanation of why this fact matters. It does not. Regardless of when or with whom L.E. would try out, it is undisputed that FHS has two separate golf teams—one for boys and one for girls—and that under SB 228 and the revised I-171 Policy, L.E. is not eligible for the boys' team. PSUMF ¶¶38, 97. This categorical bar, regardless of how well he performs at tryouts, is L.E.'s injury. Nothing about the cognizability of that injury turns on the logistics of the tryouts.

cite nothing in the record suggesting he is. Instead, L.E. challenges his categorical ineligibility to compete on the FHS boys' golf team because of his transgender status. This is a very different theory of liability than the claim that boys and girls must compete on the same golf teams. *Cf. Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity.").

State Defendants acknowledge on multiple occasions that SB 228 is what bars L.E. from the FHS boys' golf team. They recognize (SD Mem. 10), for example, that SB 228 "did away with" the TSSAA's earlier policy allowing student-athletes to compete on sex-segregated teams consistent with their gender identity ("Prior TSSAA Policy"), PSUMF ¶46. And they note (SD Mem. 9) that "TSSAA must acknowledge the birth sex of athletes when crafting rules." These acknowledgments are consistent with the evidentiary record, in which witnesses from both the State and Knox County have testified that L.E. is categorically ineligible for the boys' golf team because, under SB 228, he cannot compete on the FHS boys' golf team because of his sex assigned at birth. PSUMF ¶¶97, 98. It follows, therefore, that L.E. satisfies the traceability requirement.

### C.     L.E.'s Injuries Are Redressable

State Defendants' last standing argument is that L.E.'s injuries are not redressable "[b]ecause … TSSAA is absent from this case." SD Mem. 9. The fundamental premise of this supposed defect is that L.E. is "claim[ing] to be injured by the regulation of a third party who is not before the court." *Id.* As just explained, such a premise is wrong because L.E.'s injuries are directly traceable to SB 228 and the revised I-171 Policy. Because injunctive and declaratory

relief "will 'remove the harm'" at issue, i.e., enforcement of SB 228 and the revised I-171 Policy against L.E., his "injur[ies are] redressable." *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018).

Regardless, the record belies State Defendants' contention (SD Mem. 10) that "there is simply no way for this Court to know what the future TSSAA policy will be." For one, there is no evidence that TSSAA ever affirmatively repealed the Prior TSSAA Policy. Instead, that Policy was rendered inoperative because it was superseded by contradictory state law, namely SB 228. Dkt. 53-8 at 86:1-88:2; PSUMF ¶83 (same). It is State Defendants who engage in rank speculation that TSSAA, once no longer bound by SB 228, would rescind the Prior TSSAA Policy and enact a new policy identical to one that had just been deemed unlawful by this Court. Indeed, the best evidence of TSSAA's intentions is the declaration from TSSAA's Executive Director, which states that "the participation of transgender boys in interscholastic athletics would have posed no issue for TSSAA *in the absence of state law prohibiting such participation*." Dkt. 53-11 ¶6 (emphasis added). A reasonable factfinder could therefore only conclude that TSSAA would not prove an obstacle to L.E. vindicating his rights.

## II.    SOVEREIGN IMMUNITY DOES NOT BAR ANY OF L.E.'S CLAIMS

State Defendants and County Defendants both posit that L.E.'s claims against each of them are barred by sovereign immunity. SD Mem. 10-12; Dkt. 47 ("CD Mem.") 6-9. These arguments are all unavailing; each defendant is properly named.

### A.    *Ex Parte Young*

In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court held that actions taken by a state officer "pursuant to state authority[] … are *treated* as if they were the officer's purely personal actions—thus undeserving of immunity—on the assumption that the state cannot authorize an unconstitutional act." *Universal Life Church Monastery Storehouse v. Nabors*, 35

9

F.4th 1021, 1040 (6th Cir. 2022).  The *Young* exception to sovereign immunity, which "allows federal courts to enjoin state officers in their official capacities from prospectively violating federal law," *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 n.5 (6th Cir. 2021), applies if a plaintiff can "show that there is 'a realistic possibility the official will take legal or administrative actions against plaintiff's interests.'"  *Nabors*, 35 F.4th at 1040-1041.  L.E. has met this standard as to his Equal Protection Clause claim against each official capacity defendant (i.e., the Governor, Tennessee Department of Education ("TDOE") Commissioner, State Board of Education ("SBOE") Executive Director, SBOE individual board members, and KCS Superintendent).  He also has met this standard as to his Equal Protection Clause claim against KCBOE for its enforcement of the revised I-171 Policy against him.

### 1.  State Defendants

State Defendants argue (SD Mem. 11) that the *Young* exception is inapplicable to them because their only connection to SB 228 is a "general duty … to execute the laws."  This argument woefully understates the State's role in enforcing SB 228.

Most significantly, State Defendants do not even mention how, following the enactment of SB 1861, the SBOE is currently promulgating (and just this week adopted) the Funding Rule, a regulation that will authorize the TDOE Commissioner to withhold state funding from any Local Education Area ("LEA")—including Knox County—that does not comply with SB 228. PSUMF ¶¶69-71; S.Y. Dec. Ex. 3 at 3; *see also* PSUMF ¶¶63, 65 (explaining that SBOE develops rules and policies that are, in turn, enforced by TDOE); Tenn. Code. Ann. §49-1-102(a), (b) (same).  The Sixth Circuit has recognized that "promulgat[ing] regulations implementing the" challenged law triggers the *Young* exception.  *DeWine*, 910 F.3d at 849; *accord Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015); *Nabors*, 35 F.4th at

10

1040-1041.  This Court has previously recognized that a similar SBOE rule authorizing the

TDOE Commissioner to withhold state funding from any LEA that fails to comply with a

recently enacted state law triggers the *Young* exception.  *R.K. ex rel. J.K. v. Lee*, 575 F. Supp. 3d

957, 984 (M.D. Tenn. 2021) (Crenshaw, C.J.).  The same result should hold here.

Even beyond the Funding Rule, there is no dispute that SBOE and TDOE both possess

significant control over the Tennessee public education system.  For example, SBOE is charged

by statute with exercising supervisory authority over public schools in Tennessee.  Tenn. Code.

Ann. §49-1-302; PSUMF ¶¶62-64.  Indeed, Tennessee law expressly provides that "[t]he system

of public education in this state shall be governed … under policies, standards, and guidelines

adopted by the state board of education that are necessary for the proper operation of public

education in kindergarten through grade twelve (K-12)."  Tenn. Code. Ann. §49-1-102(a).  And

as part of its role in carrying out SBOE policies, PSUMF ¶65; Tenn. Code. Ann. §49-1-201(a),

TDOE requires LEAs to certify compliance with various state laws, including SB 228, PSUMF

¶68.  This "expansive authority" to supervise public education suffices to withdraw sovereign

immunity from the TDOE and SBOE officer defendants.  *Russell*, 784 F.3d at 1048-1049; *see*

*also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008).

As for the Governor, this Court has held that because the Tennessee Constitution

provides that a bill becomes law so long as the Governor does not veto it within five days, the

fact that the Governor affirmatively signs a bill into law triggers the *Young* exception.  *R.K.*, 575

F. Supp. 3d at 983.  This affirmative expression of support for SB 228, especially combined with

State Defendants' assertion (SD Mem. 17) that SB 228 is meant to provide statewide clarity

about the rules governing transgender student-athletes' participation in interscholastic sports,

suggests that SB 228 is a matter of "substantial public interest," thereby "plac[ing] a significant

obligation upon the Governor to use his general authority to see that state laws are enforced." *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 n.5 (6th Cir. 1982).[5]

### 2. County Defendants

County Defendants also contend (CD Mem. 5-9) that neither KCBOE nor the KCS Superintendent are proper defendants for L.E.'s Equal Protection Clause claim. Their arguments are inherently contradictory and, in any event, not a basis for summary judgment in their favor.

The Superintendent asserts (CD Mem. 5-6) that the claims against him are "duplicative to the claims against KCBOE" because the Superintendent is merely an agent of KCBOE, and (unlike the State), as a "local governing bod[y]," KCBOE is, in the ordinary course, "amenable to suit." In the next breath (*id.* at 7-8), however, KCBOE contends that *in this case*, it is "acting as an arm of the State," and therefore entitled to the State's sovereign immunity, because KCBOE's enforcement of SB 228 reflects merely the satisfaction of its mandatory duty to comply with state law. KCBOE is correct that its enforcement of SB 228 is mandatory under state law. KCBOE is also correct that if it is acting as an arm of the state, it may not be sued under 42 U.S.C. §1983. But when, as here, a county employee is enforcing state law (in this case the Superintendent enforcing SB 228), that employee "pursues [his] duties as a *state* agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) (emphasis added). And the *Young* exception is fully applicable to claims for prospective relief against county employees acting as state agents through enforcement of state law. *See id.* at 658 n.4.

---

[5]Were this Court to hold that sovereign immunity barred L.E.'s claims against every other defendant, *Young* would also apply to the claim against the Governor in order to ensure that L.E. could "vindicate the alleged infringement of [his] constitutional rights." *Allied Artists*, 679 F.2d at 665 n.5.

Moreover, a claim against a county employee acting as a state officer is not duplicative because, as KCBOE itself acknowledges, the entity on behalf of which the officer is acting is shielded by the state's sovereign immunity. Unlike, for example, actions where "local government units can be sued directly," *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985), challenging an official for his actions under color of state law is critical where sovereign immunity shields the State itself from suit. *See Virginia Office for Protection & Advocacy v. Stuart*, 563 U.S. 247, 254-255 (2011) (the *Ex parte Young* doctrine is "necessary to 'permit the federal courts to vindicate federal rights'").

KCBOE goes too far, however, in contending that its enforcement of the revised I-171 Policy renders it an arm of the state. KCS's Rule 30(b)(6) designee testified, without contradiction, that barring an affirmative act from KCBOE to repeal or amend it, the revised I-171 Policy would remain in effect even if SB 228 is no longer operative. PSUMF ¶82. KCBOE attempts (CD Mem. 9) to get around this fact by claiming that its "future policy enactments … are merely speculative at this point and also irrelevant." But this is exactly backwards. It is *certain* that even if SB 228 were repealed tomorrow, the revised I-171 Policy would remain in effect. Whatever the merits to KCBOE's argument that it has no choice but to enforce SB 228 while the statute remained in effect, nothing in state law required KCBOE to create and enforce a municipal policy that permanently forecloses transgender students from participating on sex-segregated teams consistent with their gender identity even if state law did not itself contain such a ban. The decision to enact such an enduring policy change rests with KCBOE. As such, the revised I-171 Policy is firmly a Knox County policy, and KCBOE is amenable to this claim. *See*

13

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 62 (1989) ("a municipality [i]s a person under §1983").[6]

## B.     Title IX's Abrogation Of Sovereign Immunity

State Defendants next argue (SD Mem. 12) that SBOE is immune from L.E.'s Title IX claim.  Notably, SBOE does not claim that state entities are generally immune from Title IX actions.  Nor could it have, as the Sixth Circuit squarely "h[e]ld that Congress successfully abrogated the states' Eleventh Amendment immunity from Title IX lawsuits."  *Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998).  Instead, SBOE contends (SD Mem. 12) that this abrogation does not apply to it because it "does not receive federal funds." This does not shield SBOE from suit.

Even though SBOE does not directly receive federal funds, it still constitutes a recipient of federal financial assistance, such that it is subject to Title IX.  *See* 20 U.S.C. §1681(a).  As L.E. explained in his opening brief (at 21-22), an entity that is not itself a recipient of federal funding can still be subject to Title IX if it controls another entity that directly receives federal funding.  In *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265 (6th Cir. 1994), for example, the court held that a school board which did not itself receive federal funding nonetheless was subject to Title IX because "[p]ursuant to state statute," the board "*controls and manages* … the state's schools and all programs conducted in the schools," *id.* at 272.  The same dynamic exists here between SBOE and TDOE; the former exercises supervisory authority over

---

[6]L.E. does not dispute that if this Court agrees KCBOE can be enjoined from enforcing the revised I-171 Policy, a claim seeking that same relief against the Superintendent would be duplicative.  If, however, the Court were to hold that enforcement of the I-171 Policy reflects mere non-discretionary enforcement of state law, then L.E.'s claim against the Superintendent for enforcing that policy would not be duplicative for the same reason that the Superintendent is a proper defendant for prospective relief against the enforcement of SB 228, *supra* p.12.

14

the latter, and the TDOE Commissioner is obligated to enforce and abide by all SBOE policies. PSUMF ¶¶62-65. And there is no dispute TDOE receives federal funding. PSUMF ¶66. As such, SBOE may not hide behind sovereign immunity to avoid answering for its violation of L.E.'s Title IX rights.

**III.     SB 228, AS APPLIED TO L.E., VIOLATES THE EQUAL PROTECTION CLAUSE**

State Defendants (not joined, notably, by the County Defendants) next argue that SB 228 is consistent with the Equal Protection Clause. SD Mem. 12-23. These defenses misconstrue L.E.'s claim and cannot be reconciled with binding precedent. Far from failing as a matter of law, summary judgment on this claim is warranted in L.E.'s favor. L.E. Mem. at 9-19.

**A.     SB 228 Discriminates Against L.E. Because He Is A Transgender Boy**

As they did in arguing that L.E. lacks standing, State Defendants suggest (SD Mem. 20) that this case turns on the validity of "separating boys and girls onto different sports teams." Again, that is not so. What matters instead is that SB 228 bars L.E. from competing on the boys' golf team. *Supra* pp.7-8. There is no genuine dispute that SB 228 does not bar cisgender boys from competing on boys' interscholastic athletic teams that accord with their male gender identity. PSUMF ¶99. And there is no genuine dispute that L.E. has a male gender identity. *See* PSUMF ¶¶21-26. "The overwhelming thrust of everything in the record," accordingly, is that L.E. is "similarly situated to other boys." *Grimm*, 972 F.3d at 610; *see* L.E. Mem. 10-13. Unlike cisgender boys, however, L.E. is categorically excluded from the FHS boys' golf team because he is a transgender boy. *Supra* p.4.

State Defendants' arguments to the contrary fail. First, they cite to differences in L.E.'s reproductive capacity and genitalia and assertions regarding "normal levels" of testosterone and bone density to argue that L.E. is not similarly situated to cisgender boys seeking to play on the

15

boys' golf team. But nothing in the record shows that reproductive capacity or genitalia have relevance to golf (or any athletic competition) or suggests that there is a minimum testosterone or bone density level required for participation on the boys' golf team (or any boys' athletic teams at FHS). Because "[d]isparate treatment of similarly situated persons who are dissimilar only in immaterial respects" is unconstitutional, *TriHealth, Inc. v. Board of Comm'rs of Hamilton Cty.*, 430 F.3d 783, 790 (6th Cir. 2005), State Defendants' reliance on irrelevant biological metrics is of no moment.

Next, State Defendants contend (SD Mem. 21) that SB 228 "does not treat transgender students differently from anyone else" because every student's "gender is defined as sex." This argument overlooks the language of the Equal Protection Clause, which protects "any person," U.S. Const., amend. XIV, and "established … personal rights," *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) (finding that the Equal Protection Clause prohibits racially restrictive housing covenants barring both white and Black homeowners from moving into neighborhoods primarily composed of other races). It is therefore no answer to say that both cisgender and transgender students must compete on teams consistent with their sex assigned at birth. What matters instead is that individual transgender students are treated differently from similarly situated cisgender students because only the latter can compete on teams consistent with their gender identity.

State Defendants' argument echoes Virginia defending its anti-miscegenation law on the ground that because people of all races were required to marry someone of the same race, everyone was treated equally. *Loving v. Virginia*, 388 U.S. 1, 8 (1967). The Supreme Court, however, "reject[ed] the notion that the mere 'equal application' of a statute containing … classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious … discriminations." *Id.* More recently, the Fourth Circuit used

similar reasoning to reject the argument that a school policy forcing all students—including transgender students—to use bathrooms consistent with their sex assigned at birth treats everyone the same. *Grimm*, 972 F.3d at 609. Such an argument, the court explained, "is like saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race." *Id.* The same is true here.[7]

### B. SB 228's Exclusion Of L.E. From The Boys' Golf Team Is Subject To Intermediate Scrutiny

Because SB 228 discriminates against L.E. on the basis of L.E. being a transgender boy, the State must satisfy intermediate scrutiny. As L.E. explained in his opening brief, intermediate scrutiny applies here for two independent reasons. The first is because discrimination on the basis of transgender status, by definition, entails discrimination on the basis of sex. L.E. Mem. 12-13. The second is because transgender people constitute, at the least, a quasi-suspect class. *Id.* at 14-15. State Defendants devote considerable effort trying to avoid the application of intermediate scrutiny. None of their efforts are persuasive.

With respect to SB 288 being a sex-based classification, State Defendants entirely ignore the Supreme Court's holding that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1741 (2020), *quoted in* L.E. Mem. 12. L.E.'s exclusion from the FHS boys' golf team highlights this point. The reason L.E. cannot play on that team is because his

---

[7]In any event, State Defendants also overlook that SB 228 constitutes a classification on the basis of transgender status because an incongruence between one's sex assigned at birth and gender identity, the triggering factor for SB 228's differential treatment of cisgender boys and transgender boys, "is closely correlated with being" transgender. *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring), *quoted in* L.E. Mem. 10. State Defendants baldly assert (SD Mem. 23 n.16) that L.E.'s "proposed solution would *require* students to be treated differently on the basis of gender identity," but that is wrong. L.E.'s "proposed solution" is for cisgender boys and transgender boys to be treated the same, as boys.

17

male gender does not match his sex assigned at birth. PSUMF ¶98. In other words, but for the sex he was assigned at birth, L.E. would be eligible to play on the boys' golf team. *See Bostock*, 140 S.Ct. at 1741-1742. State Defendants acknowledge (SD Mem. 13) that "intermediate scrutiny" is "the proper standard for a sex-based classification." The dispositive role of the incongruence between L.E.'s male identity and his sex assigned at birth in SB 228 and this case suffices to trigger intermediate scrutiny.[8]

SB 228's exclusion of L.E. from the boys' golf team because he is a transgender boy also constitutes impermissible sex stereotyping. The Sixth Circuit squarely held that "discriminat[ion] on the basis of transgender status … impos[es] … stereotypical notions of how sexual organs and gender identity ought to align." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576 (6th Cir. 2018), *aff'd on other grounds in Bostock*; *accord* L.E. Mem. 13. State Defendants' reliance (SD Mem. 16 n.9) on "the different organization of reproductive systems" as constituting "the distinction between males and females" thus fails to save SB 288 from being a sex-based classification rooted in unlawful stereotyping.

State Defendants also take issue with transgender people's status as a quasi-suspect class, but all their rejoinders lack merit. At the threshold level, they assert (SD Mem. 23) that L.E. "hasn't established" that transgender people satisfy the factors that determine whether a group is a quasi-suspect class. This ignores that the level of scrutiny is a legal, not factual, question; thus,

---

[8]As L.E. explained in his opening brief (at 12-13), the Fourth, Seventh, and Eighth Circuits have each held that transgender classifications are subject to intermediate scrutiny for this reason. *Grimm*, 972 F.3d at 608; *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051-1052 (7th Cir. 2017); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669-670 (8th Cir. 2022).

when courts decide whether these factors are satisfied, they are not confined to record evidence presented by the parties.[9]

Nor do State Defendants fare any better with their specific rebuttals (which notably do not contest that transgender people have faced a significant history of discrimination). First, they claim (SD Mem. 23 n.15) that transgender status is not immutable, but "the relevant inquiry is not whether a person could, in fact, change a characteristic, but rather whether the characteristic is so integral to a person's identity that it would be inappropriate to require her to change it to avoid discrimination," *Love v. Beshear*, 989 F. Supp. 2d 536, 546 (W.D. Ky. 2014). Gender identity is just this kind of "fundamental and core component of human identity," PSUMF ¶6, that need not be changed. In any event, immutability is not a prerequisite to being a quasi-suspect class. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (suspect classes "exhibit obvious, immutable, *or* distinguishing characteristics that define them as a discrete group" (emphasis added)). For example, intermediate scrutiny applies to "official distinctions based on legitimacy," *United States v. Perry*, 360 F.3d 519, 527 n.6 (6th Cir. 2004), even though one's "legitimacy" may change if, for example, two previously unwed parents marry.[10]

State Defendants' other arguments against treating transgender individuals as a quasi-suspect class also come up wanting. Specifically, the assertion (SD Mem. 23 n.15) that no "set

---

[9]In *Frontiero v. Richardson*, 411 U.S. 677 (1973), for example, the Supreme Court consulted sources as diverse as history books and law review articles before "conclud[ing] that classifications based upon sex … are inherently suspect," *id.* at 684-688. And the Fourth Circuit in *Grimm* referenced congressional records and law review articles in holding that transgender individuals constitute a quasi-suspect class. 972 F.3d at 611-613.

[10]Legitimacy classifications also undercut the accuracy of the Sixth Circuit's dicta that (as a purely descriptive matter) all suspect or quasi-suspect classes involve "a trait that is definitively ascertainable at the moment of birth," *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015), *quoted in* SD Mem. 22-23, because the paternity of a child (and thus the child's legitimacy) may be uncertain at the time of birth.

19

characteristics … unite … 'infinite' gender identities" is wrong because all transgender individuals are united by the common characteristic of an incongruence between their gender identity and their sex assigned at birth. PSUMF ¶8. And the suggestion (SD Mem. 23 n.15) "that transgender individuals are [not] politically powerless given the actions of the current presidential administration" ignores both the avalanche of anti-transgender legislation being enacted across the country (including in Tennessee, beyond just SB 228), PSUMF ¶¶117-120, and the extensive history of discrimination and underrepresentation transgender people have long faced, *Grimm*, 972 F.3d at 611-613.

Finally, State Defendants posit (SD Mem. 13) that SB 228 is not subject to intermediate scrutiny because it "does not itself separate students into different sports," but instead is merely a "definition of 'gender.'" It is wrong to say that SB 228 does not dictate team assignments; because of SB 228, transgender boys at Tennessee public secondary schools are now assigned to different teams than cisgender boys. PSUMF ¶96-99. Labeling it a "definition" does not change the purpose and operation of the law—instead, it simply makes clear the targeted nature of the discrimination here. Additionally, the proposition that "rational-basis review" applies "to challenges of the definitional contours of various classifications, even racial ones," SD Mem. 13, is inconsistent with Sixth Circuit law. *See Vitolo v. Guzman*, 999 F.3d 353, 357, 360 (6th Cir. 2021) (applying strict scrutiny to a racial classification within the definition of "socially and economically disadvantaged" businesses to determine eligibility for priority access to pandemic relief funds). And lastly, the principal case State Defendants rely on for their definition argument (SD Mem. 14) makes clear that such deferential review does not apply if the classification "inten[ded] to harm the groups … excluded." *Jana-Rock Constr., Inc. v. New York Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006). Here, the face of SB 228 and the

20

legislative record make clear that the purpose of the law was to exclude transgender students from participating on teams that accord with their gender identity. *Infra* pp.26-27.

### C. The Application Of SB 228 To L.E. Fails Intermediate Scrutiny

Because SB 228 faces intermediate scrutiny, the State "must prove that (1) [SB 228] serves 'important governmental objectives,' and (2) the classification is 'substantially and directly related' to the government's objectives." *Vitolo*, 999 F.3d at 364. This standard is "demanding," and State Defendants bear the burden of showing it is met. *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 533 (1996). They have not done so. *See* L.E. Mem. 15-18.

The State Defendants offer four interests they say justify SB 228. These interests are "clarify[ing] the meaning of 'gender' in Tennessee interscholastic sports," SD Mem. 15, "educating Tennessee students according to what the State views as the correct understanding of 'gender' and sex,'" *id.* at 19, "ensuring that boys cannot displace girls in interscholastic athletics," *id.* at 17, and "reducing the risk of injury when girls compete against boys," *id.* at 18. They also allude to a fifth, arguing that "to the extent that the statute impacts locker rooms, restrooms and the like, then it would substantially advance important privacy interests." *Id.* at 22. None of these interests satisfy intermediate scrutiny.

First, the clarification, education, and privacy interests were "invented *post hoc* in response to litigation," and are therefore incapable of justifying the statute, *VMI*, 518 U.S. at 533. Nothing in SB 228's text suggests the Legislature was concerned about any of these three issues when it enacted SB 228. *See* Dkt. 53-24. When asked during discovery to identify governmental interests furthered by SB 228, State Defendants solely pointed to SB 228's prefatory clauses. PSUMF ¶53. In fact, State Defendants revealingly refer (SD Mem. 17-18) to

the purported anti-displacement and safety interests, but not the other three, as SB 228's "stated objectives." Under *VMI*, that is the end of the road for the *post hoc* interests.

State Defendants could not rest on the three *post-hoc* interests to defend SB 228 even if they were actual bases for the law that could appropriately be considered under heightened scrutiny. An interest in "clarifying the meaning of gender" in interscholastic sports is just another way of describing the policy implemented by SB 288, and doing so in explicitly sex-based terms. As with their attempt to circumvent heightened scrutiny by characterizing the law as a mere "definition," these same semantics also fail to satisfy the requisite justificatory burden. Moreover, the purported clarification interest fails because "a ready alternative" to SB 228's discriminatory classification existed; the State could have clarified that student-athletes at Tennessee public secondary schools could compete on teams consistent with their gender identity. *See Vitolo*, 999 F.3d at 365. Similarly, the State has no legitimate interest in using discriminatory classifications to "educate" its students about its beliefs regarding gender. *See infra* Part I.E. As for any purported concerns about privacy, applying SB 228 to exclude L.E. from the boys' golf team fails to further this interest because there is no record evidence that the boys' golf team needs to change in locker rooms, nor is there any evidence that such privacy interests could not be addressed in a non-discriminatory manner. Indeed, State Defendants use tentative language to suggest there might be a link between the statute and privacy. S.D. Mem. 22 ("*to the extent that* the statute impacts locker rooms, restrooms, and the like, *then* it would substantially advance important privacy interests (emphases added)). This conditional, evidence-free connection falls well short of the "exceedingly persuasive justification" intermediate scrutiny requires. *VMI*, 518 U.S. at 524.

State Defendants fare no better with the two issues cited by the Legislature as bases for SB 228. The first—that SB 228 will prevent the displacement of cisgender girls playing on girls' sports teams—is inapplicable to this case because L.E. wants to compete on a boys' team against other boys. State Defendants do not even attempt to explain how L.E. participating on the FHS boys' golf team will, in their words (S.D. Mem. 17), "cost[] girls opportunities to participate, to achieve victory, to be recruited to play college athletics, and to earn scholarships" when L.E. would not be competing against girls. *See also* PSUMF ¶112 (State Defendants' expert witness on the purported competitive advantages of transgender girls testifying that his report does not discuss any purported "competitive advantages" relating to transgender boys in athletics). And because L.E. is raising an as-applied (not facial) challenge to SB 228, this egregious misfit between SB 228's ends and its application to L.E.'s participation on the boys' golf team fails intermediate scrutiny. *See Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1361 (6th Cir. 1992) (in an as-applied Equal Protection Clause claim, "the challenged regulation need not be found to be facially invalid, but is only invalid as applied to this plaintiff").[11]

State Defendants' asserted (SD Mem. 18) interest in the safety of student-athletes also fails heightened scrutiny. State Defendants acknowledge (*id.*) that "injury from physical contact might not be a concern in golf." This acknowledgment is well-founded, as golf is considered a non-contact sport. PSUMF ¶115. Relatedly, State Defendants' expert on the purported safety benefits of SB 228 acknowledged that his report contains no opinion on whether transgender

---

[11]While discussing SB 228's purported anti-displacement interest, State Defendants assert (SD Mem. 18) that SB 228 is necessary to provide an "objective standard to determine what TSSAA-established category to place a nonbinary or gender-fluid student in." This concern is irrelevant here, both because the record does not reflect that classification of nonbinary or gender-fluid students was ever a consideration driving SB 228, *supra* pp.21-22, and because L.E. is neither nonbinary nor gender-fluid, but rather someone who consistently identifies as male, PSUMF ¶¶5, 10.

individuals competing in non-contact sports pose heightened safety risks to cisgender individuals competing in those same events. PSUMF ¶116. Because L.E. is not seeking to participate in a contact sport, an insufficient nexus exists between excluding him from the FHS boys' golf team and any purported interest in student-athlete safety that SB 228 might further.

The purported safety interest also fails to support SB 228 because State Defendants' briefing frames the safety concerns driving the Legislature too broadly. The statute's text voiced a fear of "injury to girls if girls participate in contact sports with boys." PSUMF ¶52. State Defendants' expert on purported safety issues, accordingly, provided an opinion asserting that the participation of transgender girls in girls' contact sports supposedly poses safety risks to the cisgender girls competing in those same events. PSUMF ¶113. As this expert witness acknowledged, however, nothing in his report contained an opinion about whether transgender boys participating in boys' interscholastic sports poses a heightened safety risk to cisgender boys competing in those same events. PSUMF ¶114. Because L.E. is a transgender boy seeking to compete on a boys' sports team, State Defendants' safety interest fails to support SB 228's application to L.E. for this additional reason.

Perhaps recognizing the disjunction between SB 228's stated purposes and the application of that statute to L.E., State Defendants posit (SD Mem. 22) that SB 228 satisfies intermediate scrutiny so long as it "would … classify the vast majority of students correctly," even if it would incorrectly classify L.E. as a girl. This misstates the relevant standard. For one, it conflates a facial challenge (which L.E. is not bringing) with the as-applied challenge L.E. has pled. The two authorities State Defendants cite in this paragraph underscore the point themselves. Justice Stevens' opinion in *O'Connor v. Board of Education*, 449 U.S. 1301 (1980) (Stevens, J., in chambers), recognizes that his analysis would be different "if attention is

24

confined to the application of the rule to [the plaintiff]—rather than to the general validity of the rule," *id.* at 1306 n.4. And the statute that survived a facial challenge in *Nguyen v. INS*, 533 U.S. 53, 73 (2001), has been held to fail intermediate scrutiny when applied to certain individuals based on their particular circumstances. *See Tineo v. Attorney Gen.*, 937 F.3d 200, 215 (3d Cir. 2019).

Even beyond their misunderstanding and conflation of facial and as-applied challenges, State Defendants fundamentally misconstrue what intermediate scrutiny requires. Far from limiting the analysis to typical cases, under intermediate scrutiny, "estimates of what is appropriate for *most* … no longer justify denying opportunity to [those] outside the average description." *VMI*, 518 U.S. at 550. And even stereotypes with "statistical support" cannot support "measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1693 n.13 (2017). Even though most Tennessee public secondary school students will likely be unbothered by SB 228's mandate that sex assigned at birth determines what sex-segregated team students are eligible for, intermediate scrutiny requires more than playing the probabilities.

### D. The Application Of SB 228 To L.E. Cannot Survive Rational Basis Review

SB 228 is unconstitutional as applied to L.E. even under rational basis review. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985) (a discriminatory classification not subject to heightened scrutiny still must "rationally relate[] to a legitimate state interest" in order to "be sustained."). By excluding transgender boys from the boys' golf team in order to purportedly further interests related to opportunities and safety on girls' contact sports teams, *supra* p.23, SB 228's "breadth … is so far removed from [the] particular justifications" put forth in support that it is "impossible to credit them," *Romer v. Evans*, 517 U.S. 620, 635

25

(1996).  The same is true of the purported privacy interests, which State Defendants do not even argue are actually furthered by SB 228.  And the supposed clarification and education interests are simply a semantic front to engage in discrimination on the basis of transgender status.  *Supra* p.22.  Because the undisputed facts show that the purported justifications for applying SB 228 to L.E. are impossible to credit, it fails rational basis review.

State Defendants are incorrect that SB 228, as applied to L.E., satisfies rational basis review as a matter of law for the additional reason that there is a genuine dispute of material fact as to "whether [SB 228] is motived by an improper animus or purpose," *United States v. Windsor*, 570 U.S. 744, 770 (2013).  Specifically, a reasonable factfinder could conclude that SB 228 was motivated by animus against transgender people, and "a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

The disapproval of transgender people driving the Legislature is demonstrated by "[t]he history of [SB 228's] enactment," *Windsor*, 570 U.S. at 770.  One proponent of SB 228, speaking in support of the bill, stated that "I was born a girl, they were born a boy … that is how it is. God made men and women." *See* House K-12 Subcommittee Hearing, 112th Tenn. Gen. Assemb. at 45:50 (Feb. 9, 2021), https://tinyurl.com/5633tyrc.  Another proponent invoked the biblical quote that "God created man in His own image … male and female created He them" to explain his support.  Senate Floor Session Hearing, 112th Tenn. Gen. Assemb. at 51:10 (Mar. 1, 2021), https://tinyurl.com/5y53n95d.  And in the same session SB 228 was passed, Tennessee lawmakers passed legislation restricting transgender youth's access to health care, limiting transgender youth's access to school restrooms and other school facilities, and requiring parental notice and opt-out ability of classroom discussions involving gender identity.  PSUMF ¶¶117-

26

119; *see Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267 (1977) ("a series of official actions taken for invidious purposes" is evidence of discriminatory purpose for a particular challenged action).

In deciding State Defendants' motion for summary judgment, this Court must view the evidence in L.E.'s favor. *Simpkins v. Boyd Cty. Fiscal Court*, 48 F.4th 440, 446 (6th Cir. 2022). And in this posture, the record suggests that SB 228 is nothing more than "a status-based enactment divorced from any factual context from which … a relationship to legitimate state interests" can be "discern[ed]." *Romer*, 517 U.S. at 635. This kind of "classification of persons undertaken for its own sake[ is] something the Equal Protection Clause does not permit." *Id.*

### E. SB 228 Does Not Constitute Government Speech

Having failed to show that SB 228 satisfies any level of equal protection scrutiny, State Defendants' final hope for saving the law is the contention (SD Mem. 19-20) that the Equal Protection Clause is inapplicable to SB 228 because the statute constitutes "government speech." The cases they cite for support, however, involve legislative prayer, *Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142, 146 (3d Cir. 2019), a municipal holiday display, *Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 689-690 (6th Cir. 2013), and a memorial cross, *American Atheists, Inc. v. Port Auth. of New York & New Jersey*, 760 F.3d 227, 232-233 (2d Cir. 2014). None suggest that *enacted law affecting the rights of individuals* constitutes government speech immune from Equal Protection Clause scrutiny.

Because "the government-speech doctrine … is susceptible to dangerous misuse," the Supreme Court has called for "great caution before extending … government-speech precedents." *Matal v. Tam*, 137 S.Ct. 1744, 1758 (2017). State Defendants' argument vividly demonstrates why such caution is warranted. Under their position, the Equal Protection Clause

27

would become a dead letter, as any discriminatory classification could be reframed as merely articulating the government's view on the relevant issue.  For example, opponents of interracial marriage could frame an anti-miscegenation law as merely expressing "what the State views as the correct understanding of" the propriety of interracial marriage.  SD Mem. 19.  The Fourteenth Amendment, of course, is not vulnerable to such side-stepping.  *See Loving*, 388 U.S. at 11-12 (Virginia's anti-miscegenation law violates the Equal Protection Clause).

## IV.    SB 228, AS APPLIED TO L.E., VIOLATES TITLE IX

SB 228 and the revised I-171 Policy also violate Title IX, which provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. §1681(a).  L.E. Mem. 19-24.  Specifically, the FHS boys' golf team constitutes an education program or activity.  *See* 34 C.F.R. §106.41(a) (Title IX applies to "interscholastic … athletics"); 45 C.F.R. §86.41(a) (same).  L.E. is not allowed to participate on the FHS boys' golf team because he is a transgender boy who was assigned female at birth.  PSUMF ¶98.  KCBOE and SBOE (the two named Title IX defendants) both constitute recipients of federal funding.  PSUMF ¶75 (KCBOE); *supra* pp.14-15 (SBOE).  And L.E.'s exclusion from the FHS boys golf team harms him by stigmatizing and isolating him, PSUMF ¶¶16, 101, and denying him the opportunities to receive the numerous undisputed benefits that accrue through participation in interscholastic sports, PSUMF ¶¶31-34.[12]

---

[12]The two other decisions addressing the propriety under Title IX of a categorical ban of transgender students from interscholastic sports teams consistent with their gender identity both held that these narrower bans (applicable only to transgender girls) were likely unlawful.  *A.M. ex rel. E.M. v. Indianapolis Pub. Schs.*, --- F. Supp. 3d ---, 2022 WL 2951430, at *11 (S.D. Ind. July 26, 2022), *appeal pending* No.22-2332 (7th Cir.); *B.P.J. v. West Virginia State Bd.of Educ.*, 550 F. Supp. 3d 347, 356-357 (S.D. W.Va. 2021).  No Defendant even acknowledges these decisions.

SBOE's principal argument to the contrary (SD Mem. 24-25) is that "Title IX … allows institutions to distinguish between the two sexes."  Again, this misunderstands L.E.'s claim.  The problem with SB 228 is not that the statute separates boys and girls into different interscholastic athletic teams; indeed, it is undisputed that SB 228 did not create sex-segregated sports at Tennessee public schools.  PSUMF ¶43.  SB 228 is unlawful as applied to L.E. because it prohibits him from playing on the boys' team.  *Supra* p.4.  Title IX's allowance for sex-segregated sports teams is therefore of no moment.

SBOE also contends (SD Mem. 23) that "Title IX prohibits only discrimination 'on the basis of sex,' not discrimination on the basis of transgender status or gender identity."  This argument ignores that, for two reasons, it is impossible to discriminate on the basis of transgender status without discriminating on the basis of sex.  As discussed above, the first reason follows from the Supreme Court's *Bostock* decision, which explains that discrimination against a transgender person entails treating that transgender individual differently from a cisgender individual with the same gender identity because the two individuals were assigned different sexes at birth.  *Supra* pp.17-18.  The second reason that transgender-status discrimination constitutes sex discrimination is that it entails stereotypical notions about gender non-conformity and how sexual organs and one's sex assigned at birth intersect with one's gender identity.  *Supra* p.18; *see also Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 351 (6th Cir. 2020) (recognizing "Title IX's prohibition of sex stereotyping").

Neither SBOE nor KCBOE acknowledges, let alone refutes, that the stereotyping rationale applies to Title IX.  Instead, they both (SD Mem. 24 n.19; CD Mem. 11-12) argue that *Bostock* does not apply to Title IX.  True, *Bostock* was a Title VII case decided in the context of an employment dispute.  140 S.Ct. at 1753.  But the Court did not say its interpretation of Title

29

VII did not apply in other contexts. Rather, it left open the applicability of its holding to those contexts to "future cases." *Id.* This is such a future case. And in deciding whether transgender-status discrimination inherently entails sex discrimination in the context of Title IX and interscholastic athletics, "the reasoning underlying" *Bostock* is "just as binding as th[e] holding" itself. *Bucklew v. Precythe*, 139 S.Ct. 1112, 1126 (2019).

Both SBOE and KCBOE fail to provide any argument as to why *Bostock*'s but-for causation analysis does not apply to discrimination claims under Title IX. By failing to include any distinctions in their opening briefs, such arguments have been waived. *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (Crenshaw, C.J.). Regardless, no valid distinction between *Bostock* and this case can be drawn. After all, the Sixth Circuit "look[s] to the Title VII landscape for guidance" when "crafting [the] framework for analyzing Title IX claims." *Chisholm*, 947 F.3d at 349-350. And by banning discrimination "on the basis of sex," 20 U.S.C. §1681, Title IX uses "language … strongly suggestive of a but-for causation standard." *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1016 (2020).[13]

Rather than offer any grounds for distinguishing *Bostock*, SBOE (SD Mem. 24 n.19) and KCBOE (CD Mem. 11-12) each cite to a decision from the Eastern District of Tennessee preliminarily enjoining a pair of federal agency guidance documents (neither of which L.E. relies

---

[13]Although the Title VII provision interpreted in *Bostock* bans discrimination "because of … sex," 42 U.S.C. §2000e-2, *see Bostock*, 140 S.Ct. at 1738, while Title IX proscribes discrimination "on the basis of" sex, their meaning is the same. This is confirmed by Sixth Circuit decisions interpreting the Americans with Disabilities Act ("ADA"). A prior version of the ADA barred discrimination "because of" disability, and the en banc Sixth Circuit interpreted that earlier provision as requiring a plaintiff to show but-for causation. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). Although the statute was subsequently amended to proscribe discrimination "on the basis of disability," 42 U.S.C. §12112(a), *Lewis*, 681 F.3d at 315, the but-for causation requirement has remained unchanged. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014).

30

on) advising that Title IX bars discrimination on the bases of sexual orientation and transgender status, *Tennessee v. United States Dep't of Educ.*, --- F. Supp. 3d ---, 2022 WL 2791450 (E.D. Tenn. July 15, 2022). That decision enjoined the guidance documents *not* because they were substantively invalid, but instead because they were issued without going through notice-and-comment procedures. *See id.* at *20 ("The Court begins, and ends, with assessing Plaintiffs' notice and comment claim."). At most, *Tennessee* can be fairly read to have decided that *Bostock* did not itself hold that transgender-status discrimination is barred by Title IX. But, as just discussed, *Bostock*'s reasoning and related Sixth Circuit precedents all make clear that Title IX reaches sex-based discrimination against transgender students. And to the extent *Tennessee* held otherwise, this Court is not bound by other district court decisions. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). It is, however, bound by Supreme Court and Sixth Circuit precedent, under which Title IX bars transgender-status discrimination.

SBOE next posits (SD Mem. 25) that L.E.'s "Title IX claim fails" because he "does not allege that the State Board is treating one sex worse than the other." *Bostock* explained, however, that:

> Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII.

140 S.Ct. at 1742. Title VII recognizes discrimination against the individual because its operative provision expressly applies to "any individual." 42 U.S.C. §2000e-2(a)(1). Title IX similarly applies to any "person." 20 U.S.C. §1681(a). It therefore has the same individual-focused orientation as Title VII. *See also supra* pp.16-17 (explaining why State Defendants' similar argument against L.E.'s Equal Protection Clause claim fails). Treating L.E. differently from similarly situated cisgender boys, even if a transgender girl would likewise be treated

differently from similarly situated cisgender girls, is all L.E. must show to prevail on his Title IX claim.

Finally, SBOE contends (SD Mem. 25 n.20) that whatever the merits of L.E.'s interpretation of Title IX, "because Congress" purportedly "enacted Title IX under the Spending Clause," SB 228 only violates Title IX if it "*unambiguously violates*" the federal statute, which SBOE insists SB 228 does not do. This argument fails at every level. To start, the Sixth Circuit has held that Title IX's waiver of state sovereign immunity was pursuant to Section Five of the Fourteenth Amendment, and not pursuant to conditions precedent to the acceptance of federal funds. *See Franks*, 142 F.3d at 362-363. SBOE's "unambiguously violates" rule is therefore inapplicable.

Even if the "unambiguously violates" rule is applicable, it is easily satisfied here. For one, *Bostock* held that "no ambiguity exists about how Title VII's terms apply to" discrimination on the basis of transgender status, 140 S.Ct. at 1749, and, as explained above, *Bostock*'s analysis is fully applicable here, *supra* p.30 &n.13. Additionally, the Supreme Court has clarified that "sufficient notice" is given under the Spending Clause "where a statue makes clear that some conditions were placed on the receipt of federal funds," and that "Congress need not 'specifically identif[y] and proscrib[e]' each condition in the legislation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (brackets in *Jackson*). There is no doubt that recipients of federal funding are on notice that they may not engage in discrimination in education programs "on the basis of sex." 20 U.S.C. §1681(a). "Nothing more is required under" the Spending Clause. *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005). It is therefore unsurprising that the Fourth Circuit has rejected this very argument. *Grimm*, 972 F.3d at 619 n.18.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment should be denied, and L.E's motion for summary judgment should be granted.

Dated: November 4, 2022

Respectfully submitted,

Leslie Cooper (*pro hac vice*)
L. Nowlin-Sohl (*pro hac vice*)
Taylor Brown (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lcooper@aclu.org
lnowlin-sohl@aclu.org
tbrown@aclu.org

Thomas F. Costello-Vega (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA  90071
Tel: (213) 443-5300
thomas.costello@wilmerhale.com
Tara L. Borelli (*pro hac vice*)
Carl S. Charles (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND INC.
1 West Court Square, Suite 105
Decatur, GA 30030-2556
Tel: (404) 897-1880
Fax: (404) 506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Sasha Buchert (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND INC.
1776 K Street NW, 8th Floor
Washington, DC 20006-5500
Tel: (202) 804-6245
sbuchert@lambdalegal.org

/s/  Alan Schoenfeld
Alan Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street, 45th Floor
New York, NY 10007
Tel: (212) 937-7294
alan.schoenfeld@wilmerhale.com

Stella Yarbrough (No. 33637)
Lucas Cameron-Vaughn (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org

Jennifer Milici (*pro hac vice*)
Emily L. Stark (*pro hac vice*)
Samuel M. Strongin (*pro hac vice*)
John W. O'Toole (*pro hac vice*)
Britany Riley-Swanbeck (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel: (202) 663-6000
jennifer.milici@wilmerhale.com
emily.stark@wilmerhale.com
samuel.strongin@wilmerhale.com
john.o'toole@wilmerahle.com
britany.riley-swanbeck@wilmerhale.com

***Attorneys for Plaintiff L.E., by his next
friends and parents, Shelley Esquivel and
Mario Esquivel***

34

# CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2022, a true and correct copy of the foregoing was served on the below counsel for Defendants, via the Court's ECF/CM system.

Stephanie A. Bergmeyer
Senior Assistant Attorney General
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Stephanie.Bergmeyer@ag.tn.gov
(615) 741-6828

Clark L. Hildabrand
Assistant Solicitor General
Office of Tennessee Attorney General and
Reporter
P.O. Box 20207
Nashville, Tennessee 37202
Clark.Hildabrand@ag.tn.gov
(615) 253-5642

David M. Sanders
Senior Deputy Law Director, Knox County
Suite 612, City-County Building
400 Main Street
Knoxville, TN 37902
David.Sanders@knoxcounty.org
(865) 215-2327

Jessica Jernigan-Johnson
Deputy Law Director, Knox County
Suite 612, City-County Building
400 Main Street
Knoxville, TN 37902
Jessica.Johnson@knoxcounty.org
(865) 215-2327

/s/ Alan Schoenfeld
Alan Schoenfeld