**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **L.E., by next friends and parents,** | ) | |
| **SHELLEY ESQUIVEL and** | ) | |
| **MARIO ESQUIVEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:21-cv-00835** |
| **v.** | ) | |
| | ) | **Chief Judge Crenshaw** |
| **BILL LEE, in his official capacity as** | ) | |
| **Governor of Tennessee; et al.,** | ) | **Magistrate Judge Newbern** |
| | ) | |
| **KNOX COUNTY BOARD OF** | ) | |
| **EDUCATION a/k/a KNOX COUNTY** | ) | |
| **SCHOOL DISTRICT; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**MEMORANDUM OF LAW IN RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
_____

Defendants Governor Lee, Commissioner Schwinn, Executive Director Morrison, members of the Tennessee State Board of Education, in their official capacities, and the Tennessee State Board of Education (collectively, "State Defendants") submit this response to Plaintiff's motion for summary judgment.

## INTRODUCTION

When the States ratified the Fourteenth Amendment in 1868, they required that federal representation be reduced if the right to vote "is denied to any of the *male* inhabitants" of a State. U.S. Const. amend. XIV, § 2 (emphasis added). Everyone understood that whether someone is male or female, man or woman, is determined by sex. No woman could gain a federally enforceable right to vote merely by identifying as male. Accordingly, after years of advocacy by suffragettes, Tennessee provided the decisive vote to ratify the Nineteenth Amendment, which provides that the right to vote "shall not be denied or abridged by the United States or by any State on account of *sex*." U.S. Const. amend. XIX (emphasis added). In equating sex and gender, SB 228[1] follows the same commonplace approach of the U.S. Constitution: "A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate." Tenn. Code Ann. § 49-6-310(a). Plaintiff has failed to provide *any* alternative definition of gender or sex, let alone one consistent with the Fourteenth Amendment or Title IX. The challenged statute violates neither the Equal Protection Clause nor Title IX in defining gender as sex, which is ascertained at birth based on biology.

---

[1] Plaintiff challenged S.B. 228, 2021 Tenn. Pub. Acts, ch. 40, and refers to it as "SB 228." This law was codified at Tenn. Code Ann. § 49-6-310, and State Defendants have also referred to the law as the "Gender in Athletics Law." Although subsequent legislation deleted portions of SB 228, *see* 2022 Pub. Acts, ch. 909; 2022 Pub. Acts, ch. 1005, Plaintiff's Complaint does not challenge the new laws.

1

Tilting at the windmill of this definitional statute, Plaintiff insists that this is a giant of a statute that "categorically excludes [Plaintiff] from the benefits of competing in interscholastic golf." (Pl.'s Memo. of Law at 21, ECF 51, PageID # 21.) That is not true. Unlike other statutes, this law does not categorically bar boys from playing against girls in golf or other sports. SB 228 simply defines gender as sex for purposes of interscholastic sports; TSSAA otherwise retains decision-making authority over rules for interscholastic sports. Girls can still be allowed to golf against boys as long as administrators acknowledge that they are allowing that, an approach TSSAA *already* uses for sports such as wrestling and football. But even if Plaintiff were to prevail in this lawsuit against SB 228 and the Knox County Policy, Plaintiff has failed to establish that TSSAA would modify its existing practice and golf regulations to allow girls who identify as male to compete against boys in interscholastic golf. Because Plaintiff chose not to sue TSSAA or to challenge TSSAA's rules, Plaintiff lacks standing to sue the State Defendants over the narrow definitional rule in SB 228.

## DISPUTED FACTS

The State Defendants dispute that Plaintiff L.E. is a boy. (*See* State Defs.' Resp. to Pl.'s SUMF ¶ 1.) L.E.'s birth certificate states L.E.'s sex is female. (Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario 73:20-21.) It is also disputed that social transitioning is merely living in accordance with one's gender identity; social transition—the active affirmation of transgender identity—in young children it is a powerful psychotherapeutic intervention. (Levine Report 11-12, ¶ 15g.) Indeed, the affirmation therapy model is but one of four different models for treatment of gender dysphoria. (Levine Report 36.) Transition and affirmation are experimental therapies that have not been convincingly shown to improve mental health outcomes. (Levine Report 85-96.) (*See* Defs.' Resp. to Pl.'s SUMF ¶ 100.) In addition, the State

Defendants dispute forty-nine facts designated by Plaintiff as material to the claims. (Defs.' Resp. to SUMF ¶¶ 1, 4-11, 14-18, 20-21, 26- 27, 31-35, 37, 46, 59, 61, 64, 68-71, 83-84, 87, 90, 93-102, 107, 110, and 120.)

## SUMMARY JUDGMENT STANDARDS

Courts must presume that state laws are constitutional and seek to uphold them wherever possible. *Northland Fam. Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 339 (6th Cir. 2007). For a summary judgment, a court must "view the facts and reasonable factual inferences in the light most favorable to the nonmoving party." *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 463 (6th Cir. 2022). "Summary judgment is not proper 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*.

## ARGUMENT

### I.     Plaintiff lacks standing.

Plaintiff misunderstands the nature of SB 228. Tennessee's law simply defines "gender" as "sex" for interscholastic sports. It does not preclude L.E.—or any other student-athlete—from playing on a particular sports team. And Knox County's Policy similarly makes no preclusive rules for specific sports; it simply reiterates Tennessee's definition of "gender." Instead, it is the TSSAA that creates the actual rules for each interscholastic sport. Thus, Plaintiff's alleged injury cannot be "fairly trace[d]" to SB 228 or Knox County's Policy. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). And since Plaintiff declined to sue TSSAA, the entity responsible for separating golf into boys' and girls' divisions, Plaintiff cannot show that the alleged harm will be redressed by a favorable decision. *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

#### a.     Plaintiff's alleged injury cannot be fairly traced to SB 228 or Knox County's Policy because the allegedly discriminatory rules are created by TSSAA.

TSSAA, not SB 228 or Knox County Policy, divides interscholastic golf into separate boys'

3

and girls' divisions. Contrary to Plaintiff's briefing, SB 228 does not say that student athletes may only compete on interscholastic athletic teams consistent with their sex assigned at birth." (Pl.'s Memo. of Law at 10, PageID # 550.) SB 228 sets a definitional baseline: "gender," for the purposes of interscholastic athletic competition, is determined by a student's sex. The law requires State and local policymakers to start from that baseline definition, but the law leaves TSSAA free to craft the actual eligibility rules for each sport.

The definitional nature of SB 228 matters for the purposes of traceability. To establish standing, a plaintiff's injury must be "fairly . . . trace[able] to the challenged action of the defendant," and "not" the "result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation omitted). Here, Tennessee's law does not mandate any specific eligibility rules. And neither does Knox County's Policy. The policy simply reiterates Tennessee's definition of "gender" in athletics. Instead, TSSAA itself sets the eligibility requirements and determines whether specific sports are gender-specific/sex-segregated (like boys' and girls' golf) or gender-neutral (like football). (Hemmelgarn Dep. 56:2-17, 129:6-22, 130:1-13, ECF 53-7, PageID # 858, 884-5.)

TSSAA has long occupied that role. For decades, TSSAA separated most sports by sex and wrote separate rules for those sports, such as the rule that boys drive from golf tees farther away from the hole. *See, e.g., Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977) (upholding distinct rules for boys' and girls' basketball based on "the distinct differences in physical characteristics and capabilities between the sexes"). Everyone understood that such a "sex-based classification" meant the same as "classification by gender." *Id.*

Contrary to that longstanding approach, TSSAA issued a now-superseded statewide Transgender Policy that defined gender for gender-specific teams based on "gender identity OR

expression," not sex.  (TSSAA/TMSAA Transgender Policy, PageID # 1379**.**)  TSSAA instituted its own Gender Identity Eligibility Committee, and clarified that the TSSAA Board of Control, which handles all eligibility appeals, would issue "final and binding" decisions on transgender-student eligibility.  (*Id*. at PageID # 1380-81.)  Plaintiff and Defendants agree that SB 228, which has been on the books for well over a year, already obliviated the Transgender Policy.

But SB 228 did not strip TSSAA of its responsibility for establishing eligibility rules for interscholastic sports.  The TSSAA and its member schools have reverted to the pre-Policy status quo: the TSSAA allows all students to play in some non-gendered sports (like football), but other sports (such as golf) have separate divisions for boys and girls.[2]  (Hemmelgarn Dep. 56:2-17, 129:6-22, 130:1-13, ECF 53-7, PageID # 858, 884-5; TSSAA Handbook, ECF 53-30, PageID # 1342-48.)  TSSAA's golf regulations are what establish that "[f]our or five players will constitute a boys' team and two or three players a girls' team," not SB 228 or Knox County Policy.  2022-2023 TSSAA Handbook, Golf Regulations at 1 (June 20, 2022), https://cms-files.tssaa.org/documents/tssaa/2022-23/sports-regulations/2022-23GolfRegulations.pdf.  Without violating SB 228, TSSAA could allow girls to compete against boys or could create a non-gendered golf category.  But TSSAA has chosen not to.[3]

Because the eligibility standards for interscholastic golf stem from the TSSAA, Plaintiff's alleged injury—the inability to play against boys on the boys' golf team—cannot be fairly traced to the Defendants.  And because the TSSAA is absent from this case, Plaintiff lacks standing.

---

[2] Even if TSSAA or the Knox County Defendants were to assert that SB 228 somehow prohibits girls from competing against boys in golf, that belief would not change the objective, operative text of the statute.

[3] If Plaintiff were to prevail in this case, Plaintiff would *still* be ineligible for the Farragut High School boys' golf team because Plaintiff has demonstrated no ability to shoot an average score of 90 or better for 18-walking holes through 3 rounds of golf. (Higgins Dep. 46:11-15, Ex. 3.)

5

### b. Plaintiff's alleged harm would not be redressed by a favorable decision because the TSSAA is absent from this case.

Because the TSSAA is absent from this case, it is also nearly impossible for Plaintiff to prove that the alleged injuries are redressable. To show redressability, a plaintiff must prove that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted). When traceability and redressability hinge on the independent choices of a third party, it is "the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* at 562. And while "general factual allegations" may be sufficient at the pleading stage, the standard at summary judgment is more demanding. *Id.* at 561. Indeed, a plaintiff at summary judgment "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence '*specific facts*.'" *Lujan*, 504 U.S. at 561 (emphasis added) (quoting Fed. R. Civ. P. 56(e)). "[U]nadorned speculation" about third-party conduct "will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Plaintiff assumes that if Tennessee's law were invalidated, the TSSAA would instantly reverse course and go back to a policy where every student is allowed to play on any athletics team that aligns with the student's gender identity. But Plaintiff provides no specific facts in support of that notion. The reality is that, even if Plaintiff prevailed in invalidating SB 228, TSSAA's old Transgender Policy has been gone for over a year-and-a-half. And, for a variety of reasons, the TSSAA might decide not to resurrect it.

To start, any change in TSSAA policy will not be automatic because Plaintiff has neither sued TSSAA nor sought declaratory and injunctive relief against TSSAA's existing rules. If SB 228 were invalidated, TSSAA would have three options: (1) do nothing and maintain the status quo; (2) adopt a new policy; or (3) resurrect the old, superseded Transgender Policy.

It is not at all clear which option TSSAA would choose. Despite Plaintiff's claims to the contrary, the world of policymaking for transgender students is not a settled science. Between when Plaintiff filed the Complaint and submitting the reports of Plaintiff's putative experts, the NCAA has gone from "affirm[ing] participation of transgender athletes in sports consistent with their gender identity," (Compl., ECF 1, PageID # 15, ¶ 51), to allowing "the national governing body of an individual sport" to set rules based on sex (Carroll Report at 8). The motivating cause for this change was a transgender swimmer named Lia Thomas who previously competed as a male before beating female swimmers and even winning an NCAA championship in the women's 500-yard freestyle event, a noncontact sport. (Carroll Dep. 82:14-25, 83:1-25, 84: 1-6.)[4] FINA—world swimming's governing body—and USA Swimming both adopted new eligibility policies more restrictive than the approach that Plaintiff argues the U.S. Constitution allows. FINA, for example, only permits male swimmers to compete in women's events if they transition before age 12 and requires female swimmers receiving testosterone "to obtain a Therapeutic Use Exemption (TUE) for that treatment in accordance with the FINA Doping Control Rules." FINA, Policy on Eligibility for the Men's and Women's Competition Categories at 6-8 (June 19, 2022), https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf.[5]

If TSSAA were to consider a potential change in policy, it would undoubtedly need to

---

[4] Lia Thomas also won three individual events at the 2022 Ivy League Women's Swimming & Diving Championships. *Green v. Miss United States of America, LLC*, No. 21-35228, 2022 WL 16628387, at *27 n.3 (9th Cir. Nov. 2, 2022) (VanDyke, J., concurring).

[5] Further, FINA indicated that the best way to achieve inclusion while maintaining competitive fairness might be to create a new open competition category where athletes "would be able to compete without regard to their sex, their legal gender, or their gender identity." *Id*. at 9. Gender-neutral divisions are precisely the type of policies that TSSAA policymakers might find attractive.

7

grapple with local concerns about the consequences of adopting statewide policies such as the gender-identity-based policy that plaintiff's putative expert Carroll has, often successfully, encouraged other states to adopt, (Carroll Dep. 41, 62), despite the chance that they will result in girls losing to male athletes, *see Soule v. Conn. Assoc. of Schs., Inc.*, No. 3:20-cv-00201, 2021 WL 1617206, at *7 (D. Conn. Apr. 25, 2021) (identifying several losses by female plaintiffs in track-and-field events), *appeal pending*, No. 21-1365 (2d Cir. May 26, 2021).[6]

Moreover, given the increasingly controversial nature of athletics policies, TSSAA is likely to do nothing and maintain the status quo for sex-separated sports. *See* Allan McConnell & Paul Hart, *Inaction and Public Policy: understanding why policymakers 'do nothing'*, 52 Policy Sciences 645-661 (2019); William Samuelson & Richard Zeckhauser, *Status Quo Bias in Decision Making*, 1 J. Risk & Uncertainty 7-59 (1988). In sum, only one thing is plain: because Plaintiff declined to sue TSSAA, this Court—along with the parties—can only speculate as to what TSSAA would do if SB 228 were invalidated. And because speculation has no place in a redressability analysis at summary judgment, this Court should find that the Plaintiff lacks standing, or, at the very least, deny Plaintiff's motion for summary judgment.

## II. The States' Sovereign Immunity Bars This Suit Against State Defendants.

Consistent with the Eleventh Amendment, federal courts cannot "entertain a suit brought by a citizen against his own State." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). The State of Tennessee has not waived

---

[6] Similar developments are also unfolding much closer to home. Right across the border from Tennessee in Cherokee County, North Carolina, the local Board of Education voted to cancel all remaining girls' volleyball games against a high school in a different county after a boy, who identifies as a girl, spiked a ball with enough force that it left a Cherokee County player concussed and dealing with ongoing vision issues. Cherokee Scout, *School Board: Player a 'Safety Concern,'* (Sept. 27, 2022), https://www.cherokeescout.com/local-newsletter/school-board-player-safety-concern.

its immunity from 42 U.S.C. § 1983 cases. *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986). And Congress did not override the State's Eleventh Amendment immunity in passing 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). Nor does the *Ex parte Young* exception apply. 209 U.S. 123 (1908). The only action Plaintiff alleges that Governor Lee took is to support and sign the bill into law, actions he has already completed. (Compl., ECF 1, PageID # 4, ¶ 12.) Commissioner Schwinn is required to faithfully execute education laws, rules, and regulations. (Compl., ECF 1, PageID# 5, ¶ 13.) Plaintiff alleges no action taken by Executive Director Morrison; the State Board members merely have the responsibility to adopt policies, and Plaintiff has not identified an unconstitutional State Board policy adopted pursuant to SB 228. (Compl., ECF 1, PageID # 6, ¶¶ 15-16.) Sovereign immunity thus bars the Equal Protection claim.[7]

State "recipients of Federal financial assistance" waive their immunity by accepting Title IX funding. 42 U.S.C. § 2000d-7(a)(1). But the Tennessee State Board of Education—the only State Defendant that Plaintiff has brought a Title IX claim against—does not receive federal funds and thus is not subject to Title IX. (Morrison Dep. 42:14-16.)

True, the Sixth Circuit has allowed Title IX claims against the Kentucky State Board for its sports sanctioning decisions due to its "exclusive management and control of all the common schools in Kentucky and all of the programs operated in the schools," including control of the Commonwealth-wide athletic association. *Horner v. Ky. High Sch. Athl. Ass'n*, 43 F.3d 265, 268 (6th Cir. 1994). Here, in contrast, the General Assembly deleted the provision of SB 228 giving the State Board authority to enforce SB 228's definition of gender as sex, which the General

---

[7] The State Board did not adopt any policy or rule as a result of SB 228. And Plaintiff has challenged only SB 228, not the more recently enacted legislation. H.B. 1895 § 2, 2022 Pub. Acts, ch. 909. The general duty of a Governor and state executives to execute the laws is insufficient to invoke jurisdiction. *See Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1413 (6th Cir. 1996).

9

Assembly itself wrote, and Plaintiff did not challenge the subsequent legislation in this lawsuit. Therefore, Plaintiff's Title IX claim against the State Board is unrelated to any act of control or management by the State Board.

### III.    Plaintiff Fails to Establish an Equal-Protection Claim Against State Defendants.

Plaintiff's misreading of SB 228 results in Plaintiff making Equal Protection Clause arguments better aimed at other States' laws (or at the TSSAA's decision to separate some sports by sex).[8]  The Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  That language "was not designed to compel uniformity in the face of difference."  *Whitney v. State Tax Comm'n*, 309 U.S. 530, 542 (1940).  Instead, it bars only "intentional and arbitrary discrimination."  *Glicker v. Mich. Liquor Control Comm'n*, 160 F.2d 96, 99 (6th Cir. 1947) (quoting *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918)).

Here, Plaintiff fails to show that intermediate or heightened scrutiny are warranted.  And, even if they were, Plaintiff cannot demonstrate that SB 228 includes any intentional and arbitrary discrimination (much less demonstrate that such alleged discrimination would be beyond dispute). The Constitution allows States to define gender as sex.  Such a statewide definition is necessary, among other reasons, to provide clarification for statewide interscholastic sports and to educate student-athletes about the correct meaning of gender and sex, as decided by the General Assembly. And even if SB 228 did require TSSAA to separate sports based on sex, such a separation would be even more justified due to the "distinct physical characteristics and capabilities between the sexes," *Cape*, 563 F.2d at 795, which would result in fewer athletic opportunities for girls and

---

[8] Plaintiff brought Count I "Deprivation of Equal Protection" against all State Defendants except the State Board of Education itself.  (Compl. 24, ECF 1, PageID # 24.)

more frequent injuries if subjective gender identity dictated which gender-specific sport a student should play in. If the law went even further to impact locker rooms, restrooms, and the like, then it would substantially advance important privacy interests. *See D.H. v. Williamson Cnty. Bd. of Educ.*, No. 3:22-cv-00570, 2022 WL 16639994, at *9 (M.D. Tenn. Nov. 2, 2022) (denying a preliminary injunction "[g]iven the long history of allowing separate bathroom facilities based on sex" and the importance of the privacy interest).

### a. Rational-basis review is the proper standard for this definition of gender.

SB 228's definition of gender as sex for purposes of interscholastic is subject to rational-basis review.[9] Courts have repeatedly applied rational-basis review to challenges of the definitional contours of various classifications, even racial ones.[10] A state's definitions may "appear arbitrary or unfair to persons classified as being within or without the chosen category," but that is insufficient to subject the definitions themselves to heightened scrutiny. *Jana-Rock Constr.*, 438 F.3d at 210.

"Gender-based distinctions are less likely to create the analytical and practical[ ]problems

---

[9] Rational-basis review is a "highly deferential" standard "designed to respect the constitutional prerogatives of democratically accountable legislatures." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (en banc) (quotation marks omitted). "All that matters" under this standard "is whether the state conceivably had a rational basis to enact the legislation." *Id.* The State's rationales need not be supported with evidence and are not "subject to courtroom fact-finding." *Id.* at 484 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). "Courts may not second-guess a state's 'medical and scientific judgments.'" *Id.* at 483 (quoting *Preterm-Cleveland v. McCloud*, 994 F.3d 513, 525 (6th Cir. 2021) (en banc)). "And they must defer to a state's judgment that there is a problem that merits correction." *Id.*

[10] *See, e.g., Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) (applying rational-basis review to definition of "Hispanic"); *Orion Ins. Grp. v. Wash. State Off. of Minority & Women's Bus. Enters.*, No. 16-5582, 2017 WL 3387344, at *2, 11, 13 (W.D. Wash. Aug. 7, 2017) (applying rational-basis review to definition of "Black"), *aff'd sub nom. Orion Ins. Grp. v. Washington's Off. of Minority & Women's Bus. Enterprises*, 754 F. App'x 556 (9th Cir. 2018); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986) (applying rational-basis review to definition of "Hawaiian").

present in preferential programs premised on racial or ethnic criteria," so there is no reason not to apply rational-basis review to Tennessee's definition of gender as sex as identified at birth. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 302-03 (1978) (op. of Powell, J.). After all, "[w]ith respect to gender," using this traditional equivalence of "gender" and "sex," "there are only two possible classifications." *Id.* at 303.[11]

Transgender status and gender identity are simply irrelevant to SB 228's definition of gender as sex. A student's gender is either male or female depending on the student's sex, as indicated at birth. Because each group can contain both transgender students and non-transgender students, a "lack of identity" exists between the definition and transgender status. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Smith v. Troyan*, 520 F.2d 492, 495 (6th Cir. 1975).[12]

**b. The statutory definition of gender as sex easily satisfies rational-basis review.**

A state law satisfies rational-basis review when it "is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. This is a "relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor

---

[11] Plaintiff's Motion for Summary Judgment and Memorandum of Law identified no animus against either sex or against transgender individuals on the face of the statute.

[12] Plaintiff's rewriting of a quotation from Justice O'Connor's concurrence in *Lawrence v. Texas* does not prove otherwise. (Plaintiff's Memo. of Law at 10.) In that case, Texas argued that the law "discriminate[d] only against homosexual conduct"—homosexual sodomy. 539 U.S. 558, 583 (O'Connor, J., concurring in the judgment). The Texas law, however, did not apply equally to heterosexual sodomy. *Id.* In contrast, SB 228's definition of gender applies equally to both sexes regardless of transgender status. And TSSAA does not allow a girl to play on the boys' golf team regardless of whether the girl identifies as a boy. There was no Equal Protection claim in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 689 (2010) (including the O'Connor concurrence in a citation string). Plus, *Martinez* stands for the principle that private parties cannot force a state actor to support private views, such as Plaintiff's, that are contrary to how the State chooses to "advance state-law goals through . . . educational endeavors," which here include interscholastic sports. *Id.* at 690.

12

necessary." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976). A "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Borman's, Inc. v. Mich. Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir. 1991) (quoting *Baker v. Vanderbilt Univ.*, 616 F. Supp. 330, 331 (M.D. Tenn. 1985)).

SB 228 is rationally related to several legitimate state interests. Indeed, even if intermediate scrutiny applied to this definitional statute, the law serves "important governmental objectives" and employs means "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

*First*, the statute clarifies the meaning of "gender" in Tennessee interscholastic sports by defining "gender" as being consistent with "sex." The Supreme Court has applied heightened (or intermediate) scrutiny to discrimination "based on sex." (Compl. ¶ 91, ECF 1, PageID #25.) And since the Court began using that standard, it has treated "sex" and "gender" as synonymous. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 202-04 (1976); *Miss. Univ. for Women*, 458 U.S. at 728-31.

The definition of "gender" at the time of the Fourteenth Amendment's ratification was "sex." In 1868, "gender" had two non-obsolete definitions: (1) "Sex, male or female"; or (2) "(*Gram.*) A difference in words to express distinction of sex." *Gender*, An American Dictionary of the English Language (1865). The non-grammatical form of "gender" thus referred to binary "sex," the "distinguishing peculiarity of male or female; the physical difference between male and female; the assemblage of properties or qualities by which male is distinguished from female, or female from male." *Sex*, An American Dictionary of the English Language (1865).[13]

---

[13] *See also Sex*, A Dictionary of the English Language (1860) ("One of the two divisions of animals, male and female.") This is no stereotype; the distinction between males and females was and is the different organization of reproductive systems. A female is an "individual of the sex

For most Americans, "sex" and "gender" continue to refer to the biological binary based on the organization of reproductive systems.[14]  As SB 228 provides, sex is observed at "the time of the student's birth" and "indicated on the student's original birth certificate."  Tenn. Code Ann. § 49-6-310(a).  Neither Plaintiff nor Plaintiff's putative expert Dr. Cyperski deny that, "[a]t birth, most people are assigned a sex, typically male or female, based solely on the appearance of their external genitalia."  Cyperski Dep. 27:13-24.  Plaintiff does not deny Plaintiff's sex is male.

Nevertheless, while most Tennesseans continue to use the biologically binary understanding of "sex" and "gender," "[s]ome people maintain that the word *sex* should be reserved for reference to the biological aspects of being male or female or to sexual activity, and that the word *gender* should be used only to refer to sociocultural roles."  *Gender*, The American Heritage Dictionary (5th ed. 2011).  SB 228 resolves any ambiguity about the meaning of gender for interscholastic sports by adopting the meaning that most Tennesseans use.

All parties can agree that it is not a good idea to hide such a significant policy where citizens cannot see it.  *Summa Holdings, Inc. v. Comm'r of IRS*, 848 F.3d 779, 781 (6th Cir. 2017).  Without the statute in place, unpublished TSSAA policies failed to provide clarity to Tennesseans.  The 2018 TSSAA policy that Plaintiff attached to the Complaint did not require the provision of any notice to other schools.  (Compl. Ex. A, ECF 1-1, PageID # 31-33).  No one ever made use of the

---

among animals which conceives and brings forth young," *Female*, An American Dictionary of the English Language (1865), while a male is an individual of the "sex that begets or procreates young, as distinguished from the female," *Male*, An American Dictionary of the English Language (1865).

[14] *See Gender*, The American Heritage Dictionary (5th ed. 2011) ("Either of the two divisions, designated male and female, by which most organisms are classified on the basis of their reproductive organs and functions; sex."; *Sex*, The American Heritage Dictionary (5th ed. 2011) (same); *Gender*, Fowler's Dictionary of Modern English Usage (4th ed. 2015) ("In the 20th cent., as *sex* came increasingly to mean sexual intercourse, *gender* began to replace it (in early use euphemistically) as the usual word for the biological grouping of males and females.").

policy—not even Plaintiff, even though the policy was in effect for middle and high school athletics over a year after Plaintiff identified as a boy. (Compl. ¶¶ 61, 76, ECF 1, PageID # 19, 23.). SB 228 remedied that notice problem by clearly defining gender.

*Second*, SB 228 ensures that boys cannot displace girls in athletics simply by "claim[ing] a female gender identity." 2021 Tenn. Pub. Acts, ch. 40; *cf. Cape*, 563 F.2d at 795 ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."). If Plaintiff's understanding of gender identity is correct, "there's an infinite number of gender identities," and some individuals have "an inner sense of gender that is consistent with male, female, neither, or both, and that that may fluctuate over time." Cyperski Dep. 49:24-24, 50:20-22. That subjective approach to gender leaves no objective standard to determine what TSSAA-established category to place a nonbinary or gender-fluid student in. If an unscrupulous male student claimed a female gender identity to play on a girls' team, a subjective gender-identity approach would not stop him. SB 228 prevents that by providing an immutable, binary, and objective definition of gender.

*Third*, the statute reduces the risk of injury when girls compete against boys and by enabling interscholastic sports to be conducted in a safer manner to promote continued participation and equitable opportunities for all children. 2021 Tenn. Pub. Acts, ch. 40. Sports are safer when athletes know whom they are competing against and have a clearer understanding of injury risks. While injury from physical contact might not be a concern in golf, it is a very important consideration for mitigating risk in contact sports. State Defendants readily acknowledge that TSSAA rules *already* allow girls to compete against boys in some contact sports, such as football and wrestling. That goes to show that TSSAA's rules for golf are the real source

of Plaintiff's alleged harm. And coaches and administrators still have an interest in knowing a student's sex to minimize and respond to injuries from competition.[15]

*Fourth*, the statute achieves the State's interest in educating Tennessee students according to what the State views as the correct understanding of "gender" and "sex." Student-athletes are still students. And the State retains its obligation to educate them. From time to time, the General Assembly provides specific instructions for how to educate Tennessee students. *See, e.g.*, Tenn. Code Ann. § 49-1-308 (urging education about Civil Rights Movement). Local educational agencies have some flexibility when instructing their students about "sex" and "gender," but interscholastic sports inherently include more than one school and frequently cross county lines. Because local educational agencies might take different approaches, the General Assembly resolved that the educational message to Tennessee students should be the same one they likely encounter in biology classrooms: that male and female are immutable binaries identified at birth in recognition of reproductive system differences that are central to sexual reproduction.

The General Assembly's definition of "gender" as "sex" for purposes of participation in public school interscholastic sports is thus the government's educational speech, and "the Equal

---

[15] TSSAA's wrestling rules are illustrative. TSSAA regulations establish a girls' wrestling division and a general wrestling division that both boys and girls can compete in. Despite the option to wrestle against boys, many girls still choose to wrestle only against other girls. And the biology of sex remains an important consideration in the general wrestling division. As is common in middle and high school wrestling, TSSAA separates wrestlers into different weight categories based on a body measurement process. TSSAA Wrestling Regulations at 4 (Oct. 26, 2021), https://cms-files.tssaa.org/documents/tssaa/2021-22/sports-regulations/202122Wrestling Regulations.pdf. TSSAA calculates and establishes "a minimum wrestling weight based on 7% body fat for males and 12% for females" to discourage wrestlers from engaging in unhealthy fasting and binging practices throughout the season. *Id.* The result under TSSAA regulations is that a boy will have a higher minimum weight class than a girl with a similar weight at the beginning of the wrestling season. If a student of the female sex who, like Plaintiff, now identifies as a boy were to be considered a boy for this process, then that student would have to compete in a higher weight class where the student would be less competitive and more susceptible to injury. SB 228 thus promotes safer competition.

Protection Clause does not apply to government speech." *Fields v. Speaker of Pa. House of Reps.*, 936 F.3d 142 (3d Cir. 2019); *see also Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 F.3d 686, 698 (6th Cir. 2013). Equal Protection claims challenging government speech are barred because "it is the very business of government to favor and disfavor points of view," and "a government entity is entitled to say what it wishes and to select the views it wants to express." *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)).

In looking to biology and defining gender as sex, SB 228 does not rely on sex stereotypes; the law relies on the prevailing dictionary definition of gender at the time of the Fourteenth Amendment's ratification and Title IX's enactment. In reality, Plaintiff's suggested approach based on feelings and preferred names, pronouns, voice pitches, clothes, and bathrooms is the one reliant on sex stereotypes. *Cf. Smith v. City of Salem*, 378 F.3d 566, 572, 574 (6th Cir. 2004) (accepting that the plaintiff was a male "biologically and by birth" but allowing claims to go forward where he alleged that the employer threatened to terminate his employment after he externally "express[ed] a more feminine appearance" such as with dresses and makeup). [16]

---

[16] Ironically, Plaintiff's alternative approach to gender is also the one that focuses on gender identity and transgender status. Although Plaintiff has danced around providing a clear alternative definition of gender for the State to use if this Court rules the common equation of gender and sex unconstitutional, Plaintiff apparently determines gender by how a student "feels"; the "desire for a deeper" or higher pitched "voice"; whether a student's chosen name is "masculine" or feminine; what pronouns a student prefers; how a student "groom[s] and dress[es]"; and what restrooms a student prefers to use. (Pl.'s Memo. of Law at 2, 11, ECF 51, PageID # 542, 551.) To be sure, this nonbiological definitional gerrymander would lead to Plaintiff's desired result in this case. But it is not a "workable" one "through which" the State "could have met its educational goals, as" the General Assembly "understood and defined them." *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 387-88 (2016). Plaintiff wants the TSSAA to retain separate categories for boys' and girls' golf but provides no logical way to define the "infinite number of gender identities," which can even fluctuate over time, as just two categories. (Cyperski Dep.49:24-24, 50:20-22.)

### c. Even if SB 228 separated students into different sports based on transgender status, the law would still comport with the Equal Protection Clause.

Plaintiff agrees that TSSAA is right to have sex-segregated golf teams. But athletic teams cannot be sex-segregated if the two sexes are not actually separated onto different teams based on sex qua sex. Ignoring this reality and refusing to define gender or sex, Plaintiff argues that "[t]ransgender status classifications inherently classify based on sex" and that "[t]ransgender people constitute, at the least, a quasi-suspect class." (Plaintiff's Memo. of Law at 12, 14.) Even if this Court found that SB 228 requires TSSAA to separate student-athletes into different divisions based on sex (regardless of transgender status), that is not an Equal Protection violation.

### i. Plaintiff, whose sex is female, is not similarly situated to males.

"[T]he Constitution does not require things which are different in fact . . . to be treated in law as though they were the same." *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (quoting *Tigner v. Texas,* 310 U.S. 141, 147 (1940)). To state an Equal Protection claim, a complaint must therefore allege "that the government treated the plaintiff disparately as compared to *similarly situated* persons." *Reform Am. v. City of Detroit,* 37 F.4th 1138, 1152 (6th Cir. 2022) (emphasis added) (quotation omitted). "To be 'similarly situated' . . . , the plaintiff and the comparator must be alike 'in all relevant respects.'" *Id.* (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)).

For purposes of athletic competition, Plaintiff—who is female—is not like male peers in all relevant respects. Since birth, Plaintiff's anatomy has been that of a girl. Plaintiff never denies having female genitalia, a female reproductive system, and a female endocrine system.[17] In every relevant respect for purposes of athletic competition—from bone density to muscle mass to natural

---

[17] Plaintiff has not undergone any surgery to make Plaintiff's body appear more like that of a boy. (Shelley Dep. 79:12-15.) And Plaintiff filed this suit *before* taking cross-sex hormones (i.e., exogenous testosterone). (Compl., ECF 1; Shelley Dep. 14:10-15:5.) Plaintiff's body will never naturally produce the normal level of testosterone that boys' bodies would.

testosterone levels—Plaintiff is not alike in all relevant respects to Plaintiff's male peers. Indeed, the law has virtually always approached the two sexes as biologically distinct, recognizing that "physical differences between men and women are enduring: The two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex . . . is an immutable characteristic determined solely by the accident of birth."). Defining gender as sex is not a sex stereotype; it is sex itself.

Separating sports teams into different divisions for boys' and girls' based on sex is not a "transgender classification" that "by definition entails consideration of sex." (Plaintiff's Memo. at 12.) Such a classification is one based on sex, *regardless* of transgender status. But Plaintiff, no doubt realizing the wide sweeping ramifications of arguing that all sex classifications are unconstitutional, attempts to cabin the argument to "transgender classification" laws. That will not do. If Plaintiff wants to challenge TSSAA's separation of sports such as golf into separate sex-based categories (that entirely ignore transgender status), Plaintiff has failed to do so here.

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), provides no support for Plaintiff's Equal Protection Clause and Title IX claims. In *Bostock*, the Supreme Court ruled only that Title VII forbids an employer from "fir[ing] someone simply for being homosexual or transgender." *Id.* at 1737. The Supreme Court expressly denied that *Bostock* applies to any other question or any other federal law. *Id.* at 1753; *see Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in Bostock was clear on the narrow reach of its decision and how it was limited only to Title VII itself."). *Bostock* even "proceed[ed] on the assumption that 'sex'" in Title VII "referr[ed] only to biological distinctions between male and female" and disclaimed *Id.* at 1739. Firing an employee because he is transgender is not the same as applying a gender-identity-neutral definition of sex to all student-athletes. And while "[a]n individual's homosexuality or transgender

status *is not relevant* to employment decisions" about hiring and firing, *id.* at 1741 (emphasis added), sex is relevant to interscholastic sports.

### ii. Transgender individuals are not a quasi-suspect class.

Contrary to Plaintiff's assertions, transgender individuals are not a quasi-suspect class entitled to heightened scrutiny under the Equal Protection Clause. Indeed, "[t]he Supreme Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015) (ruling homosexuals are not a suspect or quasi-suspect class).

And even if Sixth Circuit precedent did not already foreclose Plaintiff's quasi-suspect classification argument, Plaintiff cannot demonstrate that transgender individuals are a quasi-suspect class on the record in this case. Among other requirements, Plaintiff must show that class members exhibit "immutable" "characteristics that define them as a discrete a group" and are a "politically powerless" minority. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). To start, transgender status is not immutable. A person's gender identity is frequently fluid and "may fluctuate over time." (Cyperski Dep. at 49:21-24.) There are no set characteristics that unite these "infinite" gender identities. (Cyperski Dep. at 50:20-22.) Further, some students identifying as transgender will not persist in that identity. (Cyperski Dep. at 122:5-10 (referencing a detransitioner).) This is not a "defining characteristic," (Plaintiff's Memo. of Law at 15), that is "definitively ascertainable at the moment of birth" and incapable of change, *Ondo*, 795 F.3d at 609.

And transgender individuals are not politically powerless. Plaintiff's putative expert Carroll boasts that sixteen States have *already* adopted eligibility policies that allow transgender individuals to compete in sports based on their gender identity, (Carroll Report at 5), including the neighboring States of North Carolina and Virginia, (Carroll Dep. at 62:4-16). The current

20

presidential administration—of the same political party that controlled both houses of Congress at the time Plaintiff filed this lawsuit—supports Plaintiff's interpretation of Title IX and has attempted to expand Title IX to preempt SB 228. *See Tennessee*, 2022 WL 2791450, at *2-3, *7, *21 (preliminarily enjoining the unlawful guidance documents as inconsistent with Title IX).[18] Merely because a group is a minority of the population does not mean that it is a politically powerless quasi-suspect class. *See Lying*, 477 U.S. at 638 (citing *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976) (holding that a class of state police officers over 50, an obvious minority of the population, was not entitled to anything more than rational-basis review)).

### d. Even if intermediate scrutiny applies, SB 228 satisfies that standard.

A law satisfies intermediate scrutiny when it serves "important governmental objectives" and employs means "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).[19] Intermediate scrutiny is not strict scrutiny; bringing an as-applied challenge does not mean that SB 228 has to be the best way to further the State's interests 100% of the time.[20]

---

[18] Notwithstanding an objection as to admissibility, Plaintiff has submitted an article claiming that "[m]ore than 180 major U.S. corporations," including major Tennessee employers such as Amazon, are on the side of transgender individuals. (Ex. 34, PageID # 1402.)

[19] Although Plaintiff has brought an as-applied challenge (which requires the analysis to progress through the lens of a particular circumstance), the important government objectives at play—and the law's relation to those objectives—may pull from beyond this single application. For instance, the substantially-related inquiry does not "require[] that the [policy] under consideration . . . be capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("[C]lassifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation.").

[20] Plaintiff's reliance on *Bannum v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992), is misplaced. In that case, the Sixth Circuit opined that a special zoning rule that applied only to community training centers violated the Equal Protection Clause because it did not make sense to apply to

21

SB 228's statewide definition of gender as sex in interscholastic competition is substantially related to the four important government interests described above. Even though this case revolves around Plaintiff's desire to play on the boys' golf team, that does not diminish the value of using sex as a uniform definition of gender. If SB 228 does not make sense *only* for L.E., then it would still make sense for over 99% of Tennessee student-athletes, far more than intermediate scrutiny requires. TSSAA frequently needs to know whether an individual is a boy or a girl to reduce health and injury concerns even if TSSAA ultimately allows girls to compete against boys, as in wrestling or football. And while Plaintiff's inability to demonstrate skill in golf means that there is less of a competitive parity concern from Plaintiff in particular competing on the boys' golf team, a law that applied only to girls' sports teams would itself be challenged on Equal Protection grounds for treating girls worse than boys. As a matter of fact, Plaintiff's counsel in this case—the American Civil Liberties Union Foundation—has *already* argued that an Idaho law that required sex-verification only for female sports was unconstitutional because it "contain[ed] no parallel provision for teams and sports designated for male students." *Hecox v. Little*, No. 1:20-cv-00184-DCN, Plaintiffs' Memo. in Support of Mot. for Preliminary Injunction, 2020 WL 6828997 (D. Idaho Apr. 30, 2020).[21]

And "it is simply incorrect to assert that the inclusion of only a single" female student as a putative boy in boys' golf "would not significantly alter" the States' educational and clarity

_____

community training centers *as a whole*, not because the individual plaintiff deserved an exception from the general zoning rule. 958 F.2d at 1361.

[21] *See Hecox v. Little*, 479 F. Supp. 3d 930, 985 (D. Idaho 2020) (allowing claim to proceed because the Idaho law "singl[es] out members of girls' and women's teams for sex verification"); *see also A.M. ex rel. E.M. v. Indianapolis Pub. Schs.*, No. 1:22-cv-01075-JMS-DLP, 2022 WL 2951430, at *11 (S.D. Ind. July 26, 2022) (preliminarily enjoining an Indiana law that applied only to girls' sports because it "singl[ed] out transgender females" instead of "prohibit[ing] all transgender athletes from playing with the team of the sex with which they identify").

interests. *Green*, 2022 WL 16628387, at *11 (majority opinion) (ruling that a beauty pageant did not need to allow a man to participate as a putative woman). If this Court requires the State to define even one student's gender based on gender identity rather than sex, then the statewide definition is undone, and the State has been stripped of control over its educational message. There is no way to split the baby without frustrating the State's important interests: either the State is allowed to define gender as sex or it is not.[22]

## IV. Plaintiff fails to establish a Title IX claim against the State Board of Education.

The General Assembly, not the State Board of Education, defined gender as sex. Plaintiff fails to identify any enacted rule of the State Board authorized by the now existing version of SB 228 that violates Title IX. But even if the State Board were responsible for the definition of gender in interscholastic sports, SB 228 did not violate Title IX by defining a "student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event" as "the student's sex at the time of the student's birth, as indicated on the student's original birth certificate." Tenn. Code Ann. § 49-6-310(a).

That immutable, binary definition is exactly what Congress (and the public) understood sex to mean in 1972 when Title IX became law. *See, e.g.*, *Sex*, The Random House College Dictionary (rev. ed. 1975) ("[e]ither the male or female division of a species, esp. as differentiated

---

[22] As explained above, professional and intercollegiate governing bodies have moved away from Plaintiff's preferred approach in the last year. But even if the International Olympic Committee (a Swiss-based organization) or the NCAA (an Indiana-headquartered organization) disagree with the definition of gender in SB 228, they are not the democratic government of the State of Tennessee and have no authority over our interscholastic middle and high school sports. The General Assembly is better situated to decide what is best for Tennessee athletes. *Compare NCAA v. Alston*, 141 S. Ct. 2141 (2021) (affirming preliminary injunction of anticompetitive NCAA rule that allowed the NCAA, but not intercollegiate athletes, to profit off those athletes' name, image, and likeness), *with* Tenn. Code Ann. § 49-7-2802 (allowing intercollegiate athletes to "earn compensation for the use of the intercollegiate athlete's own name, image, or likeness").

23

with reference to the reproductive functions").  Title IX itself describes how an institution may change "from . . . admit[ting] only students of one sex to . . . admit[ting] students of *both* sexes." 20 U.S.C. § 1681(a)(2) (emphasis added).  It also refers to "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one sex."  *Id.* § 1681(a)(6)(B).

Moreover, "not all differentiation based on sex is impermissible discrimination."  *D.H.*, 2022 WL 16639994, at *10.  A primary purpose of Title IX was to increase opportunities for women through education, clubs, and athletics—that, by its nature, required both a distinction between men and women, and the ability for women to maintain a degree of separateness.  *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 523-25 (1982) (also using "gender" and "sex" as synonyms). The text of Title IX makes that clear.  For example, 20 U.S.C. § 1686 states that "nothing contained herein [in Title IX] shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes."  Senator Bayh, the chief Senate sponsor of Title IX, added that provision to clarify that institutions may "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved."  118 Cong. Rec. 5,807 (1972).  Plaintiff's construction of Title IX—arguing that the State and schools cannot define gender as sex or consistently separate students based on biologically defined sex—runs headlong into 20 U.S.C. § 1686.  *Cf. Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). [23]

Lacking support in Title IX's text and regulations, Plaintiff encourages this Court to import

---

[23] Title IX regulations expressly allow institutions to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill," as is the case with golf, "or the activity is a contact sport."  34 C.F.R. § 106.41(b).  "[W]here a recipient operates or sponsors a team in a particular sport for members of one sex but operates no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport."  *Id.*

24

the Title VII reasoning of *Bostock* to Title IX or to defer to the flawed analysis of out-of-circuit precedent.  But the Sixth Circuit has already established that the text of "Title VII differs from Title IX in important respects."  *Meriwether*, 992 F.3d at 510 n.4.  It therefore "does not follow that principles announced in the Title VII context automatically apply in the Title IX context."  *Id.*; *see also Pelcha*, 988 F.3d at 324 (limiting *Bostock* to Title VII).

In short, Plaintiff does not actually allege that the State Board is treating one sex worse than the other.[24]  Title IX requires covered institutions to "provide equal athletic opportunity for members of both sexes," not to allow transgender students to play on whichever team makes them happy.  34 C.F.R. § 106.41(c).  Members of both the male and female sex have equal opportunity to play interscholastic golf.  That Plaintiff no longer wants to play on a girls' golf team does not mean that the State Board treats one sex worse than the other.  Requiring Tennessee to create a special rule for girls who identify as boys (but not girls who correctly acknowledge that they are girls) would "create[] rights for students and obligations for regulated entities not to discriminate based on . . . gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations."  *Tennessee*, 2022 WL 2791450, at *21.[25]

## CONCLUSION

For the reasons stated, this Court should deny Plaintiff's motion for summary judgment.

---

[24] A sex stereotyping claim is not cognizable under Title IX anyway.  The Sixth Circuit has expressly rejected the notion that the Title VII reasoning of *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), applies to Title IX because "Title VII differs from Title IX in important respects."  *Meriwether*, 992 F.3d at 510 & n.4 (distinguishing that case).

[25] SB 228 does not "singl[e] out transgender people on the basis of there transgender status." (Plaintiff's Memo of Law at 22.)  It provides the same definition of gender for all students.  Nor does the law "isolate[] them from their peers." (Plaintiff's Memo. of Law at 22.)  The law has no application outside of interscholastic athletics and does not forbid transgender students from playing any sport.  Even if separating sports based on sex somehow stigmatized transgender students due to their transgender status, that does not constitute sex discrimination under Title IX.

25

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

CLARK L. HILDABRAND, BPR # 038199
Assistant Solicitor General

/s/ Stephanie Bergmeyer
STEPHANIE BERGMEYER, BPR # 027096
Senior Assistant Attorney General
Office of Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Stephanie.Bergmeyer@ag.tn.gov
(615) 741-6828

*Attorneys for Governor Lee, Commissioner Schwinn, Dr. Morrison, and the individual members of the Tennessee State Board of Education, in their official capacities, and the Tennessee State Board of Education*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this Response has been served through the e-filing system on November 4, 2022, to:

Leslie Cooper
Lisa Nowlin-Sohl
Taylor Brown
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1776 K St. NW, 8th Floor
Washington, DC 20006-5500

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1 West Court Sq., Ste. 105
Decatur, GA 30030-2556

Alan E. Schoenfeld
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St., 45th Floor
New York, NY 10007

Thomas F. Costello-Vega
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Ave., Ste. 2400
Los Angeles, CA 90071

Britany Riley-Swanbeck
Emily L. Stark
Samuel M. Strongin
Jennifer Milici
John W. O'Toole
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006

Matthew D. Benedetto
WILMER & LEE, P.A.
100 Washington St., Ste. 200
Huntsville, AL 35804

Stella Yarbrough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212

David M. Sanders
Senior Deputy Law Director
Knox County, Tennessee
400 W. Main St., Suite 612
City-County Building
Knoxville, TN 37902

Jessica Jernigan-Johnson
LONDON & AMBURN, PLLC
607 Market St., Ste. 900
Knoxville, TN 37902


s/Stephanie Bergmeyer
Stephanie Bergmeyer