**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **L.E., by next friends and parents,** | ) | |
| **SHELLEY ESQUIVEL and** | ) | |
| **MARIO ESQUIVEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:21-cv-00835** |
| **v.** | ) | |
| | ) | **Chief Judge Crenshaw** |
| **BILL LEE, in his official capacity as** | ) | |
| **Governor of Tennessee; et al.,** | ) | **Magistrate Judge Newbern** |
| | ) | |
| **KNOX COUNTY BOARD OF** | ) | |
| **EDUCATION a/k/a KNOX COUNTY** | ) | |
| **SCHOOL DISTRICT; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**STATE DEFENDANTS' RESPONSE TO**
**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

---

Pursuant to Local Rule 56.01(c), Defendants Governor Lee, Commissioner Schwinn, Executive Director Morrison, members of the Tennessee State Board of Education, in their official capacities, and the Tennessee State Board of Education (collectively, "State Defendants") respond to Plaintiff's statement of undisputed material facts as follows.

1.     Plaintiff L.E. is a fifteen-year-old boy.  Declaration of L.E. ¶2, Ex. 1 ("L.E. Decl.");
Deposition Transcript of L.E. at 6:11-16, Ex. 2 ("L.E. Dep.").

**RESPONSE:**  It is undisputed that Plaintiff L.E. is fifteen.  It is disputed that Plaintiff L.E.
is a boy.  L.E.'s birth certificate states that L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID #
22; Shelley Dep. 6:19-23; Mario Esquivel Dep. 73:20-21.

2.     L.E. is currently a tenth-grade student at Farragut High School, a public high school
in Knoxville, Tennessee.  L.E. Decl. ¶2; L.E. Dep. at 6:14-16.

**RESPONSE:**  Undisputed that L.E. is currently a tenth-grade student at Farragut High
School, a public high school in Knoxville, Tennessee.  The appropriate pronouns to use to refer to
L.E. is disputed.

3.     Farragut High School is a public high school that is part of the Knox County
Schools public school system.  Deposition Transcript of Jennifer Hemmelgarn at 25:1-26:14, Ex.
7 ("Hemmelgarn Dep.").

**RESPONSE:**  Undisputed.

4.    L.E. was assigned the sex of female at birth.  L.E. Decl. ¶3; Deposition Transcript of Shelley Esquivel at 6:19-23, Ex. 3 ("Shelly Dep."); Knox County Defendants' Responses to Plaintiff's First Set of Requests for Admission ("KCD RFA Resp.") #1, Ex. 13.

**RESPONSE:**  It is undisputed that L.E.'s sex was female at birth.  It is disputed that L.E.'s sex was "assigned."  Sex is not merely "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and and almost always determined at conception.  Expert Report of Stephen B. Levine, M.D. ("Levine Rep.") 15, ¶ 17.

5.    L.E. has a male gender identity.  L.E. Decl. ¶3; KCD RFA Resp. #2-3.

**RESPONSE:**  It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. perceives L.E. to be a boy as of the time of the declaration executed October 6, 2022.  It is disputed that whether this perception is an accurate description of L.E.  It is disputed that gender identity is a fixed concept.  Levine Rep. 70-77.

6.    A person's "gender identity is a fundamental and core component of human identity."  Expert Report of Dr. Melissa A. Cyperski ("Cyperski Rep.") ¶12, Ex. 18.

**RESPONSE:**

OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion, which is unsupported by facts or data and is inadmissible under Fed. R. Evid. 702.  *See* Cyperski Rep. ¶ 12.

7.     The term "cisgender" refers to people who have a gender identity that aligns with their sex assigned at birth.  Cyperski Rep. ¶13.

**RESPONSE**:  It is undisputed, for purposes of ruling on the motion for summary judgment only, that the term "cisgender" often is used to refer to people who have a self-perception of their gender that aligns with their sex at birth.  It is disputed that sex is "assigned."  Sex is not merely "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and almost always determined at conception.  Levine Rep. 15, ¶ 17.


8.     Transgender people have a gender identity that does not align with the sex that they were assigned at birth.  Cyperski Rep. ¶13.

**RESPONSE:**  It is undisputed, for purposes of ruling on the motion for summary judgment only, that the term "transgender" may refer to people who have a self-perception of their gender that does not align with their sex at birth.  It is disputed that sex is "assigned."  Sex is not "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and almost always determined at conception.  Levine Rep. 15, ¶ 17.

9.      Because L.E.'s female sex assigned at birth and male gender identity are not in alignment, L.E. is considered a transgender boy or male.  L.E. Decl. ¶3; Deposition Transcript of Dr. Penny Schwinn at 13:11-18, Ex. 5 ("Schwinn Dep."); Deposition Transcript of Dr. Sara Heyburn Morrison at 92:3-14, Ex. 6 ("Morrison Dep."); Hemmelgarn Dep. At 13:16-14:2; KCD RFA Resp. #3.

**RESPONSE:**  It is undisputed that L.E.'s sex at birth was female.  It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. at the time of the declaration executed October 6, 2022, perceives L.E. to be a boy and may be considered to be a transgender person.  It is disputed that gender identity is a fixed concept.  Levine Rep.70-77.  It is disputed that L.E.'s sex was "assigned."   Sex is not merely "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and almost always determined at conception.  Levine Rep. 15, ¶ 17.  It is disputed that L.E. is a boy.  L.E.'s birth certificate states L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21.


10.      L.E. feels like he has "always been a boy."  L.E. Decl. ¶3; L.E. Dep. at 33:11.

**RESPONSE:**  Disputed.  L.E. disclosed to Samuel Steinbruegge that L.E. felt like a boy since fifth grade.  Declaration of Steinbruegge ¶ 3, ECF 53-12, PageID # 973.  It is also disputed that L.E. is a boy.  L.E.'s birth certificate states that L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21.

4

11.     For example, he has "always preferred … boys' clothes and … activities," L.E. Decl. ¶¶3,9; Shelley Dep. at 7:7-9; L.E. Dep. at 26:4-10, and has long "gravitated towards boys' clothes and wanting to do things with other boys," L.E. Decl. ¶¶3-9; Shelley Dep. at 8:9-16; Deposition Transcript of Mario Esquivel at 23:10-19, Ex. 4 ("Mario Dep.").

**RESPONSE:** It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. has preferred what L.E. and L.E.'s parents perceive to be boys' clothes.  Whether L.E. has preferred boys' activities or doing things with other boys is disputed.  L.E.'s best friend is a girl; L.E. has a small group of friends that are girls.  Shelley Dep. 61:15-16; Mario Dep. 16:17-19, 52:1-4.  L.E. is not friends with anyone on the high school boys' golf team.  L.E. Dep. 18:22-24.

12.     L.E. also told his parents that he was anxious about the changes to his body that female puberty would cause, and he expressed a desire for a deeper voice, Shelley Dep. at 7:7-9, 14:4-9, 22:20-22.

**RESPONSE:** It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. said that L.E. did not want to develop breasts and wanted a deeper voice.  The remaining facts are objected to as not supported by the materials cited.

13.     In late 2019, when he was in seventh grade, L.E. told his parents that he did not feel like a girl and considered himself a boy.  L.E. Decl. ¶4; Shelley Dep. at 7:5-11; Mario Dep. at 23:3-24:13.

**RESPONSE:**  Undisputed for purposes of ruling on the motion for summary judgment only that L.E. told L.E.'s parents that L.E. did not feel like a girl and considered L.E. a boy.  The correct pronouns to refer to L.E. are disputed.

14.     L.E.'s parents were "not very surprised" when L.E. told them he considered himself a boy.  L.E. Decl. ¶4; Shelley Dep. at 8:9-16; Mario Dep. at 23:10-19.

**RESPONSE:**  Disputed.  Mr. Esquivel was shocked and confused.  (Mario Dep. 23:20-22).  The correct pronouns to refer to L.E. are disputed.

15.     The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") recognizes that an incongruence between gender identity and sex assigned at birth can cause severe psychological distress, a condition the DSM-V recognizes as "gender dysphoria."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 452 (5th ed. 2013), *available at* https://tinyurl.com/jp2453k7, Ex. 33.

**RESPONSE:**  OBJECTION.  The material cited does not support this purported fact.  It is also disputed.  For a diagnosis of gender dysphoria, the DSM-V requires "clinically disignificant distress or impairment in . . . important areas of functioning" such as social, school, or occupational settings.  The symptoms must persist for at least six months."  Levine Rep. 23, ¶ 28.

6

16.     Singling out transgender individuals can further stigmatize and isolate transgender individuals.  Cyperski Rep. ¶25; Expert Report of Helen Carroll ¶44, Ex. 19 ("Carroll Rep.").

**RESPONSE:**  OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion, which is unsupported by facts or data and is inadmissible under Fed. R. Evid. 702.


17.     L.E. did not feel comfortable living as a girl and experienced significant anxiety as a result of the disjunction between his female sex assigned at birth and his male gender identity.  L.E. Decl. ¶¶6, 18, 21, 22; Shelley Dep. At 22:11-22; Mario Dep. At 26:6-28:6, 50:6-25; *see* L.E. Dep. At 31:5-12.

**RESPONSE:**  It is undisputed that L.E.'s sex at birth was female.  It is disputed that L.E.'s sex was "assigned."  Sex is not merely "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and almost always determined at conception.  Levine Rep. 15, ¶ 17.  The correct pronouns to refer to L.E. are disputed.  It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. did not feel comfortable being perceived as a girl.  The remaining facts are objected to as not supported by the materials cited.

18.     In 2020, L.E. saw his pediatrician to discuss ways to assist with his extreme discomfort with his sex assigned at birth and to assist in his transition.  L.E. Decl. ¶5; Shelley Dep. at 9:6-17; Plaintiff's Responses to Defendants Penny Schwinn, Sara Heyburn Morrison, and the Tennessee State Board of Education's Second Set of Interrogatories #2, Ex. 16 ("L.E. Resp. to SD Int.").

**RESPONSE:** It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. saw a pediatrician in 2020 to discuss options for transitioning.  The correct pronouns to refer to L.E. are disputed.  It is disputed that sex was "assigned" to L.E.  Sex is not merely "assigned at birth" by humans visualizing the genitals of a newborn; it is clear, binary, and almost always determined at conception.  Levine Rep. 15, ¶ 17.

19.     Following consultations with multiple doctors and a mental health therapist, L.E. was diagnosed with gender dysphoria on January 28, 2021.  Declaration of Samuel Steinbrugge ¶5, Ex. 12; L.E. Decl. ¶6; L.E. Dep. at 41:14-42:10; Shelley Dep. at 21:22-22:4; L.E. Resp. to SD Int. #1.

**RESPONSE:** It is undisputed, for purposes of ruling on the motion for summary judgment only, that Samuel Steinbruegge, licensed clinical social worker, diagnosed L.E. with gender dysphoria.

20.    As part of his treatment plan for gender dysphoria, L.E. is "being allowed to … live his life as a boy."  Shelly Dep. at 23:7-11; L.E. Decl. ¶¶4-11; *see also* L.E. Resp. to S.D. Int. #2 (L.E. began his social transition in 2020).

**RESPONSE:**  OBJECTION.  The material cited does not support this purported fact.  This fact is also disputed.  L.E. began the process of transitioning before being diagnosed with gender dysphoria.  L.E. Decl. ¶ 9.  The correct pronouns to refer to L.E. are disputed.

21.    Living in accordance with one's gender identity is referred to as social transitioning. Cyperski Rep. ¶23.

**RESPONSE:**  Disputed.  "Social transition"—the active affirmation of transgender identity—in young children is a powerful psychotherapeutic intervention.  Levine Rep. 11-12, ¶ 15g.

22.    L.E. has legally changed his name from a traditionally feminine one to a traditionally masculine one.  L.E. Decl. ¶9; L.E. Dep. at 26:11-27:2; Shelley Dep. at 16:14-17:11; Mario Dep. at 51:13-18.

**RESPONSE:**  It is undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. has changed L.E.'s name from what L.E. perceives as a traditionally feminine one to one that L.E. perceives as a traditionally male one.  The correct pronouns to refer to L.E. are disputed.

9

23.     L.E. uses male pronouns.  L.E. Decl. ¶9; Shelley Dep. at 19:8-17.

**RESPONSE:**  Undisputed for purposes of ruling on the motion for summary judgment only that L.E. uses male pronouns to refer to L.E.

24.     L.E. uses the boys' restrooms.  L.E. Decl. ¶9; Shelley Dep. at 66:14-18.

**RESPONSE:**  Undisputed, for purposes of ruling on the motion for summary judgment only.

25.     L.E. dresses and grooms himself in traditionally masculine ways.  L.E. Decl. ¶¶3,9; Shelley Dep.at 17:12-18:3.

**RESPONSE:**  Undisputed, for purposes of ruling on the motion for summary judgment only, that L.E. dresses and grooms in ways that L.E. views as traditionally masculine.  The correct pronouns to refer to L.E. are disputed.

26.     L.E.'s family, peers, and teachers regularly recognize him as a male.  L.E. Decl. ¶10; L.E. Dep. at 26:19-27:9, 41:14-25; Mario Dep. at 51:22-52:2; Deposition Transcript of John Bartlett at 35:11-36:10, Ex. 8 ("Bartlett Dep.").

**RESPONSE:**  Undisputed, for purposes of ruling on the motion for summary judgment only, that L.E.'s family, peers, and teachers follow L.E.'s preference to be treated as a boy.  It is disputed that L.E.'s family, peers, and teachers perceive L.E. to be a boy.  L.E. did not socially transition until after middle school.  L.E. Decl. ¶ 5; Shelly Dep. 42:14-19.  While in middle school, L.E. played for the girls' golf team.  L.E. Decl. ¶ 17.  L.E. has not yet received testosterone therapy and has not had any relevant surgeries.  Shelley Dep. 14:10-25; 15:1-5; 79:12-15.

10

27.     Much of L.E.'s gender-dysphoria-related anxiety has been significantly alleviated since he began living and being recognized as a boy.  L.E. Decl. ¶10; Shelley Dep. at 23:10-11.  In the words of L.E.'s father, a "weight lifted off [L.E.'s] shoulders" after he began socially transitioning.  Mario Dep. at 66:14-23.

**RESPONSE:**  Disputed.  L.E. began to social transition in or around September 2020.  Shelly Dep. 42:14-19.  L.E. was diagnosed with gender dysphoria after beginning to transition.  L.E. Decl. ¶¶ 6, 9.

28.     L.E. is currently receiving puberty-delaying medications that prevent the development of feminine features inconsistent with his gender identity.  L.E. Decl. ¶8; L.E. Dep. at 28:8-10; Shelley Dep. at 23:12-17.

**RESPONSE:**  Undisputed for the purposes of ruling on the motion for summary judgment only that L.E. is currently receiving puberty suppression medications to prevent the development of more feminine features.

29.     L.E. began taking pubertal suppression medications on April 23, 2021.  L.E. Decl. ¶8; Shelley Dep. at 43:3-9; L.E. Resp. to SD Int. #3.

**RESPONSE:**  Undisputed for the purposes of ruling on the motion for summary judgment only

30.     L.E will begin testosterone treatment in October 2022 in order to cause a puberty consistent with his gender identity.  L.E. Decl. ¶8; L.E. Dep. at 28:11-16; Shelley Dep. at 14:10-24.

**RESPONSE:**  Undisputed for the purposes of ruling on the motion for summary judgment only that L.E. planned to meet with an endocrinologist in October 2022 to discuss testosterone treatment.  The remaining facts are objected to as not supported by the materials cited.

31.     Participation in interscholastic sports, including at the high-school level, "has long-lasting, definitive benefits," Deposition Transcript of Jonathan Higgins at 28:12-22, Ex. 9 ("Higgins Dep."), and is often considered a "pivotal and life-changing experience," Carroll Rep. ¶41.  *Accord id.* ¶¶35, 37; Cyperski Rep. ¶29; KCD RFA Resp. #18-20; Knox County Defendants' Answer ¶¶40-47, Dkt. 20 ("KCD Answer"); Morrison Dep. at 37:15-38:17; Schwinn Dep. at 190:12-192:11.

**RESPONSE:**  OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion that is inadmissible under Fed. R. Evid. 701 because it is not helpful to determining a fact in issue.

32.     The benefits of participating in interscholastic sports include the development of resilience, discipline, teamwork, and other life skills not taught in the classroom.  Carroll Rep. ¶¶37-38; Cyperski Rep. ¶¶29-30; KCS RFA Resp. #21; KCD Answer ¶43; Higgins Dep. at 29:10-11; Bartlett Dep. at 24:19-26:12; Morrison Dep. at 37:15-38:17.

**RESPONSE:**  OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion that is inadmissible under Fed. R. Evid. 701 because it is not helpful to determining a fact in issue.


33.     Participation in interscholastic athletics also generally provides various benefits, including social and psychological benefits, to students who participate.  Carroll Rep. ¶¶36-38; Cyperski Rep. ¶29; KCD RFA Resp. #18-20; KCD Answer ¶44.

**RESPONSE:**  OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion that is inadmissible under Fed. R. Evid. 701 because it is not helpful to determining a fact in issue.


34.     Participation in sports has also been shown to increase young people's self-esteem and decrease the likelihood that young people will engage in illicit activities, such as drug and alcohol abuse.  *See* Cyperski Rep. ¶29; Carroll Rep. ¶¶36-39, 43-44; KCD RFA Resp. #18-20; Bartlett Dep. at 30:1-32:16; Mario Dep. at 75:12-77:6.

**RESPONSE:**  OBJECTION.  Plaintiff cannot produce admissible evidence to support this statement.  This statement is an opinion that is inadmissible under Fed. R. Evid. 701 because it is not helpful to determining a fact in issue.

35.     Tennessee has a system of sex-segregated interscholastic sports at the middle and high school levels which depend on the sport in question and the level of interest in playing the sport that exists at a given school.  Tennessee Secondary School Athletic Association Handbook, at 31-37, Ex. 30 ("TSSAA Handbook"); Hemmelgarn Dep. at 59:12-18, 129:11-18.

**RESPONSE:**  Undisputed that the TSSAA has a system of sex-segregating some interscholastic sports at the middle and high school level. It is disputed that the division into boys' and girls' teams is because of participation interest at a given school.  If TSSAA divides a sport into boys' and girls' teams "all of them [schools] have separate teams.  There's just not enough participation at some schools to have created one or both of those teams."  Hemmelgarn Dep. 56:7-22, 57:13-17.

36.     Some sports (such as girls' volleyball or girls' softball) are designated exclusively for girls.  (TSSAA Handbook at 32, 36); (Hemmelgarn Dep. at 59:12-18, 129:11-18).

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

37.    Many other sports are divided into boys' and girls' teams provided there is enough interest at the school to form both teams.  TSSAA Handbook at 31-37; Hemmelgarn Dep. at 51:5-52:12, 53:9-54:8, 55:15-59:11.

**RESPONSE:**  Undisputed that sports are divided into boys' and girls' teams by the TSSAA.  It is disputed that the division into boys' and girls' teams is because of participation interest.  If TSSAA divides a sport into boys' and girls' teams "all of them [schools] have separate teams.  There's just not enough participation at some schools to have created one or both of those teams."  Hemmelgarn Dep. 56:7-22, 57:13-17.


38.    Golf is in the category of sports teams that are divided into boys' and girls' teams. TSSAA Handbook at 31; Higgins Dep. at. 18:21-19:1.

**RESPONSE:**  Undisputed.


39.    A third category of sports (e.g., football) are, as a default, not explicitly gender-specific.  TSSAA Handbook at 31; Hemmelgarn Dep. at 54:9-55:4, 59:12-61:3, 129:22-130:13.

**RESPONSE:**  Undisputed.


40.    A recent example of a coed football team was FHS's football team, which had a female player during the 2021 season.  Deposition Transcript of Donald Dodgen at 35:15-16, Ex. 10 ("Dodgen Dep.").

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

15

41. This female student-athlete played on the offensive line, a "high-contact" role that often involves tackling and being tackled by other players. Dodgen Dep. at 42:4-43:7.

**RESPONSE:** Undisputed, for the purposes of ruling on the motion for summary judgment only.

42. The principal of FHS had no concern about this female student-athlete safely participating on the FHS football team. Bartlett Dep. at 45:6-8.

**RESPONSE:** Undisputed for the freshmen team for purposes of ruling on the motion for summary judgment only.

43. Sex-segregated sports teams existed in Tennessee prior to SB 228. *See* KCD RFA Resp. #15.

**RESPONSE:** Undisputed, for purposes of ruling on the motion for summary judgment only, that many sports teams in Tennessee that existed prior to SB 228 had only boys (members of the male sex) or only girls (members of the female sex) on them and thus were sex-segregated.

44. The entities that oversee middle and high school athletics in Tennessee public schools are the Tennessee Secondary School Athletic Association ("TSSAA") and its affiliate entity the Tennessee Middle School Athletic Association ("TMSAA"). State Defendants' Answer ¶56, Dkt. 19 ("SD Answer"); Declaration of Mark Reeves. ¶¶1-5, Ex. 11 ("Reeves Decl."); Schwinn Dep. at 34:17-21; Hemmelgarn Dep. at 46:3-19.

**RESPONSE:** Undisputed.

16

45.    Many schools—including all Knox County Schools—are members of the TSSAA and follow TSSAA policies for interscholastic athletics to the extent those policies are not inconsistent with federal, state, or municipal law.  *See* Hemmelgarn Dep. at 47:18-48:5, 50:3-51:4, 99:20-100:6, 119:19-121:6.

**RESPONSE:**  Undisputed.


46.    Before SB 228 was signed into law, TSSAA had a policy allowing all students "to participate in TSSAA/TMSAA activities in a manner that is consistent with their gender identity, irrespective of the gender listed on the student's record."  Reeves Decl. ¶¶6-8; TSSAA/TMSAA Transgender Policy, Ex. 32 ("Prior TSSAA Policy").

**RESPONSE:**  OBJECTION.  The materials cited do not support this statement.  It is also disputed. The TSSAA policy provided for referral to a gender identity eligibility committee for determination on the eligibility of a student to participate.  Prior TSSAA Policy 3.


47.    All TSSAA policies are subordinate to duly enacted state law.  Bartlett Dep. at 87:22-88:6; Dodgen Dep. at 71:17-72:2.

**RESPONSE:**  Undisputed.

48.     On February 8, 2021, Senate Bill 228 ("SB 228") was introduced in the Tennessee Senate.  *See* Bill History of HB 3 and SB. 228, Tenn. General Assembly, *available at* .com/38srfma2 (last viewed Oct. 7, 2022).

**RESPONSE:**  Undisputed.

49.     SB 228's text specifically identified concerns over "girls who compete in interscholastic athletic activity" as a motivation for the legislation.  Tennessee Pub. Ch. 40, No. 228, Ex. 24 ("Pub. Ch. 40").

**RESPONSE:**  Undisputed.

50.     A prefatory clause of SB 228 posits that the "dreams, goals, and opportunities for participation, recruitment, and scholarships can be directly and negatively affected by new school policies permitting boys who are male in every biological respect to compete in girls' athletic competitions if they claim a female gender identity."  Pub. Ch. 40.

**RESPONSE:**  Undisputed.

51.     Another prefatory clause of SB 228 asserts that "allowing boys to compete in girls' athletics competitions discriminates against girls by regularly resulting in boys displacing girls in competitive events and excluding specific and identifiable girls from opportunities to compete at higher levels and from public recognition critical to college recruiting and scholarship opportunities that should go to those outstanding female athletes."  Pub. Ch. 40.

**RESPONSE:**  Undisputed.

18

52.     Another prefatory clause of SB 228 claims that "studies show that boys, on average can be physically stronger than girls, having more skeletal muscle mass than girls and more upper-body and lower-body strength, which can result in injury to girls if girls participate in contact sports with boys." Pub. Ch. 40.

**RESPONSE:** Undisputed.

53.     State Defendants have pointed to SB 228's prefatory clauses, including those mentioned in the three preceding paragraphs, as "provid[ing] some governmental interests" furthered by SB 228. Response of the Tennessee State Board of Education to Plaintiff's First Set of Interrogatories #6, Ex. 14; Response of Dr. Penny Schwinn, Commissioner, Tennessee Department of Education, to Plaintiff's First Set of Interrogatories #6, Ex. 15; Morrison Dep. at 62:17-63:2.

**RESPONSE:** Undisputed.

54.     Section 1(a) of SB 228 amended Tennessee Code Annotated Title 49 to specify that "a student's gender for purposes of participation in public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate." Pub. Ch. 40.

**RESPONSE:** Undisputed.

55.     Section 1(b) of SB 228 directed the "state board of education, each local board of education, and each governing body of a public charter school [to] adopt and enforce policies to ensure compliance with" the law. Pub. Ch. 40.

**RESPONSE:** Undisputed.

19

56.     SB 228 passed both chambers of the Tennessee Legislature, and was signed into law by the Governor on March 26, 2021.  Pub. Ch. 40.

**RESPONSE:**  Undisputed.


57.     SB 228 took effect in the 2021-2022 school year.  Pub. Ch. 40.

**RESPONSE:**  Undisputed.


58.     In January 2022, a follow-on bill to SB 228 called Senate Bill 1861 ("SB 1861") was introduced in the Tennessee Senate.  *See* Bill History of SB. 1861, Tenn. General Assembly, *available at* .com/d96ujyn4 (last viewed Oct. 7, 2022); Morrison Dep. at 54:1-5.

**RESPONSE:**  Undisputed that in January 2022, Senate Bill 1861 was introduced in the Tennessee Senate.  It is disputed that Plaintiff has challenged Senate Bill 1861 in this lawsuit.

59.     SB 1861, which amends the same chapter of the Tennessee Code Annotated as SB 228, permits the Commissioner of the Tennessee Department of Education ("TDOE") to "withhold a portion of the state education finance funds" if a school district does not comply with SB 228. Tennessee Pub. Ch. 909, No. 1861, Ex. 25 ("Pub. Ch. 909").

**RESPONSE:** Disputed. Senate Bill 1861 states in Section 1 that "Tennessee Code Annotated, Section 49-6-310, is amended by adding the following as a new subsection: The commissioner of education shall withhold a portion of the state education finance funds that an LEA is otherwise eligible to receive if the LEA fails or refuses to comply with the requirements of this section. This subsection ( ) does not apply to an LEA that fails or refuses to comply with the requirements of this section in response to a court or other legally binding order that prohibits the LEA from complying."

60. The Governor signed SB 1861 on April 22, 2022. Pub. Ch. 909.

**RESPONSE:** Undisputed.

61. SB 1861 went into effect on July 1, 2022. Tenn. Code Ann. § 49-6-310(b)(1).

**RESPONSE:** Disputed. Senate Bill 1861 states in Section 3: "For purposes of promulgating rules, this act takes effect upon becoming a law, the public welfare requiring it. For all other purposes, this act takes effect July 1, 2022, the public welfare requiring it."

62. Defendant State Board of Education ("SBOE") is primarily responsible for developing policies and rules affecting education in the State of Tennessee. SD Answer ¶14; Schwinn Dep. at 32:14-33:15, 74:19-75:1; Morrison Dep. at 21:11-22:17, 108:3-109:20.

**RESPONSE:** Undisputed, for the purposes of ruling on the motion for summary judgment only.

63.     Among other powers, SBOE has primary rulemaking authority over education in Tennessee.  Schwinn Dep. at 33:13-15, 74:19-75:1; Morrison Dep. at 21:11-22:17, 44:3-45:11, 108:3-109:20.

**RESPONSE:**  OBJECTION.  The materials cited do not support this statement.  It is undisputed for the purposes of ruling on the motion for summary judgment only that among other powers, the SBOE is primarily responsible for policy development (Schwinn Dep. 33:13-15); anything that the Board sets is specific to public schools and districts in Tennessee, (Morrison Dep. 43:13-15).

64.     SBOE's authority to set policies and rules for the Tennessee public education system extends to setting policies that the Tennessee Department of Education ("TDOE") must follow.  Morrison Dep. at 41:2-21; Schwinn Dep. at 40:10-16, 75:2-4.

**RESPONSE:**  OBJECTION.  The materials cited do not support this statement.  It is also disputed.  The SBOE does not set policy or rules regarding how the TDOE spends federal dollars that they might receive.  (Morrison Dep. 43:9-12.)

65.     TDOE is the entity principally responsible for enforcing and implementing statutes related to public education and rules promulgated by SBOE.  SD Answer ¶13; Schwinn Dep. at 32:14-33:5, 70:2-9, 135:12-136:6, 173:21-175:17; Morrison Dep. at 44:3-45:11.

**RESPONSE:**  OBJECTION.  The materials cited do not support this statement.  It is undisputed for the purposes of ruling on the motion for summary judgment only that the TDOE is the state entity tasked with implementation of state education statutes and rules promulgated by SBOE.

66.     TDOE receives federal financial assistance.  Schwinn Dep. at 35:3-5, 36:6-8, 37:20-22.

**RESPONSE:**  It is undisputed for the purposes of ruling on the motion for summary judgment only that TDOE receives federal funding in the form of traditional grants, federal relief funding, and discretionary grants.  (Schwinn Dep. 35:3-12.)

67.     TDOE is responsible for ensuring that Local Education Areas ("LEAs") comply with relevant rules and policies. Schwinn Dep. at 32:14-33:5, 135:13-136:6, 173:21-175:17; Morrison Dep. at 108:3-109:20.

**RESPONSE:** Undisputed, for the purposes of ruling on the motion for summary judgment only

68.     LEAs are required to provide TDOE with reports signaling their compliance with various state laws, including SB 228. Schwinn Dep. at 173:21-175:17.

**RESPONSE:** Disputed. "[T]here's an annual report that essentially certifies that the LEA is in compliance with state law. It does not go through each individual law. It's a general assurance." (Schwinn Dep. 175:13-17).

69.     SBOE is currently developing a rule (the "Funding Rule") that will implement SB 228 and SB 1861. Morrison Dep. at 54:12-15, 55:14-61:11, 107:20-109:20.

**RESPONSE:** Disputed. The SBOE had no rulemaking or policy responsibility to ensure compliance with Tenn. Code Ann. § 49-6-310(a) after passage of SB 228, and Plaintiff did not challenge that rule in the Complaint. Answer ¶ 14, ECF 19, PageID # 141. Furthermore, any implementation of Tenn. Code Ann. § 49-6-310(a) is done by local boards and the districts that they oversee. Schwinn Dep. 163:12-15.

70.    As currently written, the Funding Rule will permit TDOE to withhold "state education finance funds" from any LEA—including Knox County—not in compliance with SB 228.  SBOE Rule 0520-01-23, Ex. 29; Morrison Dep. at 54:12-15, 61:3-17, 107:20-109:20; Schwinn Dep. at 135:13-138:2.

**RESPONSE:** Disputed.  The SBOE had no rulemaking or policy responsibility to ensure compliance with Tenn. Code Ann. § 49-6-310(a) after passage of SB 228, and Plaintiff did not challenge that rule in the Complaint.  Answer ¶ 14, ECF 19, PageID # 141.  The first draft of the rule authorizes TDOE to withhold a portion of the state education finance funds that an LEA is otherwise eligible to receive until the LEA completes each of the required [corrective]action steps. Ex. 29.

71.    The Funding Rule authorizes TDOE to withhold the state education funding of any LEA that does not comply with SB 228.  Morrison Dep. at 107:20-109:20; Schwinn Dep. at 176:4-180:6.

**RESPONSE:**  Disputed.  The SBOE had no rulemaking or policy responsibility to ensure compliance with Tenn. Code Ann. § 49-6-310(a) after passage of SB 228, and Plaintiff did not challenge that rule in the Complaint.  Answer ¶ 14, ECF 19, PageID # 141.  The first draft of the rule authorizes TDOE to withhold a portion of the state education finance funds that an LEA is otherwise eligibile to receive until the LEA completes each of the required [corrective]action steps. SBOE Rule 0520-01-23, first draft, Pl.'s Ex. 29.

72.     Day-to-day enforcement of SB 228 is primarily done at the county level. Hemmelgarn Dep. at 43:6-45:10; Schwinn Dep. at 158:18-159:3.

**RESPONSE:** Undisputed, for purposes of ruling on the motion for summary judgment only.

73.     Education policies in Knox County are set by the Knox County Board of Education ("KCBOE"). Hemmelgarn Dep. at 25:1-13.

**RESPONSE:** It is undisputed that the Knox County Board of Education develops policies that apply to the Knox County School District.

74.     KCBOE members are elected by the voting public of Knox County. Hemmelgarn Dep. at 25:14-26:14.

**RESPONSE:** It is undisputed that KCBOE members are elected by the constituents in their districts.

75.     KCBOE is a recipient of federal financial assistance. KCD RFA Resp. #22; KCD Answer ¶103.

**RESPONSE:** Undisputed.

76.     Knox County Schools ("KCS") is the entity that implements the policies enacted by KCBOE. Hemmelgarn Dep. at 25:1-13.

**RESPONSE:** Undisputed.

26

77.     The leader of KCS holds the title of "Superintendent."  Hemmelgarn Dep. at 26:15-27:11.

**RESPONSE:**  Undisputed.

78.     Following SB 228's enactment, KCBOE revised its Interscholastic Athletics Policy ("I-171 Policy") in July 2021.  Hemmelgarn Dep. at 79:8-80:16, 96:2-16; Higgins Dep. at 75:12-76:1.

**RESPONSE:**  Undisputed.

79.     The new I-171 Policy states that "a student's gender for purposes of participation in middle or high school athletics is determined by the student's sex at the time of the student's birth.  A valid original birth certificate must be provided for this purpose."  Knox County Board of Education Policy I-171: Interscholastic Athletics, Ex. 31.

**RESPONSE:**  Undisputed.

80.     Farragut High School is obligated to comply with the revised I-171 policy. Hemmelgarn Dep. at 29:1-4, 119:19-120:6; Higgins Dep. at 78:7-10.

**RESPONSE:**  Undisputed.

81.     Any failure to abide by the I-171 Policy would trigger an investigation and, ultimately, "there would be action taken" by KCS.  Hemmelgarn Dep. at 45:6-10, 101:6-103:10.

**RESPONSE:**  Undisputed.

82.     The revised I-171 Policy will remain in place unless affirmatively repealed, even if SB 228 itself is no longer operative.  Hemmelgarn Dep. at 114:10-17.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

83.     In light of SB 228's enactment, the TSSAA policy authorizing students to participate on interscholastic athletics teams consistent with their gender identity is no longer operative.  KCD RFA Resp. #9; Morrison Dep. at 80:11-81:11.

**RESPONSE:**  It is undisputed, for the purposes of a ruling on the motion for summary judgment only, that the TSSAA policy is no longer operative and would still not be operative even if SB 228 itself is enjoined.  It is disputed that the TSSAA policy authorized students to participate in interscholastic athletics teams consistent with their gender identity.  The TSSAA policy provided for referral to a gender identity eligibility committee for determination on the eligibility of a student to participate.  Prior TSSAA Policy 3, Pl.'s Ex. 32.

84. L.E. has played golf since the summer of 2018. L.E. Decl. ¶11; L.E. Dep. at 6:17-18; Plaintiff's Responses to Defendant Knox County Board of Education's First Set of Interrogatories #7, Ex. 17 ("L.E. Resp. to KCD Int.").

**RESPONSE:** It is undisputed that L.E. got free golf instruction at a clinic in the summer of 2018 for the purposes of ruling on the motion for summary judgment only. Shelley Dep. 24:4-11. The degree and frequency in which L.E. has "played golf since" is disputed. L.E. could not identify more than five times that L.E. has played 18 holes of golf. (Mario Dep. 33:17-25; 34:1-13); (Shelley Dep. Ex. 1, Int. No. 3); (L.E. Dep. 16:20-23; 17:1-7). From January 1, 2022, to July 13, 2022, L.E. played one round of golf. (Mario Dep. 33:17-25; 34:1-5.)


85. L.E. first played at a free golf clinic at a local course in the Knoxville area. L.E. Decl. ¶11; Shelley Dep. at 24:3-11.

**RESPONSE:** It is undisputed that L.E. got a free golf lesson at a local course in the Knoxville area.


86. After playing golf for the first time, L.E. began to "really, really love" the sport. L.E. Decl. ¶11; L.E. Dep. at 6:19-24; 31:10-11.

**RESPONSE:** Undisputed, for the purposes of ruling on the motion for summary judgment only.

87.     L.E. loves that playing golf requires skill, focus, and determination.  L.E. always wants to play more.  L.E. loves the challenge of having to focus on improving his game and feels really proud when he can see how his focus pays off.  L.E. Decl. ¶¶13-14.

**RESPONSE:**  Disputed.   L.E. does not keep track of or record a score when playing golf.  Shelley Dep. 37:7-12.  L.E. has never calculated and does not have a handicap index in golf.  Mario Dep. 33:8-16.  L.E. could not identify more than five times that L.E. has played 18 holes of golf.  Mario Dep. 33:17-25; 34:1-13; Shelley Dep. Ex. 1, Int. No. 3; L.E. Dep. 16:20-23; 17:1-7.  From January 1, 2022, to July 13, 2022, L.E. played one round of golf.  Mario Dep. 33:17-25; 34:1-5.


88.     In the summer of 2018, L.E.'s parents bought him some golf clubs and golf shoes.  L.E. Decl. ¶11; L.E. Dep. at 7:7-11; 13:18-22.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only that L.E.'s parent bought L.E. some golf clubs and golf shoes in the summer of 2018.  The correct pronouns to refer to L.E. are disputed.


89.     Beginning in the summer of 2018, L.E. started taking golf lessons.  L.E. Decl. ¶15; L.E. Dep. at 14:4-16:6.  Over the next three years, L.E. took golf lessons from several instructors as often as weekly.  L.E. Decl. ¶15; L.E. Resp. to KCD Int. #7.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

90.     L.E. plays golf with his father, including at various courses throughout the Knoxville area.  L.E. Decl. ¶16; L.E. Dep. at 12:3-13:7; 36:13-18; Shelley Dep. at 36:15-21; Mario Dep. at 7:20-9:1; L.E. Resp. to KCD Int., #3-6.

**RESPONSE:**  The extent to which L.E. plays golf is disputed.  L.E. could not identify more than five times that L.E. has played 18 holes of golf.  Mario Dep. 33:17-25; 34:1-13; Shelley Dep. Ex. 1, Int. No. 3; L.E. Dep. 16:20-23; 17:1-7.  From January 1, 2022, to July 13, 2022, L.E. played one round of golf.  Mario Dep. 33:17-25; 34:1-5.

91.     L.E. tries to go to the driving range a few times a month.  L.E. Decl. ¶16; Mario Dep. at 18:16-20.

**RESPONSE:**  Undisputed for the purposes of ruling on the motion for summary judgment only.  The extent that L.E. actually does go to the driving range each month, instead of just trying, is objected to as not supported by the materials cited.

92.     In seventh and eighth grade, before L.E. changed his name or began puberty suppression treatment, L.E. played on the Farragut Middle School ("FMS") girls' golf team.  L.E. Dep. at 41:14-42:10; L.E. Decl. ¶¶8-9, 17.

**RESPONSE:**  Undisputed, for the purposes of ruling on the summary judgment motion only, that L.E. played on the Farragut Middle School girls' golf team after identifying as a boy but before changing L.E.'s name or beginning puberty suppression treatment.  It is disputed whether L.E. was actually a boy while playing on the girls' golf team.  L.E.'s birth certificate states L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21. The correct pronouns to refer to L.E. are disputed.

93.     L.E. felt an overwhelming sense of discomfort playing on the FMS girls' golf team, and he found the experience "embarrassing," and a "little angering." L.E. Decl. ¶18; L.E. Dep. at 30:16-24, 31:8.  That is because L.E. did not feel like himself because he feels that he is "a boy and it [was] awkward to be the only boy playing on a girls' golf team."  L.E. Decl. ¶18; L.E. Dep. at 30:16-24; *see also* Shelley Dep. at 29:1-11; Mario Dep. at 17:11-17.

**RESPONSE:**  It is disputed that L.E. was a boy playing on a girls' golf team.  L.E.'s birth certificate states L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21.  The correct pronouns to refer to L.E. are disputed.  The remaining statement is undisputed for the purposes of ruling on the motion for summary judgment only.


94.     During his eighth-grade golf season, L.E. felt it was essential for him to play on the boys' team when he got to high school, and he has consistently expressed his desire to play on the FHS boys' golf team since.  L.E. Decl. ¶19; L.E. Dep. at 18:1-6; 20:12-16; Shelley Dep. at 30:20-31:5; Mario Dep. at 74:4-10.

**RESPONSE:**  It is disputed that L.E.is a boy.  L.E.'s birth certificate states L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21.  The correct pronouns to refer to L.E. are disputed.  The remaining statement is undisputed, for the purposes of ruling on the motion for summary judgment only.

95.     L.E. feels it is important to play on the boys' golf team at FHS because "[he is] a boy," and he wants to be able to be who he is while also playing the sport he loves.  L.E. Decl. ¶19, 23; L.E. Dep. at 17:23-18:5; Mario Dep. at 15:8-21.

**RESPONSE:**  It is disputed that L.E.is a boy.  L.E.'s birth certificate states L.E.'s sex is female.  Compl. ¶ 75, ECF 1, PageID # 22; Shelley Dep. 6:19-23; Mario Dep. 73:20-21.  The correct pronouns to refer to L.E. are disputed.  The remaining statement is undisputed for the purposes of ruling on the motion for summary judgment only.

96.     Before the passage of SB 228, L.E. would have been eligible to play on the FHS boys' golf team assuming he had successfully tried out.  Prior TSSAA Policy; Higgins Dep. at 80:15-20; Dodgen Dep. at 71:16-72:14.

**RESPONSE:**  OBJECTION.  The materials cited do not support the statement.  It is also disputed.  The TSSAA policy provides for referral to a gender identity eligibility committee for determination on the eligibility of a student to participate.  Prior TSSAA Policy 3, Pl.'s Ex. 32.

97.     Now that SB 228 and the revised I-171 Policy provide the governing law, L.E. is barred from the boys' golf team.  KCD RFA Resp. #6, 16; Schwinn Dep. at 197:8-15; Hemmelgarn Dep. at 99:5-19, 119:19-121:17.

**RESPONSE:**  Disputed.  TSSAA's regulations separate several interscholastic sports (including basketball, cross country, golf, tennis, and track and field) into separate divisions for boys and girls.  (Hemmelgam Dep. 128:21-22, 129, 130:1-13.)  The state law and county policy merely set a baseline definition for gender.

98.     The reason SB 228 bars L.E. from the boys' golf team is because L.E.'s sex assigned at birth of female does not match his male gender identity.  Schwinn Dep. at 83:11-22, 84:1-85:3; Bartlett Dep. at 41:4-42:18.

**RESPONSE:**  Disputed.  TSSAA's regulations separate several interscholastic sports (including basketball, cross country, golf, tennis, and track and field) into separate divisions for boys and girls.  Hemmelgam Dep. 128:21-22, 129, 130:1-13.  The state law and county policy merely set a baseline definition for gender.

99.     If L.E. was a cisgender boy, i.e., if L.E. was assigned the male sex at birth, he would be eligible to join the FHS boys' golf team.  Hemmelgarn Dep. at 121:13-122:5; Schwinn Dep. at 90:5-91:9.

**RESPONSE:**  Disputed.  Players who try out for the Farragut High School boys' golf team need to shoot an average score of 90 or better for 18-walking holes through 3 rounds to make the team.  Higgins Dep. 46:11-15; Ex. 3.  L.E. has not demonstrated that L.E. has ever or could ever shoot an average score of 90 or better for 18-walking holes through 3 rounds.  The correct pronouns to refer to L.E. are disputed.

100.    In light of L.E.'s previous discomfort when he participated on the FMS girls' golf team, and the importance to his gender dysphoria treatment of living as a boy in all aspects of his life, L.E. and his parents agree that the harm to L.E. of feeling "out of place" playing on the high school girls' team, Mario Dep. at 74:4-75:5, would "far outweigh the benefits that he would get from playing on a girls' … team," Shelley Dep. at 30:6-15.  *See* L.E. Dep. at 29:8-30:14; L.E. Decl. ¶22.

**RESPONSE:**  It is disputed that living as a boy in all aspects of L.E.'s life is important to gender dysphoria treatment.  Family support and resources were identified as reasons to support L.E.'s gender transition.  Decl. Steinbruegge ¶ 4, ECF 53-12, PageID # 973.  The affirmation therapy model is but one of four different models for treatment of gender dysphoria.  Levine Rep. 36.  Transition and affirmation are experimental therapies that have not been convincingly shown to improve mental health outcomes.  Levine Rep. 85-96.  The correct pronouns to refer to L.E. are disputed.  The remaining statements are undisputed for purposes of ruling on the motion for summary judgment only.

101.    The passage of SB 228 made L.E. feel very angry, "devastated," "not worthy," and like an "outcast" because he would be unable to play for the boys' golf team.  L.E. Decl. ¶¶20, 24; Shelley Dep. at 61:1-12; Mario Dep. at 75:17-77:6.

**RESPONSE:**  It is disputed that the passage of SB 228 rendered L.E. unable to play for the boys' golf team.   TSSAA's regulations separate several interscholastic sports (including basketball, cross country, golf, tennis, and track and field) into separate divisions for boys and girls.  Hemmelgam Dep. 128:21-22, 129, 130:1-13.  The state law and county policy merely set a baseline definition for gender.

The correct pronouns to refer to L.E. are disputed.  It is also disputed that L.E. would be eligible to join the FHS boys' golf team.  Players who try out for the Farragut High School boys' golf team need to shoot an average score of 90 or better for 18-walking holes through 3 rounds to make the team.  Higgins Dep. 46:11-15; Ex. 3.  The remaining statements are undisputed for the purposes of ruling on the motion for summary judgment only.

102.    Even though playing sports, and specifically golf, makes L.E. "really, really … happy," Mario Dep. at 54:17-23, L.E. has not played golf for a school team his freshman and sophomore year because SB 228 only permits him to play on the girls' team, which he does not feel he can do. *id.* 71:21-72:2; L.E. Decl. ¶22; L.E. Dep. at 42:11-14.

**RESPONSE:** It is disputed that due to the passage of SB 228, L.E. is only permitted to play on the girls' golf team. TSSAA's regulations separate several interscholastic sports (including basketball, cross country, golf, tennis, and track and field) into separate divisions for boys and girls. (Hemmelgam Dep. 128:21-22, 129, 130:1-13.) The state law and county policy merely set a baseline definition for gender. The correct pronouns to refer to L.E. are disputed. The remaining statements are undisputed for the purposes of ruling on the motion for summary judgment only.

103.    L.E. has not tried out for the boys' golf team because he saw "no point" to doing so if he couldn't ultimately play with the team. L.E. Dep. at 19:2-4.

**RESPONSE:** The correct pronouns to refer to L.E. are disputed. The remaining statement is undisputed for purposes of ruling on the motion for summary judgment only.

104.    After this suit was filed, County Defendants offered L.E. an opportunity to try out for the FHS boys' golf team, an offer L.E. rejected as "meaningless" because even if otherwise successful, he still would be unable to join the team. Shelley Dep. at 33:19-34:5.

**RESPONSE:** The correct pronouns to refer to L.E. are disputed. The remaining statement is undisputed for purposes of summary judgment only.

105.     Since 2004, the International Olympic Committee ("IOC") has allowed transgender athletes to participate in accordance with their gender identity in elite Olympic-level competitions so long as certain requirements are met.  Carroll Rep. ¶26.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only, that the IOC allowed transgender athletes to participate on the condition that they undergo sex reassignment surgery.  Carroll Report 27.

106.     The IOC's current policy, updated in 2021, delegates to each sport's governing body the responsibility of "develop[ing] eligibility criteria for their individual sports."  Carroll Rep. ¶28.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

107.     To date, no body governing an individual Olympic sport is known to have categorically banned transgender athletes from participating based on transgender status.  Carroll Rep. ¶28.

**RESPONSE:**  Disputed.  The body governing swimming issued a policy banning male-to-female transgender athletes unless they can establish that they have not experienced any part of male puberty beyond Tanner Stage 2 or before age 12, whichever is later.  FINA has also placed requirements on female-to-male transgender athletes.  FINA, Policy on Eligibility for the Men's and Women's Competition Categories at 6-8 (June 19, 2022), https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf

38

108.    In January 2022, the National Collegiate Athletics Association ("NCAA") delegated the promulgation of eligibility determination policies to each individual sport's national governing body.  Carroll Rep. ¶33.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

109.    Only one governing body, USA Swimming, has issued a policy pursuant to the NCAA's delegation.  Carroll Rep. ¶34.

**RESPONSE:**  Undisputed, for the purposes of ruling on the motion for summary judgment only.

110.    That policy does not impose a categorical ban on transgender athletes participating on teams consistent with their gender identity.  Carroll Rep. ¶34.

**RESPONSE:**  Disputed.  According to Ms. Carroll:  "The USA Swimming policy first began with a three-year waiting period for transgender women to swim.  And then it did change to you cannot swim at all unless you have stopped hormone prepuberty. . . . For college athletes it -- it pretty much does not allow them to participate, so it is very restrictive."  Carroll Dep. 113:9-21.

111.    The State Defendants have produced an expert report from Dr. Gregory A. Brown,

Ph.D., FACSM, claiming that individuals assigned the sex of male at birth have inherent and

enduring physiological advantages over individuals assigned the sex of female at birth that enable

individuals assigned the sex of male at birth, regardless of gender identity, to outperform "equally

aged, gifted, and trained" individuals assigned the sex of female at birth.  Declaration of Gregory

A. Brown, PhD., FACSM, at 4, Ex. 20.

**RESPONSE:**  Undisputed.


112.    Dr. Brown has acknowledged that his report does not discuss "competitive

advantages that transgender boys have against non transgender boys in athletics."  Deposition

Transcript of Dr. Gregory Brown at 26:14-20, Ex. 22.

**RESPONSE:**  Undisputed.


113.    The State Defendants have produced an expert report from Dr. Chad T. Carlson

asserting that "participation by biological males in …girls' or women's sports, based on gender

identity, creates significant additional risk of injury for the biologically female participants

competing alongside these transgender athletes."  Declaration of Dr. Chad T. Carlson, M.D.,

FACSM, at 1-2, Ex. 21.

**RESPONSE:**  Undisputed.

114.    Dr. Carlson has acknowledged that his report contains no opinion on whether transgender boys competing on boys' interscholastic sports teams pose heightened safety risks to cisgender boys competing in those same events.  Deposition Transcript of Dr. Chad Carlson at 67:20-21,70:2-15, 277:14-20, Ex. 23 ("Carlson Dep.").

**RESPONSE:**  Undisputed.


115.    Golf is considered a non-contact sport.  KCD RFA Resp. #5; Dodgen Dep. at 48:11-14; Higgins Dep. at 31:13-15; Carlson Dep. at 77:4-9.

**RESPONSE:**  Undisputed.


116.    Dr. Carlson has acknowledged that his report contains no opinion on whether transgender individuals competing in non-contact sports pose heightened safety risks to cisgender individuals competing in those same events.  Carlson Dep. at 76:5-14, 77:10-16.

**RESPONSE:**  Undisputed.


117.    In the same session SB 228 was passed, the Tennessee Legislature passed legislation barring health care providers from prescribing to prepubertal minor children hormone treatments for gender dysphoria or gender incongruency.  2021 Tennessee Laws Pub. Ch. 460, Ex. 26.

**RESPONSE:**  Undisputed that the legislation was enacted.  The characterization of what the legislation does is disputed.

41

118.    In the same session SB 228 was passed, the Tennessee Legislature passed legislation barring transgender youth from using school restrooms and other facilities consistent with their gender identity.  2021 Tennessee Laws Pub. Ch. 452, Ex. 27.

**RESPONSE:**  Undisputed that the legislation was enacted.  The characterization of what the legislation does is disputed.

119.    In the same session SB 228 was passed, the Tennessee Legislature passed legislation requiring that parents be notified, and have the right to opt out, of any classroom discussion involving gender identity.  2021 Tennessee Laws Pub. Ch. 281, Ex. 28.

**RESPONSE:**  Undisputed that the legislation was enacted.  The characterization of what the legislation does is disputed.

120.    In the first quarter of 2022, more than 130 pieces of legislation specifically targeting transgender people had been introduced in state legislatures across the county.  Henry Berg-Brousseau, *ICYMI: As Lawmakers Escalate Attacks on Transgender Youth Across the Country, Some GOP Leaders Stand Up for Transgender Youth*, Human Rights Campaign (Mar. 24, 2022), *available at* https://tinyurl.com/392wcmxz, Ex. 34.

**RESPONSE:**  OBJECTION.  The material cited to support this statement cannot be presented in a form that would be admissible in evidence.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

CLARK L. HILDABRAND, BPR # 038199
Assistant Solicitor General

/s/ Stephanie Bergmeyer
STEPHANIE BERGMEYER, BPR # 027096
Senior Assistant Attorney General
Office of Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Stephanie.Bergmeyer@ag.tn.gov
(615) 741-6828

*Attorneys for Governor Lee, Commissioner
Schwinn, Dr. Morrison, and the individual members
of the Tennessee State Board of Education, in their
official capacities, and the Tennessee State Board of
Education*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this Response has been served through the e-filing system on November 4, 2022, to:

Leslie Cooper
Lisa Nowlin-Sohl
Taylor Brown
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1776 K St. NW, 8th Floor
Washington, DC 20006-5500

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND INC.
1 West Court Sq., Ste. 105
Decatur, GA 30030-2556

Alan E. Schoenfeld
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St., 45th Floor
New York, NY 10007

Thomas F. Costello-Vega
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Ave., Ste. 2400
Los Angeles, CA 90071

Britany Riley-Swanbeck
Emily L. Stark
Samuel M. Strongin
Jennifer Milici
John W. O'Toole
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006

Matthew D. Benedetto
WILMER & LEE, P.A.
100 Washington St., Ste. 200
Huntsville, AL 35804

Stella Yarbrough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212

David M. Sanders
Senior Deputy Law Director
Knox County, Tennessee
400 W. Main St., Suite 612
City-County Building
Knoxville, TN 37902

Jessica Jernigan-Johnson
LONDON & AMBURN, PLLC
607 Market St., Ste. 900
Knoxville, TN 37902

s/Stephanie Bergmeyer
Stephanie Bergmeyer