2022 WL 18003879
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

Drew ADAMS, a minor, BY AND
THROUGH his next friend and mother,
Erica Adams KASPER, Plaintiff-Appellee,

v.

SCHOOL BOARD OF ST. JOHNS
COUNTY, Florida, Defendant-Appellant,
Tim Forson, et al., Defendants.

No. 18-13592
|
Filed: 12/30/2022

Appeal from the United States District Court for the Middle
District of Florida, D.C. Docket No. 3:17-cv-00739-TJC-JBT

**Attorneys and Law Firms**

Tara L. Borelli, Lambda Legal, Decatur, GA, Jennifer G.
Altman, Aryeh Lev Kaplan, Markenzy Lapointe, Shani
Rivaux, Pillsbury Winthrop Shaw Pittman, LLP, Miami, FL,
Paul David Castillo, Lambda Legal Defense and Education
Fund, Inc., Dallas, TX, Kirsten Doolittle, The Law Office
of Kirsten Doolittle, PA, Jacksonville, FL, Diana Katherine
Flynn, Lambda Legal Defense and Education Fund, Inc.,
Washington, DC, Omar Gonzalez-Pagan, Lambda Legal
Defense, New York, NY, William Clarke Miller, Cynthia
Cook Robertson, Pillsbury Winthrop Shaw Pittman, LLP,
Washington, DC, Richard M. Segal, Nathaniel R. Smith,
Pillsbury Winthrop Shaw Pittman, LLP, San Diego, CA, for
Plaintiff-Appellee.

Terry Joseph Harmon, Jeffrey Slanker, Robert Sniffen,
Michael P. Spellman, Lisa Barclay Fountain, Sniffen &
Spellman, PA, Tallahassee, FL, Robert Christopher Barden,
RC Barden & Associates, Plymouth, MN, for Defendant-
Appellant.

Craig Edward Bertschi, McRae Bertschi & Cole, LLC,
Dunwoody, GA, for Amicus Curiae Women's Liberation
Front.

John J. Bursch, Alliance Defending Freedom, Washington,
DC, Gary S. McCaleb, Gary S. McCaleb, Attorney at Law,
Flagstaff, AZ, for Amici Curiae Miriam Grossman, Michael
Laidlaw, Quentin Van Meter, Andre Van Mol.

Edward John Jacobs, Victoria Lynn Stork, Joanna F.
Wasick, Baker & Hostetler, LLP, New York, NY, for
Airbnb, Inc., Apple, Inc., Asana, Inc., Credo Mobile, Inc.,
Deutsche Bank AG, eBay Inc., General Assembly Space,
Inc., GitHub, Inc., Glassdoor, Inc., GlaxoSmithKline LLC,
Google LLC, IBM Corporation, Indiegogo, Inc., Kaiser
Permanente, Knotel, Inc., Levi Strauss & Co., Linden
Research, Inc. d/b/a Linden Lab, Lyft, Mapbox, Inc., Marin
Software Incorporated, Massachusetts Mutual Life Insurance
Company "MassMutual", Microsoft Corporation, NIO USA,
Inc., Patreon, Inc., Postmates Inc., Replacements, Ltd.,
Shutterstock, Inc., Spotify USA Inc., Tumblr, Inc., Xerox
Corporation, Yelp Inc.

Nathan W. Kellum, Center for Religious Expression,
Memphis, TN, Gregory H. Teufel, OGC Law, LLC,
Pittsburgh, PA, Robert H. Tyler, Tyler & Bursch LLP,
Murrieta, CA, for Amicus Curiae Walt Heyer.

Patricia B. Palacios, Steptoe & Johnson, LLP, Washington,
DC, David D. Mesa, Jerome Pierce, Steptoe & Johnson, LLP,
San Francisco, CA, for Amicus Curiae Terry S. Kogan.

Wesley R. Powell, Willkie Farr & Gallagher, LLP, New York,
NY, for Amici Curiae National PTA, GLSEN, The American
School Counselor Association, National Association of
School Psychologists.

Charles Alan Rothfeld, Andrew John Pincus, Mayer Brown,
LLP, Washington, DC, for Amici Curiae A Better Balance,
ADL, Advocates for Youth, American Association of
University Women, Atlanta Women for Equality, Beth
Chayim Chadashim, California Women Lawyers, California
Women's Law Center, Center for Constitutional Rights,
Center for Reproductive Rights, Champion Women, Coalition
of Black Trade Unionists, Disability Rights Education and
Defense Fund, Equal Rights Advocates, SurvJustice, Equality
California, The Impact Fund, Family Values @ Work, The
Southwest Women's Law Center, Forge, Inc., The Women's
Law Center of Maryland, Gender Justice, Union for Reform
Judaism, Girls for Gender Equity, Central Conference of
American Rabbis, Girls Inc., In Our Own Voice: National
Black Women's Reproductive Justice Agenda, Women of
Reform Judaism, and Men of Reform Judaism, LatinoJustice
PRLDEF, UniteWomen.org, Lawyers Club of San Diego,
Women Lawyers on Guard Inc., Legal Aid At Work,
Women's Bar Association of the District of Columbia,
Women's Bar Association of the State of New York,
Women's Law Project, Legal Momentum, The Women's
Legal Defense and Education Fund, Young Women United,

Legal Voice, National Asian Pacific American Women's Forum, National Association of Social Workers, National Association of Women Lawyers, National Center for Law and Economic Justice, National Center for Transgender Equality, National Council of Jewish Women, Planned Parenthood of South, East and North Florida, National Crittenton, Planned Parenthood of Southwest and Central Florida, National LGBTQ Task Force, SisterReach, National Organization for Women Foundation, Stop Sexual Assault in Schools.

James E. Tysse, Akin Gump Strauss Hauer & Feld, LLP, Washington, DC, Markos Cleomenes Generales, Jessica Weisel, Akin Gump Strauss Hauer & Feld, LLP, Los Angeles, CA, for Amicus Curiae Scholars Who Study The Transgender Population.

Steven W. Davis, Haber Law, Miami, FL, Rosanne C. Baxter, Boies Schiller & Flexner, LLP, Armonk, NY, Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton, LLP, New York, NY, for Amicus Curiae School Administrators.

Dimitri Portnoi, O'Melveny & Myers, LLP, Los Angeles, CA, for Amicus Curiae Casa De Esperanza: National Latina Network for Healthy Families and Communities, National Alliance to End Sexual Violence, National Coalition Against Domestic Violence, National Resource Center on Domestic Violence, Buckeye Region Anti-Violence Organization, A Program of Equitas Health, DC Coalition Against Domestic Violence, Empire Justice Center, Illinois Accountability Initiative, Iowa Coalition Against Sexual Assault, Louisiana Foundation Against Sexual Assault, Michigan Coalition to End Domestic & Sexual Violence, Nebraska Coalition to End Domestic and Sexual Violence, Nevada Coalition to End Domestic and Sexual Violence, New Hampshire Coalition Against Domestic and Sexual Violence, New Mexico Coalition of Sexual Assault Programs, Inc., New York State Coalition Against Sexual Assault, Northern Marianas Coalition Against Domestic & Sexual Violence, Ohio Alliance to End Sexual Violence, Oregon Coalition Against Domestic & Sexual Violence, Vermont Network Against Domestic & Sexual Violence, Virginia Sexual & Domestic Violence Action Alliance, Wisconsin Coalition Against Sexual Assault, Wyoming Coalition Against Domestic Violence and Sexual Assault, Boston Area Rape Crisis Center, Day One, Oasis Legal Services, Parent-Child Center, Rape/Domestic Abuse Program, SASA Crisis Center, Voices of Hope, Women's Center for Advancement.

Charles Alan Rothfeld, Andrew John Pincus, Mayer Brown, LLP, Washington, DC, Morgan Lindsay Anastasio, Todd

Anten, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Laura Ferguson, Quinn Emanuel, Miami, FL, for Amicus Curiae National Women's Law Center.

Dimitri Portnoi, O'Melveny & Myers, LLP, Los Angeles, CA, Maureen P. Alger, Sarah Rebecca Binning, John Dwyer, Emily Harrington, Cooley, LLP, Palo Alto, CA, Shawn Thomas Meerkamper, Transgender Law Center, Oakland, CA, Shannon Price Minter, Asaf Orr, National Center For Lesbian Rights, San Francisco, CA, Audrey J. Mott-Smith, Cooley, LLP, San Francisco, CA, Kyle Wong, Cooley, LLP, San Diego, CA, for Amicus Curiae Gender Spectrum.

Andrew W. Amend, NY Office of the Attorney General, Division of Appeals and Opinions, New York, NY, for Amici Curiae State of New York, State of Washington, State of California, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Maine, State of Maryland, State of Massachusetts, State of Michigan, State of Minnesota, State of New Mexico, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia, District of Columbia, State of New Jersey.

Sherrilyn Ann Ifill, Alexsis Johnson, Jin Hee Lee, Janai S. Nelson, Samuel Spital, NAACP Legal Defense & Educational Fund, Inc., New York, NY, for Amicus Curiae NAACP Legal Defense & Educational Fund, Inc.

Maureen P. Alger, Sarah Rebecca Binning, John Dwyer, Emily Harrington, Cooley, LLP, Palo Alto, CA, Shawn Thomas Meerkamper, Transgender Law Center, Oakland, CA, Shannon Price Minter, Asaf Orr, National Center For Lesbian Rights, San Francisco, CA, Audrey J. Mott-Smith, Cooley, LLP, San Francisco, CA, Kyle Wong, Cooley, LLP, San Diego, CA, for Amici Curiae PFLAG, Inc., Trans Youth Equality Foundation, Gender Diversity, Jacksonville Area Sexual Minority Youth Network, Inc.

Clifford Warren Berlow, Jenner & Block, LLP, Chicago, IL, for Amicus Curiae Medical, Nursing, Mental Health, and Other I Health Care Organizations.

Sarah Keeton Campbell, Tennessee Supreme Court, Nashville, TN, for Amici Curiae State of Tennessee, State of Arizona, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of West Virginia.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   2

Mark Stephen Grube, NY Office of the Attorney General, Division of Appeals and Opinions, New York, NY, for Amicus Curiae State of New York.

Elizabeth Hecker, U.S. Department of Justice, Appellate Section, Washington, DC, Bonnie I. Robin-Vergeer, U.S. Department of Justice, Civil Division, Appellate Staff, for Amicus Curiae United States.

Joshua A. Block, American Civil Liberties Union Foundation, New York, NY, Daniel Boaz Tilley, ACLU Foundation of Florida, Inc., Miami, FL, for Amici Curiae American Civil Liberties Union and ACLU of Florida.

Rakesh Kilaru, Blake Neal, Chelsea Shaffer, Wilkinson Stekloff, LLP, Washington, DC, for Amicus Curiae Historians.

Brianne Jenna Gorod, Chief Counsel, Constitutional Accountability Center, Washington, DC, for Amicus Curiae Constitutional Accountability Center.

Chris Erchull, GLBTQ Legal Advocates & Defenders, Boston, MA, for Amicus Curiae GLBTQ Legal Advocates and Defenders.

Kyle Grossman, O'Melveny & Myers, LLP, Los Angeles, CA, for Amici Curiae Anti-Sexual Assault, Domestic Violence, Gender-Based Violence Organizations.

Shireen Barday, Gibson Dunn & Crutcher, LLP, New York, NY, for Amicus Curiae The Trevor Project.

Before William Pryor, Chief Judge, Wilson, Jordan, Rosenbaum, Jill Pryor, Newsom, Branch, Grant, Luck, Lagoa, and Brasher, Circuit Judges.

**Opinion**

Lagoa, Circuit Judge, filed a concurring opinion.

Wilson, Circuit Judge, filed a dissenting opinion.

Jordan, Circuit Judge, filed a dissenting opinion, in which Wilson and Rosenbaum, Circuit Judges, joined.

Rosenbaum, Circuit Judge, filed a dissenting opinion.

Jill Pryor, Circuit Judge, filed a dissenting opinion, in which Rosenbaum, Circuit Judge, joined as to Parts I, II, III.A, III.B., III.D., and IV.

Lagoa, Circuit Judge:

**\*1** This case involves the unremarkable—and nearly universal—practice of separating school bathrooms based on biological sex. This appeal requires us to determine whether separating the use of male and female bathrooms in the public schools based on a student's biological sex violates (1) the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, and (2) Title IX of the Education Amendments Act of 1972, 🚩 20 U.S.C. § 1681 *et seq.* We hold that it does not—separating school bathrooms based on biological sex passes constitutional muster and comports with Title IX.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant-Appellant, the School Board of St. Johns County (the "School Board"), is responsible for providing "proper attention to health, safety, and other matters relating to the welfare of students" within the St. Johns County School District (the "School District"). 🚩 Fla. Stat. § 1001.42(8)(a). The School Board maintains and oversees the K-12 policies for the 40,000 students who attend the thirty-six different schools within the School District. *See generally* 🚩 *id.* § 1001.42. Of the 40,000 students attending schools within the School District, around sixteen identify as transgender.

Plaintiff-Appellee, Drew Adams, is a transgender boy. This means that Adams identifies as male, while Adams's biological sex—sex based on chromosomal structure and anatomy at birth—is female. Adams entered the School District in the fourth grade as a biological female and identified as a female. At the end of eighth grade, however, Adams began identifying and living as a boy. For example, Adams dressed in boys' clothing and wore a "chest binder" to flatten breast tissue. Most pertinently for this appeal, Adams adopted the male pronouns "he" and "him" and began using the male bathroom in public.

In August 2015, Adams entered ninth grade at Allen D. Nease High School ("Nease") within the School District. Nease provides female, male, and sex-neutral bathrooms for its 2,450 students. The communal female bathrooms have stalls, and the communal male bathrooms have stalls and undivided urinals. In addition to performing bodily functions in the communal bathrooms, students engage in other activities,

like changing their clothes, in those spaces. Single-stall, sex-neutral bathrooms are provided to accommodate any student, including the approximately five transgender students at Nease, who prefer not to use the bathrooms that correspond with their biological sex. The bathrooms at Nease are ordinarily unsupervised.

The School Board, like many others, maintains a longstanding, unwritten bathroom policy under which male students must use the male bathroom and female students must use the female bathroom. For purposes of this policy, the School Board distinguishes between boys and girls on the basis of biological sex—which the School Board determines by reference to various documents, including birth certificates, that students submit when they first enroll in the School District. The School Board does not accept updates to students' enrollment documents to conform with their gender identities.

**\*2** According to the School Board, the bathroom policy addresses concerns about the privacy, safety, and welfare of students pursuant to the School Board's duties under the governing Florida statute. In line with these concerns, the parties specified the following in their joint pretrial statement:

> The parties stipulate that certain parents of students and students in the St. Johns County School District object to a policy or practice that would allow students to use a bathroom that matches their gender identity as opposed to their sex assigned at birth. These individuals believe that such a practice would violate the bodily privacy rights of students and raise privacy, safety and welfare concerns.

In 2012, School District personnel began a comprehensive review of LGBTQ [1] issues affecting students. Indeed, the then-Director of Student Services for the School District attended, and sent personnel to, national LGBTQ conferences to help inform the School District about issues affecting the LGBTQ student community. The Director conducted significant research on LGBTQ student issues, met with LGBTQ student groups at schools throughout the School

District, and contacted school administrators outside the School District, as well as a local LGBTQ organization, to "gather every bit of information" to "support [LGBTQ] children." The Director also convened an LGBTQ task force, which met with "district administrators, ... principals, ... attorneys, ... guidance counselors, [and] mental health therapists" to hear "every perspective" on emerging LGBTQ issues.

The School District's review of LGBTQ student issues culminated in 2015 with the announcement of a set of "Guidelines for LGBTQ students – Follow Best Practices" (the "Best Practices Guidelines"). Under the Best Practices Guidelines, School District personnel, upon request, address students consistent with their gender identity pronouns. The guidelines also allow transgender students to dress in accordance with their gender identities and publicly express their gender identities. Finally, the guidelines formally note that: "Transgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex."

The School Board's decision to maintain the longstanding bathroom policy separating bathrooms based on biological sex, while providing sex-neutral bathroom accommodations for transgender students under the Best Practices Guidelines, was motivated, in part, by the issue of gender fluidity in which students may switch between genders with which they identify. Both the Best Practices Guidelines and the bathroom policy apply to all schools with communal bathrooms in the School District, not only to high schools like Nease.

Because Adams is biologically female and first enrolled in the School District as a female, Adams is identified as a female for purposes of the bathroom policy. For the first few weeks of ninth grade, Adams used the male bathrooms (in violation of the bathroom policy) without incident. However, at some point during this period, two unidentified students observed Adams using a male bathroom and complained to school officials. The school then informed Adams that, under the bathroom policy, Adams had to use either the communal female bathrooms or the single-stall, sex-neutral bathrooms. Adams took issue with that directive and, with parental help, began petitioning the school to change its policy.

**\*3** Adams continued the process of identifying as a male, including amending government documents with the State of Florida. For example, shortly before receiving a driver's license in the fall of 2016, Adams submitted medical

documents to the Florida Department of Motor Vehicles to receive a male designation on the license. And, in 2017, while this litigation was pending, Adams obtained an amended birth certificate with a male designation.

Adams also began taking birth control to stop menstruation and testosterone to appear more masculine and underwent a "double-incision mastectomy" to remove breast tissue. Because Adams was still just a teenager who had not yet reached the age of maturity, Adams could not undergo additional surgeries to rework external genitalia. Thus, at all times relevant to this lawsuit, Adams possessed the reproductive anatomy Adams was born with—that of a female.

On June 28, 2017, after Adams's efforts to change the School Board's bathroom policy failed, Adams filed suit against the School Board under 42 U.S.C. § 1983, alleging that its bathroom policy violated both the Equal Protection Clause and Title IX. After a three-day bench trial, the district court ruled in Adams's favor on both counts. The district court enjoined the School Board from prohibiting Adams's use of the male bathrooms and granted Adams $1,000 in compensatory damages.

The School Board timely appealed the district court's order. Following oral argument, a divided panel of this Court affirmed the district court over a dissent. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1292 (11th Cir. 2020); *id.* at 1311 (Pryor, C.J., dissenting). After a member of this Court withheld the mandate, the panel majority sua sponte withdrew its initial opinion and issued a revised opinion, again affirming the district court over a revised dissent but on grounds that were neither substantively discussed in the initial panel opinion nor substantively made by any party before the district court or this Court.[2] *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1303–04 (11th Cir. 2021); *id.* at 1321 (Pryor, C.J., dissenting). We then granted the School Board's petition for rehearing en banc and vacated the panel's revised opinion. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369, 1372 (11th Cir. 2021).

**\*4** Pursuant to our en banc briefing notice to the parties, on appeal the only questions before this Court are:

1) Does the School District's policy of assigning bathrooms based on sex violate the Equal Protection Clause of the Constitution? and

2) Does the School District's policy of assigning bathrooms based on sex violate Title IX?

## II. STANDARD OF REVIEW

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). A factual finding is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Morrissette–Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005)).

## III. ANALYSIS

On appeal, Adams argues that the School Board's bathroom policy violates both the Equal Protection Clause and Title IX. At its core, Adams's claim is relatively straightforward. According to Adams, the School Board's bathroom policy facially discriminates between males and females. Adams, who identifies as a male, argues that the policy violates Adams's rights because, as a transgender student, Adams cannot use the bathroom that corresponds to the sex with which Adams identifies. Which is to say, Adams argues that by facially discriminating between the two sexes, the School Board's bathroom policy also necessarily discriminates against transgender students. We disagree with Adams's theory that separation of bathrooms on the basis of biological sex necessarily discriminates against transgender students.[3]

**\*5** Indeed, when we apply first principles of constitutional and statutory interpretation, this appeal largely resolves itself. The Equal Protection Clause claim must fail because, as to the sex discrimination claim, the bathroom policy clears the hurdle of intermediate scrutiny and because the bathroom policy does not discriminate against transgender students. The Title IX claim must fail because Title IX allows schools to separate bathrooms by biological sex. We now begin our full

analysis with the Equal Protection Clause and end with Title IX.[4]

### A. The Bathroom Policy Does Not Violate the Equal Protection Clause

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

There has been a long tradition in this country of separating sexes in some, but not all, circumstances—and public bathrooms are likely the most frequently encountered example. Indeed, the universality of that practice is precisely what made Justice Thurgood Marshall's statement—"[a] sign that says 'men only' looks very different on a bathroom door than a courthouse door"—so pithy. *City of Cleburne*, 473 U.S. at 468–69, 105 S.Ct. 3249 (Marshall, J., concurring in the judgment in part and dissenting in part). Of course, not all sex-based classifications, no matter how longstanding, satisfy the mandate of the Equal Protection Clause. And it is well settled that when it comes to sex-based classifications, a policy will pass constitutional muster only if it satisfies intermediate scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). To satisfy intermediate scrutiny, the government must show "that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)).

For a governmental objective to be important, it cannot "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. For a policy to be

substantially related to an important governmental objective, there must be "enough of a fit between the ... [policy] and its asserted justification." *Danskine v. Mia. Dade Fire Dep't*, 253 F.3d 1288, 1299 (11th Cir. 2001). But the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex. *See Nguyen v. INS*, 533 U.S. 53, 70, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) ("None of our gender-based classification equal protection cases have required that the [policy] under consideration must be capable of achieving its ultimate objective in every instance."); *see also Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade County*, 122 F.3d 895, 929 (11th Cir. 1997) ("[U]nder intermediate scrutiny, a gender-conscious program need not closely tie its numerical goals to the proportion of qualified women in the market.").

In the instant appeal, Adams argues that the bathroom policy unlawfully discriminates on both the basis of sex and transgender status. We address both of Adams's arguments in turn and hold that there has been no unlawful discrimination.

### 1. The Bathroom Policy Does Not Unlawfully Discriminate on the Basis of Sex

**\*6** The School Board's bathroom policy requires "biological boys" and "biological girls"—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms. This is a sex-based classification. Adams challenges the policy's requirement that Adams must either use the female bathrooms —which correspond with Adams's biological sex—or the sex-neutral bathrooms. Simply put, Adams seeks access to the male bathrooms, which correspond with the gender Adams identifies with.

Before reaching the merits of Adams's argument and the constitutional question presented in this case, we begin with one prefatory note: the role that schools have in setting policies for students. As the Supreme Court has recognized, constitutional rights, including "Fourteenth Amendment rights, are different in public schools than elsewhere" because of "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Schools operate in loco parentis to students and are "permit[ed] a degree of supervision and control that could not be exercised over free

adults." *Id.* at 655, 115 S.Ct. 2386. This is because, "in a public school environment[,] ... the State is responsible for maintaining discipline, health, and safety." *Bd. of Educ. v. Earls*, 536 U.S. 822, 830, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).

Indeed, schools' responsibilities are so great that they can be held liable for their failures to protect students from sexual assault and harassment. *See, e.g.,* *Miami-Dade Cnty. Sch. Bd. v. A.N.*, 905 So. 2d 203, 204–05 (Fla. Dist. Ct. App. 2005) (upholding a jury verdict that found a school to be negligent and thus liable for failure to protect a student from sexual assault by another student in the bathroom); *see also* *Williams v. Bd. of Regents*, 477 F.3d 1282, 1288–91 (11th Cir. 2007) (reversing a district court's dismissal of a Title IX claim against the University of Georgia alleging gang rape by a group of athletes in a university dormitory). Given schools' responsibilities, the Supreme Court has afforded deference to their decisions even when examining certain constitutional issues. *See, e.g.,* *Acton*, 515 U.S. at 665, 115 S.Ct. 2386 (Fourth Amendment); *Morse v. Frederick*, 551 U.S. 393, 403–08, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (First Amendment); *Ingraham v. Wright*, 430 U.S. 651, 671, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (Eighth Amendment).

None of that, of course, is to say that schools have carte blanche. It is to say, though, that when school authorities have prudently assessed and addressed an issue that affects student welfare, we should pay attention. Just so here. In this case, the School Board has gone to great lengths—as the district court itself acknowledged—to accommodate LGBTQ students:

Beginning in 2012, the (now retired) Director of Student Services worked with LGBTQ students, attended and sent staff to LGBTQ conferences, and researched school policies in other school districts in Florida and elsewhere to educate herself and the School District about emerging LGBTQ issues. She formed a task force which consulted with district administrators, principals, attorneys, guidance counselors, mental health professionals, parents, students, members of the public, and LGBTQ groups in St. Johns County and elsewhere. The result was a set of Best Practices Guidelines adopted by the School Superintendent's Executive Cabinet and introduced to school administrators in September 2015....

Under the Best Practices Guidelines, upon request by a student or parent, students should be addressed with the name and gender pronouns corresponding with the student's consistently asserted gender identity; school records will be updated upon receipt of a court order to reflect a transgender student's name and gender; unofficial school records will use a transgender student's chosen name even without a court order; transgender students are allowed to dress in accordance with their gender identity; students are permitted to publicly express their gender identity; and the school will not unnecessarily disclose a student's transgender status to others. The Best Practices Guidelines also provide that "[t]ransgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex."

**\*7** (second alteration in original) (citations omitted).

Thus, after completing this process and as part of its Best Practices Guidelines, the School Board decided to maintain its bathroom policy that separates bathrooms on the basis of biological sex while providing accommodative sex-neutral bathrooms. The School Board opted to maintain this policy also after taking into account the complex issues presented by the notion of gender fluidity.

Ultimately, the School Board believes its bathroom policy is necessary to ensure the privacy and overall welfare of its entire student body under the governing Florida statute. We will not insert ourselves into the School Board's ongoing development of policies to accommodate students struggling with gender identity issues—unless, of course, the School Board's policies are unconstitutional, an issue which we now address.

Turning to the constitutional question, because the policy that Adams challenges classifies on the basis of biological sex, it is subject to intermediate scrutiny. [5] To satisfy intermediate scrutiny, the bathroom policy must (1) advance an important governmental objective and (2) be substantially related to that objective. *Miss. Univ. for Women*, 458 U.S. at 724, 102 S.Ct. 3331. The bathroom policy clears both hurdles because the policy advances the important governmental objective of protecting students' privacy in school bathrooms and does so in a manner substantially related to that objective. [6]

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**\*8** The protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective. Indeed, the district court "agree[d] that the School Board has a legitimate interest in protecting student privacy, which extends to bathrooms." Understanding why is not difficult—schoolage children "are still developing, both emotionally and physically."

*See* 🏁 *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 636 (4th Cir. 2020) (Niemeyer, J., dissenting) ("[A]ll individuals possess a privacy interest when using restrooms or other spaces in which they remove clothes and engage in personal hygiene, and this privacy interest is heightened when persons of the opposite sex are present. Indeed, this privacy interest is heightened yet further when children use communal restrooms ...."). And even the more generally acceptable notion that the protection of individual privacy will occasionally require some segregation between the sexes is beyond doubt—as then-Professor Ruth Bader Ginsburg noted, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 (emphasis added).

It is no surprise, then, that the privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, "sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding." W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019). The Supreme Court acknowledged this when it stated that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." 🏁 *Virginia*, 518 U.S. at 550 n.19, 116 S.Ct. 2264. So, too, have our sister circuits.

*See, e.g.,* 🏁 *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) ("[T]he law tolerates same-sex restrooms or same-sex dressing rooms, but not white-only rooms, to accommodate privacy needs."); 🏁 *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) ("[Society has given its] undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each gender that is

different."); *see also* 🏁 *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting) ("In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time.").

Moreover, courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts. *E.g.,* 🏁 *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing a "constitutional right to bodily privacy because most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating' " (quoting 🏁 *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981))); 🏁 *Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016); 🏁 *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494–95 (6th Cir. 2008); 🏁 *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994); 🏁 *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (en banc).

Having established that the School Board has an important governmental objective in protecting students' privacy interests in school bathrooms, we must turn to whether the bathroom policy is substantially related to that objective. 🏁 *Miss. Univ. for Women*, 458 U.S. at 724, 102 S.Ct. 3331. Intermediate scrutiny is satisfied when a policy "has a close and substantial bearing on" the governmental objective in question. 🏁 *Nguyen*, 533 U.S. at 70, 121 S.Ct. 2053. The School Board's bathroom policy is clearly related to—indeed, is almost a mirror of—its objective of protecting the privacy interests of students to use the bathroom away from the opposite sex and to shield their bodies from the opposite sex in the bathroom, which, like a locker room or shower facility, is one of the spaces in a school where such bodily exposure is most likely to occur. Therefore, the School Board's bathroom policy satisfies intermediate scrutiny.

**\*9** The district court avoided this conclusion only by misconstruing the privacy interests at issue and the bathroom policy employed. The district court found that "allowing transgender students to use the restrooms that match their gender identity does not affect the privacy protections already

in place." In the district court's eyes, this was because "Adams enters a stall, closes the door, relieves himself, comes out of the stall, washes his hands, and leaves" the male bathroom. The district court discounted the privacy interests at play by claiming that "Adams has encountered no problems using men's restrooms in public places, and there were no reports of problems from any boys or boys' parents during the six weeks ... when Adams used the boys' restrooms." Thus, the district court found "the School Board's concerns about privacy" to be "only conjectural."

But the district court's contentions, which the dissent, Adams, and many amici echo, minimize the undisputed fact that, at Nease, students' use of the sex-separated bathrooms is not confined to individual stalls, e.g., students change in the bathrooms and, in the male bathrooms, use undivided urinals. These contentions also ignore that the privacy interests, which animated the School Board's decision to implement the policy, are sex-specific privacy interests. After all, only sex-specific interests could justify a sex-specific policy. The privacy interests hinge on using the bathroom away from the opposite sex and shielding one's body from the opposite sex, not using the bathroom in privacy. Were it the latter, then only single-stall, sex-neutral bathrooms would pass constitutional muster. But that is not the law. Nor is the law predicated on "problems" or "reports of problems" from students or their parents when it comes to the validity of sex-separated bathrooms (although the record reflects that two students did, in fact, complain to the school and that—as stipulated by the parties—parents and students within the School District objected to a policy that would allow students to use the bathroom that matches their gender identity, instead of their biological sex, out of privacy, safety, and welfare concerns).

The sex-specific privacy interests for all students in the sex-separated bathrooms at Nease attach once the doorways to those bathrooms swing open. The privacy interests are not confined to the individual stalls in those bathrooms. In reaching the contrary conclusion, the district court erred by misconstruing the privacy interests at issue, minimizing the factual and practical realities of how the sex-separated bathrooms operate, and discounting the parties' stipulation that students and parents objected to any bathroom policy that would commingle the sexes out of privacy concerns, among others. *Cf.*  *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677–78, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010) ("[F]actual stipulations are 'formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the

need for proof of the fact.' " (second alteration in original) (quoting 2 K. Broun, McCormick on Evidence § 254, at 181 (6th ed. 2006))).

The dissent repeats the district court's mistakes. Of particular note, in asserting that the School Board only provided "speculative" evidence in support of linking the bathroom policy to the protection of students' privacy interests, the dissent discounts the parties' stipulation that parents and students within the School District objected to a bathroom policy that commingled the sexes based on privacy concerns, among others. Jill Pryor Dis. Op. at ——, —— n.22. The dissent equates concerns about privacy in the bathroom with unlawful complaints about racial segregation. *Id.* at —— n.22, —— – ——. But that is a false equivalence. As explained above, it is well established that individuals enjoy protection of their privacy interests in the bathroom, so concerns about privacy in the bathroom are legitimate concerns. In contrast, it is well established that racially segregating schools is unconstitutional, so complaints about racially integrating schools are illegitimate complaints.  *Brown v. Bd. of Educ.*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Only by conflating legitimate concerns about privacy with illegitimate, and unconstitutional, complaints about racial integration is the dissent able to discount the parties' binding stipulation and claim that the School Board's bathroom policy, which directly advances the important governmental objective of protecting students' privacy interests in the bathroom, fails intermediate scrutiny.

**\*10**  Finally, we turn to the dissent's contention that, despite all indications to the contrary, this case is not a case about "the legality of separating bathrooms by sex," which is primarily advanced by Judge Jill Pryor's dissent but also is discussed in Judge Jordan's dissent. Jill Pryor Dis. Op. at ——; Jordan Dis. Op. at —— – ——. As such, the dissent claims that this case is about the exclusion of Adams, as "a boy," from the male bathrooms in which the School Board restricts access to "biological boys."

The dissent's argument relies on a misreading of the record and, in fact, contradicts the dissent's own analysis. The district court explained that Adams "is transgender, meaning he 'consistently, persistently, and insistently' identifies as a boy, a gender that is different than the sex he was assigned at birth (female)." In its analysis of the Equal Protection Clause claim, the district court stated that "[t]he undisputed evidence is that [Adams] is a *transgender* boy and wants

access to use the boys' restroom." (Emphasis added). And, in concluding that the bathroom policy violated the Equal Protection Clause, the district court explained that "[t]here is no evidence to suggest that [Adams's] *identity* as a boy is any less consistent, persistent, and insistent than any other boy. Permitting [Adams] to use the boys' restroom will not integrate the restrooms between the sexes." (Emphasis added). In holding the bathroom policy unconstitutional, the district court never made a finding that Adams is a "biological boy," as the dissent claims, which is the classification that the School Board uses to restrict access to the male bathrooms and the classification that Adams is challenging. Jill Pryor Dis. Op. at —— n.10. The district court looked to Adams's gender identity—not Adams's biological sex—for purposes of evaluating the bathroom policy. And even the dissent acknowledges, as it must, that gender identity is different from biological sex. *Id.* at —— (citing the district court's order to explain "that 'transgender' persons 'consistently, persistently, and insistently identif[y] as a gender different [from] the sex they were assigned at birth' ").

Thus, despite the dissent's suggestion, the district court did not make a finding equating gender identity as akin to biological sex. Nor could the district court have made such a finding that would have legal significance. To do so would refute the Supreme Court's longstanding recognition that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion); *see also Immutable*, *Oxford English Dictionary* (2d ed. 1989) ("Not mutable; not subject to or susceptible of change; unchangeable, unalterable, changeless."). Regardless of Adams's genuinely held belief about gender identity—which is not at issue—Adams's challenge to the bathroom policy revolves around whether Adams, who was "determined solely by the accident of birth" to be a biological female—is allowed access to bathrooms reserved for those who were "determined solely by the accident of birth" to be biologically male. Thus, we are unpersuaded by the dissent's argument that the district court could make any factual finding (that would not constitute clear error) to change an individual's immutable characteristic of biological sex, just as the district court could not make a factual finding to change someone's immutable characteristic of race, national origin, or even age for that matter. Simply put, and contrary to the dissent's claims, this *is* a case about the constitutionality and legality of separating bathrooms by biological sex because it involves an individual of one sex seeking access to the bathrooms reserved for those of the opposite sex. Adams's gender identity is thus not dispositive for our adjudication of Adams's equal protection claim.

**\*11** In sum, the bathroom policy does not unlawfully discriminate on the basis of biological sex.

### 2. The Bathroom Policy Does Not Discriminate Against Transgender Students

We now turn to whether the School Board's policy, which does not unlawfully discriminate on the basis of sex, discriminates against transgender students. In finding a violation of the Equal Protection Clause, the district court never properly conducted the requisite intermediate scrutiny analysis and, instead, concluded that "although the policy treats most boys and girls the same, it treats Adams differently because, as a transgender boy, he does not act in conformity with the sex-based stereotypes associated with" biological sex. There are two flaws in the district court's conclusion.

First, the bathroom policy facially classifies based on biological sex—not transgender status or gender identity. Transgender status and gender identity are wholly absent from the bathroom policy's classification. And both sides of the classification—biological males and biological females—include transgender students. To say that the bathroom policy singles out transgender students mischaracterizes how the policy operates.

Both Adams and the dissent rely on *Bostock v. Clayton County*, —— U.S. ——, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020), to advance this faulty reasoning. Jill Pryor Dis. Op. at —— – ——. *Bostock* involved employment discrimination under Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.*—specifically, various employers' decisions to fire employees based solely on their sexual orientations or gender identities. *Id.* at 1737–38. As a preliminary matter, the Supreme Court expressly declined to address the issue of sex-separated bathrooms and locker rooms, stating:

> Under Title VII, ... we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before

us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."

*Id.* at 1753. And the instant appeal is about schools and children—and the school is not the workplace. *See, e.g.,*

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("Courts, moreover, must bear in mind that schools are unlike the adult workplace.");

*id.* at 675, 119 S.Ct. 1661 (Kennedy, J., dissenting) (noting the "differences between children and adults, peers and teachers, schools and workplaces" and that "schools are not workplaces and children are not adults").

But even holding those preliminary points aside, *Bostock* does not resolve the issue before us. While *Bostock* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," 140 S. Ct. at 1747, that statement is not in question in this appeal. This appeal centers on the converse of that statement—whether discrimination based on biological sex necessarily entails discrimination based on transgender status. It does not —a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status. *See, e.g., Nguyen*, 533 U.S. at 60, 121 S.Ct. 2053. Indeed, while the bathroom policy at issue classifies students on the basis of biological sex, it does not facially discriminate on the basis of transgender status. Because the bathroom policy divides students into two groups, both of which include transgender students, there is a "lack of identity" between the policy and transgender status, as the bathroom options are "equivalent to th[ose] provided [to] all" students of the same biological sex. *See Geduldig v. Aiello*, 417 U.S. 484, 496–97 & n.20, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (reaffirming this reasoning).

**\*12**  Our conclusion that there is a "lack of identity" between the bathroom policy and transgender status is informed by the Supreme Court's reasoning in *Geduldig*. In that case,

the Supreme Court held that a state insurance program that excluded coverage for certain pregnancy-related disabilities did not classify on the basis of sex. *Geduldig*, 417 U.S. at 486, 496–97, 94 S.Ct. 2485. Because the insurance program created two groups—a group that contained only females and a group that contained males and females—there was a "lack of identity" between the exclusion of those female-related disabilities from coverage and discrimination on the basis of being female since "[t]he fiscal and actuarial benefits of the program ... accrue[d] to members of both sexes." *Id.* at 496 n.20, 94 S.Ct. 2485. Like the insurance program in *Geduldig*, the School Board's bathroom policy does not classify students based on transgender status because a "lack of identity" exists between transgender status and a policy that divides students into biological male and biological female groups—both of which can inherently contain transgender students—for purposes of separating the male and female bathrooms by biological sex.

Second, the contention that the School Board's bathroom policy relied on impermissible stereotypes associated with Adams's transgender status is wrong. The bathroom policy does not depend in any way on how students act or identify. The bathroom policy separates bathrooms based on biological sex, which is not a stereotype. As this opinion has explained, the Supreme Court has repeatedly recognized the biological differences between the sexes by grounding its sex-discrimination jurisprudence on such differences. *See, e.g., Nguyen*, 533 U.S. at 73, 121 S.Ct. 2053 ("The difference between men and women in relation to the birth process is a real one."); *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264 ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible ....' " (first alteration in original) (quoting *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946))). And the biological differences between males and females are the reasons intermediate scrutiny applies in sex-discrimination cases in the first place. *See Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764 ("[S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.' " (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972))). To say that the

bathroom policy relies on impermissible stereotypes because it is based on the biological differences between males and females is incorrect. *See* 🚩 *Nguyen*, 533 U.S. at 73, 121 S.Ct. 2053 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real.").

At most, Adams's challenge amounts to a claim that the bathroom policy has a disparate impact on the transgender students in the School District. And a disparate impact alone does not violate the Constitution. Instead, a disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by "purposeful discrimination." 🚩 *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *accord* 🚩 *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The district court proclaimed that the bathroom policy was "no longer a neutral rule" because it "applies differently to transgender students" and because the School Board became "aware of the need to treat transgender students the same as other students." But the Supreme Court has long held that " '[d]iscriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences." 🚩 *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282 (quoting 🚩 *United Jewish Orgs. v. Carey,* 430 U.S. 144, 180, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (Stewart, J., concurring in the judgment)); *see also* 🚩 *Bray*, 506 U.S. at 271–72, 113 S.Ct. 753. Instead, a discriminatory purpose "implies that the decisionmaker," in this case the School Board, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 🚩 *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282.

**\*13** There is no evidence suggesting that the School Board enacted the bathroom policy "because of ... its adverse effects upon" transgender students. *See* 🚩 *id.* The district court itself noted that the School Board did not even "have transgender students in mind when it originally established separate multi-stall restrooms for boys and girls." The policy impacts approximately 0.04 percent of the students within the School District—i.e., sixteen transgender students out of 40,000 total students—in a manner unforeseen when the bathroom policy was implemented. And to accommodate that small percentage, while at the same time taking into account

the privacy interests of the other students in the School District, the School Board authorized the use of sex-neutral bathrooms as part of its Best Practices Guidelines for LGBTQ issues. As discussed above, the School Board provided this accommodation only after undertaking significant education efforts and receiving input from mental health professionals and LGBTQ groups both within and beyond the School District community.

Contrary to the dissent's claim, the School Board, through the Best Practices Guidelines, did not discriminatorily "single[ ] out transgender students." Jill Pryor Dis. Op. at ——. The School Board sought to accommodate transgender students by providing them with an alternative—i.e., sex-neutral bathrooms—and not requiring them to use the bathrooms that match their biological sex—i.e., the bathroom policy Adams challenges. The School Board did not place a special burden on transgender students by allowing them to use sex-neutral bathrooms under the Best Practices Guidelines, which came well after the implementation of the longstanding bathroom policy separating bathrooms by biological sex; rather, the School Board gave transgender students an alternative option in the form of an accommodation. Ultimately, there is no evidence of purposeful discrimination against transgender students by the School Board, and any disparate impact that the bathroom policy has on those students does not violate the Constitution.

## B. The Bathroom Policy Does Not Violate Title IX

Title IX was passed as part of the Education Amendments of 1972 and "patterned after" the Civil Rights Act of 1964. 🚩 *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694–96, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The statute mandates that, subject to certain exceptions: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 🚩 20 U.S.C. § 1681(a). Its purpose, as derived from its text, is to prohibit sex discrimination in education. *See* 🚩 *United States v. Bryant*, 996 F.3d 1243, 1264 (11th Cir. 2021) ("As in all cases of statutory interpretation, 'the purpose must be derived from the text.' " (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 56 (2012))), *cert. denied*, —— U.S. ——, 142 S. Ct. 583, 211 L.Ed.2d 363 (2021). The statute explicitly provides for administrative enforcement, *see*

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

20 U.S.C. § 1682, and the Supreme Court also has read in an implied private right of action for damages and injunctive relief, *see* *Cannon*, 441 U.S. at 717, 99 S.Ct. 1946 (reading an implied private right of action into Title IX); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (concluding damages are a remedy available for an action under Title IX).

Notwithstanding Title IX's general prohibition on sex discrimination, the statute provides an express carve-out with respect to living facilities: "nothing contained [in Chapter 38] shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The regulations implementing Title IX explicitly permit schools receiving federal funds to "provide separate housing on the basis of sex," so long as the housing is "[p]roportionate in quantity to the number of students of that sex applying for such housing" and "[c]omparable in quality and cost to the student," 34 C.F.R. § 106.32(b), and "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex [are] comparable to such facilities provided for students of the other sex," *id.* § 106.33.

**\*14** As such, this appeal requires us to interpret the word "sex" in the context of Title IX and its implementing regulations. We cannot, as the Supreme Court did in *Bostock*, decide only whether discrimination based on transgender status necessarily equates to discrimination on the basis of sex, as *Adams* would have us do. 140 S. Ct. at 1739 ("The question isn't just what 'sex' meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions 'because of' sex."). This is because Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others. Therefore, if to "provide separate toilet ... facilities on the basis of sex" means to provide separate bathrooms on the basis of *biological* sex, then the School Board's policy fits squarely within the carve-out. 34 C.F.R. § 106.33. And if the School Board's policy fits within the carve-out, then Title IX permits the School Board to mandate that all students follow the policy, including Adams.

*1. The Statute Is Not Ambiguous*

To interpret "sex" within the meaning of Title IX, we look to the ordinary meaning of the word when it was enacted in 1972. *Wis. Cent. Ltd. v. United States*, ––– U.S. ––––, 138 S. Ct. 2067, 2070, 201 L.Ed.2d 490 (2018) ("[O]ur job is to interpret the words consistent with their 'ordinary meaning ... at the time Congress enacted the statute.' " (second alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979))). One of the methods of determining the ordinary meaning of a word "is by looking at dictionaries in existence around the time of enactment." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021) (quoting *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016)). Reputable dictionary definitions of "sex" from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of "sex" in education, it meant biological sex, i.e., discrimination between males and females. *See, e.g.*, *Sex, American Heritage Dictionary of the English Language* (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex, American Heritage Dictionary of the English Language* (1979) (same); *Sex, Female, Male, Oxford English Dictionary* (re-issue ed. 1978) (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," "female" as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation"); *Sex, Webster's New World Dictionary* (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); *Sex, Female, Male, Webster's Seventh New Collegiate Dictionary* (1969) (defining "sex" as "either of two divisions of organisms distinguished respectively as male or female," "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function"); *Sex, Random House College Dictionary* (rev. ed. 1980) ("[E]ither the male or female division of a species, esp. as differentiated with reference to the reproductive functions.").

The district court found "sex" to be "ambiguous as applied to transgender students," due to lack of explicit definition in either Title IX or its implementing regulations. And in

deciding that "sex" was an ambiguous term, it noted that other courts, including the majority in 🔖*Grimm v. Gloucester County School Board*, "did not find the meaning [of 'sex'] to be so universally clear" under Title IX drafting-era dictionary definitions. But the district court mentioned only one dictionary definition—the *American College Dictionary* (1970), defining "sex" as "the character of being either male or female"—to support its conclusion that "sex" was an ambiguous term at the time of Title IX's enactment.

**\*15** In the face of the overwhelming majority of dictionaries defining "sex" on the basis of biology and reproductive function, the district court's determination that a single dictionary, which is supposedly at variance from its peers, supports the conclusion that the word "sex" had an ambiguous meaning when Title IX was enacted is wrong ab initio. Moreover, even a cursory examination of the *American College Dictionary*'s definition of "sex" confirms that it, too, defines "sex" based on biology and reproductive function, as illustrated by its definitions of "female" and "male." *See Female*, *American College Dictionary* (1970) ("[A] human being of the sex which conceives and brings forth young; a woman or girl."); *Male*, *American College Dictionary* (1970) ("[B]elonging to the sex which begets young, or any division or group corresponding to it."). The ambiguity purportedly found by the district court simply is not there.

But even if the district court's reading of the *American College Dictionary* supported its finding of "sex" to be ambiguous, a statutory term is not deemed to be ambiguous simply because the statute does not explicitly define the term or a single dictionary provides a different meaning. *See* 🔖*Perrin*, 444 U.S. at 42, 100 S.Ct. 311 ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Indeed, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." 🔖*Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). And reading in ambiguity to the term "sex" ignores the statutory context of Title IX.

For one, Title IX explicitly provides a statutory carve-out for "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. So, if "sex" were ambiguous enough to include "gender identity," as Adams suggests and as the district court ultimately concluded, then this carve-out, as well as the various carveouts under the implementing regulations, would be rendered meaningless. This is because

transgender persons—who are members of the female and male sexes by birth—would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status. If sex were ambiguous, it is difficult to fathom why the drafters of Title IX went through the trouble of providing an express carve-out for sex-separated living facilities, as part of the overall statutory scheme. For this reason alone, reading in ambiguity to the term "sex" ignores the overall statutory scheme and purpose of Title IX, along with the vast majority of dictionaries defining "sex" based on biology and reproductive function.

The district court claimed that the Supreme Court's decision in 🔖⚠️*Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), and this Court's decision in 🔖*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), provided support for its conclusion that "the meaning of 'sex' in Title IX includes 'gender identity' for purposes of its application to transgender students." But both cases dealt with workplace discrimination involving nonconformity with sex stereotypes; neither case departed from the plain meaning of "sex," generally, or as used within Title IX. 🔖⚠️*Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. 1775 ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, [has discriminated on the basis of sex]."); 🔖*Glenn*, 663 F.3d at 1318–19 ("All persons, whether transgender or not, are protected from discrimination on the basis of [a sex stereotype].").

Neither case reads "gender identity" into the definition of "sex"; they discuss unlawful action by employers' reliance on impermissible stereotypes. And, as discussed above, "sex" is not a stereotype. Just as importantly, and contrary to Adams's arguments that 🔖*Bostock* equated "sex" to "transgender status," the Supreme Court in 🔖*Bostock* actually "proceed[ed] on the assumption" that the term "sex," as used in Title VII, "refer[ed] only to *biological* distinctions between male and female." 🔖*140 S. Ct. at 1739* (emphasis added). There simply is no alternative definition of "sex" for transgender persons as compared to nontransgender persons under Title IX. The district court erred by divining one, and applying that definition to Adams, because courts must "avoid interpretations that would 'attribute different meanings to

the same phrase' " or word in "all but the most unusual" of statutory circumstances. 📁 *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, —— U.S. ——, 139 S. Ct. 1507, 1512, 203 L.Ed.2d 791 (2019) (quoting 📁 *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 329, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000)).

**\*16** In this regard, the district court's error is made even clearer when we consider the ramifications of its reading of Title IX. Reading "sex" to include "gender identity," and moving beyond a biological understanding of "sex," would provide more protection against discrimination on the basis of transgender status under the statute and its implementing regulations than it would against discrimination on the basis of sex. Title IX and its implementing regulations prohibit discrimination on the basis of sex, but they also explicitly permit differentiating between the sexes in certain instances, including school bathrooms, locker rooms, and showers, under various carve-outs. As explained in our discussion about the statutory scheme and purpose of Title IX, transgender persons fall into the preexisting classifications of sex—i.e., male and female. Thus, they are inherently protected under Title IX against discrimination on the basis of sex. But reading "sex" to include "gender identity," as the district court did, would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity. Such a reading would thereby establish dual protection under Title IX based on *both* sex and gender identity when gender identity does not match sex. That conclusion cannot comport with the plain meaning of "sex" at the time of Title IX's enactment and the purpose of Title IX and its implementing regulations, as derived from their text.

Finally, in this appeal, any action by the School Board based on sex stereotypes is not relevant to Adams's claim because, as discussed, Title IX and its implementing regulations expressly allow the School Board to provide separate bathrooms "on the basis of sex." *See* 📁 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. § 106.33. Regardless of whether Adams argues that the bathroom policy itself violates Title IX's general prohibition against sex discrimination, this Court must still determine whether the application of the policy fits into Title IX's carve-out, which it does. An example makes this clear.

Think of a biological female student, who does not identify as transgender and who sued her school under Title IX to gain access to the male bathroom. Regardless of whether preventing the female student from using the male bathroom would constitute separation on the basis of sex—and it plainly would—the carve-out for bathrooms under Title IX would provide the school a safe harbor. In other words, because Title IX explicitly provides for separate bathrooms on the basis of sex, the student's claim would fail. So, too, must Adams's claim, because the carve-out for bathrooms provides the School Board a safe harbor for the same reasons. [7]

In summary, Title IX prohibits discrimination on the basis of sex, but it expressly permits separating the sexes when it comes to bathrooms and other living facilities. When we read "sex" in Title IX to mean "biological sex," as we must, the statutory claim resolves itself. Title IX's implementing regulations explicitly allow schools to "provide separate toilet ... facilities on the basis of [biological] sex." 34 C.F.R. § 106.33. The School Board does just that. Because the School Board thus acts in accordance with Title IX's bathroom-specific regulation, its decision to direct Adams—who was born, and enrolled in the School District as, a female—to use the female bathrooms is consistent with Title IX's precepts. As such, Adams's claim under the statute must fail.

### 2. Even if the Statute Were Unclear, the Spending Clause Militates Toward Finding for the School Board

**\*17** Even if the term "sex," as used in Title IX, were unclear, we would still have to find for the School Board. This is because Congress passed Title IX pursuant to its authority under the Spending Clause. U.S. Const. art. I, § 8, cl. 1; 📁 *Davis*, 526 U.S. at 640, 119 S.Ct. 1661 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause."). And "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously." 📁 *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Further, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." 📁 *Davis*, 526 U.S. at 640, 119 S.Ct. 1661.

A safeguard of our federalist system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 15

of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." 🔖 *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. Thus, the "legitimacy of Congress' power to legislate under the [S]pending [Clause] ... rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' " 🔖 *Id.* (quoting 🔖 *Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–98, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). Otherwise, if Congress's spending authority were "to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause" would "give[ ] 'power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." 🔖 *South Dakota v. Dole*, 483 U.S. 203, 217, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (O'Connor, J., dissenting) (quoting 🔖 *United States v. Butler*, 297 U.S. 1, 78, 56 S.Ct. 312, 80 L.Ed. 477 (1936)).

Under the Spending Clause's required clear-statement rule, the School Board's interpretation that the bathroom carve-out pertains to biological sex would only violate Title IX if the meaning of "sex" unambiguously meant something other than biological sex, thereby providing the notice to the School Board that its understanding of the word "sex" was incorrect. As we have thoroughly discussed, it does not. The dissent implicitly acknowledges this point. Jill Pryor Dis. Op. at ——— n.25 ("I ... have no reason to address the majority opinion's Spending Clause argument. The Spending Clause cannon of construction only comes into play if we find ourselves dealing with an ambiguous statute."). Moreover, schools across the country separate bathrooms based on biological sex and colleges and universities across the country separate living facilities based on biological sex. The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable. [8]

**\*18**  Title IX's statutory structure and corresponding regulatory scheme illustrate why a clear statement from Congress equating "sex" to "gender identity" or "transgender status" is so important. Adams's view of what constitutes "sex" for purposes of Title IX will have ramifications far beyond the bathroom door at a single high school in Ponte Vedra, Florida. This is because Title IX's statutory carve-out from its general prohibition against sex discrimination applies to "living facilities," not only bathrooms. 20 U.S.C.

§ 1686. And the same regulation that authorizes schools to provide separate bathrooms on the basis of sex also permits schools to provide separate "locker room ... and shower facilities on the basis of sex." 34 C.F.R. § 106.33. Therefore, affirming the district court's order, and equating "sex" with "gender identity" or "transgender status" for purposes of Title IX, would, at the very least, generally impact living facilities, locker rooms, and showers, in addition to bathrooms, at schools across the country—affecting students in kindergarten through the post-graduate level.

For the same reason, affirming the district court's order would have broad implications for sex-separated sports teams at institutions subject to Title IX, including public schools and public and private universities. While Title IX says nothing specifically about sports, its implementing regulations do. Those regulations, which necessarily flow from Title IX's general prohibition against sex discrimination, mirror the blanket-rule-with-specific-exception framework that Title IX applies to living facilities. The implementing regulations say, first, that "[n]o person shall, on the basis of sex, be excluded from participation in ... any interscholastic, intercollegiate, club or intramural athletics offered by a recipient [of federal funds], and no recipient shall provide any such athletics separately on such basis." 🔖 34 C.F.R. § 106.41(a). In the very next paragraph, however, the regulations instruct that, notwithstanding the above statement, "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 🔖 *Id.* § 106.41(b). Thus, equating "sex" to "gender identity" or "transgender status" would also call into question the validity of sex-separated sports teams.

To be sure, the district court disclaimed any suggestion that its decision would apply beyond the bathroom. But Title IX is not so limited; it applies to "living facilities," 20 U.S.C. § 1686, "toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, and sports teams, *id.* 🔖 § 106.41, at any institution subject to its mandates. The district court did not identify any textual or other support—because there is none—for its claim that its reading of "sex" applies only to high school bathrooms. Neither can the dissent identify any textual or persuasive support to cabin the district court's decision to high school bathrooms. Jill Pryor Dis. Op. at ——— ———. If "sex" as used in Title IX means "gender identity" or "transgender status," then there is simply no principled reason to limit application of the district court's reasoning to the high school

bathroom. Absent a clear statement from Congress, such a reading of Title IX would offend first principles of statutory interpretation and judicial restraint.

\* \* \* \*

In sum, commensurate with the plain and ordinary meaning of "sex" in 1972, Title IX allows schools to provide separate bathrooms on the basis of biological sex. That is exactly what the School Board has done in this case; it has provided separate bathrooms for each of the biological sexes. And to accommodate transgender students, the School Board has provided single-stall, sex-neutral bathrooms, which Title IX neither requires nor prohibits. Nothing about this bathroom policy violates Title IX. Moreover, under the Spending Clause's clear-statement rule, the term "sex," as used within Title IX, must unambiguously mean something other than biological sex—which it does not—in order to conclude that the School Board violated Title IX. The district court's contrary conclusion is not supported by the plain and ordinary meaning of the word "sex" and provides ample support for subsequent litigants to transform schools' living facilities, locker rooms, showers, and sports teams into sex-neutral areas and activities. Whether Title IX should be amended to equate "gender identity" and "transgender status" with "sex" should be left to Congress—not the courts.

## IV. CONCLUSION

**\*19** For all these reasons, we reverse and remand the district court's order.

## REVERSED AND REMANDED.

Lagoa, Circuit Judge, Specially Concurring:
I concur fully in the majority opinion's determination that the School Board of St. Johns County's unremarkable bathroom policy neither violates the Equal Protection Clause nor Title IX. I write separately to discuss the effect that a departure from a biological understanding of "sex" under Title IX—i.e., equating "sex" to "gender identity" or "transgender status"—would have on girls' and women's rights and sports.

As discussed in the majority opinion, Title IX does not explicitly define "sex" within its statutory scheme and corresponding implementing regulations. And Title IX's statutory language says nothing specifically about sports.

But the Title IX regulations that apply to sports do, and those regulations mirror the blanket-rule-with-specific-exception framework that Title IX statutorily applies to living facilities. Indeed, notwithstanding the broad prohibition against discrimination "on the basis of sex" in athletics, 34 C.F.R. § 106.41(a), the implementing regulations also allow a recipient of federal funds to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," *id.* § 106.41(b). As with all of Title IX's regulatory carve-outs allowing certain sex-separated activities, the interpretation of "sex" in the sex-separated sports carve-out flows from the meaning of "sex" within Title IX itself. And the interpretation of "sex" in the statute "would of course take precedence" when interpreting "sex" in the regulatory sports carve-out. *Bostock v. Clayton County,* ––– U.S. ––––, 140 S. Ct. 1731, 1779 n.48, 207 L.Ed.2d 218 (2020) (Alito, J., dissenting).

Affirming the district court's order and adopting Adams's definition of "sex" under Title IX to include "gender identity" or "transgender status" would have had repercussions far beyond the bathroom door. There simply is no limiting principle to cabin that definition of "sex" to the regulatory carve-out for bathrooms under Title IX, as opposed to the regulatory carve-out for sports or, for that matter, to the statutory and regulatory carve-outs for living facilities, showers, and locker rooms. And a definition of "sex" beyond "biological sex" would not only cut against the vast weight of drafting-era dictionary definitions and the Spending Clause's clear-statement rule but would also force female student athletes "to compete against students who have a very significant biological advantage, including students who have the size and strength of a male but identify as female." *Id.* at 1779–80. Such a proposition—i.e., commingling both biological sexes in the realm of female athletics—would "threaten[ ] to undermine one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports." *Id.* at 1779.

**\*20** To understand why such a judicially-imposed proposition would be deleterious, one need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports. At nearly every park in the country, young girls chase each other up and down soccer fields, volley back and forth on tennis courts, and shoot balls into hoops. And at

colleges, it is now commonplace to see young women training in state-of-the-art athletic facilities, from swimming pools to basketball arenas, with the records of their accolades hung from the rafters.

The implementation of Title IX and its regulations is the reason such scenes are now commonplace because Title IX "precipitated a virtual revolution for girls and women in sports." Deborah Brake, *The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34 U. Mich. J.L. Reform 13, 15 (2000). Indeed, "Title IX has paved the way for significant increases in athletic participation for girls and women at all levels of education." *Id.* Its effects in this regard have been noteworthy:

> Fewer than 300,000 female students participated in interscholastic athletics in 1971. By 1998–99, that number exceed 2.6 million, with significant increases in each intervening year. To put these numbers in perspective, since Title IX was enacted, the number of girls playing high school sports has gone from one in twenty-seven, to one in three.

*Id.* (footnotes omitted).

And, as courts and commentators have noted, "Title IX *shapes* women's interest [in sports], rather than merely requiring equality based on a preexisting level of interest." *See* David S. Cohen, *Title IX: Beyond Equal Protection*, 28 Harv. J.L. & Gender 217, 263 (2005) (emphasis added) (citing 🚩*Cohen v. Brown Univ.*, 101 F.3d 155, 188 (1st Cir. 1996)). "What stimulated [the] remarkable change in the quality of women's athletic competition was not a sudden, anomalous upsurge in women's interest in sports, but the enforcement of Title IX's mandate of gender equity in sports." 🚩*Cohen*, 101 F.3d at 188 (citing Robert Kuttner, *Vicious Circle of Exclusion*, Wash. Post, Sept. 4, 1996, at A15). In short, "[t]here can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports." 🚩*Id.*

But had the majority opinion adopted Adams's argument that "sex," as used in Title IX, includes the concept of "gender

identity" or "transgender status," then it would have become the law of this Circuit for all aspects of the statute. Under such a precedent, a transgender athlete, who is born a biological male, could demand the ability to try out for and compete on a sports team comprised of biological females. Such a commingling of the biological sexes in the female athletics arena would significantly undermine the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams.

This is because it is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports. Doriane Lambelet Coleman, et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 87–88 (2020). While pre-puberty physical differences that affect athletic performance are "not unequivocally negligible" between males and females, measurable physical differences between males and females develop during puberty that significantly impact athletic performance. Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 200–01 (2021). Indeed, during puberty, "testosterone levels increase 20-fold in males, but remain low in females, resulting in circulating testosterone concentrations at least 15 times higher in males than in females of any age." *Id.* at 201. And "the biological effects of elevated pubertal testosterone are primarily responsible for driving the divergence of athletic performances between males and females." *Id.*

**\*21** For example, in comparison to biological females, biological males have: "greater lean body mass," i.e., "more skeletal muscle and less fat"; "larger hearts," "both in absolute terms and scaled to lean body mass"; "higher cardiac outputs"; "larger hemoglobin mass"; larger maximal oxygen consumption (VO2 max), "both in absolute terms and scaled to lean body mass"; "greater glycogen utilization"; "higher anaerobic capacity"; and "different economy of motion." *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports L. & Pol'y 1 (Jan. 2019). These physical differences cut directly to the "main physical attributes that contribute to elite athletic performance," as recognized by sports science and sports medicine experts. *Id.* In tangible performance terms, studies have shown that these physical differences allow post-pubescent males to "jump (25%) higher than

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  18

females, throw (25%) further than females, run (11%) faster than females, and accelerate (20%) faster than females" on average. Jennifer C. Braceras, et al., *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports*, Indep. Women's F. & Indep. Women's L. Ctr. 20 (2021) (footnotes omitted). The largest performance gap may be seen "in the area of strength." *Id.* Studies also have shown that males "are able to lift 30% more than females of equivalent stature and mass," as well as punch with significantly greater force than females. *Id.*

Importantly, scientific studies indicate that transgender females, even those who have undergone testosterone suppression to lower their testosterone levels to within that of an average biological female, retain most of the puberty-related advantages of muscle mass and strength seen in biological males. *See generally, e.g.*, Hilton & Lundberg, *supra*. As such, "trans women and girls remain fully male-bodied in the respects that matter for sport; [and] because of this, their inclusion effectively de-segregates the teams and events they join." Coleman et al., *supra*, at 108. This is because:

> [F]emale sport is by design and for good reasons, a reproductive sex classification. These reasons have nothing to do with transphobia and everything to do with the performance gap that emerges from the onset of male puberty. Whether one is trans or not, if one is in sport and cares about sex equality, this physical phenomenon is undeniably relevant. Changing how we define "female" so that it includes individuals of both sexes, and then disallowing any distinctions among them on the basis of sex, is by definition and in effect a rejection of Title IX's equality goals.

*Id.* at 133.

As particularly relevant to this appeal, such physiological differences exist in high school sports. *See id.* at 89–90. While most studies look at the differences between the best or "elite class" females in sport as compared to their male counterparts, "[i]t is perhaps more important ... that those girls who are

only average high school athletes ... would fare even worse." *Id.* at 90. Looking to these young women and girls, "if sport were not sex segregated, most school-aged females would be eliminated from competition in the earliest rounds." *Id.* For that matter, many biological girls may not even make the team, missing out on the key skills learned from participation in sports and missing out on key opportunities to further their education through higher education scholarships. *See id.* at 72.

But why does it matter if women and girls are given the equal opportunity to compete in sports? The answer cuts to the heart of why Title IX is seen as such a success story for women's rights and why this case presents significant questions of general public concern. "Girls who play sports stay in school longer, suffer fewer health problems, enter the labor force at higher rates, and are more likely to land better jobs. They are also more likely to lead." Beth A. Brooke-Marciniak & Donna de Varona, *Amazing Things Happen When You Give Female Athletes the Same Funding as Men*, World Econ. F. (Aug. 25, 2016), https://www.weforum.org/agenda/2016/08/sustaining-theolympic-legacy-women-in-sports-and-public-policy/. "[R]esearch shows stunningly that 94[ ] percent of women C-Suite executives today played sport, and over half played at a university level." *Id.*; Coleman et al., *supra*, at 106. Being engaged in sports "inculcate[s] the values of fitness and athleticism for lifelong health and wellness" and "impart[s] additional socially valuable traits including teamwork, sportsmanship, and leadership, as well as individually valuable traits including goal setting, time management, perseverance, discipline, and grit." Coleman et al., *supra*, at 104. To open up competition to transgender women and girls hinders biological women and girls—over half of the United States population—from experiencing these invaluable benefits and learning these traits. Indeed:

> **\*22** [T]he sports exception to Title IX's general nondiscrimination rule has long been one of the statute's most popular features. This affirmative approach is understood to be necessary to ensure that the sex-linked differences that emerge from the onset of male puberty do not stand as obstacles to sex equality in the athletic arena. From the beginning, it was understood that any different, sex neutral measures would ensure

precisely the opposite—that spaces on selective teams and spots in finals and podiums would all go to boys and men. The sports exception makes it possible for women and girls also to benefit from the multiple positive effects of these experiences, and for their communities and the broader society to reap the benefits of their empowerment.

*Id.* at 132 (footnote omitted).

Affirming the district court's conclusion that "the meaning of 'sex' in Title IX includes 'gender identity' " would open the door to eroding Title IX's beneficial legacy for girls and women in sports. And removing distinctions based on biological sex from sports, particularly for girls in middle school and high school, harms not only girls' and women's prospects in sports, but also hinders their development and opportunities beyond the realm of sports—a significant harm to society as a whole.

\* \* \* \*

To summarize, as a matter of principled statutory interpretation, there can only be one definition of "sex" under Title IX and its implementing regulations. Departing from a biological and reproductive understanding of such a definition, as supported by the overwhelming majority of drafting-era dictionaries, would have vast societal consequences and significantly impact girls' and women's rights and sports. The majority opinion is correct not to depart from such an understanding absent a clear statement from Congress. Whether "sex," as set forth in a statute enacted in 1972, should be updated to include "gender identity" or "transgender status" is best left for Congress and the democratic and legislative processes—not to unelected members of the Judiciary.

Wilson, Circuit Judge, dissenting:
I concur fully with Judge Jordan's analysis and agree that we should analyze the bathroom policy as a gender-based classification. I write separately, with his analysis in mind, to add that even accepting the Majority's argument that the relevant factor is an individual's biological sex, the policy is

still discriminatory, and therefore we must engage in a robust Title IX and Equal Protection analysis.

Under the Majority's rationale, the bathroom policy distinguishes between boys and girls on the basis of biological sex—"which the School Board determines by reference to various documents, including birth certificates, that students submit when they first enroll in the School District." Maj. Op. at ——. Because the policy uses these same indicia for *all* students, according to the Majority, the policy is not discriminatory. *See* Maj. Op. at ——. Underlying this sex-assigned-at-matriculation bathroom policy, however, is the presumption that biological sex is accurately determinable at birth and that it is a static or permanent biological determination. In other words, the policy presumes it does not need to accept amended documentation because a student's sex does not change. This presumption is both medically and scientifically flawed. After considering a more scientific and medical perspective on biological sex, it is clear that the bathroom policy's refusal to accept updated medical documentation is discriminatory on the basis of sex.

**I. Biological Sex is Not Static**

For argument's sake, I adopt the Majority's succinct definition of biological sex: sex based on chromosomal structure and anatomy at birth. Under this definition, assigning sex at birth is typically a non-issue. Any person who has been in a delivery room knows that doctors routinely and with little effort ascertain an infant's biological sex. For this reason, it is easy to presume that identifying biological sex is per se accurate and correctly determinable in the first instance.

**\*23** However, there are thousands of infants born every year whose biological sex is *not* easily or readily categorizable at birth. As Allan M. Josephson, M.D., an expert witness for the School Board, explained, "there are rare individuals who are delineated 'intersex' because they have physical, anatomical sex characteristics that are a mixture of those typically associated with male and female designations (e.g. congenital adrenal hyperplasia)."

The word intersex is an umbrella term describing a range of natural physiological variations—including external genitals, internal sex organs, chromosomes, and hormones—that complicate the typical binary of male and female. Intersex is not a gender identity nor a sexual orientation, but rather a way to describe conditions of physiological development. These

variations occur for a variety of reasons, and the consequent developmental variations may become apparent at different ages. Intersex people have been recognized for millennia, [1] and courts have been confronted with many intersex-related legal issues. [2]

For many intersex people, biological sex is not determinable at birth. Although intersex people are not the same as LGBTQ people, they face many of the same issues. Many intersex individuals are assigned a particular sex at birth based on the available indicia at the time, live their childhood as that sex, and later discover during adolescence—due to biological changes—that they in fact have the chromosomal or reproductive attributes of the opposite sex. Under the Majority's conception of male and female based on genital and chromosomal indicia—their biological sex assignment has changed.

Take for instance individuals who have 5-alpha reductase, a condition where the person has XY chromosomes (i.e., "male" chromosomes) and an enzyme deficiency that prevents the body from properly processing testosterone. [3] At birth, because the body did not produce enough testosterone to generate external male genitalia, the infant will present as female. Later in life, because hormonal changes at puberty produce active testosterone, male genitalia can develop. So, an infant with 5-alpha reductase assigned female at birth can later develop male genitalia and discover underlying male chromosomes. Medical professionals would most certainly, in the second-instance, recategorize him as biologically male.

**\*24** 5-alpha reductase is not the only condition that causes delayed genital development, and there are similar conditions that cause the existence of ovaries to remain hidden until puberty and ovulation. Deanna Adkins, M.D., a pediatric endocrinologist at Duke University and expert for the plaintiff, explained that intersex variations occur frequently enough that doctors use a scale called the Prader Scale to describe the genitalia on a spectrum from male to female.

How then, does the bathroom policy account for intersex people?

## II. The Bathroom Policy is Discriminatory on Biological Sex Grounds

Despite the scientific reality that intersex individuals exist and develop changes in the presentation of their biological sex over time, the School Board policy refuses to accept changes to gender or sex documentation after matriculation. The student with 5-alpha reductase who develops male genitalia and discovers male chromosomes would be barred from updating their biological sex documentation and, per the policy, remains bound to continue using the female restroom despite having medically documented male genitalia.

Thus, these intersex students, unlike other students, cannot use the bathroom associated with their medically assigned biological sex. No other category of student is required to use the bathroom associated with the opposite biological sex, and therefore such a policy is plainly discriminatory.

All of this makes the Majority's deployment of the "proverbial straw man" all the more troubling. Jordan Diss. Op. at ——. By leading the court down this path of "biological sex," misconstruing Adams's argument the whole way, the Majority interprets the School Board's policy to avoid one constitutional challenge—that the policy is discriminatory on the basis of gender—while inviting another—that the policy is discriminatory on the basis of sex.

## III. The Bathroom Policy Does Not Cure the School Board's Privacy Concerns

The existence of intersex students also reveals how nonsensical the Majority's justification for the bathroom policy is. Despite the Majority artfully sidestepping the constitutional analysis, they still devote many pages of their opinion to explaining that the policy alleviates "privacy, safety, and welfare concerns." *See* Maj. Op. at ——. Without belaboring the point, intersex students do exist; they have or can develop unexpected genitalia. Biological females may still have male genitalia in the female restroom, and vice versa. A sex-assigned-at-matriculation bathroom policy cannot prevent that phenomenon. The case of intersex students therefore proves that a privacy concern rooted in a thin conception of biological sex is untenable.

I do not raise the existence of intersex students as a fantastical hypothetical, but instead as a legitimate issue for consideration. Our sister circuit recently had to consider how intersex students disrupt the underlying premise for bathroom policies. *See* 🔖 *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 615 (4th Cir. 2020), *cert. denied*, —— U.S. ——, 141 S.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Ct. 2878, 210 L.Ed.2d 977 (2021) ("As demonstrated by the record and amici such as interACT, the Board's policy is not readily applicable to other students who, for whatever reason, do not have genitalia that match the binary sex listed on their birth certificate ...."). [4] Judge Wynn, in his concurrence, further reasoned:

> [i]f the Board's concern [justifying the policy] were truly that individuals might be exposed to those with differing physiology, it would presumably have policies in place to address differences between pre-pubescent and post-pubescent students, as well as intersex individuals who possess some mix of male and female physical sex characteristics and who comprise a greater fraction of the population than transgender individuals.

**\*25** *Id.* at 623.

The same logic applies here. If the School Board were truly concerned about male genitalia in the female bathroom, or vice versa, the policy would account for intersex students and would accept updated documentation.

I conclude by acknowledging that the case before us does not directly force us to consider the panoply of issues related to intersex individuals and the Constitution. However, intersex individuals prove the Majority's analysis unworkable when applied to a fact pattern just slightly different from the one before us. We should not adopt haphazard and incomplete analyses that will ripple out for cases to come, nor should we do so in order to avoid engaging in the rigorous intermediate scrutiny analysis the Constitution requires. The Fourth Circuit's initial foray into this topic suggests that this is a real issue and one that will be before this court sooner rather than later. For these, and the reasons stated in Judge Jordan's capable dissent, I would affirm the district court's careful opinion, and I therefore respectfully dissent.

Jordan, Circuit Judge, joined by Wilson and Rosenbaum, Circuit Judges, Dissenting:

Two legal propositions in this case are undisputed. The first is that the School Board's unwritten bathroom policy regulates on the basis of gender. The second is that the policy, as a gender-based regulation, must satisfy intermediate scrutiny. Given these two propositions, the evidentiary record, and the district court's factual findings, the School Board cannot justify its bathroom policy under the Equal Protection Clause of the Fourteenth Amendment. *See Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 318 F. Supp. 3d 1293, 1311–1320 (M.D. Fla. 2018); *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1297–99 (11th Cir. 2020); *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1308–11 (11th Cir. 2021).

The School Board did not allow Drew Adams, a transgender student, to use the boys' bathroom. As explained below, however, the School Board's policy allows a transgender student just like Drew to use the boys' bathroom if he enrolls after transition with documents listing him as male. Because such a student poses the same claimed safety and privacy concerns as Drew, the School Board's bathroom policy can only be justified by administrative convenience. And when intermediate scrutiny applies, administrative convenience is an insufficient justification for a gender-based classification. [1]

**I**

Intermediate scrutiny requires a showing that the challenged classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (internal quotation marks and citations omitted). "The burden of justification is demanding," and here it "rests entirely on" the School Board. *Id.*

**\*26** In a number of cases applying intermediate scrutiny, the Supreme Court has held that a gender-based regulation cannot be justified on the basis of administrative convenience. These cases are *Craig v. Boren*, 429 U.S. 190, 198, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ("Decisions following *Reed* [*v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)] ... have rejected administrative ease and convenience as sufficiently important objectives

to justify gender-based classifications."); 🚩 *Orr v. Orr*, 440 U.S. 268, 281, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (where there is "no reason" to use "sex as a proxy for need," "not even an administrative-convenience rationale exists to justify operating by generalization or proxy");

🚩 *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151–52, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (holding that the bare assertion of a difference in the economic standing of working men and women "falls far short of justifying gender-based discrimination on the grounds of administrative convenience"); and 🚩 *Stanley v. Illinois*, 405 U.S. 645, 656–57, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (although "[p]rocedure by presumption is always cheaper and easier than individualized determination[,]" the "Constitution recognizes higher values than speed and efficiency").

This is not a controversial proposition. Scholars and commentators agree that administrative convenience cannot save a gender-based classification under intermediate scrutiny. *See, e.g.,* Laurence H. Tribe, American Constitutional Law 1568 n.24 (2d ed. 1988) (explaining that, at the time of its decision in 🚩 *Wengler*, the Supreme Court had "never upheld a gender classification on [the] basis" of administrative convenience); 1 William J. Rich, Modern Constitutional Law: Liberty and Equality § 13:5 (3d ed. 2021) (noting that the Supreme Court has "repeatedly concluded that administrative convenience served by use of [traditional gender] stereotypes will not meet a state's need for an 'important governmental interest' "); Gabrielle Fromer, *With Equal Opportunity Comes Equal Responsibility: The Unconstitutionality of a Male-Only Draft*, 18 Geo. J. of Gender & L. 173, 189 (2017) ("Administrative convenience is an insufficient basis to uphold a law under intermediate scrutiny.").

## II

The School Board's unwritten bathroom policy is that, for grades four and up, "biological boys" must use the boys' bathrooms and "biological girls" must use the girls' bathrooms, with the terms boys and girls defined as sex assigned at birth. *See* D.E. 162 at 10–11. For transgender students, the policy purportedly requires them to use the bathrooms that correspond to their sex assigned at birth—in conflict with their gender identity—or gender-neutral/single-

stall bathrooms. But, as the district court found, that is not really how the policy works.

## A

As the School Board's own witnesses explained at trial, a student's enrollment paperwork—which are "accept[ed] ... at face value"—controls for the purpose of the bathroom policy. In other words, for the School Board the enrollment documents dictate gender with respect to the bathroom policy. *See* D.E. 161 at 229, 234–35; D.E. 162 at 12–13, 50–51.

Drew registered in the St. Johns County school system as an incoming fourth-grader prior to his transition. *See* D.E. 192 at 24. When he did so, he submitted enrollment documentation reflecting his sex assigned at birth, including a birth certificate that listed his gender as "female." *See* D.E. 161 at 31–32. The School Board therefore classified him as a girl based on his original enrollment documents. *See* D.E. 161 at 253. Years later, the School Board continued to classify him as a girl for the purposes of its bathroom policy even after he (i) had transitioned socially at school (including using male pronouns), (ii) had a double mastectomy, and (iii) had his Florida driver's license and current Florida birth certificate changed to list him as male. *See* D.E. 160-1 at 95–96 (social transition), 99–101 (medical transition), 108–110 (legal transition).

The problem for the School Board is that a transgender student who is the same age as Drew and is like him in all relevant respects (including physical appearance and the stage of gender transition and gender identity) will be treated as a boy for purposes of the bathroom policy if he registers in the school system after starting gender transition and after changing his driver's license and birth certificate to indicate that he is male. That transgender student, who presents the same safety and privacy concerns that the School Board claims Drew does, would nevertheless be allowed to use the boys' bathroom. This is fatal under intermediate scrutiny.

**\*27** Here is the testimony of Sallyanne Smith, the retired director of student services for the School Board:

Q: If a ... transgender child comes in with a birth certificate that says their gender identity, they come in with a driver's license, would St. Johns admit that student in their school?

A: You mean as a certain gender?

Q: That's right ....

A: It's based on the records in the registration packet. It's based on the birth certificate, any physicals. There are forms that are filled out where a box is checked female or male. We specifically go by that unless we had a court order to do anything different. But we have to use what's on the registration packet.

Q: So you could have a situation where you have a transfer student, say, from Broward County, a transfer transgender student, let's say a – changed to male who shows up who had their birth certificate from that – prior to coming to St. Johns and they register, you would have a transgender student basically violating your [restroom] policy because you would know; is that correct, ma'am?

A: I would go specifically by the paperwork. Whatever I see is what we would go by.

D.E. 161 at 205–06.

The testimony of Cathy Mittelstadt, the School Board's deputy superintendent for operations, was the same:

Q: If ... a transgender person matriculated to your school and had a birth certificate listing their gender identity that was different than their biological birth sex, but that's the first document that the school had that showed ... their sex, how would they be characterized by the St. Johns County School District?

A: If that student is entering our district for the first time with a birth certificate that indicates male or female ... and all the other documents support that's what the student is entering, then that first-time entry would predicate. That's how we would manage that student.

Q: And what would that mean vis-à-vis bathroom usage?

A: Based on how they enrolled, they would have access to that restroom that corresponded with how we coded it in the system at the time of enrollment.

D.E. 162 at 35–36.

And so was the testimony of Frank Upchurch, the School Board's attorney:

Q: Let's assume ... just a hypothetical, a student transfers in. The enrollment form is clicked male. The birth certificate

says male. And all the other documents on the papers indicate male. And for purposes of St. Johns County's way of determining biological sex, we have a male, but the student is actually a biological female.

Does that raise any concern from the district's perspective, that situation?

A: As a practical matter, I would say no. The district does not play bathroom cop. ...

....

Q: If you had a transgender boy in your hypothetical who came with all the paperwork checked off that's consistent with his gender identity, you would agree with me, sir, that at that point in time the school district would have no reason to question that individual's use of the boys' bathroom, yes?

A: I agree with that, yes.

Q: If you have a transgender boy who came in but whose documentation was later changed because originally it indicated female, that individual would not be permitted to use a bathroom that conforms with their gender identity, right?

**\*28** A: That's correct. Because the school board would then know that the student was not a biological male who's eligible to use that bathroom.

Q: Understood. So during that period of time when they're both in school, both transgender students, they not both being treated the same way, agreed?

A: I agree as far as that goes. The difference is that in one instance, the district would have knowledge of the pertinent facts. Whereas in the other, it wouldn't. It can't ... redirect a student to another bathroom if it doesn't know that that student is not eligible to use the one he's been using.

D.E. 162 at 53, 89–90.

**B**

Based on this consistent and unrefuted testimony, the district court found that "if a transgender student initially enrolls with documents listing the gender that matches the student's gender identity," the School Board "will accept the student as being of that gender." *Adams*, 318 F. Supp. 3d at 1302. In

other words, "if a transgender student enrolled in ... St. Johns County ... having already changed their legal documents to reflect their gender identity, the student's school records would reflect that gender as well. ... Thus, unless there was a complaint, a transgender student could use the restroom matching his or her gender identity until he or she graduated and the school would be none the wiser." 🚩 *Id.* at 1306.

Given the testimony quoted above, the district court's findings of fact are well supported by the record and are not clearly erroneous. *See* 🚩 *Cooper v. Harris*, ––– U.S. ––––, 137 S. Ct. 1455, 1465, 197 L.Ed.2d 837 (2017) ("A [factual] finding that is 'plausible' in light of the full record—even if another one is equally or more so—must govern."). And those findings are significant. They establish that if a high-school transgender student identical to Drew had registered in the St. Johns County school system for the first time as an incoming transfer student, his enrollment documents would have listed him as male and he would have been allowed to use the boys' bathroom under the School Board's policy.

If, as the majority says, gender at birth is the "driving force" behind equal protection jurisprudence, the high-school transgender transfer student described above is in all relevant respects identical to Drew. Yet he would be treated differently and allowed to use the boys' bathroom even though he, like Drew, was born female and presents the same purported safety and privacy concerns that Drew allegedly does. This is irrational, and indefensible under intermediate scrutiny.

The School Board, which shoulders a "demanding" burden under intermediate scrutiny, *see* 🚩 *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264, does not and cannot explain, much less justify, this state of affairs. If the means by which the School Board is attempting to enforce its interests in the safety and privacy of students ultimately undermines the bathroom policy, I struggle to see how the policy passes constitutional muster under intermediate scrutiny. Unfortunately, the majority is once again relegating a district court's findings of fact to the dustbin. *See Schultz v. Alabama*, 42 F. 4th 1298, 1336-42 (11th Cir. 2022) (Rosenbaum, J., dissenting in part); *Otto v. City of Boca Raton*, 41 F.4th 1271, 1285 (11th Cir. 2022) ( Jordan, J., dissenting from the denial of rehearing en banc); 🚩 *United States v. Brown*, 996 F.3d 1171, 1196–99, 1202–05 (11th Cir. 2021) (en banc) (Wilson, J., dissenting); 🚩 *Jones v. Governor of Fla.*, 975 F.3d 1016, 1066 (11th Cir. 2020) (en banc) ( Jordan, J., dissenting); 🚩 *Keohane v. Fla.*

*Dep't of Corr. Sec'y*, 952 F.3d 1257, 1279 (11th Cir. 2020) (Wilson, J., dissenting). That this keeps happening, in cases arising in every conceivable procedural posture—preliminary injunction, evidentiary hearing, trial—does not make it right.

**\*29** Even if the district court had not made findings of fact on how the bathroom policy applies to transgender students just like Drew who enroll after transition, affirmance would still be in order. First, as we have held sitting en banc, we review the judgment on appeal and not the district court's rationale. *See, e.g.,* 🚩 *United States v. $242,484.00*, 389 F.3d 1149, 1153 (11th Cir. 2004) (en banc) ("A bedrock principle upon which our appellate review has relied is that the appeal is not from the opinion of the district court but from its judgment.") (internal quotation marks and citation omitted). Second, we can "affirm the ... judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the [district] court[.]" 🚩 *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The majority says nothing about these settled principles of Eleventh Circuit law.

The majority's silence is all the more remarkable because, just earlier this year, we held that we can take up, consider, and decide a forfeited issue *sua sponte* to affirm a judgment if there are so-called extraordinary circumstances. *See* 🚩 *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc). Here there is a simple and sufficient ground —amply supported by witness testimony and factual findings —on which to affirm the district court's judgment. We will be criticized, and rightly so, for selectively applying our precedent—when we approve of the result below, we strain to find a way to affirm, but when the result is not to our liking, we do not consider alternative grounds on which to affirm.

### C

"[R]eal issues must be dealt with at retail[.]" Alexander Bickel, The Least Dangerous Branch 139 (Bobbs-Merrill Co. 1962). Although the district court explained that "[t]his case is not about eliminating separate sex bathrooms," 🚩 *Adams*, 318 F. Supp. 3d at 1317, the majority insists on discussing bathrooms at wholesale, while addressing issues not presented by the case. So much for judicial restraint, whose "fundamental principle" is that "[i]f it is not necessary to decide more to dispose of a case, then it is necessary *not*

to decide more." Dobbs v. Jackson Women's Health Org., —— U.S. ——, 142 S.Ct. 2228, 2311, 213 L.Ed.2d 545 (2022) (Roberts, C.J., concurring). See Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("[C]ourts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is applied.") (citation and internal quotation marks omitted).

On the ground, the School Board's restroom policy treats physically-similar transgender students differently based solely on their initial enrollment documents. And because the School Board's claimed safety and privacy concerns presented by someone just like Drew are the same for similarly-situated high-school transgender students who enroll with documents indicating their current gender identity, the School Board's claimed safety and privacy rationales go out the window. The only thing left to justify the School Board's refusal to accept new or revised enrollment paperwork identifying Drew as male is administrative convenience, and that does not satisfy intermediate scrutiny.

See, e.g., Craig, 429 U.S. at 198, 97 S.Ct. 451; Wengler, 446 U.S. at 151–52, 100 S.Ct. 1540.

Apparently understanding the difficulty posed by the School Board's reliance on enrollment documents, the majority says that Drew did not challenge the constitutionality of the enrollment documents policy in the district court. That assertion, however, is the proverbial straw man. At issue is the validity of the School Board's bathroom policy, and no one is claiming that the enrollment documents policy independently violates the Constitution. To satisfy intermediate scrutiny, which is a "demanding" standard, the "discriminatory means employed" must be "substantially related to the achievement of those objectives." Virginia, 518 U.S. at 533, 116 S.Ct. 2264. So the School Board must show that the means employed actually further its asserted interests. Here the means chosen by the School Board—the enrollment documents—actually undermine the claimed safety and privacy interests for the bathroom policy and at best amount to justification based on administrative convenience. On this point the majority has no satisfactory answers.

**\*30**  To make matters worse for the School Board, its student database already contains a pop-up window notifying teachers about Drew's "desire to be called upon with male

pronouns." D.E. 161 at 253. As the district court found, the School Board "has agreed to treat [Drew] as a boy in all other respects, but its position is that [his] enrollment documents and official school records identify him as a female, and he has not presented any evidence that he is a 'biological male.' " Adams, 318 F. Supp. 3d at 1308. If the School Board's own records already take into account Drew's identification as male, it is difficult to see why that same gender identification could not govern for purposes of the bathroom policy. All it would take is for the School Board to accept the new (or revised) enrollment documents (such as a new form, a new birth certificate, and a new driver's license) identifying Drew as male. Because it is already treating Drew as male for all other purposes, the School Board can only rely on administrative convenience to refuse that course of action for its bathroom policy. [2]

### III

On this record, the School Board's unwritten bathroom policy fails under intermediate scrutiny. The policy allows transgender students just like Drew whose initial enrollment documents set out their current gender identity to use the bathrooms associated with that identity. Because such students pose the same claimed safety and privacy concerns as Drew, the policy can only be justified by administrative convenience, which is constitutionally insufficient. And given that the student database already identifies Drew as male for all other purposes, it is difficult to understand why the School Board could not accept new or revised enrollment documents for Drew identifying him as male.

I would affirm the district court's well-reasoned opinion and judgment on the equal protection claim, and therefore respectfully dissent.

Rosenbaum, Circuit Judge, Dissenting:
My colleagues Judge Jill Pryor and Judge Jordan have written excellent dissents explaining why the district court's order here should be affirmed. I join Judge Jordan's dissent in its entirety and Judge Jill Pryor's dissent's equal-protection analysis. [1]  I write separately only to emphasize one point that Judge Jill Pryor already persuasively makes: the Majority Opinion's misplaced suggestions that affirming the district court's order on equal-protection grounds would require courts in this Circuit to find that all challenges

involving restrooms, locker rooms, and changing facilities must necessarily be upheld are wrong. [2]

**\*31** The Majority Opinion incorrectly suggests that if we affirm the district court here on its equal-protection analysis, required transgender students' use of locker rooms and other changing facilities of the gender with which they identify will inevitably follow. [3] Because it may be possible that the suggestion that our decision here would dictate the outcome of all cases involving sex-separated facilities might cloud some readers' vision as to what the law requires in Adams's case, I think it's important to let the sunlight in and show why that's not accurate.

Namely, the heightened-scrutiny test that governs our analysis is an extremely fact-bound test.

First, it requires the government to identify the important interest or interests that its policy serves. *See* 🚩*Nguyen v. INS*, 533 U.S. 53, 60–61, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (citation omitted). Here, the School Board identified privacy and safety. But in another case involving another policy or another type of policy, the governmental entity might invoke other important interests. And it might choose not to rely on privacy or safety. Put simply, any opinion we write today cannot limit a future governmental entity's ability to identify more or different important interests than did the School Board here.

Second, heightened scrutiny requires the governmental entity to provide evidence that its challenged policy "serve[s] important governmental objectives" and is "substantially related to achievement of those objectives." 🚩*Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see also* 🚩*Plyler v. Doe*, 457 U.S. 202, 228–29, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (assuming that the state's interest was important but holding that the challenged statute failed heightened scrutiny because the record contained no credible evidence supporting the stated governmental objective). That the School Board did not offer any such evidence, *see* J. Pryor Dissent at —— – ——, does not mean that other governmental entities will fail to do so when defending against challenges to their policies. Indeed, the School Board's failed evidentiary efforts here have no bearing on what another governmental entity might offer in the way of evidence to support its important interest in another case. Nor do they rule out the possibility that a governmental entity

in the future might be able to show the right "fit," 🚩*Craig*, 429 U.S. at 202, 97 S.Ct. 451, between its stated interest or interests and the evidence it offers to show that the challenged policy directly and substantially furthers that interest.

In short, the record in each particular case drives the equal-protection analysis. And that the School Board here utterly failed to present any non-speculative evidence to support the two particular interests it invokes does not in any way prejudice other governmental entities under equal-protection analysis in future challenges. For that reason, the concern that the Majority Opinion suggests that ruling for Adams would mean all equal-protection-based challenges to other policies involving sex-separated facilities would necessarily fail should not even subconsciously figure into the correct analysis here.

Jill Pryor, Circuit Judge, dissenting, in which Rosenbaum, Circuit Judge, joins as to Parts I, II, III.A, III.B, III.D, and IV:

Each time teenager Andrew Adams needed to use the bathroom at his school, Allen D. Nease High School, he was forced to endure a stigmatizing and humiliating walk of shame—past the boys' bathrooms and into a single-stall "gender neutral" bathroom. The experience left him feeling unworthy, like "something that needs to be put away." The reason he was prevented from using the boys' bathroom like other boys? He is a transgender boy.

**\*32** Seeking to be treated as equal to his cisgender boy classmates, Adams sued, arguing that his assignment to the gender neutral bathrooms and not to the boys' bathrooms violated the promise of the Fourteenth Amendment's Equal Protection Clause. He prevailed in the district court, and a panel of this Court, of which I was a member, affirmed. Today, a majority of my colleagues labels Adams as unfit for equal protection based on his transgender status.

To start, the majority opinion simply declares—without any basis—that a person's "biological sex" is comprised solely of chromosomal structure and birth-assigned sex. So, the majority opinion concludes, a person's gender identity has no bearing on this case *about equal protection for a transgender boy*. The majority opinion does so in disregard of the record evidence—evidence the majority does not contest—which demonstrates that gender identity is an immutable, biological component of a person's sex.

With the role of gender identity in determining biological sex thus obscured, the majority opinion next focuses on the wrong question: the legality of separating bathrooms by sex. Adams has consistently agreed throughout the pendency of this case—in the district court, on appeal, and during these en banc proceedings—that sex-separated bathrooms are lawful. He has never challenged the School District's policy of having one set of bathrooms for girls and another set of bathrooms for boys. In fact, Adams logically depends upon the existence of sex-separated bathrooms. He—a transgender boy —wanted to use *the boys' restrooms* at Nease High School and sought an injunction that would allow him to use *the boys' restrooms*.

When the majority opinion reaches Adams's equal protection claim, these errors permeate its analysis. So does another: the majority overlooks that the School District failed to carry its evidentiary burden at trial. Everyone agrees that heightened scrutiny applies. The School District therefore bore the evidentiary burden of demonstrating a substantial relationship between its bathroom policy and its asserted governmental interests. Yet the School District offered no evidence to establish that relationship.

Next, the majority opinion rejects Adams's Title IX claim. Here, too, the majority opinion errs. Even accepting the majority opinion's premise—that "sex" in Title IX refers to what it calls a "biological" understanding of sex—the biological markers of Adams's sex were but-for causes of his discriminatory exclusion from the boys' restrooms at Nease High School. Title IX's statutory and regulatory carveouts do not speak to the issue we face here: the School District's categorical assignment of transgender students to sex-separated restrooms at school based on the School District's discriminatory notions of what "sex" means.

Finally, the majority opinion depicts a cascade of consequences flowing from the mistaken idea that a ruling for Adams will mean the end of sex-separated bathrooms, locker rooms, and sports. But ruling for Adams would not threaten any of these things, particularly if, as I urge here, the ruling was based on the true nature of Adams's challenge and the School District's evidentiary failures at trial.

In sum, the majority opinion reverses the district court without addressing the question presented, without concluding that a single factual finding is clearly erroneous, without discussing any of the unrebutted expert testimony, and without putting

the School District to its evidentiary burden. I respectfully dissent.

## I. BACKGROUND

**\*33** I set out the factual and procedural background to this case in four parts. In this section I first discuss Adams's status as a transgender boy; define relevant terms; and describe the substantial changes Adams has undergone socially, physically, and legally. Second, I identify the St. Johns County School District's (the "School District") bathroom policy and discuss alternative bathroom policies other schools have adopted. Third, I explain how the School District enforced its bathroom policy against Adams at Nease High School. Fourth and finally, I provide the procedural background of this case.

### A. Adams's Status as a Transgender Boy

Before I discuss Adams's status as a transgender boy, I note that this case comes to us after a bench trial, at which experts, School District officials, and Adams testified. The evidence introduced at trial is relevant to the issues on appeal and matters for the parties involved in this case. And the district court's fact-findings based on the trial evidence are entitled to deference. Indeed, the majority opinion does not challenge these findings.

From as far back as he can remember, Adams has "liv[ed] basically as a boy." Doc. 160-1 at 189. [1] At trial, he testified that he always engaged in what he thinks of as "masculine" behaviors. *Id.* at 88, 103. For example, as a child Adams played with race cars, airplanes, and dinosaurs. If he was "given a girls' toy, it would stay primarily in its toy box." *Id.* at 85. He refused to wear skirts and dresses. When he played sports as a child, he played "almost entirely" with boys. *Id.* at 88. Adams's father testified, "You can go back through his whole childhood and see things like that." Doc. 161 at 87. "[H]e just always wasn't acting like a girl." *Id.* at 87. Adams's mother remembered his childhood the same way: "[H]e never clicked with any of the female things, the standard female stereotype things." Doc. 160-1 at 218.

Inconsistent with Adams's consistently "masculine" behavior was the fact that the doctor who attended Adams's birth "assigned" him the "[f]emale" sex at birth. *Id.* at 83. The doctor made the assignment by briefly examining Adams's external genitalia in the moments after birth. Still, for the

first several years of his life, Adams was unperturbed by any disconnect between how he lived—as a boy—and how his first birth certificate and early medical records identified him —as a girl.

When Adams reached puberty, though, his life took a painful turn. His body began to exhibit female traits, and he "started to hate ... every aspect of [his] body." *Id.* at 89. At the time, Adams did not consciously associate the hatred he felt for his body with feminine characteristics specifically. But upon reflection, he "only really hated strongly the things that made [him] look more feminine; my hips, my thighs, my breasts." *Id.*

Aided by his concerned and supportive parents, Adams got help. He assumed he "had a mental illness," but he "didn't really [know of] any particular cause" for his negative feelings. *Id.* at 90. He saw multiple therapists for what he assumed was only "anxiety" or "depression." *Id.* After he entered therapy, Adams, his parents, and his medical providers all concluded that something else was at the root of Adams's discontent—he was transgender. Being "transgender" meant that Adams "consistently, persistently, and insistently[ ] identifie[d] as a gender different [from] the sex [he was] assigned at birth." Doc. 192 at 7 (internal quotation marks omitted). [2] Put differently, his "gender identity"—his "internal sense of being male, female, or another gender," *id.* (internal quotation marks omitted— was, and remains, that of a male. As one of Adams's physicians and expert witnesses—Deanna Adkins, M.D., a pediatric endocrinologist at Duke University—testified at trial, a person's gender identity cannot be changed; it is not a choice. Diane Ehrensaft, Ph.D., a clinical psychologist and expert witness for Adams echoed Dr. Adkins's opinion, testifying that the "prevailing perspective on gender identity" is that gender identity is "an innate ... effectively immutable characteristic." Doc. 166-5 at 38 (internal quotation marks omitted). It is a "deep-seated, deeply felt component of human identity"; it "is not a personal decision, preference, or belief." Doc. 166-3 at ¶ 22. It "appears to be related to one's brain messages and mind functioning" and so, crucially, "has a biological basis." *Id.* ¶¶ 21, 25.

 **\*34** Putting these concepts together, Adams is a transgender boy because his gender identity—male—is different from his birth-assigned sex—female. When a person is not transgender, meaning his or her birth-assigned sex and gender identity align, that person is "cisgender." Doc. 192 at 7.

Upon realizing he was transgender, Adams learned why he hated the feminine parts of his own body. His psychologist diagnosed him with "gender dysphoria." *Id.* at 11. Gender dysphoria "is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Id.* at 7 (internal quotation marks omitted). The condition is recognized by the Diagnostic and Statistical Manual of Mental Disorders. The intensity of the negative emotion Adams felt, he would later testify, was life-threatening. Adams's deep distress was unexceptional when compared to the mental well-being of other transgender school-age children. Tragically, "more than 50% of transgender students report attempting suicide." Doc. 151-8 at 13. It therefore should come as no surprise that Adams and his parents sought to treat his gender dysphoria.

The World Professional Association for Transgender Health ("WPATH") has established a standard of care for persons suffering from gender dysphoria. "Many of the major medical and mental health groups in the United States recognize the WPATH Standards of Care as representing the consensus of the medical and mental health community regarding the appropriate treatment for gender dysphoria." Doc. 119-1 at 10. "The recommended treatment for transgender people with gender dysphoria includes assessment, counseling, and, as appropriate, social transition, puberty-blocking drug treatment, hormone therapy, and surgical interventions to bring the body into alignment with one's gender identity." *Id.* at 10–11. With the support of his parents and medical providers, Adams underwent changes to ensure his body and behaviors were aligned with his gender identity.

Adams began with social changes. Often, these social changes involve "changing your appearance, your activities, and your actions ... to the gender that matches your gender identity so that everything you do from the time you get up in the morning and you go to bed at night is in that particular gender." Doc. 166-2 at 27. For Adams, these changes included cutting his hair, wearing masculine clothing, using male pronouns to refer to himself, and wearing a chest binder—a device that gives the wearer the appearance of a flat chest.

Adams also began using the men's restroom in public as part of his social transition. For Adams, using the men's restroom was important because it was a "simple action" that expressed he was "just like every other boy" who could "use the men's bathroom without thinking about it." Doc. 160-1 at 107. Transgender individuals "typically seek privacy and

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

discreteness in restroom use and try to avoid exposing any parts of their genitalia that would reveal sex characteristics inconsistent with their gender identity." Doc. 192 at 8. When Adams uses the men's restroom, he walks in, goes into a stall, locks the door to the stall, uses the restroom, leaves the stall, washes his hands, and exits the restroom.

In addition to his social transition, Adams underwent medical changes. He took birth control medication to halt menstruation. With the help of his endocrinologist, he also began to take testosterone to produce secondary sex characteristics: "increased muscle mass, increased body hair on the face, chest, and abdomen, and a deepening of the voice." *Id.* at 9. Eventually, Adams had a double mastectomy to remove his breasts.

**\*35** Adams pursued legal changes, too. He followed Florida's procedure to change the sex on his driver's license to male, which required a statement from his medical provider. He followed another procedure to change the sex on his birth certificate to male. Now, the State of Florida recognizes Adams's sex as male.

The social, medical, and legal changes Adams underwent dramatically changed his outlook. His mother testified that the changes had an "absolutely remarkable" effect on him. Doc. 160-1 at 220. "He went from this quiet, withdrawn, depressed kid to this very outgoing, positive, bright, confident kid. It was a complete 180." *Id.* Adams testified, "[L]ooking back on my life up to this point and thinking about my happiest moments, the happiest moments of my life have been big moments in my transition; when I started testosterone, when I first put on the binder, when I first saw my chest after surgery." *Id.* at 107. "I don't hate myself anymore," he said. "I don't hate the person I am." *Id.* at 106.

**B. The School District's Bathroom Policy and Alternative Bathroom Policies Adopted by Other School Districts**

There are two components that together make up the School District's bathroom policy: (1) a longstanding unwritten policy and (2) a set of written guidelines the School District promulgated in 2012 (the "Best Practices Guidelines"). In this subsection, I begin by describing the School District's longstanding unwritten policy. I next describe the Best Practices Guidelines. In discussing the Best Practices Guidelines, I also review evidence in the record about alternative bathroom policies adopted by other

school districts. Last, I describe how the School District assigned students to the boys' or girls' bathrooms based on the students' enrollment documents.

*1. The Longstanding Unwritten Bathroom Policy and Its Use of the Term "Biological Sex"*

The School District has long had an unwritten school bathroom policy under which boys use the boys' restrooms, and girls use the girls' restrooms, based on their "biological sex." Doc. 192 at 14 (internal quotation marks omitted). "Biological sex" for purposes of the School District's bathroom policy means birth-assigned sex—the sex a doctor assigns an infant in the moments after birth by examining the infant's external genitalia.[3]

Dr. Ehrensaft's expert testimony illuminated the differences between the School District's definition of "biological sex" and the scientific community's biological understanding of sex. Dr. Ehrensaft testified that "[b]y the beginning of the twentieth century scientific research had established that external genitalia alone—the typical criterion for assigning sex at birth—[was] not an accurate proxy for a person's sex." Doc. 166-3 ¶ 20. Instead, she continued:

> **\*36** [M]edical understanding recognizes that a person's sex is comprised of a number of components including: chromosomal sex, gonadal sex, fetal hormonal sex (prenatal hormones produced by the gonads), internal morphologic sex (internal genitalia, i.e., ovaries, uterus, testes), external morphological sex (external genitalia, i.e., penis, clitoris, vulva), hypothalamic sex (i.e., sexual differentiations in brain development and structure), pubertal hormonal sex, neurological sex, and gender identity and role.

*Id.* As with components like chromosomal sex or external morphological sex, Dr. Ehrensaft testified, gender identity is "immutable" and "has a biological basis." *Id.* ¶ 25; Doc. 166-5 at 38.

After spelling out these numerous biological components of sex, Dr. Ehrensaft testified: "When there is a divergence between these factors, neurological sex and related gender identity are the most important and determinative factors" for determining sex. Doc. 166-3 ¶ 20. The School District did not offer any evidence to rebut this expert testimony.

The term "biological sex," as used by the School District in its bathroom policy, thus does not include many of the biological components that together make up an individual's sex as understood by medical science, including gender identity. Nor does the term "biological sex," when used to mean only sex assigned at birth, account for the reality that the biological components of sex in an individual might diverge.[4] And the term fails to account for the primacy of two biological components in particular, gender identity and neurological sex, when such a divergence occurs. Put simply, the term "biological sex" as used by the School District is at odds with medical science.

2. *The Taskforce, the Best Practices Guidelines, and Alternative Bathroom Policies Accommodating Transgender Students*

In 2012, the School District formed a taskforce to review policies related to LGBTQ students.[5] The taskforce convened in part to consider whether the School District's longtime bathroom policy appropriately accounted for transgender students' desire to use the restrooms corresponding to their gender identity. As part of its work, the taskforce researched the policies of other school districts concerning their treatment of transgender students. The taskforce learned that other school districts had policies in place permitting transgender students to use the restrooms consistent with their gender identity. The taskforce did not learn of a single negative consequence for any student resulting from transgender students' use of the restroom matching their gender identity.

At trial, Adams put on evidence of other school districts' bathroom policies that accommodated transgender students' desire to use restrooms matching their gender identity. For example, in Florida's Broward County Public Schools ("BCPS"), the sixth largest school district in the nation, "[s]tudents who identify as transgender ... have access to the restroom that corresponds to their gender identity." Doc. 151-8 at 49. BCPS's policy provides that "[w]hen meeting with the transgender student ... to discuss transgender safety

and care, ... the principal and student address [the] student's access to the restroom, locker room[,] and changing facility" independently, customizing the student's access to these facilities "based on the particular circumstances of the student and the school facilities." *Id.*

**\*37** Addressing BCPS's experience with concerns like safety and privacy that are sometimes voiced in opposition to such policies, BCPS official Michaelle Valbrun-Pope testified that "with 271,000 students, 300 schools, and implementation over ... five years, [BCPS] ha[s] not had issues related to safety in the restrooms that are specifically connected to transgender students." Doc. 161 at 64. And she had never heard about a single privacy concern related to transgender students using the restroom corresponding to their gender identity. Valbrun-Pope learned from her conversations with transgender students and other BCPS officials that "transgender students are not trying to expose parts of their anatomy ... [t]hat do[ ] not align with their gender identity" and are typically discrete in using bathrooms that do not match their birth-assigned sex. *Id.* at 65.

A BCPS high school principal who worked district-wide on issues involving transgender students, Michelle Kefford, amplified Valbrun-Pope's observations about the absence of safety and privacy issues arising out of BCPS's bathroom policy. Kefford testified that she has not "heard of a case anywhere" in which a transgender student has threatened another student's "safety or privacy" by using a restroom matching the transgender student's gender identity. *Id.* at 118. She was unaware of "any child having an issue with a transgender child using the bathroom that aligns with their gender identity." *Id.* Although the students themselves were unbothered by the bathroom policy, she explained, she encountered adults who expressed opposition to the policy. Kefford explained that, in her experience,

> [P]eople are afraid of what they don't understand ... [and] a lot of that fear [is because] they haven't experienced it, they don't know enough about it, and the first thing that comes to mind is this person wants to go into this bathroom for some other purpose. That's not the reality. The reality is this child ... just want[s] to be accepted.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*Id.* at 119–20.

Dr. Thomas Aberli, a high school principal with another school district, the Jefferson County Public Schools ("JCPS") in Kentucky, testified about his school's bathroom policy as it related to transgender students. Aberli testified that, initially, he was unsure whether being transgender was "a real thing." Doc. 160-1 at 29. But after diligent research, conversations with community members, and discussions with his staff, Aberli concluded that "being transgender was a real thing that the school would have to respond to." *Id.* at 31. While he was principal, Aberli's school adopted a policy permitting transgender students to use bathrooms aligning with their gender identity. Aberli testified that since adopting the policy, his school has experienced no privacy or security issues related to transgender students using restrooms that matched their gender identity. Although not spelled out in detail, it is clear from the record that several school districts in Florida and across the country maintain alternative bathroom policies similar to BCPS's and the one at Aberli's high school.

Notwithstanding its knowledge of the success in other school districts of bathroom policies that permitted transgender students to use school bathrooms consistent with their gender identity, [6] the taskforce rejected such a policy for St. Johns County. The leader of the taskforce, Sallyanne Smith, explained why at trial:

> [W]hen a girl goes into a girls' restroom, she feels that she has the privacy to change clothes in there, to go to the bathroom, to refresh her makeup. They talk to other girls. It's kind of like a guy on the golf course; the women talk in the restrooms, you know. And to have someone else in there that may or may not make them feel uncomfortable, I think that's an issue we have to look at. It's not just for the transgender child, but it's for the [cisgender students].

**\*38** Doc. 161 at 213. Smith testified that the taskforce also was concerned about how a change in the policy might apply to gender-fluid students—students "whose gender changes between male and female." Doc. 192 at 17 [7]:

> There's another population of people that we learned [about] at the conference, it's called gender fluid, and some days they feel they're a boy and some days they feel they're a girl. So potentially a boy could come, the football quarterback could come in and say I feel like a girl today and so I want to be able to use the girls' room.

Doc. 161 at 213.

Other members of the taskforce and School Board witnesses echoed these concerns. The Deputy Superintendent for Operations of the School District, Cathy Ann Mittelstadt, testified that "if someone [has] to go [to the restroom] and perhaps undress or clean up a stain on their clothing ..., they ha[ve] that opportunity to enter that area and receive that privacy." *Id.* at 248. Frank D. Upchurch, III, a long-time School District attorney, testified that the bathroom policy probably prevented "people with untoward intentions" from "do[ing] things they ought not to do." Doc. 162 at 112. To summarize the evidence at trial, witnesses representing the taskforce and the School District voiced two concerns with permitting transgender students to use the restrooms matching their gender identity: student privacy and student safety.

At the conclusion of its work, the taskforce produced the Best Practice Guidelines, which were then adopted by the School District. The Best Practices Guidelines address transgender students specifically, providing that "[t]ransgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." Doc. 152-6 at 1. Apart from offering gender-neutral bathrooms to transgender students as an alternative, the Best Practices Guidelines did nothing to alter the longstanding bathroom policy of assigning students to bathrooms corresponding to their birth-assigned sex, commonly determined by the appearance of their external genitalia immediately after birth.

### 3. *The Enrollment Process*

The School District administered its bathroom policy through its enrollment process. To enroll at a St. Johns County school,

a student had to provide paperwork, including state health forms and a birth certificate. Students' enrollment paperwork determined their "biological sex" for the purposes of the bathroom policy. Even "[i]f a student later present[ed] a document, such as a birth certificate or driver's license, which list[ed] a different sex, the original enrollment documents [would] control." Doc. 192 at 14. But if a transgender student transitioned and had the necessary paperwork altered before enrolling in a St. Johns County school, that student could use a "restroom matching his or her gender identity ... and the [School Board] would be none the wiser." *Id.* at 22.

**\*39** The district court summarized the School District's bathroom policy, including how it assigned students to the boys' or girls' bathrooms at the time Adams attended Nease High School:

> "[B]iological boys" may only use boys' restrooms or gender-neutral single-stall bathrooms and "biological girls" may only use girls' restrooms or gender-neutral single-stall bathrooms, with the terms "biological boys" and "biological girls" being defined by the student's sex assigned at birth, as reflected on the student's enrollment documents.

*Id.* at 19.

### C. Adams's Experience at Nease High School

The summer before he entered Nease High School, Adams was already "present[ing] as a boy." Doc. 192 at 25. He wore his chest binder, kept his hair cut short, dressed in boys' clothing, and went by male pronouns. He used men's restrooms in public. But because Adams had enrolled in the School District in fourth grade, his enrollment documents reflected he was "female." *Id.* at 24. The School District's bathroom policy therefore assigned him to the girls' restrooms and gave him the option to use the gender-neutral restrooms.

Adams's mother contacted Nease High School before the school year began to tell the school that Adams would be entering the freshman class as a boy. To help affirm his gender

identity, and as required under the Best Practices Guidelines when a student or parent makes a request, Adams's classmates and teachers used male pronouns to refer to him. And when Adams began his freshman year at Nease, he used the boys' restrooms. There is no evidence to suggest that any fellow occupant of the boys' restroom was bothered by, or even noticed, Adams's presence there.

But about six weeks after Adams started ninth grade, two anonymous female students complained to school authorities that they saw Adams entering the boys' restroom. After the female students complained, Adams was called over the school's intercom system to report to the school office. When he arrived in the school office, three adults were waiting for him. One of them, a guidance counselor, told Adams that there had been an anonymous complaint about his using the boys' bathroom and that he could no longer use it. The guidance counselor instructed Adams to use the gender-neutral bathroom or the girls' bathrooms.

Adams was humiliated. He could not use the girls' restrooms. "[J]ust thinking about" doing that caused him a great deal of "anxiety." Doc. 160-1 at 118. Indeed, the district court found the school's suggestion that Adams could use the girls' restrooms "disingenuous." Doc. 192 at 28 n.30. Adams had "facial hair," "typical male muscle development," a flat chest, and had a "voice ... deeper than a girl's." *Id.* at 66. He also wore his hair short and dressed in boys' clothing. Teachers and students at Nease High School treated Adams like any other boy in every other respect. "It would seem that permitting [Adams] to use the girls' restroom would be unsettling for all the same reasons the School District does not want any other boy in the girls' restroom," the district court found. *Id.* at 28 n.30. In reality, the School District left Adams with only one option: he had to use the gender-neutral restrooms while at school.

**\*40** Nease is a large school comprising multiple buildings, and some of its gender-neutral bathrooms are "considerably f[a]rther away than the boys' restrooms," depending upon where a student's classes are located.[8] *Id.* at 26. As a result, Adams had to "walk past [the] men's room" to the gender-neutral restroom in what he called "humiliating" "walk[s] of shame." Doc. 160-1 at 117, 204. Even on days when there were "not very many people in the hallway," Adams testified, it felt like "a thousand eyes" were watching him as he walked past the boys' restroom to make his way to a gender-neutral restroom. *Id.* at 204. The experience of being forced to use the gender-neutral restrooms, Adams testified, sent the message

that he was "[un]worthy of occupying the same space as [his] classmates." *Id.* The School District's enforcement of the policy against Adams made him feel inferior. In his words, it:

> ma[de] a statement ... to the rest of the people at the school that I'm somehow different or I'm somehow separate or I'm something that needs to be separate; that I'm something that needs to be put away and not in the commonplace and not in with the rest of the student body.

*Id.* at 117.

### D. Procedural History

After his sophomore year at Nease, Adams filed this lawsuit against the School Board. Adams claimed that his exclusion as a transgender boy from the boys' restrooms at Nease violated the Equal Protection Clause of the Fourteenth Amendment to the Constitution and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* The district court held a three-day bench trial. In a 70-page opinion containing its findings of fact and conclusions of law, the district court ruled for Adams on both claims. The district court awarded Adams $1,000 in compensatory damages and enjoined the School Board of St. Johns County from barring Adams from using the boys' restrooms at Nease.

The School Board appealed. A panel of this Court affirmed the district court's judgment on both the equal protection and Title IX claims with one member of the panel writing in dissent. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.* (*Adams I*), 968 F.3d 1286 (11th Cir. 2020). A member of the Court then withheld the mandate. The panel majority *sua sponte* withdrew its opinion and issued a revised majority opinion over another dissent. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.* (*Adams II*), 3 F.4th 1299 (11th Cir. 2021). The revised panel opinion affirmed the district court's judgment on narrower grounds in an effort to gain broader consensus among members of the Court. *Id.* at 1304. A member of the Court nevertheless continued to withhold the mandate.

A majority of the Court then voted to rehear Adams's case en banc. Our en banc proceedings resulted in the above majority opinion. The majority opinion vacates *Adams II*, rejects *Adams I*, vacates the district court's judgment, and reverses the district court on Adams's equal protection and Title IX claims.

## II. STANDARD OF REVIEW

Following a bench trial, we review a district court's findings of fact for clear error and its conclusions of law *de novo*. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). A factual finding is clearly erroneous only if in examining the record and commensurate finding we are "left with the definite and firm conviction that a mistake has been made." *In re Stanford*, 17 F.4th 116, 121 (11th Cir. 2021) (internal quotation marks omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Wallace v. NCL (Bahamas) Ltd.*, 733 F.3d 1093, 1100 (11th Cir. 2013) (internal quotation marks omitted).

## III. DISCUSSION

**\*41** My analysis proceeds in four parts. First, I clarify the question before the Court and highlight an error permeating the majority opinion—its counterfactual use of the term "biological sex." Second, I address Adams's equal protection claim. Third, I discuss Adams's Title IX claim. Fourth, I explain why the School District's slippery slope arguments and concerns about the lack of a limiting principle are unfounded.

### A. The Majority Opinion Has Reframed This Case and Addressed the Wrong Issue.

To summarize the most relevant facts thus far: The School District's bathroom policy separates students according to their sex assigned at birth—what it calls their "biological sex." The policy permits students assigned female at birth to use the girls' bathrooms and students assigned male at birth to use the boys' bathrooms. The policy requires transgender students to use the bathrooms corresponding to

their birth-assigned sex or, alternatively, a single-stall gender-neutral bathroom. The policy's definition of "biological sex," however, is at odds with the medical-science definition of the term, which encompasses numerous biological components, including gender identity. And the policy fails to account for the primacy of gender identity (an immutable characteristic) when a student's biological markers of sex diverge—as they will with all transgender students because, by definition, their gender identity is different from their sex assigned at birth. So, even though at least one primary biological component of a transgender student's "biological sex" is, for example, male, that transgender student is deemed female under the School District's policy.

Adams has challenged the School District's assignment of transgender students to the bathrooms of their birth-assigned sex or gender-neutral bathrooms. He wants to use the boys' bathrooms, because those facilities align with the most important biological component of his biological sex: his gender identity. The School District's practice of separating bathrooms by sex has never been at issue. To the contrary, Adams's claim depends on the existence of sex-separated bathrooms.

Refusing to engage with the record or with the actual question on appeal, the majority opinion reframes this case to its liking. It declares that "biological sex" is "sex based on chromosomal structure and anatomy at birth." Maj. Op. at ——. From this ipse dixit, the majority easily decides that gender identity is entirely separate from "biological sex," that Adams is "a biological female," that the Supreme Court has long relied on "biological sex" to distinguish between men and women in its sex-discrimination jurisprudence, and that this case has to be about the legality of sex-separated bathrooms because it is only about that narrow definition of "biological sex." These are but smoke and mirrors.

The majority opinion's definition of "biological sex" is untethered to anything in this case. It is not the definition the School District has employed. It is most certainly not the definition established by the unrebutted expert testimony in the record. It ignores the unrefuted evidence that gender identity is an immutable, biological component of sex, not something entirely separate. And it ignores the unrefuted evidence that birth-assigned sex and chromosomal structure take a back seat in determining a person's sex when that person's gender identity diverges from those two components.[9] In short, the majority opinion's definition of

"biological sex" has no business driving the framing and resolution of this case.

 **\*42** With these truths out of the way, the majority opinion's definition of "biological sex" permits it to declare that Adams is a biological female and that his gender identity is irrelevant to this case. *See id.* at —— (arguing that "Adams's gender identity is ... not dispositive for our adjudication of [his] equal protection claim"). For all the reasons I just summarized, that is wrong.

The majority opinion's counterfactual "biological sex" definition obscures the nuance of this case. The majority opinion invokes Supreme Court sex-discrimination cases that generally recognize "biological" differences between men and women. *See, e.g., id.* at —— ("[T]he district court did not make a finding equating gender identity as akin to biological sex. Nor could the district court have made such a finding that would have legal significance. To do so would refute the Supreme Court's longstanding recognition that 'sex ... is an immutable characteristic determined solely by the accident of birth.' " (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973))); *see also, e.g., Nguyen v. INS*, 533 U.S. 53, 73, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) ("To fail to acknowledge even our most basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it."). None of the principles in the cases the majority opinion cites is at issue, though. This case deals with a preliminary issue—what it means to be biologically male or female "by the accident of birth," *Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764—and, more importantly, with an issue these cases did not address— the rights of transgender people. No matter how many times the majority says otherwise, this case is not simply about whether there are differences between men and women.

The majority opinion uses the above counterfactuals to reframe the primary issue in this case from whether the bathroom policy discriminates against transgender students to the legality of sex-separated bathrooms. *See* Maj. Op. at —— ("We disagree with Adams's theory that separation of bathrooms on the basis of *biological sex* necessarily discriminates against transgender students." (emphasis added)). But Adams's case is not about that.

Adams's position in this litigation—from his operative complaint through these en banc proceedings—has always been that his exclusion, as a transgender boy, from the

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  35

boys' restrooms at Nease High School violated the Equal Protection Clause and Title IX. He sought an injunction that would permit him to use the boys' restrooms at school. Far from wanting to eliminate sex-separated bathrooms, Adams's case logically depends on their existence: he simply wanted to use the boys' restrooms. *See* Appellee's En Banc Br. at 22 ("Defendant's policy of separating boys and girls in restrooms ... is not at issue .... Instead, [Adams] challenges Defendant's decision to treat him differently from other boys[.]"). This case is, and always has been, about whether Adams's exclusion from the boys' bathrooms under the School District's bathroom policy violated the Equal Protection Clause or Title IX. *See* Doc. 192 at 47 ("This case is not about eliminating sex separate bathrooms; it is only about whether to allow a transgender boy to use the boys' bathroom."). It is not, and has never been (again, no matter how many times the majority opinion says it), about whether the School District can maintain separate bathrooms for boys and girls.

 **\*43** A hallmark of the federal judiciary is its passive nature—we only decide the issues presented to us by the parties. *See The Federalist No. 78* (Alexander Hamilton) (asserting that "the judiciary ... will always be the least dangerous [branch of government]" because it "can take no active resolution" of social issues). As part of our commitment to remain "neutral arbiter[s] of matters the parties present," we follow the party presentation principle and "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, ––– U.S. ––––, 140 S. Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) (internal quotation marks omitted). We "wait for cases to come to [us], and when cases arise," we "normally decide only questions presented by the parties." *Id.* (internal quotation marks omitted) (alteration adopted). We do not enter the fray uninvited to weigh in on divisive issues. Yet that is exactly what the majority does.

In sum, two errors permeate the majority opinion, infecting the entirety of its analysis. First, the majority opinion misuses the term "biological sex," contradicting unchallenged findings of fact that reflect medical science and oversimplifying—indeed, excising—the role of gender identity in determining a person's biological sex. Second, and based on the first error, the majority opinion addresses itself to answering the wrong question. In the sections that follow, I answer the questions presented—whether Adams's exclusion from the boys' restrooms at Nease High School violated the Equal Protection Clause of the Fourteenth Amendment and

Title IX. In my analysis, I rely on the district court's findings of fact and the evidence in the record. I conclude that the School District's discriminatory exclusion of Adams from the boys' restrooms violated both the Equal Protection Clause and Title IX.

## B. Adams's Exclusion from the Boys' Restrooms Under the Bathroom Policy Violated the Equal Protection Clause.

I begin with Adams's equal protection claim. The Fourteenth Amendment provides: "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). [10] State-sanctioned differential treatment is a "classification" in equal-protection terms.

 **\*44** There are three tiers of "scrutiny" we apply when analyzing equal protection claims. If the state [11] has made a classification based on race, we apply strict scrutiny. *See Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009). "Laws or regulations almost never survive" our exacting analysis under this test. *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020). If the classification is based on sex, we apply heightened scrutiny, under which the state must provide an "exceedingly persuasive justification" for the classification. *United States v. Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (internal quotation marks omitted). Other classifications are benign, and to those we apply "rational basis" review. Under rational basis review, the law or policy will be upheld if it is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249.

I analyze Adams's equal protection claim in three parts. First, I show that the School District's bathroom policy facially discriminates against transgender students. [12] Second, I offer two alternative reasons why heightened scrutiny applies. Third, I explain why the school bathroom policy of assigning children to a bathroom based only on their birth-assigned sex does not pass heightened scrutiny.

1. *The Bathroom Policy Facially Discriminates Against Transgender Students.*

Even though part of the School District's bathroom policy is unwritten, its substance is not in dispute. The district court found that the policy "[i]ncorporat[ed] both" (1) "the long-standing unwritten School Board bathroom policy" and (2) "the Best Practices Guidelines." Doc. 192 at 19. All agree that the first component—the longstanding policy—provides that "only 'biological boys' may use the boys' restroom and ... only 'biological girls' may use the girls' restroom." *Id.* at 19 n.24. All agree that the second component—the Best Practices Guidelines—provides that "[t]ransgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." Doc. 152-6 at 1.

Taking these findings together, two critical properties of the policy jump out. First, the bathroom policy singles out transgender students on its face. The Best Practices Guidelines provide that "transgender students" may use gender neutral restrooms and do not have to use the restrooms matching their birth-assigned sex. Second, in addition to referring to transgender students expressly, the bathroom policy categorically deprives transgender students of a benefit that is categorically provided to all cisgender students—the option to use the restroom matching one's gender identity.

Let me explain this second point. The bathroom policy assigns "biological boys' " to boys' restrooms, and "biological girls" to girls' restrooms. The policy is exclusive in that *only* "biological boys"—those assigned male at birth—may use the boys' restroom, and *only* "biological girls"—those assigned female at birth—may use the girls' restroom. Recall that "transgender" persons "consistently, persistently, and insistently identif[y] as a gender different [from] the sex they were assigned at birth." Doc. 192 at 7 (internal quotation marks omitted). If transgender students are "biologically female" under the policy, their gender identity is necessarily male, and vice versa. It follows that the School District's bathroom policy facially bans *all* transgender students from using the restrooms corresponding to their gender identity.

**\*45** In contrast to transgender students, *all* cisgender students are permitted to use the restroom matching their gender identity. The policy, therefore, facially discriminates against transgender students by depriving them of a benefit that is provided to all cisgender students. It places all transgender students on one side of a line, and all cisgender

students on the other side. The School District cannot hide beyond facially neutral-sounding terms like "biological sex." As the Supreme Court has observed, "neutral terms can mask discrimination that is unlawful." 🚩*Nguyen*, 533 U.S. at 64, 121 S.Ct. 2053.

The majority opinion contends that there is a "lack of identity" problem here, citing the fact that the School District's classifications of "biological males" who may use the boys' restrooms and "biological females" who may use the girls' restrooms both contain transgender students. Maj. Op. at —— – —— (citing 🚩*Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974)). I do not see it that way. The School District's policy facially discriminates against transgender students; thus, the class we are concerned with is transgender students. On one side of the policy's line, cisgender students may use the bathrooms corresponding with their gender identities. On the other side of the line, transgender students may not. The majority opinion, in concluding otherwise, overlooks that under the policy *only* transgender students are denied the benefit of using the restrooms corresponding to their gender identities. Unlike in 🚩*Geduldig*, no "benefits of the [policy] accrue to" transgender students. 🚩417 U.S. at 496 n.20, 94 S.Ct. 2485.

Because the bathroom policy facially discriminates against transgender students, I next ask what implications that classification carries for the Equal Protection Clause —namely, what level of scrutiny is appropriate given the bathroom policy's classification of transgender versus cisgender students.

2. *The Bathroom Policy Contains a Sex-Based Classification, Triggering Heightened Scrutiny.*

This case presents a cornucopia of different and sometimes overlapping theories for why the bathroom policy's classification between transgender and cisgender students is a "sex-based classification." Adams presents us with at least six theories. [13] The School District and the majority opinion rely on a seventh. [14]

Although the majority and I agree that heightened scrutiny applies to the bathroom policy, the majority opinion's decision to apply heightened scrutiny is based on its misconception that Adams challenges the legality of sex-separated bathrooms. In the majority opinion's view, a policy

providing for sex-separated bathrooms triggers heightened scrutiny. Because Adams never challenged the legality of sex-separated bathrooms and instead challenged his exclusion from the boys' restroom based on his status as a transgender boy, it is necessary to view this case through that lens and therefore ask whether the policy requiring Adams's exclusion from the boys' restroom triggers heightened scrutiny. Next, I flesh out two of Adams's theories for why heightened scrutiny applies.

### i. Heightened Scrutiny Applies under *Bostock v. Clayton County*'s Rationale.

**\*46** One of Adams's theories is that his exclusion from the boys' restroom was "based on sex" under the logic of *Bostock v. Clayton County*, —— U.S. ——, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020). Appellee's En Banc Br. at 31. *Bostock* did not purport to answer any constitutional question. Instead, it interpreted Title VII by exploring the language and meaning of the statute as originally enacted. But that surface-level distinction is of no moment, Adams argues, because it is *Bostock*'s logic—apart from any Title VII-specific language—that requires us to find there has been a sex-based classification here. I agree with Adams's reading of *Bostock*.

In *Bostock*, the Supreme Court considered whether Title VII barred employers from firing employees because they were gay or transgender. *See Bostock*, 140 S. Ct. at 1737. The Supreme Court began with the text of Title VII, which prohibits discrimination in employment "because of ... sex." *Id.* at 1738 (citing 42 U.S.C. § 2000e-2(a)(1)). Because the parties "concede[d] the point for argument's sake," the Supreme Court assumed, but did not decide, that the term "sex" in the statute "refer[ed] only to the biological distinctions between male and female." *Id.* at 1739. In making that assumption, the Supreme Court assumed that the term "sex" did not encompass a person's status as transgender or homosexual, separate and apart from his or her status as "male" or "female." *Id.*

Even with these assumptions about the scope of "sex," the Supreme Court concluded that Title VII prohibits employers from firing employees "because" they are transgender. Why?

"[B]ecause it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex." *Id.* at 1741. The Supreme Court explained that "[w]hen an employer fires an employee because she is ... transgender, two causal factors [are] in play —*both* the individual's sex *and* something else (the sex ... with which the individual identifies)." *Id.* at 1742. For this reason, the Court observed, discrimination based on transgender status was "inextricably bound up with sex" and thus proscribed by Title VII. *Id.*

Although *Bostock* is a Title VII case, *Bostock*'s reasoning maps onto Adams's exclusion from the boys' restrooms at Nease High School. Adams was excluded for one of two reasons: either because the School District concluded that (1) Adams was a "biological girl" or (2) Adams was not a "biological boy." Either way, Adams was barred from the boys' restrooms based on a reason "inextricably bound up with sex." *Id.* In excluding Adams from a state-controlled space for a reason "inextricably bound up with sex," the School District made a sex-based classification. *See id.*; *Virginia*, 518 U.S. at 530–31, 116 S.Ct. 2264 (finding that policy of excluding women from the Virginia Military Institute was a sex-based classification requiring the application of heightened scrutiny); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (concluding that policy of excluding men from nursing school required the application of heightened scrutiny). Heightened scrutiny applies because Adams's exclusion from the boys' restrooms at Nease was "based on sex" under *Bostock*'s logic.

### ii. Heightened Scrutiny Applies Because Adams Is a Member of a Quasi-Suspect Class.

Adams also argues that his exclusion from the boys' restrooms was "based on his transgender status." Appellee's En Banc Br. at 33. Here, Adams contends that transgender individuals form a quasi-suspect class. [15] When a state statute or policy makes a classification based on a "quasi-suspect class," courts apply heightened scrutiny as we would for a sex-based classification. *See Cleburne*, 473 U.S. at 440–42, 105 S.Ct. 3249.

**\*47** Courts consider four factors in determining whether a group constitutes a quasi-suspect class. First, we ask whether the group historically has been subjected to discrimination.

*See* 🚩 *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). Second, we look at whether the group has a defining characteristic that "frequently bears no relation to [the] ability to perform or contribute to society." 🚩 *City of Cleburne*, 473 U.S. at 440–41, 105 S.Ct. 3249 (citation omitted). Third, we consider whether the group has "obvious, immutable, or distinguishing characteristics that define them as a discrete group." 🚩 *Lyng*, 477 U.S. at 638, 106 S.Ct. 2727. And fourth, we review whether the group is a minority lacking in political power. *See* 🚩 *Bowen v. Gilliard*, 483 U.S. 587, 602, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987). Applying these factors here, I have no doubt that Adams, as a transgender individual, is a member of a quasi-suspect class.

The first factor—whether the class historically has been subject to discrimination—weighs heavily in favor of concluding that transgender individuals make up a quasi-suspect class. The district court found there was "a documented history of discrimination against transgender individuals." Doc. 192 at 8 n.15. For instance, transgender people "are frequently harassed and discriminated against when seeking housing or applying to jobs or schools and are often victims of violent hate crimes." Doc. 115-10 at 2.[16] They "experience ... disproportionate rate[s] of homelessness, unemployment, and job discrimination" as well as "disproportionately report income below the poverty line." *Id.* (internal citations omitted);[17] *see* Doc. 114-6 at 13 (U.S. Commission on Civil Rights report noting "extensive[ ] document[ation of] ... a long, serious, and pervasive history of official and unofficial employment discrimination" by public and private employers).[18] Even as children, the district court found, transgender individuals "face[ ] discrimination and safety concerns." Doc. 192 at 8. And "[s]eventy-five percent of transgender students report feeling unsafe at school." Doc 115-2 at 2.[19]

Other circuits have observed that transgender individuals are disproportionally victims of discrimination and violence. *See* 🚩 *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (observing that transgender individuals have historically been subjected to discrimination); 🚩 *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (reviewing "alarming"

statistics that document the "discrimination, harassment, and violence" faced by transgender individuals). Evidence abounds that transgender individuals have historically been, and continue to be, subjected to discrimination.[20] Thus, the first factor weighs in favor of finding that transgender individuals form a quasi-suspect class.

**\*48** For the second factor, we determine whether the defining characteristic of the class frequently bears no relation to the class's ability to contribute to society. At trial, Dr. Adkins offered unrebutted expert testimony that being transgender did not limit a person's "ability to function in society." Doc. 166-2 at 13. Dr. Ehrensaft testified similarly that transgender individuals "have the same capacity for happiness, achievement, and contribution to society as others." *See* Doc. 166-3 ¶ 32. Transgender individuals "live in every state, serve in our military, and raise children." Medical, Mental Health, and Other Health Care Organizations Amicus Br. at 5. "Being transgender ... implies no impairment in judgment, stability, reliability, or general social or vocational capabilities[.]" Doc. 115-10 at 2. The Fourth Circuit likewise concluded that one's status as transgender bears "no such relation" to one's "ability to perform or contribute to society." 🚩 *Grimm*, 972 F.3d at 612 (internal quotation marks omitted). The second factor, too, points to the conclusion that transgender individuals constitute a quasi-suspect class.

Now to the third factor—whether there are "obvious, immutable, or distinguishing characteristics" that define the class as a discrete group. Here again, the record contains unrebutted expert testimony from Dr. Atkins that, for transgender individuals, gender identity is not "a choice" and that it is not "voluntary." Doc. 166-2 at 12–13. Dr. Ehrensaft similarly testified that gender identity is an "innate," effectively "immutable" characteristic for transgender individuals. *See* Doc. 166-3 ¶ 26. The School District does not challenge any of the evidence establishing that one's status as a transgender person is born of immutable characteristics. The third factor thus weighs in favor of concluding that transgender individuals are a quasi-suspect class. *See also* 🚩 *Grimm*, 972 F.3d at 612–13 (concluding that the third factor supports the existence of a quasi-suspect class of transgender individuals).

Fourth and finally, we must determine whether transgender individuals are a minority class lacking in political power. The district court found that "0.6 percent of the adult population" is transgender. Doc. 192 at 7. Even when we take into

account the small proportion of the population transgender individuals comprise, they are underrepresented in political and judicial office nationwide. *See* 🔖*Grimm*, 972 F.3d at 613 (observing that "[e]ven considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government"). Plus, as I noted in discussing the first quasi-suspect-class factor, the district court found that "there is a documented history of discrimination against transgender individuals." Doc. 192 at n.15. In support, the district court cited Adams's filing identifying numerous examples of governmental discrimination against transgender individuals—for example, a 2017 Presidential directive excluding transgender people from open service or accession in the United States armed forces and a North Carolina law that blocks local governments from passing anti-discrimination rules that grant protections to transgender individuals. No group with any political power would allow this type of purportedly legalized discrimination against it. *See* 🔖*Grimm*, 972 F.3d at 613 ("[E]xamples of discrimination cited under the first factor affirm what we intuitively know: Transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process."). The fourth factor likewise breaks heavily in favor of concluding that transgender individuals constitute a quasi-suspect class.

Like the Fourth Circuit in 🔖*Grimm*, I have no trouble concluding that transgender individuals constitute a quasi-suspect class. Adams's transgender status provides an alternative reason why heightened scrutiny applies.

### 3. *The Policy Does Not Survive Heightened Scrutiny.*

I turn now to why the School District's bathroom policy fails heightened scrutiny. Under the heightened scrutiny test, a sex classification "fails unless it is substantially related to a sufficiently important governmental interest." 🔖*City of Cleburne*, 473 U.S. at 441, 105 S.Ct. 3249 (citing 🔖*Hogan*, 458 U.S. at 721, 102 S.Ct. 3331). "[T]he means adopted ... [must be] in substantial furtherance of important governmental objectives. The fit between the means and the important end [must be] 'exceedingly persuasive.' " 🔖*Nguyen*, 533 U.S. at 70, 121 S.Ct. 2053 (quoting 🔖*Virginia*, 518 U.S. at 533, 116 S.Ct. 2264). "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather

than through the mechanical application of traditional, often inaccurate, assumptions ...." 🔖*Hogan*, 458 U.S. at 725–26, 102 S.Ct. 3331. "The burden of justification is demanding and it rests entirely" on the School District. 🔖*Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. As the defender of the sex-based classification, the School Board must demonstrate that its bathroom policy (1) advances an important governmental interest and (2) is in substantial furtherance of that interest. 🔖*Hogan*, 458 U.S. at 724, 102 S.Ct. 3331.

#### i. The School District Presented No Evidence that the Policy Substantially Furthers Its Interest in Protecting Student Privacy.

**\*49** The School District first asserts that the bathroom policy advances the important governmental interest of student "privacy." The majority opinion defines the privacy interest this way: "The privacy interests hinge on using the bathroom away from the opposite sex and shielding one's body from the opposite sex." Majority Op. at ——. The Supreme Court has recognized a legitimate government interest in protecting the bodily privacy of students. 🔖*Virginia*, 518 U.S. at 550 n.19, 116 S.Ct. 2264 ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements[.]"). I agree with the majority opinion that the first 🔖*Hogan* factor is satisfied—the School Board's asserted interest of student "privacy" is a sufficiently important interest to pass heightened scrutiny.

It is on the second factor—whether the bathroom policy is "substantially related" to the asserted governmental interest—that I part ways with the majority opinion. I have four reasons.

First, the majority opinion ignores that the School District failed to introduce any nonspeculative evidence on this point. When it comes to defending a sex-based classification, we are in the business of relying on evidence, not speculation. 🔖*Nguyen*, 533 U.S. at 70, 121 S.Ct. 2053; *see* 🔖*Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (observing that there is an "extensive evidentiary showing" required for a classification "to survive heightened scrutiny"). "[S]heer conjecture and abstraction" will not do. 🔖*Whitaker*, 858 F.3d at 1052.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   40

The only evidence the School District provided to link its legitimate privacy interest with the policy of assigning transgender students to the bathrooms corresponding with their birth-assigned sex was speculative in nature. Smith, the leader of the taskforce that produced the Best Practices Guidelines, explained that "a girl ... refresh[ing] her makeup" in the bathroom might not want "someone else in there [who] may or may not make them feel uncomfortable." Doc. 161 at 213. I assume this statement articulates, however inartfully, a legitimate privacy interest. But Smith then speculated—without any evidence to support her supposition—that the mere presence of, or example, a transgender girl could make a cisgender girl feel as uncomfortable in the bathroom as she might be in the presence of a cisgender boy. Similarly, the School District's Deputy Superintendent for Operations, Mittelstadt, opined that the policy of assigning transgender students to the bathrooms of their birth-assigned sex made sense because "if [a cisgender student] [has] to go [to the restroom] and perhaps undress or clean up a stain on their clothing ..., they [should] ha[ve] that opportunity to enter that area and receive that privacy." *Id.* at 248. I agree with the district court that generalized guesses about how school-aged cisgender students may or may not feel with transgender students in the bathroom is not enough to carry the heavy weight of heightened scrutiny. The School District's failure to carry its evidentiary burden, standing alone, is reason enough to affirm the district court's judgment on Adams's equal protection claim.

Second, the majority opinion fails to contend with the evidence regarding how transgender students typically use the restroom. The majority opinion asserts that the privacy interest at issue involves "shielding one's body from the opposite sex." Majority Op. at ——. The record reflects, however, that transgender individuals are discrete in using the restroom aligning with their gender identity. As a general matter, transgender students wish to shield parts of their anatomy that would identify them as belonging to their birth-assigned sex. And with respect to Adams specifically, the district court found that he always uses a stall, locks the door to the stall, uses the restroom, leaves the stall, washes his hands, and exits the restroom. In response to this evidence, the majority opinion deflects, saying that the privacy right at issue here is different from "using the bathroom in priva[te]." *Id.* Rather, the majority opinion says, there is some abstract student privacy interest that requires students to use restrooms according to birth-assigned sex.

*50 Herein lies the third problem for the majority opinion—Adams's evidence that the bathroom policy's assignment of Adams to the girls' restrooms would actually *undermine* the abstract privacy interest the School District wished to promote. While he attended Nease and was excluded from the boys' bathrooms, Adams had "facial hair," "typical male muscle development," a deep voice, and a short haircut. Doc. 192 at 66. He had no visible breast tissue; his chest appeared flat. He wore masculine clothing. Any occupant of the girls' restroom would have seen a boy entering the restroom when Adams walked in. Thus, the district court found, "permitting him to use the girls' restroom would be unsettling for all the same reasons the School District does not want any other boy in the girls' restroom." *Id.* at 28 n.30. In other words, the evidence showed that a transgender boy walking into the girls' restroom would undermine the sense of privacy for all involved.[21] The policy therefore lacks "fit" with the asserted privacy interest because by assigning students who identify as and appear to be male to the girls' restroom and students who identify as and appear to be female to the boys' bathroom, the policy is drastically underinclusive with respect to its stated purpose. *See* 🚩*Friedman v. Harold*, 638 F.2d 262, 269 (1st Cir. 1981) (observing in dicta that a state law prohibiting creditors of a wife from attaching her interest in a tenancy by the entirety but permitting creditors of a husband to attach his interest would not survive intermediate scrutiny because the law's "limitation to only one half of the relevant situations [wives but not husbands] renders it dramatically underinclusive as a means of attaining [the] end" of protecting the interests of innocent non-debtor spouses in property held by the entirety, and thus "presents such a sharp and dramatic lack of fit between means and ends as to suggest that no such purpose was intended").

Fourth, and finally, evidence in the record that cisgender students were permitted to use the gender-neutral bathrooms further undermines any notion that there is an "exceedingly persuasive" connection between the School District's privacy interest and its policy banning transgender students from the bathrooms that align with their gender identities. 🚩*Nguyen*, 533 U.S. at 70, 121 S.Ct. 2053 (internal quotation marks omitted). BCPS official Kefford and task force director Smith both testified at trial that gender-neutral, single-stall bathrooms had long been used by cisgender students who needed "extended," or "additional privacy." Doc. 161 at 101–02, 149. Based on this testimony, the district court found—and the majority opinion does not dispute—that the gender-neutral bathrooms were a way to "accommodate[ ] the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.  41

occasional student who needed *additional privacy*" for any number of reasons. Doc. 192 at 15 n.20 (emphasis added). The fact that, by the School District's own admission, the gender-neutral single-stall bathrooms provide more privacy than the bathrooms that separate students by biological sex undermines the District's asserted privacy interest in keeping transgender students from the bathrooms that align with their gender identities because their inclusion might theoretically create privacy problems for a cisgender student who is, for example, "undress[ing] or clean[ing] up a stain on their clothing." Doc. 161 at 248; *cf.* 🚩 *Hogan*, 458 U.S. at 730–31, 102 S.Ct. 3331 (explaining that school's policy of permitting men to attend all-women's nursing school classes as auditors "fatally undermines its claim that women ... are adversely affected by the presence of men" in the classroom).

For all these reasons, the School District failed to carry its evidentiary burden to establish a "substantial relationship" between the bathroom policy and student privacy.

### ii. The School District Presented No Evidence that the Policy Substantially Furthers Its Interest in Keeping Students Safe.

The School District likewise failed to produce any evidence showing a "substantial relationship" between its policy and student safety, either for Adams as a transgender student or for cisgender students using school bathrooms. 🚩 *Hogan*, 458 U.S. at 725, 102 S.Ct. 3331. Tellingly, the majority opinion does not rely on student safety as sufficient justification for the policy.

As an initial matter, the School District's brief does not adequately explain what it means by "student safety." Is it referring to transgender students' safety? The safety of cisgender students? Or both? Is it suggesting that a transgender boy's presence in the boys' restroom makes it more unsafe for cisgender boys than when the boys' restroom contains only cisgender boys, for example? The School District leaves us to guess. It makes a few conclusory and passing references to "student safety" in its en banc brief without pointing to any evidence, citing any case law, or otherwise explaining how the bathroom policy furthers student safety. Instead, it seems to rely only on stereotypes and assumptions.

**\*51** But even if the School District had done a better job of explaining its brief on appeal, the evidentiary record would still be bare. "Any predictive judgments concerning group behavior and the differences in behavior among different groups must at the very least be sustained by meaningful evidence." ⚠️ *Lamprecht v. FCC*, 958 F.2d 382, 393 (D.C. Cir. 1992) (Thomas, J.). As our sister circuit has recognized, a "sex-based classification cannot survive unless the 'sex-centered generalization' asserted in the law's defense 'actually comports with fact' and is not 'too tenuous.' " ⚠️ *Lamprecht*, 958 F.2d at 393 n.3 (alteration adopted) (quoting 🚩 *Craig v. Boren*, 429 U.S. 190, 199, 204, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)); *see* 🚩 *Craig*, 429 U.S. at 201–02, 97 S.Ct. 451 (rejecting maleness as a proxy for driving because a correlation of 2 percent was "unduly tenuous"). Upchurch, a School District witness, vaguely guessed that the bathroom policy probably prevented "people with untoward intentions" from "do[ing] things they ought not do." Doc. 162 at 112. The district court found this speculation insufficient to carry the burden of heightened scrutiny. It further observed that "[t]here was no evidence that Adams encountered any safety concerns during the six weeks he used the boys' restroom at Nease or when he does so in other public places." Doc. 192 at 43. And there was no evidence that "Adams present[ed] any safety risk to other students or that transgender students are more likely than anyone else to assault or molest another student in the bathroom." *Id.*

Nor was there evidence that other schools experienced threats to student safety resulting from their bathroom policies that permitted transgender students to use the school bathrooms matching their gender identity. Recall that Valbrun-Pope, a BCPS official, testified that "with 271,000 students, 300 schools, and implementation over ... five years, [BCPS] ha[d] not had issues related to safety in the restrooms that are specifically connected to transgender students." Doc. 161 at 64. Kefford was unaware of "any child having an issue with a transgender child using the bathroom that aligns with their gender identity." *Id.* at 118. And Aberli, a JCPS high school principal, said he had encountered no safety issues due to the implementation of a bathroom policy allowing transgender students to use the restrooms aligning with their gender identity.

What is more, Adams showed the bathroom policy could in fact undermine student safety. At trial, Smith was asked whether it would be safe for "a transgender girl, with girls'

parts, in terms of her breasts and everything else" to use the boys' restroom. *Id.* at 209. Smith admitted that it would be more "comfortable and safe with all parties involved" if that transgender girl did not use the boys' restroom. *Id.*

Having failed either to explain what it meant by student safety or to introduce any evidence at trial to support its speculation, the School District failed to carry its evidentiary burden to show a "substantial relationship" between its bathroom policy and student safety. 🚩*Hogan*, 458 U.S. at 725, 102 S.Ct. 3331. Because the School Board failed to meet its burden of proof, the bathroom policy fails heightened scrutiny. [22]

### iii. The Policy Is Administered Arbitrarily and Enforced Inconsistently.

**\*52** Another telltale sign that the policy is untethered from any legitimate government interest is that it is administered arbitrarily. When a state actor does not take care to administer a policy containing a sex-based classification in a consistent or effective fashion, the state actor's inconsistent administration and enforcement calls into question whether the sex-based classification is substantially related to any important interest. *See* 🚩*Whitaker*, 858 F.3d at 1054 (observing that a transgender student could use the bathroom matching his or her gender identity if he or she simply chose to register with the school district using a passport rather than a birth certificate, which demonstrated "the arbitrary nature of the policy"); 🚩*Grimm*, 972 F.3d at 620 (Wynn, J., concurring) (observing that the bathroom policy at issue "is arbitrary and provides no consistent reason" for assigning certain students to certain bathrooms). And that makes sense: how can the School District's policy be substantially related to a legitimate state interest if the School District does not even care enough about the policy to administer it effectively? [23]

The School District's reliance on a student's enrollment documents gives rise to this sort of problem—the School District administers the policy in an arbitrary and haphazard way. As the School District admitted, if a transgender student legally changed his or her birth certificate and other enrollment documents to reflect a different gender *before* enrolling in the School District, then that transgender student would be able to use the bathrooms matching his or her gender identity. The School Board also admitted that it had no process for identifying transgender students in its student

population, so transgender students could violate the policy and the School District would be none the wiser. *See also* Jordan Dissenting Op. at ——– – ——. At the same time, if after enrollment a transgender student had his official documents changed to reflect his sex consistently with his gender identity, the School District will not accept the revised documents for purposes of the bathroom policy. Therefore, the policy is arbitrary in that some transgender students—like Adams—are restricted by the bathroom policy, while other transgender students are unaffected by it.

And recall Smith's admission that she hopes transgender students will *ignore* parts of the bathroom policy. When asked whether "a transgender girl, with girls' parts, in terms of her breasts and everything else" should use the boys' restroom, Smith said that she would rather that student avoid using the boys' restroom. Doc. 161 at 209. So the bathroom policy is arbitrary and "disingenuous," to use the district court's word, in this sense too: the School District hopes that transgender students will follow parts of the bathroom policy and ignore other parts of it. Doc. 192 at 28 n.30.

The arbitrary way in which the School District enforces the policy offers yet another reason why the bathroom policy fails heightened scrutiny. For this reason, too, I would affirm the district court on Adams's equal protection claim. [24]

## C. Adams's Exclusion from the Boys' Restroom Under the Bathroom Policy Violated Title IX.

**\*53** I turn now to Adams's Title IX claim. Title IX provides: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 🚩20 U.S.C. § 1681(a). There is no dispute that the use of school restrooms constitutes an "educational program or activity" and that the School District receives federal funding as required by Title IX. Therefore, Adams must show only that he was subjected to "discrimination" "on the basis of sex" to succeed on his Title IX claim. *Id.*

I begin with discrimination. Discrimination "refers to distinctions or differences in treatment that injure protected individuals." 🚩*Burlington N. Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 59, 126 S.Ct. 2405 (2006). To determine what it means to "discriminate" under Title IX, we look to the relevant implementing regulations, which explain that a

school cannot "[s]ubject any person to separate or different rules of behavior, sanctions, or other treatment" on the basis of sex. 34 C.F.R. § 106.31(b)(4). Neither can a school "[p]rovide different aid, benefits, or services or provide aid, benefits, or services in a different manner," or "[d]eny any person such aid, benefit, or service" on the basis of sex. *Id.* § 106.31(b)(2), (3).

The School District's bathroom policy bans transgender students from using the restroom that matches their gender identity. There is no doubt that this constitutes discrimination, because transgender boys are treated differently from cisgender boys and transgender girls are treated differently from cisgender girls, with only cisgender students receiving the benefit of being permitted to use the restroom matching their gender identity and transgender students being denied that benefit. *White*, 548 U.S. at 59, 126 S.Ct. 2405; *see* 34 C.F.R. § 106.31(b). Being denied this benefit injures transgender students. Adams testified that the bathroom policy left him feeling anxious, depressed, ashamed, and unworthy—like "less of a person" than his peers. Doc. 160-1 at 204. And the record evidence reflects that many transgender people benefit from using bathrooms consistent with their gender identity because it alleviates the debilitating distress and anxiety of living with gender dysphoria.

The harder question is whether the discrimination is "on the basis of sex." To begin with, we need a definition for the word "sex" in the Title IX context. Consulting contemporanous dictionary definitions, the majority opinion concludes that the word "sex" as used in Title IX unambiguously refers to "biological sex." Majority Op. at ——— – ———; *see id.* at ———, ——— (explaining that "sex" in Title IX equates to "biology and reproductive function"). I assume, for the purposes of our discussion today, that the term "sex" as used in Title IX unambiguously refers to "biological sex," a term even the majority opinion acknowledges contains more than one biological component.[25]

As I have explained above, though, undisputed record evidence in this case demonstrates that, among other biological components, "biological sex" *includes gender identity*. And, of course, it would defy the record and reality to suggest that all the markers of a person's biological sex must be present and consistent with either maleness or femaleness to determine an individual's "biological sex." Based on the unrebutted evidence that Adams introduced,

the district court found that " 'physical aspects of maleness and femaleness' may not be in alignment (for example, 'a person with XY chromosomes [may] have female-appearing genitalia)." Doc. 192 at 6 (quoting Doc. 151-4 at 7); *see also* Wilson Dissenting Op. at ——— – ———. I believe the majority would agree with me that a person can be female after a hysterectomy, for example. Or that an individual with Mayer-Rokitansky-Küster-Hauser Syndrome (that is, born with XX chromosomes, ovaries, and labia but without a vagina and uterus) can be female. Putting together these two concepts —that "biological sex" includes gender identity and that the markers of a person's biological sex may diverge—despite the majority's protestations otherwise, a person can be male if some biological components of sex, including gender identity, align with maleness, even if other biological components (for example, chromosomal structure) align with femaleness.[26]

**\*54** Next, "on the basis of." The clause "on the basis of," appearing before the word "sex," imposes the familiar but-for standard of causation. When interpreting statutes generally, and anti-discrimination laws specifically, "Congress is normally presumed" to have legislated a "but for" causation standard "when creating its own new causes of action." *Comcast Corp. v. Nat'l Ass. of African American-Owned Media*, ——— U.S. ———, 140 S. Ct. 1009, 1014, 206 L.Ed.2d 356 (2020). The but-for causation standard means that "a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739. It is possible for the same event to have more than one but-for cause. *Id.* Putting these concepts together, we ask whether Adams's discriminatory exclusion from the boys' restroom at Nease High School under the bathroom policy would not have happened but for the biological markers of his sex.

Here again, *Bostock*'s reasoning, separate from any Title VII-specific language, demonstrates that "sex" was a but-for cause of the discrimination Adams experienced. Recall that in *Bostock* the Supreme Court reasoned that when an employer fired an employee for being transgender, the discrimination was due to at least two factors, the individual's "sex" and "something else." *Id.* at 1742.[27] The same reasoning applies here: Adams was excluded from the boys' bathroom under the policy either because he had one specific biological marker traditionally associated with females, genital anatomy (or, put differently, because he lacked that one specific biological marker traditionally associated with

males). And so a but-for cause of Adams discriminatory exclusion from the boys' restroom was "sex" within the meaning of Title IX. I would therefore affirm the district court's judgment on Adam's Title IX claim in addition to the equal protection claim. [28]

**\*55** The majority opinion's analysis of Adams's Title IX claim relies on statutory and regulatory carveouts, which, it says, foreclose the claim. It points to the following language in Title IX: "[N]othing contained [in Chapter 38] shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The majority opinion also points to Title IX's implementing regulations, which allow for "separate toilet[s], locker room[s], and shower facilities on the basis of sex." 34 C.F.R. § 106.33.

But all the carveouts "suggest[ ] is that the act of creating sex-separated [facilities] in and of itself is not discriminatory." *Grimm*, 972 F.3d at 618. That is, separating the sexes based on biological sex is not per se a violation of Title IX. The carveouts do not, however, address how an educational institution may assign a person to a facility when the biological markers of his sex point in different directions. Nor do the carveouts permit an educational institution to "rely on its own *discriminatory* notions of what 'sex' means." *Id.* (emphasis added). Adams, a transgender boy, has biological markers of sex indicating that he is male and markers indicating that he is female. The School District's policy categorically assigned transgender students, including Adams, to bathrooms based on only one biological marker: their sex assigned at birth. Adams's claim that the School District's notion of what "sex" means is discriminatory is not foreclosed by the Title IX carveouts. *See id.* [29]

### D. There is No Reason to Fear the Majority Opinion's Slippery Slope Arguments.

The majority opinion warns that ruling for Adams would "have ramifications far beyond the bathroom door." Majority Op. at ——. If we ruled for Adams, the majority opinion cautions, our decision would "transform schools' living facilities, locker rooms, showers, and sports teams into sex-neutral areas and activities." *Id.* at ——. One School Board witness expressed concern that, without the bathroom policy, "the football quarterback" could say "I feel like a girl today,"

gain entry to the girls' restroom, and harm female students. Doc. 161 at 213. For at least three reasons, the majority opinion's slippery-slope predictions are unfounded.

First, most of the majority opinion's concerns, and the concerns of the School District, have to do with *gender fluid* individuals—people who are not transgender or cisgender, but who instead, according to the record, have a flexible view of gender that "changes between male and female." Doc. 192 at 17. This case has no bearing on the question how to assign gender fluid individuals to sex-separated bathrooms, though. The School District's bathroom policy categorically bans only transgender students—defined as those who "consistently, persistently, and insistently" identify as *one* gender—from using the restroom that matches their gender identity. *Id.* at 47 (internal quotation marks omitted). By its plain terms, the policy simply does not apply to gender fluid individuals. So, for today, we can set aside the concerns about gender fluidity.

**\*56** Second, we could affirm the district court's judgment on Adams's equal protection claim based on the School District's evidentiary failures alone. The School District stipulated that this is a heightened scrutiny case, but it failed to submit any evidence to establish a "substantial relationship" between the bathroom policy and student privacy or safety. Notably, although Adams presented scientific expert testimony, the School District chose not to call its experts to rebut that evidence. Affirming the district court's judgment in this narrow way would not prevent other school districts from relitigating this issue, so long as they brought evidence to court with them. But the majority has rejected that approach.

Third, recall that Adams's entire lawsuit depends upon the existence of sex-separated bathrooms. Adams sought only to be treated like any other boy. He asked for, and the district court awarded, an injunction that prevented the School District from barring Adams from the boys' bathroom, not from having sex-separated bathrooms. The majority opinion employs stereotypic ideas and assumptions in an attempt to persuade readers that admitting transgender students into the bathrooms corresponding with their consistent, persistent, and insistent biological gender identity will result in the elimination of sex-separated bathroom facilities. This is simply not so. As to equal protection claims by transgender students, the facts unique to each case will determine whether a school district has met its burden under heightened scrutiny. And with respect to Title IX claims, the fact that sex is a but-for cause of differential treatment does not necessarily mean that actionable discrimination exists. Our law, both

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

constitutional law and statutes and regulations, recognizes a legitimate, protectible privacy interest in the practice of separating bathroom facilities by sex. But that interest is not absolute: it must coexist alongside fundamental principles of equality. Where exclusion implies inferiority, as it does here, principles of equality prevail.

### IV. CONCLUSION

Adams's case tells the story of a hauntingly familiar harm. By forcing Adams to use the gender-neutral restrooms, the School Board required Adams to undergo "humiliating" public "walk[s] of shame" in front of his peers and others at school to use a separate bathroom. Doc. 160-1 at 117, 204. A member of our sister circuit powerfully described the connection between the harm Adams experienced and the harm other children suffered in the not-so-distant past:

> No less than the recent historical practice of segregating Black and white restrooms ... the unequal treatment enabled by the [School District's] policy produces a vicious

and ineradicable stigma. The result is to deeply and indelibly scar the most vulnerable among us—children who simply wish to be treated as equals at one of the most fraught developmental moments in their lives—by labeling them as unfit for equal protection in our society.

*Grimm*, 972 F.3d at 620–21. By excluding Adams from the boys' restrooms at Nease High School and relegating him to the gender-neutral restrooms, the School District forced Adams to wear what courts have called a "badge of inferiority." *See Grimm v. Gloucester Cnty. Sch. Bd.*, 976 F.3d 399, 403 (4th Cir. 2020) (Wynn, J., concurring in denial of reh'g en banc). The Constitution and laws of the United States promise that no person will have to wear such a badge because of an immutable characteristic. The majority opinion breaks that promise. Respectfully, I dissent.

**All Citations**

--- F.4th ----, 2022 WL 18003879

### Footnotes

1    LGBTQ is an acronym for the phrase "lesbian, gay, bisexual, transgender, and questioning (and/or queer)."

2    Specifically, the revised opinion eschewed addressing Title IX. And, instead, the revised opinion sua sponte framed Adams's Equal Protection Clause claim as a challenge to the School Board's enrollment documents policy—i.e., the means by which the School Board determines biological sex upon a student's entrance into the School District—and not as a challenge to the School Board's bathroom policy—i.e., the policy separating the male and female bathrooms by biological sex instead of transgender status or gender identity. But this case has never been about the enrollment documents policy.

This was not the challenge advanced by Adams in the district court. Indeed, Adams centered the district court litigation on the bathroom policy. For example, in Adams's amended complaint, Adams sought relief for "his exclusion" and denial of "equal access to the boys' restroom." Adams specifically challenged "[the School Board's] policy of excluding transgender students from the single-sex facilities that match their gender identity." Then, in the joint pretrial statement, Adams sought to recover damages for the harm Adams suffered "as a result of [the School Board's] implementation of its discriminatory restroom policy." In Adams's proposed findings of fact and conclusions of law, Adams defined the School Board's purported discriminatory bathroom policy as "[the School Board's] policy, custom, or usage, as these terms are used in 42 U.S.C. § 1983, barring transgender students from the restrooms consistent with their gender identity."

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    46

And because Adams claimed that the policy "treated [Adams] differently (i) from other boys, who can use restrooms that match their male gender identity; and (ii) from non-transgender students, since the policy in effect relegates him to a gender neutral restroom," Adams sought to have the district court enjoin the School Board from enforcing a policy "that denies transgender students access to and use of restrooms that match a student's gender identity."

Ultimately, Adams maintained, until this en banc proceeding after two prior opinions had been vacated, that this lawsuit was about allowing transgender students to access bathroom facilities that match their gender identities, not revising the means by which the School Board determines biological sex. While Adams now tries to raise a new claim that the enrollment documents policy violates the Equal Protection Clause because it creates an "arbitrary sex-based distinction," Adams cannot amend the complaint by arguments made in an appellate brief. *Cf.* 🔖*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (explaining that a plaintiff may not amend the complaint by argument in an appellate brief).

3    Adams also argues that the appeal of the district court's order should be classified as an as-applied challenge to the School Board's bathroom policy limited to Adams's particular circumstances. But that does not help in our resolution of this appeal because "classifying a lawsuit as facial or as-applied ... does not speak at all to the substantive rule of law necessary to establish a constitutional violation." 🔖*Bucklew v. Precythe*, ---- U.S. ----, 139 S. Ct. 1112, 1127, 203 L.Ed.2d 521 (2019). Indeed, an as-applied challenge merely "affects the extent to which" a plaintiff must demonstrate "the invalidity of the challenged law" or constitutional violation and "the corresponding 'breadth of the remedy.' " 🔖*Id.* (quoting 🔖*Citizens United v. FEC*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010)). But an alleged violation of one individual's constitutional rights under the Equal Protection Clause would necessarily constitute a violation of the Equal Protection Clause and the Constitution at large, regardless of the individually-applied remedy. Further, as we discuss below, equating "sex" to "gender identity" or "transgender status" under Title IX, as Adams would have us do as a matter of statutory interpretation, would touch upon the interests of all Americans—not just Adams—who are students, as well as their parents or guardians, at institutions subject to the statute. We therefore do not find merit in Adams's attempt to cabin the lawsuit to Adams's particular circumstances.

4    For purposes of this opinion, unless otherwise indicated, our references to "the dissent" in this opinion refer to Judge Jill Pryor's dissent.

5    The dissent separately asserts that intermediate scrutiny applies on the ground that there is "no doubt that Adams, as a transgender individual, is a member of a quasi-suspect class." Jill Pryor Dis. Op. at ----. We have two responses. First, the dissent reaches this conclusion through a selective reading of the record, citing to exhibits and testimony where it sees fit. But the dissent fails to acknowledge that the district court did not address the issue, expressly stating that it had "no occasion to engage in the further analysis" as to whether "transgender people are a quasi-suspect class, deserving of heightened scrutiny per se." Like the district court, we find no need to address the issue, given our conclusion that intermediate scrutiny applies, in any event. Second, and contrary to the dissent's assertion, we have grave "doubt" that transgender persons constitute a quasi-suspect class. Indeed, the Supreme Court has rarely deemed a group a quasi-suspect class. *See, e.g.,* 🔖*City of Cleburne*, 473 U.S. at 442–46, 105 S.Ct. 3249.

6    Although we do not need to address whether Adams is "similarly situated" to biological boys in the School District for purposes of reviewing the bathroom policy under the Equal Protection Clause in the first instance, we note that there are serious questions as to whether Adams would meet this requirement. *See* 🔖*City of Cleburne*, 473 U.S. at 439, 105 S.Ct. 3249. The promise of equal protection is limited to "keep[ing] governmental decisionmakers from treating differently persons who are in all relevant respects alike."

*Nordlinger*, 505 U.S. at 10, 112 S.Ct. 2326. When it comes to the bathroom policy, biological sex is the "relevant respect[ ]," *id.*, with respect to which persons must be "similarly situated," *City of Cleburne*, 473 U.S. at 439, 105 S.Ct. 3249, because biological sex is the sole characteristic on which the bathroom policy and the privacy interests guiding the bathroom policy are based. And biological sex also is the driving force behind the Supreme Court's sex-discrimination jurisprudence. *See, e.g.*, *Nguyen*, 533 U.S. at 73, 121 S.Ct. 2053 ("The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific [to men and women]."); *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264 ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible ....' " (first alteration in original) (quoting *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946))); *Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764 ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). As the Supreme Court has made clear: "To fail to acknowledge even our most basic biological differences ... risks making the guarantee of equal protection superficial, and so deserving it." *Nguyen*, 533 U.S. at 73, 121 S.Ct. 2053.

Adams claims to be similarly situated to biological boys in the School District for purposes of the bathroom policy, even though Adams is not biologically male—the only characteristic on which the policy is based. Throughout the pendency of this case, Adams remained both biologically and anatomically identical to biological females—not males. Thus, in prohibiting Adams from using the male bathrooms, it can be argued that the School Board did not "treat[ ] differently persons who are in all relevant respects alike" for purposes of the Equal Protection Clause. *Nordlinger*, 505 U.S. at 10, 112 S.Ct. 2326.

To argue otherwise, the dissent, like the district court, must assert that transgender status and gender identity are equivalent to biological sex. Indeed, this forms the foundation of the dissent's attempt to frame this case not as a case about the constitutionality and legality of separating bathrooms based on biological sex but rather as a case about the purported unlawfulness of excluding Adams—who attended school as a biological female—from using the male bathroom because, as the dissent claims, Adams is a boy for purposes of the bathroom policy. But such an assertion is contrary to the Supreme Court's reliance on physiological and biological differences between men and women in its sex-discrimination decisions, which therefore raises serious questions about Adams's similarly situated status for purposes of the bathroom policy under review. Such an assertion also is undercut by the dissent's refusal to engage the issue of gender fluidity—i.e., the practice, which the dissent acknowledges, in which some individuals claim to change gender identities associated with the male and female sexes and thereby treat sex as a mutable characteristic. Jill Pryor Dis. Op. at —— ("This case has no bearing on the question how to assign gender fluid individuals to sex-separated bathrooms."). *But see* *Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764 ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). Such an assertion is further undercut by the dissent's attempt to categorize transgender persons as members of a quasi-suspect class, which necessarily entails treating transgender persons as distinct from the sexes with which they identify. Jill Pryor Dis. Op. at —— – ——. Nevertheless, as the opinion concludes, the bathroom policy passes constitutional muster regardless of whether Adams is similarly situated to biological boys for purposes of the bathroom policy because the policy's sex-based classification satisfies intermediate scrutiny.

7    Nevertheless, the dissent, using *Bostock*, argues "that 'sex' was a but-for cause of the discrimination Adams experienced," which the dissent argues violates Title IX. Jill Pryor Dis. Op. at ——. This argument is of no avail. Under the dissent's theory, any lawful policy separating on the basis of "sex" pursuant to Title IX's

statutory and regulatory carve-outs would inherently provide the "but-for cause of ... discrimination" that the dissent is concerned about because such a policy inherently involves distinguishing between the sexes from the outset. The dissent's theory, then, would swallow the carve-outs and render them meaningless because, as the dissent would have it, any policy separating by "sex" would provide "a but-for cause of ... discrimination" if a litigant felt that she or he had been discriminated against by the sex-based separation authorized by the carve-outs. Adams, who is a biological female alleging discrimination based on not being able to access the bathrooms reserved for biological males, is no different from such a litigant.

8    Adams contends that the School Board made this argument—that Congress must condition funds under its Spending Clause authority in an unambiguous way—for the first time on appeal. Thus, Adams argues that this Court should not consider the School Board's argument. Adams is incorrect. We are duty bound to apply the correct law; "parties cannot waive the application of the correct law or stipulate to an incorrect legal test."

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018); *accord United States v. Lee*, 29 F.4th 665, 669 n.2 (11th Cir. 2022) (finding that a defendant could not waive the application of the *Blockburger* test in connection with asserting a violation of the Double Jeopardy Clause). And we are required to apply the clear-statement rule to legislation passed under Congress's Spending Clause authority. *See, e.g.*, *Davis*, 526 U.S. at 640, 119 S.Ct. 1661 ("In interpreting language in spending legislation, we thus 'insis[t] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.' " (alternations in original) (quoting *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531)). For these reasons, Adams's contention lacks merit.

1    Justinian's Code, for example, recognized "hermaphrodites" and instructed they should be assigned whichever "sex ... predominates." 1 *Enactments of Justinian: The Digest or Pandects*, tit. 5 para. 10 (Scott ed. 1932).

2    *See, e.g.*, *Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020) (considering intersex identity on a passport application); *M.C. ex rel. Crawford v. Amrhein*, 598 F. App'x 143, 149 (4th Cir. 2015) (considering whether sex reassignment surgery in infancy violated a constitutional right to delay medically unnecessary intervention); *Thompson v. Lengerich*, 798 F. App'x 204, 213 (10th Cir. 2019) (considering equal protection implications for intersex inmates who are guaranteed private showers).

3    Deanna Adkins, M.D., a pediatric endocrinologist at Duke University and expert for the plaintiff, explained this condition in her report along with the following medical conditions that lead to intersex development: Complete Androgen Insensitivity, Klinefelter Syndrome, Turner Syndrome, Mosaic Turner Syndrome, congenital adrenal hyperplasia, and cloacal exstrophy.

4    InterACT is an intersex advocacy organization.

1    The district court awarded Drew the same damages for both the equal protection claim and the Title IX claim, noting that the injuries arising out of these violations were "identical" and specifying that he was not entitled to double recovery. *See* D.E. 192 at 68 n.58. As an affirmance on the equal protection claim is sufficient to uphold the judgment, I do not address the Title IX claim.

2    The School Board has also instituted a policy creating a column on the "official student data panel" for "affirmed name." D.E. 161 at 112. This affirmed column "populates [the school's] grade book, ... BASIS, which is [the school's] information center, ... another database called Virtual Counselor, so that ... child's affirmed name is changed on all those databases." *Id.* at 113. The purpose of the affirmed name column is to inform teachers of a student's preferred name when it may be different from the student's legal name. *See id.* Though Drew did not change his name, this affirmed column shows that the School Board could easily

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

go back into its databases and records to update information that is outdated and/or may be contrary to a student's gender identity.

1    As Judge Jordan notes, *see* Jordan Dissent at —— n.1, the district court awarded Drew the same damages on both his equal-protection and Title IX claims because it found that the injuries arising out of these violations were "identical" and Adams was not entitled to double damages. *See* D.E. 192 at 68 n.58. Because affirming on Adams's equal-protection claim is enough to uphold the judgment, I do not address the Title IX claim.

2    I note that Judge Lagoa's special concurrence limits itself to the Title IX analysis and does not discuss the equal-protection analysis. For good reason. For the reasons I explain in this dissent, none of the arguments Judge Lagoa asserts in her special concurrence have any application in the equal-protection context. Judge Lagoa's concurrence, which singles out the Title IX analysis for attack, implicitly concedes that its reasoning does not apply in the equal-protection context. That is so because, as I explain, equal-protection analysis has a limiting principle—the factual record. So affirming the district court's equal-protection conclusion here would not require courts in this Circuit to find that all challenges involving restrooms, locker rooms, and changing facilities (and sports) must be upheld.

3    Of course, even if this were correct—and it's not, as I explain above—it would not be an acceptable reason to avoid doing what the Equal Protection Clause requires.

1    "Doc." refers to docket entries in the district court record.

2    The record treats the terms "sex" and "gender" as synonymous and interchangeable. Although the terms "sex" and "gender" may refer to distinct, if interconnected, concepts, I am confined to the record, where the terms are used synonymously.

3    The School Board did not define "biological sex." It contextualized the term by using words like "physiological" or "anatomical" sex, but it did not explain what it meant by those words, either. Appellant's En Banc Br. at 8. The district court found that "biological sex" as used in the bathroom policy meant birth-assigned sex. Doc. 192 at 19. And at oral argument, the School Board confirmed that, for purposes of the policy, "biological sex" meant birth-assigned sex. In using the term "biological sex," then, the School Board refers to only one biological characteristic—a child's "external genitalia" which "has historically been used to determine gender for purposes of recording a birth as male or female." *Id.* at 6.

4    Other unrebutted evidence made clear that the biological markers of sex "may not be in line with each other (e.g., a person with XY chromosomes may have female-appearing genitalia)." Doc. 151-4 at 7; *see also* Wilson Dissenting Op. at —— – —— (describing examples of divergent sex components in intersex people).

5    The acronym "LGBTQ" refers to: "lesbian, gay, bisexual, transgender, and questioning (and/or queer)." Doc. 192 at 13 n.19.

6    It is unclear whether the taskforce was aware of the policy at Aberli's school specifically when it conducted its review. The record supports, however, that the taskforce reviewed BCPS's policy and other similar policies allowing transgender students to use the restrooms corresponding to their gender identities.

7    The term "gender fluid" likely carries a more nuanced meaning that the district court's definition, but I am confined to the way in which the term is used in the record.

8    As part of its fact-finding, the district court went onsite to examine the bathrooms at Nease High School. The court found "[t]here are four sets of multi-stall, sex-segregated bathrooms available" to Nease students. Doc. 192 at 23. The boys' restrooms have both urinals and stalls with doors. In addition, Nease has 11 gender-neutral single-stall bathrooms which are open to any student or staff member. There is no gender-neutral

bathroom near the cafeteria; a student who wishes to use a gender-neutral bathroom during lunch must ask permission to leave that area.

9    Neither the School District nor the majority opinion even argues that any of the district court's findings of fact are clearly erroneous—they both simply ignore them.

10   The School District argues that Adams is not similarly situated to "a biological male" because he is "a biological female." *See* En Banc Reply Br. at 6–7. Without outright agreeing, the majority opinion expresses doubt that Adams is similarly situated to "biological boys" in the School District for purposes of its bathroom policy, apparently because Adams—unlike the "biological boys" under the policy—was not assigned male at birth. Majority Op. at ––––– – ––––– n.6. By seeking to compare Adams's treatment under the policy to that of "biological girls," rather than to that of cisgender boys, the School District (and in turn the majority opinion) reveals its own bias: "it believes that [Adams's] gender identity is a choice, and it privileges sex-assigned-at-birth over [his] medically confirmed, [biologically rooted,] persistent and consistent gender identity." 🚩*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020). "The overwhelming thrust of everything in the record ... is that [Adams] was similarly situated to other [cisgender] boys, but was excluded from using the boys restroom facilities based on his sex-assigned-at-birth." 🚩*Id.* "Adopting the [School District's] framing of [Adams's] equal protection claim here would only vindicate [its] own misconceptions, which themselves reflect stereotypic notions." 🚩*Id.* (internal quotation marks omitted).

And, once again, the majority opinion's reference to Supreme Court cases addressing the physical differences between men and women misses the point: those cases do not define what it means to be a man or a woman, so they do not demonstrate that "biological sex" as the majority opinion sees that term—sex assigned at birth, or sex assigned at birth and chromosomal structure—was the "driving force behind" the Court's sex-discrimination jurisprudence. Maj. Op. at ––––– n.6. We are in new territory here, despite the majority opinion's refusal to explore it.

11   There is no dispute that the School Board is a state actor for the purposes of this lawsuit.

12   Because the policy facially discriminates against transgender students, we do not need to discuss discriminatory intent. Only when a law is neutral on its face but has a discriminatory impact does a plaintiff have to demonstrate discriminatory intent behind the policy or law. *See generally* 🚩*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

13   Adams argues that heightened scrutiny applies because: (1) the policy cannot be stated without referencing sex-based classifications; (2) the bathroom policy excludes him on the basis of sex; (3) the bathroom policy relies on impermissible stereotypes; (4) the policy creates two classes of transgender students; (5) transgender individuals constitute a quasi-suspect class; (6) even if the policy is not facially discriminatory, it deliberately targets and disparately impacts transgender individuals.

14   The majority opinion and the School District contend that heightened scrutiny applies simply because the bathroom policy separates the two sexes.

15   The majority says it does not address the quasi-suspect-class issue because the district court did not do so. Maj. Op. at ––––– – ––––– n.5. But we can affirm the district court's decision that the Board's policy violates the Equal Protection Clause on any basis supported by the record. *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008).

16   This exhibit comes from an organization called the American Psychiatric Association. It is a three-page document called "Position Statement on Discrimination Against Transgender and Gender Variant Individuals."

Doc. 115-10. The district court took judicial notice of this exhibit and others at Docket Entry 115 cited in this paragraph to the extent the court "relied on the materials." Doc. 192 at 13 n.19.

17    This exhibit is also from the American Psychological Association. It is a five-page document captioned "Transgender, Gender Identity, and Gender Expression Non-Discrimination." Doc. 115-12 at 2.

18    The district court took judicial notice of this report. *See* Doc. 192 at 8 n.15.

19    This exhibit comes from an organization called the American Family Therapy Academy. It is a two-page document called "Statement on Transgender Students." Doc. 115-2.

20    The majority opinion expresses "grave doubt" that transgender individuals belong to a quasi-suspect class, noting that the Supreme Court has declined to designate individuals with intellectual disabilities as such. Maj. Op. at —— n.5 (internal quotation marks omitted). In declining to deem those with intellectual disabilities members of a quasi-suspect class, the Court emphasized "the distinctive legislative response, both national and state," demonstrating that "lawmakers have been addressing their difficulties in a manner that belies a continuing apathy or prejudice." *Cleburne*, 473 U.S. at 443, 105 S.Ct. 3249; *see id.* at 444, 105 S.Ct. 3249 (explaining that legislation had "singl[ed] out the [intellectually disabled] for special treatment" and that further legislative efforts to afford additional special treatment should be encouraged rather than potentially discouraged with the application of heightened scrutiny). This included remedial efforts in funding, hiring, government services, and education. *Id.* at 443, 105 S.Ct. 3249. This is not at all the case with transgender individuals. Instead of a nationwide effort to provide "special treatment" for members of this group, rampant discrimination continues largely unchecked. Indeed, legislation that has the effect of limiting the rights of transgender individuals has been introduced (and in some cases, enacted) by legislatures in this country. No precedent prevents us from concluding that transgender people are a quasi-suspect class.

21    I do not buy the majority opinion's characterization of the School District's bathroom policy as it applies to transgender students "an accommodation" under which they could use either of two restroom options. Maj. Op. at ——. In practice, the policy forced transgender students like Adams to use only the gender-neutral bathrooms.

22    The majority opinion points to the following stipulation as evidence of safety and privacy concerns:

> The parties stipulate that certain parents of students and students in the St. Johns County School District object to a policy or practice that would allow students to use a bathroom that matches their gender identity as opposed to their sex assigned at birth. These individuals believe that such a practice would violate the bodily privacy rights of students and raise privacy, safety and welfare concerns. Plaintiff submits this stipulation does not apply to himself or his parents.

Doc. 116 at 22 ¶ 3. The import of this stipulation is lost on me. What do the personal beliefs of "certain" individuals in the School District have to do with whether the policy actually furthers the asserted privacy and security interests or is instead founded on stereotypic biases and assumptions? *Id.* And even if the stipulation provided some support for the School District's policy, how does it get the District close to the "exceedingly persuasive" fit it is required to establish? *Nguyen*, 533 U.S. at 70, 121 S.Ct. 2053 (internal quotation marks omitted). It cannot and does not.

23    The majority opinion asserts that Adams, the appellee, waived this line of argument by failing to raise it in the district court or his opening brief to the panel. *See* Majority Op. at —— – —— & n.2. The majority opinion is mistaken. "Parties can most assuredly waive or forfeit positions and issues on appeal, but not individual arguments." *Hi-Tech Parm. Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018) (alteration

adopted) (internal quotation marks omitted). Adams did not waive this argument, but even if he had, we may affirm the district court on any basis supported by the record. *Wetherbee v. S. Co.*, 754 F.3d 901, 905 (11th Cir. 2014).

24    The majority opinion asserts that the School District is owed deference regarding how it chooses to manage the student population. That may be true in appropriate contexts, but no tenet of constitutional law provides that children "shed their constitutional rights ... at the schoolhouse gate." 🚩 *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). None of the cases the majority opinion cites provides for a doctrine of deference that would excuse a violation of a student's equal protection rights.

25    I therefore have no reason to address the majority opinion's Spending Clause argument. The Spending Clause cannon of construction arguably comes into play only if we find ourselves dealing with an ambiguous statute. *See generally* 🚩 *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

26    So, the majority is simply wrong when it asserts that my reading of Title IX would result in "dual protection ... based on both sex and gender identity." Maj. Op. at —— (emphasis omitted). On this record, we can discern that gender identity is one of the components of a person's sex, so protection based on gender identity *is* protection based on sex.

27    Again, and importantly, the Court in 🚩 *Bostock* merely *assumed* that "sex" did not include gender identity. 🚩 *Bostock*, 140 S. Ct. at 1739.

28    In a special concurrence, Judge Lagoa writes that permitting "sex" under Title IX to include gender identity would require that institutions allow transgender girls to participate in girls' sports. She worries that such integration threatens to undermine the progress girls and women have made via participation in Title IX programs. *See* Lagoa Concurring Op. at ——. But there is no empirical data supporting the fear that transgender girls' participation in girls' sports in any way undermines the experience and benefits of sports to cisgender girls. The fact that there may be biological differences between transgender and cisgender girls does not mean that transgender girls will so overwhelm girls' sports programs with competitive advantages as to undermine the value of girls' sports for cisgender girls. For one thing, there will never be many transgender girls who participate in girls' sports, considering the very low percentage of the population identifying as transgender, only some of whom identify as girls and many of whom will not compete in sports. *See* Jody L. Herman et al., UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://williamsinstitute.law.ucla.edu/ publications/trans-adultsunited-states (last accessed Dec. 28, 2022) (estimating that less than 1.5% of the youth population identifies as transgender). For another, an abundance of biological differences has always existed among cisgender girls and women, who compete against one another despite some having distinct biological advantages over others. *See, e.g.*, Canadian Center for Ethics in Sport E-Alliance, *Transgender Women Athletes and Elite Sport: A Scientific Review* at 18–30 (2022), https://www.transathlete.com/_files/ ugd/2bc3fc_428201144e8c4a5595fc748ff8190104.pdf ("E-Alliance Review") (last accessed Dec. 28, 2022) (analyzing biological factors affecting trans- and cis- women athletes' participation in high performance sports and concluding that there is no compelling evidence, with or without testosterone suppression, of performance benefits that can be traced directly to transgender status). Indeed, something as simple as being left-handed may offer a significant competitive advantage in some sports, and yet we do not handicap or ban left-handed girls in Title IX-funded programs. *See* Steph Yin, *Do Lefties Have an Advantage in Sports? It Depends*, https://www.nytimes.com/2017/11/21/science/lefties-sports-advantage.html (last accessed Dec. 28, 2022). Plus, to adopt Judge Lagoa's concerns is to deny the myriad ways in which transgender girls and women are

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*disadvantaged* in athletics, further casting doubt on any fears that transgender athletes will overwhelmingly dominate, and somehow spoil, girls' sports. *See* E-Alliance Review at 36–38.

What is more, Judge Lagoa's concurrence fails to acknowledge the value that inclusion of transgender girls may have on girls' sports, both to trans- *and* cisgender girls. It is well documented that the primary beneficiaries of Title IX have been white girls from socioeconomically-advantaged backgrounds. Alanis Thames, *Equity in Sports has Focused on Gender, Not Race. So Gaps Persist*, https://www.nytimes.com/2022/06/30/sports/title-ix-race.html (last accessed Dec. 28, 2022). Integration into girls' sports of girls, including transgender girls, who may have gone without such historical privileges, undoubtedly would benefit the whole of girls' sports.

29   And no, my reading does not "swallow the carve-outs and render them meaningless." Maj. Op. at —— n.7. Rather, my reading recognizes the limits to the carveouts—they cannot provide carte blanche for educational institutions to set policies defining "sex" in a manner that discriminates against transgender students like Adams. This is why the majority opinion's hypothetical of "a biological female student, who does not identify as transgender and who sued her school under Title IX to gain access to the male bathroom," Maj. Op. at ——, is unenlightening. The majority is of course correct that "preventing the female student from using the male bathroom would constitute separation on the basis of sex." *Id.* But the majority's hypothetical case —where all biological markers of the female student point to one sex—falls squarely within the carveouts, and this case—for all the reasons I have just explained—does not. The majority's hypothetical, based on its counterfactual assumption that sex is a single-factor label, is not a helpful analytical tool in this case.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.