2023 WL 111875
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia,
Charleston Division.

B. P. J., et al., Plaintiffs,
v.
WEST VIRGINIA STATE BOARD
OF EDUCATION, et al., Defendants.

CIVIL ACTION NO. 2:21-cv-00316
|
Signed January 5, 2023

**Attorneys and Law Firms**

Andrew D. Barr, Pro Hac Vice, Cooley, Denver, CO, Aubrey Sparks, Our Future West Virginia, Charleston, WV, Nicholas Ward, Loree Beth Stark, American Civil Liberties Union of West Virginia Foundation, Charleston, WV, Avatara Antoinette Smith-Carrington, Pro Hac Vice, Lambda Legal Defense and Education Fund, Washington, DC, Carl S. Charles, Decatur, GA, Tara L. Borelli, Lamda Legal Defense and Education Fund, Decatur, GA, Elizabeth Reinhardt, Pro Hac Vice, Cooley, Boston, MA, Joshua A. Block, Pro Hac Vice, Meredith Taylor Brown, Pro Hac Vice, American Civil Liberties Union, New York, NY, Valeria M. Pelet del Toro, Pro Hac Vice, Katelyn Kang, Pro Hac Vice, Cooley, New York, NY, Sruti J. Swaminathan, Pro Hac Vice, Lambda Legal Defense and Education Fund, New York, NY, Julie Veroff, Pro Hac Vice, Kathleen R. Hartnett, Pro Hac Vice, Zoe Helstrom, Pro Hac Vice, Cooley, San Francisco, CA, for Plaintiffs.

Kelly C. Morgan, Kristen Vickers Hammond, Michael W. Taylor, Bailey & Wyant, Charleston, WV, for Defendants West Virginia State Board of Education, W. Clayton Burch.

Susan L. Deniker, Jeffrey Mark Cropp, Steptoe & Johnson, Bridgeport, WV, for Defendants Harrison County Board of Education, Dora Stutler.

Anthony E. Nortz, Kimberly M. Bandy, Roberta F. Green, Shuman McCuskey & Slicer, Charleston, WV, Shannon Marlowe Rogers, Miller & Amos, Charleston, WV, for Defendant West Virginia Secondary School Activities Commission.

**MEMORANDUM OPINION AND ORDER**

JOSEPH R. GOODWIN, UNITED STATES DISTRICT JUDGE

\*1 West Virginia passed a law that defines "girl" and "woman," for the purpose of secondary school sports, as biologically female. Under the law, all biological males, including those who identify as transgender girls, are ineligible for participation on girls' sports teams. B.P.J., a transgender girl who wants to play girls' sports, challenges the law. The question before the court is whether the legislature's chosen definition of "girl" and "woman" in this context is constitutionally permissible. I find that it is.

**I. Relevant Facts**

**A. B.P.J.**

B.P.J. is an eleven-year-old transgender girl. This means that although B.P.J.'s biological sex is male, she now identifies and lives as a girl. According to her First Amended Complaint, B.P.J. began expressing her female gender identity when she was three years old. [ECF No. 285-2]. By the end of third grade, B.P.J. expressed herself fully—both at home and otherwise—as a girl. In 2019, B.P.J. was diagnosed with gender dysphoria and, at the first signs of puberty, she began taking puberty blocking medications to treat that condition. [ECF No. 289-21]. As a result, B.P.J. has not undergone endogenous male puberty.

In 2021, as she prepared to enter middle school, B.P.J. expressed interest in trying out for the girls' cross-country and track teams. When her mother, Plaintiff Heather Jackson, asked the school to allow B.P.J. to participate on the girls' teams, the school initially informed her that whether B.P.J. would be permitted to play on the girls' teams depended on the outcome of House Bill ("H.B.") 3293, which was then pending in the West Virginia legislature. When the law passed, the school informed Ms. Jackson that B.P.J. would not be permitted to try out for the girls' teams.

**B. The "Save Women's Sports Bill"**

H.B. 3293, entitled the "Save Women's Sports Bill," was introduced in the West Virginia House of Delegates on March 18, 2021. The bill passed and was codified as 🚩West Virginia Code Section 18-2-25d, entitled "Clarifying

participation for sports events to be based on biological sex of the athlete at birth." The law, which was clearly carefully crafted with litigation such as this in mind, begins with the following legislative findings:

(1) There are inherent differences between biological males and females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in *United States v. Virginia* [518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735] (1996);

(2) These inherent differences are not a valid justification for sex-based classifications that make overbroad generalizations or perpetuate the legal, social, and economic inferiority of either sex. Rather, these inherent differences are a valid justification for sex-based classifications when they realistically reflect the fact that the sexes are not similarly situated in certain circumstances, as recognized by the Supreme Court of the United States in *Michael M. v. Sonoma County, Superior Court* (1981) and the Supreme Court of Appeals of West Virginia in *Israel v. Secondary Schools Act. Com'n* (1989);

**\*2** (3) In the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated. Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females, as recognized in *Clark v. Ariz. Interscholastic Ass'n* (9th Cir. 1982);

(4) Although necessarily related, as concluded by the United States Supreme Court in *Bostock v. Clayton County* [––– U.S. ––––, 140 S.Ct. 1731, 207 L.Ed.2d 218] (2020), gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex; and

(5) Classifications of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex.

W. Va. Code § 18-2-25d(a)(1)–(5).

After making these findings, the law sets forth definitions of "biological sex," "female," and male" as follows:

(1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

(2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.

(3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

*Id.* § 18-2-25d(b)(1)–(3).

Finally, the law requires that each athletic team that is "sponsored by any public secondary school or a state institution of higher education" "be expressly designated as" either male, female, or coed, "based on biological sex." *Id.* § 18-2-25d(c). Teams that are designated "female" "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 18-2-25d(c)(2).

### C. Procedural History

On May 26, 2021, B.P.J., through her mother, filed this lawsuit against the West Virginia State Board of Education and its then-Superintendent W. Clayton Burch, the Harrison County Board of Education and its Superintendent Dora Stutler, and the West Virginia Secondary Schools Activities Commission ("WVSSAC"). The State of West Virginia moved to intervene, and that motion was granted. Plaintiff then amended her complaint, [ECF No. 64], naming the State of West Virginia and Attorney General Patrick Morrisey as defendants. Mr. Morrisey has since been dismissed as a party from this lawsuit.

In her amended complaint, B.P.J. alleges that Defendants Burch, Stutler, and the WVSSAC deprived her of the equal protection guaranteed to her by the Fourteenth Amendment and that the State, the State Board of Education, the Harrison County Board of Education, and the WVSSAC have violated Title IX. B.P.J. seeks a declaratory judgment that Section 18-2-25d of the West Virginia Code violates Title IX and the Equal Protection Clause; an injunction preventing Defendants from enforcing the law against her; a waiver of

the requirement of a surety bond for preliminary injunctive relief; nominal damages; and reasonable attorneys' fees.

B.P.J. initially requested a preliminary injunction to allow her to compete on the girls' track and cross-country teams during the pendency of this case. Finding that B.P.J. had a likelihood of success on the merits of her as-applied challenge to the law, I granted the preliminary injunction. All defendants moved to dismiss, and those motions were denied. Lainey Armistead, a cisgender [1] female college athlete then moved to intervene as a defendant and that motion was granted. All parties have now moved for summary judgment.

## II. Legal Standard

*3 Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A).

## III. Analysis

B.P.J. alleges that H.B. 3293 violates the Constitution's Equal Protection Clause and Title IX. I will address each argument in turn. Before turning to the merits of those arguments, however, I find it important to address some preliminary matters.

### A. The WVSSAC's Motion

The WVSSAC does not argue the merits of Plaintiff's Equal Protection or Title IX claims. Rather, the WVSSAC only argues that it is not a state actor and is therefore not subject to scrutiny under either the Equal Protection Clause or Title IX. I disagree. Defendant WVSSAC's motion [ECF No. 276] is **DENIED**.

A court may only apply equal protection scrutiny to state action. U.S. Const. amend. XIV, § 1, cl. 4.; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 923–24, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Likewise, only a party acting under the color of state law is subject to suit pursuant to 42 U.S.C. § 1983. Despite differing terms, the color-of-law requirement in a § 1983 claim and the state action requirement under the Fourteenth Amendment are synonymous and are analyzed the same way. *See Lugar*, 457 U.S. at 923–24, 102 S.Ct. 2744; *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

"[T]he character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 931, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)). For example, an ostensibly private actor can become a state actor when it is "controlled by an 'agency of the State,' " or "entwined with governmental policies[,]" or the government is "entwined in [its] management or control." *Pennsylvania v. Bd. of Dir. of City Trs. of Phila.*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). There is, however, no rigid test to determine when a challenged action becomes a state action. *Brentwood Acad.*, 531 U.S. at 295, 121 S.Ct. 924. No single fact nor set of conditions will definitively confer state action because there may be a better "countervailing reason against attributing activity to the government." *Id.* at 295–96, 121 S.Ct. 924. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Lugar*, 457 U.S. at 939, 102 S.Ct. 2744 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 860, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022) ("[T]he inquiry is highly fact-specific in nature.").

After considering its composition, rulemaking process, obligations under state law, and other rules for student eligibility, I find the WVSSAC is a state actor. Like in *Brentwood Acad.*, the WVSSAC's nominally private character "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." 531 U.S. at 298, 121 S.Ct. 924. I find that the WVSSAC is a state actor for several reasons. Though county boards of education have the statutory authority to supervise and

control interscholastic athletic events, they have delegated that authority to the WVSSAC. [ECF No. 285-1]. Every public secondary school in West Virginia is a member of the WVSSAC, and the school principals sit on the WVSSAC's Board of Control to propose and vote on sports rules and regulations. *Id.* Any rule the WVSSAC passes is then subject to approval by the State Board of Education, and the State Board of Education requires that any coach who is not also a teacher be trained by the WVSSAC and certified by the State Board of Education. *Id.* And the WVSSAC Board of Directors—the entity that enforces the rules—includes representatives of the State Superintendent and the State Board of Education, among other governmental entities. *Id.*; 127 C.S.R. § 127-1-8.2. Here, it appears that the WVSSAC cannot exist without the state, and the state cannot manage statewide secondary school activities without the WVSSAC. The WVSSAC is pervasively entwined with the state.

**\*4** The WVSSAC's motion for summary judgment [ECF No. 276] is therefore **DENIED**.

### B. Animus

In her Amended Complaint, B.P.J. alleges that H.B. 3293 was introduced in the legislature "as part of a concerted, nationwide effort to target transgender youth for unequal treatment." [ECF No. 64, ¶ 45]. B.P.J. alleges that the law was "targeted at, and intended only to affect, girls who are transgender." *Id.* ¶ 46. In support of these contentions, B.P.J. points to the actions of bill co-sponsor Delegate Jordan Bridges. According to the Amended Complaint, Delegate Bridges made a Facebook post announcing the introduction of the bill and then " 'liked' comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term." *Id.* ¶ 47. In her summary judgment motion, B.P.J. again points the court to the actions of Delegate Bridges and points to several instances where legislators made clear that the purpose of the bill was to address transgender participation in sports.

Notwithstanding these statements, B.P.J. does not argue that the law is unconstitutional under the Supreme Court's animus doctrine, and the record lacks sufficient legislative history to make such a finding. The record makes abundantly clear, however, that West Virginia had no "problem" with transgender students playing school sports and creating unfair competition or unsafe conditions. In fact, at the time it passed the law, West Virginia had no known instance of any transgender person playing school sports. While the legislature did take note of transgender students playing sports in other states, it is obvious to me that the statute is at best a solution to a potential, but not yet realized, "problem."

Even so, the law is only unconstitutional under the animus doctrine if the reason for its passage was the "bare desire" to harm transgender people. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). While the record before me does reveal that at least one legislator held or implicitly supported private bias against, or moral disapproval of, transgender individuals, it does not contain evidence of that type of animus more broadly throughout the state legislature. Therefore, I cannot find unconstitutional animus on the record before me.

### C. Other Matters

Next, before proceeding to the merits of the case, I find it important to briefly discuss what this case is *not*.

First, despite the politically charged nature of transgender acceptance in our culture today, this case is *not* one where the court needs to accept or approve B.P.J.'s existence as a transgender girl. B.P.J., like all transgender people, deserves respect and the ability to live free from judgment and hatred for simply being who she is. But for the state legislature, creating a "solution" in search of a problem, the courts would have no reason to consider eligibility rules for youth athletics. Nevertheless, I must do so now.

This is also *not* a case where B.P.J. challenges the entire structure of school sports. B.P.J. does not challenge, on a broad basis, sex-separation in sports. B.P.J. wants to play on a girls' team. And she admits that there are benefits associated with school athletics, "including when such athletics are provided in a sex-separated manner." [ECF No. 286-1, at 1445]. Ultimately, B.P.J.'s issue here is not with the state's offering of girls' sports and boys' sports. It is with the state's definitions of "girl" and "boy." The state has determined that for purposes of school sports, the definition of "girl" should be "biologically female," based on physical differences between the sexes. And the state argues that its definition is appropriate here because it is substantially related to an important government interest. B.P.J., for her part, seeks a legal declaration that a transgender girl is "female."

**\*5** I will not get into the business of defining what it means to be a "girl" or "woman." The courts have no business creating such definitions, and I would be hard-pressed to find many other contexts where one's sex and gender are relevant legislative considerations. But I am forced to consider whether the state's chosen definition passes constitutional muster in this one discrete context.

### D. Equal Protection

Having addressed those matters, I now turn to the merits of B.P.J.'s claim that H.B. 3293 violates the Constitution's Equal Protection Clause.

### 1. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment provides that no state may deny any person within its jurisdiction "equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. In other words, "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Realistically, though, every law impacts people differently, and the Fourteenth Amendment does not prohibit that outcome. *Reed v. Reed*, 404 U.S. 71, 75, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). But the Equal Protection Clause does forbid a statute from placing people into different classes and treating them unequally for reasons "wholly unrelated to the objective of that statute." *Id.* at 75–76, 92 S.Ct. 251. Ultimately, if a law seeks to treat different groups of people differently, it must do so "upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.* at 76, 92 S.Ct. 251 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

In general, courts presume that a law is constitutional. Based on that presumption, courts may only overturn a law if the challenger can show that the law's classification is not rationally related to *any* government interest. *Moreno*, 413 U.S. at 533, 93 S.Ct. 2821. This general review is known as rational basis review. However, the court's inquiry becomes more searching if the law disadvantages a group of people who have historically been discriminated against and whose identity has nothing to do with their ability to participate in society. Race-based laws, for example, are "immediately suspect" because "they threaten to stigmatize individuals by reason of their membership in a racial group." *Shaw v. Reno*, 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Laws based on race, or other suspect classifications such as alienage and national origin, are subject to strict scrutiny and will only be upheld "upon an extraordinary justification." *Id.* at 643–44, 113 S.Ct. 2816 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). Under strict scrutiny, the law must be "narrowly tailored to serve a compelling governmental interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249.

In the middle of rational basis review and strict scrutiny lies intermediate scrutiny. Intermediate scrutiny applies to laws that discriminate on the basis of a quasi-suspect classification, like sex, *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), and transgender status, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, ––– U.S. ––––, 141 S. Ct. 2878, 210 L.Ed.2d 977 (2021) ("Engaging with the suspect class test, it is apparent that transgender persons constitute a quasi-suspect class."). Sex discrimination receives intermediate scrutiny because while states have historically used sex as a basis for invidious discrimination, we recognize that there are some "real differences" between males and females that could legitimately form the basis for different treatment. *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264.

**\*6** The Supreme Court has long "viewed with suspicion laws that rely on 'overbroad generalizations about the different talents, capacities, or preferences of males and females.' " *Sessions v. Morales-Santana*, ––– U.S. ––––, 137 S. Ct. 1678, 1692, 198 L.Ed.2d 150 (2017) (quoting *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264). Therefore, laws that discriminate based on sex must be backed by an "exceedingly persuasive justification." *Virginia*, 518 U.S. at 531, 116 S.Ct. 2264. That is to say, the law's proponents must show that it "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss.*

*Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). Even if the law's objective is to protect the members of one sex, that "objective itself is illegitimate" if it relies on "fixed notions concerning [that sex's] roles and abilities." *Morales-Santana*, 137 S. Ct. at 1692.

The party defending the statute must "present[ ] sufficient probative evidence in support of its stated rationale for enacting a [sex] preference, i.e., ... the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997)); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) ("[T]he gender-based measures ... [must be] based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.' " (quoting *Miss. Univ. for Women*, 458 U.S. at 726, 102 S.Ct. 3331)).

**2. Discussion**

There is no debate that intermediate scrutiny applies to the law at issue here—H.B. 3293 plainly separates student athletes based on sex. And even B.P.J. agrees that the state has an important interest in providing equal athletic opportunities for female students. [ECF No. 291, at 24]. As discussed earlier, B.P.J. does not challenge sex-separation in sports on a broad basis; she does not argue that teams should be separated based on some other factor or not separated at all. Rather, B.P.J. recognizes the benefits of sex-separated athletics and takes issue only with the state's definitions of "girl" and "woman" as based on biological sex.

B.P.J. argues that "H.B. 3293 excludes students from sports teams based on 'biological sex' and defines 'biological sex' solely in terms of 'reproductive biology and genetics at birth.' " *Id.* at 19. According to B.P.J., H.B. 3293 uses this " 'ends-driven definition[ ] of "biological sex" ' " to 'guarantee a particular outcome': Barring girls who are transgender from qualifying as girls for purposes of school sports and thereby categorically excluding them from girls' teams and therefore from school sports altogether." *Id.* (quoting *Grimm*, 972 F.3d at 626 (Wynn, J., concurring)). B.P.J. argues that this definition of "biological sex," and the related definitions of "girl" and "woman," are not substantially related to the government interest in providing equal athletic opportunities for females.

The State of West Virginia, the State Board defendants, the Harrison County defendants, and Intervenor Lainey Armistead all argue that the state's classification based on "biological sex" is substantially related to its important interest in providing equal athletic opportunities for females. The state points to a longstanding recognition in the courts that " '[p]hysical differences between men and women ... are enduring' and render 'the two sexes ... not fungible.' " [ECF No. 305, at 13–14 (quoting *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264)]. And the state argues that in order to preserve athletic opportunities for females, it is necessary to exclude biological males from female teams because males as a group have significant athletic advantage over females and thus the two groups are not similarly situated. [ECF No. 287, at 6–8].

**\*7** The record does make clear that, in passing this law, the legislature intended to prevent transgender girls from playing on girls' sports teams. In making that decision, the legislature considered an instance in Connecticut where two transgender girls ran on the girls' track team and won at least one event. Cisgender girls there sued, claiming the state's policy allowing the transgender girls to play on girls' teams violated Title IX. *Id.* at 5. But acting to prevent transgender girls, along with all other biological males, from playing on girls' teams is not unconstitutional if the classification is substantially related to an important government interest. The state's interest in providing equal athletic opportunity to females is not at issue here, and B.P.J. does not argue that sex-separate sports in general are not substantially related to that interest. Rather, B.P.J. argues that she and other transgender girls should be able to play on girls' teams despite their male sex, because their gender identity is "girl."

While sex and gender are related, they are not the same. *See e.g., PFLAG, PFLAG National Glossary of Terms* (June 2022), http://pflag.org/glossary (defining "biological sex" as the "anatomical, physiological, genetic, or physical attributes that determine if a person is male, female, or intersex ... includ[ing] both primary and secondary sex characteristics, including genitalia, gonads, hormone levels, hormone receptors, chromosomes, and genes" and explaining that "[b]iological sex is often conflated or interchanged with gender, which is more societal than biological, and involves personal identity factors"). It is beyond dispute that, barring

rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes. Gender, on the other hand, refers to "a set of socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate." *Id.* Gender identity, then, is "[a] person's deeply held core sense of self in relation to gender." *Id.* For most people, gender identity is in line with biological sex. *See* *Grimm*, 972 F.3d at 594. That is, most females identify as girls or women, and most males identify as boys or men. But gender is fluid. There are females who may prefer to dress in a style that is more typical of males (or vice versa), and there are males who may not enjoy what are considered typical male activities. These individuals may, however, still identify as the gender that aligns with their sex. Others may not. When one's gender identity is incongruent with their sex, that person is transgender. To be transgender, one must have a deeply held "consistent[ ], persistent[ ], and insistent[ ]" conviction that their gender is, "on a binary, ... opposite to their" biological sex. *Id.* I recognize that being transgender is natural and is not a choice. But one's sex is also natural, and it dictates physical characteristics that are relevant to athletics.

Whether a person has male or female sex chromosomes determines many of the physical characteristics relevant to athletic performance. Those with male chromosomes, regardless of their gender identity, naturally undergo male puberty, resulting in an increase in testosterone in the body. B.P.J. herself recognizes that "[t]here is a medical consensus that the largest known biological cause of average differences in athletic performance between [males and females] is circulating testosterone beginning with puberty." [ECF No. 291, at 28]. While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes. Given B.P.J.'s concession that circulating testosterone in males creates a biological difference in athletic performance, I do not see how I could find that the state's classification based on biological sex is not substantially related to its interest in providing equal athletic opportunities for females.

**\*8** In parts of her briefing, B.P.J. asks me to find that specifically excluding transgender girls from the definition of "girl" in this context is unconstitutional because transgender girls can take puberty blockers or other hormone therapies to mitigate any athletic advantage over cisgender females. B.P.J., for example, is biologically male, but she identifies as a girl. To express her gender identity, she goes by a traditionally feminine name, wears her hair long, uses female pronouns, and in all other respects lives as a girl. Before the first signs of puberty, B.P.J. made no other changes as a result of her transgender identity. But, once she started showing signs of male puberty, B.P.J. began taking puberty blocking medications, pausing the male puberty process. In that respect, B.P.J. argues that she has not gained the physical characteristics typical of males during and after puberty.

While this may be true for B.P.J., other transgender girls may not take those medications. They may not even come to realize or accept that they are transgender until after they have completed male puberty. Even if a transgender girl wanted to receive hormone therapy, she may have difficulty accessing those treatment options depending on her age and the state where she lives. And, as evidenced by the thousands of pages filed by the parties in this case, there is much debate over whether and to what extent hormone therapies after puberty can reduce a transgender girl's athletic advantage over cisgender girls. Additionally, of course, there is no requirement that a transgender person take any specific medications or undergo hormone therapy before or after puberty. A transgender person may choose to only transition socially, rather than medically. In other words, the social, medical, and physical transition of each transgender person is unique.

The fact is, however, that a transgender girl is biologically male and, barring medical intervention, would undergo male puberty like other biological males. And biological males generally outperform females athletically. The state is permitted to legislate sports rules on this basis because sex, and the physical characteristics that flow from it, are substantially related to athletic performance and fairness in sports.

Could the state be more inclusive and adopt a different policy, as B.P.J. suggests, which would allow transgender individuals to play on the team with which they, as an individual, are most similarly situated at a given time? Of course. But it is not for the court to impose such a requirement here. Sex-based classifications fall under intermediate scrutiny and therefore do not have a "narrowly-tailored" requirement. As intervenor, Lainey Armistead, points out, "[s]ome boys run slower than the average girl ... [and] [s]ome boys have circulating testosterone levels similar to the average girl because of medical conditions or medical interventions," but B.P.J. denies that the latter "would be similarly situated

[to cisgender girls] for purposes of Title IX and the Equal Protection Clause," and does not argue that they should be allowed to play on girls' teams. [ECF No. 288, at 17 (citing ECF No. 286-1, at 1473)]. This is inconsistent with her argument that the availability of hormone therapies makes transgender girls similarly situated to cisgender girls. In fact, after reviewing all of the evidence in the record, including B.P.J.'s telling responses to requests for admission, it appears that B.P.J. really argues that transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels.

The legislature's definition of "girl" as being based on "biological sex" is substantially related to the important government interest of providing equal athletic opportunities for females. B.P.J.'s motion for summary judgment on this basis is **DENIED**.

### E. Title IX

**\*9** Finally, I address B.P.J.'s claim that H.B. 3293 violates Title IX. B.P.J. brings this claim against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC.

#### 1. Legal Standard

Title IX provides that "no person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To succeed on a Title IX claim, a plaintiff must prove that she was (1) excluded from an educational program on the basis of sex; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that "improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). "In the Title IX context, discrimination 'mean[s] treating [an] individual worse than others who are similarly situated.' " *Id.* at 618 (quoting *Bostock v. Clayton Cnty.*, ––– U.S. ––––, 140 S. Ct. 1731, 1741, 207 L.Ed.2d 218 (2020)). Title IX permits sex-separate athletic teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

#### 2. Discussion

B.P.J. argues that H.B. 3293 violates Title IX because it excludes transgender girls from participation on girls' sports teams. B.P.J. argues that this amounts to complete exclusion from school sports altogether, and that it is discrimination because she and other transgender girls are similarly situated to cisgender girls. [ECF No. 291, at 17]. The state responds that the law does not violate Title IX because it does not exclude B.P.J. from school athletics. "To the contrary, it simply designates on which team [she] shall play." [ECF No. 287, at 22]. And, the County Defendants argue that Title IX authorizes sex separation in sports in the same scenarios outlined in H.B. 3293—"where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). All Defendants [2] argue that while it did not define the term, Title IX used "sex" in the biological sense because its purpose was to promote sex equality. Therefore, they argue that H.B. 3293 furthers, not violates, Title IX. I agree.

Title IX authorizes sex separate sports in the same manner as H.B. 3293, so long as overall athletic opportunities for each sex are equal. 34 C.F.R. § 106.41(b)–(c). As other courts that have considered Title IX have recognized, although the regulation "applies equally to boys as well as girls, it would require blinders to ignore that the motivation for the promulgation of the regulation" was to increase opportunities for women and girls in athletics. *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). There is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex. Nevertheless, B.P.J. argues that transgender girls are similarly situated to cisgender girls, and therefore their exclusion from girls' teams is unlawful discrimination. But as I have already discussed, transgender girls are biologically male. Short of any medical intervention that will differ for each individual person, biological males are not similarly situated to biological females for purposes of athletics. And, despite her repeated argument to the contrary, transgender girls are not excluded from school sports entirely. They are permitted to try out for boys' teams, regardless of how they express their gender.

**\*10** I do not find that H.B. 3293, which largely mirrors Title IX, violates Title IX. B.P.J.'s motion for summary judgment on this basis is **DENIED.**

### IV. Conclusion

I have no doubt that H.B. 3293 aimed to politicize participation in school athletics for transgender students. Nevertheless, there is not a sufficient record of legislative animus. Considering the law under the intermediate scrutiny standard, I find that it is substantially related to an important government interest. B.P.J.'s motion for summary judgment is **DENIED**. Defendant WVSSAC's motion for summary judgment [ECF No. 276] is **DENIED**. The motions for summary judgment filed by the State of West Virginia [ECF No. 285], the Harrison County defendants [ECF No. 278], the State Board defendants [ECF No. 283], and Intervenor Lainey Armistead [ECF No. 286] are **GRANTED** to the extent they argue that H.B. 3293 is constitutional and complies with Title IX. The preliminary injunction is **DISSOLVED**. All other pending motions are **DENIED as moot.**

### All Citations

--- F.Supp.3d ----, 2023 WL 111875

### Footnotes

1     "Cisgender" means a person whose gender identity aligns with her biological sex. *See* Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, ––– U.S. ––––, 141 S. Ct. 2878, 210 L.Ed.2d 977 (2021).

2     Excluding the WVSSAC.

**End of Document**     © 2023 Thomson Reuters. No claim to original U.S. Government Works.