# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| L.E., by his next friends and parents, SHELLEY ESQUIVEL and MARIO ESQUIVEL, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:21-cv-00835 |
| BILL LEE, et al., | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court are three Motions for Summary Judgment. The first Motion for Summary Judgment was filed by Defendants Knox County Board of Education and Superintendent Jon Rysewyk ("Knox County Defendants"). (Doc. No. 46). The second was filed by Defendants Governor Bill Lee, Tennessee Education Commissioner Lizzette Gonzalez Reynolds,[1] Executive Director of the Tennessee State Board of Education Sara Heyburn Morrison, members of the Tennessee State Board of Education, and the Tennessee State Board of Education ("State Defendants"). (Doc. No. 54). The third motion, filed by Plaintiff L.E., by his next friends and parents, Shelley and Mario Esquivel, seeks summary judgment against both groups of Defendants. (Doc. No. 50). When the motions were fully briefed and ripe for review, (Doc. Nos. 47, 48, 51–52, 55–56, 66–68, 74–76, 82), the Court administratively stayed the case pending the Sixth Circuit's decision in <u>L.W. ex rel. Williams v. Skrmetti</u>, 83 F.4th 460 (6th Cir. 2023). After the

---

[1] After the instant Motions were filed, then-Defendant Penny Schwinn resigned from her position as Tennessee Education Commissioner and was replaced by Lizzette Gonzalez Reynolds. Pursuant to Federal Rule of Civil Procedure 25(d), Reynolds was automatically substituted as a party. (<u>See</u> Doc. No. 89).

1

Sixth Circuit issued its decision, the Court ordered additional briefing, which has concluded. (Doc. Nos. 97, 101–102, 104–05).

For the following reasons, the Court will grant in part and deny in part the parties' Motions for Summary Judgment. (Doc. Nos. 46, 50, 54). L.E. will be permitted to try out for the boy's golf team at his high school.[2]

## UNDISPUTED FACTS

The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts,[3] the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.

Because this Memorandum Opinion addresses three sets of cross-motions, certain proposed undisputed facts bind one group of Defendants but not the other. State Defendants and Knox County Defendants did not respond uniformly to Plaintiff's proposed undisputed facts, nor did either group of Defendants respond to the other's proposed undisputed facts. However, Knox County Defendants adopted State Defendants' proposed undisputed facts in their Response in Opposition to Plaintiff's Motion for Summary Judgement (Doc. No. 82 at 6 (citing "deposition excerpts . . . filed in support of the State's Motion for Summary Judgment")), and State

---

[2] The Court will use L.E.'s preferred pronouns, despite Defendants' objection, because the Court extends this basic respect to every litigant. This also conforms with Supreme Court's practice when using pronouns to refer to transgender individuals. See Santos–Zacaria v. Garland, 598 U.S. 411, 414 (2023) (referring to a transgender woman as "she").

[3] The Court's Local Rules dictate that "[a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purposes of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." L.R. 56.01(c). To demonstrate a fact is disputed, a party must provide a "specific citation to the record." Id. Accordingly, responses not consistent with the forgoing are not credited.

Defendants' responses to Plaintiff encompass the material facts Knox County Defendants propose. (Compare Doc. No. 67; with Doc. No. 71).

**L.E. and his Transition**

L.E. is a transgender boy, (Doc. Nos. 64 ¶¶ 1, 4–5, 8–9; 71 ¶¶ 1, 4–5, 8–9), and a student at Farragut High School ("FHS"), a Knox County public high school in Knoxville, Tennessee. (Doc. Nos. 64 ¶¶ 2–3; 71 ¶¶ 2–3). L.E. feels that he has always been a boy, (Doc. Nos. 64 ¶ 10; 71 ¶ 10), and he has known this since the fifth grade. (Doc. No. 53-12 ¶ 3). In late 2019, when he was in the seventh grade, L.E. shared these feelings with his parents. (Doc. Nos. 64 ¶ 13; 71 ¶ 13).

Uncomfortable with being perceived or living as a girl, L.E. experienced anxiety due to the disjunction between his female sex assigned at birth and his male gender identity. (Doc. Nos. 64 ¶ 17; 71 ¶ 17). This anxiety worsened as he approached puberty. (Doc. Nos. 53-3 at 22:20–22; 64 ¶ 12; 71 ¶ 12). In 2020, he saw his pediatrician to discuss ways to address this extreme discomfort and to assist in his transition. (Doc. Nos. 64 ¶ 18; 71 ¶ 18). Following consultations with multiple doctors and a mental health therapist, L.E. was diagnosed with gender dysphoria[4] on January 28, 2021. (Doc. Nos. 64 ¶ 19; 71 ¶ 19).

As part of his treatment for gender dysphoria, L.E. has been permitted to socially transition, a process that he had already started. (Doc. Nos. 64 ¶ 20; 71 ¶ 20). As part of his social transition,

---

[4] The American Psychiatric Association's Diagnostic and Statistical Manual of Disorders, Fifth Edition ("DSM-V") recognizes that an incongruence between gender identity and sex assigned at birth (as manifested by at least six months of at least six criteria) can cause severe psychological distress, a condition that DSM-V refers to as "gender dysphoria in children." (Doc. Nos. 52-33 at 7; 64 ¶ 15; 71 ¶ 15). The Court notes that the State Defendants dispute L.E.'s definition of the condition, asserting that the DSM-V indicates the diagnosis also requires "clinically significant distress or impairment . . . in important areas of functioning such as social, school, or occupational settings." (Doc. No. 71 ¶ 15). The plain language of the DSM-V, which Plaintiff submitted as an exhibit to his pending Motion, establishes that the condition is "*associated* with clinically significant distress or impairment in social, school, or other important areas of functioning." (Doc. No. 52-33 at 7). The Court will follow the clear words in the DSM-V.

L.E. has legally changed his name from a traditionally feminine one to a traditionally masculine one, (Doc. Nos. 64 ¶ 22; 71 ¶ 22), uses male pronouns, (Doc. Nos. 64 ¶ 23; 71 ¶ 23), uses the boys' restrooms, (Doc. Nos. 64 ¶ 24; 71 ¶ 24), and dresses and grooms himself in traditionally masculine ways, (Doc. Nos. 64 ¶ 25; 71 ¶ 25). L.E.'s family, peers, and teachers all address and treat him as they would any other boy. (Doc. Nos. 64 ¶ 26; 71 ¶ 26). Although L.E. began his social transition before his formal diagnosis, much of his gender-dysphoria related anxiety has been significantly alleviated since he began living and being recognized as a boy. (Doc. Nos. 64 ¶ 27; 71 ¶ 27).

Since April 23, 2021, L.E. has received puberty-delaying medications that prevent the development of feminine features inconsistent with his gender identity. (Doc. Nos. 64 ¶¶ 28–29; 71 ¶¶ 28–29). L.E. also represented that he intended to meet with an endocrinologist to discuss testosterone treatments to induce puberty consistent with his gender identity. (Doc. Nos. 64 ¶ 30; 68 ¶ 22; 71 ¶ 30).

**Tennessee's System of Sex-Segregated Sports**

The Tennessee Secondary School Athletic Association ("TSSAA") and its affiliate entity, the Tennessee Middle School Athletic Association ("TMSAA"), oversee middle and high school athletics in Tennessee public schools, including Knox County Schools. (Doc. Nos. 64 ¶ 44–45; 71 ¶ 44–45). The TSSAA segregates certain interscholastic sports at the middle and high school levels based on the student-athlete's sex. (Doc. Nos. 64 ¶ 35; 71 ¶ 35). A few sports, such as football, are open to all students. (Doc. No. 53-30 at 32–39). Other sports, including girls' volleyball and girls' softball, are open only to girls. (Doc. Nos. 64 ¶ 36; 71 ¶ 36). A third category of sports are divided into boys' and girls' teams. (Doc. Nos. 64 ¶ 37; 71 ¶ 37). Golf—L.E.'s sport of choice—falls into this third category. (Doc. Nos. 64 ¶ 38; 71 ¶ 38).

Before the challenged bill was signed into law, TSSAA had a policy aimed at allowing "all students [to] have the opportunity to participate in TSSAA/TMSAA activities in a manner

4

consistent with their gender identity, irrespective of the gender listed on a student's records." (Doc. Nos. 53-32 at 2; 64 ¶ 46; 71 ¶ 46). Under the former policy, a transgender student-athlete and their school would complete the TSSAA/TSMAA Gender Identity Eligibility Process, which required them to submit specific documentation to the Executive Director of the TSSAA, who would then refer the case to the Gender Identity Eligibility Committee for consideration. (Doc. No. 53-32 at 1). In making its gender eligibility determination, this committee would consider: "[d]ocumentation . . . that the student's action, attitudes, dress, and manner demonstrate the student's consistent gender identification and expression;" "[d]ocumentation from the member school administration outlining specific accommodations that have been made for the student;" and "[w]ritten verification from an appropriate health care professional . . . of the student's consistent gender identification and expression." (Id. at 3).

**Gender in Athletics Law**

On February 8, 2021, Senate Bill 228 ("SB 228") was introduced in the Tennessee Senate. (Doc. Nos. 64 ¶ 48; 71 ¶ 48). In relevant part, SB 228 amends Tennessee Code Annotated, Title 49, Chapter 6, Part 3, (as amended, the "Gender in Athletics Law"), by adding the following sections:

> (a) A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate. If a birth certificate provided by a student pursuant to this subsection (a) does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth, then the student must provide other evidence indicating the student's sex at the time of birth. The student or the student's parents or guardian must pay any costs associated with providing the evidence required under this subsection (a).

> (b) The state board of education, each local board of education, and each governing body of a public charter school shall adopt and enforce policies to ensure

5

compliance with subsection (a) in the public schools governed by the respective entity.

(Doc. No. 53-24 at 1). SB 228 passed both chambers of the Tennessee Legislature and was signed into law by the Governor on March 26, 2021. (Doc. Nos. 64 ¶ 56; 71 ¶ 56). State Defendants have pointed to SB 228's prefatory clauses as "providing some governmental interests" furthered by the Gender in Athletics Law. (Doc. Nos. 64 ¶ 53; 71 ¶ 53). The prefatory clauses, which exclusively express interests in safety and anti-displacement in girls' sports, read as follows:

> girls who compete in interscholastic athletic activities strive to improve their performance in their particular field of competition in order to experience the personal satisfaction of victory, gain opportunities to participate in state and regional events, gain access to opportunities to be recruited and offered athletic scholarships by colleges, and more; and . . . it is unfortunate for some girls that those dreams, goals, and opportunities for participation, recruitment, and scholarships can be directly and negatively affected by new school policies permitting boys who are male in every biological respect to compete in girls' athletic competitions if they claim a female gender identity; and . . . allowing boys to compete in girls' athletic competitions discriminates against girls by regularly resulting in boys displacing girls in competitive events and excluding specific and identifiable girls from opportunities to compete at higher levels and from public recognition critical to college recruiting and scholarship opportunities that should go to those outstanding female athletes; and . . . studies show that boys, on average, can be physically stronger than girls, having more skeletal muscle mass than girls and more upper-body and lower-body strength, which can result in injury to girls if girls participate in contact sports with boys; and . . . interscholastic athletic programs in public schools should be conducted in a safe manner to promote continued participation and equal opportunities for all children, consistent with the rules and guidelines of an association that regulates interscholastic athletics.

(Doc. No. 53-24 at 1).

In January 2022, a follow-on bill to SB 228 called Senate Bill 1861 ("SB 1861") was introduced in the Tennessee Senate. (Doc. Nos. 64 ¶ 58; 71 ¶ 58). SB 1861, which amends the same chapter of the Tennessee Code Annotated as SB 228, requires the Commissioner of the Tennessee Department of Education to "withhold a portion of the state education finance funds" if a school district or other Local Education Area ("LEA") does not comply with the Gender in Athletics Law, unless required to do so by a court order or other legally binding prohibition. (Doc.

Nos. 64 ¶ 59; 71 ¶ 59). The Governor signed SB 1861 into law on April 22, 2022. (Doc. Nos. 64 ¶ 60; 71 ¶ 60). By July 1, 2022, SB 1861 was in effect. (Doc. Nos. 64 ¶ 61; 71 ¶ 61).

**State Defendants' Involvement After the Gender in Athletic Law's Passage**

The Tennessee State Board of Education ("SBOE") is primarily responsible for developing policies and rules affecting education in the State of Tennessee. (Doc. Nos. 64 ¶ 62; 71 ¶ 62). Among other powers, SBOE has primary policy- and rule-making authority over public schools and public-school districts in Tennessee. (Doc. Nos. 64 ¶ 63; 71 ¶ 63). SBOE's authority to set policies and rules for the Tennessee public education system extends to setting policies that the Tennessee Department of Education ("TDOE") must follow.[5] (Doc. Nos. 64 ¶ 64; 71 ¶ 64). The TDOE receives federal financial assistance, (Doc. Nos. 64 ¶ 66; 71 ¶ 66), and is the entity responsible for implementing statutes related to state education and rules promulgated by SBOE and for ensuring LEAs compliance. (Doc. Nos. 64 ¶¶ 65, 67; 71 ¶¶ 65, 67). LEAs are required to provide TDOE with reports signaling their compliance with state law, including the Gender in Athletics Law. (Doc. Nos. 64 ¶ 68; 71 ¶ 68).

When the parties briefed their Motions, SBOE was developing a rule (the "Funding Rule") that would implement the Gender in Athletics Law and SB 1861. (Doc. Nos. 64 ¶ 69; 71 ¶ 69). The Court takes judicial notice that this rule has been enacted. As enacted, the Funding Rule requires TDOE to withhold portions of "state education finance funds" from any LEA—including Knox County—not in compliance with the Gender in Athletics Law until they take the necessary "corrective action steps" within the specified timeline. See Rules of the State Board of Education, Chapter 0520-01-03 (effective May 25, 2023) (available at https://publications.tnsosfiles.com/rules/0520/0520-01/0520-01-23.20230525.pdf).

---

[5] State Defendants aver that this does not extend to policies or rules regarding how the TDOE spends federal dollars that they might receive. (Doc. No. 71 ¶ 64).

7

**Knox County Defendants' Involvement after the Gender in Athletics Law's Passage**

Day-to-day enforcement of the Gender in Athletics Law occurs primarily at the county level. (Doc. Nos. 64 ¶ 72; 71 ¶ 72). Education policies are set by the Knox County Board of Education[6] ("KCBOE"). Knox County Schools ("KCS") implement the policies enacted by KCBOE. (Doc. Nos. 64 ¶ 76; 67 ¶¶ 1–2; 71 ¶ 76). The chief executive of KCS is its Director of Schools and is also referred to as its "Superintendent." (Doc. Nos. 64 ¶ 77; 71 ¶ 77).

Following the Gender in Athletics Law's enactment, KCBOE revised its Interscholastic Athletics Policy ("I-171 Policy") in July 2021. (Doc. Nos. 64 ¶ 78; 67 ¶ 4; 71 ¶ 78). The revised I-171 Policy states that "a student's gender for purposes of participation in middle or high school athletics is determined by the student's sex at the time of the student's birth. A valid original birth certificate must be provided for this purpose." (Doc. Nos. 64 ¶ 79; 71 ¶ 79). Farragut High School is obligated to comply with the revised I-171 Policy. (Doc. Nos. 64 ¶ 80; 71 ¶ 80). Any failure to abide by the revised I-171 Policy would trigger an investigation, and ultimately, if KCS determined that a violation occurred, "there would be action taken" by KCS. (Doc. Nos. 64 ¶ 81; 71 ¶ 81). The revised I-171 Policy will remain in place unless affirmatively repealed, even if the Gender in Athletics Law itself is no longer operative. (Doc. Nos. 64 ¶ 82; 71 ¶ 82). In light of the Gender in Athletics Law and the revised I-171 Policy, the TSSAA policy that provided an avenue for students in Knox County to participate on interscholastic athletics teams consistent with their gender identity is no longer operative. (Doc. Nos. 64 ¶ 83; 71 ¶ 83).

**L.E.'s Desire to Play on FHS's Boys' Golf Team**

L.E. first played golf at a free clinic at a local course in the Knoxville area in the summer of 2018 and immediately began to "really, really love" the sport. (Doc. Nos. 64 ¶¶ 84–86; 71 ¶¶

---

[6] KCBOE receives federal funding, and its members are elected by the voting public of Knox County. (Doc. Nos. 64 ¶¶ 73–75; 67 ¶¶ 1–2; 71 ¶¶ 73–75).

84–86).  That same summer, L.E.'s parents bought him some golf clubs and golf shoes and placed him in lessons.  (Doc. Nos. 64 ¶¶ 88–89; 71 ¶¶ 88–89).  Over the next three years, L.E. took golf lessons from several instructors as often as weekly.  (Doc. Nos. 64 ¶ 89; 71 ¶ 89).  Now, L.E. plays golf with his father at various courses throughout the Knoxville area[7] and tries to go to the driving range a few times a month.  (Doc. Nos. 64 ¶¶ 90–91; 71 ¶¶ 90–91).

In seventh and eighth grade, before L.E. changed his name or began puberty suppression treatment, he played on the Farragut Middle School ("FMS") girls' golf team.  (Doc. Nos. 64 ¶ 92; 71 ¶ 92).  However, L.E. felt an overwhelming sense of discomfort playing on the FMS girl's golf team because he felt he was "a boy and it [was] awkward to be the only boy playing on a girls' golf team."  (Doc. Nos. 64 ¶ 93; 71 ¶ 93).  During his eighth-grade golf season, L.E. felt it was essential for him to play on the boys' team when he got to high school, and he has consistently expressed his desire to play on the FHS boys' golf team.  (Doc. Nos. 64 ¶ 94; 71 ¶ 94).  L.E. feels it is important to play on the boys' golf team at FHS because "[he is] a boy," and "he wants to be able to be who he is while also playing the sport he loves."  (Doc. Nos. 64 ¶ 95; 71 ¶ 95).  Before the passage of the Gender in Athletics Law, L.E. could have been deemed eligible to try out and play for the FHS boys' golf team.  (Doc. Nos. 64 ¶ 96; 71 ¶ 96).  Now that the Gender in Athletics Law and the revised I-171 Policy are effective, L.E. is barred from the boys' golf team.  (Doc. Nos. 64 ¶ 97; 71 ¶ 97).

If L.E. were a cisgender boy, he would at least be eligible to join the FHS boys' golf team—he would only need to succeed at tryouts.  (Doc. Nos. 64 ¶ 99; 71 ¶ 99).  Of course, not every

---

[7] When L.E. and his father play golf together, they primarily do so on par-three courses, which are typically only nine holes, and because they are par-three courses, the holes are typically shorter than the average hole on 18-hole golf course, which might also contain par-four and par-five holes. (Doc. No. 68 ¶ 3–4).  At his deposition, when asked to identify his last ten rounds of 18-hole golf played, L.E. could name five, only one of which was played that year.  (Id.  ¶ 5–6).

9

student who tries out for the team is guaranteed a spot. The Farragut High School boys' golf team is very competitive; it won the state championship tournament in 2020, and placed second in the 2021 state regional tournament, with its top four players scoring 75, 78, 78, and 80. (Doc. No. 68 ¶¶ 12–13). Players who try out for the FHS boys' golf team must shoot an average score of 90 or better for 18-walking holes over three rounds to make the team. (Id. ¶ 14). L.E. was not a top scorer on the Farragut Middle School girls' golf team and did not participate in the state or district meets. (Id. ¶ 7). He also generally does not keep track of his score when playing golf, nor has he ever calculated a handicap index. (Id. ¶¶ 1–2).

L.E. and his parents believe that the harm to L.E. of feeling "out of place" playing on the high school girls' team would "far outweigh the benefits that he would get from playing on a girls' . . . team." (Doc. Nos. 64 ¶ 100; 71 ¶ 100). Despite the joy playing golf brings him, L.E. has not played golf for a school team because he would only be permitted to play on the girls' team, which he does not feel he can do. (Doc. Nos. 64 ¶ 102; 71 ¶ 102). He has not tried out for the boys' golf team because he sees "no point" in doing so absent a change in the law. (Doc. Nos. 64 ¶ 103; 67 ¶ 13; 68 ¶ 8; 71 ¶ 103). Neither L.E., nor L.E.'s parents have spoken directly to the team's coach. (Doc. Nos. 67 ¶ 14; 68 ¶ 10). However, his mother has spoken to the principal of FHS about L.E.'s desire to try out for the boys' team. (Doc. Nos. 67 ¶ 14; 68 ¶ 10). After this suit was filed, Knox County Defendants offered L.E. an opportunity to try out for the FHS boys' golf team, an offer L.E. rejected as "meaningless" because even if otherwise successful, the Gender in Athletics Law and the revised I-171 Policy still would deny him the opportunity to join the team. (Doc. Nos. 64 ¶ 104; 68 ¶ 11; 71 ¶ 104).

**L.E.'s Challenge**

L.E. filed the instant action on November 11, 2021. (See generally Doc. No. 1). In his complaint, L.E. brings as-applied challenges to the Gender in Athletics Law and the revised I-171

Policy on two grounds: (1) deprivation of equal protection guaranteed under the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983 ("§ 1983"); and (2) violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). (<u>Id.</u> ¶¶ 89–108). He requests the Court declare that S.B. 228 and the revised I-171 Policy violate his rights under the Equal Protection Clause and Title IX; permanently enjoin all Defendants, their officials, agents, employees, assigns and all other persons acting in concert or participating with Defendants from enforcing the Gender in Athletics Law or any other law, custom, or policy to preclude his participation on boys' school sports teams in Tennessee; award him his costs, expenses, and reasonable attorneys' fees pursuant to U.S.C. § 1988 and other applicable laws; and grant any other relief the Court deems proper. (<u>Id.</u> at 28).

## LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. <u>Id.</u>

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the

matter.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party.  <u>Rodgers</u>, 344 F.3d at 595.

Moreover, if, "after adequate time for discovery and upon motion," the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  When this occurs, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323 (citation and internal quotation marks omitted).  Conclusory statements "unadorned with supporting facts are insufficient."  <u>Viet v. Le</u>, 951 F.3d 818, 823 (6th Cir. 2020).  Thus, if the nonmovant does not support the elements of a claim or defense, the moving party is entitled to judgment as a matter of law.

## ANALYSIS

## I.      **L.E. Has Standing.**

Defendants first argue that L.E. lacks standing to bring each of his claims.  Under Article III of the Constitution, a plaintiff must have standing to sue in federal court.  To do so, a plaintiff must show: (1) some concrete, particularized, and actual or imminent injury in fact; (2) that the defendants likely caused the injury; and (3) that judicial relief would likely redress the injury.  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992); <u>Hurst v. Caliber Home Loans, Inc.</u>, 44 F.4th 418, 423 (6th Cir. 2022).  This showing must be more than mere allegations; at summary judgment, he or she must "present enough evidence to create a genuine issue of material fact over each

12

standing element." Davis v. Colerain Twp., Ohio, 51 F.4th 164, 171 (6th Cir. 2022). The Court will address each element in turn.

### A.      Injury in Fact

*First*, Defendants contend that L.E. fails to demonstrate an injury in fact, meaning "an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). For an injury to be sufficiently distinct, or "particularized," it "must affect the plaintiff in a personal and individual way," Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016), apart from his mere "'special interest' in th[e] subject." Lujan, 504 U.S. at 563 (1992) (quoting Sierra Club v. Morton, 405 U.S. 727, 736 (1972)).

Specifically, Defendants argue that L.E. cannot establish that his exclusion from the boys' golf team constitutes an injury in fact because he has not brought forward specific evidence showing that he is a member of the class of people affected by the Gender in Athletics Law and the revised I-171 Policy. (Doc. Nos. 56 at 6; 82 at 5). According to Defendants, L.E. "must provide objective indicators showing that he is in a class of golfers who would otherwise have the requisite skill to play on the boys' golf team." (Doc. Nos. 56 at 6; 82 at 5).

Whether L.E. would make the boys' golf team is an open question. Farragut High School's boys golf team is, by all accounts, highly competitive. In recent years, the team has either closely competed for or won both regional and state-wide titles. (Doc. No. 68 ¶¶ 12–13). To make the team, L.E. would need to play three rounds of golf on an 18-hole course and finish with an average score of 90 or better. (Id. ¶ 14). Even then, there is no guarantee that L.E. would compete interscholastically. (Id. ¶ 18). But whether L.E. has demonstrated the requisite golfing acumen is immaterial. Though Defendants may insist L.E. prove that he would make the team, that is not the law.

13

As L.E. highlights, (see Doc. No. 66 at 3–4), the Supreme Court rejected this precise argument in Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656 (1993) (hereinafter "NFAGC").  There, the Supreme Court overturned the Court of Appeals' decision that a trade association lacked standing to bring an Equal Protection Clause challenge to a municipality's minority set-aside program "because it failed to allege that one or more of its members would have been awarded a contract but for the challenged ordinance."  Id. at 658, 664.  As the Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

Id. at 666.  Accordingly, to establish standing after NFAGC, a plaintiff "need only demonstrate that [he] is able and ready to [compete] and that a discriminatory policy prevents [him] from doing so on an equal basis."  Id.; see also Hile v. Michigan, 86 F.4th 269, 274 (6th Cir. 2023) (quoting NFAGC for the same proposition).

That standard is satisfied here.  L.E. need not show the actual denial of an independent right to make out an injury in fact.  Id.; see also Turner v. Fouche, 396 U.S. 346, 362–63 (1970) (finding that, although appellants had no right to be appointed to the board of education, the Equal Protection Clause guaranteed that the "State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees.").  He need only demonstrate that he is able and ready to compete and is barred from doing so on equal footing—that L.E. is ready and able to try out for the FHS boy's golf team and that the Gender in Athletics Law and the revised I-171 Policy create a barrier based upon his gender identity.

14

The undisputed record evidence makes both points clear. As a student at Farragut High School, L.E. may try out for its sports teams. But unlike L.E.'s cisgender male classmates who may earn a spot on the FHS boys' golf team so long as they meet the minimum skill requirements during tryouts (i.e. golfing an average of 90 or below on three rounds), (Doc. Nos. 64 ¶ 99; 71 ¶ 99; 68 ¶ 14), L.E. is categorically barred from the team no matter how well he performs. (Doc. Nos. 64 ¶ 97–99; 71 ¶ 97–99). His exclusion from the FHS boys' golf team can only be ascribed to the Gender in Athletics Law and the revised I-171 Policy because each provides that "a student's gender for purposes of participation in middle or high school athletics is determined by the student's sex at the time of the student's birth." (Doc. Nos. 64 ¶¶ 54, 79; 71 ¶¶ 54, 79). L.E. is forced to deny his gender identity or to live his true and authentic life without golf. As a result, L.E. has demonstrated an injury in fact—he is categorically denied the opportunity to "compete on an equal footing" with his cisgender peers.

Defendants argue in the alternative that L.E.'s "'profession of an intent' to try out without supporting evidence is simply not enough." (Doc. Nos. 56 at 7; 82 at 6). This attack, though not explicitly framed as such, confronts whether L.E. has offered sufficient evidence to prove that his alleged injuries are "actual or imminent." Defendants aver that L.E. has failed to make the requisite showing in light of four facts: (1) that L.E. and L.E.'s parents are unaware of the dates of the tryouts; (2) that L.E. has not exhibited a training regimen commensurate with the level of success that the FHS boys' golf team has recently achieved; (3) that neither L.E. nor L.E.'s parents ever spoke to the FHS boys' golf coach about L.E.'s desire to try out for the team; and (4) that L.E. rejected an offer to try out for the 2022 season. (Doc. Nos. 70 at 7–8; 82 at 6–7). Defendants then liken L.E.'s expressed intention to try out for the FHS boy's golf team to that of the plaintiffs in Lujan, (Doc. Nos. 70 at 8; 82 at 7), where the Supreme Court held that the plaintiffs' "'some

day' intention—without any description of concrete plans, or indeed even any specification of when that 'some day' will be—do not support a finding of the 'actual or imminent' injury" required for Article III standing. 504 U.S. at 564.

But Defendants' argument is easily set aside. Defendants do not dispute that L.E. has "consistently expressed his desire to play on the FHS boys' golf team." (Doc. Nos. 64 ¶ 94; 71 ¶ 94). The record clearly demonstrates that L.E. enjoys golf, (Doc. Nos. 64 ¶ 86; 71 ¶ 86), has taken years of golf lessons, (Doc. Nos. 64 ¶ 89; 71 ¶ 89), plays golf in his spare time, (Doc. Nos. 64 ¶¶ 90–91; 71 ¶¶ 90–91), and finds value in improving his golf game. (Doc. Nos. 64 ¶ 87; 71 ¶ 87). Nor do Defendants dispute that the uncontroverted record evidence indicates that the only reason he has not tried out for the boys' golf team is because he would be rejected per se due to the policy choice in the Gender in Athletics Law and the revised I-171 Policy. (Doc. Nos. 64 ¶ 97; 71 ¶ 97). Still, Defendants would require L.E. to take additional affirmative steps in the face of that futility to establish standing.

The law of this circuit instructs otherwise. Mays v. LaRose, 951 F.3d 775, 782 (6th Cir. 2020) ("When doing so would be futile, Article III does not require plaintiffs to take actions simply to establish standing."). In Mays, the Sixth Circuit considered whether the plaintiff-appellees had standing to bring an "Equal Protection claim, challenging Ohio's disparate treatment of hospital-confined and jail-confined electors, and a First Amendment claim, challenging Ohio's absentee ballot request deadline, both as applied to unexpectedly jail-confined electors." 951 F.3d at 780. One of the plaintiff-appellees, Mays, was arrested the evening after the Ohio's deadline to request an absentee ballot had passed. Addressing standing, the panel reasoned that "whether Mays actually requested an absentee ballot once jailed is immaterial because any such request would have been futile. . . . It was the State's absentee ballot request deadline and confinement of Mays

that caused his inability to vote." Id. at 782. Mays controls. Whether L.E. attempted to try out for the FHS boys' golf team is immaterial because the Gender in Athletics Law and the revised I-171 Policy bar him from earning a spot on the team no matter how well he performs.

The facts that Defendants marshal on this point are equally unavailing. That neither L.E. nor his parents knew in their deposition the specific date of the upcoming tryouts stands for little. There is no reason to circle the calendar for a tryout that the Gender in Athletics Law and the revised I-171 Policy deny L.E. a meaningful opportunity to participate, absent a change in the law and policy. L.E.'s refusal to accept an invitation to attend the tryout for the 2022 season is inconsequential for the same reason. And that neither L.E. nor his parents spoke with the team's coach about L.E.'s desire to play is undercut by L.E.'s mother's email to the school's principal regarding her son's intention. (Doc. Nos. 68 ¶ 10; 69-2 at 2). Even if L.E. was able to persuade FHS's principal and the boys' golf coach that he should have the opportunity to participate consistent with his gender identity, in the face of the Gender in Athletics Law and the revised I-171 Policy, they would be powerless to grant him that chance.

Defendants' last fact most obviously misses the mark. There is no record evidence of what a "training regimen commensurate with the fact that the Farragut boys' golf team won the state championship in 2020 and in 2021 placed second in the regional tournament with its players scoring 75, 78, 78, and 80," (Doc. No. 58 at 7), would look like. Even if there were, Defendants offer no cogent explanation of why L.E. should train to be among the team's top scorers rather than train to make the team. (See id.). And if L.E. adopted a training regimen that would satisfy Defendants, the Gender in Athletics Law and the revised I-171 Policy would still categorically bar him from the opportunity to play on the FHS boys' golf team.

17

Knox County Defendants point to Miller v. City of Wickliffe, 852 F.3d 497, 503 (6th Cir. 2017), for the proposition that "the Sixth Circuit upheld the district court's determination that the plaintiff night club lacked standing to challenge the city's nightclub ordinance which allegedly prevented them from opening their club when the record demonstrated that the club had never applied for a permit." (Doc. No. 82 at 6). While this is somewhat distinct from State Defendants' challenge, which Knox County Defendants otherwise copied verbatim, it could be construed as a separate argument: that L.E. lacks standing to challenge the Gender in Athletics Law and the revised I-171 Policy because he never actually tried out for the FHS boys' golf team. However, the facts in Miller clearly distinguish it from those at bar. Crucially, in Miller v. City of Wickliffe, No. 1:12-cv-1248, 2015 WL 9304665 (N.D. Ohio Dec. 21, 2015), the district court determined that plaintiffs failed to make a strong showing that they would have been automatically denied a permit based on the geographical restrictions in the relevant ordinance. Id. at *5. Indeed, it found that the plaintiffs' evidence "d[id] not prove that Wickliffe would have automatically denied the permit" because "[t]he printouts do not show the actual boundaries of other business" and "[t]hey do not demonstrate that Wickliffe would have had no discretion in measuring the boundaries or distance between organizations listed . . . and [the site of plaintiffs' proposed nightclub]." Id. at *5 n.12. Knox County Defendants' attempt to construe Miller more broadly and apply it here— where there is no dispute L.E. is categorically barred from playing for the FHS boys' team—would go well beyond the Court of Appeals' affirmance of the court below and contradict other clear binding precedent. See, e.g., Mays, 951 F.3d at 782 ("When doing so would be futile, Article III does not require plaintiffs to take actions simply to establish standing") (citing Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392–93 (1988)).

In any event, the record evidence makes clear that L.E. intends to try out for the FHS boys'
golf team when doing so is no longer futile.  (See e.g., Doc. Nos. 64 ¶ 94; 71 ¶ 94).  L.E. began
high school in 2021, and, as such, likely has only one more opportunity to do so.  Although the
specific dates of that tryout are not in the record, they will undoubtedly be set by a Defendant or
one of their employees.  Accordingly, L.E. has provided specification that the plaintiffs in Lujan
lacked, (see Lujan, 504 U.S. at 564 ("Such 'some day' intention—without any description of
concrete plans, or indeed even any specification of when the some day will be—do not support a
finding of the 'actual or imminent' injury that our cases require")), and Defendants argument fails.

   **B.  Traceability**

   *Second*, State Defendants[8] argue that L.E.'s "actual injuries cannot be traced back to the
statute" and are, in fact, "the product of rules and policies issued by the TSSAA."  (Doc. No. 56 at
8; see also Doc. No. 70 at 4–5).  Simply put, traceability requires that a plaintiff's claimed injury
flows from the defendant's conduct rather than the plaintiff's own actions or the actions of a third
party.  See Turaani v. Wray, 988 F.3d 313, 316 (6th Cir. 2021) ("[T]raceability . . . looks at whether
the defendant's actions have a 'causal connection' to the plaintiff's injuries.  Indirect harms
typically fail to meet this element because harms resulting from the independent action of some
third party not before the court are generally not traceable to the defendant.").  "Beyond that
threshold, however, the plaintiff's burden of alleging that their injury is fairly traceable to the
defendant's challenged conduct is relatively modest."  Grow Mich., LLC v. LT Lender, LLC, 50
F.4th 587, 592 (6th Cir. 2022) (quoting Buchholz v. Meyer Njus Tanick, PA, 946 F.3d 855, 866
(6th Cir. 2020)) (internal quotation marks omitted).  "Any harm flowing from the defendant's
conduct, even indirectly, is said to be 'fairly traceable.'"  Id.

---

[8] Knox County Defendants do not make any traceability argument in their briefing.  (See generally
Doc. Nos. 47, 74, 82).

According to State Defendants, the Gender in Athletics Law and, by extension, the revised I-171 Policy are a degree removed from "those other laws [that] explicitly bar students from playing certain sports," (Doc. No. 56 at 8), and merely "set[] a definitional baseline" for gender but "leave[s the] TSSAA free to craft the actual eligibility rules for each sport." (Doc. No. 70 at 4). As a result, "the decision to have separate divisions for boys' golf and girls' golf was entirely [the] TSSAA's independent action," (Doc. No. 56 at 9), and "[p]laintiff's alleged injury—the inability to play against boys on the boys' golf team—cannot be fairly traced to the Defendants." (Doc. No. 70 at 5).

But this argument sorely misconstrues L.E.'s challenge. As previously explained, "L.E. is not challenging the separation of interscholastic golf teams into boys' and girls' teams. . . . Instead, L.E. challenges his categorical ineligibility to compete on the FHS boys' golf team." (Doc. No. 66 at 7–8). This is not to say that the TSSAA's decision to separate boys' and girls' golf is wholly irrelevant to this case; had the TSSAA made the opposite decision, as it did with certain other sports, L.E.'s only option would be to play on a co-ed team. But the teams are separate, and, as State Defendants admit in their brief, because of the Gender in Athletics Law, "[the] TSSAA must acknowledge the birth sex of athletes when crafting rules." (Doc. No. 56 at 9). At a minimum, the Gender in Athletics Law and the revised I-171 Policy are "motivating factor[s]" excluding L.E. from competing on an equal footing for a spot on the FHS boys' golf team. See Parson v. U.S. Dep't of Justice, 801 F.3d 701, 714 (6th Cir. 2015) ("In the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard"). To find otherwise would flout both the undisputed record evidence, State Defendants' own representations, (see, e.g., Doc. No. 71 ¶ 99 (disputing only that L.E. is capable of meeting

the minimum skill requirements to make the FHS boy's golf team during the tryout)), and common sense.

### C. Redressability

*Third*, Defendants argue that L.E.'s alleged injuries cannot be redressed because "there is no way for the Court to know what the future TSSAA policy will be [if the Gender in Athletics Law and the revised I-171 Policy are enjoined.]" (Doc. Nos. 56 at 10; 70 at 6–8; 82 at 7–8). To show redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Gerber v. Herskovitz, 14 F.4th 500, 505 (6th Cir. 2021) (quoting Lujan, 504 U.S. at 561) (internal quotation marks omitted).

On this point, Defendants assert that, "even if Plaintiff prevailed in invalidating the Gender in Athletics Law [and the revised I-171 Policy], . . . [the] TSSAA would have three options: (1) do nothing and maintain the status quo; (2) adopt a new policy; or (3) resurrect the old, superseded Transgender Policy," and "speculate as to what the TSSAA would do." (Doc. No. 70 at 6, 9; see also Doc. No. 82 at 8). However, as L.E. explains "there is no evidence that the TSSAA ever affirmatively repealed the Prior TSSAA Policy. Instead, that Policy was rendered inoperative because it was superseded by contradictory state law, namely [the Gender in Athletics Law]." (Doc. No. 66 at 6). The only evidence available to the Court indicates that the Gender in Athletics Law rendered the Policy inoperative, (Doc. Nos. 64 ¶ 83; 71 ¶ 83), and it would control if the Gender in Athletics Law and the revised I-171 Policy were enjoined. (Id.; see also Doc. No. 53-8 at 86:1–88:10 (stating that the Gender in Athletics Law and the revised I-171 Policy *superseded* the 2018 TSSAA Policy)). This would place the TSSAA in a very different position than that described by Defendants. The TSSAA could either: (1) do nothing, in which case the prior TSSAA policy would govern; or (2) adopt a new policy. Accordingly, L.E.'s alleged injuries are redressable.

21

## II.     State Sovereign Immunity Does Not Protect Most Defendants from This Suit.

Next, Defendants assert that L.E.'s claims are barred by sovereign immunity.  (Doc. Nos. 47, 56, 70).  In most instances, the Eleventh Amendment protects states from private civil suits, both from their own citizens and citizens of other states.  T.M. ex rel. H.C. v. DeWine, 49 4th 1082, 1088 (6th Cir. 2022) (citing U.S. CONST. amend. XI; Lapides v. Bd. of Regents, 535 U.S. 613, 616 (2002)).  State officials sued in their official capacity share in a state's sovereign immunity.  Id. (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  However, courts have recognized three exceptions to this general protection: "(a) when the state has consented to suit; (b) when the exception first set forth in Ex parte Young[, 209 U.S. 123 (1908)] applies; and (c) when Congress has properly abrogated a State's immunity."  S & M Brands, Inc. v. Cooper, 527 F.3d 500, 507 (6th Cir. 2008).

Recognizing that Tennessee has not waived and Congress has not overridden the state's immunity in § 1983 cases, L.E. invokes Ex parte Young to circumvent Defendants' asserted sovereign immunity.  The Ex parte Young framework "allows plaintiffs to sue officers, irrespective of immunity to enjoin their future action on behalf of the state if those actions would violate the federal constitution."  Universal Life Church Monastery Storehouse v. Nabors, 35 F.4th 1021, 1040 (6th Cir. 2022).  This is because, pursuant to Ex parte Young and its progeny, "a suit that claims that a state official's actions violate the constitution or federal law is not deemed a suit against the state, and so barred by sovereign immunity, so long as the state official is the named defendant and the relief sought is only equitable and prospective."  Proctor v. Bd. of Med., 718 Fed. App'x 325, 328 (6th Cir. 2017) (quoting Westside Mothers v. Haveman, 289 F.3d 852, 861 (6th Cir. 2002)).  When a court addresses a claim made under Ex parte Young, it should simply ask "whether a complainant alleges an ongoing violation of federal law and seeks relief properly

22

characterized as prospective." Westside Mothers, 289 F.3d at 861 (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)).

Accordingly, Ex parte Young "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." Russell v. Lundergan-Grames, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting Child.'s Healthcare is a Legal Duty v. Deters, 92 F.3d 1412, 1415 (6th Cir. 1996)). A government official's "[g]eneral authority to enforce the laws of the state is not sufficient." Id. at 1048. "Rather, a state official must possess some connection with the enforcement of the challenged law, and . . . it must be likely that the official will enforce the law against the plaintiff." Doe v. DeWine, 910 F.3d 842, 849 (6th Cir. 2018) (internal quotations marks and citations omitted).

State Defendants argue that L.E. fails to allege sufficient facts to demonstrate a connection between themselves and the challenged law. (Doc. No. 70 at 9 ("The only action Plaintiff alleges Governor Lee took is to support and sign the bill into law, actions he has already completed. Commissioner Schwinn is required to faithfully execute education laws, rules and regulations. Plaintiff alleges no action taken by Executive Director Morrison; the State Board members merely have the responsibility to adopt policies, and Plaintiff has not identified an unconstitutional State Board policy adopted pursuant to [the Gender in Athletics Law].")). But in doing so, State Defendants look past SB 1861 and SBOE's promulgation of the Funding Rule, which requires the TDOE Commissioner to withhold state funding from any LEA that is non-compliant with the Gender in Athletics Law if they fail to timely take the necessary corrective steps. This is precisely the type of action that the Sixth Circuit deemed sufficient in Russell, where the Sixth Circuit reasoned that the members of the State Board of Elections "fell within the Ex parte Young exception because they were actively involved in administering the challenged statute." See

23

DeWine, 910 F.3d at 849 (citing Russell, 784 F.3d at 1048–49). What's more, SBOE is charged with exercising supervisory authority over public schools in Tennessee, and, as part of its role in carrying out SBOE policies, the TDOE requires LEAs to certify their uniform compliance with several state laws, including the Gender in Athletics Law.

Governor Lee's connection to the law, on the other hand, does not go to its enforcement. To tie the governor to the challenged laws, L.E. avers that Governor Lee took the affirmative step of signing them both into law even though SB 228 and 1861 could have been vetoed or passed without his signature. See Tenn. CONST. Art. III, §18; Webb v. Carter, 129 Tenn. 182, 165 S.W. 426, 449 (1914) (Williams, J., concurring) (Tennessee's "[c]onstitution does not require the Governor to either sign or veto a bill. If he holds it for more than five days without signifying either his approval or disapproval, it shall become law."). While undisputed and perhaps evidence that Governor Lee approves of the Gender in Athletics Law, it does not create, in the words of Russell, a "realistic possibility" the Governor would take legal or administrative actions against the Plaintiff's interests. 784 F.3d at 1048. After all, "a bare connection to administering the statute" is not enough. Id. at 1047; see also id. at 1408 (also requiring "that the official threaten and be about to commence proceedings."). And "holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend Young beyond what the Supreme Court has intended and held." Id. at 1047 (quoting Child.'s Healthcare, 92 F.3d at 1416); see also Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979) ("The mere fact that a governor is under a general duty to enforce state law does not make him a proper defendant in every action attacking the constitutionality of a state statute."). Accordingly, Governor Lee cannot be subject to suit.

State Defendants next argue that SBOE is immune from L.E.'s Title IX claim[9] because "the Tennessee State Board of Education does not receive federal funds and thus is not subject to Title IX." (Doc. No. 70 at 9; see also Doc. No. 56 at 12 (same)). However, the TDOE—which SBOE exercises supervisory authority over—does. (Tenn. Code. Ann. § 49-1-302; Doc. Nos. 64 ¶¶ 63–65; 71 ¶¶ 63–65). This supervisory authority suffices. In Horner v. Kentucky High School Athletics Association, the Sixth Circuit held that a state board that did not itself receive federal funding could still be subject to Title IX because the state's department of education—which the state board controlled and managed—was a recipient, explaining that a party's status as a recipient under Title IX is a question of "substance," not "form." 43 F.3d 265, 272 (6th Cir. 1994). The panel reasoned that "while the federal funds may flow into and out of the Department, the Board's position at the Department's helm cannot be ignored." Id. State Defendants attempt to distinguish Horner by calling attention to the General Assembly's decision to "delete the provision of [the Gender in Athletics Law] giving the State Board authority to enforce [the law's] definition of gender as sex." (Doc. No. 70 at 9). However, they offer no rationale, let alone a citation to authority, for why this contrast should be dispositive. (Id.). What ultimately matters is that SBOE controls and manages TDOE. (Doc. Nos. 64 ¶ 64; 71 ¶ 64); see also Horner, 43 F.3d at 271–72 ("The legislative history describes the effect of the amendments, stating that the definition of 'program or activity' and 'program' 'make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance.'" (citation omitted)). Accordingly, SBOE's immunity from suit under Title IX is waived.

---

[9] SBOE is the only State Defendant against whom L.E. brought his Title IX claim. (Doc. No. 1 at 26).

Knox County Defendants also maintain that neither KCBOE nor the KCS Superintendent are proper defendants for L.E.'s Equal Protection Clause claim.[10]  Though Knox County Defendants concede that the local governing bodies and officers thereof, acting in their official capacities, are generally not immune to suit under § 1983, they argue that KCBOE should receive Tennessee's immunity for adopting the revised I-171 policy because it did so "solely as an extension of the State."  (Doc. No. 47 at 6–7).  They observe that the Gender in Athletics Law required KCBOE to "adopt and enforce a policy to ensure compliance with sub§(a)," (id. at 7), and point to testimony explaining that KCBOE had "no role in drafting, advocating, or passing [the Gender in Athletics Law]."  (Id.).

Knox County Defendants adequately describe the law.  When a local body or its official are sued for complying with state mandates that afford no discretion, they act as an arm of the state, and enjoy the state's immunity.  Brotherton v. Cleveland, 173 F.3d 552, 566–67 (6th Cir. 1999); see also Cady v. Arenac Cnty., 574 F.3d 334, 343 (6th Cir. 2009) ("[T]he essential question is the degree of discretion possessed by the [governing body or] official . . . implementing the contested policy.").  However, their argument falters because there is a subtle but significant difference between "adopt[ing] and enfor[ing] a policy to ensure compliance with [the Gender in Athletics Law]" and revising the I-171 Policy to include verbatim the relevant provisions in the Gender in Athletics Law.  Rather than merely enact a rule that complies with the Gender in Athletics Law, Knox County Defendants went beyond their mandate and enacted an independent, identical rule.

---

[10] Having determined L.E.'s claims against KCS Superintendent Rysewyk are duplicative, the Court need not address his liability under § 1983.

As L.E. succinctly puts it, "KCBOE goes too far." (Doc. No. 66 at 13). KCBOE admits that the revised I-171 Policy would remain in effect even if the Gender in Athletics Law is no longer operative absent some affirmative step from KCBOE to repeal or amend the policy. (Doc. No. 64 ¶ 82). But the Gender in Athletics Law did not require KCBOE to *permanently* foreclose transgender students from participating on sex-segregated teams consistent with their gender identity as the revised I-171 Policy does. The decision to pass a policy that would endure beyond— not simply comply with—the Gender in Athletics Law rests solely on KCBOE. Therefore, KCBOE cannot hide behind the State's immunity.

## III.     L.E.'s Section 1983 Claims Against Superintendent Rysewyk Are Duplicative.

Knox County Defendants argue that L.E.'s claims against KCBOE and Superintendent Rysewyk in his official capacity are duplicative because claims against individuals in their official capacity, "generally represent[] only another way of pleading an action against an entity of which an officer is an agent." (Doc. No. 47 at 5–6 (quoting <u>Kentucky v. Graham</u>, 473 U.S. 159, 15 (1985)) (internal quotation marks and citations omitted)). L.E. does not challenge this. (<u>See</u> Doc. No. 66 at 14 n.6 ("L.E. does not dispute that if this Court agrees KCBOE can be enjoined from enforcing the revised I-171 Policy, a claim seeking the same relief against the Superintendent would be duplicative.")). Accordingly, his claim against Superintendent Rysewyk will be dismissed as duplicative.

## IV.     The Gender in Athletics Law and the Revised I-171 Policy, As Applied to L.E., Violate the Equal Protection Clause.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) (quoting <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982)). It "is essentially a direction that all persons similarly situated should be treated alike."

27

Id. (citing Plyler, 457 U.S. at 216). This directive must "coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantages to various persons or groups." Romer v. Evans, 517 U.S. 620, 631 (1996) (citing Pers. Admin. of Mass. v. Feeney, 442 U.S. 256, 271–72 (1979); F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). Thus, "the general rule is that legislation is presumed to be valid and will be sustained if the classification by the statute is rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 440 (citation omitted); see also Romer, 517 U.S. at 631 ("We have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classifications so long as it bears a rational relation to some legitimate end."). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process." Id. (citation omitted).

"The general deference to government action, however, yields to a heightened judicial scrutiny when a statute or government act interferes with a person's fundamental rights, such as freedom of speech or religion, or singles out suspect classes by such characteristics as race, alienage, or national origin." Bower v. Vill. of Mount Sterling, 44 Fed. App'x 670, 676 (6th Cir. 2002) (citation omitted). "Legislative classifications based on gender also call for a heightened standard of review." City of Cleburne, 473 U.S. at 441. The heightened standard of review applicable to sex-based classifications—intermediate scrutiny—dictates "[t]he State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objective." United States v. Virginia, 518 U.S. 515, 533 (1996) (internal quotation marks, brackets, and

citation omitted); see also Clark v. Jeter, 486 U.S. 456, 461 (1988) ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective."). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." Id.

## A. The Gender in Athletics Law and the Revised I-171 Policy Discriminate Against Transgender Student-Athletes.

Although the Gender in Athletics Law and the revised I-171 Policy, by their own terms use sex as the sole criterion to determine who may participate on specific teams and, in certain instances, who may play specific sports, (see Doc. Nos. 53-24 at 1; 58-1 at 1 (mandating that "gender for purposes of participation in public middle or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate."); see also Doc. Nos. 64 ¶¶ 36–38; 71 ¶¶ 36–38 (creating one category of sports with separate boys' and girls' divisions and another category of sports open exclusively to girls)), L.E. is not challenging Defendants' larger system of sex-segregated sports. "[H]e is challenging his categorical ineligibility to participate on a specific sex-segregated team." (Id.). Although L.E. identifies as a boy, the Gender in Athletics Law and the revised I-171 Policy render him ineligible to compete on the FHS boys' golf team. His cisgender male peers, by contrast, are eligible to compete on the boys' golf team because they are male. Thus, L.E. argues that he "is barred from the FHS boys' golf team, solely because he is a transgender boy." (Doc. No. 51 at 16).

State Defendants and Knox County Defendants oppose L.E.'s interpretation of the Gender in Athletics Law and the revised I-171 Policy. Defendants describe the challenged law and policy as "definitional" and implore the Court to consider them separately from any law creating distinct boys' and girls' sports divisions. (See Doc. No. 56 at 14 ("The Gender in Athletics Law does not

29

itself separate students into different sports, and Plaintiff has declined to sue the agency that does—the TSSAA. The TSSAA separates several interscholastic sports (including basketball, cross, country, golf, tennis, and track and field) into separate divisions for boys and girls."); see also Doc. No. 82 at 8 (same in reference to the revised I-171 Policy)). This, in effect, repackages the same traceability argument the Court has already addressed. Though Knox County Defendants' argument ends there, (see Doc. No. 82 at 8–9), State Defendants go on to argue that "to the extent that [L.E.]'s Equal Protection claim is based on transgender status, the Gender in Athletics Law does not treat transgender students differently from anyone else" because, under the law, "[e]veryone's gender is defined by sex." (Doc. No. 56 at 22). Thus, according to State Defendants, the Gender in Athletics Law is not discriminatory.

As already explained, Defendants' arguments misconstrue L.E.'s as-applied challenge. The Gender in Athletics Law and the revised I-171 Policy are more than mere definitions. They control the terms by which transgender students have the opportunity to participate on specific teams. Since their implementation, both the Gender in Athletics Law and the revised I-171 Policy have categorically banned transgender students from the opportunity to participate on sports teams consistent with their gender identity. This is no accident. The Court need not look further than SB 228's "whereas clauses" for undisputed evidence of the government's intentions. (See Doc. No. 53-14 at 6 (answering "the legislature provided some governmental interests in the whereas clauses of Senate Bill 228").

These clauses specifically discuss the proponents' concern with "permitting boys who are male in every biological respect to compete in girls' athletic competitions if they claim a female gender identity." (Doc. No. 53-24 at 1). The Court can only conclude—and State Defendants concede, (Doc. No. 76 at 4 n.3)—that excluding transgender girls from girls' sports animated this

regime. To this end, the Gender in Athletics Law and the revised I-171 Policy's use of "sex at the time of the student's birth" to define "gender" for purposes of participating in Tennessee public school interscholastic sports is little more than a "seemingly neutral criteri[on] that [is] so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." Hecox v. Little, 79 F.4th 1009, 1024 (9th Cir. 2023) (reasoning that the use of "biological sex" as the sole criterion by which to separate students-athletes targeted transgender identity) (quoting Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)); see also Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."); Lawrence v. Texas, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexuals to discrimination."). The Gender in Athletics Law and, by proxy, the revised I-171 Policy's classification based on "sex at the time of the student's birth" target transgender student-athletes even though the definition does not use the word "transgender" specifically.

That the Gender in Athletics Law and the revised I-171 Policy impose the same definition on all students regardless of their gender identity does not bring the challenged law and policy outside the ambit of the Equal Protection Clause. The Supreme Court has long rejected the "notion that the mere equal application of a statute containing classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious . . . discriminations." Loving v. Virginia, 338 U.S. 1, 8 (1967). Just as the equal application of the law was no answer for racial discrimination then, equal application of the law cannot insulate transgender discrimination from scrutiny. As the Fourth Circuit observed in a case focused on a bathroom bill, that logic "is like saying that racially segregated bathrooms treated everyone

31

equally, because everyone was prohibited from using the bathroom of a different race." Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 606 (4th Cir. 2020).

At bottom, the Gender in Athletics Law and the revised I-171 Policy discriminate against transgender student-athletes. Under the challenged law and policy, every cisgender student is permitted to play on the team that aligns with their gender identity. L.E. and other transgender students are not.

## B. The Gender in Athletics Law and the Revised I-171 Policy are Subject to Intermediate Scrutiny.

To bring transgender discrimination within the domain of intermediate scrutiny, L.E. must demonstrate that he receives disparate treatment as compared to similarly situated persons because of his sex. See Reform Am. v. City of Detroit, Mich., 37 F.4th 1138, 1152 (6th Cir. 2022) ("A valid equal-protection claim requires showing that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting Ctr. For Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011)). "To be 'similarly situated' for purposes of an equal-protection claim, the plaintiff and the comparator must be alike 'in all relevant respects.'" Id. (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

L.E. avers that he is similarly situated to other boys (a group made up mostly of his cisgender male peers) because "the record in this case unambiguously reflects that L.E. expresses his male identity in all aspects of his life." (Doc. No. 51 at 61 (citing Grimm, 972 F.3d at 593)). After all, as part of his social transition, L.E. has legally changed his name to a traditionally masculine one, (Doc. Nos. 64 ¶ 22; 71 ¶ 22), uses male pronouns, (Doc. Nos. 64 ¶ 23; 71 ¶ 23), uses the boys' restrooms, (Doc. Nos. 64 ¶ 24; 71 ¶ 24), and dresses and grooms himself in traditionally masculine ways. (Doc. Nos. 64 ¶ 25; 71 ¶ 25). L.E.'s family, peers, and teachers also

all address and treat him as they would any other boy. (Doc. Nos. 64 ¶ 26; 71 ¶ 26). Thus, according to L.E., "the overwhelming thrust of everything in the record . . . is that L.E. is 'similarly situated to other boys.'" (Doc. No. 66 at 21 (quoting Grimm, 972 F.3d at 610)). With this in mind, L.E. contends that intermediate scrutiny should apply because the sole reason he cannot compete on the FHS boys' golf team is his sex. (Doc. No. 51 at 16–17).

State Defendants argue that intermediate scrutiny should not apply because the "similarly situated" inquiry should be limited to the "purposes of athletic competition" and L.E. is distinct from to other boys because he is anatomically female. (Doc. No. 70 at 19–20). State Defendants assert that L.E. has "female genitalia, a female reproductive system, and a female endocrine system" as well as other traits—"from bone density to muscle mass to natural testosterone levels"—that affect athletic competition that are not alike in all relevant respects to L.E.'s cisgender male peers. (Id.). They then implore the Court to recognize that the "physical difference between men and women are enduring" as reason to find L.E. most similarly situated to those sharing his sex assigned at birth. (Doc. No. 70 at 20 (quoting United States v. Virginia, 518 U.S. 515, 533 (1996))).

Both the record and weight of persuasive authority across the country favor L.E.'s position. For one, State Defendants cite no evidence and offer no explanation of why L.E.'s genitalia or reproductive system are relevant for the purposes of athletic competition. (See generally Doc. Nos. 56, 70). Nor do State Defendants rely on anything in the record to support their assertions about L.E.'s endocrine system, bone density, muscle mass, or natural testosterone levels. (Id.). More importantly, while these physical traits may affect certain aspects of athletic performance, State Defendants fail to show that these traits are connected to the Gender in Athletics Law or the revised I-171 Policy. (Id.). Indeed, if one of L.E.'s classmates had identical muscle mass, bone

density, and/or natural testosterone levels as L.E., but his birth certificate indicated that he was male, these rules would allow that student to play on FHS boys' team.

Neither the Supreme Court nor the Sixth Circuit has addressed to whom middle and high school transgender athletes are most similarly situated. State Defendants offer no justification for their suggestion that the "similarly situated" inquiry should be limited to the "purposes of athletic competition," and courts assessing similar categorical bans on transgender athletes in middle and high school sports have applied intermediate scrutiny to Equal Protection challenges without such limitations. This is true even for courts that determine that those transgender athlete's claims are unlikely to succeed. See B.P.J. v. W. Va. State Bd. of Edu., 649 F. Supp. 3d 220, 232 (S.D. W.Va. Feb. 7, 2023) (applying intermediate scrutiny to the plaintiff's as-applied Equal Protection challenge of a law that "clarif[ied] participation for sports events to be based on biological sex of the athlete at birth.") *rev'd on other grounds* 2023 WL 2803113, at *1 (4th Cir. Feb. 22, 2023); see also D.N. ex rel. v. DeSantis, --- F. Supp. 3d ---, 2023 WL 7323078, at *10 (S.D. Fl. Nov. 6, 2023) (applying intermediate scrutiny in rejecting the plaintiff's facial Equal Protection challenge of a law prohibiting transgender girls from participating in any school-sponsored girls' sports). And, in the context of bathroom bills, circuit courts across the country do not narrow their "similarly situated" inquiry to anatomy. See e.g., Grimm, 972 F.3d at 610 ("The overwhelming thrust of everything in the record—from Grimm's declaration, to his treatment letter, to the amicus briefs—is that Grimm was similarly situated to other boys, but was excluded from using the boys restroom facilities based on his sex-assigned-at-birth."); see also Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty., 57 F.4th 781, 803 n.6 (11th Cir. 2022) (en banc) (applying intermediate scrutiny in rejecting the plaintiff-appellee's claim but noting that biological sex was likely relevant only because "it was the sole characteristic on which the bathroom policy and the privacy interests

34

guiding the bathroom policy are based."). Thus, persuasive authority on the subject and on its nearest analog indicate the Court should not narrow its inquiry to fit State Defendants' unsupported, preferred framing.

The import of recent binding precedent is not lost on this Court. For that reason, the Court ordered supplemental briefing following the Sixth Circuit's recent decision in L.W. v. Skrmetti, 83 F.4th 460 (6th Cir. 2023). (Doc. No. 97). There, the panel considered a set of facial challenges to laws prohibiting minors from receiving puberty blockers, hormones, or surgery to transition, and applied rational-basis review. L.W., 83 F.4th at 488. As the panel reasoned, "[s]uch an across-the-board regulation lacks any of the hallmarks of sex discrimination" and is most accurately described as one "regulating medical procedures unique to each sex." Id. at 480–81. Thus, while instructive, L.W. is distinguishable from the case at hand. There, the panel considered a facial challenge to laws that prohibit the use of specific interventions and procedures to treat gender dysphoria, id. at 491, whereas the Court here must consider an as-applied challenge to a regime that specifically categorizes students based on their sex at the time of birth. See United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.); see also Speet v. Schuette, 726 F.3d 867, 871–92 (6th Cir. 2013) ("In contrast to an as-applied challenge, which argues that a law is unconstitutional as enforced against the plaintiffs before the court, a facial challenge is not an attempt to invalidate the law in a discrete setting but an effort to leave nothing standing." (internal quotation marks and citation omitted)).

35

**C.** **The Gender in Athletics Law and the Revised I-171 Policy Fail Intermediate Scrutiny.**

When intermediate scrutiny applies, "[t]he State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objective" without relying on "hypothesized or invented post hoc" justifications. Virginia, 518 U.S. at 533.

State Defendants offer four justifications for the Gender in Athletics Law. Specifically, they assert that the challenged law: (1) clarifies the meaning of "gender" in Tennessee interscholastic sports, (Doc. No. 66 at 14–16); (2) constitutes government speech, (id. at 17–18); (3) "ensure[s] that boys cannot displace girls in athletics simply by claiming a female gender identity," (id. at 16); and (4) "reduce[s] the risk of injury when girls compete against boys and by enabling interscholastic sports to be conducted in a safer manner to promote continued participation and equitable opportunities for children," (id. at 16–17).

These proposed justifications do not survive intermediate scrutiny. At the outset, State Defendants' first and second justifications cannot be considered because they were invented post hoc for the purpose of litigation. Virginia, 518 U.S. at 533. As L.E. points out, "nothing in [the Gender in Athletics Law]'s text suggests the Legislature was concerned about . . . these issues when it enacted SB 228" and "when asked during discovery to identify governmental interests furthered by [the Gender in Athletics Law], State Defendants solely pointed to the prefatory clauses." (Doc. No. 66 at 27–28). Likewise, nothing in the record suggests that these interests were on the minds of the state legislature when the Gender in Athletics Law was passed. The prefatory clauses only set out the third and fourth justifications (the anti-displacement and safety interests), (Doc. No. 53-24 at 1), and, just as tellingly, State Defendants refer to these—but not the first or second justifications—as the Gender in Athletics Law's "stated objectives." (Doc. No. 56

36

at 18–19).  If these justifications were genuine, State Defendants could have articulated them at an earlier stage of litigation.  They failed to do so.  (<u>See</u> Doc. Nos. 53-14 at 6 (answering "the legislature provided some governmental interests in the whereas clauses of Senate Bill 228 and those interests are advanced by safe and orderly participation in interscholastic athletic activity as provided for in the law" when asked to identify "all the government interests advanced by [SB] 228"); 53-15 at 6 (same)).

In response, State Defendants contend that they "have consistently asserted that the prefatory clauses of the statute only provide *some* of the governmental interests" and that "[s]ince the State's first substantive filings . . . the State has asserted all four interests for the law, and all those interests are evidenced from the full text of the statute."  (Doc. No. 76 at 3 n.3).  Neither of these arguments can save either justification.  First, the interrogatories upon which State Defendants rely merely assert that "the legislature provided some governmental interests in the whereas clauses of Senate Bill 228."  (Doc. Nos. 53-14 at 6; 53-15 at 6).  They neither state nor imply that the Gender in Athletics Law was genuinely enacted pursuant to other governmental interests not listed.  <u>Id.</u>  And, even if they did, the Court could not permit State Defendants to keep the door open to other undisclosed justifications to raise only when advantageous, as doing so would render any attempt to detect an ingenuine, post hoc justification impossible.  For this same reason, State Defendant's second argument, that the two justifications were not post hoc because they articulated both in their first substantive filing, holds no weight.[11]  At bottom, the notion that State Defendants relied on these supposed justifications when passing the law, but failed to disclose them until now, is unsupported and wholly unserious.

---

[11] The "first substantive filing" referred to is State Defendants' Memorandum in Support of their Motion for Summary Judgment (Doc. No. 56).

State Defendants remaining two justifications—the anti-displacement and safety interests—must be set aside because L.E. has brought an as-applied challenge, not a facial one. L.E. is a transgender boy seeking to play a non-contact sport. (See generally Doc. No. 1). State Defendants describe the anti-displacement interest as one to "ensure that boys cannot displace girls in interscholastic athletics—costing girls opportunities to participate, to achieve victory, to be recruited to play college athletics, and to earn scholarships, by claiming a female gender identity." (Doc. No. 56 at 18–19). L.E.'s status as a transgender boy removes any concern that he will displace any girl in his attempt to play for the FHS boys' team. The State Defendants' anti-displacement interest is in no way implicated. (See id. (describing a hypothetical "unscrupulous male student" who intentionally lies about his gender identity to compete against cisgender female athletes)). As for the safety interest, State Defendants concede in their briefing that safety is not an issue in non-contact sports like golf. (See id. ("While injury from physical contact might not be a concern in golf, it is a very important consideration for mitigating risk in contact sports")). With no other justification, the Gender in Athletics Law, as applied to L.E., fails intermediate scrutiny.

Knox County Defendants assert a single justification for implementing its revised I-171 Policy—compliance with the Gender in Athletics Law. (Doc. No. 82 at 11). However, complying with a statute that violates the Equal Protection Clause, as applied to L.E., cannot be an important government interest for enforcing an identical rule against L.E. See U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973) (prohibiting discrimination for its own sake). Thus, as goes the Gender in Athletics Law, so must go the revised I-171 Policy.

38

### D. The Gender in Athletics Law and the Revised I-171 Policy Also Fail Rational-Basis Review.

Defendants argue that rational-basis review (not intermediate scrutiny) should apply here. Even assuming *arguendo* that Defendants are correct, their purported rationales for passing the Gender in Athletics Law and revised I-171 Policy still fail under the less stringent rational-basis review. Under rational-basis review, a "legislative classification" does not violate the Equal Protection Clause so long as the classification "bears a rational relation to some legitimate end." Romer, 517 U.S. at 631. This "rational basis review, while deferential, is not 'toothless.'" Peoples Rts. Org., Inc. v. City of Columbus, 152 F.3d 522, 532 (6th Cir. 1998) (citing Mathews v. Lucus, 427 U.S. 495, 510 (6th Cir. 1976)).

Although the Court was required to set State Defendants' first two purported justifications for passing the Gender in Athletics Law aside when applying intermediate scrutiny, rational-basis review does not share intermediate scrutiny's prohibition on post hoc justifications. See Am. Ex. Travel Related Servs. Co., Inc. v. Kentucky, 641 F.3d 685, 690 (6th Cir. 2011) ("[I]f a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny."). Both warrant further discussion.

State Defendants' first justification asserts that the Gender in Athletics Law "clarifies the meaning of gender in Tennessee interscholastic sports" by defining gender based on the student's sex shown on their original birth certificate. (Doc. No. 56 at 16–18). According to State Defendants, the Gender in Athletics Law "resolves any ambiguity about the meaning of gender for purposes of participation in interscholastic sports by adopting the meaning most Tennesseans use." (Id. at 17). Although the Court takes no position on whether "most" Tennesseans agree with the Gender in Athletics Law's views on gender and sex, see Craigmiles v. Giles, 312 F.3d 220, 224 (6th Cir. 2002) ("We will be satisfied with the government's rational speculation linking the

39

regulation to a legitimate purpose, even unsupported by evidence or empirical data.") (internal quotation marks and citation omitted), this "clarity" justification cannot be accepted as a legitimate governmental interest.

As already explained, the use of "sex at the time of the student's birth" as the sole criterion by which the Gender in Athletics Law discriminates renders the law no different from facial discrimination against transgender students-athletes. Hecox v. Little, 79 F.4th 1009, 1024 (9th Cir. 2023). Though, in certain circumstances, a discriminatory classification based on biological sex may be warranted, the very purpose of the Equal Protection Clause is to prevent "intentional and arbitrary discrimination." See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curium) (internal quotation marks and citation omitted). For this reason, the state's line-drawing must be tethered to "legitimate public policies which justify the . . . disadvantages they impose on certain persons." Romer, 517 U.S. at 635. The disadvantage imposed on L.E. here is evident: the Gender in Athletics Law requires L.E. to play golf on the team that corresponds with his sex as designated by his original birth certificate and in contravention of his legitimate gender identity. Otherwise, he must forgo the opportunity to play golf for FHS altogether.

The described clarity, however, is nothing more than the disadvantage it imposes. Stated differently, State Defendants' "clarity" justification is that the Gender in Athletics Law prevents transgender student-athletes from participating in middle and high school sports consistent with their gender identity and does so effectively. On one hand, State Defendants' justification is another concession that the discrimination described is intentional. At the same time, without more, it establishes that the discrimination imposed is arbitrary. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate government interest."

Moreno, 413 U.S. at 534; see also Vill. of Willowbrook, 528 U.S. at 564 ("[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination."). That the Gender in Athletics Law has the desired discriminatory effect is no justification at all; it is discrimination for discrimination's sake.

State Defendants' second justification asserts that the Gender in Athletics law is protected government speech. However, this justification has no home in law. For one, "government speech" is not a legitimate government interest for discrimination under the Equal Protection Clause—it is a category of conduct to which the Equal Protection Clause does not apply. See Fields v. Speaker of Pa. House of Reps., 936 F.3d 142, 161 (3d Cir. 2019) ("[T]he Equal Protection Clause does not apply to government speech"). The reason for this is clear: "private citizens 'have no personal interest in government speech on which to base an equal protection claim.'" Id. at 160 (quoting Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 970 (9th Cir. 2011)). Though perhaps true in the context of legislative prayer or holiday displays, see Freedom of Religion Found., Inc. v. City of Warren, Mich., 707 F.3d 686, 698 (6th Cir. 2013) ("To the extent the Foundation means to claim that the City's government speech commemorating the holiday disparately treats its preferred message, the answer is: welcome to the crowd."), the Gender in Athletics Law clearly affects L.E.'s opportunity to participate in interscholastic athletics in a manner consistent with his gender identity. Simply calling the Gender in Athletics Law government speech does not make it so.

Crediting State Defendants' government speech justification would cause the Equal Protection Clause to become dead letter, as any discriminatory classification could be framed as an articulation of the governments views on a given issue. As L.E. points out, this reasoning would

41

allow for "opponents of interracial marriage [to] frame an anti-miscegenation law as merely expressing what the State views as the correct understanding of the propriety of interracial marriage." (Doc. No. 66 at 34 (internal quotation marks and citation omitted)). There is no limiting principle. Much like State Defendants' clarity justification, their government speech justification simply launders discrimination under a different name. Semantics cannot be used to circumvent the Equal Protection Clause so easily.

For the reasons already described, the Court can discard State Defendants' two remaining justifications for the challenged law—namely, the government's interest in anti-displacement and safety. In this as-applied challenge, where the anti-displacement interest is wholly unserved and State Defendants concede there is no legitimate safety interest, "the legislation's classifications bear no rational relation to [either] legitimate end." Romer, 517 U.S. at 631. With no other offered legitimate ends, (see Doc. No. 56 at 15–20 (outlining only the four purported justifications already addressed)), the Gender in Athletics law fails to pass constitutional muster.

Because Knox County Defendants only offered justification is compliance with the Gender in Athletics Law, (Doc. No. 82 at 11), it too fails rational-basis review. Blind compliance with a law that, as applied to L.E., is unconstitutional cannot amount to a legitimate government interest. See Moreno, 413 U.S. at 534.

## V. The Gender in Athletics Law and the Revised I-171 Policy, As Applied to L.E., Do Not Violate Title IX.

"Title IX prohibits sex discrimination by recipients of federal education funding." Jackson v. Birmingham Bd. of Educ., 554 U.S. 167, 173 (2005). Specifically, its text provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "To sustain a claim under Title IX, a plaintiff

42

must first show that a person or entity affiliated with a federal funded education program engaged in some form of sex-based discrimination against the plaintiff." Chisholm v. St. Marys City Sch. Dist. Bd. of Educ., 947 F.3d 342, 349 (6th Cir. 2020). L.E. contends that SBOE's and KCBOE's enforcement of the Gender in Athletics Law and the revised I-171 Policy to exclude him from the FHS boys' golf team constitutes sex-based discrimination for two reasons described below. (Doc. No. 1 ¶¶ 99–108).

First, L.E. argues that "discrimination on the basis of transgender status constitutes sex discrimination . . . because (as the Supreme Court held in Bostock) as a definitional matter it is impossible to discriminate on the basis of transgender status without discriminating on the basis of sex." (Doc. No. 51 at 25). In Bostock v. Clayton County, Georgia, 590 U.S. 644 (2020), the Supreme Court considered whether "an employer can fire someone simply for being homosexual or transgender" under Title VII. Id. at 651. Justice Gorsuch, writing for the majority, explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," id. at 660, because, in a firing decision that turns on "traits or actions it would not have questioned in members of a different sex," the employee's sex necessarily played a role. Id. at 651–52; see also id. at 659 ("If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."). L.E. asserts that this logic may be grafted directly onto Title IX. (See Doc. No. 51 at 25 ("The Sixth Circuit 'look[s] to the Title VII landscape for guidance' when 'crafting [the] framework for analyzing Title IX claims'" (quoting Chisholm, 947 F.3d at 349–50))). Thus, he argues that the Gender in Athletics Law and the revised I-171 Policy's categorical ban on transgender athletes competing on sports teams consistent with

43

their gender identity, which the Court has already determined is transgender discrimination, should also be considered sex-based discrimination for Title IX purposes. (Id.).

Second, L.E. argues that "(as the Sixth Circuit held in Smith) transgender status discrimination impermissibly implicates sex stereotypes." (Id.). This argument stems from a Sixth Circuit opinion regarding sex stereotypes, Smith v. City of Salem, Ohio, 378 F.3d 566 (6th Cir. 2004), where the panel considered whether the plaintiff-appellee, a transgender woman, had stated a claim for relief under Title VII for sex-based discrimination by alleging the city fired her on account of her gender non-conformity. On this issue, the panel determined that she had sufficiently alleged a Title VII claim because "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior." Id. at 575. According to the panel, the employee's diagnosis of gender identity disorder and her transgender status were "not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity." Id. Summarizing this decision in a later Title VII case, the Sixth Circuit explained that "there is no way to disaggregate discrimination on the basis of transgender status from discrimination on the basis of gender non-conformity." EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 576–77 (6th Cir. 2018) aff'd on other grounds in Bostock, 590 U.S. 644 (2020). With this, L.E. again invokes the Sixth Circuit's practice of looking to the Title VII landscape when crafting the framework for analyzing Title IX claims as reason to do so in this instance. (Doc. No. 51 at 25).

L.E.'s Title IX arguments are not novel. Indeed, they have been accepted by circuit courts across the country in litigation involving transgender students facing alleged discrimination. See e.g., A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville, 75 F.4th 760, 769 (7th Cir. 2023) (concluding the challenged policy "that engaged in sex-stereotyping could violate Title IX" and

"applying Bostock's reasoning to Title IX"); Doe v. Snyder, 28 F.4th 103, 114 (9th Cir. 2022) (applying Bostock's reasoning to Title IX, "[g]iven the similarity in the language prohibiting sex discrimination in Titles VII and IX."); Grimm, 972 F.3d at 616–17 (relying on Bostock to determine that the challenged policy constituted sex-based discrimination for Title IX purposes). In light of the Court's earlier determination that the Gender in Athletics Law and the revised I-171 Policy constitute transgender discrimination, these cases may have instructed the Court's analysis. That is, until the Sixth Circuit recently clarified the issue in L.W.

In L.W., the Sixth Circuit explicitly and conclusively cabined both Bostock's and Smith's reasoning to Title VII. See 83 F.4th 460, 464 (6th Cir. 2023) ("But the text-driven reasoning applies only to Title VII."). Although the panel's analysis primarily concerned the Equal Protection Clause, regarding Bostock, it cited a footnote from a prior Sixth Circuit case it viewed as dispositive of the Title IX issue. See id. (citing Meriwether v. Hartop, 992 F.3d 492, 510 n.8 (6th Cir. 2021)). Though, as L.E. points out in his supplemental briefing on L.W., (Doc. No. 104 at 7–8), the footnote relied upon states that the "Title VII context [does not] automatically apply in the Title IX context," (see Meriweather, 992 F.3d at 510 n.4), the L.W. panel read it more broadly. See L.W., 83 F.4th at 468 (citing the case for the proposition that "Title VII analysis does not apply to Title IX"). As for Smith, the L.W. panel explained that it "does not purport to break new ground or to create a new rule for transgender discrimination." Id. at 486. The panel then lauded its subsequent cases that followed Smith for "largely tak[ing] the hint" and "refusing to extend Smith beyond claims about discrimination over dress or appearance." Id.

This Court must defer to the Sixth Circuit's interpretation of its own opinions.  See e.g., Durham v. Martin, 388 F. Supp. 3d 919, 934 (M.D. Tenn. 2019) ("This court, however, is bound by the Sixth Circuit's interpretation . . . ").  For this reason, L.E.'s Title IX claim must fail.[12]

## VI.  L.E. Is Entitled to Permanent Injunctive Relief.

Last, L.E. requests the Court permanently enjoin the enforcement of the Gender in Athletics Law and the revised I-171 Policy against him.[13]  (Doc. No. 51 at 22–23).  To receive such relief, L.E. "must demonstrate that [he] has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction." Audi AG v. D'Amato, 469 F.3d 534, 550 (6th Cir. 2006).

With regard to his § 1983 claim, these requirements are easily met.  When constitutional rights are threatened or impaired, irreparable harm is presumed," Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012), and, when that harm is caused by governmental entities, the balance of equities and public interest "factors merge," Nken v. Holder, 556 U.S. 418, 434 (2009); Daunt v. Benson, 956 F.3d 396, 422 (6th Cir. 2020).  Having established that the Gender in Athletics Law and the revised I-171 Policy impair his rights under the Equal Protection Clause as a matter of law, L.E. need only demonstrate that there is no adequate remedy at law.  See Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio, 610 F.3d 340, 349 (6th Cir. 2010) ("A party is entitled to a

---

[12] The Court understands that the United States Department of Education is currently revising its regulations on Title IX to prohibit categorical bans on transgender students participating in sports consistent with their gender identity.  Brooke Migdon, *Biden administration punts deadline for updated Title IX regulations to March*, THE HILL (Dec. 7, 2023), https://thehill.com/homenews/administration/4346760-biden-administration-title-ix-regulations/.

[13] Neither State Defendants nor Knox County Defendants address whether L.E. would be entitled to permanent injunctive relief if the Court ruled in L.E.'s favor on the merits of his § 1983 and Title IX claims. (See generally Doc. Nos. 47, 56, 70, 74, 76, 82).

46

permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law.") (quoting Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty, 446 F.3d 391, 349 (6th Cir. 2006)); see also Vitolo v. Guzmna, 999 F.3d 353, 360 (6th Cir. 2021) ("[Because] no cognizable harm results from stopping unconstitutional conduct, . . . 'it is always in the public interest to prevent violation of a party's constitutional rights.'").  But monetary damages cannot make L.E. whole from the unlawful denial of an opportunity to participate in a unique, temporally isolated activity, such as high school sports.  B.M. ex rel. Bao Xiang v. Minnesota State High Sch. League, 917 F.3d 994, 1003 (8th Cir. 2019).  Nor will he be able to get his remaining season back if he is denied the requested injunctive relief.  Anything short of a permanent injunction here would be inadequate.

## CONCLUSION

The Court's decision here wipes neither the Gender in Athletics Law nor the revised I-171 Policy off the books.  Rather, it enjoins the enforcement of the challenged law and policy against L.E. as he attempts to make the FHS boys' golf team in a few short months.  This is the nature of an as-applied challenge.  That L.E. is a transgender boy and that he seeks to play a non-contact sport factor heavily into the Court's analysis.

For the foregoing reasons, States Defendants' Motion for Summary Judgment (Doc. No. 54) will be granted in part and denied in part; Knox County Defendants' Motion for Summary Judgment (Doc. No. 46) will be granted in part and denied in part; and Plaintiff's Motion for Summary Judgment (Doc. No. 50) will be granted in part and denied in part.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE